No. 24-30706

# 𝕴𝖓 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘 𝖋𝖔𝖗 𝖙𝖍𝖊 𝕱𝖎𝖋𝖙𝖍 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

DARCY ROAKE, REVEREND, ON BEHALF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILDREN, REAL PARTY IN INTEREST A.V., REAL PARTY IN INTEREST S.V.; ADRIAN VAN YOUNG, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILDREN, REAL PARTY IN INTEREST A.V., REAL PARTY IN INTEREST S.V.; MAMIE BROADHURST, REVEREND, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST N.W.; RICHARD WILLIAMS, REVEREND, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST N.W.; JEFF SIMS, REVEREND, ON BEHALF OF HIMSELF AND ON BEHALF OF HIS MINOR CHILDREN, REAL PARTY IN INTEREST A.S., REAL PARTY IN INTEREST C.S. 1, REAL PARTY IN INTEREST C.S. 2; JENNIFER HARDING, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST A.O.; BENJAMIN OWENS, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST A.O.; DAVID HAWLEY, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILDREN REAL PARTY IN INTEREST A.H., REAL PARTY IN INTEREST L.H.; ERIN HAWLEY, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILDREN, REAL PARTY IN INTEREST A.H, REAL PARTY IN INTEREST L.H.; DUSTIN MCCRORY, ON BEHALF OF THEMSELVES AND ON BEHALF OF HIS MINOR CHILDREN, REAL PARTY IN INTEREST E.M.; REAL PARTY IN INTEREST P.M., REAL PARTY IN INTEREST L.M.; GARY SERNOVITZ, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST T.S.; MOLLY PULDA, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD. REAL PARTY IN INTEREST T.S.; CHRISTY ALKIRE, ON BEHALF OF HERSELF AND ON HEHALF OF HER MINOR CHILD, REAL PARTY IN INTEREST L.A.; JOSHUA HERLANDS, ON BEHALF OF HIMSELF AND ON BEHALF OF HIS MINOR CHILDREN, REAL PARTY IN INTEREST E.H., REAL PARTY IN INTEREST J.H.,

*Plaintiffs-Appellees*

v.

CADE BRUMLEY, IN HIS OFFICIAL CAPACITY AS THE LOUISIANA STATE SUPERINTENDENT OF EDUCATION; CONRAD APPEL, IN HIS OFFICIAL CAPACITY

AS A MEMBER OF THE LOUISIANA STATE BOARD OF ELEMENTARY AND SECONDARY EDUCATION (LSBESE); JUDY ARMSTRONG, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; KEVIN BERKEN, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; PRESTON CASTILLE, IN HIS OFFICIAL CAPACITY AS A MEMBER OF LSBESE; SIMONE CHAMPAGNE, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; SHARON LATTEN-CLARK, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; LANCE HARRIS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF LSBESE; PAUL HOLLIS, LOUISIANA STATE BOARD OF ELEMENTARY AND SECONDARY EDUCATION; SANDY HOLLOWAY, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; STACEY MELERINE, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; RONNIE MORRIS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; EAST BATON ROUGE PARISH SCHOOL BOARD; LIVINGSTON PARISH SCHOOL BOARD; VERNON PARISH SCHOOL BOARD; ST. TAMMANY PARISH SCHOOL BOARD,

*Defendants-Appellants*

---

On Appeal from the United States District Court
for the Middle District of Louisiana
No. 3:24-cv-517, Hon. John W. deGravelles

---

## MOTION FOR STAY PENDING APPEAL

---

ERIC C. RASSBACH
JOSEPH C. DAVIS
BENJAMIN A. FLESHMAN
AMANDA L. SALZ
KELSEY BAER FLORES
THE BECKET FUND FOR
    RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
    Suite 400
Washington, D.C. 20006

*Counsel for Appellants Brumley and LSBESE Officials*

ELIZABETH B. MURRILL
Attorney General of Louisiana

J. BENJAMIN AGUIÑAGA
Solicitor General

ZACHARY FAIRCLOTH
Principal Deputy Solicitor General

OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

*Counsel for Appellants*

# CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required here because, under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellants—as "governmental" parties—need not furnish a certificate of interested persons.

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iv

INTRODUCTION ................................................................................... 2

JURISDICTIONAL STATEMENT ........................................................... 3

BACKGROUND ..................................................................................... 3

    A.  H.B. 71 .................................................................................... 3

    B.  Plaintiffs' Lawsuit ................................................................ 5

    B.  District Court's Order ........................................................... 5

STANDARD OF REVIEW ..................................................................... 11

ARGUMENT ........................................................................................ 12

  I.  THE STATE IS LIKELY TO SUCCEED ON APPEAL. ................................. 12

    A.  The District Court Lacks Subject Matter Jurisdiction. ............ 12

       1.  Plaintiffs' Claims Are Not Ripe. ............................................ 12

       2.  Plaintiffs Lack Article III Standing. ...................................... 14

       3.  Brumley and BESE Members Are
          Entitled to Sovereign Immunity. ........................................... 16

    B.  Plaintiffs Fail to State an Establishment Clause Claim. ......... 18

       1.  H.B. 71 Does Not Implicate the
          Historical Hallmarks of an Establishment. ........................... 19

       2.  The District Court's Alternative
          Establishment Clause Theories Are Meritless. ...................... 22

    C.   Plaintiffs Fail to State a Free Exercise Clause Claim. .............29

    D.   At Minimum, the Notice Provision Is Unlawful. ......................30

  II. THE REMAINING FACTORS FAVOR A STAY...........................................31

CONCLUSION ......................................................................................32

CERTIFICATE OF SERVICE...................................................................34

CERTIFICATE OF COMPLIANCE ...........................................................35

# TABLE OF AUTHORITIES

## Cases

*ACLU of Ky. v. Mercer County,*
  432 F.3d 624 (6th Cir. 2005) ................................................................ 26

*Am. Legion v. Am. Humanist Ass'n,*
  588 U.S. 29 (2019) .......................................... 2, 3, 22, 28, 29

*Barber v. Bryant,*
  860 F.3d 345 (5th Cir. 2017) ....................................................... 16, 17

*Book People, Inc. v. Wong,*
  91 F.4th 318 (5th Cir. 2024) ....................................................... 18, 19

*Bowen v. Roy,*
  476 U.S. 693 (1986) ............................................................................ 30

*Braidwood Mgmt., Inc. v. EEOC,*
  70 F.4th 914 (5th Cir. 2023) ....................................................... 13, 15

*Briggs v. Mississippi,*
  331 F.3d 499 (5th Cir. 2003) .............................................................. 29

*Campaign for S. Equal. v. Bryant,*
  773 F.3d 55 (5th Cir. 2014) ................................................................ 12

*Choice Inc. of Tex. v. Greenstein*
  691 F.3d 710 (5th Cir. 2012) .............................................................. 15

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993) ............................................................................ 31

*City of Austin v. Paxton,*
  943 F.3d 993 (5th Cir. 2019) ....................................................... 17, 18

*Croft v. Perry,*
624 F.3d 157 (5th Cir. 2010) ............................................................. 5, 21

*Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan,*
938 F.3d 246 (5th Cir. 2019) .................................................................. 24

*Doe v. Beaumont Indep. Sch. Dist.,*
240 F.3d 462 (5th Cir. 2001) .................................................................. 30

*E.T. v. Paxton,*
19 F.4th 760 (5th Cir. 2021) .................................................................. 32

*Freedom From Religion Found., Inc. v. Mack,*
49 F.4th 941 (5th Cir. 2022) ...................................................... 16, 27, 28

*Fulton v. City of Philadelphia,*
593 U.S. 522 (2021) ................................................................................ 30

*Groff v. DeJoy,*
600 U.S. 447 (2023) ................................................................................ 20

*Ingebretsen v. Jackson Public School District,*
88 F.3d 274 (5th Cir. 1996) .................................................................... 16

*K.P. v. LeBlanc,*
627 F.3d 115 (5th Cir. 2010) .................................................................. 17

*Kennedy v. Bremerton Sch. Dist.,*
597 U.S. 507 (2022) ..................................................... 20, 23, 26, 27, 28, 29

*Lemon v. Kurtzman*
*403 U.S. 602 (1971)* ...................................... *11*, 20, 23, 24, 26

*McCreary County v. ACLU,*
545 U.S. 844 (2005) .......................................................................... 24, 25

*Moody v. NetChoice, LLC,*
144 S. Ct. 2383 (2024) ............................................................................ 22

v

*Murray v. City of Austin*,
  947 F.2d 147 (5th Cir. 1991) ................................................... 31

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ......................................................... 15, 17

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................ 33

*Shurtleff v. City of Boston*,
  596 U.S. 243 (2022) ....................................................... 20, 21

*Staley v. Harris County*,
  461 F.3d 504 (5th Cir. 2006) ................................................. 14

*Staley v. Harris County*,
  485 F.3d 305 (5th Cir. 2007) ....................................... 13, 14, 15

*Stone v. Graham*,
  449 U.S. 39 (1980) ....................................... 11, 23, 24, 25, 26

*Tex. All. For Retired Ams. v. Scott*,
  28 F.4th 669 (5th Cir. 2022) ................................................. 18

*Town of Greece v. Galloway*,
  572 U.S. 565 (2014) ....................................................... 27, 28

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ............................................................ 17

*Van Orden v. Perry*,
  545 U.S. 677 (2005) ......................................................... 4, 29

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
  535 U.S. 635 (2002) ............................................................ 17

*Vote.org v. Callanen,*
   39 F.4th 297 (5th Cir. 2022) ................................................ 12

*Whole Woman's Health v. Jackson,*
   595 U.S. 30 (2021) ............................................................. 19

## Statutes

28 U.S.C. §1292(a)(1) ............................................................... 3

La. R.S. §17.22(3) .................................................................... 19

La. R.S. §17:2122 ..................................................... 25, 27, 29, 32

La. R.S. §17:2124 ......................................................... 4, 5, 18, 19

## Other Authorities

*The New England Primer* ......................................................... 27

*McGuffey Readers* .................................................................. 27

## Rules

Fed. R. Civ. P. 12(b)(1) ............................................................. 6

Fed. R. Civ. P. 12(b)(6) ............................................................. 6

# MOTION

Under Federal Rules of Appellate Procedure 8 and 27, Defendants-Appellants, Louisiana officials and school boards (the State or Defendants), respectfully move the Court to stay the district court's preliminary-injunction order entered November 12, 2024, pending appeal. *See* Ex.A (Op.). The underlying statute at issue requires compliance by January 1, 2025. Accordingly, Defendants request that this Court's stay issue as soon as practicable given the statutory deadline.[1]

---

[1]    Counsel for Plaintiffs advised that Plaintiffs oppose the requested relief and will file a response.

## INTRODUCTION

This is not the blockbuster case Plaintiffs hoped it would be. H.B. 71 requires Louisiana schools to post in each classroom a display barely larger than letter-size paper that reflects the Ten Commandments and its historical context. This should not be controversial. After all, the Supreme Court itself has emphasized that the Ten Commandments "have historical significance as one of the foundations of our legal system." *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 53 (2019). Nonetheless, five days after Governor Landry signed H.B. 71 into law, Plaintiffs rushed to federal court eager to proclaim in press releases and media interviews that they were first in line to attack the Ten Commandments.

The problem? Neither this Court nor the Supreme Court has ever adjudicated an Establishment Clause case based on religious displays that no one has seen. In fact, the *en banc* Court has squarely held that such claims are not ripe. More still, because Plaintiffs concededly assert facial challenges, their burden is to show that *every* possible H.B. 71 display is unconstitutional. But that is an impossible burden for them to carry, not least because they have never seen such a display and there

are quite literally an infinite number of potential H.B. 71 displays that are constitutionally compliant.

Undeterred, the district court issued a 177-page opinion enjoining Defendants from implementing H.B. 71. Respectfully, it is difficult to read that opinion as anything other than a rejection of this Court's and the Supreme Court's precedents no matter the likelihood of reversal on appeal. The State is exceedingly likely to succeed on appeal—and every day that Defendants are unable to comply with H.B. 71 ahead of its January 1, 2025, compliance deadline causes irreparable harm. The Court should stay the injunction pending appeal.

## JURISDICTIONAL STATEMENT

On November 12, the district court issued its preliminary injunction. Ex.A. The State appealed that ruling the same day. Dist.ECF.87. This Court has jurisdiction under 28 U.S.C. §1292(a)(1).

## BACKGROUND

### A. H.B. 71

Ten Commandments displays are part of "the rich American tradition of religious acknowledgements," *Van Orden v. Perry*, 545 U.S. 677, 689-92 (2005) (plurality). They therefore appear on "government

3

property" across the country—and indeed within and outside the Supreme Court's "own Courtroom." *Id.* at 688.

This summer, Louisiana enacted H.B. 71, which requires public schools to display the Ten Commandments in classrooms. La. R.S. §17:2124. H.B. 71 specifies that the Commandments' text must be "identical" to that upheld in *Van Orden*, in "large, easily readable font," on "a poster or framed document that is at least eleven inches by fourteen inches," and "the central focus" of the display. *Id.* §§17:2124(B)(1), (B)(6). Each display must include a three-paragraph "context statement" about the history of the Ten Commandments in American public education. *Id.* §17:2124(B)(3). "[E]ach governing authority" will determine "[t]he nature of the display," including additional and different contextual elements. *Id.* §§17:2124(B)(1), (B)(4). No school is required to pay for the displays but must either accept donations or donated displays. *Id.* §17:2124(B)(5).

By January 1, 2025, (a) schools must comply with H.B. 71, (b) the Louisiana State Board of Elementary and Secondary Education (BESE) must "adopt rules and regulations in accordance with the Administrative Procedure Act" for the law's implementation, and (c) the Department of Education must "identify appropriate [compliance] resources" that are

"free of charge" and list them on the department's website. *Id.*
§§17:2124(B)(1), (B)(6)(a), (B)(6)(b).

## B. Plaintiffs' Lawsuit

Five days after Governor Landry signed H.B. 71 into law, Plaintiffs
sued the Louisiana State Superintendent of Education, Cade Brumley,
the BESE members in their official capacities, and five parish school
boards (East Baton Rouge, Vernon, Livingston, St. Tammany, and
Orleans). Dist.ECF.1. Plaintiffs claim H.B. 71 violates the First
Amendment's Establishment Clause (Count I) and Free Exercise Clause
(Count II). Their claims—as they concede, and the district court agreed—
are facial challenges, which means that, "under binding Fifth Circuit
precedent, they must show that H.B. 71 is 'unconstitutional in every
application.'" Op.8 (quoting *Croft v. Perry*, 624 F.3d 157, 164 (5th Cir.
2010)). Plaintiffs then sought to enjoin Defendants (and apparently
several others not before the court) from complying with H.B. 71.
Dist.ECF.20.

Defendants moved for dismissal under Rules 12(b)(1) and 12(b)(6),
pointing out that binding Fifth Circuit precedent not only bars this
lawsuit on jurisdictional grounds, but it (and Supreme Court precedent)

also foreclose this lawsuit on the merits. To illustrate these points, Defendants emphasized that no one had seen (and still no one has seen) an H.B. 71 display—and there are quite literally innumerable ways to create an H.B. 71 display in a constitutionally compliant manner. Defendants thus offered several illustrations (reproduced by the district court, Op.63-77), including the following:



Case 3:24-cv-00517-JWD-SDJ   Document 39-2   06/05/24   Page 19 of 20

# THE HOUSE OF REPRESENTATIVES



## &
# THE LAWGIVERS



Twenty-three marble relief portraits hanging over the gallery doors of the House Chamber in the U.S. Capitol depict historical figures noted for their work in establishing the principles that underlie American law. Those lawgivers include notable figures like Hammurabi, Solon, and Thomas Jefferson. When the Speaker of the House assumes his position on the dais, he looks directly at yet another lawgiver, Moses. In fact, the Architect of the Capitol emphasizes that the 22 other lawgivers lining the Chamber walls are oriented "so that all look towards the full-face relief of Moses in the center of the north wall."

## MOSES
## THE LAWGIVER



### THE TEN COMMANDMENTS

I AM THE LORD THY GOD.
THOU SHALT HAVE NO OTHER GODS BEFORE ME.
THOU SHALT NOT MAKE TO THYSELF ANY GRAVEN
IMAGES.
THOU SHALT NOT TAKE THE NAME OF THE LORD
THY GOD IN VAIN.
REMEMBER THE SABBATH DAY, TO KEEP IT HOLY.
HONOR THY FATHER AND THY MOTHER, THAT THY
DAYS MAY BE LONG UPON THE LAND WHICH THE
LORD THY GOD GIVETH THEE.
THOU SHALT NOT KILL.
THOU SHALT NOT COMMIT ADULTERY.
THOU SHALT NOT STEAL.
THOU SHALT NOT BEAR FALSE WITNESS AGAINST
THY NEIGHBOR.
THOU SHALT NOT COVET THY NEIGHBOR'S HOUSE.
THOU SHALT NOT COVET THY NEIGHBOR'S WIFE,
NOR HIS MANSERVANT, NOR HIS MAIDSERVANT,
NOR HIS CATTLE, NOR ANYTHING THAT IS THY
NEIGHBOR'S.

## SPEAKER
## MIKE JOHNSON



The History of the Ten Commandments in American Public Education: The Ten Commandments were a prominent part of American public education for almost three centuries. Around the year 1688, The New England Primer was used in public schools throughout the United States for more than one hundred fifty years to teach Americans to read and contained more than forty questions about the Ten Commandments. The Ten Commandments were also included in public school textbooks published by educator William McGuffey, a noted university president and professor. A version of the famous McGuffey Readers was written in the early 1800s and became one of the most popular textbooks in the history of American education, selling more than one hundred million copies. Copies of the McGuffey Readers are still available today. The Ten Commandments also appeared in textbooks published by Noah Webster in which were widely used in American public schools along with America's first comprehensive dictionary that Webster also published. His textbook, The American Spelling Book, contained the Ten Commandments and sold more than one hundred million copies for use by public school children all across the nation and was still available for use in American public schools in the year 1975.

7

Case 3:24-cv-00517-JWD-SDJ   Document 39-2   06/05/24   Page 19 of 20

# IMPORTANT SUPREME COURT CASES
## VAN ORDEN V. PERRY

THIS CASE ASKED WHETHER THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT ALLOWS THE DISPLAY OF A MONUMENT INSCRIBED WITH THE TEN COMMANDMENTS ON THE TEXAS STATE CAPITOL GROUNDS.

THE SUPREME COURT FOUND NO ESTABLISHMENT CLAUSE VIOLATION, WITH THE PLURALITY OPINION EMPHASIZING THAT "ACKNOWLEDGEMENTS OF THE ROLE PLAYED BY THE TEN COMMANDMENTS IN OUR NATION'S HISTORY ARE COMMON THROUGHOUT AMERICA." THE COURT NOTED THAT MOSES AND THE COMMANDMENTS APPEAR IN THE SUPREME COURT COURTROOM ITSELF, THE GATES LINING THE COURTROOM, AND THE DOORS LEADING INTO THE COURTROOM.



THE MAIN DISSENT JOINED BY JUSTICE GINSBURG AND TWO OTHER JUSTICES DISAGREED WITH THE COURT'S JUDGEMENT, BUT ACKNOWLEDGED THAT "A DISPLAY OF THE COMMANDMENTS ACCOMPANIED BY AN EXPOSITION OF HOW THEY HAVE INFLUENCED MODERN LAW WOULD MOST LIKELY BE CONSTITUTIONALLY UNOBJECTIONABLE." THE DISSENT ALSO RECOGNIZED THAT THE COMMANDMENTS COULD "BE INTEGRATED CONSTITUTIONALLY INTO A COURSE OF STUDY IN PUBLIC SCHOOLS."

NOTE: THIS IS THE VERSION OF THE TEN COMMANDMENTS UPHELD IN VAN ORDEN, BUT DIFFERENT FAITH TRADITIONS ADOPT DIFFERENT VERSIONS OF THE TEXT OF THE TEN COMMANDMENTS. FOR EXAMPLE, THE CATHOLIC VERSION GENERALLY DOES NOT REFERENCE "GRAVEN IMAGES," AND THE TORAH USES THE PHRASE "I AM THE LORD YOUR GOD WHO BROUGHT YOU OUT OF THE LAND OF EGYPT, OUT OF THE HOUSE OF BONDAGE."

The History of the Ten Commandments in American Public Education: The Ten Commandments were a prominent part of American public education for almost three centuries. Around the year 1688, The New England Primer became the first published American textbook and was the equivalent of a first grade reader. The New England Primer was used in public schools throughout the United States for more than one hundred fifty years to teach Americans to read and combined more than forty questions about the Ten Commandments. The Ten Commandments were also included in public school textbooks published by educator William McGuffey, a noted university president and professor. A version of the famous McGuffey Readers was written in the early 1800s and became one of the most popular textbooks in the history of American education, selling more than one hundred million copies. Copies of the McGuffey Readers are still available today. The Ten Commandments also appeared in textbooks published by Noah Webster in which were widely used in American public schools along with America's first comprehensive dictionary that Webster also published. His textbook, The American Spelling Book, contained the Ten Commandments and sold more than one hundred million copies for use by public school children all across the nation and was still available for use in American public schools in the 1970s.



To be clear, Defendants themselves do not know how they will carry out their obligations under H.B. 71—nor is there any record evidence how the Defendant school boards here or any other Louisiana school board will go about selecting and posting their own H.B. 71 displays. As these illustrations show, however, the possibilities are endless.

### C. District Court's Order

Notwithstanding all this, on November 12, the district court entered a 177-page opinion holding that H.B. 71 is "FACIALLY

UNCONSTITUTIONAL and UNCONSTITUTIONAL IN ALL APPLICATIONS." Op.176-77. Despite its length, the order offers little by way of analysis, largely consisting of block quotes and summaries of the parties' briefing. Nonetheless, the district court eschewed this Court's precedent, which forecloses jurisdiction in this case on ripeness, standing, and sovereign-immunity grounds. Turning to the merits, the court also found that H.B. 71 violates the Establishment Clause and the Free Exercise Clause. Relying on *Stone v. Graham*, 449 U.S. 39 (1980)—and in fact, applying the now-defunct *Lemon* test—the court concluded "any purported purpose [of H.B. 71] was not sincere but rather a sham," chalking up the real purpose to "fundraising efforts of the Governor." Op.6, 95-97. The court also determined that H.B. 71 would still be unlawful "even if the Court did examine" Plaintiffs' claims "under subsequent caselaw." Op.112, 151-52.

Accordingly, the lower court enjoined Defendants from implementing H.B. 71 and ordered Defendants Brumley and members of BESE to "provid[e] notice of this order and H.B. 71's unconstitutionality to all Louisiana public elementary, secondary, and charter schools, and all public post-secondary education institutions." Op.177 (the Notice

Provision). The district court also denied Defendants' motion to stay the injunction. *Id.* at 175.

Defendants immediately appealed and sought an administrative stay of the Notice Provision pending the Court's disposition of this motion. Dkt.12. This Court granted the administrative stay on November 15. Dkt.32.

## STANDARD OF REVIEW

The Court considers four factors when considering whether a stay pending appeal is appropriate: "(1) whether the applicant has made a strong showing of likelihood to succeed on the merits; (2) whether the movant will be irreparably harmed absent a stay; (3) whether issuance of a stay will substantially injure other interested parties; and (4) where the public interest lies." *Vote.org v. Callanen*, 39 F.4th 297, 302-03 (5th Cir. 2022). "[W]hen a serious legal question is involved," movants "need only present a substantial case on the merits … and show that the balance of equities weighs in favor of granting a stay." *Campaign for S. Equal. v. Bryant*, 773 F.3d 55, 57 (5th Cir. 2014).

# ARGUMENT

## I. The State Is Likely to Succeed on Appeal.

### A. The District Court Lacks Subject Matter Jurisdiction.

#### 1. Plaintiffs' Claims Are Not Ripe.

The district court's rejection of this Court's ripeness precedent in religious-display cases ends this case. In the ordinary case, a claim is not ripe if (a) it is not "fit for judicial decision" and (b) there would be no "hardship to the parties" if the court withheld its consideration. *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 930 (5th Cir. 2023).

The *en banc* decision in *Staley v. Harris County*, 485 F.3d 305 (5th Cir. 2007), is squarely on point. There, because "no decision ha[d] been made regarding any aspect of the future display" of a monument featuring an open Bible, the Court was "unable to conduct the fact-intensive and context-specific analysis required" by the "Supreme Court decisions addressing the constitutionality of Ten Commandments displays." *Id.* at 308-09. The "claim that the Establishment Clause *may* be violated" in the future was "not ripe for review." *Id.* at 309 (emphasis added).

Plaintiffs here likewise challenge only unspecified future H.B. 71 displays that they presume *may* violate their rights. But nobody knows how Plaintiffs' schools (or any school) will select H.B. 71 displays, what size they will be, where they will be located within the classroom, or what additional context may be included. So *Staley* says this case is unripe.

The district court nonetheless tried to side-step *Staley* by reasoning that, while in *Staley* there was no decision regarding "any aspect" of the future display, here, due to statutory language, it is "known when, where, and under what circumstances the Ten Commandments will be displayed in public schools." Op.32. But in *Staley*, the Court had far *more* information about the future display because the plaintiff had *actually seen the display*, *see* 485 F.3d at 309, and the Court—in a panel opinion authored by the same judge—had previously concluded the monument was unconstitutional. The Court knew (a) the monument's dimensions; (b) its engraving; (c) its shape (like a lectern); (d) its central feature (an open Bible in a display case); (e) the Bible's dimensions; (f) a red neon light surrounding the Bible; (g) the yearly cost the government paid to illuminate the monument; and (h) the practice of turning pages of the Bible. *See Staley v. Harris County*, 461 F.3d 504, 506-07 (5th Cir. 2006)

13

(Jolly, J.). But without the actual display on, well, display, the plaintiff's claims were not ripe. *Staley*, 485 F.3d at 309 (Jolly, J.). Here, because there are no H.B. 71 displays yet, there are by definition fewer details available than there were about the *Staley* monument.

Plaintiffs also cannot establish "hardship" resulting from "withholding court consideration." *Braidwood*, 70 F.4th at 930. Such hardship "inhere[s] in legal harms, such as the harmful creation of legal rights or obligations; practical harms on the interests advanced by the party seeking relief, and the harm of being forced to modify one's behavior in order to avoid future consequences." *Choice Inc.*, 691 F.3d at 715. Here, H.B. 71 creates no legal rights or obligations for Plaintiffs; Plaintiffs are not currently subject to any H.B. 71 display; and there is no practical impediment to Plaintiffs filing suit if they actually encounter a display. Their claims are not ripe—and that ends this case.

## 2. Plaintiffs Lack Article III Standing.

For similar reasons, Plaintiffs also cannot establish standing. Most significantly, Plaintiffs have not established a "concrete, particularized, and actual or imminent" injury-in-fact. *Murthy v. Missouri*, 603 U.S. 43, 57 (2024). "In cases involving religious displays and exercises," this Court

has "required an encounter with the offending item or action to confer standing." *Barber v. Bryant*, 860 F.3d 345, 353 (5th Cir. 2017). Even then, a simple encounter "represent[s] the outer limits of what is constitutionally cognizable." *Freedom From Religion Found., Inc. v. Mack*, 49 F.4th 941, 949 (5th Cir. 2022). Never having seen an H.B. 71 display, therefore, Plaintiffs cannot establish standing under *Barber*.

Nevertheless, relying on *Ingebretsen v. Jackson Public School District*, 88 F.3d 274 (5th Cir. 1996), the district court held that Plaintiffs had standing because H.B. 71 made an encounter with an allegedly unconstitutional display "inevitable." Op.35. But if *past* offense from encountering an actual display represents Article III's "outer limits," surely *future* offense at a not-yet-existent display lies well beyond them.

Regardless, it is not "inevitable" that every H.B. 71 display will cause the Establishment Clause harms Plaintiffs allege. Indeed, as Defendants illustrated, many possible variations of an H.B. 71 display would not even conceivably encourage Plaintiffs to "venerate" or "adopt" the Commandments. *Cf.* Op.37 (citing Plaintiffs' claims). Plaintiffs have no way of knowing which among these myriad options hypothetical private donors might present to their schools. This is exactly why "[t]he

religious-display cases do not provide a basis for standing to challenge the endorsement of beliefs that exist only in the text of a statute." *Barber*, 860 F.3d at 354.

Having suffered no injury, and facing no imminent and concrete future injury, Plaintiffs also cannot show causation, *Murthy*, 603 U.S. at 76, or redressability, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021).

### 3. Brumley and BESE Members Are Entitled to Sovereign Immunity.

Last, the claims against Brumley and BESE members "are effectively suits against a state" barred by the Eleventh Amendment. *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). The district court incorrectly applied *Ex parte Young*'s equitable exception to allow the claims anyway. Op.54.

*Ex parte Young*'s "straightforward inquiry" asks "whether [the] complaint alleges an ongoing violation of federal law." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002); *accord K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010) (*Ex parte Young* applies only "where a state actor enforces an unconstitutional law"). There is no ongoing violation here because Defendants have not carried out their

obligations under H.B. 71. Moreover, the district court was wrong to rely (Op.54) on cases where threatened enforcement of a challenged law *against a plaintiff* suffices to meet the ongoing-harm requirement. H.B. 71 does not apply to Plaintiffs and, by definition, can never be enforced against them.

Defendants also lack the requisite enforcement authority. This Court has repeatedly held that the "general duty to see that the laws of the state are implemented" is insufficient to invoke the *Ex parte Young* exception. *Tex. All. For Retired Ams. v. Scott*, 28 F.4th 669, 671 (5th Cir. 2022). Instead, the official must exercise some form of "compulsion or constraint." *Id.*; *see City of Austin*, 943 F.3d at 1001-02 (collecting examples).

These Defendants have no such authority under H.B. 71. For BESE members, the district court relied on their obligation to "adopt rules and regulations … to ensure the proper implementation of" H.B. 71, La. R.S. §17:2124(6)(a). Op.54. That, of course, is not "compulsion and constraint." *Scott*, 28 F.4th at 671. To conclude otherwise, the district court relied on *Book People, Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024). But there, officials had authority to "compel [plaintiffs] to submit ratings with which they

disagree[d]," and "constrain [plaintiffs] from continuing to do business with school districts." *Id.* at 335. No one knows whether any BESE regulation would be comparable, which is independently fatal. *See Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) (that an agency "might in the future promulgate" a rule is insufficient for *Ex parte Young* purposes).

For Brumley, the district court focused on a general duty to "implement the policies and programs of the board and laws affecting schools under the jurisdiction of the board," La. R.S. §17.22(3); *see* Op.55. But Brumley's only obligation to "implement" H.B. 71 is limited to "identify[ing] appropriate resources to comply" with H.B. 71 and "list[ing]" those resources online. La. R.S. §17:2124(6)(b). That is not compulsion or constraint.

## B. Plaintiffs Fail to State an Establishment Clause Claim.

If the Court reaches the merits, the district court's Establishment Clause holding is profoundly wrong, not least because the court applied the wrong test.

1.  **H.B. 71 Does Not Implicate the Historical Hallmarks of an Establishment.**

For decades, the *Lemon* test haunted Establishment Clause jurisprudence, encouraging courts and plaintiffs to "purge from the public square anything" that "partakes of the religious." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535 (2022). In *Kennedy*, the Court "abrogated" the *Lemon* test. *Groff v. DeJoy*, 600 U.S. 447, 460 & n.7 (2023). In its place, *Kennedy* emphasized "that the Establishment Clause must be interpreted by reference to historical practices and understandings." 597 U.S. at 510.

But the Court did not stop there. Rather, *Kennedy* also described what the key practices and understandings *are*—namely, "the hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Id.* at 537. The point of identifying these hallmarks, *Kennedy*'s author had previously explained, was to give guidance "localities and lower courts can rely on," ameliorating the "serious" and "challeng[ing]" work of reconstructing the history from scratch in every case. *Shurtleff v. City of Boston*, 596 U.S. 243, 285 (2022) (Gorsuch, J., concurring), *cited in Kennedy*, 597 U.S. at 537 n.5.

There are six hallmarks:

a. "the government exerted control over the doctrine and personnel of the established church";

b. "the government mandated attendance in the established church and punished people for failing to participate";

c. "the government punished dissenting churches and individuals for their religious exercise";

d. "the government restricted political participation by dissenters";

e. "the government provided financial support for the established church, often in a way that preferred the established denomination over other churches"; and

f. "the government used the established church to carry out certain civil functions, often by giving the established church a monopoly over a specific function."

*Id.* at 286 (Gorsuch, J., concurring).

Because this is a "facial challenge," Plaintiffs' burden was to "show that there is no set of circumstances under which [H.B. 71] is constitutional"—*i.e.*, that it is "unconstitutional in every application." *Croft*, 624 F.3d at 164. But neither Plaintiffs nor the district court seriously contend that *any* potential H.B. 71 display implicates these hallmarks, much less that *every conceivable* one does.

Nor could they, as "[n]o one at the time of the founding is recorded as arguing that the use of religious symbols in public contexts was a form of religious establishment." *Shurtleff*, 596 U.S. at 287 (Gorsuch, J.,

concurring) (citation omitted). Indeed, one of Defendants' illustrations merely tracks the Supreme Court's own Ten Commandments display, whose legality "no Member of the Court" has ever questioned. *Am. Legion*, 588 U.S. at 53. That should have been enough to resolve this case—and it is all this Court needs to know to conclude that Louisiana is eminently likely to prevail in this appeal.

Invoking Homer, the district court complained that, by making this argument, the State was "leaving potential challengers like Menelaus trying to seize and hold the ever shape-shifting Proteus until Proteus eventually tires and divulges the hero's way of the island." Op.81. "[P]hrased another way," the district court said, the State "would have aggrieved parents and children play an endless game of whack-a-mole, constantly having to bring new lawsuits to invalidate any conceivable poster that happens to have the Decalogue on it." *Id.*

This complaint lays bare the district court's fundamental misapprehension of facial challenges: They are "hard to win" by design, *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2409 (2024), because (as the district court purported to accept, Op.8) Plaintiffs must prove that every possible H.B. 71 display is unconstitutional. That they obviously cannot

do so is not the State's fault—to borrow the district court's vernacular, by bringing a facial challenge, Plaintiffs *themselves* elected to become Menelaus and play a game of whack-a-mole. The obvious solution to the district court's concern is an as-applied challenge to a discrete display if and when Plaintiffs see one. It is *not* to underrule settled facial-claim jurisprudence, as the district court did.

## 2. The District Court's Alternative Establishment Clause Theories Are Meritless.

The district court sought to end-run *Kennedy*'s hallmarks test in two ways, both meritless.

**a.** *First*, the district court held that H.B. 71 "runs afoul of" the Supreme Court's *per curiam* decision in *Stone*, which struck down a Kentucky law requiring Ten Commandments displays in public-school classrooms. Op.6, 89-92. But *Stone* is *Lemon* to its core—*Stone* concluded that Kentucky "had no secular legislative purpose" as required by "the first part of the *Lemon v. Kurtzman* test." 449 U.S. at 41, 43. In *Kennedy*, meanwhile, the Court expressly disapproved of *Lemon*'s "call[] for an examination of a law's purposes." 597 U.S. at 534. And it said the Court has "abandoned" not only *Lemon* itself but also its "progeny" and "offshoot[s]"—a category undoubtedly including *Stone*. *Id.*

In any event, *Stone* at minimum was "built upon" a test the Supreme Court has "walked back from." *Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 259 (5th Cir. 2019). So even if this Court had to follow *Stone* in a case just like it, this Court certainly cannot "extend [that decision's] reasoning" to other facts. *Id.* at 257-59 & n.11. And *Stone* is distinguishable here, for two reasons.

One, in *Stone*, the displays "stood alone" as an "isolated exhibition" "not part of an arguably secular display." *McCreary County v. ACLU*, 545 U.S. 844, 867-68 (2005):



Dist.ECF.57-3 (full-page rendering). Even in the *Lemon* era, the Supreme Court understood this as critical to *Stone*'s scope—discussing *Stone* with

respect to a later *standalone* Commandments display, *McCreary*, 545 U.S. at 867-68, but resolving on different grounds a dispute over another display presenting the Commandments "in the company of other documents," *id.* at 871. Here, meanwhile, no one knows what H.B. 71 displays will look like in practice. But consistent with H.B. 71's text, the illustratives above depict the Ten Commandments surrounded by a variety of other content that indicates a wide array of pedagogical purposes—which is worlds away from the displays in *Stone*. *Supra* p.6–9.

Two, *Stone* rejected Kentucky's proffered secular purpose as a sham—explaining that it was based solely on a one-sentence "notation" untethered to the educational context (and indeed, which did not even claim that the secular purpose was the legislature's). 449 U.S. at 41-42. Here, meanwhile, H.B. 71 requires that each display include a three-paragraph "context statement" explaining "The History of the Ten Commandments in American Public Education." La. R.S. §17:2122(B)(3). And it explicitly articulates the Legislature's secular historical and educational purposes for displaying the Ten Commandments. *Id.* §17:2122(A)(1)-(9).

These distinctions mattered even *before Lemon*'s overruling. *See ACLU of Ky. v. Mercer County*, 432 F.3d 624, 634 (6th Cir. 2005) ("Whatever is left of *Stone* is limited to circumstances involving public displays of the Ten Commandments in isolation."). But the district court rejected them, instead second-guessing the Legislature's "purported secular purpose" based on extra-textual statements by "H.B. 71's primary sponsor" and a "fundraising email" from "Governor Landry," via judicial notice of as reported in "the local paper." Op.95-96. Not even *Stone* adverted to such dubious sources in its search for Kentucky's true "purpose." So the district court's reasoning is not merely a rote application of *Stone*—it is an aggressive resurrection of *Lemon*, which thumbs a nose at *Kennedy*.

**b.** *Second*, the district court wrongly claimed that H.B. 71 "would be unconstitutional under *Kennedy*." Op.10. This is so, according to the district court, because H.B. 71 does not "fit[] within a broader tradition" of "permanently displaying the Decalogue in public-school classrooms at the time of the Founding or of incorporation." Op.153.

This misunderstands *Kennedy*'s analysis. Of course a practice is constitutional if it is supported by a sufficiently lengthy tradition. *E.g.*,

*Town of Greece v. Galloway*, 572 U.S. 565, 575-76 (2014). But to hold that it *must* be so supported "confuses a sufficient condition for a necessary one." *Mack*, 49 F.4th at 950. Under *Kennedy*, the threshold question is whether the challenged practice implicates the historical "hallmarks of religious establishments." 597 U.S. at 537 & n.5. If not, it does not violate the Establishment Clause—regardless of whether a specific tradition affirmatively *supports* it. *See Kennedy*, 597 U.S. at 534-42 (upholding challenged practice without inquiry into whether it was a longstanding tradition dating back to the Founding).

In addition, even on the district court's (erroneous) view of the *Kennedy* test, H.B. 71 would be constitutional. As H.B. 71 explains, the "Ten Commandments were a prominent part of American public education for almost three centuries," featuring in the most widespread textbooks used in early American education. La. R.S. §17:2122(B)(3). (citing *The New England Primer* and the *McGuffey Readers*). Record excerpts from those textbooks amply bear that out. *See* Dist.ECF 57-10–57-18. Resisting this conclusion, the district court relied on Plaintiffs' "expert" to reason that, tallying up the Ten Commandments lessons against the total number of lessons in these books, "references to the

Decalogue" were too "scattered and infrequent" to count. Op.160. But this reduction of the First Amendment to a law-professor-driven counting exercise bears no resemblance to the analyses employed in *Kennedy*, *Town of Greece*, or *Mack*.[2]

Alternatively, the district court held that "[e]ven if there were a broader tradition," H.B. 71 would not be "consistent with" it because the statute is "discriminatory and coercive." Op.131-134, 161. The court said H.B. 71 was "discriminatory" because it "requires a version of the Ten Commandments that many Protestants use" and therefore "fails to select … versions of the Ten Commandments … 'without regard for belief.'" Op.131 (quoting *Mack*, 49 F.4th at 958).

But the quoted language—ripped from a case about a government official's selection of *outside* prayer-givers to deliver their own prayers— makes no sense in a case about the government's *own speech*. If governmental religious acknowledgments must be limited to imagery all faiths share, then there can be no such acknowledgments at all. *But see*

---

[2] Plaintiffs' expert is Professor Steven Green, former legal director of Plaintiffs' counsel, Americans United for Separation of Church and State. His report opined that "the Ten Commandments are not a foundation of the American government or legal system," Dist.ECF.50-2 at 11, despite the Supreme Court's recognition in *American Legion* that they *are*.

*Am. Legion*, 588 U.S. at 38 (upholding Latin cross, "preeminent Christian symbol"). More importantly, the district court's theory defies precedent: In *Van Orden*, both this Court and the Supreme Court upheld a Ten Commandments display featuring a "version" of the Commandments that is identical to that used here. La. R.S. §17:2122(A)(6); *see* 545 U.S. at 707 (Stevens, J., dissenting). So whatever limits there are on "discriminatory" display designs, H.B. 71 does not transgress them.

As for "coercive," the district court adopted Plaintiffs' allegations that "posting the Ten Commandments" would "unconstitutionally pressure[] students" into "veneration." Op.10-11, 132-134. But it failed to cite a single case holding that purely passive religious imagery was unconstitutionally coercive. This is understandable because—consistent with the hallmarks—precedent prohibits only coercion "to engage in 'a formal religious exercise,'" like prayer or devotional Bible reading. *Kennedy*, 597 U.S. at 536-37. But "the mere display on public property of [a religious symbol] is in no meaningful sense either a religious activity or coercive." *Briggs v. Mississippi*, 331 F.3d 499, 505 (5th Cir. 2003). As this *en banc* Court has put it: "If no religious *activity* is at issue, any speculation as to whether students might feel pressured to participate is

28

irrelevant." *Doe v. Beaumont Indep. Sch. Dist.*, 240 F.3d 462, 470 (5th Cir. 2001).

## C. Plaintiffs Fail to State a Free Exercise Clause Claim.

The district court's Free Exercise holding likewise is demonstrably wrong and unprecedented. Indeed, just as the court failed to cite any case finding a passive religious display coercive in violation of the Establishment Clause, *supra* p.18–28, it also failed to cite any case determining that such a display violates the Free Exercise Clause. There is no good reason for this case to be the first.

The most fundamental problem is that H.B. 71 does not "burden" Plaintiffs' or their children's "religious exercise." *Fulton v. City of Philadelphia*, 593 U.S. 522, 532 (2021). The district court worried that H.B. 71 "is at odds with" Plaintiffs' "views," "tradition," and "teachings." Op.143. But the Free Exercise Clause does not obligate the State to "comport with the religious beliefs of particular citizens," or "demand that the Government join in [their] chosen religious practices." *Bowen v. Roy*, 476 U.S. 693, 699-700 (1986). What it protects is *exercise*—believing, professing, and engaging in "conduct motivated by religious belief." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543

(1993). And nonparticipatory exposure to passive religious imagery does not pressure or require Plaintiffs to modify, stifle, or violate their religious exercise in any way.

This Court's decision in *Murray v. City of Austin*, 947 F.2d 147 (5th Cir. 1991), demonstrates the point. In *Murray*, the plaintiff alleged that a cross on a city seal violated the Free Exercise Clause by imposing "subtle coercion" on him to "adhere to the majoritarian faith" and "forc[ing] [him] to support" the cross. *Id.* at 152. This Court "quickly dispose[d] of" his claim—noting the plaintiff had "fail[ed] to articulate a sufficient burden or restriction imposed on the free exercise of his religion." *Id.* That case, like this one, was "a 'far cry from cases dealing with actual interference,' "actual compulsion," or any other free-exercise burden. *Id.*

## D. At Minimum, the Notice Provision Is Unlawful.

Finally, the Court has received full stay briefing on the question whether the Notice Provision is unlawful. *See* Dkt.12. It is. In response, Plaintiffs suggested (Dkt.20-1 at 1-4) that the State did not preserve a challenge to the Notice Provision in the district court. Not so. As Plaintiffs acknowledge (*id.* at 2)—and as the district court

30

twice recognized (Op.150-51, 163)—the State vigorously opposed Plaintiffs' enticing the district court to enter the Notice Provision. Plaintiffs also suggest that the State did not seek to stay the Notice Provision. Wrong again. The State specifically asked the district court to stay any injunction order, specifically incorporating its arguments on jurisdiction, the merits, *and* Plaintiffs' inappropriate preliminary-injunction request. Dist.ECF.39-1 at 49.

## II. The Remaining Factors Favor a Stay.

Aside from likelihood of success, irreparable injury is "most critical" to the stay inquiry. *E.T. v. Paxton*, 19 F.4th 760, 764 (5th Cir. 2021). For a State, its "interest and harm merge with that of the public." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam). Absent a stay pending appeal, both the State and the public are irreparably harmed every day that the Defendants in this case cannot carry out their H.B. 71 obligations in advance of the January 1, 2025, compliance deadline. La. R.S. §17:2122(B)(1). "When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *E.T.*, 19 F.4th at 770.

Meanwhile, Plaintiffs will experience no harm if the district court's injunction is stayed pending appeal. Plaintiffs' claimed below that "the loss of First Amendment freedoms, for even minimal period of time, unquestionably constitutes irreparable injury." Dist.ECF.20-1 at 24. But there is no loss of First Amendment freedoms. Without knowing how H.B. 71 will be implemented, Plaintiffs cannot show a stay would "substantially injure" their interests. *Nken v. Holder*, 556 U.S. 418, 426 (2009).

## CONCLUSION

The Court should stay the district court's order pending appeal.

Respectfully submitted,

ERIC C. RASSBACH
JOSEPH C. DAVIS
BENJAMIN A. FLESHMAN
AMANDA L. SALZ
KELSEY BAER FLORES
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, D.C. 20006

*Counsel for Appellants*
*Brumley and LSBESE Officials*

Dated:   November 15, 2024

ELIZABETH B. MURRILL
Attorney General of Louisiana

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA
Solicitor General

ZACHARY FAIRCLOTH
Principal Deputy Solicitor General

OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

*Counsel for Appellants*

**CERTIFICATE OF SERVICE**

I certify that on November 15, 2024, I filed the foregoing brief with the Court's CM/ECF system, which will automatically send an electronic notice of filing to all counsel of record.

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA

# CERTIFICATE OF COMPLIANCE

Pursuant to Fifth Circuit Rule 32.3, the undersigned certifies that this motion complies with:

(1) the type-volume limitations of Federal Rule of Appellate Procedure 27 (d)(2) because it contains 5,200 words; and

(2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016 (the same program used to calculate the word count).

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA

Dated:    November 15, 2024

EXHIBIT A

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**DARCY ROAKE, ET AL.**

**VERSUS**

**CADE BRUMLEY, ET AL.**

**CIVIL ACTION**

**NO. 24-517-JWD-SDJ**

## RULING AND ORDER

### Table of Contents

I.    Introduction ........................................................................................................... 3

II.   The Named Plaintiffs ........................................................................................... 13

III.  AG Defs. MTD: Rule 12(b)(1) Motion ............................................................... 20

   A.   Rule 12(b)(1) Standard ................................................................................ 20

   B.   Ripeness ....................................................................................................... 21

      1.   Parties' Arguments .............................................................................. 21

      2.   Applicable Law ................................................................................... 24

      3.   Analysis .............................................................................................. 28

   C.   Standing ....................................................................................................... 35

      1.   Parties' Arguments .............................................................................. 35

      2.   Applicable Law ................................................................................... 40

      3.   Analysis .............................................................................................. 41

   D.   Sovereign Immunity for Brumley and the BESE Members ......................... 48

      1.   Parties' Arguments .............................................................................. 48

      2.   Applicable Law ................................................................................... 51

      3.   Analysis .............................................................................................. 54

IV.  Rule 12(b)(6) Standard ........................................................................................ 60

V.   AG Defs. MTD: Rule 12(b)(6) Motion: The Establishment Clause Claim ......... 61

   A.   Facial Challenge .......................................................................................... 62

      1.   Parties' Arguments .............................................................................. 62

      2.   Law and Analysis ............................................................................... 79

   B.   *Stone v. Graham* ......................................................................................... 82

  1. Parties' Arguments ................................................................. 82

  2. Law and Analysis ................................................................. 86

 C. *Kennedy v. Bremerton School District* ....................................... 98

  1. Parties' Arguments ................................................................. 98

  2. Law and Analysis ................................................................. 112

VI. AG Defs. MTD: Rule 12(b)(6) Motion: The Free Exercise Clause Claim ..................... 135

 A. Parties' Arguments ................................................................. 135

  1. AG Defendants' Original Memorandum (Doc. 39-1) ............................... 135

  2. Plaintiffs' Opposition (Doc. 47) ............................................. 137

  3. AG Defendants' Reply (Doc. 54) .............................................. 140

 B. Law and Analysis ................................................................. 142

VII. Pls. MPI ............................................................................. 149

 A. Parties' Arguments ................................................................. 149

 B. Law and Analysis ................................................................. 151

  1. Substantial Likelihood of Success ............................................ 151

  2. The Other Requirements for Injunctive Relief ................................. 162

  3. Remaining Issues Related to Pls. MPI .......................................... 163

VIII. OPSB MTD ............................................................................. 164

 A. Relevant Background and Parties' Arguments ....................................... 164

 B. Law and Analysis ................................................................. 169

IX. AG Defs. Motion to Stay ............................................................. 174

 A. Parties' Arguments ................................................................. 174

 B. Law and Analysis ................................................................. 174

X. Conclusion ............................................................................. 176

## I. INTRODUCTION

This matter is before the Court on four motions. The first is the *Motion for Preliminary Injunction* (Doc. 20) ("*Pls. MPI*") brought by all Plaintiffs.[1] In response, Defendant Orleans Parish School Board ("OPSB") filed a *Rule 12(b)(1) Motion to Dismiss and Opposition to Motion for Preliminary Injunction* (Doc. 38) ("*OPSB MTD*"). The other defendants—all represented by the Louisiana Attorney General ("AG") and including (1) Cade Brumley, the Louisiana State Superintendent of Education ("Brumley" or the "Superintendent"); (2) the members of the Louisiana State Board of Elementary and Secondary Education ("BESE") (collectively, "BESE Members");[2] and (3) the other schoolboards relevant to this action (the "School Board Defendants")[3] (collectively, "AG Defendants")—filed a *Consolidated Motion to Dismiss, Opposition to Plaintiffs' Motion for Preliminary Injunction, and Alternative Motion for Stay Pending Appeal* (Doc. 39) ("*AG Defs. MTD*"). Plaintiffs then filed separate replies in support of their own motion and in opposition to *OPSB MTD* (Doc. 46) and *AG Defs. MTD* (Doc. 47). OPSB filed a reply in support of its motion, (Doc. 52), and AG Defendants did the same, (Doc. 54). The fourth motion is the AG Defendants' *Conditional Motion to Stay Preliminary Injunctive Relief Pending Appeal* (Doc. 40) ("*AG Defs. Motion to Stay*"), which Plaintiffs oppose, (Doc. 47). Oral argument on all of these motions was heard on October 21, 2024. (Docs. 78, 79.)

---

[1] The plaintiffs in this action are: Reverend Darcy Roake and Adrian Van Young, on behalf of themselves and on behalf of their minor children, A.V. and S.V.; Reverend Mamie Broadhurst and Reverend Richard Williams, on behalf of themselves and on behalf of their minor child, N.W.; Reverend Jeff Sims, on behalf of himself and on behalf of his minor children, A.S., C.S. 1, and C.S. 2; Jennifer Harding and Benjamin Owens, on behalf of themselves and on behalf of their minor child, A.O.; Erin Hawley and David Hawley, on behalf of themselves and on behalf of their minor children, A.H. and L.H.; Dustin McCrory, on behalf of himself and on behalf of his minor children, E.M., P.M., and L.M.; Gary Sernovitz and Molly Pulda, on behalf of themselves and on behalf of their minor child, T.S.; Christy Alkire, on behalf of herself and on behalf of her minor child, L.A.; and Joshua Herlands, on behalf of himself and on behalf of his minor children, E.H. and J.H.

[2] The BESE Members include: Conrad Appel, Judy Armstrong, Kevin Berken, Preston Castille, Simone Champagne, Sharon Latten-Clark, Lance Harris, Paul Hollis, Sandy Holloway, Stacey Melerine, and Ronnie Morris.

[3] The School Board Defendants include: the East Baton Rouge Parish School Board, the Livingston Parish School Board, the Vernon Parish School Board, and the St. Tammany Parish School Board.

This case involves the constitutionality of House Bill No. 71, Act 676 ("H.B. 71" or the "Act"). This law provides in relevant part:

> No later than January 1, 2025, each public school governing authority shall display the Ten Commandments in each classroom in each school under its jurisdiction. The nature of the display shall be determined by each governing authority with a minimum requirement that the Ten Commandments shall be displayed on a poster or framed document that is at least eleven inches by fourteen inches. The text of the Ten Commandments shall be the central focus of the poster or framed document and shall be printed in a large, easily readable font.

H.B. 71(B)(1). The Act also mandates that a specific version of the Ten Commandments be used—a Protestant one contained in the King James Bible. (*See* Expert Report of Steven K. Green, J.D., Ph.D. ("Green Report") ¶¶ 50–51, Doc. 47-2.)

The Act requires that the Decalogue be "displayed with a context statement." H.B. 71(B)(3). This statement begins, "[t]he Ten Commandments were a prominent part of American public education for almost three centuries." *Id.* Examples purportedly include *The New England Primer* from around 1688, McGuffey *Readers* written in the early 1800s, and textbooks published by Noah Webster. *Id.*

H.B. 71 further provides that a public-school governing authority is not required to spend its funds to purchase a display; rather, "[a] governing authority may spend its funds or donated funds to purchase the displays and may accept donated displays." H.B. 71(B)(5).

The Act mandates that BESE "adopt rules and regulations . . . to ensure the proper implementation of" the law. H.B. 71(B)(6)(a). The Louisiana Department of Education must (1) "identify appropriate resources to comply with the provisions" of the Act "that are free of charge," and (2) "[o]nce identified, . . . list the free resources on the department's internet website."

H.B. 71(B)(6)(b). The law goes on to require the same for every public post-secondary education institution. H.B. 71(C).

In *Pls. MPI*, Plaintiffs seek to enjoin (1) all defendants from adopting any rules and regulations in accordance with the Act and from requiring that the Ten Commandments be displayed in every public-school classroom in Louisiana, and (2) the School Board Defendants from displaying the Ten Commandments in any public-school classroom. (Doc. 20 at 1.)[4] In sum, Plaintiffs argue that H.B. 71 violates the Establishment Clause and the Free Exercise Clause of the First Amendment. (*Id.* at 2.)

The AG Defendants respond with attacks on jurisdiction and the substance of Plaintiffs' claims. (Doc. 39-1.) Specifically, AG Defendants contend that Plaintiffs' claims should be dismissed under Federal Rule of Civil Procedure ("Rule") 12(b)(1) because (1) the claims are not ripe in that they require the further factual developments of (a) rules implementing the statute and (b) encounters with actual displays of the Ten Commandments; (2) Plaintiffs lack standing, purportedly in every way possible, though mainly because Plaintiffs have allegedly not yet suffered an injury-in-fact (for essentially the same reasons AG Defendants say the claims are not ripe); and (3) Defendants Brumley and the BESE Members are entitled to sovereign immunity because (a) *Ex parte Young*, 209 U.S. 123 (1908), requires an *ongoing* violation of harm, not the risk of a future violation; and (b) these defendants lack the required connection to the Act's enforcement. (*Id.* at 10–11, 17–29.)

The Court has carefully considered these arguments and will deny *AG Defs. MTD*. First, "[i]ssues have been deemed ripe when they would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is

---

[4] All page citations are to record document page numbers, not internal page numbers.

now." *Pearson v. Holder*, 624 F.3d 682, 684 (5th Cir. 2010) (quoting *Simmonds v. INS*, 326 F.3d

351, 359 (2d Cir. 2003)). While context is critical in First Amendment cases, *see Staley v. Harris*

*Cnty.*, 485 F.3d 305, 309 (5th Cir. 2007) (en banc), here, the Court has sufficient information about

what the Ten Commandment displays will look like from the Act itself to determine whether the

display is constitutional:

> (a) *what*: a specific Protestant version of the Ten Commandments
> contained in the King James Bible, as opposed to a Roman
> Catholic or Jewish version;
>
> (b) *when and where*: in "each public school," in every "classroom
> in each school," all year round, regardless of subject matter, and
> regardless of the age of the student;
>
> (c) *why:* purportedly for historical reasons, though, as will be
> explored below, this justification is undermined by the
> legislative history and fundraising efforts of the Governor;[5] and
>
> (d) *how*: with the "minimum requirements" that the Decalogue
> "shall be displayed on a poster or framed document that is at
> least eleven inches by fourteen inches," with the Ten
> Commandments as "the *central focus* of the poster or framed
> document" and "printed in a large, easily readable font," and
> funded with either school funds or private donations. H.B.
> 71(B)(1) (emphasis added).

All of this is sufficient for this Court to find that the Act runs afoul of *Stone v. Graham*, 449 U.S.

39 (1980), and later cases without the need for further factual development. And Plaintiffs will

endure considerable hardship if the Court delays a decision—specifically, a violation of their First

---

[5] For example, Governor Landry sent a fundraising email to supporters in response to the filing of this challenge to H.B. 71 which urged them to help him "ADVANCE [] the Judeo-Christian values that this nation was built upon." Patrick Wall, *Jeff Landry vows to defend 'Judeo-Christian values' after Ten Commandments lawsuit*, TIMES-PICAYUNE (June 25, 2024), https://www.nola.com/news/politics/jeff-landry-lawsuit-ten-commandments-judeo-christian/articl e_0555d6e6-3314-11ef-863e-1b07594ff87c.html. *See also Mealey v. Gautreaux*, No. 16-716, 2020 WL 515853, at *23 (M.D. La. Jan. 31, 2020) (deGravelles, J.) ("Courts have the power to take judicial notice of the coverage and existence of newspaper and magazine articles." (first citing *Washington Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991) (allowing judicial notice of the existence of newspaper articles); and then citing *Jackson v. Godwin*, 400 F.2d 529, 536 (5th Cir. 1968) (finding that newspapers and magazines allowed in a prison carried extensive coverage of riots to the point where the district court could take judicial notice of such coverage))). *See also Ieradi v. Mylan Lab'ys, Inc.*, 230 F.3d 594, 598 n.2 (3d Cir. 2000) (taking judicial notice of newspaper article).

Amendment rights. Ultimately, "one does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581 (1985) (cleaned up). And "there is no need for [Plaintiffs] to wait for actual implementation of the statute and actual violations of [their] rights under the First Amendment where the statute makes inappropriate government involvement in religious affairs inevitable." *Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 278 (5th Cir. 1996) (cleaned up).

Second, and for similar reasons, the Court finds that Plaintiffs have a personal stake in the outcome of the litigation sufficient to confer standing. AG Defendants maintain that Plaintiffs require a personal encounter with the offending display to sustain an injury, but this rests on a faulty premise. Courts have recognized that a plaintiff can have standing if injury is "actual or *imminent*, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (emphasis added) (cleaned up). For the reasons already given, these Plaintiffs face an *imminent* infringement of their First Amendment rights, one which will occur by January 1, 2025. And this encounter is real and not hypothetical or speculative, as the First Amendment violation will occur based on the minimum requirements described above. Moreover, Plaintiffs have shown that their injuries are fairly traceable to the conduct of each defendant based on the allegations of the *Complaint*, the language of the Act, and each defendant's specific statutory duties. Finally, a favorable ruling by this Court will clearly redress their injuries by averting any constitutional violations that would otherwise occur. In short, Plaintiffs have standing.

Third, the Superintendent and BESE Members are not entitled to sovereign immunity. AG Defendants' arguments are flawed: (1) it is well established that *Ex parte Young* applies when there is a threat of future harm and not merely an ongoing violation, and, as stated above, here

there is a risk of imminent First Amendment violations; and (2) contrary to AG Defendants' position, these defendants have a particular duty to enforce the Act, a willingness to do so, and the ability to compel and constrain others to obey the challenged law. *See Book People, Inc. v. Wong*, 91 F.4th 318, 335–36 (5th Cir. 2024) (citations omitted). Thus, for many of the same reasons the Court found standing, the Court also finds that Plaintiffs have satisfied the *Ex parte Young* exception as to Brumley and the BESE Members.

The Court also finds that AG Defendants' Rule 12(b)(6) motion must be denied. Preliminarily, Plaintiffs concede that they are making a facial challenge to the Act, so, under binding Fifth Circuit precedent, they must show that H.B. 71 is "unconstitutional in every application." *Croft v. Perry*, 624 F.3d 157, 164 (5th Cir. 2010). That is, Plaintiffs must show that "there is no set of circumstances under which" the display of the Ten Commandments is constitutional under the Act. *Id.*

But AG Defendants err in believing this standard ensures them total victory. These defendants ignore the fact that the Act establishes certain "minimum requirements" that the Ten Commandments "shall be displayed on a poster or framed document that is at least eleven inches by fourteen inches," with the Decalogue as "the *central focus* of the poster or framed document" and "printed in a large, easily readable font." H.B. 71(A)(1) (emphasis added). Further, these posters must be "display[ed] . . . in each . . . classroom in each school under [the] jurisdiction" of each school board. *Id.* Thus, the question before the Court remains whether, as a matter of law, there is any constitutional way to display the Ten Commandments *in accordance with the minimum requirements of the Act*.

The Court finds that there is not. Specifically, the Act violates the Establishment Clause for two independent reasons.

First, H.B. 71 is impermissible under *Stone v. Graham*. Though *Stone* was based on the test established by *Lemon v. Kurtzman*, 403 U.S. 602 (1971), which has since been abrogated, this District Court remains bound to follow *Stone* until the Supreme Court overrules it, provided *Stone* directly controls the case. *Stone* does so control; the unconstitutional law in *Stone* and H.B. 71 share the following similarities that make them legally indistinguishable:

> (a) both require that the Ten Commandments be displayed on the wall in every public elementary and secondary school classroom in the state;
>
> (b) the two laws impose comparable minimum size requirements for the display;
>
> (c) each statute contains a context statement purporting to describe the historical basis for the display;
>
> (d) the two statutes allowed for financing by private contributions;
>
> (e) neither represented or represents "a case in which the Ten Commandments are integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like," *Stone*, 449 U.S. at 42; and
>
> (f) the Louisiana and Kentucky laws both single out the Decalogue for *central* display while declining to give preferential treatment to foundational documents like the U.S. Constitution, the Declaration of Independence, or the Magna Carta.

Just as in *Stone*, "[i]f the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments," and that "is not a permissible state objective under the Establishment Clause." *Id*. Subsequent cases do not undermine the application of *Stone* to this case; they strengthen it, particularly in their emphasis of the heightened First Amendment concerns in the public-school setting given the impressionability of young students and the fact that they are captive audiences. *See Van Orden v. Perry*, 545 U.S. 677, 690–91 (2005) (plurality opinion) (citing *Edwards v.*

9

*Aguillard*, 482 U.S. 578, 583–84 (1987); and then citing *Lee v. Weisman*, 505 U.S. 577, 596–597 (1992)). *See also id.* at 703 (Breyer, J., concurring) (citing, inter alia, *Lee*, 505 U.S. at 592).

Second, even if *Stone* did not control, H.B. 71 would be unconstitutional under *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022). The parties disagree somewhat on the appropriate standard, but a close reading of *Kennedy* and Fifth Circuit precedent shows that the standard remains whether the practice at issue "fits within" or is "consistent with a broader tradition." *See id.* at 535–36. Historical evidence is critical to this analysis. *See Freedom From Religion Found., Inc. v. Mack*, 49 F.4th 941, 951, 957 (5th Cir. 2022). Additionally, in looking at whether a particular practice is consistent with the tradition at issue, the Court must consider whether the practice is sectarian, discriminatory, or coercive. *See id.* at 958–59.

The Court finds that Plaintiffs have adequately pled an Establishment Clause claim post-*Kennedy*. The *Complaint* alleges that there was no broader tradition of using the Ten Commandments in public-school education at the time of the Founding or incorporation of the First Amendment. (*Compl.* ¶¶ 42, 162, Doc. 1.) Further, even if the practice at issue—posting the Ten Commandments in public-school classrooms—did fit within a broader tradition during those eras, the Act would still be unconstitutional; as pled, H.B. 71 fails to select historical documents generally and versions of the Decalogue specifically "without regard for belief," *cf. Mack*, 49 F.4th at 958 (cleaned up), and so, as a result, the practice is discriminatory.

Most critically though, the Act's mandatory practice is coercive. As Plaintiffs highlight, by law, parents must send their minor children to school and ensure attendance during regular school hours at least 177 days per year. (*Compl.* ¶¶ 69–70, Doc. 1 (citing La. R.S. §§ 17:221(A)(1)(c), 154.1(A)(1)).) The *Complaint* further alleges:

> Permanently posting the Ten Commandments in every Louisiana public-school classroom—rendering them unavoidable—

> unconstitutionally pressures students into religious observance, veneration, and adoption of the state's favored religious scripture. It also sends the harmful and religiously divisive message that students who do not subscribe to the Ten Commandments—or, more precisely, to the specific version of the Ten Commandments that H.B. 71 requires schools to display—do not belong in their own school community and should refrain from expressing any faith practices or beliefs that are not aligned with the state's religious preferences. And it substantially interferes with and burdens the right of parents to direct their children's religious education and upbringing.

(*Id.* ¶ 3.) Finally, the *Complaint* sets forth in detail all the ways these particular Plaintiffs are so affected by H.B. 71. (*See id.* ¶¶ 82–155.)

Looking "holistic[ally]" at the Act, Louisiana law, and the facts as pled in the *Complaint* and as supported by Plaintiffs' declarations, the Court finds that the Plaintiff parents and their minor children will suffer more than mere "subjective offense," *Mack*, 49 F.4th at 958–59; rather, they face a "real and substantial likelihood of coercion," *id.* at 959, because "in every practical sense," they will be "compelled [to] attend[] and participat[e] in a religious exercise," *Kennedy*, 597 U.S. at 541 (cleaned up). For these additional reasons, the Court finds that the Act violates the Establishment Clause.

Additionally, the Court finds that Plaintiffs have established a viable Free Exercise claim. First, they have sufficiently alleged that the Act burdens their "sincere religious practice[s]" and beliefs—with respect to both the faiths of these Plaintiffs and the rights of all parents to direct the religious upbringing of their children. *See Kennedy*, 597 U.S. at 525 (citation omitted). (*See also Compl.* ¶¶ 82–155, Doc. 1.) Second, H.B. 71 is not neutral toward religion, and this is evident from the text of the statute, its effects, and the statements of lawmakers before and after the Act's passage. Third, since the law is not neutral, it easily fails strict scrutiny analysis; even assuming AG Defendants had established a compelling interest (e.g., for education or history), there are any

11

number of ways that they could advance an alleged interest in educating students about the Ten Commandments that would be less burdensome on the First Amendment than the one required by H.B. 71. For all these reasons, *AG Defs. MTD* will be denied on the Free Exercise claim.

Having denied *AG Defs. MTD* in full, the Court will grant *Pls. MPI*. Plaintiffs have satisfied the four requirements necessary for injunctive relief. First, for all the reasons given in reference to *AG Defs. MTD*, and for the additional reasons given by Plaintiffs' expert Dr. Steven K. Green, Plaintiffs have easily established a likelihood of success on their Establishment Clause and Free Exercise claims. In sum, the historical evidence showed that the instances of using the Ten Commandments in public schools were too "scattered" to amount to "convincing evidence that it was common" at the time of the Founding or incorporation of the First Amendment to utilize the Decalogue in public-school education. *Cf. Mack*, 49 F.4th at 956–57. That is, the evidence demonstrates that the practice at issue does not fit within and is otherwise not consistent with a broader historical tradition during those time periods.

The other requirements for injunctive relief have been satisfied as well. Concerning the second, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Book People*, 91 F.4th at 341 (citation omitted). As to the third and fourth requirements (which merge for AG Defendants), while the State generally has an interest in the enforcement of its laws, (a) "neither the State nor the public has any interest in enforcing a regulation that violates federal law," and (b) "injunctions protecting First Amendment freedoms are always in the public interest." *Id.* (cleaned up). Accordingly, the Court will grant *Pls. MPI* and issue an order:

> (1) finding H.B. 71 unconstitutional on its face and in all applications;

12

(2) prohibiting AG Defendants from (a) enforcing H.B. 71; (b) adopting rules or regulations for the enforcement of H.B. 71; and (c) requiring that the Ten Commandments be posted in every public-school classroom in Louisiana in accordance with H.B. 71;

(3) requiring AG Defendants to provide notice of this ruling to all Louisiana public elementary, secondary, and charter schools, and all public post-secondary education institutions; and

(4) ordering Plaintiffs to post a bond in the nominal amount of $100.

Next, *OPSB MTD* will be granted in part and denied in part. Specifically, Plaintiffs Roake and Van Young's children do not attend schools under the jurisdiction of the OPSB, so their claims against OPSB will be dismissed without prejudice for lack of standing. However, Plaintiffs Sernovitz, Pulda, and Herlands (individually and on behalf of their children) have established standing for their claims against this defendant, so *OPSB MTD* will be denied as to them.

Finally, for all the above reasons, the Court will deny *AG Defs. Motion to Stay* the injunction pending an appeal.

## II. THE NAMED PLAINTIFFS

Before turning to the various motions at issue, the Court will first look at the specific Plaintiffs bringing this action. The following allegations comes from the *Complaint* (Doc. 1), but these allegations are supported by the Plaintiffs' declarations submitted in conjunction with *Pls. MPI.* (*Compare, e.g., Compl.* ¶¶ 82–90, Doc. 1, *with* Roake Decl., Doc. 20-2.)

Plaintiff Reverend Roake is an ordained minister in the Unitarian Universalist Church, and her husband, Plaintiff Van Young, is a Reform Jew. (*Compl.* ¶ 82, Doc. 1.) The *Complaint* alleges they object to the Act "because the overtly religious classroom displays mandated by the law will promote, and forcibly subject their children to, religious scripture in a manner that violates the family's religious beliefs and practices." (*Id.* ¶ 83.) Reverend Roake's faith, which she believes

and teaches, holds that "forcing religious beliefs on individuals causes them significant spiritual, psychological, and emotional harm" and "conflicts with her commitment to religious tolerance and acceptance, which is fundamental to her practice as a Unitarian Universalist and minister." (*Id.* ¶ 84.) Plaintiff Van Young has similar beliefs about evangelizing and religious tolerance. (*Id.*) Plaintiffs allege that Roake and Van Young have undertaken efforts to "guid[e] the spiritual development of their children, who are being raised in both the Unitarian Universalist and Jewish traditions," and that they enrolled the children in public schools to receive a secular education. (*Id.* ¶ 85.) H.B. 71's "mandatory religious displays will conflict with their spiritual beliefs and the spiritual values that they seek to instill in their children" by failing to provide the proper context for a Unitarian Universalist reading of the Decalogue, by not providing the Torah's version of the text, and by "send[ing] the message" that the posted version is the "'correct' or superior version of religious doctrine" and will "constitute official rules that" the children must follow. (*Id.* ¶¶ 87–89.) The *Complaint* concludes its allegations with respect to these Plaintiffs:

> As a result of these messages, Reverend Roake and Mr. Van Young believe that their children will be pressured to observe, venerate, and adopt the state's preferred religious doctrine and to suppress expression of their own religious backgrounds and views at school. This religious coercion will harm their children spiritually and substantially interfere with, impede, and burden their children's ability to conduct a free and responsible inquiry for truth and meaning and to decide, for themselves, what to believe when it comes to matters of faith.

(*Id.* ¶ 90.)

Similarly, Plaintiffs Erin and David Hawley and their minor children A.H. and L.H. attend the Unitarian Universalist church, where Mr. Hawley was the one-time church president. (*Id.* ¶ 114.) The *Complaint* details the various ways in which the Act coerces them; for instance:

> The ability to direct and guide their children in matters of faith and protect their children's ability to undertake a free and responsible

14

search for truth and meaning is an essential aspect of the Hawleys'
religious exercise. H.B. 71 will significantly interfere with and
burden their ability to carry out this religious exercise.

(*Id.* ¶ 119.) Plaintiffs allege various other ways the state's mandated Decalogue conflicts with their

beliefs, (*see id.* ¶¶ 120–22), many of which were highlighted above with Plaintiffs Roake and Van

Young, (*see id.* ¶¶ 82–90). Additionally:

> The Hawleys believe that the state's posting of these religious
> displays in every public-school classroom, untethered to any
> academic lesson, confers on the Ten Commandments the highest
> level of legitimacy—an official stamp of approval that will send the
> message to their children that the state-selected version of the Ten
> Commandments is the "correct" or superior religious doctrine,
> contrary to the family's [Unitarian Universalist] beliefs and
> practices. They also believe that, as a result of this message and the
> sheer ubiquity of the displays mandated by H.B. 71, their children
> will be pressured into religious observance, veneration, and
> adoption of this scripture, violating the family's faith tenets and
> interfering with, deterring, or preventing a free and responsible
> search for truth and meaning by their children.
>
> [ ] The Hawleys further believe that H.B. 71 and the displays it
> mandates send a harmful message to them and their children that
> they are outsiders and not fully part of the school community
> because they do not believe in the state's official religious scripture.
> They believe that, because of this message, their children will be
> pressured to avoid or truncate their search for spiritual meaning and
> to suppress expression of their own spiritual beliefs and views at
> school.

(*Id.* ¶¶ 123–24.)

Likewise, Plaintiffs Reverend Mamie Broadhurst and Reverend Richard Williams are the

parents of N.W., and they are Presbyterian ministers who "strongly believe," in a way "rooted" in

their religion's beliefs, "that scriptural matters and questions, including which version of scripture

is correct and what it means, are far too sacred to place in the hands of government officials. They

believe that these are issues that must be reserved for faith communities." (*Id.* ¶¶ 91–93.)

Broadhurst and Williams further believe that the government should not "interfere with the

administration of God's Word or misappropriate God's authority," but they claim the state has done just that "by placing its stamp of approval on one particular version of the Ten Commandments and mandating that this version be posted in every public-school classroom." (*Id.* ¶ 93.) Plaintiffs allege that this "send[s] a message to all students," including Broadhurst and Williams's child, that "the government holds religious authority." (*Id.*) Additionally, they believe that "[r]eceiving and navigating scripture, such as the Ten Commandments, within the context of their faith is critical to ensuring that N.W.'s understanding of the commandments aligns with Presbyterian teachings and values." (*Id.* ¶ 94.) The *Complaint* alleges:

> The Ten Commandments displays posted in N.W's classrooms will not only interfere with and undermine Reverend Broadhurst's and Reverend Williams's ability to guide N.W.'s religious education, but they will also create pressure for N.W. to accept and believe— contrary to the family's Presbyterian faith—the overtly religious messages conveyed by them, including that the state has authority on theological or scriptural questions and that students who do not subscribe to the state's official version of the Ten Commandments are lesser in status. This also will create pressure for N.W. to suppress expression, especially in school, of N.W's own religious beliefs on these issues and other religious questions or concerns raised by the religious displays.

(*Id.* ¶ 99.)

Plaintiff Reverend Jeff Sims is also an ordained Presbyterian minister, and he is the parent of three minors. (*Id.* ¶ 101.) The *Complaint* makes substantially similar allegations with respect to the effects on Sims as on Broadhurst and Williams. (*See id.* ¶¶ 101–07.)

Plaintiffs Jennifer Harding and Benjamin Owens are nonreligious and the parents of a minor child, A.O., who is an atheist. (*Id.* ¶ 109.) They believe that the Act's required displays "will promote, and forcibly subject their child to, religious scripture to which they and their child do not subscribe. In so doing, the displays will also usurp Ms. Harding's and Mr. Owens's parental role in directing their child's non-religious upbringing." (*Id.* ¶ 108.) The *Complaint* provides more

16

details as to how their parental rights are interfered with and burdened, (*id.* ¶¶ 109–13), including that "H.B. 71's Ten Commandments displays will impose on A.O. one set of religious values and beliefs over their family's values, which are not based in religion." (*Id.* ¶ 111.) They "do not want the government to push religious morality on A.O. (*Id.*) Harding and Owens also believe the Act "increase[s] the pressure on A.O. to suppress expression of A.O.'s own nonreligious background and atheist views at school as well as pressure A.O. to observe, venerate, and adopt the state's preferred religious doctrine." (*Id.* ¶ 113.)

Plaintiff Dustin McCrory is an agnostic atheist who is raising his minor children, Plaintiffs E.M., P.M., and L.M., to be nonreligious. (*Id.* ¶ 126.) The *Complaint* raises similar concerns here as with Harding and Owens, (*see id.* ¶¶ 125–29), though the pleading adds:

> Mr. McCrory will feel compelled to discuss the Ten Commandments with E.M., P.M., and L.M. if the displays will be put in their classrooms. He does not wish to be forced to have this sensitive conversation with E.M., P.M., and L.M. about the Ten Commandments given their young age. He also opposes posting the mandated language of H.B. 71 because he believes that it addresses age-inappropriate religious content. For example, Mr. McCrory does not wish for his elementary-age children to be instructed by their school about the biblical conception of adultery.

(*Id.* ¶ 128.)

Likewise, Plaintiffs Christy Alkire and her minor plaintiff L.A. are also nonreligious. (*Id.* ¶ 141.) They raise similar concerns as to the other nonreligious plaintiffs. (*Id.* ¶¶ 140–45.) The *Complaint* adds here:

> L.A. has already felt some pressure in school to be careful about exposing L.A.'s nonbelief to other students. L.A. believes that the religious displays mandated by H.B. 71 will increase the pressure on L.A. to suppress expression of L.A.'s own nonreligious background and nonreligious views at school as well as pressure L.A. to observe, venerate, and adopt the state's preferred religious doctrine.

(*Id.* ¶ 145.)

Additionally, Plaintiffs Gary Sernovitz and Molly Pulda are Jewish and are raising their minor child T.S. in the Reform Jewish tradition. (*Id.* ¶ 130.) They regularly attend synagogue, and they are raising T.S. in the public-school system because of their strong belief in separating the child's secular education from the child's religious one, and to oversee the latter to ensure it complies with Jewish beliefs and practices. (*Id.* ¶ 130.) These plaintiffs object to the Act

> because, among other reasons, it forcibly imposes on T.S. overtly religious classroom displays that are, in many ways, contrary to the family's Jewish faith. Specifically, they believe that H.B. 71 (1) misappropriates a Jewish text, ripping it from its Jewish context, (2) selectively edits that text by altering its meaning and obscuring or erasing its Jewish significance, and (3) then mandates the display of the altered text to non-Jews, in violation of core Jewish tenets that oppose proselytizing. In so doing, the displays are likely to result in religious coercion of T.S. and usurp Mr. Sernovitz's and Ms. Pulda's parental roles in directing T.S.'s religious education, religious values, and religious upbringing.

(*Id.* ¶ 131.) These plaintiffs also object that:

> H.B. 71's characterization of the Ten Commandments as merely a "historically significant document" that reflects nothing more than the "function of civic morality to the functioning of self-government" improperly denies the sacred significance of the Ten Commandments to the Jewish faith. Indeed, Mr. Sernovitz and Ms. Pulda believe that this official version of the Ten Commandments obscures, and conflicts with, the Reform Jewish tradition on the history and meaning of the commandments.

> [ ] Specifically, Mr. Sernovitz and Ms. Pulda do not believe that the Ten Commandments are a universal benign ethical guide. The language of H.B. 71 omits key biblical text after the first commandment that, they believe, makes this clear: In the book of Exodus, chapter 20, in the Torah, the words "I am the Lord Your God" are followed by "who brought you out of the land of Egypt, out of the house of bondage." This clause is an important part of their Jewish understanding of the origins and purpose of the Ten Commandments, and omission of this text denies the commandments' specific meaning in their Jewish faith. This omission is, for Mr. Sernovitz and Ms. Pulda, tantamount to an official, governmental erasure of the Jewish significance of the Ten Commandments.

(*Id.* ¶ 132–33.) As Reform Jews, these Plaintiffs believe that introducing the Decalogue to their minor child could be construed as trying to convey proper religious meaning and interpretation and that this "must occur in the context of the broader Reform Jewish tradition." (*Id.* ¶ 134.)

> Indeed, in the modern Jewish tradition, the Ten Commandments would rarely, if ever, be displayed on the walls of a *religious* classroom, as the commandments must be interpreted and reconciled with many other parts of the Torah and the interpretative body of work that has emerged over millennia to understand the Torah. In mandating such displays in the secular classroom, H.B. 71 interferes with Mr. Sernovitz's and Ms. Pulda's ability and right to address this religious doctrine with T.S. in a manner that complies with their faith.

(*Id.*) These Plaintiffs also view the mandated text as conflicting with Reform Jewish views of women and the equality between the sexes, and the mandatory displays interfere with these parents' ability to teach their child that belief. (*Id.* ¶ 135.) As with the other parents, "[t]he ability to direct and guide their child in matters of faith is an essential aspect of Mr. Sernovitz's and Ms. Pulda's religious exercise[,]" and "H.B. 71 will significantly interfere with and burden their ability to carry out this religious exercise." (*Id.* ¶ 136.) These include (1) "undermin[ing] and interfere[ing] with their ability to instill in T.S. what it means to be specifically Jewish and their ability to introduce and teach the Ten Commandments to T.S. in a manner that comports with other important Jewish tenets[,]" (*id.* ¶ 137); (2) making it so that T.S. "will likely face situations in which T.S. feels pressured to suppress expression of T.S.'s own Jewish background and beliefs, including the fundamental Jewish belief in tolerating and supporting the expression of all faiths[,]" (*id.* ¶ 138); and (3) "violat[ing] Jewish tenets that oppose proselytizing[,]" (*id.* ¶ 139).

Plaintiff Joshua Herlands is also Jewish and is raising his minor children, plaintiffs E.H. and J.H., within the Jewish tradition. (*Id.* ¶ 146.) Herlands makes similar objections as Sernovitz and Pulda, including the objection about missionizing and the fact that the display obscures

important principles concerning interpretation of the Decalogue. (*Id.* ¶¶ 146–51.) Herlands also protests that the version of the Ten Commandments differs from the one contained in the Torah in significant ways. (*Id.* ¶¶ 151–52.) Herlands likewise alleges that the Act significantly interferes with his religious exercise of directing and guiding his children in matters of faith. (*Id.* ¶¶ 153–55.)

## III.    AG DEFS. MTD: RULE 12(B)(1) MOTION

### A.    Rule 12(b)(1) Standard

In a Rule 12(b)(1) motion, a party may raise the defense of lack of subject matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). "Under Rule 12(b)(1), a claim is 'properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate' the claim." *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012) (quoting *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998)).

"The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (citing *McDaniel v. United States*, 899 F. Supp. 305, 307 (E.D. Tex. 1995)). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Id.* (citing *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)). But, "[a] motion under 12(b)(1) should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." *Home Builders Ass'n of Miss.*, 143 F.3d at 1010; *see also Ramming*, 281 F.3d at 161 (citing *Home Builders Ass'n of Miss.* with approval).

There are two forms of Rule 12(b)(1) challenges to subject matter jurisdiction: "facial attacks" and "factual attacks." *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). "A

facial attack consists of a Rule 12(b)(1) motion unaccompanied by supporting evidence that challenges the court's jurisdiction based solely on the pleadings." *Harmouche v. Consulate Gen. of the State of Qatar*, 313 F. Supp. 3d 815, 819 (S.D. Tex. 2018) (citing *Paterson*, 644 F.2d at 523). In considering a "facial attack," the court "is required merely to look to the sufficiency of the allegations in the complaint because they are presumed to be true. If those jurisdictional allegations are sufficient the complaint stands." *Paterson*, 644 F.2d at 523. Whereas, "[a] factual attack challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings—such as testimony and affidavits—may be considered." *Harmouche*, 313 F. Supp. 3d at 819 (citing *Paterson*, 644 F.2d at 523). The "court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981) (citation omitted). "[N]o presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.* When a factual attack is made, the plaintiff, as the party seeking to invoke jurisdiction, must "submit facts through some evidentiary method and . . . prov[e] by a preponderance of the evidence that the trial court does have subject matter jurisdiction." *Paterson*, 644 F.2d at 523.

## B. Ripeness

### 1. Parties' Arguments

AG Defendants claim that the "clearest dismissal ground is lack of ripeness." (Doc. 39-1 at 18.) In sum, AG Defendants assert that (1) Plaintiffs claims are not fit for judicial decision, and (2) even if they were, dismissal would pose no hardship on the parties. (*Id.* at 18–21.)

As to the former, AG Defendants contend that Plaintiffs' claims are contingent on events that may not occur as anticipated or at all. (*Id.*) These defendants primarily rely on *Staley v. Harris*

*County*, where the Fifth Circuit allegedly found that a First Amendment challenge to a Ten Commandments display was not ripe because no decision had been made about the future display of the monument, so the Court could not undertake the fact-intensive and context-specific analysis required by the Supreme Court. (*Id.* at 18–19.) According to AG Defendants, Plaintiffs here face the same problem, as no defendant has taken steps to carry out or comply with H.B. 71 and no child has seen any display. (*Id.* at 19–20.) AG Defendants assert:

> And so critical questions are currently unanswered: What would any display viewed by Plaintiffs' children actually look like? Would that display place the Ten Commandments in a certain context, and if so, what context? Where would the display be located in the classroom—by a teacher, on a side wall, on a back wall? How big would the display be? What would be included as part of the display? Would the same display appear in multiple classrooms, or would different classrooms have different versions? Will any particular school actually receive donated posters that a school opts to use? And these critical questions are compounded by the fact that there are countless ways a Defendant might comply with H.B. 71. . . .

(*Id.* at 19.)

AG Defendants then say, even if Plaintiffs could prove the first ripeness requirement, they fail the second because they face no hardship: (1) no legal rights or obligations are created by H.B. 71; (2) no plaintiff faces any imminent display (or, indeed, even know how the AG Defendants will comply with the law); and (3) there is no practical impediment to Plaintiffs filing suit once their children actually view the displays. (*Id.* at 20–21.)

Plaintiffs dispute these arguments, asserting first that the case is fit for judicial decision. (Doc. 47 at 27.) Plaintiffs maintain that they will suffer serious, irreparable injury when the Act is implemented and that the harm is not hypothetical. (*Id.*) Additionally, this case does not depend on further factual development because it presents a purely legal issue: "Does the imposition of the Ten Commandments on the minor-child Plaintiffs, in accordance with the minimum statutory

22

dictates of the Act, violate the First Amendment?" (*Id.* at 27–28.) Plaintiffs distinguish *Staley* on the grounds that *Staley* involved a Bible, not a Ten Commandments display, and that, more importantly:

> Here, the legislature has already made a number of decisions regarding the Act's mandatory, permanent displays, including where they will be posted (in every classroom in every public school, without exception); when they will be posted (no later than January 1, 2025); what the "central focus" will be (the state's preferred, denominational version of the Ten Commandments); their size (no smaller than eleven by fourteen inches); and even how legible the commandments must be (printed in a "large, easily readable font"). *See generally* H.B. 71.

(*Id.* at 28–29.) "Displays posted in accordance with this statutory scheme will harm Plaintiffs and violate their rights." (*Id.* at 29.) As to hardship, Plaintiffs primarily rely on the standing analysis, maintaining that the loss of their First Amendment freedoms, even briefly, will constitute irreparable injury. (*Id.*)

In reply, AG Defendants begin, "Plaintiffs seek to enjoin displays they have never seen, that have never been posted, and whose ultimate form(s) [AG] Defendants have not determined (if they will ever determine them at all)." (Doc. 54 at 8.) As to the first ripeness requirement, these defendants again hammer *Staley*, contending that, there, "the court knew exactly what the 'Mosher monument' entailed down to its inscription, the size of the open Bible on its façade, the details of its refurbishment, and the precise location of its display case in the courthouse[,]" yet the Court still found the display not ripe for review because no decision had been made about the context in which the monument would be displayed. (*Id.* at 8–9.) Moreover, AG Defendants contend that Plaintiffs cannot argue that the case presents a pure question of law, as that runs afoul of *Barber v. Bryant*, 860 F.3d 345 (5th Cir. 2017); that is, Plaintiffs can have no standing without an encounter with the offending item. (Doc. 54 at 9.) Such caution is critical in the context of the Ten

Commandments, says AG Defendants, where some displays are allowed and some are not. (*Id.*)

AG Defendants assert:

> So the problem persists that Plaintiffs have not seen an H.B. 71
> display, nor does anyone know what any such display may look
> like—and there is no basis to believe that H.B. 71 displays will look
> anything like the standalone Ten Commandments displays at issue
> in *Stone v. Graham*, 449 U.S. 39 (1980), *see* Defs.' MTD 24–33
> (illustrations of potential displays). *See* Ex. G, Faircloth Decl. ¶¶ 2–
> 8 (collecting *Stone* displays). Under *Staley* and *Barber*, therefore,
> Plaintiffs' claims are unfit for judicial decision.

(*Id.* at 9–10.)

As to hardship, AG Defendants again contend that Plaintiffs do not allege the type of harms

required to constitute hardship for ripeness purposes; rather, they turn "the hardship inquiry [into]

a mashup of Article III injury and [the] irreparable harm standard." (*Id.* at 10.) AG Defendants

then largely repeat their prior arguments. (*Id.*)

### 2. *Applicable Law*

"Under Article III of the Constitution, federal courts are confined to adjudicating 'cases'

and 'controversies.'" *Lower Colo. River Auth. v. Papalote Creek II, L.L.C.*, 858 F.3d 916, 922 (5th

Cir. 2017) (quoting *United Transp. Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000)). "And to

be a case or controversy for Article III jurisdictional purposes, the litigation 'must be ripe for

decision, meaning that it must not be premature or speculative.'" *Id.* (first quoting *Shields v.

Norton*, 289 F.3d 832, 835 (5th Cir. 2002); and then citing *Choice Inc. of Tex. v. Greenstein*, 691

F.3d 710, 715 (5th Cir. 2012) ("The justiciability doctrines of standing, mootness, political

question, and ripeness 'all originate in Article III's "case" or "controversy" language. . . .'"

(omission in original) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)))). *See

also Thomas*, 473 U.S. at 580 ("[The] basic rationale" of the ripeness doctrine "is to prevent the

courts, through premature adjudication, from entangling themselves in abstract disagreements."

(quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977))). "In other words, 'ripeness is a constitutional prerequisite to the exercise of jurisdiction.'" *Lower Colo.*, 858 F.3d at 922 (quoting *Shields*, 289 F.3d at 835).

"[R]ipeness is peculiarly a question of timing." *Thomas*, 473 U.S. at 580 (quoting *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 140 (1974)). "[A] court must look at two factors to determine ripeness: (1) 'the fitness of the issues for judicial decision' and (2) 'the hardship to the parties of withholding court consideration.'" *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 930 (5th Cir. 2023) (quoting *Abbott Lab'ys*, 387 U.S. at 149).

"First, a claim is 'fit for judicial decision' if it presents a pure question of law that needs no further factual development." *Id.* (citing *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 833 F.2d 583, 586–87 (5th Cir. 1987)). "So, if a claim is 'contingent [on] future events that may not occur as anticipated, or indeed may not occur at all,' the claim is not ripe." *Id.* at 930–31 (quoting *Thomas*, 473 U.S. at 580–81 (quotation omitted)). But, "[i]ssues have been deemed ripe when they would not benefit from any further factual development and when the court would be in no better position to adjudicate the issues in the future than it is now." *Pearson*, 624 F.3d at 684 (quoting *Simmonds*, 326 F.3d at 359). "One does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Thomas*, 473 U.S. at 581 (quoting *Reg'l Rail*, 419 U.S. at 143 (quoting *Pennsylvania v. West Virginia*, 262 U.S. 553, 593 (1923))).

Second, the Court must evaluate if Plaintiffs have "shown that hardship will result if court consideration is withheld at this time." *Choice Inc.*, 691 F.3d at 715. The question is whether "the impact of the [laws] upon the [Plaintiffs] is sufficiently direct and immediate as to render the issue

appropriate for judicial review at this stage." *Abbott Lab'ys*, 387 U.S. at 152. "An assessment of hardship often turns on a straight-forward prediction of the course events are likely to take." 13B Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3532.3 (3d ed. 2024). "Although it often is difficult to make secure predictions of the probable occurrence or severity of future injury in any particular case, there is nothing complicated about the process." *Id.* Thus, for instance, in a case involving an abortion statute, the Fifth Circuit stated generally that "hardship [ ] inhere[s] in legal harms, such as the harmful creation of legal rights or obligations; practical harms on the interests advanced by the party seeking relief; and the harm of being 'force[d] . . . to modify [one's] behavior in order to avoid future adverse consequences.'" *Choice Inc.*, 691 F.3d at 715 (quoting *Texas v. United States*, 497 F.3d 491, 499 (5th Cir. 2007) (quoting *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998))).

"The assessment of hardship may be complicated, however, by the fact that some rights are more jealously protected than others." Wright & Miller, *supra*, at § 3532.3. "When such rights are at issue, ripeness may require a lower probability and gravity of any predicted intrusion." *Id.* First Amendment rights have been identified as one of those "accorded special ripeness treatment":

> First Amendment rights of free expression and association are particularly apt to be found ripe for immediate protection, because of the fear of irretrievable loss. In a wide variety of settings, courts have found First Amendment claims ripe, often commenting directly on the special need to protect against any inhibiting chill. Of course, not all First Amendment claims are ripe; at some point, claims of subjective chilling effect are put aside as too fanciful. Ripeness likewise may be denied if the plaintiff seems able to comply with a challenged regulation without significant cost, if the plaintiff has been able to defy the regulation without apparent loss, or if the desire to protect First Amendment values is offset by the risk that factual ignorance may jeopardize other important values.

*Id.*

Plaintiffs point to several cases which confirm Wright & Miller's instruction that First Amendment rights are "accorded special ripeness treatment." *Id.* For instance, in *Book People*, the Fifth Circuit found that a booksellers' First Amendment challenge to a state-mandated book rating system was ripe, even though the state argued that the "regulatory scheme [was] not yet established." 91 F.4th at 334. The appellate court found that "the hardship to Plaintiffs would not be minimal, as the State contends," because "Plaintiffs allege[d] that complying with the law [would] cost valuable time and resources" and that, as to one book vendor, "compliance costs alone could put it out of business." *Id.*

Even more relevant here, in *Karen B. v. Treen*, 653 F.2d 897 (5th Cir. 1981), *aff'd*, 455 U.S. 913 (1982), the Fifth Circuit evaluated whether a particular Louisiana statute violated the Establishment Clause. "The challenged provision . . . provide[d] that a school board may authorize the appropriate school officials to allow each classroom teacher to ask whether any student wishes to offer a prayer and, if no student volunteers, to permit the teacher to pray." *Id.* at 899. Though ripeness was not at issue, the Fifth Circuit noted that the parish "program [had] yet to be put into effect," so "the nature and extent of state involvement in religious activity [was] in some measure speculative at [that] time." *Id.* at 902. Nevertheless, "[w]hat [was] certain [was] that the statute itself ma[de] inappropriate governmental involvement in religious affairs inevitable." *Id.*

The Fifth Circuit relied on *Karen B.* favorably in *Ingebretsen* to find that a plaintiff had standing to challenge a School Prayer Statute, even though the law had not yet been implemented. 88 F.3d at 278. The Fifth Circuit concluded, "There is no need for Ingebretsen to wait for actual implementation of the statute and actual violations of his rights under the First Amendment where the statute 'makes inappropriate government involvement in religious affairs inevitable.'" *Id.* (quoting *Karen B.*, 653 F.2d at 902). The appellate court agreed with the district court that plaintiff

had "clearly" shown "the sort of state involvement contemplated by *Karen B.*," including (1) that "implementation of the statute would inevitably lead to improper state involvement in school prayer[;]" (2) that, "[u]nder the terms of the statute, the state or its representatives [would] inevitably be forced to decide who prays and which prayers qualify as nonsectarian and nonproselytizing[;]" and (3) that "[t]he state [would] also be in the position of punishing students who attempt to leave so as to avoid hearing the prayers." *Id.*

As one district court said, "[t]he standard for constitutional ripeness mirrors the injury-in-fact requirement for standing." *Schelske v. Austin*, 649 F. Supp. 3d 254, 278 (N.D. Tex. 2022) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 n.5 (2014)). "Both stem from 'Article III's case-or-controversy requirement, which mandates that an "actual controversy" exist between the parties.'" *Id.* (quoting *DM Arbor Ct., Ltd. v. City of Hous.*, 988 F.3d 215, 218 n.1 (5th Cir. 2021) (quoting *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160 (2016))). Thus, the Fifth Circuit's conclusion in *Ingebretsen* remains highly relevant to the instant issue.

### 3. Analysis

Having carefully considered the matter, the Court will deny *AG Defs. MTD* on this issue. In short, this matter is ripe for adjudication.

First, the Court agrees with Plaintiffs that this case involves a purely legal question: Does the law mandating that defendants display the Ten Commandments in the classrooms of Plaintiffs' minor children, according to the minimum statutory requirements of the Act, violate the First Amendment? This issue is fit for judicial decision because it "would not benefit from any further factual development," and "the court would be in no better position to adjudicate the issues in the future than it is now." *Pearson*, 624 F.3d at 684. That is, regardless of what iterations of the displays AG Defendants are able to conjure up for purposes of their briefing, the fundamental

requirements of the Act mandate that the displays occur in a specific time, place, and manner that contravene the First Amendment. Moreover, given the "fear of irretrievable loss" and the "inhibiting chill[ing]" of their First Amendment rights, Wright & Miller, *supra*, at § 3532.3, Plaintiffs would suffer a hardship if the Court delayed a decision until the Act was implemented, *see id.*; *Book People*, 91 F.4th at 334; *cf. Karen B.*, 653 F.2d at 902.

AG Defendants' ripeness argument essentially boils down to a reliance on *Staley*, but the Court finds *Staley* distinguishable. That case dealt with a monument erected on courthouse property. *Staley v. Harris Cnty.*, 461 F.3d 504, 506 (5th Cir. 2006), *on reh'g en banc*, 485 F.3d 305 (5th Cir. 2007). The monument was built in 1953 by a Christian charity named Star of Hope Mission and "measure[d] two feet, six inches by three feet, and [was] four feet, five inches high." *Id.* The death memorial was dedicated to an individual named William S. Mosher, who was a prominent Houston businessman and philanthropist. *Id.* The monument contained an open Bible on display in a glass case measuring twelve by sixteen inches. *Id.*

> Because the monument face[d] the main entrance to the Courthouse, it [wa]s readily visible to attorneys, litigants, jurors, witnesses, and other visitors to the Courthouse. However, a passerby would have to walk up to the monument to observe that it contain[ed] a Bible and would have to stand in front of it to read the Bible.

*Id.* In 1995, a newly elected state district judge, who "campaigned on a platform of putting Christianity back into government," refurbished the monument, restored the Bible to the display case, and added a "red neon light outlining the Bible." *Id.* at 507. After 1997, Star of Hope Mission "maintained the monument and turned the pages of the Bible." *Id.*

The district court found this monument violated the Establishment Clause and ordered the Bible removed. *Staley*, 485 F.3d at 307. The Fifth Circuit initially affirmed but then granted rehearing en banc. *Id.* "[O]nly days before oral argument in [the] en banc case, the County removed

the monument from the public grounds and placed it in storage, to permit the ongoing renovation of the Courthouse and its grounds." *Id.* The Fifth Circuit thus found the case moot. *Id.*

In deciding this, the Fifth Circuit also determined that the case was not ripe for adjudication. *Id.* at 309. "[T]he County emphasize[d] that no decision has been made regarding when, where, or under what circumstances the monument will be displayed again in the future." *Id.* at 308. Even though the county "specifically [ ] asserted that it [would] display the monument again after [ ] renovations [were] complete[d]" a few years later, the County argued that "the monument's future [was] too speculative to determine whether the monument [would] violate the Establishment Clause in the future." *Id.* at 307–08.

The Fifth Circuit agreed. *Id.* at 309. The en banc court explained that:

> In determining the constitutionality of a religious display, the Supreme Court has made clear that "under the Establishment Clause detail is key." *McCreary County, Ky. v. ACLU of Ky.*, 545 U.S. 844, 867–68 [ ] (2005) (citing *County of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573, 595 [ ] (1989) ("[T]he question is what viewers may fairly understand to be the purpose of the display. That inquiry, of necessity, turns upon the context in which the contested object appears") (internal quotation marks and citation omitted)).

> The importance of facts and context is evident from the respective outcomes in two recent Supreme Court decisions addressing the constitutionality of Ten Commandments displays. *See McCreary,* 545 U.S. at 844 [ ]; *Van Orden v. Perry,* 545 U.S. 677 [ ] (2005). In both *McCreary* and *Van Orden,* the issue before the Supreme Court was whether a Ten Commandments display violated the Establishment Clause. *See McCreary,* 545 U.S. at 850 [ ]; *Van Orden,* 545 U.S. at 681 [ ]. The two cases, however, involved very different facts, and based on the specific facts and context of each case, the Supreme Court upheld the display in *Van Orden* but struck down the displays in *McCreary. See McCreary,* 545 U.S. at 881 [ ]; *Van Orden,* 545 U.S. at 692 [ ].

*Id.* at 308. *See also id.* at 308–09 (discussing the specific factual and legal distinctions between *McCreary* and *Van Orden*). Turning to the facts of its own case, the *Staley* court determined:

> [A]ny dispute over a probable redisplay of the Mosher monument is not ripe because there are no facts before us to determine whether such a redisplay might violate the Establishment Clause. Indeed, no decision has been made regarding any aspect of the future display of the monument. In the absence of this evidence, we are unable to conduct the fact-intensive and context-specific analysis required by *McCreary* and *Van Orden*. Thus, any claim that the Establishment Clause may be violated after the Courthouse and grounds have been renovated, is not ripe for review. *See United States v. Carmichael*, 343 F.3d 756, 761 (5th Cir. 2003) ("A claim is not ripe for review if 'it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.' " (citing *Texas v. United States*, 523 U.S. 296, 300 [ ] (1998) (internal quotation marks omitted))).

*Id.* at 309.

*Staley* is distinguishable for several reasons. First, *Staley*, *Van Orden*, and *McCreary* all involved displays at courthouses, not schools. As *Staley* itself acknowledged, "[i]n [the *Van Orden*] opinion, the plurality distinguished the display from classroom Ten Commandments displays held unconstitutional in *Stone v. Graham*, 449 U.S. 39 [ ] (1980) (per curiam), noting a 'far more passive use of those texts than was the case in *Stone*,'" *Staley*, 485 F.3d at 308 (quoting *Van Orden*, 545 U.S. at 691), "where . . . the text confronted elementary school students every day," *Van Orden*, 545 U.S. at 691. Moreover, in Justice Breyer's concurring opinion in *Van Orden*, which the Fifth Circuit found controlling, *Staley*, 485 F.3d at 308–09, he explained that, "[t]he display [was] not on the grounds of a public school, where, given the impressionability of the young, government must exercise particular care in separating church and state," *Van Orden*, 545 U.S. at 703 (citing *Lee*, 505 U.S. at 592; *Stone*, 449 U.S. 39). Thus, again, there are heightened concerns in this case that simply aren't present in monuments cases.

Second, and equally important, the Act provides sufficient context concerning the placement of the Ten Commandments so that the Court can evaluate the Act's constitutionality at this time. As described above, H.B. 71 requires a specific Protestant version of the Ten

Commandments to be posted all year long, in "each public school," in every "classroom in each school," regardless of the subject matter or the age of the student, with the "minimum requirements" that the Decalogue "shall be displayed on a poster or framed document that is at least eleven inches by fourteen inches," with the Ten Commandments as "the *central focus* of the poster or framed document" and "printed in a large, easily readable font," and obtained by either school "funds" or private donations, all by January 1, 2025. H.B. 71(B)(1), (5) (emphasis added). Thus, unlike *Staley*, where "no decision ha[d] been made regarding *any aspect* of the future display of the monument," *Staley*, 485 F.3d at 309 (emphasis added), here, it *is* "known when, where, [and] under what circumstance" the Ten Commandments will be displayed in public schools, *id.* at 307, and the "pure question of law" to be addressed by this Court is whether the displays, as mandated by the State, violate the Establishment and Free Exercise Clauses of the First Amendment, *Braidwood Mgmt.*, 70 F.4th at 930 (citation omitted).

The Court also finds *Barber v. Bryant* distinguishable. There, plaintiffs challenged a Mississippi statute which prohibited the state government from discriminatory actions against persons who act in accordance with certain beliefs under specific circumstances. 860 F.3d at 350–51. The statute identified three particular "religious beliefs or moral convictions" which dealt with marriage being between a man and a woman, sexual relations being confined to marriage, and a person's sex being immutable and "objectively determined by anatomy and genetics at time of birth." *Id.* at 351 (quoting 2016 Miss. Law H.B. 1523 § 2). Section 3 of the act described the set of circumstances in which adverse state action was restricted; for example, "[r]eligious organizations are protected when they make decisions regarding employment, housing, the placement of children in foster or adoptive homes, or the solemnization of a marriage based on a

belief listed in Section 2," and "[b]usinesses that offer wedding-related services are protected if they decline to provide them on the basis of a Section 2 belief." *Id.* (citation omitted).

Plaintiffs were Mississippi residents and two organizations that did not share the Section 2 beliefs. *Id.* They challenged the law as violating, inter alia, "the Establishment Clause because it endorse[d] specific religious beliefs . . . ." *Id*. at 352. "The district court issued a preliminary injunction against the implementation of H.B. 1523." *Id.*

The Fifth Circuit determined that plaintiffs did not have standing and reversed. *Id.* at 350. Plaintiffs claimed they "suffered a stigmatic injury from the statute's endorsement of the Section 2 beliefs," but the appellate court explained:

> "[T]he concept of injury for standing purposes is particularly elusive in Establishment Clause cases," but we are not without guidance. [*Murray v. City of Austin*, 947 F.2d 147, 151 (5th Cir. 1991)] (quoting *Saladin v. City of Milledgeville*, 812 F.2d 687, 691 (11th Cir. 1987)). In cases involving religious displays and exercises, we have required an encounter with the offending item or action to confer standing. *See id.; Doe v. Tangipahoa Par. Sch. Bd.*, 494 F.3d 494, 497 (5th Cir. 2007) (en banc) (addressing religious invocations). . . .
>
> A plaintiff has standing to challenge a religious display where his stigmatic injury results from a "personal[ ] confront[ation]" with the display. *See Murray*, 947 F.2d at 150–51. For comparison, the caselaw offers some examples of such a confrontation. There is standing where a plaintiff personally encounters a religious symbol on his public utility bill. *Id.* at 150. Personally encountering a religious message on the currency a plaintiff regularly handles is also sufficient. But once that display is removed from view, standing dissipates because there is no longer an injury. *See Staley*[, 485 F.3d at 309]. The personal confrontation must also occur in the course of a plaintiff's regular activities; it cannot be manufactured for the purpose of litigation. *ACLU–NJ v. Twp. of Wall*, 246 F.3d 258, 266 (3d Cir. 2001).

*Id.* at 353–54.

The *Barber* plaintiffs attempted to analogize to the injury-in-fact law in religious-display cases, but the Fifth Circuit rejected the argument. *Id.* at 354. These plaintiffs made "no clear showing of a personal confrontation with Section 2: The beliefs listed in that section exist only in the statute itself." *Id.* The appellate court concluded:

> Just as an individual cannot "personally confront" a warehoused monument, he cannot confront statutory text. *See Staley*, 485 F.3d at 309. Allowing standing on that basis would be indistinguishable from allowing standing based on a "generalized interest of all citizens in" the government's complying with the Establishment Clause without an injury-in-fact. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 483 (1982)]. That, we know, "cannot alone satisfy the requirements of Art. III without draining those requirements of meaning." *Id.* The religious-display cases do not provide a basis for standing to challenge the endorsement of beliefs that exist only in the text of a statute.

*Id.* at 354.

*Barber* is not controlling, and this is clear by returning to first principles of standing, which, as will be discussed below, is connected to ripeness. "An injury sufficient to satisfy Article III must be 'concrete and particularized' and 'actual or imminent, not "conjectural" or "hypothetical."'" *Driehaus*, 573 U.S. at 158 (quoting *Lujan*, 504 U.S. at 560 (some internal question marks omitted)). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a '"substantial risk" that the harm will occur.'" *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5, 133 S. Ct. 1138, 1150 n.5 (2013) (emphasis deleted and internal quotation marks omitted)). Thus, in *Barber*, plaintiffs lacked standing because there could be no possible way of being confronted with the law at issue; "[t]he beliefs listed in that section exist only in the statute itself." 860 F.3d at 354. Conversely, here, the risk of a future encounter by the Plaintiff children, who are required under the Act to attend classes with displays of the Ten Commandments and their statutorily "minimum requirements" by January 1, 2025, is

34

"certainly impending," and there is a "substantial risk that the harm will occur." *Driehaus*, 573 U.S. at 158; *see also Mack*, 49 F.4th at 949 (recognizing under *Barber* that, "[f]or a plaintiff to sue under the Establishment Clause, his 'regular activities' must prompt 'personal confrontation' with the challenged religious exercise," but also recognizing that, "[w]hen a plaintiff seeks only prospective relief, he must show that future confrontation is substantially likely." (first quoting *Barber*, 860 F.3d at 354; and then citing *Crawford v. Hinds Cnty. Bd. of Supervisors*, 1 F.4th 371, 375–76 (5th Cir. 2021))).

Again, "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Thomas*, 473 U.S. at 581 (cleaned up). Under *Ingebretsen*, "[t]here is no need for [Plaintiffs] to wait for actual implementation of the statute and actual violations of his rights under the First Amendment where the statute 'makes inappropriate government involvement in religious affairs inevitable.'" 88 F.3d at 278. Because Plaintiffs have shown that the Act makes such involvement inevitable, and because the Plaintiffs will suffer hardship in the form of an infringement of their First Amendment rights if the Act is allowed to be implemented, this matter is ripe for decision.

### C. Standing

#### 1. *Parties' Arguments*

AG Defendants assert, "[t]he same considerations tee up Plaintiffs' lack of Article III standing." (Doc. 39-1 at 21.) AG Defendants maintain that Plaintiffs fail each requirement for standing. (*Id.*)

First, AG Defendants argue that Plaintiffs do not show a "concrete, particularized, actual or imminent injury-in-fact." (*Id.*) Here, nothing has been done to implement H.B. 71, so Plaintiffs make only a facial attack on the law. (*Id.*) According to AG Defendants, *Barber* holds that there

is no standing to challenge religious displays existing only in statutory text. (*Id*. at 21–22.) Additionally, Plaintiffs are advancing an alleged "offended observer standing," which they lack because they have not been exposed to the challenged action. (*Id.* at 22.) First Amendment cases, say AG Defendants, require an encounter with the offending item, and Plaintiffs have not alleged an exposure to any display of H.B. 71. (*Id.* at 22–23.) Moreover, Plaintiffs cannot establish imminent harm because there has been no decision on how the Ten Commandments will be displayed, so there may be no concrete, particularized injury. (*Id.* at 23–24.) Further, Plaintiffs' notion that they will be offended by any form the display takes runs afoul of *Barber*. (*Id.* at 23–24.)

Second, AG Defendants attack traceability. (*Id.* at 24.) Here, there is no allegation that the school boards and state officials somehow "caused" any harm resulting from H.B. 71; rather, Plaintiffs claim only unspecified harm from future H.B. 71 displays. (*Id.*) That is to say, the alleged harms are not linked to any defendant, which, AG Defendants say, is not surprising since no defendant took any action to implement the Act. (*Id.* at 24–25.) Further, Plaintiffs treat all defendants as a unified whole, but standing must be established for each defendant for each claim. (*Id.* at 25.)

Third, Plaintiff fails to establish redressability. (*Id.* at 25–26.) In short, there is no injury for the Court to address. (*Id.*)

Finally, AG Defendants contend that Plaintiffs cannot manufacture standing solely because of the *Stone* decision. (*Id*. at 26.) *Stone* is not controlling, but, even if it were, Plaintiffs must still prove standing to establish jurisdiction. (*Id.*)

Plaintiffs respond that they satisfy all requirements for standing. (Doc. 47 at 18.) First, they have asserted sufficient injuries under the Supreme Court's ruling in *School District of Abington*

*Township v. Schempp*, 374 U.S. 203 (1963). (Doc. 47 at 18.) Their injuries are concrete and particularized. (*Id.*) Plaintiffs do not assert only "offended observer standing," as AG Defendants say, but rather:

> As stated in the Complaint, the minor-child Plaintiffs will be subjected to a state-mandated, religiously preferential version of the Ten Commandments in every classroom, for at least 177 days every school year, for the entire remainder of their elementary and secondary public-school education. *Compl.* ¶¶ 70–77. Plaintiffs further allege that Defendants' imposition of this scripture will injure them by, among other harms, (1) promoting and forcibly subjecting the minor-child Plaintiffs to religious doctrine in a manner that violates and contradicts their families' religious or non-religious beliefs and practices, (2) pressuring the minor-child Plaintiffs to observe, meditate on, venerate, and adopt the state's preferred religious doctrine and to suppress expression of their own religious backgrounds and views at school, and (3) interfering and conflicting with the ability of the parent-Plaintiffs to direct their children's religious education and upbringing. *Supra* pp. 2–3.

(*Id.* at 18–19.)

Plaintiffs then attack AG Defendants' legal authority. (*Id.* at 19–20.) Plaintiffs say *Barber* is distinguishable because the statute at issue "had no effect on the *Barber* plaintiffs beyond the fact that they knew about the alleged endorsement." (*Id.* at 19 (citation omitted).) In *Barber*, there was no required confrontation with a religious display or exercise, which is not the case here. (*Id.* at 19.) "Furthermore, the Act has an obvious legal effect on Plaintiffs: It conditions their access to Louisiana's public schools on their acquiescence to unavoidable, state-mandated displays of scripture." (*Id.*) Defendant's reliance on *Doe v. Tangipahoa Parish School Board* is also misplaced, as, in that case, there was no evidence any plaintiff had been personally and directly subjected to the challenged practice of school-board prayers. (*Id.* at 20.) Here, conversely, the law will take effect by January 1, 2025, and each "minor-child Plaintiff will come into direct contact with the Act's displays." (*Id.*)

Plaintiffs then contend that the future injuries are "certainly impending." (*Id.*) Plaintiffs rely on *Ingebretsen*. (*Id.* at 21.) Again, "[a]n allegation of future injury" is adequate for purposes of Article III standing if the "threatened injury is certainly impending, or there is a substantial risk that the harm will occur." (*Id.* (quoting *Driehaus*, 573 U.S. at 158).) Plaintiffs then cite certain cases involving the Americans with Disabilities Act to support their position. (*Id.* at 21–22.) AG Defendants say no child will experience harm or a violation of rights, but, again, "the threatened harms to Plaintiffs will occur as a result of Defendants' implementation of the Act's minimum requirements alone." (*Id.* at 22.)

As to traceability, Plaintiffs say this is not a proximate cause requirement, and, for each defendant, there need be only one plaintiff with standing to seek an injunction. (*Id.* at 22–23 (citations omitted).) Here, the BESE Members are required for oversight and governance of all public elementary and secondary schools in Louisiana, and the Act specifically requires BESE to adopt rules and regulations "to ensure the proper implementation of" the Act. (*Id.* at 23.) Additionally, "the State Superintendent of Education, Defendant Cade Brumley[,] is statutorily responsible for administering and implementing all policies and programs adopted by BESE," so he shares in the responsibility for implementing the Act. (*Id.*) Finally, each School Board Defendant is pled to be a "public-school governing authority," and they are required under the Act to display the Ten Commandments by January 1, 2025. (*Id.*) Each has jurisdiction over at least one school attended by at least one minor Plaintiff. (*Id.* at 23–24.) In sum:

> Because the Act requires the display of the Ten Commandments in every public school in the state, including the schools attended by the minor-child Plaintiffs, these allegations demonstrate that Plaintiffs' injuries are fairly traceable to the BESE Defendants and Superintendent Brumley, whose implementation responsibilities under the Act are statewide. . . . Similarly, because each School Board Defendant is required, under the Act, to display the Ten Commandments, Plaintiffs' injuries are fairly traceable to each

> Board that is the public-school governing authority for each of the
> minor-child Plaintiffs' schools.

(*Id.* at 25 (citations omitted).) As to AG Defendants' argument that the future harm is inadequate,

Plaintiffs refer to the harm that will necessarily take place with the required implementation of the

Act. (*Id.*)

Finally, Plaintiffs assert that AG Defendants' redressability argument is largely a

reiteration of their injury-in-fact one. (*Id.* at 26.) But a favorable decision would protect children

from unavoidable unconstitutional displays required by the Act, prevent religious coercion, and

"shield[ ] them from an officially sponsored religious message that they are lesser in the eyes of

the State because of their own religious or non-religious beliefs." (*Id.*) Moreover, "[i]t will also

preserve the ability of the parent-Plaintiffs to direct their children's religious education and

upbringing." (*Id.*)

In reply, AG Defendants reiterate that Plaintiffs have not met their burden for standing.

(Doc. 54 at 10.) First, they have not established a "concrete, particularized, and actual or imminent"

injury-in-fact because (a) there can be no facial challenges for Establishment Clause claims and

(b) they have suffered no encounter with any display. (*Id.* at 11.) AG Defendants maintain that

*Schempp* and *Ingebretsen* do not trump *Barber*; in *Schempp*, the exercises were conducted in

plaintiff's classroom at the time suit was filed, and in *Ingebretsen*, the law made "inappropriate

government involvement in religious affairs *inevitable*," which, AG Defendants argue, is not the

case here. (*Id.* at 11–12 (quoting *Ingebretsen*, 88 F.3d at 278).) The disability cases are also

distinguishable. (*Id.* at 12.)

> Moreover, Plaintiffs' standing theory "require[s] guesswork as to
> how independent decisionmakers will exercise their judgment."
> *Clapper*[, 568 U.S. at 413]. No one has committed to donating
> displays (much less specific displays that could be analyzed for
> context) or the funds for such a display, so it is entirely speculative

what sort of display (if any) a hypothetical donor may provide. Plaintiffs' "theory of *future* injury" resulting from independent decisionmakers' judgment "is too speculative to satisfy the well-established requirement that threatened injury must be 'certainly impending.'" *Id*. at 401 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

(*Id*. at 12.) Ultimately, "nothing prevents Plaintiffs from filing a new lawsuit if and when they actually suffer an Article III injury." (*Id.* at 13.)

AG Defendants close with traceability and redressability. (*Id.*) As to the former, AG Defendants point to Plaintiffs' argument that the traceability link will occur as soon as AG Defendants take actions. (*Id.*) These defendants then say that this is a concession that there is no injury traceable at the time they filed suit and that no link exists today. (*Id.*) As to redressability, AG Defendants again point to the injury-in-fact requirement to support their position. (*Id.*)

## 2.  *Applicable Law*

"A proper case or controversy exists only when at least one plaintiff 'establish[es] that [she] ha[s] standing to sue.'" *Murthy v. Missouri*, 144 S. Ct. 1972, 1985–86 (2024) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997); *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019)). A plaintiff "must show that [he or] she has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Id.* at 1986 (quoting *Clapper*, 568 U.S. at 409 (internal quotation marks omitted)). "These requirements help ensure that the plaintiff has 'such a personal stake in the outcome of the controversy as to warrant [his or her] invocation of federal-court jurisdiction.'" *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

"The plaintiff 'bears the burden of establishing standing as of the time [he or she] brought th[e] lawsuit and maintaining it thereafter.'" *Murthy*, 144 S. Ct. at 1986 (first alterations by this Court; second by *Murthy*) (quoting *Carney v. Adams*, 592 U.S. 53, 59 (2020)). The Plaintiff "must

support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *Id.* (quoting *Lujan*, 504 U.S. 555, 561). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 195 (5th Cir. 2012) (quoting *Lujan*, 504 U.S. at 561 (internal quotation marks and alterations omitted)). "At the preliminary injunction stage, then, the plaintiff must make a 'clear showing' that [he or] she is 'likely' to establish each element of standing." *Murthy*, 144 S. Ct. at 1986 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis deleted)). "Where . . . the parties have taken discovery, the plaintiff cannot rest on 'mere allegations,' but must instead point to factual evidence." *Id.* (quoting *Lujan*, 504 U.S. at 561 (internal quotation marks omitted)).

Additionally, "standing is not dispensed in gross." *Id.* at 1988 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021)). "That is, 'plaintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" *Id.* (quoting *TransUnion*, 594 U.S. at 431). Thus, "for every defendant, there must be at least one plaintiff with standing to seek an injunction." *Id.*

### 3. *Analysis*

Having carefully considered the matter, the Court will deny AG Defendants' motion on this issue. In sum, Court finds that Plaintiffs have satisfied the three requirements for standing for each claim as to each defendant.

Preliminarily, the injury-in-fact and redressability requirements can be easily dispensed with. "To establish Article III standing, an alleged 'injury in fact' must be 'concrete, particularized, and actual or imminent.'" *Consumer Data Indus. Ass'n v. Texas ex rel. Paxton*, No. 21-51038,

2023 WL 4744918, at *4 (5th Cir. July 25, 2023) (per curiam) (quoting *Clapper*, 568 U.S. at 409). Again, "[a]n allegation of future injury may establish standing if the threatened injury is 'certainly impending or there is a substantial risk that the harm will occur.'" *Id.* (quoting *Driehaus*, 573 U.S. at 158). As stated above, "[t]he standard for constitutional ripeness mirrors the injury-in-fact requirement for standing." *Schelske*, 649 F. Supp. 3d at 278 (citing *Driehaus*, 573 U.S. at 157–58). Here, the Court finds that the analysis provided above for ripeness applies with equal force to the injury-in-fact requirement, so this part of AG Defendants' motion will be denied.

The motion will also be denied as to the redressability requirement. "[T]o satisfy the third element of redressability[,] . . . the plaintiff must show that the requested relief, if provided, will likely redress the injury-in-fact." *Hancock Cnty.*, 487 F. App'x at 195 (citations omitted). "To satisfy redressability, a plaintiff must show that 'it is *likely*, as opposed to merely *speculative*, that the injury will be redressed by a favorable decision.' " *Reule v. Jackson*, 114 F.4th 360, 368 (5th Cir. 2024) (quoting *Inclusive Cmtys. Project, Inc. v. Dep't of Treas.*, 946 F.3d 649, 655 (5th Cir. 2019) (emphasis in original) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000))). But, Plaintiffs are "not required to show that their requested relief would *certainly* redress their injuries; rather, they are required to show that their requested relief would *likely* (or substantially likely) redress their injuries." *Hancock Cnty.*, 487 F. App'x at 197 (citing *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000); *Lujan*, 504 U.S. at 561). "Moreover, the proper focus of the redressability inquiry is not whether the relief is likely to be granted; rather, the focus is whether, assuming that the requested relief is granted, that relief will likely redress the plaintiffs' injuries." *Id.* (citing *Adar v. Smith*, 639 F.3d 146, 150 (5th Cir. 2011) (en banc); *Rogers v. Brockette*, 588 F.2d 1057, 1063 (5th Cir. 1979) ("There must be a substantial probability that, if the court affords the relief requested, the plaintiffs' legal injuries

will be remedied.") (internal quotation marks and ellipses omitted)). Moreover, "[t]he relief sought needn't completely cure the injury, however; it's enough if the desired relief would lessen it." *Inclusive Cmtys.*, 946 F.3d at 655 (citing *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014)). But, "[r]elief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998)).

Here, it is highly likely that Plaintiffs' injuries to their First Amendment rights will be remedied by an injunction prohibiting the display of the Ten Commandments according to the minimum requirements of the Act and preventing the implementation of rules regarding same. Indeed, the Court agrees with Plaintiffs that AG Defendants' redressability argument boils down to a reiteration of their injury-in-fact position. As a result, *AG Defs. MTD* will be denied on this issue as well.

This leaves only traceability. To establish traceability, a plaintiff must show "that there is 'a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court[.]'" *Reule*, 114 F.4th at 367 (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997)). "Standing exists where the purported injury is connected to allegedly unlawful government conduct." *Id.* (citing *Duarte ex rel. Duarte v. City of Lewisville*, 759 F.3d 514, 520 (5th Cir. 2014)). Further, "[c]ausation . . . isn't precluded where the defendant's actions produce a 'determinative or coercive effect upon the action of someone else,' resulting in injury." *Inclusive Cmtys.*, 946 F.3d at 655 (quoting *Bennett*, 520 U.S. at 169). "Even though Article III requires a causal connection between the plaintiff's injury and the defendant's challenged conduct, it doesn't require a showing of proximate cause or that 'the defendant's actions are the very last step in the chain of causation.'" *Id.* (quoting *Bennett*, 520 U.S. at 169).

Here, the Court finds that Plaintiffs' alleged injuries are fairly traceable to the action of each defendant. First, as to the BESE Members, the Act requires that "[t]he State Board of Elementary and Secondary Education shall adopt rules and regulations in accordance with the Administrative Procedure Act to ensure the proper implementation of this Section." H.B. 71(B)(6)(a). This is consistent with the general powers BESE has over such schools under the Louisiana Constitution and the Louisiana Revised Statutes. *See* La. Const. art. VIII, § 3 ("The State Board of Elementary and Secondary Education . . . shall supervise and control the public elementary and secondary schools and special schools and shall have budgetary responsibility for all funds appropriated or allocated by the state for those schools, all as provided by law."); La. R.S. § 17:6(A)(10) (giving BESE the power, in the exercise of its "supervision and control" and "its budgetary responsibility," to adopt "rules, regulations, and policies necessary or proper for the conduct of the business of the board").[6] All of this is plead in the *Complaint* as well. (*Compl.* ¶ 24, Doc. 1.)

Additionally, the Superintendent of Education, Defendant Cade Brumley, is empowered by law to "execute and implement those educational policies and programs which are under the supervision and control of the board." La. R.S. § 17:21(A). Brumley "shall [also] administer and implement policies and programs adopted by the board and shall serve as the administrative head of the Department of Education." *Id.* § 17:21(B)(1). One of his specific functions and duties is to "[i]mplement the policies and programs of the board and the laws affecting schools under the jurisdiction of the board." La. R.S. § 17:22(3). Thus, as Plaintiffs allege, Brumley "is responsible

---

[6] *See also* La. R.S. § 17:6(A)(10) ("In the exercise of its supervision and control over the public elementary and secondary schools and special schools under its jurisdiction, and in the exercise of its budgetary responsibility for all funds appropriated or allocated by the state for public elementary and secondary schools and special schools placed under its jurisdiction, the board shall have authority to: . . . Adopt, amend, or repeal rules, regulations, and policies necessary or proper for the conduct of the business of the board.").

for the implementation of all state laws that fall under the jurisdiction of the State Board of Elementary and Secondary Education, which includes H.B. 71." (*Compl.* ¶ 21, Doc. 1.) Moreover, under the Act, the Louisiana Department of Education must (1) "identify appropriate resources to comply with the provisions" of the Act "that are free of charge" and, (2) "[o]nce identified, . . . list the free resources on the department's internet website." H.B. 71(B)(6)(b).

Lastly, Defendants do not seriously dispute that each School Board Defendant is, as alleged, "the governing authority" for its respective parish that serves in a "policymaking capacity" in each jurisdiction. *See* La. R.S. § 17:51 ("There shall be a parish school board for each of the parishes . . . ."); La. R.S. § 17:81(A)(1) ("Each local public school board shall serve in a policymaking capacity that is in the best interests of all students enrolled in schools under the board's jurisdiction."); La. R.S. § 17:1373 ("The parish school board is the governing body of all school districts created by it . . . ."). (*See also Compl.* ¶¶ 27–36, Doc. 1 (making these allegations at to the School Board Defendants for the parishes of East Baton Rouge, Livingston, Vernon, and St. Tammany).) Nor do AG Defendants argue that each parent plaintiff has plaintiff minors enrolled as students in public schools in these parishes.[7] Nor can they argue that, under the Act, "[n]o later than January 1, 2025, each public school governing authority shall display the Ten Commandments in each classroom in each school under its jurisdiction." H.B. 71(B)(1).

In the face of these allegations and the AG Defendants' legal duties, AG Defendants' arguments ring hollow. Contrary to their assertions, Plaintiffs do in fact link the alleged constitutional violations to each individual AG Defendant without treating them as a unified

---

[7] *See* Rev. Broadhurst Decl. ¶¶ 1—3, Doc. 20-4; Rev. Williams Decl. ¶¶ 1—3, Doc. 20-5; *Compl.* ¶ 10, Doc. 1; Sims Decl. ¶¶ 1—2, Doc. 20-6; *Compl.* ¶ 11, Doc. 1; Harding Decl. ¶ 1, Doc. 20-7; Owens Decl. ¶ 1, Doc. 20-8; *Compl.* ¶ 12, Doc. 1; Erin Hawley Decl. ¶¶ 1—2, Doc. 20-9; David Hawley Decl. ¶¶ 1—2, Doc. 20-10; *Compl.* ¶ 13, Doc. 1; McCrory Decl. ¶ 1, Doc. 20-11; *Compl.* ¶ 14, Doc. 1; Alkire Decl. ¶ 1, Doc. 20-14; *Compl.* ¶ 16, Doc. 1. The standing issues as to Plaintiffs Rev. Roake and Young, Sernovitz and Pulda, Herlands, and all of their minor children, (*see Compl.* ¶¶ 9, 15, 17, Doc. 1), will be addressed *infra* in the Court's discussion of *OPSB MTD.*

whole. Moreover, AG Defendants' arguments that they have not caused any harm *yet* is merely a repackaging of their ripeness and injury-in-fact arguments.

Rather, the Court agrees with Plaintiffs that *Texas Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020) is controlling. There, state officials contended that there was no traceability or redressability for Texas vote-by-mail statutes because "[a]cceptance or rejection of an application to vote by mail falls to local, rather than state, officials." *Id.* at 399. The Fifth Circuit rejected this argument as to the Secretary of State, pointing to his statutory duty to "'obtain and maintain uniformity in the application, operation, and interpretation of' Texas's election laws, including by 'prepar[ing] detailed and comprehensive written directives and instructions relating to' those vote-by-mail rules." *Id.* (quoting Tex. Elec. Code § 31.003). Moreover, "the Secretary of State ha[d] the power to 'take appropriate action to protect' Texans' voting rights 'from abuse by the authorities administering the state's electoral processes,'" which "include[d] the power to issue orders and, if necessary, seek a temporary restraining order, injunction, or writ of mandamus." *Id.* at 399 & n.19 (first quoting Tex. Elec. Code § 31.005(a); and then citing § 31.005(b)). Thus, the state officials failed to show that the plaintiffs lacked standing as to the Secretary of State. *Id.* However, they had shown that there was no standing as to Governor Abbott because the plaintiffs "pointed to nothing that outline[d] a relevant enforcement role for" him. *Id.* at 400.

*Book People* also supports Plaintiffs' position. There, the law in question ("READER") "require[d] school book vendors who want to do business with Texas public schools to issue sexual-content ratings for all library materials they have ever sold (or will sell), flagging any materials deemed to be 'sexually explicit' or 'sexually relevant' based on the materials' depictions of or references to sex." *Book People*, 91 F.4th at 324. "The State admit[ted] that the Agency Commissioner [in question] [was] empowered to enforce the Act against school districts, which

mean[t] the school districts' purchasing decisions are determined or coerced by the State through READER." *Id.* at 331. The Fifth Circuit concluded that the First Amendment violations were fairly traceable to the Commissioner. *Id.* at 332–33. The Fifth Circuit cited as reasons:

> To enforce READER, Commissioner Morath is required to collect ratings from vendors and post them on the Agency's website. He has discretion to review vendors' ratings, and if he does, he must notify vendors of the updated ratings and their duty to conform their rating to the Agency's. He must then post the names of the vendors that don't accept the Agency's updated ratings on the Agency's website.

*Id.* Further, the Commissioner had "the authority to enforce § 35.003(d), which prohibit[ed] school districts from purchasing books from vendors who are on the noncompliance list, through a special investigation and sanctions." *Id.* at 333. The appellate court concluded,

> Because Commissioner Morath oversees the challenged process and because his actions are among those that would contribute to Plaintiffs' harm, Plaintiffs' injuries can be traced to the Commissioner's enforcement of READER. If Commissioner Morath is enjoined, he cannot prohibit school districts from purchasing books from any vendors, either because the vendors did not initially provide ratings or because they refused to accept the Agency's updated ratings. . . . [E]njoining the Commissioner from enforcing READER would free Plaintiffs from the injurious dilemma that READER creates: either submit unconstitutionally compelled ratings to the Agency at great expense or refuse to comply and lose customers and revenue.

*Id.* (cleaned up).

The same reasoning applies here. Plaintiffs have easily shown, through their extensive allegations and reference to statutory duties, how each AG Defendant will have a role to play in enforcing H.B. 71, which will directly lead to constitutional violations. *See Book People*, 91 F.4th at 332–33; *Tex. Democratic Party*, 961 F.3d at 399–400. They have thus satisfied this element of standing, particularly given the fact that "the injury must be *fairly* traceable to the challenged action of the defendant[s]," *Reule*, 114 F.4th at 367 (emphasis added), but it need not rise to the level of

47

"proximate cause" or be the "very last step in the chain of causation," *Inclusive Cmtys.*, 946 F.3d at 655 (citation omitted).

In sum, Plaintiffs have demonstrated all three requirements for standing. As a result, *AG Defs. MTD* will be denied on this issue.

### D.  Sovereign Immunity for Brumley and the BESE Members

#### 1.  *Parties' Arguments*

AG Defendants next assert that Defendants Brumley and BESE Members are entitled to sovereign immunity. (Doc. 39-1 at 26.) Each of these defendants is sued in his or her official capacity, so the suit is barred by the Eleventh Amendment. (*Id.* at 27.) Plaintiffs must rely on the *Ex parte Young* exception, but AG Defendants claim that Plaintiffs cannot satisfy those requirements. (*Id.*) First, Plaintiffs do not allege an ongoing violation of federal law, for all the reasons AG Defendants gave previously. (*Id.*)

Second, AG Defendants argue that Plaintiffs fail to allege that Brumley and the other BESE Members have the requisite authority to enforce H.B. 71. (*Id.*) That is, *Ex parte Young* requires that the "officer sued has some connection with the enforcement of the challenged act," and, here, there is none. (*Id.* (cleaned up).) AG Defendants maintain that Brumley simply has a general duty to see that the laws are implemented, and this, they say, is insufficient. (*Id.* at 28.) Brumley has no duty to enforce the law through "compulsion or constraint" either, and this is also fatal. (*Id.*) Likewise, the BESE Members are just alleged to have general oversight and governance of all public and elementary schools in Louisiana. (*Id.*) While BESE Members have the authority to adopt rules and regulations, they have not done so yet, and the possibility they might in the future is not enough. (*Id.*) Again, there is no compulsion or constraint, so Plaintiffs' claims are defective. (*Id.* at 28–29.)

Plaintiffs respond that they have satisfied the requirements of *Ex parte Young*. (Doc. 47 at

29.) Plaintiffs assert:

> Here, the Act *specifically names* BESE and states that BESE "*shall*
> adopt rules and regulations in accordance with the Administrative
> Procedure Act to ensure the proper implementation of this Section."
> H.B. 71A(4) (emphasis added); *see* Compl. ¶¶ 24–25. Those rules
> and regulations, in BESE's own words, "have the force and effect
> of law." Furthermore, as the Superintendent of Education,
> Defendant Brumley is statutorily "responsible for administering and
> implementing all policies and programs adopted by [BESE]."
> Compl. ¶ 19 (citing La. R.S. § 17:21 *et seq*.). Accordingly, BESE's
> and Brumley's "connection with the enforcement" of the Act goes
> well beyond a "general duty to see that the laws of the state are
> implemented" and is based on far more than the required "scintilla"
> of legal obligation required under *Ex Parte Young. See* [*Jackson v.
> Wright*, 82 F.4th 362, 367 (5th Cir. 2023)] (internal quotation marks
> omitted).

(Doc. 47 at 29–30.) The defendants here have never suggested they will not carry out their

mandatory obligations under the Act, and they will necessarily take actions that result in constraint

or compulsion when they exercise their duty to adopt and administer "rules and regulations . . . to

ensure the proper implementation" of the law. (*Id* at 30.) "The minor-child Plaintiffs will be forced

to attend school and submit to unwanted and unconstitutionally coercive religious displays, and

the parent-Plaintiffs will be forced to acquiesce to schools' usurpation of their right to direct their

children's religious education." (*Id.*) Plaintiffs rely on *Book People*, where the Fifth Circuit

purportedly found that the Texas Education Agency commissioner had a sufficient connection to

a certain law barring school districts from purchasing books from vendors that failed to place

sexual-content ratings on library materials. (*Id.* at 30–31.)

Finally, Plaintiffs say AG Defendants cannot prevail by arguing that this is not an "*ongoing*

violation of federal law," as *Ex parte Young* allows suits based on imminent harm. (*Id.* at 31.)

"Indeed, *Ex Parte Young* was itself a facial challenge to a state law, made prior to the law's

implementation and based on the plaintiffs' alleged future injuries." (*Id.* (citing *Ex parte Young*, 209 U.S. at 144 ("[T]he question really to be determined under this objection is whether the acts of the legislature and the orders of the railroad commission, *if enforced*, would take property without due process of law." (emphasis added))).) Plaintiffs maintain that *Ex parte Young* does not require that there be an actual violation of law before a Plaintiff files suit; a threat of future enforcement is enough. (*Id.* at 31–32 (quoting *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1338 (11th Cir. 1999)).) Plaintiffs conclude, "Defendants' reasoning would foreclose the relief granted by the Supreme Court to the *Ex Parte Young* plaintiffs and preclude any pre-enforcement challenges to state laws. Because courts have routinely recognized that the exception to sovereign immunity applies in pre-enforcement challenges, Defendants' position must be rejected." (*Id.* at 32 (footnotes omitted).)

In reply, AG Defendants reiterate that, under *Ex parte Young*, Plaintiffs cannot prevail because there is no ongoing violation of federal law. (Doc. 54 at 14.) Moreover, Plaintiffs cannot identify the requisite enforcement authority to invoke *Ex parte Young*'s "compulsion or constraint" requirement. (*Id.*) AG Defendants say:

> The Fifth Circuit has repeatedly held that the "general duty to see that the laws of the state are implemented" is insufficient. Yet Plaintiffs retreat to the same allegations about BESE's and Brumley's generalized responsibilities to promulgate and implement rules concerning H.B. 71 that supposedly "will necessarily result in the constraint or compulsion of Plaintiffs."

(*Id.* (citations omitted).)

According to AG Defendants, the Act just requires the Department of Education to "identify," and "list," "free [compliance] resources on the department's internet website," which is considerably different than *Book People*, where the Texas Legislature had the authority to

compel and constrain the plaintiffs. (*Id.* at 15 (citations omitted). Thus, Brumley is entitled to sovereign immunity. (*Id.*)

As to the BESE Members, "there is no basis to think any rule they promulgate will necessarily compel or constrain anyone." (*Id.*) For example, BESE has a rule about the "In God We Trust" motto that merely tells schools to adopt "polices and procedures that address . . . display of the national motto in each classroom in each school under its jurisdiction in accordance with R.S. [§] 17:262." (*Id.* (citing La. Admin. Code § 28:337(B)(41)).)

### 2. *Applicable Law*

"Generally, 'sovereign immunity bars private suits against nonconsenting states in federal court.'" *Book People*, 91 F.4th at 334 (quoting *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019)). "This bar also applies to suits like this one 'against state officials or agencies that are effectively suits against a state.'" *Id.* (quoting *City of Austin*, 943 F.3d at 997). "Under the *Ex parte Young* exception to sovereign immunity, however, a plaintiff can seek prospective injunctive relief 'against individual state officials acting in violation of federal law.'" *Id.* (quoting *City of Austin*, 943 F.3d at 997 (citation omitted)). "These state officials must 'have some connection with the enforcement of the allegedly unconstitutional law.'" *Id.* (quoting *United States v. Abbott*, 85 F.4th 328, 337 (5th Cir. 2023) (internal quotation marks and citation omitted)).

"To satisfy the required enforcement connection, the state official must have a duty beyond 'the general duty to see that the laws of the state are implemented.'" *Id.* at 335 (quoting *City of Austin*, 943 F.3d at 999–1000 (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014))). "Rather, the official must have 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty.'" *Id.* (quoting *City of Austin*, 943 F.3d at 1000 (quoting *Morris*, 739 F.3d at 746)). "This analysis is '"provision-by-provision": The officer must

enforce "the particular statutory provision that is the subject of the litigation."'" *Id.* (quoting *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022) (quoting *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 179 (5th Cir. 2020))). "We have defined 'enforcement' as 'compulsion or constraint,' so if the official does not compel or constrain anyone to obey the challenged law, enjoining that official could not stop any ongoing constitutional violation." *Id.* (cleaned up).

"Plaintiffs need only show a 'scintilla of enforcement by the relevant state official.'" *Id.* (quoting *Tex. Democratic Party,* 978 F.3d at 179 (internal quotation marks and citation omitted)). The Fifth Circuit has "noted that the Article III standing analysis and *Ex parte Young* analysis significantly overlap, such that a finding of standing tends toward a finding that a plaintiff may sue the official under the *Ex parte Young* exception." *Id.* (cleaned up).

Additionally, "the inquiry into whether a suit is subject to the *Young* exception does not require an analysis of the merits of the claim." *City of Austin*, 943 F.3d at 998 (citing *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 646 (2002)). "Rather, 'a court need only conduct a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."'" *Id.* (quoting *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011) (alteration in original) (quoting *Verizon*, 535 U.S. at 645)). As one leading treatise explained:

> The ongoing violation requirement is satisfied when a state officer's enforcement of an allegedly unconstitutional state law is threatened, even if that threat is not yet imminent. [*Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 329–340 (4th Cir. 2001).] A threat that is sufficient to confer Article III standing . . . satisfies this element of *Ex parte Young*. [*Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015) (state attorney general's threat of enforcement of no-political-speech buffer zone around polling locations satisfied *Ex parte Young*).] An Indian tribe's challenge to the state's application of Title VII against the tribe was cognizable under the *Ex parte Young* doctrine because the threats to tribal sovereignty, self-governance, and sovereign immunity posed by the

investigations themselves were sufficiently imminent even if enforcement was uncertain. [*Aroostook Band of Micmacs v. Ryan*, 404 F.3d 48, 56–66 (1st Cir. 2005).]

17A *Moore's Federal Practice - Civil* § 123.40 (Matthew Bender 3d ed. 2024).

Thus, for instance, in *Summit*, the Eleventh Circuit found:

> *Ex parte Young* requires the allegation of an ongoing and continuous violation of federal law. This requirement does not mean that the enforcement of the allegedly unconstitutional state statute actually must be in progress against the particular plaintiffs initiating suit. Rather, . . . ongoing and continuous requirement merely distinguishes between cases where the relief sought is prospective in nature, *i.e.,* designed to prevent injury that will occur in the future, and cases where relief is retrospective. . . . Thus, where there is a threat of future enforcement that may be remedied by prospective relief, the ongoing and continuous requirement has been satisfied.

180 F.3d at 1338 (citations omitted).

The Fifth Circuit recognized the balance here in *United States v. Abbott*. There, the appellate court found that *Ex parte Young* did not apply to allow an action against the governor because the order at issue "plainly delegate[d] all remaining enforcement discretion to DPS," not the governor, who had "no ongoing authority over DPS." 85 F.4th at 336. In doing so, the Fifth Circuit explained:

> True, plaintiffs need not show that the Governor, like Attorney General Young, is so intent on bringing enforcement proceedings that he has, in violation of a court-issued injunction, obtained and served upon an individual plaintiff a court order mandating compliance with an allegedly unconstitutional state law; and only a stint in federal prison in contempt of court can stop him from instituting enforcement proceedings. *See Ex parte Young*, 209 U.S. at 126–27 [ ]; [*Stewart*, 563 U.S. at 254]. But plaintiffs do need to identify at least some enforcement action that the Governor will initiate for this court to enjoin. *See* [*Whole Woman's Health v. Jackson*, 595 U.S. 30, 43 (2021)]. After all, we can only "enjoin named defendants from taking *specified* unlawful actions." *See id.* at 44 [ ] (emphasis added).

*Id.*

### 3. *Analysis*

AG Defendants make two main arguments on this issue: (1) *Ex parte Young* requires ongoing harm, not the prospect of future harm, and (2) Brumley and the BESE Members lack the requisite connection to the Act. (Doc. 54 at 14–15.) In short, the Court finds neither argument convincing.

The first argument is easily dispensed with. *Moore's* and the other authorities listed above clearly demonstrate that *Ex parte Young* allows for threatened violations of federal law and not merely ongoing ones. *See Moore's*, *supra*, at § 123.40; *Summit*, 180 F.3d at 1338; *cf. Abbott*, 85 F.4th at 336. And for all the reasons given in the injury-in-fact discussion provided above, the Court finds that the threatened constitutional violations here are both imminent and substantial, not hypothetical or speculative. *See Book People*, 91 F.4th at 334–36 (linking standing and sovereign immunity analysis). Thus, AG Defendants cannot prevail on this ground.

They cannot prevail on their second ground either. In the traceability analysis above, this Court detailed the duties that the BESE Members and Superintendent have with respect to H.B. 71. In sum, BESE "shall adopt rules and regulations in accordance with the Administrative Procedure Act to ensure the proper implementation of this Section." H.B. 71(B)(6)(a). Without question, that specific statutory directive goes beyond "the general duty to see that the laws of the state are implemented" and requires the BESE Members to "enforce the particular statutory provision that is the subject of the litigation." *Book People*, 91 F.4th at 335 (cleaned up). By law, the BESE Members must compel the display of the Ten Commandments in classrooms, allegedly in violation of the First Amendment rights of Plaintiffs and their minor children. *See id.* Thus, contrary to AG Defendants' position, an injunction against the BESE Members would stop a threatened violation of federal law. *See id.*

While a closer call, the Court also finds that Brumley is subject to the *Ex parte Young* exception. BESE is responsible for implementing the rules concerning the Ten Commandments displays under the Act, and the Superintendent of Education remains responsible for "[i]mplement[ing] the policies and programs of the board and the laws affecting schools under the jurisdiction of the board." La. R.S. § 17:22(3). Thus, Plaintiffs have identified a specific duty of the Superintendent to enforce the Act and compel students to view the displays. As with the BESE Members, an injunction against the Superintendent would prevent the implementation of any regulations related to H.B. 71, thus preventing constitutional violations.

Additionally, Plaintiffs have identified a willingness on the part of Brumley and BESE Members to enforce the statutes at issue. On July 19, 2024, the AG—who is counsel for Brumley and the BESE members—posted on her Facebook page:



**Office of the Louisiana Attorney General** ✔
July 19 · 🌐

The Ten Commandments law is not "paused," "blocked," or "halted." No posters are going up before November 15 because certain legal actions take time, specifically publishing rules through BESE, in addition to creating the posters. The court was considering schedules for motions, briefing, oral argument and issuing a decision. All the parties agreed nothing would occur until November 15. The compliance date of January 2025 has not changed (and lawyers have no authority to change it). The judge declined expediting the briefing schedule because nothing would have occurred that justified it.

(Slater Decl., Ex. B-2, Doc. 50-5 at 2.) Likewise, the AG announced on July 24:



(Slater Decl., Ex. B-3, Doc. 50-6.) Meanwhile, BESE President Ronnie Morris testified that the Board's statutory duty under the Act was to "adopt rules and regulations that will govern the proper implementation of the law[.]" (Morris Decl. ¶ 6, Doc. 39-3.) Thus, Plaintiffs have "demonstrated willingness" by the state officials "to exercise [their] dut[ies]" under the Act to adopt and implement rules requiring the posting of the Ten Commandments in every public-school classroom, all year long, according to the minimum requirements of H.B. 71. *Book People*, 91 F.4th at 335 (cleaned up).

The Court agrees with Plaintiffs that *Book People* is controlling. There, the Commissioner of the state agency that administered the book-rating system argued that he was entitled to sovereign immunity. *Book People*, 91 F.4th at 334–35. The state argued that the commissioner's "only enforcement authority is over school districts and, if Plaintiffs are compelled to or constrained from doing anything, it is by school districts, not the State." *Id.* at 335. The Fifth Circuit rejected this argument:

> True, the enforcement here "is not the same type of direct enforcement found in *Ex Parte Young*, for instance, where the attorney general threatened civil and criminal prosecution." [*Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 519 (5th Cir. 2017)]. But "such enforcement is not required." [*Id.*; *see also City of Austin*, 943 F.3d at 1001.] Plaintiffs have identified specific actions that this court can enjoin: Commissioner Morath is ultimately responsible for collecting and posting the vendors' lists of ratings, reviewing those ratings to determine whether a corrected rating is required, notifying vendors when their ratings are overridden, and posting lists of noncompliant vendors on TEA's website. And he is responsible for ensuring that school districts comply with READER's prohibition on buying material from vendors that violate this statute. [*See also supra* Part III.A.2; *Air Evac EMS*, 851 F.3d at 513–14 ("[T]here is significant overlap between standing and Ex Parte Young's applicability.").]
>
> We agree with Plaintiffs that these acts "compel[ ] them to submit ratings with which they disagree," and "constrain[ ] them from continuing to do business with school districts if they fail to submit the required ratings or decline to acquiesce in the State's revised ratings." That Commissioner Morath enforces the law through the school districts doesn't change our analysis.

*Id.* at 335–36.

Similar reasoning applies here. The fact that H.B. 71 will be enforced through the School Board Defendants does not gainsay the role of the Superintendent and BESE Members in implementing and enforcing the Act. Like *Book People*, Plaintiffs have identified specific actions that can be enjoined against these defendants—namely, in the case of BESE Members, adopting

rules and regulations to ensure the implementation of the Act, and, in the case of Brumley, implementing those regulations and policies. Thus, *Book People* shows why these defendants are not entitled to relief.

At oral argument, AG Defendants reiterated a contention made in briefing: that Plaintiffs "do not (and cannot) challenge any such BESE rule or regulation [adopted to ensure the implementation of the Act], and that BESE 'might in the future promulgate' a rule is insufficient for *Ex parte Young* purposes." (Doc. 39-1 at 28 (quoting *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021)).)

But the Court finds *Jackson* distinguishable. There, abortion providers brought a pre-enforcement challenge against a newly-enacted law (S.B. 8) prohibiting an abortion where a physician detects a fetal heartbeat. *Jackson*, 595 U.S. at 35. The providers sought to enjoin, among others, the Texas attorney general, but the Supreme Court rejected the argument. *Id.* at 43–44. "While *Ex parte Young* authorizes federal courts to enjoin certain state officials from enforcing state laws, the petitioners d[id] not direct this Court to any enforcement authority the attorney general possesses in connection with [the challenged law] that a federal court might enjoin him from exercising." *Id.* at 43. "Maybe the closest the petitioners [came] [wa]s" identifying a state law that allows the attorney general to bring actions for civil penalties for violations of that subtitle (the Texas Occupational Code) or of a rule or order adopted by the Texas Medical Board. *Id.* at 44. But there was no such rule in place. *Id.* at 44. Writing for the majority, Justice Gorsuch then said,

> To be sure, some of our colleagues suggest that the Board might in the future promulgate such a rule and the attorney general might then undertake an enforcement action. *Post*, at —— (opinion of ROBERTS, C. J.) (citing 22 Tex. Admin. Code § 190.8(7) (West 2021)). But this is a series of hypotheticals and an argument even the petitioners do not attempt to advance for themselves.

> Even if we could overcome this problem, doing so would only expose another. Supposing the attorney general did have some enforcement authority under S. B. 8, the petitioners have identified nothing that might allow a federal court to parlay that authority, or any defendant's enforcement authority, into an injunction against any and all unnamed private persons who might seek to bring their own S. B. 8 suits. The equitable powers of federal courts are limited by historical practice. *Atlas Life Ins. Co. v. W. I. Southern, Inc.*, 306 U.S. 563, 568 [ ] (1939). "A court of equity is as much so limited as a court of law." *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832 (CA2 1930) (L. Hand, J.). Consistent with historical practice, a federal court exercising its equitable authority may enjoin named defendants from taking specified unlawful actions. But under traditional equitable principles, no court may "lawfully enjoin the world at large," *ibid.*, or purport to enjoin challenged "laws themselves," [*Whole Woman's Health v. Jackson*, 141 S. Ct. 2494, 2495 (2021)] (citing *California v. Texas*, [ ] 141 S. Ct. 2104, 2115-2116 [ ] (2021)).

*Id.*

The instant case is a far cry from *Jackson*. Here, Plaintiffs do not seek to enjoin the AG or the "world at large;" they are trying to enjoin specific state officials charged with adopting and implementing rules for the enforcement of an unconstitutional law. Further, in *Jackson*, the attorney general had no real enforcement power, whereas, here, the Court has identified the specific powers of the BESE Members and Superintendent which can be curbed through injunctive relief. Finally, and perhaps most critically, in *Jackson*, the majority concluded that it was a mere "series of hypotheticals" that (1) future rules would be promulgated (2) for which the attorney general could then bring actions for civil penalties. Conversely, here, the AG—who is the lawyer for these defendants—is on record, on multiple occasions, stating that, absent Court intervention, the Ten Commandments will be posted in classrooms according to the Act by January 2025. Thus, *Jackson* does not prevent the application of *Ex parte Young* in this case.

Again, "Plaintiffs need only show a scintilla of enforcement by the relevant state official," and "the Article III standing analysis and *Ex parte Young* analysis significantly overlap, such that

a finding of standing tends toward a finding that a plaintiff may sue the official under the *Ex parte Young* exception." *Book People*, 91 F.4th at 335 (cleaned up). For all the above reasons, and particularly those described in the standing section, the Court finds that Plaintiffs have satisfied the requirements of the *Ex parte Young* exception and therefore *AG Defs. MTD* will be denied on this issue.

## IV.   RULE 12(B)(6) STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Hamilton v. Dall. Cnty.*, 79 F.4th 494, 499 (5th Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

"To be plausible, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010) (quoting *Twombly*, 550 U.S. at 555). "In deciding whether the complaint states a valid claim for relief, we accept all well-pleaded facts as true and construe the complaint in the light most favorable to the plaintiff." *Id.* (citing *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)). The Court does "not accept as true 'conclusory allegations, unwarranted factual inferences, or legal conclusions.'" *Id.* (quoting *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007)). "A claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679).

The Court's "task, then, is 'to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success.'" *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (quoting *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Iqbal*, 556 U.S. at 678)). "[A] claim is plausible if it is supported by 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct].'" *Calhoun v. City of Hous. Police Dep't*, 855 F. App'x 917, 919–20 (5th Cir. 2021) (per curiam) (quoting *Twombly*, 550 U.S. at 556).

Additionally, "[i]n determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the court addresses its inquiry is limited to (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019) (citations omitted). "Although a 'court may also consider documents attached to either a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claims,' . . . the court need not do so." *Brackens v. Stericycle, Inc.*, 829 F. App'x 17, 23 (5th Cir. 2020) (per curiam) (quoting *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014)). *See also Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (using permissive language regarding a court's ability to rely on documents incorporated into the complaint by reference).

## V. AG DEFS. MTD: RULE 12(B)(6) MOTION: THE ESTABLISHMENT CLAUSE CLAIM

AG Defendants next contend that Plaintiffs fail to sufficiently allege a violation of the Establishment Clause. (Doc. 39-1 at 29.) AG Defendants' position boils down to the following:

(1) because Plaintiffs make a facial challenge, they must demonstrate that the Act is unconstitutional in every application, which they cannot do; (2) *Stone* is no longer good law, and, even if it were, *Stone* is distinguishable; and (3) since *Stone* does not control, Plaintiffs must allege an Establishment Clause claim in accord with *Kennedy*, which they fail to do. The Court will take each of these arguments in turn.

## A. Facial Challenge

### 1. Parties' Arguments

#### a. AG Defendants' Original Memorandum (Doc. 39-1)

AG Defendants assert that the first step is to characterize the nature of the claim. (Doc. 39-1 at 30.) Here, AG Defendants argue that Plaintiffs assert a facial attack on the Act, as Plaintiffs do not challenge any particular display implemented by H.B. 71. (*Id.*) Thus, say AG Defendants, Plaintiffs' claim is disfavored, and they must show "that there is no set of circumstances under which the implementation of H.B. 71 is constitutional." (*Id.* (cleaned up).) That is, the law must be "unconstitutional in every application." (*Id.* (cleaned up).) AG Defendants maintain that Plaintiffs fail to satisfy this standard. (*Id.* at 30–31.)

AG Defendants contend that H.B. 71 can be implemented "in countless ways that do not implicate [the] 'hallmarks of religious establishments'" set forth in *Kennedy*. (*Id.* at 31.) According to AG Defendants, Justice Gorsuch has laid out six specific such "hallmarks of religious establishment the framers sought to prohibit when they adopted the First Amendment[,]" most of which "reflect forms of 'coercion' regarding 'religion or its exercise.'" (*Id.* (cleaned up).) "Therefore, Plaintiffs' burden here is to plausibly allege that *every* potential display implementing H.B. 71 will violate the Establishment Clause because it falls within one of these historical hallmarks of religious establishments." (*Id.* at 32 (citations omitted).)

AG Defendants argue that Plaintiffs cannot meet that burden. (*Id.*) To demonstrate this, AG Defendants have provided twelve "Illustrations" of ways that the Ten Commandments could be displayed in classrooms that would pass muster under the First Amendment. (*Id.* at 32–40.) Some purport to "explain the historical role that the Ten Commandments have played in American history, both in education and law":

# AMERICAN PUBLIC EDUCATION: A HISTORICAL PERSPECTIVE

The History of the Ten Commandments in American Public Education: The Ten Commandments were a prominent part of American public education for almost three centuries. Around the year 1688, The New England Primer became the first published American textbook and was the equivalent of a first grade reader. The New England Primer was used in public schools throughout the United States for more than one hundred fifty years to teach Americans to read and contained more than forty questions about the Ten Commandments.

The Ten Commandments were also included in public school textbooks published by educator William McGuffey, a noted university president and professor. A version of his famous McGuffey Readers was written in the early 1800s and became one of the most popular textbooks in the history of American education, selling more than one hundred million copies. Copies of the McGuffey Readers are still available today.

The Ten Commandments also appeared in textbooks published by Noah Webster in which were widely used in American public schools along with America's first comprehensive dictionary that Webster also published. His textbook, The American Spelling Book, contained the Ten Commandments and sold more than one hundred million copies for use by public school children all across the nation and was still available for use in American public schools in the year 1975.

### THE TEN COMMANDMENTS

I AM THE LORD THY GOD.
THOU SHALT HAVE NO OTHER GODS BEFORE ME.
THOU SHALT NOT MAKE TO THYSELF ANY GRAVEN IMAGES.
THOU SHALT NOT TAKE THE NAME OF THE LORD THY GOD IN VAIN.
REMEMBER THE SABBATH DAY, TO KEEP IT HOLY.
HONOR THY FATHER AND THY MOTHER, THAT THY DAYS MAY BE LONG UPON THE LAND WHICH THE LORD THY GOD GIVETH THEE.
THOU SHALT NOT KILL.
THOU SHALT NOT COMMIT ADULTERY.
THOU SHALT NOT STEAL.
THOU SHALT NOT BEAR FALSE WITNESS AGAINST THY NEIGHBOR.
THOU SHALT NOT COVET THY NEIGHBOR'S HOUSE. THOU SHALT NOT COVET THY NEIGHBOR'S WIFE, NOR HIS MANSERVANT, NOR HIS MAIDSERVANT, NOR HIS CATTLE, NOR ANYTHING THAT IS THY NEIGHBOR'S.



**NOAH WEBSTER**



**WILLIAM McGUFFEY**







63



(Illustrations 1 & 2, Doc. 39-1 at 33.) Some might be used by elementary schools:



(Illustration 3, Doc. 39-1 at 34.) Some involve the Ten Commandments and their place at the

Supreme Court and at the House of Representatives:



# THE SUPREME COURT
# &
# THE LAWGIVERS




Various lawgivers, including Blackstone, Moses, and Marshall, look over the Supreme Court as it goes about its daily business. They are represented through the west and east wall friezes.

**WILLIAM BLACKSTONE**



COMMENTARIES
ON THE
L A W S
OF
E N G L A N D.

BOOK THE THIRD.

BY
WILLIAM BLACKSTONE, Esq.
SOLICITOR GENERAL TO HER MAJESTY

OXFORD,
PRINTED AT THE CLARENDON PRESS
M DCC LXVIII.

**MOSES**



THE TEN COMMANDMENTS

I AM THE LORD THY GOD.
THOU SHALT HAVE NO OTHER GODS BEFORE ME.
THOU SHALT NOT MAKE TO THYSELF ANY GRAVEN IMAGES.
THOU SHALT NOT TAKE THE NAME OF THE LORD THY GOD IN VAIN.
REMEMBER THE SABBATH DAY, TO KEEP IT HOLY.
HONOR THY FATHER AND THY MOTHER, THAT THY DAYS MAY BE LONG UPON THE LAND WHICH IF THE LORD THY GOD GIVETH THEE.
THOU SHALT NOT KILL.
THOU SHALT NOT COMMIT ADULTERY.
THOU SHALT NOT STEAL.
THOU SHALT NOT BEAR FALSE WITNESS AGAINST THY NEIGHBOR.
THOU SHALT NOT COVET THY NEIGHBOR'S HOUSE.
THOU SHALT NOT COVET THY NEIGHBOR'S WIFE, NOR HIS MANSERVANT, NOR HIS MAIDSERVANT, NOR HIS CATTLE, NOR ANYTHING THAT IS THY NEIGHBORS.

**JOHN MARSHALL**



"IT IS EMPHATICALLY THE PROVINCE AND DUTY OF THE JUDICIAL DEPARTMENT TO SAY WHAT THE LAW IS."

The History of the Ten Commandments in American Public Education: The Ten Commandments were a prominent part of American public education for almost three centuries. Around the year 1690, The New England Primer became the first published American textbook and was the equivalent of a first grade reader. The New England Primer was used in public schools throughout the United States for more than one hundred fifty years to teach Americans to read and contained more than forty questions about the Ten Commandments. The Ten Commandments were also included in public school textbooks published by educator William Holmes McGuffey, a noted university president and professor. As a series of his famous McGuffey Readers was written in the early 1800s and became one of the most popular textbooks in the history of American education, selling more than one hundred million copies. Copies of the McGuffey Readers are still available today. The Ten Commandments also appeared in textbooks published by Noah Webster in which were widely used in American public schools along with America's first comprehensive dictionary that Webster also published. His textbook, The American Spelling Book, contained the Ten Commandments and sold more than one hundred million copies for use by public school children all across the nation and was still available for use in American public schools in the year 1975.

66






# THE HOUSE OF REPRESENTATIVES
## &
## THE LAWGIVERS

Twenty–three marble relief portraits hanging over the gallery doors of the House Chamber in the U.S. Capitol depict historical figures noted for their work in establishing the principles that underlie American law. Those lawgivers include notable figures like Hammurabi, Solon, and Thomas Jefferson. When the Speaker of the House assumes his position on the dais, he looks directly at yet another lawgiver, Moses. In fact, the Architect of the Capitol emphasizes that the 22 other lawgivers lining the Chamber walls are oriented "so that all look towards the full-face relief of Moses in the center of the north wall."

## MOSES
## THE LAWGIVER

### THE TEN COMMANDMENTS

I AM THE LORD THY GOD.
THOU SHALT HAVE NO OTHER GODS BEFORE ME.
THOU SHALT NOT MAKE TO THYSELF ANY GRAVEN IMAGES.
THOU SHALT NOT TAKE THE NAME OF THE LORD THY GOD IN VAIN.
REMEMBER THE SABBATH DAY, TO KEEP IT HOLY.
HONOR THY FATHER AND THY MOTHER, THAT THY DAYS MAY BE LONG UPON THE LAND WHICH THE LORD THY GOD GIVETH THEE.
THOU SHALT NOT KILL.
THOU SHALT NOT COMMIT ADULTERY.
THOU SHALT NOT STEAL.
THOU SHALT NOT BEAR FALSE WITNESS AGAINST THY NEIGHBOR.
THOU SHALT NOT COVET THY NEIGHBOR'S HOUSE.
THOU SHALT NOT COVET THY NEIGHBOR'S WIFE, NOR HIS MANSERVANT, NOR HIS MAIDSERVANT, NOR HIS CATTLE, NOR ANYTHING THAT IS THY NEIGHBOR'S.

## SPEAKER
## MIKE JOHNSON

The History of the Ten Commandments in American Public Education: The Ten Commandments were a prominent part of American public education for almost three centuries. Around the year 1690, The New England Primer became the first published American textbook and was the equivalent of a first grade reader. The New England Primer was used in public schools throughout the United States for more than one hundred fifty years to teach Americans to read and contained more than forty questions about the Ten Commandments. The Ten Commandments were also included in public school textbooks published by educator William McGuffey, a noted university president and professor. A version of his famous McGuffey Readers was written in the early 1800s and became one of the most popular textbooks in the history of American education, selling more than one hundred million copies. Copies of the McGuffey Readers are still available today. The Ten Commandments also appeared in textbooks published by Noah Webster in which were widely used in American public schools along with America's first comprehensive dictionary that Webster also published. His textbook, The American Spelling Book, contained the Ten Commandments and sold more than one hundred million copies for use by public school children all across the nation and was still available for use in American public schools in the year 1975.

(Illustrations 4 & 5, Doc. 39-1 at 35.)

"Along the same lines, a school, teacher, or civic non-profit looking to donate displays may turn to Charlton Heston's historic portrayal of Moses in *The Ten Commandments* and one of the clever songs from Lin-Manuel Miranda's *Hamilton* for their fine art[s] classroom":



(Illustration 6, Doc. 39-1 at 36.) One might turn to Justice Ruth Bader Ginsberg:



"Since the beginning of time, the world has known four great documents, great because of all the benefits to humanity which came about as a result of their fine ideals and principles."

-RUTH BADER GINSBURG





1689 English Bill of Rights   Ten Commandments   Declaration of Independence   Magna Carta

The History of the Ten Commandments in American Public Education: The Ten Commandments were a prominent part of American public education for almost three centuries. Around the year 1688, The New England Primer became the first published American textbook and was the equivalent of a first grade reader. The New England Primer was used in public schools throughout the United States for more than one hundred fifty years to teach Americans to read and contained more than forty quotations about the Ten Commandments. The Ten Commandments were also included in public school textbooks published by educator William McGuffey, a noted university president and professor. A version of his famous McGuffey Readers was written in the early 1800s and became one of the most popular textbooks in the history of American education, selling more than one hundred million copies. Copies of the McGuffey Readers are still available today. The Ten Commandments also appeared in textbooks published by Noah Webster in which were widely used in American public schools along with America's first comprehensive dictionary that Webster also published. His textbook, The American Spelling Book, contained the Ten Commandments and sold more than one hundred million copies for use by public school children all across the nation and was still available for use in American public schools in the year 1975.

(Illustration 7, Doc. 39-1 at 37.) Alternatively, schools could "highlight civil rights leaders":

69



# MLK & MOSES

**LIKE MOSES HANDED DOWN THE LAW, MARTIN LUTHER KING JR. REQUIRED BIRMINGHAM CAMPAIGN VOLUNTEERS TO SIGN A COMMITMENT CARD CONSISTING OF TEN COMMANDMENTS.**



### TEN COMMANDMENTS FOR NON-VIOLENCE

MEDITATE DAILY ON THE TEACHINGS AND LIFE OF JESUS.
REMEMBER ALWAYS THAT THE NON-VIOLENT MOVEMENT SEEKS JUSTICE AND RECONCILIATION - NOT VICTORY.
WALK AND TALK IN THE MANNER OF LOVE, FOR GOD IS LOVE.
PRAY DAILY TO BE USED BY GOD IN ORDER THAT ALL MEN MIGHT BE FREE.
SACRIFICE PERSONAL WISHES IN ORDER THAT ALL MEN MIGHT BE FREE.
OBSERVE WITH BOTH FRIEND AND FOE THE ORDINARY RULES OF COURTESY.
SEEK TO PERFORM REGULAR SERVICE FOR OTHERS AND FOR THE WORLD.
REFRAIN FROM THE VIOLENCE OF FIST, TONGUE, OR HEART.
STRIVE TO BE IN GOOD SPIRITUAL AND BODILY HEALTH.
FOLLOW THE DIRECTIONS OF THE MOVEMENT AND OF THE CAPTAIN ON A DEMONSTRATION.

### THE TEN COMMANDMENTS

I AM THE LORD THY GOD.
THOU SHALT HAVE NO OTHER GODS BEFORE ME.
THOU SHALT NOT MAKE TO THYSELF ANY GRAVEN IMAGES.
THOU SHALT NOT TAKE THE NAME OF THE LORD THY GOD IN VAIN.
REMEMBER THE SABBATH DAY, TO KEEP IT HOLY.
HONOR THY FATHER AND THY MOTHER, THAT THY DAYS MAY BE LONG UPON THE LAND WHICH THE LORD THY GOD GIVETH THEE.
THOU SHALT NOT KILL.
THOU SHALT NOT COMMIT ADULTERY.
THOU SHALT NOT STEAL.
THOU SHALT NOT BEAR FALSE WITNESS AGAINST THY NEIGHBOR.
THOU SHALT NOT COVET THY NEIGHBOR'S HOUSE.
THOU SHALT NOT COVET THY NEIGHBOR'S WIFE, NOR HIS MANSERVANT, NOR HIS MAIDSERVANT, NOR HIS CATTLE, NOR ANYTHING THAT IS THY NEIGHBOR'S.

The History of the Ten Commandments in American Public Education: The Ten Commandments were a prominent part of American public education for almost three centuries. Around the year 1600, The New England Primer was used in public schools throughout the United States for more than one hundred fifty years to teach Americans to read and contained more than forty questions about the Ten Commandments. The Ten Commandments were also included in public school textbooks published by educator William McGuffey, a noted university president and professor. A version of his famous McGuffey Readers was written in the early 1800s and became one of the most popular textbooks in the history of American education, selling more than one hundred million copies. Copies of the McGuffey Readers are still available today. The Ten Commandments also appeared in textbooks published by Noah Webster in which were widely used in American public schools along with America's first comprehensive dictionary that Webster also published, this textbook, The American Spelling Book, contained the Ten Commandments and sold more than one hundred million copies for use by public school children all across the nation and was still available for use in American public schools in the year 1925.

70

 

# MARSHALL & MOSES

**"OUR CONSTITUTION IS THE ENVY OF THE WORLD, AS IT SHOULD BE FOR IT IS THE GRAND DESIGN OF THE FINEST NATION ON EARTH."**
**- THURGOOD MARSHALL**

**"MR. CIVIL RIGHTS," SOLICITOR GENERAL OF THE UNITED STATES, SUPREME COURT JUSTICE**

**"MR. MARSHALL BRANDISHED THE UNITED STATES CONSTITUTION THE WAY MOSES BRANDISHED THE TEN COMMANDMENTS."**
**- NEW YORK TIMES**

**THE TEN COMMANDMENTS**

I AM THE LORD THY GOD.
THOU SHALT HAVE NO OTHER GODS BEFORE ME.
THOU SHALT NOT MAKE TO THYSELF ANY GRAVEN IMAGES.
THOU SHALT NOT TAKE THE NAME OF THE LORD THY GOD IN VAIN.
REMEMBER THE SABBATH DAY, TO KEEP IT HOLY.
HONOR THY FATHER AND THY MOTHER, THAT THY DAYS MAY BE LONG UPON THE LAND WHICH THE LORD THY GOD GIVETH THEE.
THOU SHALT NOT KILL.
THOU SHALT NOT COMMIT ADULTERY.
THOU SHALT NOT STEAL.
THOU SHALT NOT BEAR FALSE WITNESS AGAINST THY NEIGHBOR.
THOU SHALT NOT COVET THY NEIGHBOR'S HOUSE. THOU SHALT NOT COVET THY NEIGHBOR'S WIFE, NOR HIS MANSERVANT, NOR HIS MAIDSERVANT, NOR HIS CATTLE, NOR ANYTHING THAT IS THY NEIGHBOR'S.

The History of the Ten Commandments in American Public Education. The Ten Commandments were a prominent part of American public education for almost three centuries. Around the year 1688, The New England Primer became the first published American textbook and was the equivalent of a first grade reader. The New England Primer was used in public schools throughout the United States for more than one hundred fifty years to teach Americans to read and contained more than forty questions about the Ten Commandments. The Ten Commandments were also included in public school textbooks published by educator William McGuffey, a noted university president and professor. A version of his famous McGuffey Readers was written in the early 1800s and became one of the most popular textbooks in the history of American education, selling more than one hundred million copies. Copies of the McGuffey Readers are still available today. The Ten Commandments also appeared in textbooks published by Noah Webster in which were widely used in American public schools along with America's first comprehensive dictionary that Webster also published - his textbook. The American Spelling Book, contained the Ten Commandments and sold more than one hundred million copies for use by public school children all across the nation and was still available for use in American public schools in the year 1975.

(Illustrations 8 & 9, Doc. 39-1 at 37.) Other illustrations may be "humor-inspired" for computer class or inspirational for speech classes:





(Illustrations 10 & 11, Doc. 39-1 at 38.) AG Defendants continue, "[a] school, teacher, or civil non-profit looking to donate displays also could explain the impact of non-profit organizations on legislative and litigation processes in a government class":



(Illustration 12, Doc. 39-1 at 39.) "Or, using many of the same headlines, a school, teacher, or civic non-profit may similarly highlight the impact of litigation on our governance by alluding to pop culture by invoking Internet memes":



(Illustration 13, Doc. 39-1 at 39.) Finally, AG Defendants say these Illustrations can discuss how the Supreme Court has dealt with the Ten Commandments:

# IMPORTANT SUPREME COURT CASES
## *VAN ORDEN V. PERRY*

THIS CASE ASKED WHETHER THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT ALLOWS THE DISPLAY OF A MONUMENT INSCRIBED WITH THE TEN COMMANDMENTS ON THE TEXAS STATE CAPITOL GROUNDS.

THE SUPREME COURT FOUND NO ESTABLISHMENT CLAUSE VIOLATION, WITH THE PLURALITY OPINION EMPHASIZING THAT "ACKNOWLEDGEMENTS OF THE ROLE PLAYED BY THE TEN COMMANDMENTS IN OUR NATION'S HISTORY ARE COMMON THROUGHOUT AMERICA." THE COURT NOTED THAT MOSES AND THE COMMANDMENTS APPEAR IN THE SUPREME COURT COURTROOM ITSELF, THE GATES LINING THE COURTROOM, AND THE DOORS LEADING INTO THE COURTROOM.



THE MAIN DISSENT JOINED BY JUSTICE GINSBURG AND TWO OTHER JUSTICES DISAGREED WITH THE COURT'S JUDGEMENT, BUT ACKNOWLEDGED THAT "A DISPLAY OF THE COMMANDMENTS ACCOMPANIED BY AN EXPOSITION OF HOW THEY HAVE INFLUENCED MODERN LAW WOULD MOST LIKELY BE CONSTITUTIONALLY UNOBJECTIONABLE." THE DISSENT ALSO RECOGNIZED THAT THE COMMANDMENTS COULD "BE INTEGRATED CONSTITUTIONALLY INTO A COURSE OF STUDY IN PUBLIC SCHOOLS."

NOTE: THIS IS THE VERSION OF THE TEN COMMANDMENTS UPHELD IN VAN ORDEN, BUT DIFFERENT FAITH TRADITIONS ADOPT DIFFERENT VERSIONS OF THE "TEXT OF THE TEN COMMANDMENTS." FOR EXAMPLE, THE CATHOLIC VERSION GENERALLY DOES NOT REFERENCE "GRAVEN IMAGES," AND THE TORAH USES THE PHRASE "I AM THE LORD YOUR GOD WHO BROUGHT YOU OUT OF THE LAND OF EGYPT" OUT OF THE HOUSE OF BONDAGE."

**the Ten Commandments**

I AM the LORD thy God.

Thou shalt have no other gods before me.
Thou shalt not make to thyself any graven images.
Thou shalt not take the name of the Lord thy God in vain.
Remember the Sabbath day, to keep it holy.
Honor thy father and thy mother that thy days may be long upon the land which the Lord thy God giveth thee.
Thou shalt not kill.
Thou shalt not commit adultery.
Thou shalt not steal.
Thou shalt not bear false witness against thy neighbor.
Thou shalt not covet thy neighbor's house. Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's.

PRESENTED TO THE PEOPLE OF OKLAHOMA BY DR. MIKE AND CONNIE RITZE AND CHILDREN AMITY, HEIDI AND JAMEY

The History of the Ten Commandments in American Public Education. The Ten Commandments were a prominent part of American public education for almost three centuries. Around the year 1690, The New England Primer became the first published American textbook and was the equivalent of a first grade reader. The New England Primer was used in public schools throughout the United States for more than one hundred fifty years to teach Americans to read and contained more than forty questions about the Ten Commandments. The Ten Commandments was also included in public school textbooks published by educator William McGuffey, a noted university president and professor. A version of the famous McGuffey Readers was written in the early 1830s and became one of the most popular textbooks in the history of American education, selling more than one hundred million copies. Copies of the McGuffey Readers are still available today. The Ten Commandments also appeared in textbooks published by Noah Webster in which were widely used in American public schools along with America's first comprehensive dictionary that Webster also published. His textbook, The American Spelling Book, contained the Ten Commandments and sold more than one hundred million copies for use by public school children all across the nation and was still available for use in American public schools in the year 1975.



(Illustrations 14 & 15, Doc. 39-1 at 40.)

AG Defendants assert:

> As these few examples demonstrate, there are quite literally innumerable ways to comply with H.B. 71. From different topics, to different content, to different fonts, to different colors, to different sizes, to different orientations—the possibilities are endless. *See* Ex. A ¶ 13 (in addition to considering these illustrations, the Department of Education "will likely also consider other illustratives with different themes, content, formats, layouts, graphics, typography, color schemes, sizes, styles, interactive elements, spacing, borders, and headings"). And that sets aside a whole host of other questions about where schools and teachers actually place the posters, what size the posters are, whether each classroom may have a different poster, and so on.

(Doc. 39-1 at 40–41.) AG Defendants maintain that Plaintiffs must demonstrate that each of these

displays reflects one of Justice Gorsuch's six "historical hallmarks of an established religion." (*Id.*

at 41 (quoting *Kennedy*, 597 U.S. at 537 n.5 (citing *Shurtleff v. City of Boston*, 596 U.S. 243, 286 (2022) (Gorsuch, J., concurring); *Croft*, 624 F.3d at 164).) AG Defendants then go on to explain how a few particular illustrations they have provided do not violate Justice Gorsuch's hallmarks. (*Id.* at 41–43.)

"At bottom, Plaintiffs' Establishment Clause claim must be dismissed because Plaintiffs have not met—and cannot meet—the high standard for facial claims given the endless possibilities of H.B. 71 displays that may be implemented." (Doc. 39-1 at 44.)

b.  Plaintiffs' Opposition (Doc. 47)

In response, Plaintiffs first argue that the standard AG Defendants advance—that Plaintiffs must prove "no set of circumstances" under which the Act is constitutional—has never been used by the Supreme Court in an Establishment Clause and Free Exercise Clause case and only once been used by the Fifth Circuit, in *Croft*. (Doc. 47 at 33.) But, even if this standard did apply, Plaintiffs would satisfy it. (*Id.*)

Plaintiffs maintain that AG Defendants' approach ignores the terms of the statute, which is the proper focus for facial challenges. (*Id.* at 33–34.) Here, looking at the language of the statute itself, the Act is unconstitutional, and "displays of the Ten Commandments posted pursuant to, and in compliance with, that scheme will infringe Plaintiffs' First Amendment rights—no matter the content of any individual display." (*Id.* at 34.)

> Whatever else may be included in any individual display, lawmakers have written the statute to ensure that, across the board, the Ten Commandments are the displays' defining feature and that students' attention will be drawn to them. Subjecting the minor-child Plaintiffs to permanent displays of a state-mandated, denominational version of the Ten Commandments in every classroom for the duration of their public-school education is, in and of itself, patently unconstitutional under *Stone* and any applicable First Amendment test.

(*Id.*) Thus, the Act is unconstitutional in every application. (*Id.*) AG Defendants' Illustrations do not comply with Act, nor would they be constitutional on an individual basis. (*Id.*) But, ultimately, the Illustrations are irrelevant because Plaintiffs are claiming that "no single implementation of the Act can be separated from its unconstitutional statutory scheme as a whole." (*Id.* at 34–35.)

c.   AG Defendants' Reply (Doc. 54)

AG Defendants reply first:

> None of Plaintiffs' counterarguments refute the obvious: Plaintiffs do not and cannot plausibly allege that every potential H.B. 71 display violates the Establishment Clause or their Free Exercise rights. . . . [A]s Defendants' illustrations demonstrate, there are endless ways to formulate H.B. 71-compliant displays that satisfy the Establishment Clause; indeed, all of them pass muster under the now-governing historical hallmarks test."

(Doc. 54 at 15.) AG Defendants maintain that *Croft* is binding precedent which "makes good sense" because it governs "most First Amendment facial challenges." (*Id.* at 16.) The Court must follow *Croft* and "explore the laws' full range of applications . . . to decide, in this case, if there is no set of circumstances under which the implementation of H.B. 71 is constitutional." (*Id.* (cleaned up).) Plaintiffs cannot prevail, AG Defendants say, even under *Lemon*-era cases because context matters and because the Court must evaluate the Government's displays in their "full setting." (*Id.* (citations omitted).) AG Defendants reiterate that Plaintiffs cannot demonstrate that every one of their illustrations violate the Establishment Clause. (*Id*. at 16–17.)

## 2.   *Law and Analysis*

Plaintiffs do not seriously dispute that they make a facial attack, so the real question is: how does this affect their challenge to H.B. 71?

The issue is answered in part by *Croft.* There, plaintiffs were parents of minors who attended public schools. *Croft*, 624 F.3d at 161. They "challenge[d] the Texas pledge of allegiance,

as amended to include the phrase 'one state under God,' and a provision of the Texas Education Code requiring students to recite the pledge daily." *Id*.

On appeal, plaintiffs argued that there was no distinction between facial and as-applied challenges in Establishment Clause cases, so the government's actions were to be reviewed solely under the various tests used by the Supreme Court to identify Establishment Clause violations. *Id.* at 163. That is, plaintiffs maintained that they need not meet the "heightened burden" of "showing [ ] unconstitutionality under all circumstances . . . ." *Id.*

The Fifth Circuit rejected this argument. *Id.* at 163–64. The appellate court first explained that "[b]oth we and the Supreme Court have recognized the difference between facial and as-applied Establishment Clause challenges." *Id.* at 163 (citations omitted). "In fact, [the Fifth Circuit has] . . . point[ed] out that 'speculative possibilities may be fertile ground for as-applied challenges if they occur,' but were inappropriate on facial review." *Id.* (quoting *Croft v. Governor of Tex.*, 562 F.3d 735, 750 (5th Cir. 2009)).

"The Supreme Court has [ ] explained that where the 'plaintiffs' claim and the relief that would follow . . . reach beyond the particular circumstances of th[o]se plaintiffs,' the plaintiffs must 'satisfy our standards for a facial challenge to the extent of that reach.'" *Id.* at 164 (quoting *John Doe No. 1 v. Reed,* 561 U.S. 186, 194, 130 S. Ct. 2811, 2817 (2010) (citing *United States v. Stevens,* 559 U.S. 460, 472–73, 130 S. Ct. 1577, 1587 (2010)). The Fifth Circuit concluded that the challenges were "clearly [ ] facial attack[s]" because "[n]one [were] limited to the 'particular circumstances of [the] plaintiffs'" and because the relief sought was "that the pledge be invalidated in its entirety, not merely that it not be applied to them or their children." *Id*.

Consequently, the circuit court concluded: "To successfully mount a facial challenge, the plaintiffs must show that there is no set of circumstances under which either the language of the

pledge or the requirement that children recite the pledge in classrooms is constitutional. If the plaintiffs successfully show either provision to be unconstitutional in every application, then that provision will be struck down as invalid." *Id.*

Similar reasoning applies here. Again, Plaintiffs do not seriously dispute that they mount a facial challenge, so, under *Croft*, they must prove the Act is "unconstitutional in every application" and that there is "no set of circumstances under which" the Ten Commandments could be posted in compliance with the Act that would be constitutional. *See id.* Plaintiffs lament that *Croft* is the only Establishment Clause case in the Fifth Circuit to reach this result, but *Croft* remains binding precedent that this Court must follow.

AG Defendants treat this as a kill shot. They maintain that they can comply with the Establishment Clause by surrounding the Ten Commandments with nonreligious matter no matter how outlandish that material might be. That is to say, AG Defendants believe they can constantly change their iterations, leaving potential challengers like Menelaus trying to seize and hold the ever shape-shifting Proteus until Proteus eventually tires and divulges the hero's way off the island. *See* HOMER, THE ODYSSEY 135.391–142.644 (Robert Fagles trans., Penguin Books, 1997). Or, phrased another way, AG Defendants would have aggrieved parents and children play an endless game of whack-a-mole, constantly having to bring new lawsuits to invalidate any conceivable poster that happens to have the Decalogue on it.

AG Defendants overreach. Critically, they ignore the fact—both in briefing and in many of their Illustrations—that the Act contains certain "minimum requirements" that the Ten Commandments "shall be displayed on a poster or framed document that is at least eleven inches by fourteen inches," with the Decalogue as "the *central focus* of the poster or framed document" and "printed in a large, easily readable font." H.B. 71(B)(1). (emphasis added). Further, these

displays must be posted in every "classroom in each school," all year round, regardless of subject matter, and regardless of the age of the student. *Id.* Thus, the question is not whether the Biblical laws can ever be put on a poster; the issue is whether, as a matter of law, there is any constitutional way to display the Ten Commandments *in accordance with the minimum requirements of the Act.*

In short, the Court finds that there is not. First, *Stone* remains good law and is directly on point, and this Court is bound to follow it. Second, even putting *Stone* aside, for purposes of this Rule 12(b)(6) motion, Plaintiffs have adequately alleged that H.B. 71 fails to comply with the Establishment Clause analysis laid out in *Kennedy* and Fifth Circuit precedent.

### B. *Stone v. Graham*

#### 1. *Parties' Arguments*

##### a. AG Defendants' Original Memorandum (Doc. 39-1)

AG Defendants declare, "*Stone* is dead and inapposite." (*Id.* at 47.) Specifically, they contend: (1) that *Stone* is no longer good law, and (2) that *Stone* has been narrowed by its own language and subsequent Supreme Court cases, all of which makes it distinguishable from "the myriad ways H.B. 71 may be implemented." (*Id.*)

As to the former, AG Defendants contend that *Stone* applied the test from *Lemon v. Kurtzman*, 403 U.S. 602 (1971), but the Supreme Court rejected the *Lemon* test in *Kennedy*. (*Id.* at 47–48.) That means: (1) *Stone* cannot be extended and is limited to the facts of its case, and (2) under the Supreme Court's own precedent, the Court should treat *Stone* as bad law. (*Id.* at 48 (citations omitted).)

As to the latter, AG Defendants maintain that *Stone* is distinguishable. (*Id.*) The display in *Stone* was "plainly religious," and *Stone* emphasized that "[t]his is not a case in which the Ten Commandments are integrated into the school curriculum, where the Bible may constitutionally

be used in an appropriate study of history, civilization, ethics, comparative religion, or the like." (*Id.* at 48–49 (quoting *Stone*, 449 U.S. at 41–42).) That is, there was "no educational function" in *Stone*. (*Id.* at 49 (quoting *Stone*, 449 U.S. at 42).) The Supreme Court has subsequently narrowed *Stone*, emphasizing that *Stone* did not decide the constitutionality of every possible display of the Ten Commandments and that *Stone* only applied to "plainly religious" displays with that "pre-eminent purpose." (*Id.* (cleaned up).) For similar reasons, each Illustration provided by the AG Defendants lacks such a religious purpose, and their context reflects an educational one. (*Id.* at 49–50.) Thus, AG Defendants argue that, even if *Stone* is good law, the Court should uphold H.B. 71. (*Id.*)

### b. Plaintiffs' Opposition (Doc. 47)

Plaintiffs respond that *Stone* remains binding and is dispositive. (Doc. 47 at 35.) "[O]nly the Supreme Court may overrule its precedents even where subsequent decisions or factual developments may appear to have significantly undermined the rationale for the earlier holding." (*Id.* (quoting *Nat'l Coal. for Men v. Selective Serv. Sys.*, 969 F.3d 546, 549–50 (5th Cir. 2020) (alteration and internal quotation marks omitted)).) Lower courts may not ignore Supreme Court precedent unless the High Court itself so instructs. (*Id.*) Even if the continued validity of a Supreme Court decision is called into doubt, that case controls, and lower courts should leave it to the Supreme Court to overrule its own decisions. (*Id.* at 35–36.) AG Defendants point to *Agostini v. Felton*, 521 U.S. 203 (1997), but that case (1) was unique because the Supreme Court was evaluating the case in the context of a Rule 60(b)(5) motion, and (2) in any event, reaffirmed the general rule that lower courts should not decide for themselves whether a Supreme Court decision remains good law. (Doc. 47 at 36–37.) Likewise, the federal Second Circuit has also rejected the position that all cases based on *Lemon* are no longer binding. (*Id.* at 37 (citing *Jusino v. Fed'n of*

*Catholic Teachers, Inc.*, 54 F.4th 95, 102 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 1056 (2023)).) Like the Second Circuit reasoned, *Kennedy* did not overrule *Stone* or even mention it, and, in any event, *Stone* also relied on *Schempp*, which, as *Van Orden* recognized, reflects the special treatment received by elementary and secondary schools. (*Id.* (citations omitted).)

Additionally, AG Defendants' efforts to distinguish *Stone* are not persuasive. (*Id.*) Both cases involved a facial challenge to a law requiring the permanent display of the Ten Commandments in all classrooms. (*Id.* at 37–38.) Moreover, (1) neither statute required the commandments be displayed alone; (2) both statutes had minimum requirements for size; and (3) each statute was accompanied by a context statement. (*Id.*) Plaintiffs conclude:

> Finally, as in *Stone*, the state's purpose here is plainly religious, with the principal author and sponsor of the Act explaining: "It is so important that our children learn what God says is right and what He says is wrong, and to allow [the Ten Commandments] to be displayed in our classrooms as a visual aid, I believe, especially in this day and time is so important." Compl. ¶ 79. The statutory scheme further belies [AG] Defendants' claim that the displays mandated by the Act have a "non-religious objective." Def. Br. at 41. The Act does not tie the displays to any existing, possibly relevant curriculum, such as world history or world religions, or to any curriculum at all. Pl. Br. at 23–24. It mandates the display of only one (purportedly) historical document, regardless of instructional context: the Ten Commandments. Even the Declaration of Independence, one of the most consequential documents in U.S history, does not get this special treatment. And the other core Founding documents, the Constitution and Bill of Rights, are nowhere to be found in the Act. That's because lawmakers had one aim: to impose the Ten Commandments on students in an effort to induce them to believe in and live by the state's preferred religious doctrine. See Pl. Br. at 6 (Governor Landry defending the Act by questioning, "[s]ince when did the Ten Commandments become a bad way to live your life?!").

(*Id.* at 38.) In sum, *Stone* is on point, and "[i]ndeed, the Act is more constitutionally egregious than the Kentucky statute because it adopts and prescribes a specific, denominational version of the Ten Commandments." (*Id.* at 39 (citations omitted).)

c.  AG Defendants' Reply (Doc. 54)

AG Defendants begin their reply by emphasizing that Plaintiffs concede that the *Lemon* test has been abandoned and that *Lemon* was the primary basis for *Stone*'s holding. (Doc. 54 at 17.) Further, the Supreme Court's rejection of *Stone*'s underlying rationale should limit *Stone* to the facts of that case, not just because of *Kennedy* but also because of other cases from other circuits which predate *Kennedy*. (*Id.*)

AG Defendants argue *Stone* is distinguishable in two ways. "*First*, *Stone*, unlike this case, did not involve pre-enforcement adjudication of displays of unknown content[,]" and there were "'15,000 framed copies' . . . 'in all classrooms in 55 counties,'" (*id.* (quoting *Stone v. Graham*, 599 S.W.2d 157, 159 (Ky. 1980) (Lukowsky, J., for reversal)).) "The text of the Commandments 'stood alone,' with 'no context that might have indicated an object beyond the religious character of the text.'" (*Id.* (quoting *McCreary*, 545 U.S. at 867–68).) Conversely, here, no decision has been made on what the displays will end up looking like, and the illustrations show there can be numerous pedagogical purposes. (*Id.* at 17–18.) AG Defendants say that "context matters, . . . [a]nd now that *Kennedy* has confirmed *Lemon*'s abrogation, *Stone* certainly does not apply to the kind of elaborate, creative, and diverse displays that H.B. 71 permits and [AG] Defendants might consider here." (*Id.* at 18.)

Second, in *Stone*, Kentucky failed to provide a "secular legislative purpose" for their required displays, whereas, here, Louisiana has done so. (*Id.*) AG Defendants maintain that each display contains the three-paragraph long context statement explaining the historical and educational purpose of the law, and the Act itself cites historical sources to support those purposes. (*Id.* at 19 (citations omitted).) In *Stone*, Kentucky failed to provide those bases, and Courts should

defer to the "secular purpose" advanced by the Legislature, even if some legislators did have a religious motive. (*Id.*) Thus, *Stone* is distinguishable and should not be extended. (*Id.*)

### 2. *Law and Analysis*

AG Defendants assert that "*Stone* is dead and inapposite." (Doc. 39-1 at 47.) The Court will begin with an analysis of *Stone* before returning to AG Defendants' arguments.

In *Stone*, the Supreme Court found that "[a] Kentucky statute [which] require[d] the posting of a copy of the Ten Commandments, purchased with private contributions, on the wall of each public classroom in the State" violated the Establishment Clause. 449 U.S. at 39. That statute provided in full:

> "(1) It shall be the duty of the superintendent of public instruction, provided sufficient funds are available as provided in subsection (3) of this Section, to ensure that a durable, permanent copy of the Ten Commandments shall be displayed on a wall in each public elementary and secondary school classroom in the Commonwealth. The copy shall be sixteen (16) inches wide by twenty (20) inches high.
>
> "(2) In small print below the last commandment shall appear a notation concerning the purpose of the display, as follows: 'The secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States.'
>
> "(3) The copies required by this Act shall be purchased with funds made available through voluntary contributions made to the state treasurer for the purposes of this Act."

*Id.* at 40 n.1 (quoting 1978 Ky. Acts, ch. 436, § 1 (effective June 17, 1978), Ky. Rev. Stat. § 158.178 (1980)).

The High Court looked to the three-part test articulated by *Lemon*: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion . . .; finally[,] the statute must not foster 'an excessive government

entanglement with religion.'" *Id.* at 40 (quoting *Lemon*, 403 U.S. at 612–613 (citations omitted)). The Supreme Court found that the statute "had no secular legislative purpose[ ] and [was] therefore unconstitutional." *Id.* at 41.

Kentucky argued that the statute did have such a purpose. The state pointed to the fact "that the legislature required the following notation in small print at the bottom of each display of the Ten Commandments: 'The secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States.'" *Id.*

The Supreme Court rejected this argument, explaining that, "[u]nder this Court's rulings, however, such an 'avowed' secular purpose is not sufficient to avoid conflict with the First Amendment." *Id. Stone* relied upon *Schempp*, where the High Court found that "the daily reading of Bible verses and the Lord's Prayer in the public schools" was unconstitutional, even though the school district argued "such secular purposes as 'the promotion of moral values, the contradiction to the materialistic trends of our times, the perpetuation of our institutions and the teaching of literature.'" *Id.* (quoting *Schempp*, 374 U.S. at 223).

After declaring that "[t]he pre–eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature[,]"[8] the Court then stated:

---

[8] The Supreme Court explained:

> The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact. The Commandments do not confine themselves to arguably secular matters, such as honoring one's parents, killing or murder, adultery, stealing, false witness, and covetousness. See Exodus 20: 12–17; Deuteronomy 5: 16–21. Rather, the first part of the Commandments concerns the religious duties of believers: worshipping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day. See Exodus 20: 1–11; Deuteronomy 5: 6–15.

*Stone*, 449 U.S. at 41–42.

> This is not a case in which the Ten Commandments are integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like. *Abington School District v. Schempp,* [374 U.S.] at 225 [ ]. Posting of religious texts on the wall serves no such educational function. If the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments. However desirable this might be as a matter of private devotion, it is not a permissible state objective under the Establishment Clause.
>
> It does not matter that the posted copies of the Ten Commandments are financed by voluntary private contributions, for the mere posting of the copies under the auspices of the legislature provides the "official support of the State . . . Government" that the Establishment Clause prohibits. 374 U.S., at 222 [ ]; see *Engel v. Vitale*, 370 U.S. 421, 431 [ ] (1962). . . . Moreover, while the actual copies of the Ten Commandments were purchased through private contributions, the state nevertheless expended public money in administering the statute. . . . Nor is it significant that the Bible verses involved in this case are merely posted on the wall, rather than read aloud as in *Schempp* and *Engel*, for "it is no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment." *Abington School District v. Schempp, supra*, at 225, [ ]. We conclude that § 158.178 (1980) violates the first part of the *Lemon v. Kurtzman*, test, and thus the Establishment Clause of the Constitution.

*Stone*, 449 U.S. at 42–43, 42 n.4. The Court also distinguished cases highlighted by the dissent as "involving state assistance to private schools" before concluding, "[t]he posting of the Ten Commandments on classroom walls has no such secular purpose." *Id.* at 43 n.5.

With that background, the Court returns to AG Defendants' argument that "*Stone* is dead and inapposite." (Doc. 39-1 at 47.) As to the former, AG Defendants do not seriously argue that *Stone* has been overruled; rather, they maintain in briefing that the Supreme Court has rejected *Lemon*, which was "the doctrinal foundation for *Stone*," and that, consequently, "this Court should treat *Stone* as bad law altogether." (*Id.* at 47–48.)

AG Defendants are only half right. Specifically, they are correct that the foundation of *Stone*—the *Lemon* test—has been abandoned. *See Kennedy*, 597 U.S. at 534–35;[9] *Groff v. DeJoy*, 600 U.S. 447, 460 (2023) (describing *Lemon* as "now abrogated" by *Kennedy*). The Court will discuss what replaced *Lemon infra*, but for present purposes, it is essential that *Kennedy* did not overrule *Stone*, or even mention it.

Why is that important? Because "[i]t is [the Supreme] Court's prerogative alone to overrule one of its precedents." *Bosse v. Oklahoma*, 580 U.S. 1, 3 (2016) (per curiam) (quoting *United States v. Hatter*, 532 U.S. 557, 567 (2001)). The High Court's "decisions remain binding precedent until [it] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." *Id.* (quoting *Hohn v. United States*, 524 U.S. 236, 252–53 (1998)).

---

[9] In *Kennedy*, Justice Gorsuch, writing for the majority, explained the Court's evolution on the *Lemon* test and why the Supreme Court "abandoned" it:

> [T]he "shortcomings" associated with this "ambitiou[s]," abstract, and ahistorical approach to the Establishment Clause became so "apparent" that this Court long ago abandoned *Lemon* and its endorsement test offshoot. [*Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 139 S. Ct. 2067, 2079–81 (2019)] (plurality opinion); see also *Town of Greece v. Galloway*, 572 U.S. 565, 575–577 [ ] (2014). The Court has explained that these tests "invited chaos" in lower courts, led to "differing results" in materially identical cases, and created a "minefield" for legislators. [*Cap. Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 768–69, 768 n.3 (1995)] (plurality opinion) (emphasis deleted). This Court has since made plain, too, that the Establishment Clause does not include anything like a "modified heckler's veto, in which . . . religious activity can be proscribed" based on " 'perceptions' " or " 'discomfort.' " *Good News Club v. Milford Central School*, 533 U.S. 98, 119 [ ] (2001) (emphasis deleted). An Establishment Clause violation does not automatically follow whenever a public school or other government entity "fail[s] to censor" private religious speech. *Board of Ed. of Westside Community Schools (Dist. 66) v. Mergens*, 496 U.S. 226, 250 [ ] (1990) (plurality opinion). Nor does the Clause "compel the government to purge from the public sphere" anything an objective observer could reasonably infer endorses or "partakes of the religious." [*Van Orden*, 545 U.S. at 699] (BREYER, J., concurring in judgment). In fact, just this Term the Court unanimously rejected a city's attempt to censor religious speech based on *Lemon* and the endorsement test. See *Shurtleff*, 596 U. S., at —— – ——, 142 S. Ct., at 1587–1588; *id.*, at —— ——, 142 S. Ct., at 1595 (ALITO, J., concurring in judgment); *id.*, at ——, —— – ——, 142 S. Ct., at 1587, 1588–1589 (opinion of GORSUCH, J.).

*Kennedy*, 597 U.S. at 534–35.

"If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [lower courts] should follow the case which directly controls, leaving to th[e] [Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). "This is true even if the lower court thinks the precedent is in tension with some other line of decisions." *Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 356 (5th Cir. 2024) (quoting *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023)).

Thus, even if the "doctrinal foundation of *Stone*" has been undermined, as AG Defendants argue, it remains binding precedent. *See Jusino*, 54 F.4th at 102 (finding that "[*NLRB v. Catholic Bishop of Chi.*, 440 U.S. 490, 496 (1979)] . . . remain[ed] good law notwithstanding its reliance . . . on *Lemon* [ ], which was overruled by the Supreme Court" because *Kennedy* "did *not* . . . overrule—or even mention—*Catholic Bishop*" and so, "unless and until the Supreme Court sees fit to overrule *Catholic Bishop* directly, it remain[ed] binding on this Court." (citation omitted)). In short, this Court must follow *Stone* if it "directly controls." *Rodriguez*, 490 U.S. at 484.

*Stone* does directly control this case, as its facts and reasoning are on all fours. Again, H.B. 71 provides:

> No later than January 1, 2025, each public school governing authority shall display the Ten Commandments in each classroom in each school under its jurisdiction. The nature of the display shall be determined by each governing authority with a minimum requirement that the Ten Commandments shall be displayed on a poster or framed document that is at least eleven inches by fourteen inches. The text of the Ten Commandments shall be the central focus of the poster or framed document and shall be printed in a large, easily readable font.

The Act also requires that the Decalogue be "displayed with a context statement" which begins, "[t]he Ten Commandments were a prominent part of American public education for almost three

90

centuries." Examples purportedly include, among other things, *The New England Primer* from around 1688, McGuffey *Readers* written in the early 1800s, and textbooks published by Noah Webster. H.B. 71 further states that a public-school governing authority is not required to spend its funds to purchase a display; rather, "[a] governing authority may spend donated funds to purchase the Ten Commandments or other historical documents provided for in [the Act] or may accept donated displays." *Id.*

Thus, the unconstitutional law in *Stone* and H.B. 71 share the following similarities: (1) both require that the Ten Commandments be displayed on the wall in every public elementary and secondary school classroom in the state; (2) the two laws impose comparable minimum size requirements for the display; (3) each statute contains a context statement purporting to describe the historical basis for the display; (4) the two statutes allow for financing by private contributions; (5) neither represents "a case in which the Ten Commandments are integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like," *Stone*, 449 U.S. at 42 (citing *Schempp*, 374 U.S. at 225); *see also generally* La. Student Standards: Social Studies (updated May 11, 2023), https://www.louisianabelieves.com/docs/ ;[10] and (6) the Louisiana and Kentucky laws both single out the Decalogue for *central* display (in the case of the Louisiana statute, central *focus*) while declining to give similar preferential treatment to foundational documents like the U.S. Constitution, the Declaration of Independence, or the Magna Carta. As in *Stone*, "[i]f the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the

---

[10] "[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Norris v. Hearst Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) (citing *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994) ("In deciding a 12(b)(6) motion to dismiss, a court may permissibly refer to matters of public record." (citation omitted))).

schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments[,]" and that "is not a permissible state objective under the Establishment Clause." *Stone*, 449 U.S. at 42.

AG Defendants attempt to distinguish *Stone* on a number of grounds by relying on *McCreary* and *Van Orden*. (Doc. 39-1 at 48–49.) But this position is undermined by a closer reading of the two cases and their relationship to *Stone*.

In *McCreary*, the Court found that various attempts to display the Ten Commandments on the walls of a courthouse violated the Establishment Clause. 545 U.S. at 858. The *McCreary* Court said of *Stone*:

> *Stone* recognized that the Commandments are an "instrument of religion" and that, at least on the facts before it, the display of their text could presumptively be understood as meant to advance religion: although state law specifically required their posting in public school classrooms, their isolated exhibition did not leave room even for an argument that secular education explained their being there. 449 U.S., at 41, n.3 [ ] (internal quotation marks omitted). But *Stone* did not purport to decide the constitutionality of every possible way the Commandments might be set out by the government, and under the Establishment Clause detail is key. [*County of Allegheny*, 492 U.S. at 595 (opinion of Blackmun, J.)] ("[T]he question is what viewers may fairly understand to be the purpose of the display. That inquiry, of necessity, turns upon the context in which the contested object appears" (internal quotation marks and citation omitted)).

*Id.* at 867–68. The High Court traced the evolution of three displays attempted by the counties and ultimately concluded that there was "ample support for the District Court's finding of a predominantly religious purpose behind the Counties' third display" and so upheld the preliminary injunction." *Id.* at 881. In doing so, the Supreme Court rejected the counties' "argu[ment] that purpose in a case like this one should be inferred, if at all, only from the latest news about the last in a series of governmental actions," explaining that "the history of the government's actions" was "perfectly probative evidence." *Id.* at 866 (citing, inter alia, *Edwards,* 482 U.S. at 595 (enquiry

looks to "the historical context of the statute . . . and the specific sequence of events leading to [its] passage")).

AG Defendants also point to *Van Orden*. As explained above, there the Supreme Court upheld the placement of a Ten Commandments monument on the Texas Capital Grounds. *Van Orden*, 545 U.S. at 691–92. The plurality opinion said of *Stone*:

> There are, of course, limits to the display of religious messages or symbols. For example, we held unconstitutional a Kentucky statute requiring the posting of the Ten Commandments in every public schoolroom. [*Stone*, 449 U.S. 39]. In the classroom context, we found that the Kentucky statute had an improper and plainly religious purpose. *Id.,* at 41 [ ]. As evidenced by *Stone's* almost exclusive reliance upon two of our school prayer cases, *id.,* at 41–42 [ ] (citing [*Schempp,* 374 U.S. 203], and [*Engel,* 370 U.S. 421]), it stands as an example of the fact that we have "been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools," [*Edwards,* 482 U.S. at 583–584]. Compare [*Lee,* 505 U.S. at 596–597] (holding unconstitutional a prayer at a secondary school graduation), with *Marsh v. Chambers,* [463 U.S. 783 (1983)] (upholding a prayer in the state legislature). Indeed, *Edwards v. Aguillard* recognized that *Stone*— along with *Schempp* and *Engel*—was a consequence of the "particular concerns that arise in the context of public elementary and secondary schools." 482 U.S., at 584–585 [ ]. Neither *Stone* itself nor subsequent opinions have indicated that *Stone's* holding would extend to a legislative chamber, see *Marsh v. Chambers, supra,* or to capitol grounds. . . . Nor does anything suggest that *Stone* would extend to displays of the Ten Commandments that lack a "plainly religious," "pre-eminent purpose," id., at 41 [ ]. *See Edwards v. Aguillard, supra*, at 593–594 [ ] ("[Stone] did not mean that no use could ever be made of the Ten Commandments, or that the Ten Commandments played an exclusively religious role in the history of Western Civilization"). Indeed, we need not decide in this case the extent to which a primarily religious purpose would affect our analysis because it is clear from the record that there is no evidence of such a purpose in this case.
>
> *The placement of the Ten Commandments monument on the Texas State Capitol grounds is a far more passive use of those texts than was the case in Stone, where the text confronted elementary school students every day.* Indeed, Van Orden, the petitioner here,

apparently walked by the monument for a number of years before bringing this lawsuit.

*Van Orden*, 545 U.S. at 690–91 & 691 n.11 (plurality opinion) (emphasis added). Likewise, Justice Breyer's controlling concurrence said:

> This case, moreover, is distinguishable from instances where the Court has found Ten Commandments displays impermissible. The display is not on the grounds of a public school, where, given the impressionability of the young, government must exercise particular care in separating church and state. See, *e.g.,* [*Lee,* 505 U.S. at 592]; [*Stone,* 449 U.S. 39]. This case also differs from *McCreary County*, where the short (and stormy) history of the courthouse Commandments' displays demonstrates the substantially religious objectives of those who mounted them, and the effect of this readily apparent objective upon those who view them. See [545 U.S. 844, 125 S. Ct. 2722, 2738–2740] (opinion of the Court). That history there indicates a governmental effort substantially to promote religion, not simply an effort primarily to reflect, historically, the secular impact of a religiously inspired document. And, in today's world, in a Nation of so many different religious and comparable nonreligious fundamental beliefs, a more contemporary state effort to focus attention upon a religious text is certainly likely to prove divisive in a way that this longstanding, pre-existing monument has not.

*Van Orden*, 545 U.S. at 703 (Breyer, J., concurring).

This Court concludes that *Van Orden* and *McCreary* do not undermine Plaintiffs' position for two reasons. First, as *Stone* found, "[t]he pre–eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature," 449 U.S. at 41, and that is certainly the case with H.B. 71. As the Fifth Circuit explained in *Croft*:

> Courts are normally deferential to a legislative articulation of a secular purpose. Nevertheless, we do review to ensure that the alleged secular purpose is the actual purpose, in other words, it must be sincere; a law will not pass constitutional muster if the secular purpose articulated by the legislature is merely a sham, or merely secondary to a religious one. However, the statute need not have exclusively secular objectives to meet the sincerity standard; the touchstone is neutrality, and it is only when the government acts with the ostensible and predominant purpose of advancing religion

that it violates the first prong of the *Lemon* test. Importantly, the eyes that look to purpose belong to an objective observer, and require no judicial psychoanalysis of a drafter's heart of hearts. In sum, openly available data must support a commonsense conclusion that a religious objective permeated the government's action. The purpose test is rarely . . . determinative.

624 F.3d at 166–67 (cleaned up). Here, Plaintiffs allege:

> These requirements are intended to, and will, ensure that students are more likely to observe, absorb, accept, and follow the Ten Commandments. For example, during the House Education Committee's debate, Representative Horton, the primary author and sponsor of the bill, explained: "It is so important that our children learn what God says is right and what He says is wrong, and to allow [the Ten Commandments] to be displayed in our classrooms as a visual aid, I believe, especially in this day and time is so important." Horton later told a reporter that she is only "concerned with our children looking and seeing what God's law is." Representative Sylvia Taylor, Horton's co-author and co-sponsor of H.B. 71, similarly stated: "I really believe that we are lacking in direction. A lot of people, their children, are not attending churches or whatever . . . So what I'm saying is, we need to do something in the schools to bring people back to where they need to be." And Representative Roger Wilder, another co-author and co-sponsor of H.B. 71, expressed his support for the law by claiming that those who oppose it are waging an "attack on Christianity" and suggesting that it would provide a religious counterbalance to students' secular education: "My wife is a Christian and if she was a teacher she would be asked to teach evolution which is in complete contradiction with the theory of creation that we believe out of the Bible. . . . I am a parent and am asking for this [bill]."

(*Compl.* ¶ 79, Doc. 1.) AG Defendants do not dispute that these statements were in fact made.

Additionally, the Court takes judicial notice of an article in the local paper stating that Governor

Landry sent a fundraising email to supporters in response to the filing of this challenge to H.B. 71

urging them to help him "ADVANCE [] the Judeo-Christian values that this nation was built

upon." Patrick Wall, *Jeff Landry vows to defend 'Judeo-Christian values' after Ten*

*Commandments lawsuit*, TIMES-PICAYUNE (June 25, 2024),

https://www.nola.com/news/politics/jeff-landry-lawsuit-ten-commandments-judeo-

christian/articl e_0555d6e6-3314-11ef-863e-1b07594ff87c.html.

Granted, the Fifth Circuit has noted, "[o]f course, if one legislator was motivated by a desire to advance religion, that is not enough to defeat other legislators' sincere interest in acknowledging the state's religious heritage; that '[s]ome legislators may have religious motives . . . does not invalidate an act with an otherwise secular legislative purpose.'" *Croft*, 624 F.3d at 167 n.4 (quoting *Croft*, 562 F.3d at 742–43 (citing *Bd. of Educ. of Westside Cmty. Schs. v. Mergens*, 496 U.S. 226, 249 (1990))). "Even if some legislators were motivated by a conviction that religious speech in particular was valuable and worthy of protection, that alone would not invalidate" a challenged act "because what is relevant is the legislative *purpose* of the statute, not the possibly religious *motives* of the legislators who enacted the law." *Croft*, 562 F.3d at 743 (quoting *Mergens*, 496 U.S. at 249)).

But this case is far different than the one in *Croft*, where the law at issue merely included the phrase "one state under God" in the daily state pledge recited by Texas school children, and where the bill's sponsor merely wanted to mirror the federal pledge in the reference to God but not necessarily include other parts. *Croft*, 624 F.3d at 161–62. As the *Croft* court stated:

> Ultimately, the alleged secular purposes in mirroring the federal pledge and acknowledging the state's religious heritage are not so implausible or inadequate that they ought not be credited. Nor have the plaintiffs presented other evidence indicating that the secular purposes are a "sham" or "secondary" to some overriding legislative interest in coercing Texas's population into religious practice or reverence.

*Id.* at 167 (cleaned up). Conversely, here, H.B. 71's primary sponsor expressed a much more overtly religious and coercive *purpose*, which was echoed by the Governor, and which is evident on the face of H.B. 71. That is, in light of the requirements of H.B. 71 itself and the undisputed

statements of its proponents as to its purpose, the Act's alleged secular purposes are "so implausible [and] inadequate that they ought not be credited." *See id.* (cleaned up).

All of this is not intended to show compliance with the now-defunct *Lemon* test. Rather, the above legislative history and statements support the conclusions that (1) here, any purported secular purpose was not sincere but rather a sham; (2) that, under *Stone*, H.B. 71 is "plainly religious in nature[;]" and (3) that, consequently, *Stone* is directly on point and controlling.

Second, as stated above, the two opinions in *Van Orden* discussed above both recognized the heightened First Amendment concerns in a public-school setting, given the impressionability of young students and the fact that they are captive audiences. All of these concerns remain present with H.B. 71, regardless of whether this is a facial challenge or an as-applied one. While the Court of course must look at the context of the displays, *see Staley*, 485 F.3d at 308–309 (citing *Van Orden*, 545 U.S. at 700 (Breyer, J., concurring) and *McCreary*, 545 U.S. at 874), the Court has sufficient context, from both the language of the statute and the statements of lawmakers, to conclude that H.B. 71's minimum requirements for posting a specific version of the Ten Commandments in every classroom, all year round, regardless of subject matter of the class or the age of the student, which will certainly be seen by impressionable youths required to attend class, runs afoul of *Stone*.

In closing, the Court notes that, at oral argument, AG Defendants conceded that *Stone* remains binding on this Court, but they attempted to downplay and distinguish it by asserting that, unlike the displays in *Stone*, these posters are relatively small and unobtrusive and will be incorporated into the curriculum. But, as the Court pointed out at the hearing, the "minimum requirements" of the Act include that "[t]he text of the Ten Commandments shall be the central focus of the poster or framed document *and shall be printed in a large, easily readable font*." H.B.

71(B)(1) (emphasis added). The illustrative example provided by AG Defendants (which was made a part of the record) fails to satisfy those requirements, as the Decalogue was not "printed in a large, easily readable font." As to the latter argument, while the Court agrees—and Plaintiffs do not dispute—that the Ten Commandments can be incorporated into a curriculum, for all the reasons given above, the Court finds that the Act's "minimum requirements" fail to do so in a constitutionally permissible manner.

For all these reasons, the Court finds that *Stone* remains binding on this Court and is controlling. Consequently, *AG Defs. MTD* will be denied with respect to the Establishment Clause claim.

## C. *Kennedy v. Bremerton School District*

### 1. *Parties' Arguments*

#### a. AG Defendants' Original Memorandum (Doc. 39-1)

Again, AG Defendants maintain that Plaintiffs must demonstrate that each of these displays reflects one of Justice Gorsuch's six "historical hallmarks of an established religion." (Doc. 39-1 at 41 (first quoting *Kennedy*, 597 U.S. at 537 n.5 (citing *Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring)); and then citing *Croft*, 624 F.3d at 164).) AG Defendants then go on to explain how a few particular illustrations they have provided do not violate Justice Gorsuch's hallmarks. (*Id.* at 41–43.)

AG Defendants also argue that, putting aside Plaintiffs' failure to satisfy the *Kennedy* hallmarks for all possible displays, H.B. 71 is also constitutional because of "the historical role of the Ten Commandments not only in America, but also in American public education." (*Id.* at 45.) AG Defendants support this argument by quoting Supreme Court cases such as *Van Orden* and *American Legion v. American Humanist Ass'n*, 588 U.S. 29 (2019). (*Id.*) AG Defendants then turn

to the historical justification provided in the preamble to the Act, including the Ten Commandments' use in *The New-England Primer* and McGuffey *Readers*. (*Id.* at 45–46 (citations omitted).)[11] "To be sure, much of the 19th-century curricula were (lamentably) non-ecumenical," but "the 19th-century debates were about whether *more* or *different* religious instruction should be supported by the state, . . . not whether religious materials in schools could coexist with the principles of disestablishment[.]" (*Id.* at 46–47 (cleaned up).) Ultimately, AG Defendants say,

> [S]chools today act comfortably within historical norms when they take one aspect of the religious material long presented in schools— one that has 'an undeniable historical meaning,'—and display it passively and with context: not in textbooks, but on the wall; not to be read and tested on, but merely available to be viewed (with bemusement or admiration) as an aspect of legal, civic, and educational history.

(*Id.* at 47 (quoting *Van Orden*, 545 U.S. at 690 (plurality opinion)).)

AG Defendants dispute Plaintiffs' position that any of the above illustrations are coercive, particularly in light of the forms of coercion described by *Kennedy*. (*Id.* at 43.) AG Defendants maintain:

> Plaintiffs' children are not required to do anything, nor does H.B. 71 require displays to be read, discussed, or even placed in an especially

---

[11] AG Defendants explain:

> One example (of many) of how the Ten Commandments were used in public education is a story called *The Young Witness*, which appeared in *McGuffey's Readers*. William Holmes McGuffey, *McGuffey's Fourth Eclectic Reader* 207–210 (1920 rev. ed.) (available at https://tinyurl.com/5n64bcsu). That story described a nine-year-old girl who was called to testify at a criminal trial. The defendant's counsel sought to disqualify her on the ground that she "does not understand the nature of an oath." So, the judge asked her if she knew what the Bible was (she did) and whether she knew what would happen if she lied after placing her hand on the Bible and swearing to tell the truth. She replied that she would be sent to prison and she would never go to Heaven. "How do you know this," the judge asked. She took the Bible from him, turned to the Commandments, and explained, "Thou shalt not bear false witness against thy neighbor." So, the judge—moved by the sincerity of her belief and the seriousness with which she took her oath—found her competent to testify.

(Doc. 39-1 at 46.)

> visible part of the classroom; they are simply passive displays. This case thus "looks very different from those in which [the Supreme Court has found prayer" and devotional Bible reading "involving public school students to be problematically coercive." *Kennedy*, 597 U.S. at 541; *see* [*Schempp*, 374 U.S. at 206–07, 225] (holding unconstitutional vocal, school-directed prayer and Bible reading at the beginning of each day).

(*Id.*) AG Defendants say children are not forced to participate in a religious activity here, because "there is no religious activity occurring and nothing is required of Plaintiffs' children." (*Id.* at 43–44.) Children may be offended, but AG Defendants maintain that, under *Kennedy*, "offense does not equate to coercion." (*Id.* at 44 (quoting *Kennedy*, 597 U.S. at 539 (cleaned up)).)

Further, Plaintiffs' contention that the AG Defendants are adopting an official position is, to these defendants, implausible in light of the different illustrations provided above. (*Id.*) AG Defendants emphasize the contextualizing note to be included on all displays as mitigation. (*Id.*)

AG Defendants again conclude: "At bottom, Plaintiffs' Establishment Clause claim must be dismissed because Plaintiffs have not met—and cannot meet—the high standard for facial claims given the endless possibilities of H.B. 71 displays that may be implemented." (*Id.*)

### b. Plaintiffs' Opposition (Doc. 47)

According to Plaintiffs, even if *Stone* did not end the analysis, H.B. 71 would be unconstitutional under *Kennedy*. (Doc. 47 at 39.) Plaintiffs take issue with AG Defendants' argument that Justice Gorsuch's six hallmarks represent the only possible way that violations of the Establishment Clause can occur. (*Id.*)

> On the contrary, the *Kennedy* Court's Establishment Clause approach was not so circumscribed, commanding only that "the Establishment Clause must be interpreted by reference to historical practices and understandings." 597 U.S. at 535; *see also, e.g.,* [*Chambers*, 463 U.S. at 792] (citing an "unambiguous and unbroken history" of legislative prayer as the reason for finding against an

> Establishment Clause violation); *Town of Greece v. Galloway*, 572
> U.S. 565, 577 (2014) (reiterating that it is "*not* necessary to define
> the precise boundary of the Establishment Clause where history
> shows that the *specific practice* is permitted" (emphases added)).

(*Id.* at 39–40.)

Plaintiffs then turn to the history supporting their position. (*Id.* at 40.) Plaintiffs say the

Founding Fathers would have taken issue with the State's efforts to establish an official

government version of the Ten Commandments in a statute "that imposes religious teachings" on

citizens. (*Id.*) Relying on their expert, Dr. Steven K. Green,[12] Plaintiffs assert that these Framers

believed the First Amendment was built on the principles that government should not take a

position on religious doctrine and that it should not coerce or promote religious beliefs, on which

the Founding Fathers took a broad view. (*Id.* at 40–41 (citing Green Report ¶¶ 13–32, Doc. 47-2).)

Jefferson was concerned not only with "'fine & imprisonment'" but also with "government action

that could result in 'some degree of proscription perhaps in public opinion.'" (*Id.* at 41 (quoting

Letter from Jefferson to S. Miller, Jan. 23, 1808).) Madison agreed. (*Id.* (citing Green Report ¶ 21,

Doc. 47-2).)

Plaintiffs then assert that "[t]he Ten Commandments do not form the basis of the U.S. legal

system or government." (*Id.*) "Consistent with the leading Founders' general reproach toward

government support for, or interference with, religion, neither the Constitution nor the Bill of

---

[12] Dr. Green's qualifications are discussed further in the Court's ruling on AG Defendants' *Motion to Exclude Putative Expert Testimony* (Doc. 53), which this Court denied, (Doc. 83). As stated in that ruling, Green earned a B.A. degree in History and Political Science, *Magna Cum Laude*, from Texas Christian University in 1978 where his minor was Religious Studies. (Green Report, Doc. 47-2 at 32.) He graduated from the University of Texas Law School in 1981, earning a J.D. degree. (*Id.*) In 1987, he received a Master's degree in American Religious History from the University of North Carolina, Chapel Hill and a Ph.D. in Constitutional History from the same university in 1997. (*Id.*) He is currently the Fred H. Paulus Professor of Law and Affiliated Professor of History and Religious Studies at Willamette University in Salem, Oregon, where he was also the Director of the Willamette Center for Religion, Law and Democracy from 2007 to 2020. (*Id.*) He has authored "seven books and more than fifty scholarly articles and book chapters" in the area of "the intersection of law, religion, and history." (*Id.* at 3; *see also id.* at 33–40.)

Rights—the core foundational documents for the American legal system and government—mentions God, the Bible, or any commandment." (*Id.* (citing U.S. Const. & amends.; Green Report ¶ 29, Doc. 47-2).) The *Federalist Papers* make no mention either. (*Id.* at 41–42 (citing Green Report ¶ 31, Doc. 47-2).) After quoting Green, Plaintiffs point out, "With the exception of a few generic quotes from Supreme Court opinions, [AG] Defendants fail to offer any evidence demonstrating any influence of the Ten Commandments on the American legal system and government at the Founding." (*Id.* at 41–42.)

Plaintiffs next contend that the historical record shows no longstanding, widespread tradition of displaying the Ten Commandments permanently in classrooms in public elementary and secondary schools. (*Id.* at 42.) Plaintiffs rely on Green's expert report here. (*Id.*) For example, the Act cites the *New England Primer*, but Green explains that this "was used chiefly, if not exclusively, in *religiously* run schools" and "fell into disuse during the early decades of the nineteenth century, before the rise of public education." (*Id.* at 42.) Likewise, Plaintiffs maintain that while some versions of the McGuffey *Readers* contained lessons with the Ten Commandments in their entirety or that reference particular commandments, others did not. (*Id.* at 42–43.) Even when used, they were not a significant part of the texts, and the extent of their use compared to other readings cannot be verified. (*Id.* at 43.) Regardless, references were largely eliminated from the *Readers* in later versions, and reliance on them tapered in the early twentieth century as public schools looked at other available options. (*Id.*) Ultimately:

> This limited history does not support the Act's expansive claim in the context statement that "[t]he Ten Commandments were a prominent part of American public education for almost three centuries," H.B. 71(B)(3), and the use of privately written textbooks with discrete passages referring to the commandments most certainly does not prove a longstanding, "unambiguous and unbroken" history of permanently displaying the Ten Commandment in public-school classrooms. See Pl. Br. at 8–10.

(*Id.*) Green also notes that there is an absence in the record of late 1800s surveys by the U.S. Commissioner of Education about "specific, routine practices of displaying the Ten Commandments in classrooms" or using them for instruction. (*Id.*) "Simply put, there is no 'evidence of a longstanding, let alone unbroken, historical acceptance and practice of widespread, permanent displays of the Ten Commandments in public schools.'" (*Id.*) Plaintiffs also assert that AG Defendants do not identify "a single piece of historical evidence specifically involving the Ten Commandments and schools, other than the use of the *New England Primer* and *McGuffey Readers*." (*Id.* at 44.) Rather, they rely primarily on general quotes about religion in public life pulled from *Van Orden* and *American Legion* plurality opinions, neither of which deal with public schools. (*Id.*) And the displays are not presumptively constitutional, as AG Defendants contend. (*Id.*)

Plaintiffs next note that AG Defendants concede the Act mandates a particular, Protestant version of the Ten Commandments that does not comport with Catholic or Jewish faiths. (*Id.*) Instead, AG Defendants dispute that the Act takes an official position on religious matters or a side on a theological question and point to their many Illustrations as evidence. (*Id.* at 44–45.) Plaintiffs respond that they "take issue with the statutory regime in its entirety" and its mandate that only one specific version be posted in classrooms, despite the Supreme Court's holding that "one religious denomination cannot be officially preferred over another." (*Id.* at 45 (citing *Larson v. Valente*, 456 U.S. 228, 244 (1982)).) AG Defendants' failure to address this argument (or to advance any compelling interest or narrow tailoring to satisfy strict scrutiny) amounts to a waiver. (*Id.*)

Plaintiffs then argue that "[t]he displays mandated by H.B. 71 are religiously coercive." (*Id.* at 45.) Plaintiffs maintain that AG Defendants' position rests on a faulty premise, namely, that

the outcome depends on the content of specific displays. (*Id.*) "Rather, the Court must consider whether students will be religiously coerced under the mandatory provisions of the statutory scheme, which will subject students, including the minor-child Plaintiffs, to a state-approved, Protestant version of the Ten Commandments in every classroom for every day of their public-school education." (*Id.*) AG Defendants contend that students don't have to do anything with the displays, but Plaintiffs respond that "[t]he Supreme Court has repeatedly recognized that children are particularly susceptible to religious indoctrination at school," because (1) "they are captive audiences to the state's religious messages" and (2) they are "vulnerable to the immediate impressions and judgments of their teachers and classmates if they" do not conform their conduct. (*Id.* at 45–46 (citing *Lee*, 505 U.S. at 593; *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000)).) Plaintiffs further state, "*Lee* is the seminal and binding Supreme Court precedent pertaining to religious coercion of students," but AG Defendants do not address or cite it. (*Id.* at 46.) AG Defendants also ignore the fact that students are "a quintessentially captive audience." (*Id.* (citing *Ingebretsen*, 88 F.3d at 279–80).) Thus, it is not implausible for Plaintiffs to plead that their "minor-child Plaintiffs will feel pressured to observe, meditate on, venerate, and adopt or obey the state's preferred religious doctrine." (*Id.*)

Plaintiffs then assert:

> Defendants' "illustrations," even if they were not irrelevant to Plaintiffs' facial challenge, would merely put a finer point on the matter, demonstrating that the State is deeply and bizarrely obsessed with imposing the commandments on students and will do whatever it can to shoehorn its preferred version of that religious doctrine into any number of displays. Whether schools decide to display one or more of Defendants' hypothetical posters, or use posters featuring other content, the common denominator, from classroom to classroom and school to school, will be the State's mandatory version of the Ten Commandments. Students will be acutely aware of the lengths to which the State has gone in ensuring that they encounter these displays in every classroom for nearly every minute

104

of their school day, and students will reasonably feel religiously
coerced by the State's desperate insistence that they take heed of the
commandments. The Supreme Court effectively recognized this in
*Stone*, holding that the only function served by such permanent and
pervasive displays is "to induce . . . schoolchildren to read, meditate
upon, perhaps to venerate and obey, the Commandments." 442 U.S.
at 42.

(*Id.* at 46–47.) Additionally, AG Defendants argue that, unlike *Schempp*[,] here "there is no
religious activity," but the Supreme Court has rejected this:

In *Schempp*, the Court recognized that daily scriptural readings
constituted "religious exercise," 374 U.S. at 224–25; and in *Stone*,
the Court held that it is not "significant that the Bible verses
involved in this case are merely posted on the wall, rather than read
aloud as in *Schempp* and *Engel*." 449 U.S. at 42. School-promoted
religious activity is no less unconstitutional merely because it is
silent. *See Wallace v. Jaffree*, 472 U.S. 38, 60–61 (1985) (holding
that state law improperly encouraged students to engage in silent
prayer); Pl. Br. at 18.

(*Id.*) For all these reasons, Plaintiffs contend that the Act violates the Establishment Clause. (*Id.* at
47.)

### c. AG Defendants' Reply (Doc. 54)

AG Defendants respond: "*Kennedy* instructs courts to look elsewhere—to the six hallmarks

of religious establishments the framers sought to prohibit." (Doc. 54 at 19 (cleaned up).) According

to AG Defendants, Plaintiffs cannot escape these hallmarks because the Fifth Circuit and this Court

have decided Establishment Clause cases "with reference to them." (*Id.* at 19–20 (citations

omitted).) "The hallmarks question is not whether a practice is itself old; it is whether the practice

(old or new) fits within one of the historical 'hallmarks of an established religion.'" (*Id.* at 20

(quoting *Kennedy*, 597 U.S. at 537 & n.5).) This requires an examination of what the "public

understanding" of an establishment was "when the [provision] was adopted." *Id.* (quoting *N.Y.

State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 37 (2022)).) Plaintiffs' expert fails to address

the hallmarks, and, in any event, the Court should "reason[ ] by analogy" without the need of experts but rather perform "a commonplace task for any lawyer or judge." (*Id.* at 20 (citing *Bruen*, 597 U.S. at 28–29).)

AG Defendants maintain that they need not show an "'unambiguous and unbroken' history of 'the *specific practice*' tracing back to the Founding . . . ." (*Id.* at 20–21 (citation omitted).) *Kennedy*, they argue, undertook no such analysis. (*Id.* at 21.)

According to AG Defendants, even if the Court adopted Plaintiffs' method of historical analysis, H.B. 71 is still constitutional. (*Id.*) AG Defendants refer to a seal proposed for the United States by Jefferson and Franklin that depicted "Moses leading the Israelites across the Red Sea," (*id.* (citing *Shurtleff*, 596 U.S. at 287 n.11 (Gorsuch, J., concurring in judgment))), and there is a tradition of religious content in public schools, including the Ten Commandments, (*id.* (citing *Town of Greece*, 572 U.S. at 577; H.B. 71(B)(3))). AG Defendants argue that Plaintiffs' expert largely agrees with AG Defendants' historical assessment about the *New England Primer* and McGuffey *Readers*, despite the "nitpick[ing]." (*Id.*) In short, Green may think the Ten Commandments were not "prominent," but courts should not decide the sufficiency of "the historical analysis contained in documentary exhibits appearing on public grounds." (*Id.* at 21–22 (citation omitted).) Here, they contend, the Supreme Court has already reaffirmed the importance of the Ten Commandments on the legal system of this country. (*Id.* at 22 (citing *Van Orden*, 351 F.3d at 181; *Am. Legion*, 588 U.S. at 53).)

AG Defendants take issue with Plaintiffs' reliance on *Lee* and its alleged prohibition on coercion in the school context. (*Id.*) AG Defendants maintain that *Kennedy* states that *Lee* bars the government from "forcing citizens to engage in a formal religious exercise" such as reading the

106

Bible or prayer. (*Id.* (cleaned up).) AG Defendants say that the Fifth Circuit has likewise prohibited

only religious exercises or activity. (*Id.* (citations omitted).) AG Defendants continue:

> Meanwhile, neither the Supreme Court nor the Fifth Circuit has ever adopted the bizarre notion that being in the same room with passive religious symbols amounts to being coerced to engage in a religious exercise. Rather, the Justices have repeatedly taken as given the constitutionality of the Ten Commandments displays in buildings throughout our Nation's capital, *see Am. Legion*, 588 U.S. at 53, even though citizens must walk by them on a daily basis and even sit beneath them in the Supreme Court's courtroom. The Fifth Circuit has upheld a "Latin cross with three crosslets" on a city seal, though the plaintiff was required to see it if he wanted to pay utility bills or visit the municipal building. *Murray*, 947 F.2d at 150. And if Plaintiffs were right, any student in any of the States or municipalities whose "seals and flags . . . include religious symbols or mottos" could demand that those flags be taken down from their classrooms. *Freedom From Religion Found., Inc. v. County of Lehigh*, 933 F.3d 275, 284 (3d Cir. 2019); *see, e.g., Am. Legion*, 588 U.S. at 55–56 & n.23 (Maryland's flag includes "two crosses"); *Briggs v. Mississippi*, 331 F.3d 499, 503 (5th Cir. 2003) (upholding former Mississippi flag, which featured a symbol "frequently . . . described as . . . a St. Andrew's Cross"). That is not the law.

(*Id.* at 22–23.)

Larson is also distinguishable, argue AG Defendants, because that case involved a law

imposing "*legal obligations* (registration and reporting requirements) on some religious

organizations but not others. . . ." (*Id.* at 23.) The Supreme Court has also distinguished *Larson*

and allowed a nativity scene on government property (in *Lynch v. Donnelly*, 465 U.S. 668, 687

n.13 (1984)) and a Latin cross on public land (in *Am. Legion*, 588 U.S. 29). AG Defendants contend

that H.B 71 used the King James version of the Ten Commandments because it was upheld in *Van*

*Orden*. (*Id.*) AG Defendants close by arguing that facial challenges are hard to win, and, again,

Plaintiffs have not shown that every application of H.B. 71 is unconstitutional. (*Id.* at 24.)

d. *AG Defs. Daubert Motion* (Doc. 53)

In AG Defendants' *Motion to Exclude Putative Expert Testimony* (Doc. 53) ("*AG Defs. Daubert Motion*"), AG Defendants argue, inter alia, that Plaintiffs' expert does not provide testimony that is relevant to the Establishment Clause claim. (Doc. 53-1 at 10–12.) While Plaintiffs' expert opinions bear more on *Pls. MPI* than *AG Defs. MTD*, where the sufficiency of the *Complaint* controls, the parties' disagreement about the appropriate standard to apply is relevant to the instant analysis.

In *AG Defs. Daubert Motion*, these defendants contend:

> Whether Ten Commandments displays existed in public or private schools in prior centuries, or whether the Ten Commandments were taught in public or private schools, is not determinative of the relationship between today's displays and the historical hallmarks identified by the Supreme Court. Similarly, the history of a "*specific practice*" tracing back to the Founding, or the private "views of Madison and Jefferson" on the practice, are not "facts at issue" for purposes of Rule 702. Pls.' Reply & MTD Resp. 28–29, ECF 47; Green Rep. 7–10, 18–26. Of course, the longstanding prominent role of the Ten Commandments in American classrooms is of great *educational* relevance—presumably no one thinks schoolchildren should be kept intentionally ignorant of those historical facts—but here what is educationally relevant is not *legally* relevant.

(*Id.* at 11.)

AG Defendants maintain that "Plaintiffs' overall approach to their case" relies on "a misunderstanding of the relevant historical analysis." (*Id.*) According to AG Defendants, the Supreme Court provided the "historical hallmarks of a religious establishment" in *Kennedy*, so that, now, this Court needs only to "determine whether a challenged modern practice displays any of those hallmarks, using the 'reasoning by analogy' that is 'a commonplace task for any lawyer or judge.'" *Id.* (quoting *Bruen*, 597 U.S. at 28–29). The hallmarks were intended to give lower

courts guidance so that they did not have to scour the historical record or look to experts. (*Id.* at 11–12 (citing *Shurtleff*, 596 U.S. at 285–86 (Gorsuch, J., concurring in judgment)).)

AG Defendants close by urging that Plaintiffs do not dispute much of the history cited in the Act; rather, they only disagree that the presence of the Ten Commandments in those documents counts as "'prominent' or 'widespread.'" (*Id.* at 12.)

### e.  Plaintiffs' Opposition to *AG Defs. Daubert Motion* (Doc. 61)

Plaintiffs respond first that AG Defendants mischaracterize the "original meaning and history" test in *Kennedy*. (Doc. 61 at 19–22.) Plaintiffs claim that AG Defendants' efforts to reduce this standard to Justice Gorsuch's six hallmarks in the *Shurtleff* concurrence is unsupported by *Kennedy* or *Shurtleff* itself. (*Id.* at 19–20.)

Plaintiffs maintain that, "[w]hile Justice Gorsuch's *Shurtleff* opinion may be useful with respect to assessing the validity of certain challenged practices under the Establishment Clause, it does not purport to set forth the entire universe of permitted or prohibited practices." (*Id.* at 20 (citing *Shurtleff*, 596 U.S. at 285 (Gorsuch, J., concurring in judgment)).) "Rather, the opinion identifies '*some* helpful hallmarks [of establishment] that localities and lower courts can rely on.'" (*Id.* (quoting *Shurtleff*, at 285).) Justice Gorsuch explained that "'founding-era religious establishments *often* bore certain other telling traits' that 'explain many of th[e] Court's Establishment Clause cases.'" (*Id.* (quoting *Shurtleff*, at 286 (emphasis added)).)

Further, Plaintiffs argue, *Kennedy* does not require such a limited reading of the "original meaning and history" test. (*Id.*) According to Plaintiffs, *Kennedy* reaffirmed the standard in *Town of Greece v. Galloway* and stated that "the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" (*Id.* (quoting *Kennedy*, 597 U.S. at 535 (quoting *Town of Greece*, 572 U.S. at 576)).)

Plaintiffs maintain that *Town of Greece* demonstrates how this standard operates. (*Id.* at 20–21.) Plaintiffs say that the *Town of Greece* court examined the "specific practice" in question and asked whether it "accorded with history and reflected the Founders' understanding." (*Id.* (quoting *Town of Greece*, 572 U.S. at 577).)

> The Court held that the challenged legislative invocations were constitutional because there was an "'unambiguous and unbroken history of more than 200 years . . . of opening legislative sessions with a prayer[,]'" which dates back to the First Congress and "'has become part of the fabric of our society.'" [*Town of Greece*, 572 U.S.] at 576 (quoting [*Chambers*, 462 U.S. at 792]). In other words, the practice "was accepted by the Framers and has withstood the critical scrutiny of time and political change." *Id.*; . . . As the Court recognized in *Town of Greece*, "sweep[ing] away what has so long been settled would create new controversy and begin anew the very divisions along religious lines that the Establishment Clause seeks to prevent." 572 U.S. at 577.

> Defendants' insistence that the *Kennedy* Court's footnoted citation to Justice Gorsuch's *Shurtleff* concurrence somehow transforms and elevates his "hallmarks" passage—itself a nonexclusive treatment of *some* traits of religious establishment—into a binding, hard-and-fast checklist would effectively negate the Court's discussion of the "historical practices and understandings" analysis in *Kennedy* and *Town of Greece*. . . . Even the Court's short parenthetical explaining Justice Gorsuch's *Shurtleff* opinion makes clear that his treatment of this issue is not exhaustive, noting that he discusses "coercion and *certain other* historical hallmarks of an established religion." *See Kennedy*, 597 U.S. at 537 n.5 (emphasis added).

(*Id.* at 21–22.)

Plaintiffs conclude by explaining how Green's testimony will be relevant; "[i]t will help the Court draw the line 'between the permissible and the impermissible' by elucidating historical facts that illuminate whether the challenged practice 'accor[ds] with history and faithfully reflec[ts] the understanding of the Founding Fathers.'" (*Id.* at 22 (quoting *Kennedy*, 597 U.S. at 535–36 (internal quotation marks omitted)).) After describing this, Plaintiffs then point out how AG "Defendants repeatedly rely on the historical significance of the Ten Commandments,

especially their purported use in public school[,]" which undermines AG Defendants' position that the history is not relevant. (*Id.* at 23–25.)

### f. Reply in Support of *AG Defs. Daubert Motion* (Doc. 63)

AG Defendants reply that, because the Green Report does not address Plaintiffs' burden under *Kennedy* or the six "hallmarks," it is irrelevant. (Doc. 63 at 9.) Plaintiffs claim that this Court should follow *Town of Greece*'s historical analysis of asking if the "specific practice" was engaged in at the Founding and continued as an "unambiguous and unbroken history," but (1) the *Kennedy* court did not undertake that analysis but rather looked to the hallmarks, and (2) Fifth Circuit caselaw after *Kennedy* has specifically rejected the idea that an "unambiguous and unbroken history" is required. (*Id.* at 9–10 (cleaned up).)

AG Defendants also dispute the idea that they have the burden under the *Kennedy* test and rely on a Fourth Circuit case for this point. (*Id.* at 10–11 (citations omitted).) Otherwise, they claim, every government action would be presumptively unconstitutional until the government identified a specific historical practice to support it. (*Id.* at 11.)

Experts are also not required, say AG Defendants; that is clear from Justice Gorsuch's hallmarks test and the fact that the author did not rely on it in his opinions in *Kennedy* and *Shurtleff*. (*Id.* (citations omitted).) Even if historical analysis was required, none of the cases Plaintiffs cite relied on the use of expert testimony. (*Id.*) And, by Plaintiffs' line of reasoning, some of their arguments would also need a theological or scriptural scholar rather than a law professor specialized in history. (*Id.* at 11–12.)

111

## 2.   Law and Analysis

Again, the Court found above that *Stone* controls and that the Act violates the holding of that case. On that ground alone, the Court could deny *AG Defs. MTD* with respect to the Establishment Clause claim.

But, even if the Court did examine this claim under the standards laid out by *Kennedy* and subsequent caselaw, *AG Defs. MTD* would again be denied. The Court will begin by discussing the appropriate standard to be applied under *Kennedy* before applying that standard to the allegations of Plaintiffs' *Complaint*.

### a.   The Relevant Standard

Preliminarily, the parties dispute the appropriate standard to apply. AG Defendants maintain that the Court must evaluate and decide the issue based on Justice Gorsuch's six hallmarks, while Plaintiffs look to other standards endorsed by the Supreme Court.

Both sides somewhat miss the mark. This Court will first examine the case law before and after *Kennedy* and will then extrapolate some guiding principles.

### i.   *Pre*-Kennedy

Before *Kennedy*, "[t]he Supreme Court generally applied at least one of three tests under the Establishment Clause," *Am. Humanist Ass'n v. McCarty*, 851 F.3d 521, 525 (5th Cir. 2017) (citations omitted), though the High Court "repeatedly emphasized [its] unwillingness to be confined to any single test or criterion in this sensitive area[,]" *id.* at 525 n.9 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 679 (1984)). The first test, *Lemon*, was covered above. "Under [the second test,] the endorsement test, a '[g]overnment unconstitutionally endorses religion whenever it appears to take a position on questions of religious belief, or makes adherence to a religion relevant in any way to a person's standing in the political community.'" *Id.* at 525 n.11 (quoting

112

*Ingebretsen*, 88 F.3d at 280). "The government creates this appearance when it conveys a message

that religion is favored, preferred, or promoted over other beliefs." *Id.* (quoting *Ingebretsen*, 88

F.3d at 280). "Under [the third test,] the coercion test, unconstitutional coercion occurs where '(1)

the government directs (2) a formal religious exercise (3) in such a way as to oblige the

participation of objectors.'" *Id.* at 525 n.12 (quoting *Doe ex rel. Doe v. Beaumont Indep. Sch. Dist.*,

173 F.3d 274, 285 (5th Cir. 1999)).

That standard evolved somewhat in "legislative-prayer cases." *Id.* at 526. Specifically, the

Fifth Circuit explained:

> [I]n *Marsh v. Chambers*, 463 U.S. 783, 784–85[ ] (1983), a member
> of the Nebraska Legislature sued state officials, claiming that the
> practice of opening each session with a chaplain's prayer violated
> the Establishment Clause. The Court upheld the practice without
> applying any of the conventional tests, observing that "[t]he opening
> of sessions of legislative and other deliberative public bodies with
> prayer is deeply embedded in the history and tradition of this
> country." *Id.* at 786 [ ].
>
> The Court revisited the issue in *Town of Greece v. Galloway*, [ ],
> 134 S. Ct. 1811, 1827–28 [ ] (2014), stating unequivocally that the
> legislative-prayer exception in *Chambers* extends to prayers
> delivered at town-board meetings. Those prayers, however, must not
> "denigrate nonbelievers or religious minorities, threaten damnation,
> or preach conversion." *Id.* at 1823. Moreover, "[t]he principal
> audience for these invocations is not . . . the public but lawmakers
> themselves, who may find that a moment of prayer or quiet
> reflection sets the mind to a higher purpose and thereby eases the
> task of governing." *Id.* at 1825.

*McCarty*, 851 F.3d at 525–26. But the Fifth Circuit also emphasized that "school-prayer cases"

were treated differently:

> As distinguished from legislative-prayer cases, however, the
> Supreme Court, in school-prayer cases such as *Santa Fe
> Independent School District v. Doe*, 530 U.S. 290 [ ] (2000), *Lee v.
> Weisman*, 505 U.S. 577 [ ] (1992), and *County of Allegheny v.
> ACLU*, 492 U.S. 573 [ ] (1989), has applied the conventional
> Establishment Clause tests. In *Weisman*, a graduation-prayer case,

> the Court, 505 U.S. at 592 [ ], explained that "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools" and that "prayer exercises in public schools carry a particular risk" of unconstitutional coercion. The Court distinguished *Weisman* from *Chambers*, noting that the legislative-prayer exception does not apply in "the public school context." *Id.* at 597 [ ]. In *ACLU*, the Court opined that "state-sponsored prayer in public schools" is "unconstitutional." [492 U.S. at 590 n.40 (citing *Schempp*, 374 U.S. 203)].

*Id.* at 526. Thus, in *McCarty*, "[t]he key question" was whether "whether [the] case [was] essentially more a legislative-prayer case or a school-prayer matter." *Id.*

Then, in 2022, the Supreme Court decided two cases: *Shurtleff* and *Kennedy*. In *Shurtleff*, the Supreme Court evaluated a decision by the city of Boston to refuse the petitioner's request to fly a Christian flag outside city hall, even though no request had before been denied. 596 U.S. at 247. The Supreme Court found that "Boston's refusal to let Shurtleff and [his] Camp Constitution raise their flag based on its religious viewpoint 'abridg[ed]' their 'freedom of speech.'" *Id.* at 248 (quoting U.S. Const. amend. I).

One of the issues raised in that case was the city's claim that it could not raise the religious flag because doing so would violate the Establishment Clause. *Id.* at 258. The High Court rejected this argument, explaining, "[w]hen a government does not speak for itself, it may not exclude speech based on 'religious viewpoint'; doing so 'constitutes impermissible viewpoint discrimination.'" *Id.* (quoting *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001)). Since Boston denied petitioner's "request solely because the Christian flag he asked to raise 'promot[ed] a specific religion' . . . that refusal discriminated based on religious viewpoint and violated the Free Speech Clause." *Id.* at 258–59.

Justice Gorsuch, joined by Justice Thomas, filed a concurring opinion attributing Boston's erroneous view of the Establishment Clause to *Lemon*, which, "instead of bringing clarity to the

area, [ ] produced only chaos." *Id.* at 277 (Gorsuch, J., concurring in judgment). Justice Gorsuch

looked back at recent cases like *Town of Greece* and *American Legion*, both of which "direct[ed]

and redirect[ed] the inquiry to original meaning as illuminated by history," before addressing two

particular reasons why lower courts still erroneously applied *Lemon*. *Id.* at 283–87. Relevant here:

> Second, it seems that *Lemon* may occasionally shuffle from its grave for another and more prosaic reason. By demanding a careful examination of the Constitution's original meaning, a proper application of the Establishment Clause no doubt requires serious work and can pose its challenges. *Lemon*'s abstract three-part test may seem a simpler and tempting alternative to busy local officials and lower courts. But if this is part of the problem, it isn't without at least a partial remedy. For our constitutional history contains some helpful hallmarks that localities and lower courts can rely on.

> Beyond a formal declaration that a religious denomination was in fact the established church, it seems that founding-era religious establishments often bore certain other telling traits. See M. McConnell, Establishment and Disestablishment at the Founding, Part I: Establishment of Religion, 44 Wm. & Mary L. Rev. 2105, 2110–2112, 2131 (2003) (Establishment and Disestablishment). First, the government exerted control over the doctrine and personnel of the established church. Second, the government mandated attendance in the established church and punished people for failing to participate. Third, the government punished dissenting churches and individuals for their religious exercise. Fourth, the government restricted political participation by dissenters. Fifth, the government provided financial support for the established church, often in a way that preferred the established denomination over other churches. And sixth, the government used the established church to carry out certain civil functions, often by giving the established church a monopoly over a specific function. See *id.*, at 2131–2181. Most of these hallmarks reflect forms of "coerc[ion]" regarding "religion or its exercise." [*Lee*, 505 U.S. 577 [ ]; *id.*, at 640 [ ] (Scalia, J., dissenting); *Van Orden*, 545 U.S. at 693 [ ] (THOMAS, J., concurring).

> These traditional hallmarks help explain many of this Court's Establishment Clause cases, too. . . . The thread running through these cases derives directly from the historical hallmarks of an establishment of religion—government control over religion offends the Constitution, but treating a church on par with secular

entities and other churches does not. See Establishment and
Disestablishment 2205–2208.

*Id.* at 285–87. Justice Gorsuch ultimately concluded, "[t]his Court long ago interred *Lemon*, and it

is past time for local officials and lower courts to let it lie." *Id.* at 288.

*ii.*  <u>Kennedy</u>

*Kennedy* came a month after *Shurtleff* and was authored by Justice Gorsuch. 597 U.S. 507.

There, the issue was whether a high school football coach's First Amendment rights were violated

when he knelt at midfield after games to pray quietly. *Kennedy*, 597 U.S. at 512. The Court

evaluated the coach's claim under the Free Exercise Clause (which this Court will have more to

say about below) before turning to the school district's argument that its conduct was justified to

prevent an Establishment Clause violation. *Id* at 532.

In doing so, the Court discussed "the shortcomings" of the *Lemon* and endorsement test,

described the Supreme Court's "unambiguous reject[ion] [of] a city's attempt to censor religious

speech" on those bases, *id.* at 533–35 (citing *Shurtleff*, 142 S. Ct. at 1587–88; *id*. at 1595 (Alito,

J., concurring in judgment); *id.* at 1587, 1588–89 (opinion of Gorsuch, J.)), and noted "[i]n the last

two decades, th[e] Court ha[d] often criticized or ignored *Lemon* and its endorsement test

variation," *id.* at n.4 (collecting cases). The Supreme Court then explained:

> In place of *Lemon* and the endorsement test, this Court has instructed
> that the Establishment Clause must be interpreted by " 'reference to
> historical practices and understandings.' " *Town of Greece*, 572 U.S.
> at 576 [ ]; see also *American Legion*, [ ] 139 S. Ct., at 2087 (plurality
> opinion). " '[T]he line' " that courts and governments "must draw
> between the permissible and the impermissible" has to " 'accor[d]
> with history and faithfully reflec[t] the understanding of the
> Founding Fathers.' " *Town of Greece*, 572 U.S. at 577 [ ] (quoting
> [*Schempp*, 374 U.S. at 294] (Brennan, J., concurring)). An analysis
> focused on original meaning and history, this Court has stressed, has
> long represented the rule rather than some " 'exception' " within the
> "Court's Establishment Clause jurisprudence." 572 U.S. at 575 [ ];
> see *American Legion*, [ ] 139 S. Ct., at 2087 (plurality opinion);

116

> *Torcaso v. Watkins*, 367 U.S. 488, 490 [ ] (1961) (analyzing certain historical elements of religious establishments); *McGowan v. Maryland*, 366 U.S. 420, 437–440 [ ] (1961) (analyzing Sunday closing laws by looking to their "place . . . in the First Amendment's history"); *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 680 [ ] (1970) (analyzing the "history and uninterrupted practice" of church tax exemptions).

*Id.* at 535–36.

The Supreme Court then rejected the district court's position that the coach coerced students to pray as being unsupported by the evidence. *Id.* at 536–37. The Court first acknowledged the role coercion plays in Establishment Clause cases:

> To be sure, this Court has long held that government may not, consistent with a historically sensitive understanding of the Establishment Clause, "make a religious observance compulsory." *Zorach v. Clauson*, 343 U.S. 306, 314 [ ] (1952). Government "may not coerce anyone to attend church," *ibid.*, nor may it force citizens to engage in "a formal religious exercise," [*Lee*, 505 U.S. at 589]. No doubt, too, coercion along these lines was among the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment. [See, e.g., *Lee*, 505 U.S. at 640–642] (Scalia, J. dissenting); *Shurtleff*, 142 S. Ct., at 1608–1610 (opinion of GORSUCH, J.) (discussing coercion and certain other historical hallmarks of an established religion); 1 Annals of Cong. 730–731 (1789) (Madison explaining that the First Amendment aimed to prevent one or multiple sects from "establish[ing] a religion to which they would compel others to conform"); M. McConnell, Establishment and Disestablishment at the Founding, Part I: Establishment of Religion, 44 Wm. & Mary L. Rev. 2105, 2144–2146 (2003).] Members of this Court have sometimes disagreed on what exactly qualifies as impermissible coercion in light of the original meaning of the Establishment Clause. Compare *Lee*, 505 U.S. at 593 [ ] with *id.*, at 640–641 [ ] (Scalia, J., dissenting).

*Id.* at 536–37, 537 n.5.

The Court concluded that "in this case Mr. Kennedy's private religious exercise did not come close to crossing any line one might imagine separating protected private expression from impermissible government coercion." *Id.* at 537. In short, Mr. Kennedy did not seek to direct any

prayers to students or require anyone else to participate." *Id.* at 538. While some would have seen

him pray, the Supreme Court advised, "learning how to tolerate speech or prayer of all kinds is

'part of learning how to live in a pluralistic society,' a trait of character essential to 'a tolerant

citizenry.'" *Id.* (quoting *Lee*, 505 U.S. at 590).

> This Court has long recognized as well that "secondary school students are mature enough . . . to understand that a school does not endorse," let alone coerce them to participate in, "speech that it merely permits on a nondiscriminatory basis." *Mergens*, 496 U.S. at 250 [ ] (plurality opinion). Of course, some will take offense to certain forms of speech or prayer they are sure to encounter in a society where those activities enjoy such robust constitutional protection. But "[o]ffense . . . does not equate to coercion." *Town of Greece*, 572 U.S. at 589 [ ] (plurality opinion).

*Id.* at 538–39. Moreover, though the district argued that kids could be compelled to participate in

the prayers, the Supreme Court rejected this stance: "There is no indication in the record that

anyone expressed any coercion concerns to the District about the quiet, postgame prayers that Mr.

Kennedy asked to continue and that led to his suspension. Nor is there any record evidence that

students felt pressured to participate in these prayers." *Id.* at 539.

The Supreme Court then rejected the "District['s] suggest[ion] that *any* visible religious

conduct by a teacher or coach should be deemed—without more and as a matter of law—

impermissibly coercive on students." *Id.* at 540. The High Court explained:

> Such a rule would be a sure sign that our Establishment Clause jurisprudence had gone off the rails. In the name of protecting religious liberty, the District would have us suppress it. Rather than respect the First Amendment's double protection for religious expression, it would have us preference secular activity. . . . It is a rule that would defy this Court's traditional understanding that permitting private speech is not the same thing as coercing others to participate in it. See *Town of Greece*, 572 U.S. at 589 [ ] (plurality opinion). It is a rule, too, that would undermine a long constitutional tradition under which learning how to tolerate diverse expressive activities has always been "part of learning how to live in a pluralistic society." *Lee*, 505 U.S. at 590 [ ]. We are aware of no

> historically sound understanding of the Establishment Clause that begins to "mak[e] it necessary for government to be hostile to religion" in this way. *Zorach*, 343 U.S. at 314[ ].

*Id.* at 540–41. The Supreme Court then distinguished those cases in which public-school prayers were found to be coercive.

> Meanwhile, this case looks very different from those in which this Court has found prayer involving public school students to be problematically coercive. In *Lee*, this Court held that school officials violated the Establishment Clause by "including [a] clerical membe[r]" who publicly recited prayers "as part of [an] official school graduation ceremony" because the school had "in every practical sense compelled attendance and participation in" a "religious exercise." 505 U.S. at 580, 598 [ ]. In *Santa Fe Independent School Dist. v. Doe*, the Court held that a school district violated the Establishment Clause by broadcasting a prayer "over the public address system" before each football game. 530 U.S. 290, 294 [ ] (2000). The Court observed that, while students generally were not required to attend games, attendance *was* required for "cheerleaders, members of the band, and, of course, the team members themselves." *Id.*, at 311 [ ]. None of that is true here. The prayers for which Mr. Kennedy was disciplined were not publicly broadcast or recited to a captive audience. Students were not required or expected to participate. And, in fact, none of Mr. Kennedy's students did participate in any of the three October 2015 prayers that resulted in Mr. Kennedy's discipline. . . .

*Id.* at 541–42. The Court concluded:

> Respect for religious expressions is indispensable to life in a free and diverse Republic—whether those expressions take place in a sanctuary or on a field, and whether they manifest through the spoken word or a bowed head. Here, a government entity sought to punish an individual for engaging in a brief, quiet, personal religious observance doubly protected by the Free Exercise and Free Speech Clauses of the First Amendment. And the only meaningful justification the government offered for its reprisal rested on a mistaken view that it had a duty to ferret out and suppress religious observances even as it allows comparable secular speech. The Constitution neither mandates nor tolerates that kind of discrimination. Mr. Kennedy is entitled to summary judgment on his First Amendment claims. The judgment of the Court of Appeals is *Reversed.*

*Id.* at 543–44.

### iii.    Post-Kennedy

To this Court's knowledge, the Fifth Circuit has only interpreted one Establishment Clause

claim in light of *Kennedy*, and that was in *Freedom From Religion Found., Inc. v. Mack*, 49 F.4th

941 (5th Cir. 2022). There, plaintiffs filed suit against a justice of the peace named Mack because

he "open[ed] his court with a ceremony that include[d] a prayer." *Id.* at 944.

The Fifth Circuit began its analysis by "identify[ing] the legal standard." *Id.* at 950.

Plaintiffs maintained that Mack had to show "that legislative prayer was supported by

'unambiguous and unbroken history of more than 200 years.'" *Id.* (quoting *Chambers*, 463 U.S. at

792). The appellate court rejected this argument, explaining, "offering that language as a legal

standard confuses a sufficient condition for a necessary one." *Id.* The Court instead turned to *Town*

*of Greece v. Galloway*:

> [In *Town of Greece*], the Court asked whether the town's prayer
> practice "fit[ ] within," [572 U.S. at 577], or was "consistent with
> the tradition of legislative prayer," *id.* at 578 [ ]. Accordingly, the
> Court identified only three historical instances of sectarian prayer
> before concluding that the standard for consistency was satisfied.
> *See id.* at 578–79 [ ].
>
> We follow the Court's lead. So we ask whether courtroom prayer is
> consistent with a broader tradition of public, government-sponsored
> prayer. *See* [*McCarty*, 851 F.3d at 527] (concluding that prayer
> before school board meetings was consistent with the broader
> tradition of "opening meetings of deliberative bodies with
> invocations").

*Mack*, 49 F.4th at 951.

The Fifth Circuit then looked at the four categories of historical evidence offered by

plaintiffs: "*first*, the behavior of early federal judges and Justices in court-related proceedings;

*second*, the in-court behavior of those judges and Justices; *third*, the in-court behavior of non-

federal judges; and *fourth*, indirect evidence of the prevalence of courtroom prayer." *Id.* The Court explained:

> That evidence is relevant, if at all, because widespread practice around the Founding helps reveal an amendment's original public meaning. *See McDonald v. City of Chicago*, 561 U.S. 742, 769–70 [ ] (2010). We address an incorporated amendment's application to a state, so we must also consider practice around the time of incorporation [in 1868]. *See id.* at 770–78 [ ] Our analysis depends on "original meaning and history," with particular attention paid to "historical practices." [*Kennedy*, 142 S. Ct. at 2428] (quotation omitted).

*Id.* at 951 & n.7.

After undertaking this historical analysis (which included an examination of briefs filed by *amici*), *see id.* at 954–57, the Fifth Circuit ultimately determined that, though some of plaintiffs' criticism that Mack had provided "selective, acontextual 'law-office history' . . . ha[d] merit[,] . . . on the whole, Mack [had] identified enough evidence to satisfy the legal standard." *Id.* at 954. In doing so, the Court also "consider[ed] the two most prominent Establishment Clause tests previously used by the Supreme Court: 'the endorsement test[ ] and the coercion test.'" *Id.* (quoting *McCarty*, 851 F.3d at 525 (footnotes omitted)). But the appellate court emphasized:

> We do not suggest that those tests govern our overall analysis. History—not endorsement—matters. *Kennedy*, 142 S. Ct. at 2427–28. Here, we look to those tests for the limited purpose of deciding whether historical evidence is similar enough to the challenged practice to establish consistency.
>
> We do not, however, consider the *Lemon* test. Its long Night of the Living Dead, *Lamb's Chapel v. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 398 [ ] (1993) (Scalia, J., concurring in the judgment), is now over, *Kennedy*, 142 S. Ct. at 2427. And it is too easily manipulated to shed light on history's relevance.

*Id.* at 954 n. 20.

121

After conducting this analysis, the Fifth Circuit found that it would "include the first and second categories of historical evidence in deciding whether courtroom prayer is consistent with the relevant tradition." *Id.* at 956. The appellate court rejected the third category, which consisted of "scattered instances of state-court prayer, some of which occurred before the Establishment Clause was incorporated against the states." *Id.* at 956–57. The appellate court found:

> The history cannot tell us about what "coexisted with the principles of disestablishment," *Chambers*, 463 U.S. at 786 [ ], if the actors did not consider themselves bound by the principles of disestablishment. And, although it is clear that prayer happened in state courts, there is too little evidence too thinly spread to conclude that those prayers occurred regularly.

*Id.* at 957. The fourth category was likewise rejected, as "[i]t reflect[ed] the reality that courtroom prayer was at least conceivable to some Americans[,] [b]ut it [could not] independently establish anything with enough certainty." *Id.* Looking at all of this evidence, the Fifth Circuit summarized its findings:

> So, on the whole, we have convincing evidence that it was common for Founding-era Justices to preside over court-term-opening ceremonies at which chaplains delivered prayers. We have comparable evidence that those Justices also personally delivered short, ecumenical supplications in charges to grand jurors and, sometimes, in their judicial opinions. And we have a litany of short, ecumenical supplications that federal courts have recited from the Founding to the present.
>
> We conclude that, under the methodology of [*Town of Greece*], the evidence establishes that courtroom prayer "fits within," 572 U.S. at 577 [ ], and is "consistent with the tradition," *id.* at 578 [ ], of prayer before "deliberative bodies," *McCarty*, 851 F.3d at 527. Although, as the plaintiffs and their *amici* have pointed out, the probative value of each item is less, there are still far more instances than the Supreme Court considered sufficient to establish consistency. [*Town of Greece*], 572 U.S. at 578–79 [ ].

*Id.*

122

The Fifth Circuit then "ask[ed] whether Mack's particular practice [was] consistent with that tradition." *Id.* In doing so, the Court addressed three arguments raised by plaintiffs as to "why that might not be so." *Id.*

First, these plaintiffs contended that "Mack's practice [ ] include[d] prayers that [were] often decidedly sectarian." *Id.* (internal quotations omitted). The Fifth Circuit found that any factual dispute here was "immaterial," as the "'content of the prayer is not of concern to judges.'" *Id.* (quoting *Town of Greece*, 572 U.S. at 581 (quotation omitted)). "Once it invites prayer into the public sphere, government must permit a prayer giver to address his or her own God or gods as conscience dictates, unfettered by what an administrator or judge considers to be nonsectarian." *Id.* (quoting *Town of Greece*, 572 U.S. at 582).

> There is, however, a limiting principle: "If the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion," the invocations are inconsistent with the public-prayer tradition. [*Galloway*, 572 U.S.] at 583 [ ]. Prayer must be "solemn and respectful in tone" and invite officials to "reflect upon shared ideals and common ends." *Id.*

*Id.* at 958. Plaintiffs failed to meet this burden, as "[a]t most, the plaintiffs' accounts [ ] show[ed] that the contents of the prayers delivered in Mack's courtroom are quite like the contents of the prayers in the historical record" and "[t]here [was] no suggestion that Mack's chaplains ha[d] preached damnation, denigration, or conversion." *Id.*

Second, the *Mack* plaintiffs argued that the justice of the peace "fail[ed] to maintain a policy of nondiscrimination," *id.* at 957, but the Fifth Circuit rejected this stance, *id.* at 958. While Mack was required to "maintain[ ] a policy of nondiscrimination," he did not need to "search" or attempt "to achieve religious balancing." *Id.* (quoting *Town of Greece*, 572 U.S. at 585–86). The appellate court concluded:

123

> Mack maintains a policy of nondiscrimination so long as (1) members of any faith are free to participate in the JCC Program and (2) he selects prayer-givers from among those members without regard for belief. The plaintiffs have identified no evidence that suggests those elements are unsatisfied. So there is no material factual dispute on nondiscrimination.

*Id.*

Third, plaintiffs argued that Mack's practice was inconsistent with the above tradition because "courtroom prayer inherently coerces attendees and that even if not, the specific attributes of Mack's prayer practice evince coercion." *Id.* at 957–58. "The coercion test asks whether the government obliged objectors to participate in 'a formal religious exercise.'" *Id.* at 954 (quoting *McCarty*, 851 F.3d at 525 n.12). The Fifth Circuit "turn[ed] once again to" *Town of Greece* and ultimately "assume[d], without deciding, that Justice Kennedy's approach in [*Town of Greece*] controls the coercion standard." *Id.* at 958–59.[13] The Fifth Circuit summarized that standard as follows:

> A three-Justice plurality, led by Justice Kennedy, recognized that objective evidence that a person has been treated differently from others, even if that difference is abstract, can show coercion. The plurality's approach is "fact-sensitive" and holistic. [*Town of Greece*], 572 U.S. at 587 [ ]. But it emphasizes that subjective offense "does not equate to coercion." *Id.* at 589 [ ]. Reports of subjective pressure to participate require "evidentiary support," such

---

[13] The Fifth Circuit recognized that "[t]he [*Town of Greece*] Court could not agree on the standard for showing that the government coerced religious exercise." *Id.* at 958 (citing *Kennedy*, 142 S. Ct. at 2429). The Fifth Circuit explained that there were "four opinions relevant to the question [of] whether Mack's practice [was] coercive," but the Court ultimately assumed that Justice Kennedy's controlled because:

> Where no majority opinion governs an issue, ordinarily we ask which position could sustain the Supreme Court's judgment "on the narrowest grounds," provided that "there is some common denominator upon which all of the Justices of the majority can agree." But there is no reason to decide whether Justice Kennedy's or Justice Thomas's approach is the narrower ground for decision because any practice deemed coercive under the latter approach will also be coercive under the former. So if a plaintiff's challenge fails under Justice Kennedy's approach, it "fails under either standard." *Bormuth v. Cnty. of Jackson*, 870 F.3d 494, 516 (6th Cir. 2017) (en banc). As we will explain, that is so here.

*Mack*, 49 F.4th at 959 (footnotes omitted).

as indications that "leaders allocated benefits and burdens based on participation in the prayer, or that citizens were received differently depending on whether they joined the invitation or quietly declined." *Id.* Courts must assess "whether coercion is a real and substantial likelihood." *Id.* at 590 [ ].

*Mack*, 49 F.4th at 958–59.[14]

Applying this test, the Fifth Circuit rejected "plaintiffs' theory that courtrooms are inherently coercive [as] conflict[ing] with that test" because the Court was "not free to invent [its] own legal standard" given the "many factual similarities to *Town of Greece*" and the town-board meetings there. *Id.* at 960. The plaintiffs could also not rely on a "perceived *risk* of prejudice" because "[t]he plaintiffs must present evidence that any such perception is objectively reasonable—evidence from which we can conclude that 'coercion is a real and substantial likelihood.'" *Id.* The appellate court went on to analyze the "two categories of evidence[—]*first*, evidence regarding entry and exit from Mack's courtroom; and *second*, evidence concerning Mack's decisions in cases involving nonpraying litigants"—before concluding that "Mack's practice [was] noncoercive." *Id.* at 961.

In sum, the Fifth Circuit found that the "history, character, and context of Mack's ceremony show that it is no establishment" of religion. *Id.* (cleaned up). "To maintain a lawful prayer ceremony, Mack must ensure that (1) he has a policy of denominational nondiscrimination and that (2) anyone may choose not to participate and suffer no consequences. Mack has shown that the plaintiffs fail materially to dispute those elements." *Id.*

---

[14] Justice Thomas' "stricter coercion test . . . would recognize coercion only as compulsion of religious orthodoxy and of financial support by force of law and threat of penalty. In other words, the perception of subtle pressure or government endorsement doesn't count." *Mack*, 49 F.4th at 959 (cleaned up).

#### iv. *Synthesizing the Above Law*

Having considered the history and development of the recent Establishment Clause cases, the Court lays out the following principles it draws therefrom and will use in deciding this opinion.

First, while *Kennedy* did eliminate the *Lemon* and endorsement tests, its focus on history and tradition was consistent with cases that came before it like *Town of Greece*. *See Kennedy*, 597 U.S. at 535–36 (relying in part on *Town of Greece*, 572 U.S. at 576); *see also Mack*, 49 F.4th at 950–51. Under *Town of Greece* and *Kennedy*, as interpreted by *Mack*, the issue is whether the practice at issue "fits within" and is "consistent with a broader tradition." *See Mack*, 49 F.4th at 951 (quoting *Town of Greece*, 572 U.S. at 577–78); *see also Firewalker-Fields v. Lee*, 58 F.4th 104, 122 n.6 (4th Cir. 2023) ("Identify the relevant tradition, then determine whether the challenged practice is in or out.").

Second, historical evidence is relevant because "widespread practice around the Founding helps reveal an amendment's original public meaning[,]" as does the practice "around the time of incorporation" in 1868. *See Mack*, 49 F.4th at 951 & n.7 (citation omitted). *See also id.* at 957 ("So, on the whole, we have *convincing evidence* that it was common for Founding-era Justices to preside over court-term-opening ceremonies at which chaplains delivered prayers. We have *comparable evidence* that those Justices also personally delivered short, ecumenical supplications . . . ." (emphasis added)). Again, the "analysis depends on 'original meaning and history,' with particular attention paid to 'historical practices.'" *Id.* at 951 (quoting *Kennedy*, 597 U.S. at 535). The Fifth Circuit has relied on *amici* to shed light on the historical analysis, and, for the same reasons, the Court finds expert testimony on this issue relevant (though by no means dispositive). *See id.* at 951–57. The burden on this claim remains with the Plaintiff. *See Croft*, 624 F.3d at 164 (finding plaintiff asserting facial challenges under the Establishment Clause had the burden). *See*

*also Firewalker-Fields*, 58 F.4th at 123 n.7 ("[T]he plaintiff has the burden of proving a set of facts that would have historically been understood as an establishment of religion. That requires proving both a set of facts, like in all litigation, and proving that those facts align with a historically disfavored establishmentarian practice." (citing *Bruen*, 597 U.S. at 25 n.6, 142 S. Ct. at 2130 n.6)). Indeed, *Mack*'s reliance on *Town of Greece*'s analysis and its approach as a whole make clear that historical evidence is not only relevant but essential to resolving these motions.

Third, *Kennedy* did not limit Establishment Clause claims to Justice Gorsuch's six hallmarks found in his *Shurtleff* concurrence. *See Kennedy*, 597 U.S. at 536–37 & n.5. In *Kennedy*, Justice Gorsuch used language indicating that his *Shurtleff* hallmarks were not an exhaustive list adopted by the Court. *See id.*[15] Moreover, *Kennedy* acknowledged that, "Members of this Court have sometimes disagreed on what exactly qualifies as impermissible coercion in light of the original meaning of the Establishment Clause." *Id.* at 537 (comparing *Lee*, 505 U.S. at 593, with *id.*, at 640–41 (Scalia, J., dissenting)). *Kennedy* did not attempt to resolve that uncertainty and disagreement. Finally, even AG Defendants acknowledged at oral argument that Justice Gorsuch's six hallmarks are not an exhaustive set of criteria for determining the viability of an Establishment Clause claim.

Fourth, *Mack* provides general guidance within the Fifth Circuit for determining (a) what the relevant tradition is and (b) whether a particular practice was consistent with the tradition at issue. As to the former, the Court must take heed "not to steer between Scylla and Charybdis— /

---

[15] The *Kennedy* opinion's parenthetical explanation for Justice Gorsuch's *Shurtleff* concurrence specifically stated that it "discuss[ed] coercion and *certain other* historical hallmarks of an established religion[.]" 597 U.S. at 537 n.5 (emphasis added) (citing *Shurtleff*, 596 U.S. at 284–87, 142 S. Ct. at 1608–1610 (Gorsuch, J., concurring)). Moreover, in *Kennedy*, the Court recognized that "coercion *along the[ ] lines*" of certain types recognized by the Supreme Court, such as the prohibition on the government from "coerc[ing] anyone to attend church," *id.* at 537 (quoting *Zorach*, 343 U.S. at 314), or "forc[ing] citizens to engage in 'a formal religious exercise,'" *id.* (quoting *Lee*, 505 U.S. at 589), were "*among* the *foremost* hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment[,]" *id.* (emphasis added) (citing, inter alia, *Shurtleff*, 596 U.S. at 284–87, 142 S. Ct. at 1608–1610 (Gorsuch, J., concurring)).

only a razor-edge between the devil and deep blue sea . . . ." VIRGIL, THE AENEID 125.789–90 (Robert Fagles trans., Penguin Books, 2008). That is to say, the Court must not construe the tradition too broadly (e.g., as the Ten Commandments in all of public life at the time of the Founding or Incorporation) or too narrowly (e.g., as exclusively the posting of the Decalogue according to the minimum requirements of the Act during that time). Rather, just as *Mack* identified the relevant tradition as "a broader tradition of public, government-sponsored prayer," *Mack*, 49 F.4th at 951, so too does this Court characterize the "broader tradition" as the use of the Ten Commandments in public-school education. While AG Defendants advanced at oral argument a different framing of the broader tradition,[16] the Court agrees with their characterization of the relevant practice as: the permanent posting of the Ten Commandments in public-school classrooms. Again, the question is whether there was a "widespread practice" or whether the practice was "common for Founding-era" public schools. *See Mack*, 49 F.4th at 951, 957. Evidence is insufficient if there are only "scattered instances" or "too little evidence too thinly spread to conclude that [the practice] occurred regularly." *See id.* at 957.

Fifth, again, *Mack* also provides general guidance as to whether a particular practice is consistent with the tradition at issue. One (but not the only) way a practice may be inconsistent is when it is sectarian; that is, the practice "denigrate[s] nonbelievers or religious minorities, threaten damnation, or preach conversion" rather than be "solemn and respectful in tone" and inviting others "to reflect upon shared ideals and common ends." *Id.* at 958 (quoting *Town of Greece*, 572 U.S. at 583). Additionally, the practice must "maintain[ ] a policy of nondiscrimination." *Id.* at 958 (quoting *Town of Greece*, 572 U.S. at 585). The government does so by ensuring that "members of any faith are free to participate in the [ ] [p]rogram" and, in the context of public

---

[16] AG Defendants argued that the broader tradition in which Plaintiffs must fit their challenge was Justice Gorsuch's six hallmarks. For the reasons given above, this Court disagrees.

prayer, ensuring that the government "selects prayer-givers from among [its] members without regard for belief." *Id.*

Sixth, under *Kennedy* and *Mack*, a particular practice can also be inconsistent with the broader historical tradition because it coerces religious exercise. As a general matter, the analysis is "'fact-sensitive' and holistic." *Mack*, 49 F.4th at 958–59 (quoting *Town of Greece*, 572 U.S. at 587). "[S]ubjective offense 'does not equate to coercion.'" *Id.* (quoting *Town of Greece*, 572 U.S. at 589). A plaintiff can show coercion with "objective evidence that [he] has been treated differently from others, even if that difference is abstract. . . ." *Id.* at 959 (citing *Town of Greece*, 572 U.S. at 587). The key questions are "whether coercion is a real and substantial likelihood," *id.*, and whether "anyone may choose not to participate and suffer no consequences," *id.* at 961.

Seventh, in the public-school context, the Establishment Clause is not violated by "*any* visible religious conduct" by a teacher or coach, as that would reflect a "hostilit[y] to religion" that is prohibited. *Kennedy*, 597 U.S. at 540–41. But, coercion has been found in the public-school context where "the school ha[s] 'in every practical sense compelled attendance and participation in' a 'religious exercise.'" *Id.* at 541–42 (quoting *Lee*, 505 U.S. at 580, 598); *see also id.* (citing *Sante Fe Indep. Sch. Dist.*, 530 U.S. at 294, 311). Students cannot be a "captive audience" or "required or expected to participate." *See id.* Ultimately, as Justice Breyer said in *Van Orden*, in distinguishing a display of the Ten Commandments on courthouse grounds from the display in classrooms in *Stone*, the "government must exercise particular care in separating church and state . . . on the grounds of a public school . . . given the impressionability of the young. . . ." *Van Orden*, 545 U.S. at 703 (Breyer, J., concurring in judgment) (citing *Lee*, 505 U.S. at 592). And, as *Lee* stated:

> [T]here are heightened concerns with protecting freedom of
> conscience from subtle coercive pressure in the elementary and

> secondary public schools. . . . Our decisions in *Engel* [ ] and
> [*Schempp*] recognize, among other things, that prayer exercises in
> public schools carry a particular risk of indirect coercion. The
> concern may not be limited to the context of schools, but it is most
> pronounced there. See [*County of Allegheny*, 492 U.S. at 661]
> (KENNEDY, J., concurring in judgment in part and dissenting in
> part). What to most believers may seem nothing more than a
> reasonable request that the nonbeliever respect their religious
> practices, in a school context may appear to the nonbeliever or
> dissenter to be an attempt to employ the machinery of the State to
> enforce a religious orthodoxy.

505 U.S. at 592.

b. <u>Analysis</u>

Having carefully considered the allegations of the *Complaint* and accepting them as true at

the Rule 12(b)(6) phase—which the Court must do—the Court finds that Plaintiffs have adequately

pled a violation of the Establishment Clause under *Kennedy*. As a result, *AG Defs. MTD* will be

denied on this issue.

With respect to history, Plaintiffs allege:

> There is no longstanding tradition of permanently displaying the
> Ten Commandments in public-school classrooms in Louisiana or
> the United States more generally. Indeed, for nearly half a century,
> it has been well settled that the First Amendment forbids public
> schools from posting the Ten Commandments in this manner. *See
> Stone v. Graham*, 449 U.S. 39 (1980)

(*Compl.* ¶ 2, Doc. 1; *see id.* ¶ 45.) The *Complaint* also maintains that "[t]he Act includes false

statements relating to a purported history and connection between the Ten Commandments and

government and public education in the United States[,]" such as the quote allegedly attributed to

James Madison, which Plaintiffs claim "is fabricated" and was never said by Madison "in any of

his public or private writings or in any of his speeches." (*Id.* ¶¶ 42–44.)[17]

---

[17] The Court notes that Green's testimony that this Madison quote was fabricated was uncontradicted and, indeed, unchallenged by AG Defendants.

Even if there were a broader tradition, Plaintiffs also sufficiently allege that the practice is not consistent with any tradition by being discriminatory and coercive.[18] Concerning discrimination, the *Complaint* demonstrates—"by the nature of the mandatory displays themselves, the history of H.B. 71," and statements of purpose made by various lawmakers—"that the state's main interest in enacting and implementing H.B. 71 is the imposition of religious beliefs on public-school children." (*Compl.* ¶ 55, Doc. 1.) Moreover,

> H.B. 71 is not neutral with respect to religion. By design, it expressly requires the display of religious scripture—the Ten Commandments—in every public-school classroom, and it requires a specific, state-approved version of that scripture to be posted, taking sides on theological questions regarding the correct content and meaning of the Decalogue.

(*Id.* ¶ 56.) This Act requires this despite the fact that many Louisianians (like the Plaintiffs) (a) do not subscribe to the specific version of the Ten Commandments listed in the Act; (b) are not religious and do not agree with any version of the Decalogue; or (c) believe in other religions (such as Hinduism, Buddhism, and Taoism) that "generally do not consider the commandments to be part of their belief system." (*Id.* ¶¶ 57–62.) The *Complaint* also highlights that H.B. 71 requires a version of the Ten Commandments that many Protestants use and that this is inconsistent with versions recognized by Jews or Catholics. (*Id.* ¶¶ 63–67.) Ultimately, while the Act need not "search or try to achieve religious balancing," *Mack*, 49 F 4th at 958 (cleaned up), as pled, H.B. 71 fails to select both historical documents generally and versions of the Ten Commandments in particular "without regard for belief," *cf. id.*, and is thus discriminatory as a matter of law.

---

[18] The Court passes on the question of whether the Act is sectarian. Specifically, the Court need not address whether H.B. 71's mandatory display of "the first part of the Commandments concern[ing] the religious duties of believers: worshipping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day," *Stone*, 449 U.S. at 42 (citing Exodus 20: 1–11; Deuteronomy 5: 6–15), are inconsistent with historical practices by "denigra[ting] nonbelievers or religious minorities, threaten[ing] damnation, or preach[ing] conversion" rather than inviting students to "reflect upon shared ideals and common ends," *Mack*, 49 F.4th at 958 (citation omitted). While Plaintiffs make numerous allegations of the extent to which they feel so denigrated, it is unnecessary to resolve this issue in this ruling.

Additionally, Plaintiff adequately pleads that the Act is coercive. The *Complaint* concisely summarizes this assertion as follows:

> Permanently posting the Ten Commandments in every Louisiana public-school classroom—rendering them unavoidable— unconstitutionally pressures students into religious observance, veneration, and adoption of the state's favored religious scripture. It also sends the harmful and religiously divisive message that students who do not subscribe to the Ten Commandments—or, more precisely, to the specific version of the Ten Commandments that H.B. 71 requires schools to display—do not belong in their own school community and should refrain from expressing any faith practices or beliefs that are not aligned with the state's religious preferences. And it substantially interferes with and burdens the right of parents to direct their children's religious education and upbringing.

(*Compl.* ¶ 3, Doc. 1.)

Plaintiffs elaborate in detail on these allegations. The *Complaint* correctly references the fact that, by law, parents must send their minor children to school and ensure attendance during regular school hours at least 177 days per year. (*Id.* ¶¶ 69–70 (citing La. R.S. §§ 17:221(A)(1)(c), 154.1(A)(1)).) Further, as stated above, many children and their families do not subscribe to this version of the Ten Commandants, or any version. (*Id.* ¶¶ 72–75.) "Under H.B. 71, each of these children will be forcibly subjected to the state's official version of the Ten Commandments for nearly every hour that they are in school," which, cumulatively, amounts to at least 2,124 minimum number of school days from age six to eighteen. (*Id.* ¶¶ 76–77.) Plaintiffs also highlight certain requirements of the Act—that the Decalogue be the "central focus," in a certain size, and printed in "large, easily readable font"—before asserting, "[t]hese requirements are intended to, and will, ensure that students are more likely to observe, absorb, accept, and follow the Ten Commandments." (*Id.* ¶¶ 78–79.) That, indeed, is what the authors of the Act intended.[19] The

---

[19] Again, the *Complaint* alleges:

*Complaint* recounts the legislative history (which this Court quoted above) before concluding that, "[a]s a result of the displays mandated by H.B. 71, students who do not subscribe to the state's official version of the Ten Commandments—including minor-child Plaintiffs—will" (1) "be pressured into religious observance, veneration, and adoption of this religious scripture;" and (2) "will feel pressure to avoid fully expressing or practicing their own faiths and religious beliefs or nonreligious beliefs in view of their peers, teachers and other school staff." (*Id.* ¶¶ 79–81.) After describing in detail the specific ways each of the named Plaintiffs will be harmed by H.B. 71, (*see* Section II, "The Named Plaintiffs," *supra* (citing generally *Compl.* ¶¶ 82–155, Doc. 1)), the *Complaint* concludes this point by stating:

> As a result of the Ten Commandments displays mandated by H.B. 71, Louisiana students—including minor-child Plaintiffs—will be unconstitutionally coerced into religious observance, veneration, and adoption of the state's favored religious scripture, and they will be pressured to suppress their personal religious beliefs and practices, especially in school, to avoid the potential disfavor, reproach, and/or disapproval of school officials and/or their peers.

(*Compl.* ¶ 160, Doc. 1.)

---

> For example, during the House Education Committee's debate, Representative Horton, the primary author and sponsor of the bill, explained: "It is so important that our children learn what God says is right and what He says is wrong, and to allow [the Ten Commandments] to be displayed in our classrooms as a visual aid, I believe, especially in this day and time is so important." Horton later told a reporter that she is only "concerned with our children looking and seeing what God's law is." Representative Sylvia Taylor, Horton's co-author and co-sponsor of H.B. 71, similarly stated: "I really believe that we are lacking in direction. A lot of people, their children, are not attending churches or whatever . . . So what I'm saying is, we need to do something in the schools to bring people back to where they need to be." And Representative Roger Wilder, another co-author and co-sponsor of H.B. 71, expressed his support for the law by claiming that those who oppose it are waging an "attack on Christianity" and suggesting that it would provide a religious counterbalance to students' secular education: "My wife is a Christian and if she was a teacher she would be asked to teach evolution which is in complete contradiction with the theory of creation that we believe out of the Bible. . . . I am a parent and am asking for this [bill]."

(*Compl.* ¶ 79, Doc. 1.)

133

Having considered Louisiana's laws (including the challenged Act and those dealing with mandatory attendance) and having evaluated the above allegations in light of the "fact-sensitive" and "holistic" inquiry required by the Fifth Circuit in *Mack*, the Court finds that these plaintiffs' concerns rise far beyond "subjective offense"; rather, Plaintiffs have shown a real and substantial likelihood of coercion, 49 F.4th at 958–59, particularly given the fact that, in the school context, coercion has been found where "the school has in every practical sense compelled attendance and participation in a religious exercise," *Kennedy*, 597 U.S. at 541–42 (cleaned up) (relying upon *Lee*, 505 U.S. at 580, 598, and *Sante Fe Indep. Sch. Dist.*, 530 U.S. at 311); *cf. Mack*, 49 F.4th at 961 (stressing that, to be constitutional, "anyone may choose not to participate and suffer no consequences."). Each of the Plaintiffs' minor children will be forced "in every practical sense," through Louisiana's required attendance policy, to be a "captive audience" and to participate in a religious exercise: reading and considering a specific version of the Ten Commandments, one posted in every single classroom, for the entire school year, regardless of the age of the student or subject matter of the course. And, despite the differences among the Plaintiffs' religious beliefs (be they Unitarian Universalist, Reform Jewish, Presbyterian, or atheist/agnostic), the common threads are (1) that the required posting of the Decalogue conflicts with specific parts of their faith, and (2) that one of those articles of faith, shared by nearly all Plaintiff parents, is raising their children in accordance with their own beliefs and values. Considering the totality of the circumstances, the Court finds that the Act and its requirements are coercive and inconsistent with the history of First Amendment and public education.

In sum, Plaintiffs have sufficiently alleged that the Act violates the Establishment Clause because it does not fit within and is not consistent with a broader tradition in place at the time of the Founding or incorporation. Moreover, even if there were a broader tradition in play, the practice

mandated by the Act would be inconsistent with that tradition because it is discriminatory and coercive. For all these reasons, *AG Defs. MTD* on this issue will be denied.

## VI.    AG DEFS. MTD: RULE 12(B)(6) MOTION: THE FREE EXERCISE CLAUSE CLAIM

### A.  Parties' Arguments

#### *1.  AG Defendants' Original Memorandum (Doc. 39-1)*

AG Defendants assert that the *Complaint* is implausible with respect to the Free Exercise claim for three reasons. (Doc. 39-1 at 50.) First, "it defies common sense to say that students will feel any alleged pressure if they happen to view" one of the Illustrations offered by AG Defendants such as Illustration 13, "Memes and Law," or Illustration 6, concerning *Hamilton* and Charlton Heston's *The Ten Commandments*. (*Id.* at 50–52.) "[S]eeing Lin-Manuel Miranda's clever spin on the Ten Commandments may prompt an observer to watch *Hamilton*, but it would not burden their religion or force them to change it any more than it would coerce a student to duel." (*Id.* at 52.)

Second, AG Defendants argue:

> More fundamentally, the Free Exercise Clause is not implicated here. As its name suggests, the Free Exercise Clause protects only religious *exercise*—believing, professing, and engaging in "conduct motivated by religious belief." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993). And nothing in the Free Exercise Clause obligates the State to "comport with the religious beliefs of particular citizens," or "demand[s] that the Government join in [their] chosen religious practices." *Bowen v. Roy*, 476 U.S. 693, 699–700 (1986).

(*Id.*) AG Defendants maintain that the nonreligious Plaintiffs are not exercising religion at all, so their Free Exercise claim must fail. (*Id.* at 53.) Others complain of "objecting to" or being "offended" by H.B. 71, but, AG Defendants claim, this too does not constitute an exercise of religion. (*Id.*) Ultimately, "the Free Exercise Clause does not compel government to affirm Plaintiffs' chosen religious practices." (*Id.* at 53 (citing *Bowen*, 476 U.S. at 699).)

> In reality, Plaintiffs' Free Exercise claim boils down to a redux of their Establishment Clause coercion theory—but this time characterized as a substantial burden on their religious exercise. To be sure, the Free Exercise Clause protects against "indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Carson v. Makin*, 596 U.S. 767, 778 (2022) (citation omitted). But the government "do[es] not engage in impermissible coercion merely by *exposing* constituents to [something] they would rather not hear and in which they need not participate." *Town of Greece*, 572 U.S. at 590 (emphasis added). Nor does "[o]ffense . . . equate to coercion." *Kennedy*, 597 U.S. at 539 (quoting *Town of Greece*, 572 U.S. at 589). That is no less true in classrooms where, "[i]f no religious *activity* is at issue, any speculation as to whether students might feel pressured to participate is irrelevant." *Beaumont Indep. Sch. Dist.*, 240 F.3d at 470 (emphasis added).

(*Id.*)

AG Defendants look to case law for comparable situations. First, they analogize to students objecting to the Pledge of Allegiance; schools cannot force a student objecting on the basis of religion to recite the Pledge or stand, but hearing the Pledge does not cause any Free Exercise violation. (*Id.* at 53–54 (citations omitted).) Additionally, AG Defendants say this case is like the motto "In God We Trust," which also is permissible. (*Id.* at 54.) These defendants conclude this point by saying that, while the State cannot force religious objectors to participate in a religious exercise, "non-participatory exposure is not" forbidden; though students may opt out of specific activities, "they do not have a right to remove content from the curriculum (or the classroom wall) because the presence allegedly offends them." (*Id.*).

Third, AG Defendants say that Plaintiffs cannot demonstrate that the Act is "not neutral or generally applicable." (*Id.* (quoting *Kennedy*, 597 U.S. at 525).) "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." (*Id.* at 54–55 (quoting *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021) (citations omitted)).) Here, H.B. 71 does not restrict anything and is not "intolerant of religious

beliefs." (*Id.* (citations omitted).) "If anything, it is exceedingly *tolerant* of beliefs across faith traditions that espouse the Ten Commandments, by urging education about the role of the Ten Commandments in Louisiana, America[ ], and world history." (*Id.* at 55.) According to AG Defendants, any argument that the State is being intolerant of other faiths would contradict the Supreme Court's Establishment Clause cases, like *Van Orden* and *American Legion*, which upheld the display of the Latin Cross. (*Id.*) Thus, H.B. 71 is neutral as contemplated by the Supreme Court. (*Id.*)

Further, they claim the Act is generally applicable. (*Id.*) Indeed, AG Defendants maintain that Plaintiffs do not argue otherwise. (*Id.* at 55–56.)

## 2. *Plaintiffs' Opposition (Doc. 47)*

Plaintiffs respond that AG Defendants' argument about their allegedly innocuous illustrations are a "red herring that prove[s] nothing other than the extraordinary efforts that public schools might make to infuse scripture into their classrooms, draw students' attention to it, and pressure them into observing, meditating on, venerating, and living by its faith tenets." (Doc. 47 at 48.) According to Plaintiffs, AG Defendants concede that the Free Exercise Clause prohibits direct and "indirect coercion and penalties on the free exercise of religion, not just outright prohibitions." (*Id.* (quoting *Carson v. Makin*, 596 U.S. 767, 778 (2022)).) Despite this, AG Defendants maintain that the Act is merely "non-participatory exposure" to "unwelcomed content." (*Id.* (quoting Doc. 39-1 at 45).) But:

> That characterization does not reflect the wide-ranging, all-pervading nature of the statutory regime, which capitalizes on the State's compulsory-education laws . . . and the coercive school context . . . to impose on students constant and unavoidable displays of the Ten Commandments—the State's preferred version, no less—that will follow them throughout their educational journeys.

(*Id.* at 48–49.)

Plaintiffs also take issue with the analogies AG Defendants draw upon from case law. For example, AG Defendants rely on *Town of Greece* to support their position that the Act imposes mere "offense," but Plaintiffs respond:

> [T]he Court's assessment of coercion there was premised wholly on the fact that the objectors were "mature adults" who voluntarily attended government meetings and were "free to enter and leave with little comment and for any number of reasons." *Town of Greece*, 572 U.S. at 590 (quoting *Lee*, 505 U.S. at 597). The minor-child Plaintiffs, by contrast, are students who are compelled by law to attend school and are under the thumb of State control while there—a distinction recognized by the Court itself in *Town of Greece. Id.* at 590–91 (citing *Lee*, 505 U.S. at 597). According to the Court, "[s]hould nonbelievers choose to exit the room during a prayer they find distasteful, their absence will not stand out as disrespectful or even noteworthy[,]" and "should they remain, their quiet acquiescence will not, in light of our traditions, be interpreted as an agreement with the words or ideas expressed." *Id.* at 590. It is an entirely different story for children, who are "readily susceptible to religious indoctrination or peer pressure." *See id.* (internal quotation marks omitted).

(*Id.* at 49.)

Likewise, AG Defendants' reliance on Pledge of Allegiance cases fails. (*Id.*) There, courts have emphasized that the students were confronted with secular conduct, whereas, here, the activity is religious. (*Id.*) Moreover, there, students could opt out, which they cannot do here. (*Id.* at 49–50.) The same goes for AG Defendants' hypothetical challenge to evolution lessons or homework on world affairs, both of which involve secular instruction, not religious scripture. (*Id.* at 50.) Again, there is simply no right to opt out of or avoid the displays mandated by the Act, and, in any event, the State's curriculum does not mention the Ten Commandments or tie them to same. (*Id.*)

> In sum, the Act cannot be constitutionally implemented because its mandatory, permanent displays of the Ten Commandments in every classroom will "effectively induce [] schoolchildren to meditate upon the Commandments during the school-day." *See City of*

138

> *Elkhart v. Books*, 532 U.S. 1058, 1061 (2001) (Rehnquist, C.J.,
> dissenting from denial of certiorari); *see also Van Orden*, 545 U.S.
> at 690–91 (plurality opinion). The Act provides no path for objectors
> to opt out, and the permanent, ubiquitous nature of the displays
> offers no relief from them. As a result, students will be coercively
> indoctrinated in the State's favored religious beliefs and
> concomitantly pressured to suppress their own religious beliefs and
> practices at school. That is anathema to the "freedom of conscience
> and worship" that the Free Exercise Clause embraces. *See Lee*, 505
> U.S. at 591; Pl. Br. at 20–22.

(*Id.* at 50–51.) In sum, Plaintiffs argue they have shown a sufficient burden on their religious

practice, "including but not limited to the coercive effect the Act's displays will have on the minor-

Plaintiffs' expression and practice at school, and the Act's interference with the parent-Plaintiffs'

right to direct the religious education and upbringing of their children." (*Id.* (citing *Wisconsin v.*

*Yoder*, 406 U.S. 205, 232 (1972)).)

Plaintiffs also contend that the Act is not religiously neutral. (*Id.* at 50, 52.) Plaintiffs

maintain that the relevant factors for determining neutrality under the Free Exercise Clause include

"the historical background of the decision under challenge, the specific series of events leading to

the enactment or official policy in question, and the legislative or administrative history, including

contemporaneous statements made by members of the decisionmaking body." (*Id.* at 52 (quoting

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 584 U.S. 617, 638 (2018) (internal

quotation marks omitted)).) Plaintiffs maintain that the "lack of neutrality" is "evident from its

text" and "is two-fold: (1) The Act mandates the display of explicitly religious doctrine, and (2)

the particular text of the religious doctrine prescribed by the Act is Protestant." (*Id.*) This is

particularly clear given the fact that many Plaintiffs do not adhere to these commandments, either

generally or to the particular version at issue. (*Id.*) Further, "[t]he legislative history also evinces

legislators' deviation from neutrality." (*Id.*) Plaintiffs then recount some of the statements from

legislators supporting this. (*Id.* at 52–53.)

AG Defendants cannot "evade what is obvious from the text of the Act itself and its legislative history" by relying on *Van Orden*. (*Id.* at 53.) The setting in *Van Orden* was "wildly different" from this one, and, in that case, "the government there did not mandate the creation of the display or select and approve its denominationally preferential text," whereas, "[h]ere, the State went out of its way to require public-school displays of the commandments and to select, vote on, and officially approve the specific text to be used . . . ." (*Id.*)

Plaintiffs argue that, as a result of the above analysis, AG Defendants then have the burden of satisfying strict scrutiny. (*Id.*) They claim that AG Defendants fail to advance a compelling interest in "subjecting students—for nearly every minute of the school day, year after year—to religiously preferential displays of scripture in order to show children 'what God's law is.'" (*Id.*) Moreover, even if there were an educational or historical interest, the law lacks narrow tailoring because "BESE could simply update its own curricular standards, which currently omit any mention of the commandments . . . and address the commandments objectively through 'an appropriate study of history, civilization, ethics, comparative religion, or the like.'" (*Id.* at 53–54 (quoting *Stone*, 449 U.S. at 42).)

### 3. AG Defendants' Reply (Doc. 54)

In reply, AG Defendants reiterate their assertion that the Free Exercise claim is merely an effort to "repackage" Plaintiffs' Establishment Clause claim. (Doc. 54 at 24.) AG Defendants first argue, "Plaintiffs fail to cite a single case in which a court has held passive religious symbolism to violate the Free Exercise Clause. That is because mere non-participatory exposure to objectionable speech does not violate the Free Exercise Clause." (*Id.*) As with the Pledge of Allegiance, they say, objectors have the right to opt out, but not the right to stop it. (*Id.*) Though Plaintiffs maintain they cannot opt out, here "there is nothing for students to opt out *from*." (*Id.*) Students are required

to recite the pledge, but, here, they need not do anything with the displays mandated by H.B. 71. (*Id.*)

Additionally, AG Defendants' legal authority cannot be written off on the grounds that the action there involved "secular conduct." (*Id.* at 25.)

> The Free Exercise Clause does not depend on whether the *government's action* is religious; it depends on whether the *plaintiff's* religious conduct is impermissibly burdened. Moreover, just as the Pledge has "secular purposes" even as it "acknowledg[es] . . . religious heritage," *Croft*, 624 F.3d at 167, so too the Ten Commandments "have both a religious and secular message," *Van Orden*, 351 F.3d at 180.

(*Id.*)

Moreover, AG Defendants argue that, even if it were possible that a Ten Commandments display could rise to the level of coercion, their Illustrations do not. (*Id.*) "Unlike the bare-bones display in *Stone*, displays showcasing the Ten Commandments alongside other historical documents, legal context, and pop-culture references can have no conceivable tendency to coerce students to 'read, meditate upon, [or] perhaps to venerate and obey, the Commandments.'" (*Id.* (quoting *Stone*, 449 U.S. at 42).)

Lastly, AG Defendants maintain that, if religious exercise is implicated, H.B. 71 should be subject to rational-basis review because it is neutral and generally applicable. (*Id.*) They say the case relied upon by Plaintiffs involved "government officials disparaging the claimant's religion and penalizing its religious exercise under state law." (*Id.* (cleaned up).) AG Defendants contend that Plaintiffs' real argument is that any "'explicitly religious'" display of a "'particular' faith tradition is 'presumptively unconstitutional,'" but that this cannot be squared with the fact that the same version of the Ten Commandments was allowed by *Van Orden*. (*Id.* at 25–26 (quoting Doc. 47 at 41).) AG Defendants conclude:

H.B. 71 does not "infringe upon or restrict practices because of their religious motivation." *Lukumi*, 508 U.S. at 533. It does not provide "a mechanism for individualized objections" on religious or non-religious bases. *Fulton*, 593 U.S. at 533 (quotation omitted). And its "design" does not demonstrate "deliberate[ ] disrespect[ ]" for any faith. *Am. Legion*, 588 U.S. at 64. Thus, strict scrutiny does not apply. Plaintiffs have forfeited any argument that H.B. 71 would fail under rational-basis review. The Court should thus dismiss Count II for failure to state a claim.

(*Id.* at 26.)

### B. Law and Analysis

"The Free Exercise Clause of the First Amendment, applicable to the States under the Fourteenth Amendment, provides that 'Congress shall make no law . . . prohibiting the free exercise' of religion." *Fulton*, 593 U.S. at 532. "[T]he Free Exercise . . . Clause[ ] of the First Amendment . . . protects religious exercises, whether communicative or not . . . ." *Kennedy*, 597 U.S. at 523 (citations omitted).

"At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Church of Lukumi Babalu Aye*, 508 U.S. at 532 (citations omitted). This "Clause[ ] requires government respect for, and noninterference with, the religious beliefs and practices of our Nation's people." *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005).

"[A] plaintiff may carry the burden of proving a free exercise violation in various ways, including by showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy*, 597 U.S. at 525 (citation omitted). "Should a plaintiff make a showing like that, this Court will find a First Amendment violation unless the government can satisfy 'strict scrutiny' by demonstrating its course was

justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Id.* (citation omitted).

Having carefully considered the matter, the Court finds that Plaintiffs have established a viable Free Exercise claim. First, they have sufficiently alleged that the Act burdens their "sincere religious practice[s]" and beliefs. *See id.* As summarized above, the *Complaint* describes in detail all of the ways in which the mandatory display of the Ten Commandments in H.B. 71 conflicts with and burdens the sincere beliefs of the Unitarian Universalist, Presbyterian, agnostic or atheist, and Reform Jewish Plaintiffs. (*See* Section II, "The Named Plaintiffs," *supra* (citing generally *Compl.* ¶¶ 82–155, Doc. 1).) Specifically, the Act is at odds with, inter alia, (a) Unitarian Universalist, agnostic, and atheist views about proselytizing and the Ten Commandments generally; (b) Reform Jewish tradition as to the particular content of this specific version of the Decalogue and the need to instruct about it in the context of that tradition; and (c) Presbyterian teachings on the display of the Ten Commandments by secular authorities. (*See id.*)

Additionally, there is another sincerely held religious practice that the Act burdens. For over fifty years, the Supreme Court has recognized "traditional concepts of parental control over the religious upbringing and education of their minor children. . . ." *Yoder*, 406 U.S. at 231. That is, there is a "fundamental interest of parents, as contrasted with that of the State, to guide the religious future and education" and "to direct the religious upbringing of their children." *Id.* at 232–33. *See also id.* at 234 ("[W]e hold . . . the First and Fourteenth Amendments prevent the State from compelling [the Amish parent] respondents to cause their children to attend formal high school to age 16."). H.B. 71 violates this principle; as the *Complaint* alleges, the Act "substantially interferes with and burdens the right of parents to direct their children's religious education and

upbringing." (*Compl.* ¶ 3, Doc. 1.) Thus, Plaintiffs have established a burden on their sincerely held religious beliefs.

The Court also easily rejects AG Defendants' argument that the Act is neutral. "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533 (citing *Masterpiece Cakeshop*, 584 U.S. at 636–39, 138 S. Ct. at 1730–1732; *Church of Lukumi Babalu Aye*, 508 U.S. at 533).

"There are, of course, many ways of demonstrating that the object or purpose of a law is the suppression of religion or religious conduct." *Church of Lukumi Babalu Aye*, 508 U.S. at 533. "To determine the object of a law, [the Court] must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face. A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Id.*

But, "[f]acial neutrality is not determinative. The Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination." *Id.* at 534. "The Free Exercise Clause bars even subtle departures from neutrality on matters of religion." *Masterpiece Cakeshop*, 584 U.S. at 638 (cleaned up). "The Constitution 'commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures.'" *Id.* at 638–39 (quoting *Church of Lukumi Babalu Aye*, 508 U.S. at 547).

Thus, "[a]part from the text, the effect of a law in its real operation is strong evidence of its object." *Church of Lukumi Babalu Aye*, 508 U.S. at 535. "To be sure, adverse impact will not

always lead to a finding of impermissible targeting. For example, a social harm may have been a legitimate concern of government for reasons quite apart from discrimination." *Id.* (citations omitted). But the laws at issue cannot "disclose an object remote from these legitimate concerns. The designs of [the] law[ ]" cannot "accomplish[ ] . . . a religious gerrymander, an impermissible attempt to target" the Plaintiffs "and their religious practices." *Id.* (cleaned up).

Additionally, "[f]actors relevant to the assessment of governmental neutrality include 'the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body.'" *Masterpiece Cakeshop*, 584 U.S. at 639 (quoting *Church of Lukumi Babalu Aye*, 508 U.S. at 540). "These objective factors bear on the question of discriminatory object." *Church of Lukumi Babalu Aye*, 508 U.S. at 540 (citing *Pers. Admin. of Mass. v. Feeney*, 442 U.S. 256, 279 n.24 (1979)).

Here, the Court finds that H.B. 71 is not neutral toward religion. As stated throughout this opinion, the Act requires the display of a specific Protestant version of the Decalogue. Again, this required display conflicts with the religious views of Unitarian Universalists, agnostics, atheists, Presbyterians, and Reform Jewish parents, particularly about proselytizing, the Ten Commandments (both generally and this version), and the role of the secular authorities. (*See Compl.* ¶¶ 82–155, Doc. 1.) AG Defendants argue that H.B. 71's version of the Decalogue is identical to the one upheld in *Van Orden*, but (a) as the plurality pointed out, that case was a "far more passive use of those texts than was the case in *Stone*," where students were captive audiences, *Van Orden,* 545 U.S. at 691 (plurality opinion), and, (b) the specific context of that particular, single display made it acceptable, part of which context included that "[t]he display [was] not on the grounds of a public school, where, given the impressionability of the young, government must

exercise particular care in separating church and state," *id.* at 703 (Breyer, J., concurring in judgment) (citations omitted).

Additionally, the legislative history confirms that the Act "proceed[ed] in a manner intolerant of religious beliefs." *Fulton*, 593 U.S. at 533. Again, the Act's primary author and sponsor, Rep. Dodie Horton, declared of H.B. 71 in the Louisiana House Chamber, "I'm not concerned with an atheist. I'm not concerned with a Muslim. I'm concerned with our children looking and seeing what God's law is." La. House Reg. Sess. (Apr. 10, 2024), at 47:42, https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2024/apr/0410_24_24RS_D ay16; *see also* La. State Legislature (Sept. 16, 2024), https://www.legis.la.gov/legis/BillInfo.aspx?s=24rs&b=HB71 (describing Rep. Horton as "primary" author). Rep. Horton also stated during the House Education Committee debate on the bill: "It is so important that our children learn what God says is right and what He says is wrong and to allow [the Ten Commandments] to be displayed in our classrooms as a visual aid, I believe, especially in this day and time is so important." La. House Educ. Comm. (Apr. 4, 2024), at 5:08, https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2024/apr/0404_24_ED.3 . Representative Sylvia Taylor, another author of H.B, 71, similarly said, "I believe that we are lacking in direction. A lot of people, their children, are not attending churches or whatever. . . . So what I'm saying is, we need to do something in the schools to bring people back to where they need to be." *Id*. at 15:15; La. State Legislature (Sept. 16, 2024), https://www.legis.la.gov/legis/BillInfo.aspx?s=24rs&b=HB71 (describing Rep. Taylor as another author). And all of this must be seen in the context of (1) the fact that AG Defendants offer little from the legislative history to rebut Plaintiffs, and (2) the Governor's statement in response to this challenge to H.B. 71 that supporters should help him "ADVANCE [] the Judeo-Christian values

that this nation was built upon." Wall, *supra*, at note 5. Thus, in addition to the Act's plain language and effects, H.B. 71's legislative history confirms that the law's "departures from neutrality on matters of religion" are more than "subtle." *Masterpiece Cakeshop*, 584 U.S. at 638–39 (cleaned up); *see also Church of Lukumi Babalu Aye*, 508 U.S. 540–42 (noting in its finding of no neutrality that "[t]he minutes and taped excerpts of the June 9 session . . . evidence significant hostility exhibited by residents, members of the city council, and other city officials toward the Santeria religion and its practice of animal sacrifice.").

Since the Act is not neutral, the Court turns to the next phase of the analysis. "A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny." *Church of Lukumi Babalu Aye*, 508 U.S. at 546. "To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance '"interests of the highest order"' and must be narrowly tailored in pursuit of those interests." *Id.* (citations omitted). "A law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." *Id.*

Here, AG Defendants failed to satisfy these requirements. Even assuming that H.B. 71 advanced a compelling interest (e.g., for educational or historical value), the Act is unquestionably not "narrowly tailored in pursuit of those interests." *Id.* (citations omitted). There are any number of ways that the State could advance an alleged interest in educating students about the Ten Commandments that would be less burdensome on the First Amendment than the one required by the Act, including but not limited to: (1) posting the laws for a designated amount of time (i.e., days or hours) rather than every day, all year around; (2) displaying them only when the students reach a particular age (like one in which they are able to read and understand the elevated language

of the King James version of the Bible and to discuss or at least consider the sensitive issue of adultery); (3) using them in relevant course curricula (like social studies or world religions), rather than any subject matter, regardless of pertinence (like trigonometry, biology, and even gym class); or (4) having one single display at school (like the monument in *Van Orden*) rather than countless posters in every single classroom at the institution regardless of the subject taught. In short, H.B. 71 is not narrowly tailored, so it must fall under the Free Exercise Clause. *See id.* ("The absence of narrow tailoring suffices to establish the invalidity of the ordinances." (citation omitted)).

The Court also rejects AG Defendants' arguments that (1) the Act is not coercive; (2) this case is no different than those involving issues like the Pledge of Allegiance, where students can opt out; and (3) that, at heart, Plaintiffs are really themselves showing a hostility to any religion by trying to suppress it. All of these arguments were addressed above in reference to the Establishment Clause. In short, the Act is coercive to students, and, for all practical purposes, they cannot opt out of viewing the Ten Commandments when they are displayed in every classroom, every day of the year, every year of their education. As the Supreme Court recognized in *Stone*, "[i]f the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments[,]" *Stone*, 449 U.S. at 42, and this is particularly true considering the "heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools," *Lee*, 505 U.S. at 592.

AG Defendants complain that Plaintiffs merely "repackage" their arguments about the Establishment Clause; but, this position ignores the fact that "the [two] Clauses appear in the same sentence of the same Amendment[,]" and "[a] natural reading of that [Amendment] would seem to suggest the Clauses have complementary purposes, not warring ones where one Clause is always

sure to prevail over the others." *Kennedy*, 597 U.S. at 533 (cleaned up). The same reasoning applies here.

In sum, the Court finds that Plaintiffs have stated a viable Free Exercise claim. As a result, *AG Defs. MTD* will be denied on this issue.

## VII. PLS. MPI

### A. Parties' Arguments

Plaintiffs move for a preliminary injunction seeking the following relief:

> Plaintiffs pray that this Court: preliminarily enjoin (1) all Defendants and their officers, agents, affiliates, subsidiaries, servants, employees, successors, and all other persons or entities in active concert or privity or participation with them, from adopting rules or regulations in accordance with, or otherwise enforcing, House Bill No. 71, Act No. 676, and from requiring that the Ten Commandments be displayed in every public-school classroom in Louisiana; and (2) the School Board Defendants and their officers, agents, affiliates, subsidiaries, servants, employees, successors, and all other persons or entities in active concert or privity or participation with them from displaying the Ten Commandments in any public-school classroom. Plaintiffs further pray that this Court issue an order directing Defendants Brumley and the members of the Louisiana State Board of Elementary and Secondary Education to provide a copy of any preliminary injunction granted to all Louisiana public elementary, secondary, and charter schools, and all public post-secondary education institutions.

(Doc. 20 at 3.) They also maintain that the requirement of posting a bond should be waived because (1) the injunction seeks non-monetary relief; (2) "the gravity of interest is great"; and (3) AG Defendants cannot show a likelihood of harm or loss if the injunction is granted. (*Id.* at 3 n.1 (citations omitted).)

Plaintiffs argue that they satisfy the four requirements for a preliminary injunction. (*See* Doc. 20-1.) They have established a substantial likelihood of relief, for all the reasons given above. (*See also id.* at 12–29.) Where First Amendment plaintiffs make this showing, the other injunction

factors are typically presumed. (*Id.* at 29.) Further, Plaintiffs have shown irreparable injury because of the violation of their First Amendment freedoms. (*Id.*) Plaintiffs also contend that the public interest and balance of potential harms weigh in their favor; there is no harm because the preliminary injunction merely preserves the status quo, and the public interest would be served by preventing the violation of their constitutional rights. (*Id.* at 29–30.)

AG Defendants oppose the motion. (Doc. 39-1 at 56.) They argue first that, if the Court grants their motions to dismiss, *Pls. MPI* should be denied as moot. (Doc. 39-1 at 56.)

But, if the Court denies *AG Defs. MTD*, then, AG Defendants argue, the Court should still deny *Pls. MPI*. (*Id.*) First, for all the reasons they give above, AG Defendants contend that Plaintiffs are unlikely to succeed on the merits, either from jurisdictional defects or from a failure to state a claim. (*Id.*)

Second, these defendants assert that Plaintiffs will not suffer irreparable harm if an injunction is not granted. (*Id.* at 57.) AG Defendants again reiterate the above arguments for this issue as well. (*Id.*)

Third, AG Defendants assert that the equities and public interest weigh in their favor. (*Id.*) The State and its citizens will suffer if their statute is not implemented, and it is inequitable to grant an injunction when AG Defendants must decide how to comply with H.B. 71 before the January 1, 2025, implementation deadline. (*Id.*)

Fourth, AG Defendants attack the request for an order that Brumley and the BESE Members provide a copy of the preliminary injunction to all Louisiana public elementary, secondary, and charter schools and all public post-secondary institutions. (*Id.*) AG Defendants say State officials should not be "coopt[ed] . . . for that purpose," and, in any event, the injunction

should not apply to all schools in Louisiana since Plaintiffs only chose to sue a small number of Defendants. (*Id.* at 57–58.)

Plaintiffs reply that each relevant factor weighs in favor of a preliminary injunction. (Doc. 47 at 54.) First, for all the reasons they advance above, Plaintiffs have shown a likelihood of success on the merits. (*Id.*) Second, the loss of First Amendment freedoms constitutes irreparable injury, and Plaintiffs have shown that loss. (*Id.*) Third, Plaintiffs stress that injunctions protecting First Amendment freedoms serve the public interest, and any harm AG Defendants will suffer is outweighed by the facts that (a) the statute violates federal law and (b) the other injunction requirements weigh in Plaintiffs' favor. (*Id.* at 54–55.)

### B. Law and Analysis

A plaintiff must demonstrate four requirements to obtain a preliminary injunction:

> 1) a substantial likelihood of success on the merits; 2) a substantial threat that he will suffer irreparable injury if the injunction is not issued; 3) that the threatened injury to him outweighs any damage the injunction might cause to the state and its citizens; and 4) that the injunction will not disserve the public interest.

*Ingebretsen*, 88 F.3d at 278 (citing *Doe v. Duncanville Indep. Sch. Dist.*, 994 F.2d 160, 163 (5th Cir.1993) (citations omitted)).

Here, Plaintiffs have satisfied all of these requirements. The Court will address each of them in turn.

### *1. Substantial Likelihood of Success*

First, for all the reasons given above, Plaintiffs have shown a substantial likelihood of success on the merits. The Court's approach in resolving the merits of Plaintiffs' claims was summarized above, and it need not be repeated in full here.

In short, the Court must determine whether the practice at issue "fits within" and is "consistent with a broader tradition." *See Mack*, 49 F.4th at 951 (cleaned up). Historical evidence is critical because "widespread practice around the Founding helps reveal an amendment's original public meaning," as does the practice "around the time of incorporation" in 1868. *See id.* (citations omitted). The question is whether there was a "widespread practice" or whether the practice was "common for [the] Founding-era. . . ." *See id.* at 951, 957. Evidence is insufficient if there are only "scattered instances" or "too little evidence too thinly spread to conclude that [the practice] occurred regularly." *See id.* at 956–57.

Additionally, a practice can be inconsistent with a tradition by being discriminatory or by coercing religious exercise. *Id.* at 958. As to the former, the government must ensure that "members of any faith are free to participate in the [ ] [p]rogram" and that it acts "without regard for belief." *See id.* As to coercion, the analysis is "fact-sensitive and holistic," *id.* at 958–59 (cleaned up); the key questions are "whether coercion is a real and substantial likelihood," *id.* at 959 (citation omitted), and whether "anyone may choose not to participate and suffer no consequences," *id.* at 961. Coercion has been found in the public-school context where "the school ha[s] 'in every practical sense compelled attendance and participation in' a 'religious exercise.'" *Kennedy*, 597 U.S. at 541 (citation omitted). Students cannot be a "captive audience" or "required or expected to participate." *See id.* at 542. Again:

> [T]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools. . . . What to most believers may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy.

*Lee*, 505 U.S. at 592 (citations omitted).

As stated above, the broader tradition at issue is the use of the Ten Commandments in public education. The Court finds that there is insufficient evidence of such a broader tradition to justify H.B. 71. Indeed, none of the primary documents offered by AG Defendants—*The New England Primer*, the McGuffey *Readers* from the 1800s, or Noah Webster's *The American Spelling Book* (Faircloth Decl., Exs. G-8 through G–18, Docs. 59-9 through 59-19)—reflect any sort of tradition of permanently displaying the Decalogue in public-school classrooms at the time of the Founding or of incorporation.

On this key question of whether the practice at issue fits within a broader tradition existing at the time of the founding, Plaintiffs offered the testimony of Dr. Steven K. Green which the Court heard at the hearing on October 21, 2024. The Court found Green to be highly qualified and concluded that he utilized an adequate and standard methodology used by historians. (*See* Ruling on *AG Defs. Daubert Motion*, Doc. 83.) The Court had the opportunity to judge his demeanor and finds that the witness was credible and his testimony on this issue was well supported and persuasive. The Court rejects the AG Defendants' charge of bias. The Court notes that not only did the AG Defendants fail to offer contrary or competing expert testimony on this critical issue, but they also failed to seriously challenge any of Green's substantive opinions on the merits of this issue.

Green testified that, at the time the U.S. Constitution and First Amendment were drafted, *public* schooling was essentially nonexistent. (Green Report ¶ 34, Doc. 47-2; Green Decl. ¶ 5, Doc. 47-1 (affirming contents of report).) Green explained that education at the time of the Founding occurred in private academies or through tutors and generally had a strong religious component due to the dominance of clergy as teachers. (Green Report ¶ 34, Doc. 47-2.) Quasi-public-school prototypes existed in New England, but they required parents to pay a rate, were largely taught by

clergy, and primarily had a religious purpose of making Christians. (*Id.*) Early textbooks like *The New England Primer* were chiefly designed to inculcate religious fealty. (*Id.*) Thus, as Green opined, practices in these schools provide little insight into public education and the Ten Commandments. (*Id.*) Green further stated that there is a lack of evidence that these schools permanently displayed the Ten Commandments on classroom walls. (*Id.*)

Green also said that publicly operated and funded "common schools" developed in the early 1800s. (*Id.* ¶ 35.) After discussing these schools, Green concluded: "Looking more specifically at the Ten Commandments, the evidence for a longstanding historical practice and acceptance of widespread and permanent displays of the Ten Commandments in public-school classrooms does not exist." (*Id.* ¶ 39.) Moreover, as will be explored below, Green looked at the AG Defendants' tendered evidence and found:

> [A]s a matter of historical methodology and analysis, the common schools' use of these *Readers* or Webster's *Spelling Book*, standing alone, does not prove H.B. 71's broad assertion that the "Ten Commandments were a *prominent* part of American public education for almost *three* centuries." Nor does it demonstrate a longstanding historical acceptance of an entirely *distinct* practice—permanently displaying the Ten Commandments in public-school classrooms.

(*Id.* ¶ 44.)

Green relied on other evidence to support his conclusion that there was no longstanding, widespread use of the Ten Commandments in public education by focusing on the lack of evidence supporting the permanent displaying of the Ten Commandments in public-school classrooms. (*Id.* ¶ 45.) First, Green believed that, as a historian, since there was "substantial religious turmoil and conflict that arose from the incorporation of prayer and Bible reading into some common schools," he would have expected to see a similar response if undue emphasis was placed on *Readers* lessons involving the Ten Commandments or permanently displaying them. (*Id.*) But, only two of the

above reported cases involved the Ten Commandments, and neither involved displaying them on

classroom walls. (*Id.* (citing *Commonwealth v. Cooke*, 7 Am. L. Reg. 417–26 (Mass. 1859);

*Pfeiffer v. Bd. of Educ.*, 77 N.W. 250 (Mich. 1898)).) The Court notes that only the former case

took place around the time of incorporation.

Second, surveys conducted by the U.S. Commissioner of Education in the 1880s and 1890s

"did not reflect any specific, routine practice of displaying the Ten Commandments in classrooms

or otherwise using them in instruction." (*Id.* ¶ 46.)

Third, Green examined a popular nineteenth-century legal treatise—Thomas Cooley's

*Constitutional Limitations*. (*Id.*) Each edition of Cooley's treatise contained information about

religious liberty and religious exercises in public schools. (*Id.*) And there was no reference in this

treatise to the posting of the Ten Commandments or their use in public-school curricula. (*Id.*)

Fourth, to Green's knowledge, "no state law specifically permitted or mandated the posting

of the Ten Commandments in public schools prior to 1927." (*Id.* ¶ 47.) The first state law

specifically allowing the display of the Decalogue was in 1927 in North Dakota, but that was struck

down in 1980. (*Id.* ¶ 47 & n.76.)

Considering this evidence, Green concluded:

> Based on all the factors discussed above, *supra* ¶¶ 34–47, and the
> lack of compelling counterevidence, it is my expert judgment that
> the Ten Commandments were *not* "a prominent part of American
> public education for almost three centuries," as H.B. 71 claims. Nor
> more specifically, in my expert opinion, is there evidence of a
> longstanding, let alone unbroken, historical acceptance and practice
> of widespread, permanent displays of the Ten Commandments in
> public schools.

(*Id.* ¶ 48.)

Green also rebutted the historical evidence offered by AG Defendants. By way of

background, the Act contains certain legislative findings and declarations. H.B. 71(A). After

setting forth some general history about the role of the Ten Commandments in public life,[20] the

Act declares, "[i]ncluding the Ten Commandments in the education of our children is part of our

state and national history, culture, and tradition." H.B. 71(A)(4)–(5). The context statement for the

Act then provides the basis for AG Defendants' historical evidence:

> The History of the Ten Commandments in American Public Education
>
> The Ten Commandments were a prominent part of American public education for almost three centuries. Around the year 1688, *The New England Primer* became the first published American textbook and was the equivalent of a first grade reader. *The New England Primer* was used in public schools throughout the United States for more than one hundred fifty years to teach Americans to read and contained more than forty questions about the Ten Commandments.
>
> The Ten Commandments were also included in public school textbooks published by educator William McGuffey, a noted university president and professor. A version of his famous *McGuffey Readers* was written in the early 1800s and became one of the most popular textbooks in the history of American education, selling more than one hundred million copies. Copies of the *McGuffey Readers* are still available today.
>
> The Ten Commandments also appeared in textbooks published by Noah Webster [ ] which were widely used in American public schools along with America's first comprehensive dictionary that Webster also published. His textbook, *The American Spelling Book*, contained the Ten Commandments and sold more than one hundred million copies for use by public school children all across the nation and was still available for use in American public schools in the year 1975.

H.B. 71(B)(3).

---

[20] This includes: (a) the Supreme Court's upholding of the display in *Van Orden*; (b) the Louisiana Legislature's enacting of Act No. 602 of its 2006 Regular Session, which provided "for the secretary of state to publish the Ten Commandments and other historically significant documents for posting in court houses and other public buildings to address 'a need to educate and inform the public as to the history and background of American and Louisiana law;'" and (c) the Supreme Court's recognition in *American Legion* that the Ten Commandments "have historical significance as one of the foundations of our legal system" and the Court's alleged ruling that the display of Ten Commandments on public property could have "'multiple purposes'" such as "'historical significance'" and representing a "'common cultural heritage.'" H.B. 71(A)(1)–(3) (quoting, inter alia, *American Legion*, 588 U.S. at 53–54).

But Green systematically dismantled this purported historical evidence and its conclusions. Green's conclusions about the *New England Primer* and education before the nineteenth century were given above and need not be repeated here. (*See also* Green Report ¶ 34, Doc. 47-2.) Again, Green explained in his report that publicly operated and funded "common schools" developed in the early 1800s. (*Id.* ¶ 35.) Massachusetts was the first state to mandate universal "non-sectarian" public education, and its board of education, led by Horace Mann, eliminated doctrinal religious instruction but retained the use of the Bible to inculcate "universal" Christian morals. (*Id.*) The Bible was read without "note or comment," to "let the Bible speak for itself." (*Id.*) Other states followed suit, offering liberal education with some "nonsectarian" religious activities like prayer and Bible reading. (*Id.*)

Green highlighted though, how even these activities were "deeply controversial and not universality accepted;" for instance, the use of the Protestant King James Bible drew opposition from Catholics and Jews. (*Id.* ¶ 36.) Green provided some details on that conflict in the 1840s, including the Philadelphia "Bible riots" as well as the following:

> In 1840, the nation's Catholic bishops issued a pastoral letter denouncing the use of the King James Bible and Protestant-biased textbooks, such as the McGuffey *Reader*: "We can scarcely point out a book in general use in the ordinary schools . . . wherein covert and insidious efforts are not made to misrepresent our principles, to distort our tenets, to vilify our practices, and to bring contempt upon our Church."

(*Id.*)

Green also documented about thirty reported decisions between 1850 and 1960 involving challenges to public-school religious exercises. (*Id.* ¶ 37.) Green said this demonstrates that practices were not universally permitted or accepted. (*Id.*) One of these was from 1854, and three were in the 1880s. (*Id.* ¶ 37 n.59.) Green also highlighted other evidence supporting the conclusion

that, in the late nineteenth century, the prevalence of religious exercises in schools declined significantly. (*Id.* ¶ 38.)

Green then turned to the Act's context statement itself and asserted:

> [E]xamining these sources [(i.e., the *New England Primer*, the McGuffey *Readers*, and Webster's *American Spelling Book*)] and their use in more detail, it is my conclusion that the evidence cited in H.B. 71 does not support the broad assertion that "the Ten Commandments were a prominent part of American public education for almost three centuries."

(*Id.* ¶ 40.) First:

> [T]he *New England Primer*, which first appeared around 1690 and was republished into the early nineteenth century, had the central purpose of inculcating religious fealty along sectarian, Calvinist lines – "the primer was a codification of primary religious creed." But the *Primer* was used chiefly, if not exclusively, in *religiously* run schools, and, importantly, it fell into disuse during the early decades of the nineteenth century, before the rise of public education. Thus, as a matter of historical methodology and analysis, it does not represent a precedent for, or provide evidence of, later practices in *public* schooling.

(*Id.* ¶ 41.)

Additionally, Green testified that "H.B. 71 also misrepresents or overstates matters considerably with respect to the other texts it cites." (*Id.* ¶ 42.) For example:

> Noah Webster's *American Spelling Book*, first published in 1783, was the most popular speller into the mid-nineteenth century. However, as an early leader in the nonsectarian reform movement, Webster was opposed to a religiously infused curriculum, and his spellers made only occasional references to "commandments." For example, the 1839 edition of his speller includes only one mention of the commandments: "Fear God, and keep his commandments, for this is the whole duty of man." Similarly, the 1863 *Speller* states in a single entry: "God is the divine legislator. He proclaimed his ten commandments from Mt. Sinai." Significantly, the words "commandment" or "commandments" do not appear in the book's 1795, 1808, 1822, 1843, 1848, 1857, 1866, 1880, and 1908 editions.

(*Id.*) As to the McGuffy *Readers*, Green stated:

The McGuffey *Readers*, written and compiled by Presbyterian minister William McGuffey, were also used in many common schools throughout much of the nineteenth century. McGuffey wrote various *Readers* for grades one through six, with numerous editions that were published into the early twentieth century. While some early editions and versions of the *Readers* set out some version of the Ten Commandments as part of a reading lesson, it was just one of dozens of lessons available to students and teachers. For example, the 1853 edition of McGuffey's *Eclectic Second Reader* included 105 separate lessons, with only one lesson focusing on the "The Ten Commandments," listed last, starting at page 216. Many other editions and versions did not reproduce the Ten Commandments verbatim, making only sporadic reference to a specific commandment, such as the prohibition on bearing false witness, as part of a lesson or story. And references to the Ten Commandments in other editions and versions were even more attenuated. The 1853 edition of the *Third Reader*, for instance, included an extract from the Sermon on the Mount: "Whosoever, therefore, shall break one of these least commandments . . . shall be least in the kingdom of heaven." The 1857 edition of the *Fifth Reader* stated that "the commandment of the Lord is pure, enlightening the eyes." Even then, references to a "commandment" were minimal when compared to the numerous lessons (up to 200, depending on the edition) included in each book. Still other editions and versions of McGuffey's *Readers*, especially later ones, did not include any reference to a "commandment."

[ ] In sum, the Ten Commandments, even when used or referred to in McGuffey's *Readers*, were not a significant aspect of the texts, and the extent to which common-school teachers may have relied on those particular readings and spelling lessons, as opposed to the dozens of others available in the same book, cannot be verified. Moreover, references to the commandments were largely eliminated in later versions of the *Readers*; and, while the *Readers* were used in many common schools from their initial publication through the early twentieth century, reliance on them tapered as public schools turned to myriad other available options. It follows that, as a matter of historical methodology and analysis, the common schools' use of these *Readers* or Webster's *Spelling Book*, standing alone, does not prove H.B. 71's broad assertion that the "Ten Commandments were a *prominent* part of American public education for almost *three* centuries." Nor does it demonstrate a longstanding historical acceptance of an entirely *distinct* practice—permanently displaying the Ten Commandments in public-school classrooms.

(*Id.* ¶¶ 43–44.) Considering this evidence, Green again concluded, "Based on all the factors discussed above, *supra* ¶¶ 34–47, and the lack of compelling counterevidence, it is my expert judgment that the Ten Commandments were *not* 'a prominent part of American public education for almost three centuries,' as H.B. 71 claims." (*Id.* ¶ 48.)

Green's testimony at the hearing confirmed the conclusions of his Report. Most significant to the Court, Green elaborated on how scattered and infrequent the references to the Decalogue were in the McGuffey *Readers*. Specifically, Green emphasized footnote 69 of his report:

> I conducted word searches though digitized editions of the books available through online resources, including Early American Imprints, Evans Digital Collection, the HathiTrust digital service, the Internet Archive, and Project Gutenberg. The editions and versions I reviewed included all six levels of the *Readers* with edition dates ranging from 1844 to 1920 (a total of 36 books). The word "commandment" or "commandments" occurred primarily in the Third and Fourth *Readers* and varied between one to three references per book out of 100-200 lessons per book. As noted above, some editions, such as the 1853 edition of the *Second Reader*, included a lesson on the Ten Commandments or other references to the commandments, but many later editions did not. For example, a search of the 1866 and 1880 Second *Reader*, as well as a sampling of the First, Fifth, and Sixth Readers between 1865 to 1901, uncovered no references to a "commandment" or "commandments."

(*Id.* ¶ 43 n. 69.) Green acknowledged on cross the presence of the Ten Commandments in certain *Readers* (such as those from 1825, 1836, and 1879), but he responded that isolated examples must be judged in the context of the larger historical record; otherwise, the forest is lost for the trees. Again, the Court heard Green's testimony and found it convincing, logical, and consistent with the Court's own review of the evidence.

In sum, the Court finds that the historical records show only "scattered instances" that are "too little evidence too thinly spread to conclude that [the practice] occurred regularly." *See Mack*, 49 F.4th at 957. That is to say, the limited examples offered by AG Defendants do not show a

"widespread practice" of using the Ten Commandments in public schools that was "common for [the] Founding-era" or at the time of incorporation. *See id.* at 951, 957. Consequently, the practice at issue (permanently displaying the Ten Commandments in public-school classrooms) does not "fit[ ] within" and is not "consistent with a broader tradition" of using the Decalogue in public-school education, *id.* at 951, so Plaintiffs have shown a substantial likelihood of success on the merits on their Establishment Clause claim.

Further, even if there was sufficient evidence to show that this practice fit within a broader tradition of using the Ten Commandments in public schools, Plaintiffs have still demonstrated a substantial likelihood of success on their Establishment Clause and Free Exercise Clause claims. The declarations of the named Plaintiffs are nearly identical to the allegations of the *Complaint*, summarized above.[21] This testimony confirms, inter alia, Plaintiffs' religious or nonreligious beliefs, the manner in which the Act substantially burdens those beliefs, and the ways in which Act is inconsistent with any historical tradition by being discriminatory and coercive.[22] The legislative history, also detailed above, further supports the point that H.B. 71 is not neutral but is in fact coercive and discriminatory. And for all the reasons given above, AG Defendants have failed to satisfy the requirements of strict scrutiny on the Free Exercise claim. Consequently, for these additional reasons, Plaintiffs have shown a substantial likelihood of success on the merits.

---

[21] *See* Rev. Roake Decl., Doc. 20-2; Van Young Decl., Doc. 20-3; *Compl.* ¶¶ 9, 82—90, Doc. 1; Rev. Broadhurst Decl., Doc. 20-4; Rev. Williams Decl., Doc. 20-5; *Compl.* ¶¶ 10, 91—100, Doc. 1; Sims Decl., Doc. 20-6; *Compl.* ¶¶ 11, 101—107, Doc. 1; Harding Decl., Doc. 20-7; Owens Decl., Doc. 20-8; *Compl.* ¶¶ 12, 108—113, Doc. 1; Erin Hawley Decl., Doc. 20-9; David Hawley Decl., Doc. 20-10; *Compl.* ¶¶ 13, 114—124, Doc. 1; McCrory Decl., Doc. 20-11; *Compl.* ¶¶ 14, 125—129, Doc. 1; Sernovitz Decl., Doc. 20-12; Pulda Decl., Doc. 20-13; *Compl.* ¶¶ 15, 130—139, Doc. 1; Alkire Decl., Doc. 20-14; *Compl.* ¶¶ 16, 140—145, Doc. 1; Herlands Decl., Doc. 20-15; *Compl.* ¶¶ 17, 146—155, Doc. 1.

[22] The Court also notes that Green provided extensive testimony about the ways in which the Ten Commandments as adopted by H.B. 71 are Protestant and religiously exclusive. (Green Report ¶¶ 49–56, Doc. 47-2; Green Decl. ¶ 5, Doc. 47-1 (affirming contents of report).) Green highlights how the King James version of the Decalogue, as used in *Van Orden* and H.B. 71, is inconsistent in various ways with the Jewish and Catholic versions. (Green Report ¶¶ 53–55, Doc. 47-2), and much of this coincides with the testimony of the named Plaintiffs, summarized above.

## 2. The Other Requirements for Injunctive Relief

As to the second requirement, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Book People*, 91 F.4th at 340–41 (quoting *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012)); *see also* Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2948.1 (3d ed. 2024) (same). "Indeed, the Supreme Court has said that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Book People*, 91 F.4th at 341 (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)). *See also Ingebretsen*, 88 F.3d at 280 (same). Thus, Plaintiffs have shown irreparable injury.

As to the third and fourth requirements, "Plaintiffs' risk of irreparable harm must be weighed against any injury the State would sustain. Where the State is appealing an injunction, its interest and harm merge with the public interest." *Book People*, 91 F.4th at 341 (citations omitted). On the one hand, "[w]hen a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Id.* (citations omitted). But "neither [the State] nor the public has any interest in enforcing a regulation that violates federal law." *Id.* (citation omitted). "Indeed, '[i]njunctions protecting First Amendment freedoms are always in the public interest.'" *Id.* (quoting *Opulent Life Church*, 697 F.3d at 298 (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006))). *See also Ingebretsen*, 88 F.3d at 280 (holding that where a law violates the First Amendment, "the public interest was not disserved by an injunction preventing its implementation"). Thus, "[b]ecause Plaintiffs are likely to succeed on the merits of their First Amendment claim, the State and the public won't be injured by an injunction of a statute that likely violates the First Amendment." *Book People*, 91 F.4th at 341.

In sum, all four requirements for injunctive relief weigh in Plaintiffs' favor. As a result, the Court will grant *Pls. MPI*.

### 3. Remaining Issues Related to Pls. MPI

Additionally, Plaintiffs seek an order compelling the Superintendent and BESE Members to serve this ruling on all schools in the state. AG Defendants contend that this "coopts" them and that Plaintiffs should be charged with this task.

In short, the Court agrees with Plaintiffs. The Court has ruled that the Act is facially unconstitutional. That is, H.B. 71 is unconstitutional in all applications. As a result, the Act cannot be enforced throughout the state. While AG Defendants do not have to serve each school with a copy of this ruling, they certainly will be ordered to provide notice to all schools that the Act has been found unconstitutional, particularly since the burden on AG Defendants to accomplish this task is minimal.

The sole remaining question is whether Plaintiffs need to post bond. "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

"[T]he amount of security required pursuant to Rule 65(c) 'is a matter for the discretion of the trial court . . . .'" *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (quoting *Corrigan Dispatch Co. v. Casa Guzman*, 569 F.2d 300, 303 (5th Cir. 1978)).

> Accordingly, the judge usually will fix security in an amount that covers the potential incidental and consequential costs as well as either the losses the unjustly enjoined or restrained party will suffer during the period the party is prohibited from engaging in certain activities or the complainant's unjust enrichment caused by his adversary being improperly enjoined or restrained.

Wright, Miller, and Kane, *supra*, at § 2954.

"Indeed, it has been held that the court may dispense with security altogether if the grant of an injunction carries no risk of monetary loss to the defendant." *Id.* Likewise, the Fifth Circuit has ruled that "the court 'may elect to require no security at all.'" *Kaepa*, 76 F.3d at 628 (quoting *Corrigan Dispatch*, 569 F.2d at 303). And other courts have found that no security, or only nominal security, would be required for violations of First Amendment rights. *See Abdullah v. Cnty. of St. Louis*, 52 F. Supp. 3d 936, 948 (E.D. Mo. 2014) ("Given the constitutional issues at stake here[,] [including under the First Amendment,] and taking into account plaintiff's status as employee of a not-for-profit entity, I will set the bond in the amount of $100."); *United Food & Com. Workers Loc. 99 v. Brewer*, 817 F. Supp. 2d 1118, 1128 (D. Ariz. 2011) ("There is no realistic likelihood that Defendants will be harmed by being enjoined from enforcing a law that constitutes viewpoint discrimination in violation of the First Amendment on its face. No bond will be required.").

For the same reasons—the lack of any real harm shown by AG Defendants from being unable to enforce an unconstitutional law; the significant First Amendment issues successfully raised by Plaintiffs; and Plaintiffs' status as parents of minors in schools—the Court will require only a nominal bond in the amount of $100.

## VIII.    OPSB MTD

### A.  Relevant Background and Parties' Arguments

The Court now turns to *OPSB MTD*. By way of background, the *Complaint* alleges that certain plaintiffs have minor children who attend school in the "NOLA Public School System"— specifically, Plaintiffs Reverend Roake and Van Young (parents of A.V. and S.V.), Sernovitz and Pulda (parents of T.S.) and Herlands (parent of E.H. and J.H.). (*Compl.* ¶¶ 9, 15, 17, Doc. 1.) However, OPSB argues that it "directly runs only two public schools," neither of which are attended by these Plaintiffs' children. (Doc. 38-1 at 3.) Rather, these children attend charter

schools; specifically, Roake and Van Young's children go to the International School of Louisiana, a Type 2 charter school authorized by BESE, and the other children go to Willow School, a Type 3B charter school authorized by OPSB. (*Id.* at 3 (citing Illarmo Decl., Doc. 38-2).)

The basis for *OPSB MTD* is that "[these] Plaintiffs lack Article III standing to sue OPSB in this action because of the separate legal identities, autonomy, independence, and compliance obligations of the charter schools that Plaintiffs' children attend." (*Id* at 9.) Charter schools have "autonomous operations and governance," and they "exercise clear autonomy and independent operational decision making over school programming, instruction, curriculum, materials, [and] texts." (*Id.*) As to the specific schools at issue, again, the International School is authorized by BESE, and:

> Although the OPSB is the authorizer for the Willow School, this does not negate the separate juridical identity of the public corporation that operates the Willow School, the independence and autonomy of the Willow School as a charter school, or the statutory immunity OPSB enjoys for the conduct of any charter school it authorizes.

(*Id.* at 9–10.) Thus, OPSB asserts, Plaintiffs' injuries are not traceable to any conduct by OPSB. (*Id.* at 10.) Further, Plaintiffs fail redressability because "[e]njoining OPSB from displaying the Ten Commandments in either of its two direct[ly] run public schools would not redress any alleged injury suffered by Plaintiffs and their children" in the two charter schools. (*Id.* at 11.) Finally, OPSB argues that it is redundant to the other parties in this case. (*Id.*)

In response, Plaintiffs concede that the parents with children attending the International School (Roake and Van Young) lack standing *as to OPSB*. (Doc. 46 at 7 n.7.) But, Plaintiffs argue that BESE is the proper party for these Plaintiffs and that BESE is already a defendant in this action. (*Id.*) Further, Plaintiffs maintain that OPSB is not entitled to dismissal entirely because there is standing for those other parents with children at the Willow School. (*Id.*)

Plaintiffs contend they satisfy the traceability and redressability requirements based on "[t]he plain text of the Act, state charter-school laws, OPSB's own policies, and OPSB's Charter School Operating Agreements[.]" (*Id.* at 5.) As to the Act, H.B. 71 provides that "each public school governing authority" must display the Ten Commandments, and OPSB is the governing authority of Willow School. (*Id.* at 13.) "OPSB's own policies, meanwhile, repeatedly affirm that OPSB-authorized charter schools are 'under its jurisdiction.'" (*Id.*)

Plaintiffs highlight that traceability is not a proximate-cause requirement. (*Id.* at 14.) "As the Supreme Court has held, while 'it does not suffice if the injury complained of is the result of the independent action of some third party not before the court, . . . that does not exclude injury produced by determinative or coercive effect upon the action of someone else.'" (*Id.* (quoting *Bennett*, 520 U.S. at 169).) Plaintiffs rely on the facts and holding of *Bennett* to support their position before asserting, "[a]s in *Bennett*, OPSB wields a 'powerful coercive effect' on its charter schools' compliance with legal requirements." (*Id.* at 14–15 (quoting *Bennett*, 520 U.S. at 169).) Plaintiffs base this on the facts that:

> (a) "Louisiana law requires OPSB to monitor charter schools' compliance with both state law and the terms of OPSB's Charter School Operating Agreements," (*id.* at 15 (citing, inter alia, La. R.S. § 17:10.7.1 and § 17:3992));
>
> (b) "OPSB policy requires the school district to 'oversee each charter school's compliance with its operating agreement, federal and state laws and regulations and School Board policy,'" and "the Charter School Operating Agreement with the Willow School and other charter schools repeatedly affirms that charter schools must follow the law[,]" (*id.* at 16); and
>
> (c) "OPSB monitors charter schools for compliance with the Operating Agreement and applicable laws, including numerous provisions of state law, from which charter schools are not exempt, as enumerated in La. R.S. § 17:3996(B)," and OPSB can take corrective action, including "to deny or limit renewal of the charter or to revoke it entirely," (*id.* at 16–17).

Moreover, Plaintiffs explain that charter-school autonomy has limits, and, as such, institutions must still comply with the law. (*Id.* at 17.) While OPSB has immunity from "civil liability" for "damages" under La. R.S. § 17:3993(A), it is not immune from injunctive or other equitable relief like that asserted here. (*Id.* at 17 n.17.) Ultimately, OPSB can exercise "coercive control" over the charter schools, so the traceability requirement is satisfied. (*Id.* at 17.)

Plaintiffs also maintain that the redressability requirement is satisfied. (*Id.* at 18.) They assert:

> An injunction will prohibit OPSB from carrying out its legal obligations—confirmed in state law, [OPSB] policy, and the Willow School Charter Agreement—to ensure that the school attended by three minor-child Plaintiffs complies with the Act. And, as set forth in state law, [OPSB] policy, and OPSB's Charter School Operating Agreement, OPSB has the plain authority and legal duty to ensure that the three minor-child Plaintiffs' school complies with federal law (as determined by this court) and any injunction entered against [OPSB]. Indeed, under the Willow School Charter Agreement any injunction entered against OPSB prohibiting the display of the Ten Commandments will automatically bind the school. *Supra* p. 6 (noting provision in Operating Agreement that "Charter School shall adhere to the requirements of any and all consent decrees and court orders imposed upon Charter School and/or OPSB").

(*Id.*) Thus, the injury is redressable. (*Id.*)

Plaintiffs close by arguing that OPSB is not redundant in this suit, as it "does not 'simply stand in the shoes' of the State Defendants." (*Id.* at 19.) For all these reasons, Plaintiffs contend that *OPSB MTD* must be denied. (*Id.* at 20.)

OPSB replies first by emphasizing Plaintiffs' concession about the International School and then by returning to the issue of autonomy:

> The Willow School "is governed by the Advocates for Arts-Based Education (AABE) Board" which "has an important role in advancing the school's mission by setting policies, supervising the activities of the Corporation, and adopting positions on issues of

> substance related to the purposes of the Corporation." [*See* School
> Governance, The Willow School New Orleans,
> https://www.willowschoolnola.org/page/school-governance (last
> visited 8-28-24).] Although OPSB is involved in limited aspects of
> the Willow School's administration, OPSB's responsibilities are
> more holistic in nature and do not concern daily governance issues
> such as what posters should or should not be displayed in charter
> school classrooms.

(Doc. 52 at 1–3.) Thus, says OPSB, "the Charter School Agreement between OPSB and AABE actually affirms the Willow School's independence to control its daily operations." (*Id.* at 3.) OPSB quotes Section 1.9 of the Charter School Agreement, entitled "Operational Autonomy," which provides in relevant part:

> **[T]he local school board [OPSB] shall not impede the
> operational autonomy of a charter school under its jurisdiction
> in the areas of school programming, instruction, curriculum,
> materials and texts,** yearly school calendars and daily schedules,
> hiring and firing of personnel, employee performance management
> and evaluation, terms and conditions of employment, teacher or
> administrator certification, salaries and benefits, retirement,
> collective bargaining, budgeting, purchasing, procurement, and
> contracting for services other than capital repairs and facilities
> construction.

(*Id.* at 3–4 (emphasis by OPSB).) Further, OPSB says that, under Section 9.10 of the Charter School Agreement, AABE, as charter operator, is responsible for complying with all federal and state law. (*Id.* at 4.) OPSB also cites to Louisiana Act No. 334 of 2024, which amended La. R.S. § 7:3972(A) ("Act 334"), in support of its argument that charter schools have "operational autonomy[,]" which includes "autonomy necessary to manage its educational programming and daily operations." (*Id.* (quoting La. R.S. § 17:3991(C)(7)).) This is reinforced by Section 1.9 of the Charter Agreement. (*Id.* at 4–5.)

OPSB then argues that, based on this autonomy, Plaintiffs fail to establish traceability. (*Id.* at 5.) Plaintiffs' harm must be "trace[able] to the challenged action of the defendant, and not . . .

the result of the independent action of some third party not before the court[.]" (*Id.* (quoting *Lujan*, 504 U.S. at 560–61 (emphasis omitted)).) Plaintiffs' injuries are "too conjectural or hypothetical" because their "existence depends on the decisions of third parties[.]" (*Id.* (quoting *Little*, 575 F.3d at 540).)

"Here, Plaintiffs' alleged harm, if any, would be directly attributable to the governing authority of the Willow School, and not the authority of OPSB. . . . Simply put, it is the Willow School's responsibility, contractually, legally, and practically, to enforce – or not to enforce – H.B. 71." (*Id.* at 6.) Even if OPSB could take corrective action, this just shows how "extremely far removed" Plaintiffs' injuries are from OPSB's power: "Should OPSB hypothetically, in the future, decide to take some unspecified corrective action against the Willow School, it would only do so after the Willow School decided if and how it was going to enforce H.B.71, which has not even taken effect yet." (*Id.*)

Finally, OPSB says that Plaintiffs fail to establish redressability. (*Id.* at 7.) Even if Plaintiffs prevail, OPSB lacks "the authority to enforce or not enforce H.B. 71 against the Willow School. At the very least, OPSB would have to work with the board of the Willow School to implement any ruling by the Court." (*Id.*) Again, this is because of the charter school's "operational autonomy in its daily governance." (*Id.*)

### B. Law and Analysis

Preliminarily, Plaintiffs have conceded that the parents with children attending the International School (Roake and Van Young) lack standing as to OPSB. (Doc. 46 at 7 n.7.) As a result, their claims against OPSB will be dismissed without prejudice. However, the Court notes, as Plaintiffs do, that the International School is authorized by BESE, who is a party to this action. (Illarmo Decl. ¶ 10, Doc. 38-2.) BESE makes no argument that Roake and Van Young lack

standing against BESE here, and, even if BESE did, for the reasons which follow, such an argument would be meritless.

The Court laid out the requirements for standing *supra*. In short, a plaintiff "must show that [he or] she has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy*, 144 S. Ct. at 1986 (citation omitted). OPSB disputes only the second and third requirements.

For the second, a plaintiff must show "that there is 'a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court[.]'" *Reule*, 114 F.4th at 367 (quoting *Bennett*, 520 U.S. at 167). But "[c]ausation . . . isn't precluded where the defendant's actions produce a 'determinative or coercive effect upon the action of someone else,' resulting in injury." *Inclusive Cmtys.*, 946 F.3d at 655 (quoting *Bennett*, 520 U.S. at 169). "Even though Article III requires a causal connection between the plaintiff's injury and the defendant's challenged conduct, it doesn't require a showing of proximate cause or that 'the defendant's actions are the very last step in the chain of causation.'" *Id.* (quoting *Bennett*, 520 U.S. at 169).

The Court finds that the Plaintiffs with children in Willow School have established traceability as to OPSB. The Act provides that, "[n]o later than January 1, 2025, each public school governing authority shall display the Ten Commandments. . . .[,]" H.B. 71(B)(1), and charter schools are not exempt from this requirement, *see id.* (amending La. R.S. § 17:3996(B)(72)).

Louisiana law establishes that the OPSB is the "public school governing authority" for purposes of the Act. For example, state law provides, "[i]n order to determine quality standards

for all schools and intervene appropriately in instances when student needs are not being met, *the local superintendent* shall: . . . (2) *Monitor* and *require corrective actions* by a charter school with respect to compliance with board policy, *state law*, or terms of the charter contract." La. R.S. § 17:10.7.1(F)(2) (emphasis added). Another Revised Statute provides:

> A school charter may be revoked by the authority that approved its charter upon a determination by an affirmative vote of at least a majority of the local board membership or upon the affirmative vote of a majority of the members of the State Board of Elementary and Secondary Education, whichever approved the charter, that the charter school or its officers or employees did any of the following: . . . (4) Violated any provision of law applicable to a charter school, its officers, or employees.

La. R.S. § 17:3992(C)(4).

All of this is consistent with the OPSB Policy. For instance, a policy entitled "School Board Chartering Authority" provides:

> [OPSB] has adopted the following criteria as mandatory elements of all charter *Operating Agreements* executed by the School Board. . . .
>
> 2. Autonomy - Each charter school shall have complete autonomy over all areas of school operation as set forth in each school's Operating Agreement, *as long as such operations are in compliance with all applicable federal, state, and municipal laws and regulations*. Areas of school autonomy shall include, but not be limited to, the following:
>
> > A. School programming, instruction, curriculum, materials and texts; . . .

(Slater Decl., Ex. A-2, Doc. 51-3 at 6 (emphasis added).) Another policy on "Oversight and Evaluation of Charter Schools" states, "[t]he School District shall oversee each charter school's compliance with its operating agreement, federal and state laws and regulations and School Board policy." (Slater Decl., Ex. A-6, Doc. 51-7 at 2.)

These policies also show OPSB's enforcement authority. "At any point in a school year, a school may be deemed noncompliant" and subject to "the process for corrective action, " which includes different notice levels. (*Id.* at 2–3.) Another provision says,

> The Superintendent may revoke a school's operating agreement during its charter term for the following reasons, as identified in statute and/or the terms of the school's operating agreement:
>
> 1. Material violation of the operating agreement; [or] . . .
>
> 4. Egregious and/or consistent violation of federal, state or local laws or School Board policies;

(*Id.* at 8–9.)

All of this demonstrates that, despite the general independence and autonomy of charter schools, OPSB still maintains the power to "produce a 'determinative or coercive effect upon the action of someone else,' resulting in injury." *Inclusive Cmtys.*, 946 F.3d at 655 (quoting *Bennett*, 520 U.S. at 169). And this is particularly true since traceability "doesn't require a showing of proximate cause or that 'the defendant's actions are the very last step in the chain of causation.'" *Id.* (cleaned up).

OPSB makes much of the broad "operational autonomy" for charter schools under the recently enacted Act 334. But, as Plaintiffs point out, OPSB omits a key part of that definition:

> "Autonomy" means that unless mutually agreed upon by the chartering authority and charter school, *or otherwise required or prohibited by law*, the charter school shall have independent operational decision making authority in the areas including but not limited to:
>
> (a) School programming, instruction, curriculum, materials, texts, calendars, and schedules. . . .

La. S.B. No. 350, Act No. 334 (May 28, 2024) (emphasis added). Thus, charter-school autonomy is still circumscribed by state and federal law, and, based on the above statutes and policies, OPSB

still retains control over Willow School to require or prevent the posting of the Ten Commandments according to this Court's interpretation of federal and state law. Thus, Plaintiffs have shown traceability.

They have also shown redressability. Here, Plaintiffs are "not required to show that their requested relief would *certainly* redress their injuries; rather, they are required to show that their requested relief would *likely* (or substantially likely) redress their injuries." *Hancock Cnty.*, 487 F. App'x at 197 (citations omitted). "Moreover, the proper focus of the redressability inquiry is not whether the relief is likely to be granted; rather, the focus is whether, assuming that the requested relief is granted, that relief will likely redress the plaintiffs' injuries." *Id.* (citations omitted)). Further, "[t]he relief sought needn't completely cure the injury, however; it's enough if the desired relief would lessen it." *Inclusive Cmtys.*, 946 F.3d at 655 (citation omitted).

For all the reasons given above, the Court finds that the relief Plaintiffs seek (an injunction against OPSB to prevent the posting of the Ten Commandments in Willow School) would "likely (or substantially likely) redress their injuries." *Hancock Cnty.*, 487 F. App'x at 197 (cleaned up). OPSB complains that it is redundant to the other defendants, but this just underscores the fact that Plaintiffs need not obtain complete relief from OPSB. *See Inclusive Cmtys.*, 946 F.3d at 655.

In sum, the Court finds that Plaintiffs Sernovitz and Pulda (on behalf of T.S.) and Herlands (on behalf of E.H. and J.H.) have demonstrated standing for their claims against OPSB, and the *OPSB MTD* will be denied as to them. However, this motion will be granted as to Roake and Van Young, and their claims against OPSB (individually and on behalf of their minor children) will be dismissed without prejudice.

## IX. AG DEFS. MOTION TO STAY

### A. Parties' Arguments

AG Defendants argue in the alternative that, if the Court is not inclined to dismiss the suit, and if the Court is inclined to grant an injunction, the Court should order a stay pending appeal. (Doc. 39-1 at 58.) AG Defendants again incorporate all the arguments summarized above. (*Id.*) They then assert that: (1) they are likely to succeed on the merits; and (2) the equities and public interest favor a stay, since Plaintiffs have identified no ongoing or imminent harm. (*Id.*)

Plaintiffs respond that any stay at this juncture is premature; the Court has not ruled on anything, and there has been no appeal. (Doc. 47 at 55.) "By filing their motion before any ruling has issued, Defendants improperly deny Plaintiffs the benefit of reviewing and relying on this Court's reasoning and ultimate decision in connection with any opposition that Plaintiffs may file to a stay motion, should they prevail on their preliminary-injunction motion." (*Id.*)

Plaintiffs then contend that, if the Court were to consider the stay issue, then AG Defendants' motion should fail for the same reasons advanced in the support of *Pls. MPI.* (*Id.*) "The standard for stay pending appeal overlaps substantially with the standard for a preliminary injunction." (*Id.* at 55–56 (citing *Louisiana v. Becerra*, 20 F.4th 260, 262 (5th Cir. 2021) (per curiam)).) Thus, if the Court grants *Pls. MPI*, it will have found that Plaintiffs are likely to succeed on the merits, that Plaintiffs will suffer irreparable harm, and that an injunction serves the public interest. (*Id.* at 56.)

### B. Law and Analysis

"Unless the court orders otherwise, the following are not stayed after being entered, even if an appeal is taken: (1) an interlocutory or final judgment in an action for an injunction . . . ." Fed. R. Civ. P. 62(c). "While an appeal is pending from an interlocutory order or final judgment

that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62(d).

Having carefully considered the matter, the Court will deny AG Defendants' request for a stay. Preliminarily, several courts have recognized that a request to stay an injunction pending appeal is premature until an actual notice of appeal has been filed. *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1241 (C.D. Cal. 2007) ("The Court agrees with Plaintiffs that StreamCast's motion for a stay pending appeal pursuant to Rule 62(c) is premature . . . . Once the Court finalizes the terms of a permanent injunction, and an appeal is taken, StreamCast can renew its request." (citing *Nikon, Inc. v. Ikon Corp.*, No. 89-6044, 1992 WL 398440, at *3 (S.D.N.Y. Dec. 18, 1992) ("In the absence of a pending appeal, a request for relief under Rule 62(c) is premature."))); *see also Gregory v. Baucum*, No. 16-103, 2018 WL 10096597, at *1 (N.D. Tex. Feb. 23, 2018) ("Defendant [ ] also requests a stay pending appeal of the denial of his motion for summary judgment to the . . . Fifth Circuit. As there is no appeal currently pending, Defendant['s] . . . Motion to Stay . . . is DENIED, without prejudice to his right to re-urge that Motion should he file a notice of appeal.").

Nevertheless, even assuming AG Defendants' request was ripe, it would be denied on the merits.

> When analyzing a request to stay a district court's preliminary injunction, we are to consider the following factors:
>
> > (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

> *Veasey v. Perry*, 769 F.3d 890, 892 (5th Cir. 2014) (quoting *Nken v.*
> *Holder*, 556 U.S. 418, 426 [ ] (2009)). Likelihood of success and
> irreparable injury to the movant are the most significant factors. *Id.*

*Becerra*, 20 F.4th at 262.

For all the reasons given above, the Court finds that (1) AG Defendants have not made a strong showing that they are likely to succeed on the merits; (2) they will not be irreparably harmed absent a stay, given the Court's finding that the Act violates the First Amendment; (3) a stay will substantially injure Plaintiffs and expose them to further constitutional violations; and (4) the public interest lies in maintaining an injunction to prohibit the enforcement of the State's unconstitutional Act. Indeed, the Court agrees with Plaintiffs that it would be logically inconsistent to grant AG Defendants this relief after granting *Pls. MPI*, and AG Defendants acknowledged at oral argument that they filed this motion primarily to preserve the issue on appeal. Accordingly, *AG Defs. Motion to Stay* will be denied.

## X. CONCLUSION

Accordingly,

**IT IS ORDERED** that the *Consolidated Motion to Dismiss, Opposition to Plaintiffs' Motion for Preliminary Injunction, and Alternative Motion for Stay Pending Appeal* (Doc. 39) brought by all defendants other than the Orleans Parish School Board—specifically, Defendants Cade Brumley, Conrad Appel, Judy Armstrong, Kevin Berken, Preston Castille, Simone Champagne, Sharon Latten-Clark, Lance Harris, Paul Hollis, Sandy Holloway, Stacey Melerine, Ronnie Morris, East Baton Rouge Parish School Board, Livingston Parish School Board, Vernon Parish School Board, and St. Tammany Parish School Board—is **DENIED**.

**IT IS FURTHER ORDERED** that the Plaintiffs' *Motion for Preliminary Injunction* (Doc. 20) is **GRANTED.** The Court finds that House Bill No. 71, Act No. 676, is **FACIALLY**

176

**UNCONSTITUTIONAL** and **UNCONSTITUTIONAL IN ALL APPLICATIONS.** As a result, AG Defendants and their agents shall be prohibited from (1) enforcing H.B. 71; (2) adopting rules or regulations for the enforcement of H.B. 71; and (3) requiring that the Ten Commandments be posted in every public-school classroom in Louisiana in accordance with H.B. 71.

      **IT IS FURTHER ORDERED** that Defendants Brumley and BESE Members shall be responsible for providing notice of this order and H.B. 71's unconstitutionality to all Louisiana public elementary, secondary, and charter schools, and all public post-secondary education institutions.

      **IT IS FURTHER ORDERED** that Plaintiffs shall post a bond in the amount of $100 within five (5) days of this ruling.

      **IT IS FURTHER ORDERED** that the *Rule 12(b)(1) Motion to Dismiss and Opposition to Motion for Preliminary Injunction* (Doc. 38) filed by the Defendant Orleans Parish School Board is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** as to Plaintiffs Roake and Van Young, and their claims against OPSB (individually and on behalf of their minor children A.V. and S.V.) will be **DISMISSED WITHOUT PREJUDICE** for lack of standing. In all other respects, the *OPSB MTD* is **DENIED**.

      **IT IS FURTHER ORDERED** that the *Conditional Motion to Stay Preliminary Injunctive Relief Pending Appeal* (Doc. 40) filed by AG Defendants is **DENIED**.

      Signed in Baton Rouge, Louisiana, on <u>November 12, 2024</u>.

                                      _____

                                  **JUDGE JOHN W. deGRAVELLES**
                                  **UNITED STATES DISTRICT COURT**
                                  **MIDDLE DISTRICT OF LOUISIANA**