No. 24-30706

# In the United States Court of Appeals for the Fifth Circuit

DARCY ROAKE, REVEREND, ON BEHALF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILDREN, REAL PARTY IN INTEREST A.V., REAL PARTY IN INTEREST S.V.; ADRIAN VAN YOUNG, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILDREN, REAL PARTY IN INTEREST A.V., REAL PARTY IN INTEREST S.V.; MAMIE BROADHURST, REVEREND, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST N.W.; RICHARD WILLIAMS, REVEREND, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST N.W.; JEFF SIMS, REVEREND, ON BEHALF OF HIMSELF AND ON BEHALF OF HIS MINOR CHILDREN, REAL PARTY IN INTEREST A.S., REAL PARTY IN INTEREST C.S. 1, REAL PARTY IN INTEREST C.S. 2; JENNIFER HARDING, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST A.O.; BENJAMIN OWENS, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST A.O.; DAVID HAWLEY, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILDREN REAL PARTY IN INTEREST A.H., REAL PARTY IN INTEREST L.H.; ERIN HAWLEY, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILDREN, REAL PARTY IN INTEREST A.H, REAL PARTY IN INTEREST L.H.; DUSTIN MCCRORY, ON BEHALF OF THEMSELVES AND ON BEHALF OF HIS MINOR CHILDREN, REAL PARTY IN INTEREST E.M.; REAL PARTY IN INTEREST P.M., REAL PARTY IN INTEREST L.M.; GARY SERNOVITZ, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST T.S.; MOLLY PULDA, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD. REAL PARTY IN INTEREST T.S.; CHRISTY ALKIRE, ON BEHALF OF HERSELF AND ON HEHALF OF HER MINOR CHILD, REAL PARTY IN INTEREST L.A.; JOSHUA HERLANDS, ON BEHALF OF HIMSELF AND ON BEHALF OF HIS MINOR CHILDREN, REAL PARTY IN INTEREST E.H., REAL PARTY IN INTEREST J.H.,

*Plaintiffs-Appellees*

v.

CADE BRUMLEY, IN HIS OFFICIAL CAPACITY AS THE LOUISIANA STATE SUPERINTENDENT OF EDUCATION; CONRAD APPEL, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE LOUISIANA STATE BOARD OF ELEMENTARY AND

SECONDARY EDUCATION (LSBESE); JUDY ARMSTRONG, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; KEVIN BERKEN, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; PRESTON CASTILLE, IN HIS OFFICIAL CAPACITY AS A MEMBER OF LSBESE; SIMONE CHAMPAGNE, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; SHARON LATTEN-CLARK, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; LANCE HARRIS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF LSBESE; PAUL HOLLIS, LOUISIANA STATE BOARD OF ELEMENTARY AND SECONDARY EDUCATION; SANDY HOLLOWAY, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; STACEY MELERINE, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; RONNIE MORRIS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; EAST BATON ROUGE PARISH SCHOOL BOARD; LIVINGSTON PARISH SCHOOL BOARD; VERNON PARISH SCHOOL BOARD; ST. TAMMANY PARISH SCHOOL BOARD,

*Defendants-Appellants*

---

On Appeal from the United States District Court
for the Middle District of Louisiana
No. 3:24-cv-517, Hon. John W. deGravelles

---

## PETITION FOR INITIAL HEARING EN BANC IN THE JANUARY SITTING

---

ERIC C. RASSBACH
JOSEPH C. DAVIS
BENJAMIN A. FLESHMAN
AMANDA L. SALZ
KELSEY BAER FLORES
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, D.C. 20006

*Counsel for Appellants Brumley
and LSBESE Officials*

ELIZABETH B. MURRILL
Attorney General of Louisiana

J. BENJAMIN AGUIÑAGA
Solicitor General

ZACHARY FAIRCLOTH
Principal Deputy Solicitor General

OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

*Counsel for Appellants*

# CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required here because, under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellants—as "governmental" parties—need not furnish a certificate of interested persons.

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA

## INTRODUCTION AND RULE 35(B)(1) STATEMENT

For decades, lower federal courts have allowed plaintiffs to purge religious imagery from the public square based on no injury other than the alleged offense they feel from seeing it. "This 'offended observer' theory of standing has no basis in law," *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 80 (2019) (Gorsuch, J., concurring in the judgment); turns political disputes into legal questions, *City of Ocala v. Rojas*, 143 S. Ct. 764, 765 (2023) (Gorsuch, J., respecting the denial of certiorari); and "appears to warp the very essence of the judicial power vested by the Constitution," *id.* at 767 (Thomas, J., dissenting from the denial of certiorari). Members of this Court have long criticized the theory—and this is the case to get rid of it.

H.B. 71 requires Louisiana schools to post displays of the Ten Commandments with historical context in classrooms by January 1, 2025. Here is one of innumerable potential displays (ROA.483):

ii



Plaintiffs—students and their parents—have never seen an H.B. 71 display in a classroom, nor do they know what H.B. 71 display(s) may be placed in their classrooms. Still they sued. And the district court entered a preliminary injunction, finding standing based on Plaintiffs' "future encounter" with H.B. 71 displays and holding on the merits that *every* conceivable H.B. 71 display unconstitutionally "pressure[s]" viewers "to observe, meditate on, venerate, and adopt or obey the state's preferred religious doctrine." ROA.1651–52, 1721 (citation omitted).

The district court's decision is profoundly wrong in numerous respects—including on one threshold issue that "presents a question of exceptional importance" and implicates potential "conflicts" among this Court's and the Supreme Court's cases, Fed. R. App. P. 35(b)(1)(A), (B):

> Whether a federal court lacks jurisdiction, on ripeness or offended-observer standing grounds, to adjudicate an Establishment Clause challenge to a hypothetical future religious display no plaintiff has seen.

Neither this Court nor the Supreme Court has ever permitted such a challenge. In fact, properly read, this Court's precedents foreclose jurisdiction. As to ripeness, *Staley v. Harris County*, 485 F.3d 305 (5th Cir. 2007) (en banc), holds that an Establishment Clause challenge to a "future display" "is not ripe" where, as here, the Court is "unable to conduct the fact-intensive and context-specific analysis required by [the Supreme Court]." *Id.* at 309. As to standing, a long line of this Court's offended-observer precedents holds that, "[i]n cases involving religious displays and exercises, we have required an encounter with the offending item or action to confer standing"—a condition undisputedly not satisfied here. *Barber v. Bryant*, 860 F.3d 345, 350 (5th Cir. 2017) (citing *Doe v. Tangipahoa Par. Sch. Bd.*, 494 F.3d 494, 497 (5th Cir. 2007) (en banc)).

On either ripeness or standing, therefore, the district court lacks jurisdiction.

Nonetheless, the district court invoked an older precedent to avoid that conclusion. Said the court: "[T]here is no need for [Plaintiffs] to wait for actual implementation of the statute and actual violations of [their] rights under the First Amendment ...." ROA.1624, 1652 (quoting *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 278 (5th Cir. 1996)). *Ingebretsen* is factually distinguishable. It was wrong the day it was decided. *See Ingebretsen*, 88 F.3d at 284–85 (Jones, J., dissenting from denial of rehearing en banc) (emphasizing that "fear of exposure to student-initiated prayers in the future is simply not injury," and alternatively explaining that "the controversy is not ripe"). And it is especially wrong today given this Court's subsequent decisions in *Staley* and *Doe*.

But the most fundamental problem is that the district court's reliance on *Ingebretsen* harkens back to a bygone era haunted by the *Lemon* test. After the Supreme Court's rejection of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), in *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), the *Lemon* test's "long Night of the Living Dead ... is now

over," *Freedom From Religion Found., Inc. v. Mack*, 49 F.4th 941, 954 n.20 (5th Cir. 2022). And that spells the end of offended-observer standing—a mistaken invention of the lower courts. The offended-observer standing theory morphed from *Lemon*'s focus on a "reasonable observer," which could suggest that "such an observer must be able to sue." *City of Ocala*, 143 S. Ct. at 765 (Gorsuch, J.) (citation omitted). But "with the demise of *Lemon*'s reasonable observer test, 'little excuse' now remains 'for the anomaly of offended observer standing.'" *Id.* Thus, "the gaping hole it tore in standing doctrine in the lower courts should now begin to close." *Id.* (cleaned up); *accord id.* at 766–67 (Thomas, J.) (collecting cases and favorably citing this Court's criticism of offended-observer standing in *Mack*).

The time has come to bury offended-observer standing alongside *Lemon*. This is the perfect case in which to do so because, in a radical extension of the theory, Plaintiffs hang their hat on *imaginary* offended-observer standing—the theory that someday, somewhere they will be offended by an H.B. 71 display. That is not, and has never been, a cognizable standing theory. But only the full Court can say so. *See id.* at

768 (Thomas, J.) (urging "the Courts of Appeals to reconsider their offended observer precedents en banc"). And that will end this case.

Finally, while initial en banc review is rare, three considerations warrant such review here. *First*, the Court already has scheduled this case for argument during the January en banc sitting, ECF 70, and briefing will be complete two weeks before that sitting, ECF 64. *Second*, there are seemingly divergent views within the Court regarding the disposition of this case, which underscores the virtue of full Court review. The motions panel entered a partial administrative stay, expedited the appeal, and referred the State's full-length stay motion to the merits panel. ECF 32, 59. Less than 24 hours after the referral, the State's stay motion was summarily denied without a response and the administrative stay was dissolved. ECF 68. And *third*, the State's frontal attack on offended-observer standing would be futile (given binding precedent) if presented to a panel. *See Williams v. Catoe*, 946 F.3d 278, 279 (5th Cir. 2020) (en banc) (approving of "initial en banc hearing as an efficient means of revisiting [an] issue ... without requiring the matter to percolate uselessly through a panel").

vii

For these reasons, the State respectfully submits that full Court review—on a schedule that already accommodates an en banc hearing in the January sitting—is the best way to ensure clarity of this Court's precedents, while efficiently disposing of this case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..........................................i

INTRODUCTION AND RULE 35(B)(1) STATEMENT ...........................ii

TABLE OF AUTHORITIES.........................................................x

STATEMENT OF THE CASE ................................................. 1

ARGUMENT ..................................................................... 8

    I. THIS COURT'S RIPENESS AND STANDING PRECEDENTS IN THE ESTABLISHMENT CLAUSE CONTEXT REQUIRE FULL COURT REVIEW. .... 9

        A.  *Staley* and *Doe* Bar Jurisdiction in This Case. ..........................9

        B.  *Ingebretsen* Is Distinguishable and Wrong. ..............................11

    II. FULL COURT REVIEW IS WARRANTED TO REJECT OFFENDED-OBSERVER STANDING. ....................................................... 13

CONCLUSION ...................................................................... 18

CERTIFICATE OF SERVICE................................................20

CERTIFICATE OF COMPLIANCE......................................21

# TABLE OF AUTHORITIES

## Cases

*Am. Legion v. Am. Humanist Ass'n,*
  588 U.S. 29 (2019)........................................................ passim

*Barber v. Bryant,*
  860 F.3d 345 (5th Cir. 2017)........................................ passim

*City of Ocala v. Rojas,*
  143 S. Ct. 764 (2023)...........................................ii, vi, 15, 17

*Croft v. Perry,*
  624 F.3d 157 (5th Cir. 2010)...............................................3

*Doe v. Tangipahoa Par. Sch. Bd.,*
  494 F.3d 494 (5th Cir. 2007)............................ iv, 10, 14, 15

*El Paso Cnty. v. Trump,*
  982 F.3d 332 (5th Cir. 2020).............................................16

*Freedom From Religion Found., Inc. v. Mack,*
  49 F.4th 941 (5th Cir. 2022) ............................... vi, 12, 14, 16

*Glass v. Paxton,*
  900 F.3d 233 (5th Cir. 2018).......................................16, 18

*Ingebretsen v. Jackson Pub. Sch. Dist.,*
  88 F.3d 274 (5th Cir. 1996)................................. v, 11, 12, 13

*Kennedy v. Bremerton School District,*
  597 U.S. 507 (2022) ..........................................................v

*Kondrat'yev v. City of Pensacola,*
  949 F.3d 1319 (11th Cir. 2020)..........................................18

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,*
  508 U.S. 384 (1993)...........................................................14

*Lemon v. Kurtzman,*
    403 U.S. 602 (1971) ..................................................................... passim

*McMahon v. Fenves,*
    946 F.3d 266 (5th Cir. 2020) ............................................................... 17

*Miss. Rising Coal v. City of Ocean Springs,*
    910 F.3d 191 (5th Cir. 2018) ............................................................... 17

*Moore v. Bryant,*
    853 F.3d 245 (5th Cir. 2017) ............................................................... 17

*NAACP v. Tindell,*
    95 F.4th 212 (5th Cir. 2024) ............................................................... 17

*Staley v. Harris County,*
    485 F.3d 305 (5th Cir. 2007) ....................................................... passim

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ............................................................................ 14

*Van Orden v. Perry,*
    545 U.S. 677 (2005) ..................................................................... 1, 12

*Williams v. Catoe,*
    946 F.3d 278 (5th Cir. 2020) ............................................................. vii

**Statutes**

La. R.S. §17:2124 ................................................................................ 1, 2

**Rules**

Fed. R. App. P. 35(b)(1) ..................................................................... ii, iv

## STATEMENT OF THE CASE

**1.** Ten Commandments displays are part of "the rich American tradition of religious acknowledgements." *Van Orden v. Perry*, 545 U.S. 677, 689–92 (2005) (plurality). This is not controversial. After all, the Ten Commandments "have historical significance as one of the foundations of our legal system." *Am. Legion*, 588 U.S. at 53. And "for largely that reason, they are depicted in the marble frieze in [the Supreme Court's] courtroom and in other prominent public buildings in our Nation's capital." *Id.*

This summer, Louisiana enacted H.B. 71, which requires public schools to display the Ten Commandments in classrooms. La. R.S. § 17:2124. H.B. 71 specifies that the Commandments' text must be "identical" to that upheld in *Van Orden*, in "large, easily readable font," on "a poster or framed document that is at least eleven inches by fourteen inches," and "the central focus" of the display. *Id.* § 17:2124(B)(1), (6). Each display must include a three-paragraph "context statement" about the history of the Ten Commandments in American public education. *Id.* § 17:2124(B)(3). "[E]ach governing authority" will determine "[t]he nature of the display," including additional and different contextual

elements. *Id.* § 17:2124(B)(1), (4). No school is required to pay for the displays but must accept either donations or donated displays. *Id.* § 17:2124(B)(5).

By January 1, 2025, (a) schools must comply with H.B. 71, (b) the Louisiana State Board of Elementary and Secondary Education (BESE) must "adopt rules and regulations in accordance with the Administrative Procedure Act" for the law's implementation, and (c) the Department of Education must "identify appropriate [compliance] resources" that are "free of charge" and list them on the department's website. *Id.* § 17:2124(B)(1), (6)(a), (6)(b).

**2.** Five days after Governor Landry signed H.B. 71 into law, Plaintiffs—students and their parents—sued Louisiana State Superintendent of Education Cade Brumley, the BESE members in their official capacities, and five parish school boards (East Baton Rouge, Vernon, Livingston, St. Tammany, and Orleans). ROA.39. Plaintiffs claim H.B. 71 violates the First Amendment's Establishment Clause (Count I) and Free Exercise Clause (Count II). ROA.76–79. Their claims—as they concede, and the district court agreed—are facial challenges, which means that, "under binding Fifth Circuit precedent,

they must show that H.B. 71 is 'unconstitutional in every application.'" ROA.1625 (quoting *Croft v. Perry*, 624 F.3d 157, 164 (5th Cir. 2010)). Plaintiffs then sought to enjoin Defendants from implementing H.B. 71. ROA.239.

The State moved to dismiss under Rules 12(b)(1) and 12(b)(6), noting that binding Fifth Circuit precedent bars this lawsuit not only on jurisdictional grounds but also on the merits. To illustrate these points, the State emphasized that Plaintiffs have not seen an H.B. 71 display— and there are quite literally innumerable ways to create an H.B. 71 display in a constitutionally compliant manner. The State thus offered several illustrations (reproduced by the district court, ROA.1680–94), including the following, ROA.480–94:



# THE SUPREME COURT
## &
# THE LAWGIVERS

Various lawgivers, including Blackstone, Moses, and Marshall, look over the Supreme Court as it goes about its daily business. They are represented through the west and east wall friezes.

**WILLIAM BLACKSTONE**

COMMENTARIES
ON THE
L A W S
OF
E N G L A N D.

BOOK THE THIRD.

BY
WILLIAM BLACKSTONE, Esq.
SOLICITOR GENERAL TO HIS MAJESTY.

OXFORD,
PRINTED AT THE CLARENDON PRESS
M.DCC.LXVIII.

**MOSES**

THE TEN COMMANDMENTS

I AM THE LORD THY GOD.
THOU SHALT HAVE NO OTHER GODS BEFORE ME.
THOU SHALT NOT MAKE TO THYSELF ANY GRAVEN IMAGES.
THOU SHALT NOT TAKE THE NAME OF THE LORD THY GOD IN VAIN.
REMEMBER THE SABBATH DAY, TO KEEP IT HOLY.
HONOR THY FATHER AND THY MOTHER, THAT THY DAYS MAY BE LONG UPON THE LAND WHICH THE LORD THY GOD GIVETH THEE.
THOU SHALT NOT KILL.
THOU SHALT NOT COMMIT ADULTERY.
THOU SHALT NOT STEAL.
THOU SHALT NOT BEAR FALSE WITNESS AGAINST THY NEIGHBOR.
THOU SHALT NOT COVET THY NEIGHBOR'S HOUSE.
THOU SHALT NOT COVET THY NEIGHBOR'S WIFE, NOR HIS MANSERVANT, NOR HIS MAIDSERVANT, NOR HIS CATTLE, NOR ANYTHING THAT IS THY NEIGHBOR'S.

**JOHN MARSHALL**

"IT IS EMPHATICALLY THE PROVINCE AND DUTY OF THE JUDICIAL DEPARTMENT TO SAY WHAT THE LAW IS."

The History of the Ten Commandments in American Public Education:  The Ten Commandments were a prominent part of American public education for almost three centuries. Around the year 1688, The New England Primer became the first published American textbook and was the equivalent of a first grade reader. The New England Primer was used in public schools throughout the United States for more than one hundred fifty years to teach Americans to read and contained more than forty questions about the Ten Commandments. The Ten Commandments were also included in public school textbooks published by educator William McGuffey, a noted university president and professor. A version of his famous McGuffey Readers were written in the early 1800s and became one of the most popular textbooks in the history of American education, selling more than one hundred million copies. Copies of the McGuffey Readers are still available today. The Ten Commandments also appeared in textbooks published by Noah Webster in which were widely used in American public schools along with America's first comprehensive dictionary that Webster also published. His textbook, The American Spelling Book, contained the Ten Commandments and sold more than one hundred million copies for use by public school children all across the nation and was still available for use in American public schools in the year 1975.

4

Case 2:24-cv-00517-JWD-GDJ  Document 39-1  05/05/24  Page 12 of 20

# THE HOUSE OF REPRESENTATIVES



## &
## THE LAWGIVERS



Twenty-three marble relief portraits hanging over the gallery doors of the House Chamber in the U.S. Capitol depict historical figures noted for their work in establishing the principles that underlie American law. Those lawgivers include notable figures like Hammurabi, Solon, and Thomas Jefferson. When the Speaker of the House assumes his position on the dais, he looks directly at yet another lawgiver, Moses. In fact, the Architect of the Capitol emphasizes that the 22 other lawgivers lining the Chamber walls are oriented "so that all look towards the full-face relief of Moses in the center of the north wall."

## MOSES
## THE LAWGIVER



### THE TEN COMMANDMENTS

I AM THE LORD THY GOD.
THOU SHALT HAVE NO OTHER GODS BEFORE ME.
THOU SHALT NOT MAKE TO THYSELF ANY GRAVEN IMAGES.
THOU SHALT NOT TAKE THE NAME OF THE LORD THY GOD IN VAIN.
REMEMBER THE SABBATH DAY, TO KEEP IT HOLY.
HONOR THY FATHER AND THY MOTHER, THAT THY DAYS MAY BE LONG UPON THE LAND WHICH THE LORD THY GOD GIVETH THEE.
THOU SHALT NOT KILL.
THOU SHALT NOT COMMIT ADULTERY.
THOU SHALT NOT STEAL.
THOU SHALT NOT BEAR FALSE WITNESS AGAINST THY NEIGHBOR.
THOU SHALT NOT COVET THY NEIGHBOR'S HOUSE.
THOU SHALT NOT COVET THY NEIGHBOR'S WIFE, NOR HIS MANSERVANT, NOR HIS MAIDSERVANT, NOR HIS CATTLE, NOR ANYTHING THAT IS THY NEIGHBOR'S.

## SPEAKER
## MIKE JOHNSON



The History of the Ten Commandments in American Public Education: The Ten Commandments were a prominent part of American public education for almost three centuries. Around the year 1688, The New England Primer became the first published American textbook and was the equivalent of a first grade reader. The New England Primer was used in public schools throughout the United States for more than one hundred fifty years to teach Americans to read and contained more than forty questions about the Ten Commandments. The Ten Commandments were also included in public school textbooks published by educator William McGuffey, a noted university president and professor. A version of his famous McGuffey Readers was written in the early 1800s and became one of the most popular textbooks in the history of American education, selling more than one hundred million copies. Copies of the McGuffey Readers are still available today. The Ten Commandments also appeared in textbooks published by Noah Webster in which were widely used in American public schools along with America's first comprehensive dictionary that Webster also published. His textbook, The American Spelling Book, contained the Ten Commandments and sold more than one hundred million copies for use by public school children all across the nation and was still available for use in American public schools in the year 1975.

5

Case 3:24-cv-00517-JWD-SDJ   Document 39-2   03/05/24   Page 19 of 33

# IMPORTANT SUPREME COURT CASES
## VAN ORDEN V. PERRY

THIS CASE ASKED WHETHER THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT ALLOWS THE DISPLAY OF A MONUMENT INSCRIBED WITH THE TEN COMMANDMENTS ON THE TEXAS STATE CAPITOL GROUNDS.

THE SUPREME COURT FOUND NO ESTABLISHMENT CLAUSE VIOLATION, WITH THE PLURALITY OPINION EMPHASIZING THAT "ACKNOWLEDGEMENTS OF THE ROLE PLAYED BY THE TEN COMMANDMENTS IN OUR NATION'S HISTORY ARE COMMON THROUGHOUT AMERICA." THE COURT NOTED THAT MOSES AND THE COMMANDMENTS APPEAR IN THE SUPREME COURT COURTROOM ITSELF, THE GATES LINING THE COURTROOM, AND THE DOORS LEADING INTO THE COURTROOM.

THE MAIN DISSENT JOINED BY JUSTICE GINSBURG AND TWO OTHER JUSTICES DISAGREED WITH THE COURT'S JUDGEMENT, BUT ACKNOWLEDGED THAT "A DISPLAY OF THE COMMANDMENTS ACCOMPANIED BY AN EXPOSITION OF HOW THEY HAVE INFLUENCED MODERN LAW WOULD MOST LIKELY BE CONSTITUTIONALLY UNOBJECTIONABLE." THE DISSENT ALSO RECOGNIZED THAT THE COMMANDMENTS COULD "BE INTEGRATED CONSTITUTIONALLY INTO A COURSE OF STUDY IN PUBLIC SCHOOLS."

NOTE: THIS IS THE VERSION OF THE TEN COMMANDMENTS UPHELD IN VAN ORDEN, BUT DIFFERENT FAITH TRADITIONS ADOPT DIFFERENT VERSIONS OF THE TEXT OF THE TEN COMMANDMENTS. FOR EXAMPLE, THE CATHOLIC VERSION GENERALLY DOES NOT REFERENCE 'GRAVEN IMAGES.' AND THE TORAH USES THE PHRASE 'I AM THE LORD YOUR GOD WHO BROUGHT YOU OUT OF THE LAND OF EGYPT, OUT OF THE HOUSE OF BONDAGE."



the Ten Commandments

I AM the LORD thy God.
Thou shalt have no other gods before me.
Thou shalt not make to thyself any graven images.
Thou shalt not take the Name of the Lord thy God in vain.
Remember the Sabbath day, to keep it holy.
Honor thy father and thy mother that thy days may be long upon the land which the Lord thy God giveth thee.
Thou shalt not kill.
Thou shalt not commit adultery.
Thou shalt not steal.
Thou shalt not bear false witness against thy neighbor.
Thou shalt not covet thy neighbor's house.
Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's.

PRESENTED TO THE PEOPLE OF OKLAHOMA BY DR. MIKE AND CONNIE RITZE AND CHILDREN AMITY, HEIDI AND JAMEY

The History of the Ten Commandments in American Public Education: The Ten Commandments were a prominent part of American public education for almost three centuries. Around the year 1688, The New England Primer became the first published American textbook and was the equivalent of a first grade reader. The New England Primer was used in public schools throughout the United States for more than one hundred fifty years to teach Americans to read and contained more than forty questions about the Ten Commandments. The Ten Commandments were also included in public school textbooks published by educator William McGuffey, a noted university president and professor. A version of his famous McGuffey Readers were written in the early 1800s and became one of the most popular textbooks in the history of American education, selling more than one hundred million copies. Copies of the McGuffey Readers are still available today. The Ten Commandments also appeared in textbooks published by Noah Webster, in which were widely used in American public schools along with America's first comprehensive dictionary that Webster also published. His textbook, The American Spelling Book, combined the Ten Commandments and sold more than one hundred million copies for use by public school children all across the nation and was still available for use in American public schools in the year 1975.

6



**3.** Notwithstanding all this, on November 12, the district court held that H.B. 71 is "FACIALLY UNCONSTITUTIONAL and UNCONSTITUTIONAL IN ALL APPLICATIONS" and enjoined Defendants from implementing H.B. 71. ROA.1793–94.

The State immediately appealed and sought a partial administrative stay. ECF 12; ECF 38. The motions panel granted the administrative stay on November 15, ECF 32, expedited the merits briefing schedule, and referred the State's stay motion to the merits panel on November 19, ECF 59. Less than 24 hours later, the State's stay

motion was summarily denied without a response and the administrative stay was dissolved. ECF 68. Merits briefing will be complete by January 10, 2025, ECF 64, and oral argument is scheduled for January 23 in the en banc courtroom, ECF 70.

## ARGUMENT

The State's stay motion (ECF 38) details numerous respects in which the district court erred, not least of which is the district court's badly mistaken First Amendment analysis—and the State's opening merits brief will expound upon those errors. But this Court will almost certainly never reach the merits. That is because the lack of subject matter jurisdiction begins and ends this case, and only the full Court can give the clearest reason why.

The best reading of this Court's precedents is that Plaintiffs' lawsuit is not ripe and Plaintiffs lack standing. For they have never seen an H.B. 71 display and do not know how their respective schools will choose to implement H.B. 71. But the district court cited an older case to reach the opposite conclusion. That was wrong under this Court's precedents. Even more significantly, Plaintiffs' entire case depends on a super-charged version of offended-observer standing: that anticipated

offense from a future unspecified religious display is constitutionally sufficient for Article III standing. That, too, is wrong for a reason only the full Court can give: It would improperly expand offended-observer standing, when the proper route today—after *Lemon*'s demise—is to lay offended-observer standing to rest. The Court should thus take this opportunity to do away with offended-observer standing once and for all.

## I. THIS COURT'S RIPENESS AND STANDING PRECEDENTS IN THE ESTABLISHMENT CLAUSE CONTEXT REQUIRE FULL COURT REVIEW.

### A. *Staley* and *Doe* Bar Jurisdiction in This Case.

The State has a perfect combination of Fifth Circuit precedents to obtain dismissal for lack of jurisdiction. *First*, *Staley* held that, because a challenged Bible monument had been temporarily stored for renovations, any challenge to its future display was not ripe since the Court was "unable to conduct the fact-intensive and context-specific analysis required" by the "Supreme Court decisions addressing the constitutionality of Ten Commandments displays." 485 F.3d at 307–09. Put otherwise, the "claim that the Establishment Clause *may* be violated" in the future was "not ripe for review." *Id.* at 309 emphasis added); *Barber*, 860 F.3d at 353–54 ("[O]nce that display is removed from view, standing dissipates, because there is no longer an injury.").

9

That is this case. Plaintiffs challenge only unspecified future H.B. 71 displays that they presume *may* violate their rights. But nobody knows how Plaintiffs' schools (or any school) will select H.B. 71 displays, what size they will be, where they will be located, or what additional context may be included. So *Staley* says this case is unripe.

*Second*, *Doe* held that, "[i]n cases involving religious displays and exercises, we have required an encounter with the offending item or action to confer standing." *Barber*, 860 F.3d at 353 (citing *Doe*, 494 F.3d at 497). "But these religious display and exercise cases represent the outer limits of where we can find these otherwise elusive Establishment Clause injuries." *Id.*

Here too, this black-letter principle of offended-observer standing forecloses jurisdiction. It is undisputed that Plaintiffs have *never* encountered an H.B. 71 display. Never having seen an H.B. 71 display, therefore, Plaintiffs lack standing under *Doe* and related cases.

Neither this Court nor the Supreme Court has *ever* found Article III jurisdiction over an Establishment Clause challenge to a religious display that no one has seen. And here, this Court's precedent compels

the opposite conclusion. Under *Staley*, this dispute is not ripe. And under *Doe*, Plaintiffs lack standing.

## B. *Ingebretsen* Is Distinguishable and Wrong.

The district court, however, invoked one of this Court's older precedents to effectively override *Staley* and *Doe*. That case is *Ingebretsen*, 88 F.3d 274, which involved an Establishment Clause challenge to a Mississippi statute that permitted student-initiated prayer during certain school events. The plaintiffs sued before any prayer occurred or any school took any steps to implement the law—and the district court enjoined implementation of the statute. *Id.* at 278.

*Ingebretsen* contains one paragraph on standing, which addresses Mississippi's argument that the plaintiffs did not have standing "because the statute has not yet been implemented." *Id.* This Court rejected that argument on the ground that "[t]here is no need for [a plaintiff] to wait for actual violations of his rights under the First Amendment where the statute 'makes inappropriate government involvement in religious affairs inevitable.'" *Id.* And that is the holding on which the district court below rested. In its view, Plaintiffs in this case need not suffer an alleged

11

violation of their First Amendment rights by actually seeing an H.B. 71 display before filing suit. ROA.1624, 1652.

But *Ingebretsen* does not control here for at least three reasons. *First*, if *past* offense from encountering an actual display represents Article III's "outer limits," *Barber*, 860 F.3d at 353, then surely *future* offense regarding a not-yet-existent display "pushe[s] beyond those limits," *Mack*, 49 F.4th at 949. And that is especially so given that the subsequent decision in *Staley* expressly rests on the particular demands of Supreme Court *Ten Commandments* precedents that themselves post-date *Ingebretsen*. *See Staley*, 485 F.3d at 308 (citing *Van Orden* and *McCreary* decisions from 2005).

*Second*, unlike what the *Ingebretsen* panel believed to be true in *Ingebretsen*, it is not "inevitable" that every H.B. 71 display will cause the Establishment Clause harms that Plaintiffs allege. For example, a display discussing Supreme Court or Capitol architecture would not conceivably compel Plaintiffs to "venerate" or "adopt" the Commandments. *Cf.* ROA.1654 (citing Plaintiffs' claims). And Plaintiffs have no way of knowing which among these myriad options hypothetical private donors might present to their schools. This is exactly why "[t]he

religious-display cases do not provide a basis for standing to challenge the endorsement of beliefs that exist only in the text of a statute." *Barber*, 860 F.3d at 354.

*Third*, and in all events, *Ingebretsen* was wrong the day it was decided for all the reasons explained by Judge Jones and joined by Judges Jolly, Smith, Barksdale, Garza, and DeMoss. "[F]ear of exposure ... in the future is simply not injury." 88 F.3d at 284 (Jones, J., dissenting from the denial of rehearing en banc). The defect in the panel opinion was that "[t]he court was unwilling to let events take their course under the statute and trust to the good will of students and school administrators to implement it properly." *Id.* at 285. The case simply "did not present a factual, specific dispute." *Id.*

For these reasons, *Staley* and *Doe* dictate the outcome of this case— but given *Ingebretsen*, the full Court is best positioned to say so.

## II. FULL COURT REVIEW IS WARRANTED TO REJECT OFFENDED-OBSERVER STANDING.

Resolving the tension above would be sufficient to rule for the State and end this case. But the more fundamental Article III problem here is also one that only the full Court can fix. The district court reasoned that since those who "personally encounter[]" an allegedly offensive religious

display have standing to sue, *Barber*, 860 F.3d at 353–54, then surely those whose encounter is "imminent" have standing, too, ROA.1651–52. That is wrong. "[O]ffense" at seeing something disagreeable does not "qualif[y] as a 'concrete and particularized' injury sufficient to confer standing." *Am. Legion*, 588 U.S. at 80 (Gorsuch, J.). There is no good reason to allow that erroneous standing theory to continue to haunt this Court's precedents. *Cf. Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 398 (1993) (Scalia, J., concurring in the judgment). Accordingly, the State respectfully submits that the Court should take this opportunity to reconsider its offended-observer precedents and reject that standing theory altogether.

Members of this Court have long criticized the Fifth Circuit's endorsement of offended-observer standing.[1] *See, e.g., Mack*, 49 F.4th at 949 ("Undeniably, the law of Establishment Clause standing is hard to

---

[1] Offended-observer standing is a creation of the lower courts, not the Supreme Court. *See Am. Legion*, 588 U.S. at 84 (Gorsuch, J.) ("Lower courts invented offended-observer standing for Establishment Clause cases in the 1970s in response to this Court's decision in *Lemon*."). The Supreme Court has never endorsed it. That the Supreme Court has implicitly assumed standing in certain Establishment Clause cases, moreover, has no binding effect on this Court. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) ("[D]rive-by jurisdictional rulings ... have no precedential effect."); *Doe*, 494 F.3d at 498 (rejecting dissent's argument "that lower courts can infer standing from the Supreme Court's decision[s] in similar Establishment Clause cases where the issue was not ruled on by the Court").

reconcile with the general principle that standing is absent where a plaintiff has only a 'generalized grievance shared in substantially equal measure by all or most citizens.' Indeed, the Establishment Clause has repeatedly gotten special treatment when it comes to standing. That treatment may have been unwarranted. But correct or not, our precedents bind us."); *Doe*, 494 F.3d at 500 (DeMoss, J., specially concurring) ("This double standard must be corrected because ... it opens the courts' doors to a group of plaintiffs who have no complaint other than they dislike any government reference to God.").

In light of *Lemon*'s demise, moreover, Members of the Supreme Court have echoed that criticism of lower courts' endorsement of offended-observer standing. *See Am. Legion*, 588 U.S. at 80 (Gorsuch, J.) ("This 'offended observer' theory of standing has no basis in law."); *accord City of Ocala*, 143 S. Ct. at 764–65 (Gorsuch, J.); *id.* at 765–68 (Thomas, J.). For good reason: Because *Lemon* "suggested that 'the Establishment Clause forbids anything a reasonable observer would view as an endorsement of religion,'" "lower courts deduced[] 'such an observer must be able to sue.'" *City of Ocala*, 143 S. Ct. at 765 (Gorsuch, J.). "But if that logic ever made sense, it no longer does" now that the Supreme Court has

15

overruled *Lemon*. *Id.* "[W]ith the demise of *Lemon*'s reasonable observer test, 'little excuse' now remains 'for the anomaly of offended observer standing.'" *Id.* Thus, "the gaping hole it tore in standing doctrine in the lower courts should now begin to close." *Id.* (cleaned up). And that begins with the courts of appeals "reconsider[ing] their offended observer precedents en banc." *Id.* at 768 (Thomas, J.).

This is the right case to answer that call. For starters, unlike in *Mack*, the challenge to offended-observer standing is squarely presented here. *Cf. Mack*, 49 F.4th at 949. In addition, this remedial step is warranted immediately given the serious separation-of-powers concerns. As Judge Richman put it for the Court, "[t]he Article III standing requirement 'serves to prevent the judicial process from being used to usurp the powers of the political branches' and 'confines the federal courts to a properly judicial role.'" *El Paso Cnty. v. Trump*, 982 F.3d 332, 341 (5th Cir. 2020). And as Judge Southwick recently emphasized, by failing to hew closely to Article III standing requirements, "federal courts risk disregarding their constitutional mandate to limit their jurisdiction to actual cases and controversies." *Glass v. Paxton*, 900 F.3d 233, 242 (5th Cir. 2018). Both are exactly right.

"Under Article III, federal courts are authorized 'to adjudge the legal rights of litigants in actual controversies,' not hurt feelings." *City of Ocala*, 143 S. Ct. at 767 (Thomas, J.). By crediting hurt feelings, however, offended-observer standing "warp[s] the very essence of the judicial power." *Id.*; *cf. NAACP v. Tindell*, 95 F.4th 212, 218 (5th Cir. 2024) (no "stigmatic harm ... no matter how strongly plaintiffs feel about H.B. 1020's message").

And warped it is: Since offended-observer standing is an Establishment Clause-only doctrine, if Plaintiffs had standing here, that would mean a Black student would *not* have standing to sue over a Confederate flag poster, yet Plaintiffs *would* have standing to sue if the Ten Commandments appeared on the *same* poster. *Compare Moore v. Bryant*, 853 F.3d 245, 249–51 (5th Cir. 2017) (Higginson, J.) (explaining lack of standing to sue over Confederate flag; distinguishing "Establishment Clause case law"); *see Miss. Rising Coal v. City of Ocean Springs*, 910 F.3d 191, 193 (5th Cir. 2018) (per curiam) ("If exposure to a flag does not injure a plaintiff for equal protection purposes, exposure to the same flag does not injure a plaintiff for [Fair Housing Act] purposes either."); *cf. McMahon v. Fenves*, 946 F.3d 266, 271–72 (5th Cir. 2020)

("offense" at the *removal* of a monument, however "acutely" felt, is a "generalized psychological injury" insufficient to support standing). That *cannot* be the law. *See Am. Legion*, 588 U.S. at 81–82 (Gorsuch, J.). And it skews the playing field against religion, inviting courts to entertain otherwise non-justiciable cases—but only those aimed at purging the public square of religious symbolism. As Judge Newsom exhaustively explained, this is all "just plain wrong." *Kondrat'yev v. City of Pensacola*, 949 F.3d 1319, 1335 (11th Cir. 2020) (Newsom, J., concurring).

Now is the time to restore the Constitution's limits on federal jurisdiction over "actual cases and controversies." *Glass*, 900 F.3d at 242. Doing so "will bring with it the welcome side effect of rescuing" courts in this Circuit "from the sordid business of having to pass aesthetic judgment" on religious displays for their "perceived capacity to give offense." *Am. Legion*, 588 U.S. at 87 (Gorsuch, J.).

## CONCLUSION

The Court should grant the petition and hear argument during the January 2025 en banc sitting.

Respectfully submitted,

Eric C. Rassbach
Joseph C. Davis
Benjamin A. Fleshman
Amanda L. Salz
Kelsey Baer Flores
The Becket Fund for
  Religious Liberty
1919 Pennsylvania Ave. NW
  Suite 400
Washington, D.C. 20006

*Counsel for Appellants
Brumley and LSBESE Officials*

Dated:    November 22, 2024

Elizabeth B. Murrill
Attorney General of Louisiana

*/s/ J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga
Solicitor General

Zachary Faircloth
Principal Deputy Solicitor General

Office of the Attorney General
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

*Counsel for Appellants*

19

# CERTIFICATE OF SERVICE

I certify that on November 22, 2024, I filed the foregoing brief with the Court's CM/ECF system, which will automatically send an electronic notice of filing to all counsel of record.

/s/ *J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA

# CERTIFICATE OF COMPLIANCE

Pursuant to Fifth Circuit Rule 32.3, the undersigned certifies that this motion complies with:

(1) the type-volume limitations of Federal Rule of Appellate Procedure 35(b)(2) because it contains 3,895 words; and

(2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016 (the same program used to calculate the word count).

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA

Dated:    November 22, 2024