No. 24-30706

# In the United States Court of Appeals for the Fifth Circuit

DARCY ROAKE, REVEREND, ON BEHALF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILDREN, REAL PARTY IN INTEREST A.V., REAL PARTY IN INTEREST S.V.; ADRIAN VAN YOUNG, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILDREN, REAL PARTY IN INTEREST A.V., REAL PARTY IN INTEREST S.V.; MAMIE BROADHURST, REVEREND, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST N.W.; RICHARD WILLIAMS, REVEREND, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST N.W.; JEFF SIMS, REVEREND, ON BEHALF OF HIMSELF AND ON BEHALF OF HIS MINOR CHILDREN, REAL PARTY IN INTEREST A.S., REAL PARTY IN INTEREST C.S. 1, REAL PARTY IN INTEREST C.S. 2; JENNIFER HARDING, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST A.O.; BENJAMIN OWENS, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST A.O.; DAVID HAWLEY, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILDREN REAL PARTY IN INTEREST A.H., REAL PARTY IN INTEREST L.H.; ERIN HAWLEY, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILDREN, REAL PARTY IN INTEREST A.H, REAL PARTY IN INTEREST L.H.; DUSTIN MCCRORY, ON BEHALF OF THEMSELVES AND ON BEHALF OF HIS MINOR CHILDREN, REAL PARTY IN INTEREST E.M.; REAL PARTY IN INTEREST P.M., REAL PARTY IN INTEREST L.M.; GARY SERNOVITZ, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST T.S.; MOLLY PULDA, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD. REAL PARTY IN INTEREST T.S.; CHRISTY ALKIRE, ON BEHALF OF HERSELF AND ON HEHALF OF HER MINOR CHILD, REAL PARTY IN INTEREST L.A.; JOSHUA HERLANDS, ON BEHALF OF HIMSELF AND ON BEHALF OF HIS MINOR CHILDREN, REAL PARTY IN INTEREST E.H., REAL PARTY IN INTEREST J.H.,

*Plaintiffs-Appellees,*

v.

CADE BRUMLEY, IN HIS OFFICIAL CAPACITY AS THE LOUISIANA STATE SUPERINTENDENT OF EDUCATION; CONRAD APPEL, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE LOUISIANA STATE BOARD OF ELEMENTARY AND SECONDARY EDUCATION (LSBESE); JUDY ARMSTRONG, IN HER OFFICIAL CAPACITY AS A

MEMBER OF THE LSBESE; KEVIN BERKEN, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; PRESTON CASTILLE, IN HIS OFFICIAL CAPACITY AS A MEMBER OF LSBESE; SIMONE CHAMPAGNE, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; SHARON LATTEN-CLARK, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; LANCE HARRIS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF LSBESE; PAUL HOLLIS, LOUISIANA STATE BOARD OF ELEMENTARY AND SECONDARY EDUCATION; SANDY HOLLOWAY, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; STACEY MELERINE, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; RONNIE MORRIS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; EAST BATON ROUGE PARISH SCHOOL BOARD; LIVINGSTON PARISH SCHOOL BOARD; VERNON PARISH SCHOOL BOARD; ST. TAMMANY PARISH SCHOOL BOARD,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Middle District of Louisiana
No. 3:24-cv-517, Hon. John W. deGravelles

---

**APPELLANTS' OPENING BRIEF**

---

ERIC C. RASSBACH
JOSEPH C. DAVIS
BENJAMIN A. FLESHMAN
AMANDA L. SALZ
KELSEY BAER FLORES
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, D.C. 20006

*Counsel for Appellants Brumley
and LSBESE Officials*

ELIZABETH B. MURRILL
Attorney General of Louisiana

J. BENJAMIN AGUIÑAGA
Solicitor General

ZACHARY FAIRCLOTH
Principal Deputy Solicitor General

OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

*Counsel for Appellants*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required here because, under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellants—as "governmental" parties—need not furnish a certificate of interested persons.

## STATEMENT REGARDING ORAL ARGUMENT

The Court has scheduled oral argument for January 23, 2025. Defendants agree that argument is warranted.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................i

STATEMENT REGARDING ORAL ARGUMENT ..................................ii

TABLE OF CONTENTS ........................................................... iii

TABLE OF AUTHORITIES.........................................................v

INTRODUCTION................................................................... 1

JURISDICTIONAL STATEMENT ................................................5

STATEMENT OF ISSUES PRESENTED................................6

STATEMENT OF THE CASE ................................................ 7

SUMMARY OF THE ARGUMENT ......................................20

STANDARD OF REVIEW........................................................24

ARGUMENT ......................................................................25

   I.   THE DISTRICT COURT LACKS SUBJECT MATTER JURISDICTION. .......25

     A.   This Case Is Not Ripe............................................25

     B.   Plaintiffs Lack Article III Standing. ........................30

       1.   Plaintiffs' theory of imaginary offended-observer
          standing is not viable............................................30

       2.   The Court's offended-observer precedents are wrong
          and should be reconsidered.................................34

     C.   Defendants Brumley and BESE members have sovereign
       immunity. ..............................................................38

II.  Plaintiffs Fail to State a Claim for Relief. ............................ 40

  A.   H.B. 71 Does Not Facially Violate the
       Establishment Clause. ........................................... 41

    1.   H.B. 71 does not implicate the historical hallmarks of a
         religious establishment. ...................................... 41

    2.   Separately, H.B. 71 fits within longstanding tradition. ...... 45

    3.   The district court's reasoning is mistaken. ................. 49

    4.   The district court's reliance on "expert" history
         underscores the flaws in the decision below ................. 59

  B.   H.B. 71 Does Not Facially Violate the Free Exercise
       Clause. ......................................................... 63

III.  The District Court Erred by Entering a Preliminary
      Injunction. ....................................................... 68

IV.  At Minimum, the Injunction Is Overbroad. ........................... 70

CONCLUSION ................................................................ 72

CERTIFICATE OF SERVICE .................................................... 74

CERTIFICATE OF COMPLIANCE ................................................. 75

# TABLE OF AUTHORITIES

## Cases

*ACLU v. Mercer County,*
    432 F.3d 624 (6th Cir. 2005) ....................................................... 33, 53

*Airlines for Am. v. Dep't of Transp.,*
    110 F.4th 672 (5th Cir. 2024) ............................................................ 68

*Am. Legion v. Am. Humanist Ass'n,*
    588 U.S. 29 (2019) ................................................................... passim

*Ass'n of Am. Physicians & Surgeons Educ. Found. v. Am. Bd. of Internal Med.,*
    103 F.4th 383 (5th Cir. 2024) ........................................................... 29

*Barber v. Bryant,*
    860 F.3d 345 (5th Cir. 2017) ....................................................... 30, 31

*Bocanegra v. Vicmar Servs., Inc.,*
    320 F.3d 581 (5th Cir. 2003) ............................................................ 60

*Book People, Inc. v. Wong,*
    91 F.4th 318 (5th Cir. 2024) ............................................................ 39

*Books v. Elkhart County,* 4
    01 F.3d 857 (7th Cir. 2005) ............................................................. 33

*Bowen v. Roy,*
    476 U.S. 693 (1986) ...................................................................... 63

*Braidwood Mgmt., Inc., v. EEOC,*
    70 F.4th 914 (5th Cir. 2023) ............................................................ 25

*Briggs v. Mississippi,*
    331 F.3d 499 (5th Cir. 2003) ............................................................ 58

*Cal. Parents for the Equalization of Educ. Materials v. Torlakson,*
    973 F.3d 1010 (9th Cir. 2020) ..................................................... 65, 66

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) ...................................................................... 71

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.,*
    98 F.4th 220 (5th Cir. 2024) ............................................................ 69

*Choice Inc. of Tex. v. Greenstein,*
   691 F.3d 710 (5th Cir. 2012) ............................................................. 29

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,*
   508 U.S. 520 (1993) .............................................................. 63, 67

*City of Austin v. Paxton,*
   943 F.3d 993 (5th Cir. 2019) .............................................. 38, 39

*City of Ocala v. Rojas,*
   143 S. Ct. 764 (2023) ........................................ 34, 35, 36, 37

*City of Tuscaloosa v. Harcros Chems., Inc.,*
   158 F.3d 548 (11th Cir. 1998) ............................................ 61

*Croft v. Perry,*
   624 F.3d 157 (5th Cir. 2010) ...................................... passim

*Daubert v. Merrell Dow Pharms. Co.,*
   509 U.S. 579 (1993) .............................................................. 60

*Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan,*
   938 F.3d 246 (5th Cir. 2019) ........................................... 50

*Doe v. Beaumont Indep. Sch. Dist.,*
   240 F.3d 462 (5th Cir. 2001) ...................................... 58, 59

*Doe v. Tangipahoa Sch. Bd.,*
   494 F.3d 494 (2007)......................................... 31, 32, 37

*E.T. v. Paxton,*
   41 F.4th 709 (5th Cir. 2022) ...................................... 25, 69

*Ex parte Young. Tex. All. for Retired Ams. v. Scott,*
   28 F.4th 669 (5th Cir. 2022) ............................................ 39

*Ex parte Young. Whole Women's Health v. Jackson,*
   595 U.S. 30 (2021)........................................................ 39

*Firewalker-Fields v. Lee,*
   58 F.4th 104 (4th Cir. 2023) ...................................... 43, 50

*Freedom From Religion Found., Inc. v. Mack,*
   49 F.4th 941 (5th Cir. 2022) .................................. passim

*Freedom From Religion Foundation, Inc. v. County of Lehigh,*
   933 F.3d 275 (3d Cir. 2019) ............................................ 46

*Fulton v. City of Philadelphia,*
    593 U.S. 522 (2021) ..................................................... 64, 67

*Gill v. Whitford,*
    585 U.S. 48 (2018) ..................................................... 71

*Griffin v. HM Fla.-ORL, LLC,*
    144 S. Ct. 1 (2023) ..................................................... 71

*Groff v. DeJoy,*
    600 U.S. 447 (2023) ..................................................... 42

*Hilsenrath on behalf of C.H. v. Sch. Dist. of the Chathams,*
    698 F. Supp. 3d 752 (D.N.J. 2023) ..................................... 43

*Ingebretsen v. Jackson Public School District,*
    88 F.3d 274 (5th Cir. 1996) ..................................... 31, 32, 34

*Jiao v. Xu,*
    28 F.4th 591 (5th Cir. 2022) ..................................... 24

*K.P. v. LeBlanc,*
    627 F.3d 115 (5th Cir. 2010) ..................................... 38

*Kennedy v. Bremerton Sch. Dist.,*
    597 U.S. 507 (2022) ..................................... passim

*Kondrat'yev v. City of Pensacola,*
    949 F.3d 1319 (11th Cir. 2020) ..................................... 36

*Koon v. United States,*
    518 U.S. 81 (1996) ..................................... 24

*Labrador v. Poe,*
    144 S. Ct. 921 (2024) ..................................... 70, 71, 71

*Lee v. Weisman,*
    505 U.S. 577 (1992) ..................................... 58

*Lozano v. Collier,*
    98 F.4th 614 (5th Cir. 2024) ..................................... 43

*Lynch v. Donnelly,*
    465 U.S. 668 (1984) ..................................... 46, 55

*Magnolia Marine Transp. Co. v. Laplace Towing Corp.,*
    964 F.2d 1571 (5th Cir. 1992) ..................................... 24

*Marsh v. Chambers*,
   463 U.S. 783 (1983) ............................................................... 46

*McCreary County v. ACLU of Ky.*,
   545 U.S. 844 (2005) ........................................... 27, 28, 41, 51

*McRorey v. Garland*,
   99 F.4th 831 (5th Cir. 2024) ............................................... 24

*Miller v. Dunn*,
   35 F.4th 1007 (5th Cir. 2022) ............................................ 32

*Moody v. NetChoice, LLC*,
   144 S. Ct. 2383 (2024) .................................................. 44, 45

*Moore v. Bryant*,
   853 F.3d 245 (5th Cir. 2017) ............................................... 37

*Murray v. City of Austin*,
   947 F.2d 147 (5th Cir. 1991) ........................................ 64, 65

*Murthy v. Missouri*,
   603 U.S. 43 (2024) ....................................................... 30, 34

*NetChoice, L.L.C. v. Paxton*,
   121 F.4th 494 (5th Cir. 2024) .............................................. 3

*New Doe Child #1 v. United States*,
   901 F.3d 1015 (8th Cir. 2018) ............................................ 65

*Ortiz v. United States*,
   585 U.S. 427 (2018) ............................................................ 59

*Renfroe v. Parker*,
   974 F.3d 594 (5th Cir. 2020) ............................................... 59

*Rogers v. McMaster*,
   696 F. Supp. 3d 193 (D.S.C. 2023) ..................................... 43

*Shurtleff v. City of Boston*,
   596 U.S. 243 (2022) .............................................. 42, 44, 46

*Staley v. Harris County*,
   461 F.3d 504 (5th Cir. 2006) ......................................... 26, 28

*Staley v. Harris County*,
   485 F.3d 305 (2007) ........................................ 26, 28, 32, 33

*Steel Co. v. Citizens for a Better Env't,*
    523 U.S. 83 (1998) ................................................................ 37

*Stone v. Graham,*
    449 U.S. 39 (1980) ..................................................... passim

*Sw. Airlines Pilots Ass'n v. Sw. Airlines Co.,*
    120 F.4th 474 (5th Cir. 2024) ............................................ 24

*Thomas v. Union Carbide Agric. Prods. Co.,*
    473 U.S. 568 (1985) .................................... 25, 35, 36, 71

*Town of Greece v. Galloway,*
    572 U.S. 565 (2014) .................................................... 45, 54

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ............................................................ 34

*United States v. Abbott,*
    110 F.4th 700 (5th Cir. 2024) ............................................ 69

*United States v. Billingsley,*
    615 F.3d 404 (5th Cir. 2010) ............................................. 24

*Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.,*
    454 U.S. 464 (1982) ............................................................ 35

*Van Orden v. Perry,*
    351 F.3d 173 (5th Cir. 2003) ...................................... passim

*Veasey v. Abbott,*
    870 F.3d 387 (5th Cir. 2017) ............................................. 69

*Verizon Md., Inc. v. Pub. Serv. Comm'n,*
    535 U.S. 635 (2002) ............................................................ 38

*W. Va. State Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943) ............................................................ 66

*Wallace v. Jaffree,*
    472 U.S. 38 (1985) .............................................................. 52

*Watts v. Gerking,*
    228 P. 135 (Or. 1924) ......................................................... 48

*Wisconsin v. Yoder*,
406 U.S. 205 (1972) ...................................................................... 63, 66

*Wright v. Houston Indep. Sch. Dist.*,
486 F.2d 137 (5th Cir. 1973) ................................... 60, 65, 66

**Statutes**

28 U.S.C. § 1292 ................................................................................ 5, 24

28 U.S.C. § 1331 ...................................................................................... 5

Ark. Code § 22-3-221(b)(1) (2015) ............................................. 9

La. Admin. Code § 28:337(B)(41) .............................................. 40

La. R.S. § 17.22 ............................................................................. 40

La. R.S. § 17:2122 ................................................................... 52, 57

La. R.S. § 17:2124 ............................................................... passim

La. R.S. § 3351 ............................................................................. 47

**Other Authorities**

29 Wright & Miller, Fed. Prac. & Proc. Evid. § 6265.2 (2d ed. 2023) .... 60

Act of March 3, 1865, ch. 100 § 5, 13 Stat. 518 ...................................... 47

*Courtroom Friezes: South and North Walls*, Office of the Curator,
Supreme Court of the United States, https://perma.cc/BJV5-3GLL .... 8

*Frieze of Prophets, North Wall*, Digital Commonwealth,
https://perma.cc/9EEQ-4PW9 ............................................................. 8

James W. Fraser, *Between Church and State* 35 (2d ed. 2016) ............. 48

Letter from Chief Justice William H. Taft to Henry Ford re: *McGuffey's Readers* (Oct. 31, 1924), https://perma.cc/B8XG-WVX5 ..................... 48

*Main Reading Room*, Library of Congress, https://perma.cc/PY3S-QZVX
.................................................................................................................. 8

*McGuffey's Second Eclectic Reader* vii (1836 ed.),
https://perma.cc/9FFM-978R ............................................................. 49

*Self-Guide to the Building's Exterior Architecture*, Office of the Curator,
Supreme Court of the United States, https://perma.cc/5YUB-HEYC ..8

*The Final Demise of* Lemon *and the Future of the Establishment Clause*,
    21 Harv. J.L. & Pub. Pol'y Per Curiam (Summer 2022)......................43

**Rules**

Fed. R. Evid. 702 ........................................................................60

## INTRODUCTION

When the Supreme Court hears oral argument, Moses and the Ten Commandments watch from on high in the courtroom—and when the Justices assemble in the conference room to cast their votes, they do so under Moses and the Ten Commandments, the central feature of the Court's East Pediment. Similarly, when the Speaker of the U.S. House of Representatives ascends to the dais, he looks directly at a marble-relief portrait of Moses—in fact, all 22 other lawgivers depicted in marble-relief portraits likewise look directly at Moses.

No one thinks this is some elaborate effort to coerce every public servant, attorney, and tourist who sees these displays into worshipping and obeying Moses and the Commandments. Nor does anyone think that these displays *burden* the religious exercise of anyone who happens to see them, or that they, in fact, *discriminate* against other religions. No. Rather, these displays—like countless others across our Nation—simply recognize the "historical significance" that the Ten Commandments have "as one of the foundations of our legal system." *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 53 (2019).

So it is with H.B. 71. This summer, the Louisiana Legislature passed H.B. 71, which requires Louisiana schools to post displays of the Ten Commandments that explain the Commandments' historical significance. Plaintiffs (students and their parents) disagreed. Five days after Governor Landry signed H.B. 71 into law, Plaintiffs rushed to federal court eager to proclaim in press releases and media interviews that they were first in line to attack the Ten Commandments. To be clear: Plaintiffs have never seen an H.B. 71 display and have no clue how one of their schools might seek to implement H.B. 71. The district court obliged and enjoined Defendants (state officials and five school boards) from implementing H.B. 71 by its January 1, 2025 deadline.

The district court's decision is profoundly wrong on many levels. Most fundamental is the district court's mistaken insistence that it has subject matter jurisdiction. Neither this Court nor the Supreme Court has ever claimed Article III jurisdiction to adjudicate a First Amendment challenge to a religious display that no one has seen. That is true both as a matter of ripeness and as a matter of offended-observer standing. Indeed, if Plaintiffs could successfully press their theory of *imaginary* offended-observer standing here, that would only highlight how the theory

of offended-observer standing itself distorts ordinary justiciability principles. That theory "has no basis in law," *Am. Legion*, 588 U.S. at 80 (Gorsuch, J., concurring in the judgment)—and Plaintiffs' *imaginary* extension of that theory has no basis in law *or* reality. That is all a panel or the en banc Court need do to reverse and render judgment for Defendants.

If the Court were to reach the merits, the Court should reverse in light of *NetChoice, L.L.C. v. Paxton*, 121 F.4th 494 (5th Cir. 2024), and its history. The Supreme Court sent *NetChoice* back to this Court with an unmistakable message: "facial challenges to state laws are difficult to successfully mount"; they are "disfavored"; they "short circuit the democratic process"; they "sit uncomfortably with Article III"; and thus, "[b]ecause of the significant risks associated with facial challenges—even those under the First Amendment—challengers bear a heavy burden." *Id.* at 497 (quotation marks omitted). The district court's decision reads as if *NetChoice* does not exist. The district court never seriously attempted to "determine every hypothetical application" of H.B. 71, *id.* at 498, and it conspicuously refused to say that the possible illustrations of H.B. 71 displays Defendants offered are unconstitutional. But that did

not stop the district court from proclaiming that H.B. 71 is "FACIALLY UNCONSTITUTIONAL and UNCONSTITUTIONAL IN ALL APPLICATIONS." ROA.1794.

Respectfully, this is not how facial claims work. It also misconceives the First Amendment, which under binding Supreme Court precedent can no longer be construed as "compel[ling] the government to purge" from society anything perceived as "partak[ing] of the religious." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 534–35 (2022). If the Court reaches the merits, therefore, reversal is necessary.

## JURISDICTIONAL STATEMENT

The district court has federal question jurisdiction under 28 U.S.C. § 1331, but it lacks Article III jurisdiction, *see infra* Argument Section I. The district court entered its order granting a preliminary injunction and denying Defendants' motion to dismiss on November 12. ROA.1794. Defendants appealed that order the same day. ROA.1795–1796. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES PRESENTED

1. Whether Plaintiffs' challenge is unripe since they have never seen an H.B. 71 display and do not know the essential context of any such future display in their schools.

2. Whether Plaintiffs lack standing on offender-observer grounds to challenge hypothetical H.B. 71 displays no one has seen, based solely on anticipated, potential offense.

3. Whether Defendants Brumley and the BESE members are entitled to sovereign immunity.

4. Whether the district court erred in determining that H.B. 71 facially violates the Establishment Clause.

5. Whether the district court erred in determining that H.B. 71 facially violates the Free Exercise Clause.

6. Whether the district court otherwise erred in granting a preliminary injunction, *i.e.*, by finding the necessary requisites and ordering overbroad relief.

## STATEMENT OF THE CASE

### A. The Ten Commandments in America

The Ten Commandments began as rules given by God to Moses for the children of Israel, following their liberation from Egyptian slave masters. But over the millennia, their status as written law and Moses's stature as lawgiver took on even greater historical significance. "The law given from Sinai … contained many statutes of universal application—laws essential to the existence of men in society, and most of which have been enacted by every nation which ever professed any code of laws." Letters of John Quincy Adams, to His Son, on the Bible and Its Teachings 61 (Alden ed., 1850). "Even those who" doubt the Commandments' divine origin "cannot deny [their] influence upon the civil and criminal laws of this country," or on the "ethics and ideals of a just society" writ large. *Van Orden v. Perry*, 351 F.3d 173, 181 (5th Cir. 2003).

It is no surprise, therefore, that the Supreme Court itself has emphasized that the Ten Commandments "have historical significance as one of the foundations of our legal system." *Am. Legion*, 588 U.S. at 53. For that reason, Americans have long displayed them in prominent public spaces. For example, for nearly a century, a sculpture of Moses has

adorned the Supreme Court's own courtroom as one of the "great lawgivers of history"—holding the Ten Commandments. *Courtroom Friezes: South and North Walls*, Office of the Curator, Supreme Court of the United States, https://perma.cc/BJV5-3GLL; *see also Self-Guide to the Building's Exterior Architecture*, Office of the Curator, Supreme Court of the United States, https://perma.cc/5YUB-HEYC (Moses and Commandments represented also at center of East Pediment). And in the Library of Congress, a bronze statue of Moses holding the Ten Commandments stands tall over the Main Reading Room's rotunda. *Main Reading Room*, Library of Congress, https://perma.cc/PY3S-QZVX.

In fact, public Ten Commandments displays have been identified in "almost every state." Br. for United States as *Amicus Curiae* at *11, *1A-7A, *Van Orden v. Perry*, 545 U.S. 677 (2005), 2005 WL 263790 ("non-exhaustive survey"). In the Boston Public Library, for example, a raised frieze centrally depicts Moses holding the Ten Commandments. *Frieze of Prophets, North Wall*, Digital Commonwealth, https://perma.cc/9EEQ-4PW9. And in Texas and Arkansas, the state capitol grounds feature six-foot-tall granite Ten Commandments monuments with identical text to the language in the displays at issue here. *See Van Orden*, 545 U.S. at

681–82 (plurality); Ark. Code § 22-3-221(b)(1) (2015). This is our "rich American tradition of religious acknowledgements." *Van Orden*, 545 U.S. at 689–92.

## B. H.B. 71

Keeping with that tradition, Louisiana enacted H.B. 71, which requires public schools to display the Ten Commandments in each classroom. La. R.S. § 17:2124 (2024). H.B. 71 specifies that the Commandments' text must be "identical" to that upheld in *Van Orden*, in "large, easily readable font," on "a poster or framed document that is at least eleven inches by fourteen inches," and "the central focus" of the display. *Id.* § 17:2124(B)(1), (B)(1)(6). Each display must include a three-paragraph "context statement" about the history of the Ten Commandments in American public education. *Id.* § 17:2124(B)(3). It is up to "[e]ach governing authority" to determine "[t]he nature of the display," though H.B. 71 provides schools with examples of documents to consider displaying alongside the Ten Commandments, such as "the Mayflower Compact, the Declaration of Independence, and the Northwest Ordinance." *Id.* § 17:2124(B)(1), (B)(3). No school governing board is required to pay for

the displays but must either accept donated displays or donated funds. *Id.* § 17:2124(B)(5).

Under H.B. 71, schools must comply by January 1, 2025; the Louisiana State Board of Elementary and Secondary Education ("BESE") must "adopt rules and regulations in accordance with the Administrative Procedure Act" for the law's implementation; and the Department of Education must "identify appropriate [compliance] resources" that are "free of charge" and list them on the department's website. *Id.* § 17:2124(B)(1), (B)(6)(a), (B)(6)(b).

### C. Plaintiffs' Lawsuit

Plaintiffs are Louisiana students and parents. ROA.42–44. Some Plaintiffs claim to hold religious beliefs, while others describe themselves as atheist or nonreligious. ROA.64, 68, 72.

Five days after Governor Landry signed H.B. 71 into law—and before any Louisiana school could consider implementing H.B. 71—Plaintiffs sued Louisiana State Superintendent of Education Cade Brumley, the BESE members in their official capacities, and five parish school boards (East Baton Rouge, Vernon, Livingston, St. Tammany, and Orle-

10

ans). Plaintiffs claim that H.B. 71 violates the First Amendment's Establishment Clause (Count I) and Free Exercise Clause (Count II). ROA.76–79.

As to the Establishment Clause, Plaintiffs claim that H.B. 71 "prescribe[s] an official religious text for schoolchildren to venerate." ROA.77. And as to the Free Exercise Clause, Plaintiffs allege that H.B. 71 "substantially burdens the religious exercise" of Plaintiffs by "pressuring them to suppress or limit expression of their religious or nonreligious backgrounds, beliefs, or practices" or to "adopt[] the state's favored religious scripture." ROA.78–79.

Two weeks later, Plaintiffs sought a preliminary injunction. ROA.239–246. Plaintiffs also submitted an "expert" report from law professor Steven Green—the former legal director of Plaintiffs' counsel, Americans United for Separation of Church and State—which opined that, *contra* "*American Legion*," "the Ten Commandments are not a foundation of the American government or legal system." ROA.851–852, 858.

In response, Defendants sought dismissal under Rules 12(b)(1) and 12(b)(6), opposed the preliminary injunction, and moved to exclude Green's testimony. ROA.415–474, 1119–1131. Defendants explained

that, while Plaintiffs fail to state a claim for relief on the merits, this case should begin and end with Article III. That is because "[n]o Plaintiff or their child has seen an H.B. 71 display" and "no one knows how any given school or official … will implement H.B. 71, what any given H.B. 71 display will look like, or whether any given H.B. 71 display will pose a potential constitutional issue." ROA.424.

Defendants also submitted an affidavit explaining that, although "DOE staff members do not yet know how DOE … will implement H.B. 71, DOE will likely consider" certain "illustratives … or variations of them" as possibilities for suggesting to schools. ROA.477–478. Here is a sample of the illustratives (with full-page renderings at ROA.480–494):

# IMPORTANT SUPREME COURT CASES
## VAN ORDEN V. PERRY

THIS CASE ASKED WHETHER THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT ALLOWS THE DISPLAY OF A MONUMENT INSCRIBED WITH THE TEN COMMANDMENTS ON THE TEXAS STATE CAPITOL GROUNDS.

THE SUPREME COURT FOUND NO ESTABLISHMENT CLAUSE VIOLATION, WITH THE PLURALITY OPINION EMPHASIZING THAT "ACKNOWLEDGEMENTS OF THE ROLE PLAYED BY THE TEN COMMANDMENTS IN OUR NATION'S HISTORY ARE COMMON THROUGHOUT AMERICA." THE COURT NOTED THAT MOSES AND THE COMMANDMENTS APPEAR IN THE SUPREME COURT COURTROOM ITSELF, THE GATES LINING THE COURTROOM, AND THE DOORS LEADING INTO THE COURTROOM.

THE MAIN DISSENT JOINED BY JUSTICE GINSBURG AND TWO OTHER JUSTICES DISAGREED WITH THE COURT'S JUDGEMENT, ACKNOWLEDGED THAT "A DISPLAY OF THE COMMANDMENTS ACCOMPANIED BY AN EXPOSITION OF HOW THEY HAVE INFLUENCED MODERN LAW WOULD MOST LIKELY BE CONSTITUTIONALLY UNOBJECTIONABLE." THE DISSENT ALSO RECOGNIZED THAT THE COMMANDMENTS COULD "BE INTEGRATED CONSTITUTIONALLY INTO A COURSE OF STUDY IN PUBLIC SCHOOLS."

NOTE: THIS IS THE VERSION OF THE TEN COMMANDMENTS UPHELD IN VAN ORDEN, BUT DIFFERENT FAITH TRADITIONS ADOPT DIFFERENT VERSIONS OF THE TEXT OF THE TEN COMMANDMENTS. FOR EXAMPLE, THE CATHOLIC VERSION GENERALLY DOES NOT REFERENCE 'GRAVEN IMAGES,' AND THE TORAH USES THE PHRASE 'I AM THE LORD YOUR GOD WHO BROUGHT YOU OUT OF THE LAND OF EGYPT, OUT OF THE HOUSE OF BONDAGE.'



the Ten Commandments
I AM the LORD thy God

The History of the Ten Commandments in American Public Education: The Ten Commandments were a prominent part of American public education for almost three centuries. Around the year 1688, The New England Primer became the first published American textbook and was the equivalent of a first grade reader. The New England Primer was used in public schools throughout the United States for more than one hundred fifty years to teach Americans to read and contained more than forty questions about the Ten Commandments.

---

# AMERICAN PUBLIC EDUCATION:
# A HISTORICAL PERSPECTIVE

The History of the Ten Commandments in American Public Education: The Ten Commandments were a prominent part of American public education for almost three centuries. Around the year 1688, The New England Primer became the first published American textbook and was the equivalent of a first grade reader. The New England Primer was used in public schools throughout the United States for more than one hundred fifty years to teach Americans to read and contained more than forty questions about the Ten Commandments.
The Ten Commandments were also included in public school textbooks published by educator William McGuffey, a noted university president and professor. A version of his famous McGuffey Readers was written in the early 1800s and became one of the most popular textbooks in the history of American education, selling more than one hundred million copies. Copies of the McGuffey Readers are still available today.
The Ten Commandments also appeared in textbooks published by Noah Webster in which were widely used in American public schools along with America's first comprehensive dictionary that Webster also published. His textbook, The American Spelling Book, contained the Ten Commandments and sold more than one hundred million copies for use by public school children all across the nation and was still available for use in American public schools in the year 1975.

### THE TEN COMMANDMENTS

I AM the LORD thy GOD.
THOU SHALT HAVE NO OTHER GODS BEFORE ME.
THOU SHALT NOT MAKE TO THYSELF ANY GRAVEN IMAGES.
THOU SHALT NOT TAKE THE NAME OF THE LORD THY GOD IN VAIN.
REMEMBER THE SABBATH DAY, TO KEEP IT HOLY.
HONOR THY FATHER AND THY MOTHER, THAT THY DAYS MAY BE LONG UPON THE LAND WHICH THE LORD THY GOD GIVETH THEE.
THOU SHALT NOT KILL.
THOU SHALT NOT COMMIT ADULTERY.
THOU SHALT NOT STEAL.
THOU SHALT NOT BEAR FALSE WITNESS AGAINST THY NEIGHBOR.
THOU SHALT NOT COVET THY NEIGHBOR'S HOUSE. THOU SHALT NOT COVET THY NEIGHBOR'S WIFE, NOR HIS MANSERVANT, NOR HIS MAIDSERVANT, NOR HIS CATTLE, NOR ANYTHING THAT IS THY NEIGHBOR'S.



**NOAH WEBSTER**



**WILLIAM McGUFFEY**

















14

Case 3:24-cv-00517-JWD-SDJ   Document 29-2   04/05/24   Page 12 of 26



"Since the beginning of time, the world has known four great documents, great because of all the benefits to humanity which came about as a result of their fine ideals and principles."

—RUTH BADER GINSBURG





1689 English Bill of Rights    Ten Commandments    Declaration of Independence    Magna Carta

Case 3:24-cv-00517-JWD-SDJ   Document 29-2   04/05/24   Page 17 of 26

# LEGAL NON-PROFITS IN ACTION

Nonprofit organizations are often some of the most powerful legal forces involved in cutting-edge legislation and litigation across the country, including high-profile First Amendment issues.

**AMERICAN CIVIL LIBERTIES UNION**
"The ACLU today is the nation's largest public interest law firm, with a 50-state network of staffed, autonomous affiliate offices."

EDITORIAL: Satanists and ACLU target Ten Commandments

ACLU of Arkansas Files First Amendment Challenge to Ten Commandments Shrine on Capitol Grounds

ACLU sues Giles County over Ten Commandments display

ACLU sues Dixie County over 10 Commandments



**FIRST LIBERTY**
"First Liberty Institute is the largest legal organization in the nation dedicated exclusively to defending religious liberty for all Americans."

Victory! Oklahoma District Judge Says "Yes!" to Ten Commandments Monument

First Liberty Moves to Stop Attacks Against Ten Commandments Monument

First Liberty Testifies in Support of Texas Ten Commandments Bill

Arkansas Ten Commandments Monument Should Stand, Religious Liberty Law Firm Tells Court

15

As these illustrations suggest, the possibilities are endless.

The district court held a hearing on October 21. ROA.2325–2548. At the hearing, Green was asked—by Plaintiffs' counsel—about the conflict between his views and those expressed in the above-quoted statements from *American Legion* and *Van Orden*:

> Q. So are the opinions you're offering here today inconsistent with those statements and established law?

> A. Essentially yes.

ROA.2376:13–24; *see also* ROA.2419:6–21.

### D. The District Court's Decision

On November 12, the district court denied Defendants' motion to exclude Green's testimony, ROA.1595–1617, and issued an order denying Defendants' motion to dismiss and granting Plaintiffs' preliminary-injunction motion, ROA.1618–1794, finding H.B. 71 "FACIALLY UNCONSTITUTIONAL and UNCONSTITUTIONAL IN ALL APPLICATIONS." ROA.1794.

The court rejected Defendants' ripeness and standing arguments, reasoning that—even though Plaintiffs have never seen an H.B. 71 display—"the risk of a future encounter" is "certainly impending." ROA.1651–1652. On the merits, the court held that H.B. 71 "runs afoul

of *Stone v. Graham*, 449 U.S. 39 (1980)," a decision in which the Supreme Court applied the *Lemon* test to strike down a Kentucky law requiring displays of the Ten Commandments in public-school classrooms. ROA.1623; *see* ROA.1729 (based on *Stone* "alone, the Court could deny AG Defs. MTD").

The court claimed to be avoiding "the now-defunct *Lemon* test" itself. ROA.1714. But it nevertheless concluded that "any purported secular purpose [of H.B. 71] was not sincere but rather a sham," and that the actual purpose was "overtly religious," as demonstrated by "the legislative history and fundraising efforts of the Governor." ROA.1623 & n.5, 1712–1714. The court also concluded that "even if [it] did examine [Plaintiffs'] Establishment Clause claim under" the Supreme Court's more recent Establishment Clause decisions, Defendants' motion to dismiss would still be denied and Plaintiffs would still be entitled to a preliminary injunction. ROA.1729, 1768–1778. On this point, the court relied extensively on Green's report and testimony, which it found "convincing, logical, and consistent with the Court's own review of the evidence." ROA.1777.

The court further found that Plaintiffs were likely to succeed on their Free Exercise Clause claims, because Plaintiffs' "testimony confirms, inter alia, Plaintiffs' religious or nonreligious beliefs, the manner in which the Act substantially burdens those beliefs, and the ways in which the Act is inconsistent with any historical tradition by being discriminatory and coercive." ROA.1778.

With these determinations, the court enjoined Defendants' enforcement of H.B. 71 and ordered them "to provide notice of this ruling"—not just to the schools falling within the Defendant school boards' jurisdictions, but to "*all* Louisiana public elementary, secondary, and charter schools, and *all* public post-secondary education institutions." ROA.1630 (emphases added).

### E. Appellate Proceedings

Defendants appealed the same day. ECF 1. Defendants then immediately sought, and secured, an administrative stay of the district court's Notice Provision. ECF 12, 32. Defendants also moved for a stay pending appeal of the district court's order in its entirety, and to expedite the appeal given H.B. 71's January 1, 2025 compliance deadline. ECF 38–39.

The motions panel referred the stay motion to the merits panel on November 19. ECF 59.

On November 20, the Court summarily denied the stay pending appeal and dissolved the administrative stay. ECF 68. Since the district court's Article III reasoning is based on this Court's offended-observer precedents, and since Defendants argue that "offended observer standing' is no longer "a viable doctrine," ROA.436 n.1, Defendants moved for initial hearing en banc. ECF 75. That motion remains pending.

## SUMMARY OF THE ARGUMENT

**I.** The district court lacks subject matter jurisdiction.

**(A)** That is principally because this case is not ripe—no Plaintiff has seen an H.B. 71 display, and this Court's precedents state that a fact-intensive and context-specific analysis is required in Ten Commandments cases.

**(B)** In the same vein, Plaintiffs lack offended-observer standing. They have never cited a religious-display case allowing a plaintiff to sue based on anticipatory harm. And that just illustrates that the Court should take this opportunity to scrap the whole offended-observer enterprise. It has no basis in law, and it is directly contrary to basic Article III precedents.

**(C)** Finally, as for Defendants Brumley and BESE members, they are entitled to sovereign immunity—and the district court identified no valid basis for applying *Ex parte Young*.

**II.** Although the Court need not reach the merits, the district court profoundly erred on the merits as well because Plaintiffs failed to state a claim for relief.

**(A)** That is principally so as to the Establishment Clause claim. Because Plaintiffs have asserted a facial challenge, they bore the burden of proving that *every* application of H.B. 71 is unconstitutional—that is, that every potential H.B. 71 display bears a historical hallmark of a religious establishment. Everyone knows Plaintiffs did not, and could not, meet that standard. And the district court's efforts at navigating around that problem do not work: *first*, the Supreme Court's decision in *Stone* does not govern here both because it is no longer good law and also because the facts in this case are materially different; and *second*, the district court's belief that *Kennedy* requires a longstanding tradition of the challenged practice is flat wrong, as *Kennedy* itself (which undertook no such analysis) illustrates. Finally, that the district court went to great lengths to base its decision on the input of an "expert" who could not answer the relevant questions and openly contradicted both this Court and the Supreme Court only underscores the errors below.

**(B)** Plaintiffs' Free Exercise claim fares no better. Plaintiffs do not cite a single case holding that a passive religious display somehow violates a viewer's Free Exercise rights. In fact, this Court has precedents

21

going the opposite way, which reinforces that the novel Free Exercise Clause violation Plaintiffs claim is nothing of the sort.

**III.** Resolving the issues above in Defendants' favor means that the Court should reverse and render judgment for Defendants, which moots the preliminary-injunction issue. At the least, however, the district court abused its discretion in granting the injunction. Plaintiffs' only claimed irreparable harm depends on their claim of a constitutional violation—a claim on which they are, at the least, unlikely to succeed. The State and the public, by contrast, suffer harm every day that schools and State officials cannot implement H.B. 71, especially as the January 1, 2025 deadline comes and goes.

**IV.** If nothing else, the Court should vacate the Notice Provision as unlawful. Basic principles of equity require federal courts to remedy only the harm of the plaintiff before them. By requiring Defendants to provide notice of the district court's decision to non-party schools, however, the Notice Provision avowedly has nothing to do with Plaintiffs. They will not benefit from it, and they will not be harmed in its absence. Indeed, the only apparent purpose of the Notice Provision is to scare non-party

schools—in the State's voice—into complying with an injunction that can-
not legally bind them. That is an extraordinary abuse of authority that
requires vacatur.

## STANDARD OF REVIEW

Preliminary relief is appropriate only if the movant shows: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction does not issue; (3) that the threatened injury outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction is in the public interest." *McRorey v. Garland*, 99 F.4th 831, 836 (5th Cir. 2024). This Court reviews the grant of a preliminary injunction for abuse of discretion. *United States v. Billingsley*, 615 F.3d 404, 409 (5th Cir. 2010). "A district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996).

Because the district court's "order[] ... granting" the "injunction[]"denied Defendants' motion to dismiss, 28 U.S.C. § 1292(a)(1), that denial is also before this Court—so this Court can reverse and render. *See Jiao v. Xu*, 28 F.4th 591, 596 (5th Cir. 2022); *Magnolia Marine Transp. Co. v. Laplace Towing Corp.*, 964 F.2d 1571, 1580 (5th Cir. 1992). This Court reviews de novo the denial of a motion to dismiss. *Sw. Airlines Pilots Ass'n v. Sw. Airlines Co.*, 120 F.4th 474, 481 (5th Cir. 2024).

## ARGUMENT

## I. THE DISTRICT COURT LACKS SUBJECT MATTER JURISDICTION.

Because "Article III jurisdiction is always first," this case should begin and end with Article III. *See E.T. v. Paxton*, 41 F.4th 709, 714 (5th Cir. 2022) (quotation omitted).

### A. This Case Is Not Ripe.

The easiest way to resolve this case is on ripeness grounds. Plaintiffs seek to enjoin displays they have never seen, that have never been posted, and whose form and appearance have not yet even been determined. Their claims are not ripe because (1) they are not "fit for judicial decision," and (2) there would be no "hardship to the parties" if the court withheld its consideration. *Braidwood Mgmt., Inc., v. EEOC*, 70 F.4th 914, 930 (5th Cir. 2023).

**1.** A claim is "fit for judicial decision if it presents a pure question of law that needs no further factual development." *Id.* If a claim is "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all," then the claim is not ripe. *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985). That standard applies

with full force in Establishment Clause cases, as this Court's en banc opinion in *Staley v. Harris County*, 485 F.3d 305 (2007), illustrates.

*Staley* involved a Bible monument at the Harris County Civil Courthouse. *Id.* at 307. "[A]n attorney claimed Article III standing" to challenge this display "because she passed the monument going to and from the Courthouse in the course of her occupation." *Id.* at 309. A panel of this Court initially held that the display violated the Establishment Clause. *See Staley v. Harris County*, 461 F.3d 504, 515 (5th Cir. 2006). "[O]nly days before oral argument in [the] en banc case," however, "the County removed the monument from the public grounds and placed it in storage, to permit the ongoing renovation of the Courthouse and its grounds." *Staley*, 485 F.3d at 307. But the County "specifically … asserted that it will display the monument again after the renovations are complete." *Id.* at 307–08.

Despite this assertion, the en banc Court held that Staley's challenge to the monument as it had existed was moot because the monument was "[o]ut of sight in some warehouse." *Id.* at 309. And then it held that "any dispute over a probable redisplay of the [Bible] monument is not ripe because there are no facts before us to determine whether such a

redisplay might violate the Establishment Clause." *Id.* The court was thus "unable to conduct the fact-intensive and context-specific analysis required by" the "Supreme Court decisions addressing the constitutionality of Ten Commandments displays." *Id.* at 308–09.

*Staley* is on all fours here. Just as in *Staley*, because "no decision has been made regarding any aspect of the future" H.B. 71 displays, Plaintiffs' claims are not ripe. *Id.* at 309. No Plaintiff has seen any H.B. 71 display. They do not know what any given display will look like, what context may accompany it, or where in any specific classroom a display may be placed. Without these details, there is no way to conduct the context-specific analysis required in Establishment Clause cases. *See id.* ("[U]nder the Establishment Clause detail is key." (quoting *McCreary County v. ACLU of Ky.*, 545 U.S. 844, 867–68 (2005)).

The district court tried to distinguish *Staley*, stating that H.B. 71 sets out details about the displays that were not available in *Staley*. ROA.1648–1649. Not so. True, H.B. 71 lays out certain minimum requirements, including (a) the text of the Ten Commandments and contextual statement that must be included, (b) the minimum size and readability of the poster, and (c) the requirement that a display be posted

27

somewhere in each classroom. *See* La. R.S. § 17:2124(B). But all these details and more were available to the en banc Court in *Staley*. Because the plaintiff had actually *seen* the display, the Court there knew (a) the monument's dimensions; (b) its engravings; (c) its shape (like a lectern); (d) its central feature (an open Bible in a display case); (e) the Bible's dimensions; (f) a red neon light surrounded the Bible; (g) the yearly cost the government paid to illuminate the Bible; and (h) the practice of turning pages of the Bible. *See Staley*, 461 F.3d at 506–07. Nevertheless, the en banc Court held (in an opinion written by the same judge as at the panel stage) that without the display actually displayed, the plaintiff's Establishment Clause claim was "not ripe for review." *Staley*, 485 F.3d at 309. Since even fewer details are known about H.B. 71 displays, the same is *a fortiori* true here.

To say otherwise, the district court had to conclude that *all* H.B. 71 displays automatically violate the Establishment Clause. That would not be correct in the *Lemon* era, much less today. *Compare Van Orden*, 545 U.S. at 692 (upholding Ten Commandments display), *with McCreary*, 545 U.S. at 860 (striking down Ten Commandments display).

And indeed, no H.B. 71-defined detail would inevitably violate the Establishment Clause. For example, Plaintiffs claimed below that H.B. 71's version of the Commandments is automatically objectionable. *See* ROA.819–820. But the statute prescribes the *same text* upheld in *Van Orden*, 545 U.S. at 707—so the text cannot be *per se* illicit. And without ever seeing a display in its full context, Plaintiffs cannot say that they are coerced into "venerating" the Ten Commandments in any way. *Staley*'s rule thus makes perfect sense here: Plaintiffs cannot challenge H.B. 71 displays that do not yet exist because their claims rely on unseen events and decisions that may not occur in the way Plaintiffs anticipate.

**2.** Plaintiffs also face no hardship from denying review at this time. *See Ass'n of Am. Physicians & Surgeons Educ. Found. v. Am. Bd. of Internal Med.*, 103 F.4th 383, 396 (5th Cir. 2024). The type of hardship relevant to ripeness "inhere[s] in legal harms, such as the harmful creation of legal rights or obligations; practical harms on the interests advanced by the party seeking relief, and the harm of being forced to modify one's behavior in order to avoid future consequences." *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012) (cleaned up). Here, H.B. 71

creates no legal rights or obligations for Plaintiffs; Plaintiffs are not currently subject to any H.B. 71 display; and there is no practical impediment to Plaintiffs filing an appropriately ripened suit if they actually encounter an objectionable display. Plaintiffs' claims are unripe and should be dismissed.

### B. Plaintiffs Lack Article III Standing.

Plaintiffs also lack standing because they cannot show they have suffered or will suffer an injury that is "concrete, particularized, and actual or imminent." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024). That is principally so under this Court's offended-observer precedents—and it is especially so if, as Defendants urge, the Court reconsiders its offended-observer precedents altogether.

### 1. Plaintiffs' theory of imaginary offended-observer standing is not viable.

"In cases involving religious displays and exercises," this Court has "required an encounter with the offending item or action to confer standing." *Barber v. Bryant*, 860 F.3d 345, 353 (5th Cir. 2017). And even then, a simple encounter "represent[s] the outer limits of what is constitutionally cognizable." *Freedom From Religion Found., Inc. v. Mack*, 49 F.4th

941, 949 (5th Cir. 2022). Yet Plaintiffs have never seen an H.B. 71 display, much less been injured by one. *See, e.g.*, *Doe v. Tangipahoa Sch. Bd.*, 494 F.3d 494, 497 (2007) (en banc) (requiring proof that plaintiffs "were exposed to, and may thus claim to have been injured by, invocations" at public meetings to establish Article III injury).

Nevertheless, relying on *Ingebretsen v. Jackson Public School District*, 88 F.3d 274 (5th Cir. 1996), the district court held that Plaintiffs have standing because H.B. 71 makes an encounter with an unconstitutional display "inevitable." ROA.1652. But if *past* offense from encountering an actual display represents Article III's "outer limits," then surely *future* offense at a display that exists "only in the statute" lies well beyond them. *Barber*, 860 F.3d at 353–54.

It is not clear that *Ingebretsen* is relevant because, unlike this case, it involved religious *exercise*, not a religious *display*. *Ingebretsen* also was wrong the day it was decided. *See* 88 F.3d at 284 (Jones, J., dissenting from the denial of rehearing en banc). But, in all events, even if *Ingebretsen* authorized standing based on anticipatory offense, this Court's later en banc opinions in *Staley* and *Doe* overrode that view. Both of those decisions require "proof" that the plaintiffs "were exposed to, and may thus

claim to have been injured by," a religious display or exercise to establish standing. *Doe*, 494 F.3d at 497 ("Standing to challenge invocations as violating the Establishment Clause has not previously been based solely on injury arising from mere abstract knowledge that invocations were said."); *Staley*, 485 F.3d at 309 (reaching a similar conclusion on ripeness grounds). Thus, *Ingebretsen*'s "inevitable encounter" standard is no longer binding.[1] *See, e.g.*, *Miller v. Dunn*, 35 F.4th 1007, 1012 (5th Cir. 2022).

But that's not all. Even if a plaintiff could establish an injury based on a supposedly inevitable future encounter, that is not this case. We know from (for example) *Van Orden*, *McCreary*, and *Stone* that Ten Commandments displays are not inevitably unconstitutional. Indeed, even Justice Souter's dissent in *Van Orden* acknowledged that "a display of the Commandments accompanied by an exposition of how they have influenced modern law would most likely be constitutionally unobjectiona-

---

[1]    Defendants are unaware of any case since *Doe* was decided in which this Court cited *Ingebretsen* for its standing holding or applied any similar rule in the Establishment Clause context. Neither Plaintiffs nor the district court cited any such case.

ble" and that the "Decalogue could, as *Stone* suggested, be integrated constitutionally into a course of study in public schools." 545 U.S. at 741–42 (Souter, J., dissenting).

Yet by concluding that an unconstitutional encounter was "inevitable," the district court adopted a categorical rule that *all* H.B. 71 displays, regardless of form or context, are unconstitutional. *See* ROA.1648–1649, 1652. Because courts must "conduct [a] fact-intensive and context-specific analysis" in display cases, *Staley*, 485 F.3d at 309, this cannot be correct—particularly given the likelihood of H.B. 71 displays with additional historical or educational context, as contemplated by H.B. 71 and as demonstrated by the illustratives. *See, e.g.*, *ACLU v. Mercer County*, 432 F.3d 624, 637–38 (6th Cir. 2005) (approving Ten Commandments display that was "placed on a level with other documents" with "unquestioned civil, legal, and political influence"); *Books v. Elkhart County*, 401 F.3d 857, 864–66 (7th Cir. 2005) (upholding Ten Commandments situated within display of many documents).

There are innumerable displays that would satisfy the Establishment Clause, *see* ROA.480–494, and Plaintiffs have no way of knowing which among countless variations may be posted in their schools. Thus,

an unconstitutional encounter is not "inevitable," *Ingebretsen* does not apply, and Plaintiffs cannot establish injury. And for the same reason, Plaintiffs cannot show causation, *Murthy*, 603 U.S. at 76, or redressability, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021).

**2. The Court's offended-observer precedents are wrong and should be reconsidered.**

Plaintiffs' anticipation of a *future* encounter with H.B. 71 displays is insufficient—but their standing argument betrays a more fundamental problem: Even a *past* or *current* confrontation does not suffice under Article III. To be sure, this Court's precedents hold otherwise. But "[t]his 'offended observer' theory of standing has no basis in law," *Am. Legion*, 588 U.S. at 80 (Gorsuch, J., concurring in the judgment), and "appears to warp the very essence of the judicial power vested by the Constitution," *City of Ocala v. Rojas*, 143 S. Ct. 764, 767 (2023) (Thomas, J., dissenting from the denial of certiorari). The Court should discard it.

Offended-observer standing is *Lemon*'s zombie child. Long ago, the Supreme Court articulated the rule that should be dispositive here: "[T]he psychological consequence presumably produced by observation of conduct with which one disagrees" is not an injury-in-fact "sufficient to confer standing under Article III." *Valley Forge Christian Coll. v. Ams.*

*United for Separation of Church and State, Inc.*, 454 U.S. 464, 485 (1982). But during the *Lemon* era, "lower courts deduced" that if "the Establishment Clause forbids anything a reasonable observer would view as an endorsement of religion," then "an observer must be able to sue." *City of Ocala*, 143 S. Ct. at 765 (Gorsuch, J., respecting the denial of certiorari).

Now that *Lemon*'s "abstract" and "ahistorical approach" has been correctly "abandoned," however, *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 534 (2022), "'little excuse' … remains" for lower courts to continue to "indulge[] the fiction of 'offended observer' standing," *City of Ocala*, 143 S. Ct. at 764–65 (Gorsuch, J.). Thus, "the gaping hole it tore in standing doctrine in the lower courts should now begin to close." *Id.* (cleaned up).

This is so not only because *Lemon* is dead but also because offended-observer standing is profoundly wrong as a matter of first principles. "Under Article III, federal courts are authorized 'to adjudge the legal rights of litigants in *actual controversies*,' not hurt feelings." *City of Ocala*, 143 S. Ct. at 767 (Thomas, J.) (emphasis added). And mere "offense" at seeing something disagreeable does not "qualif[y] as a 'concrete and particularized' injury sufficient to confer standing." *Am. Legion*, 588

35

U.S. at 80 (Gorsuch, J.). Adjudicating cases based on this "sort of squishy 'psychological' injury" thus "creates the potential for abuse of the judicial process" and "open[s] the Judiciary to an arguable charge of providing 'government by injunction.'" *Kondrat'yev v. City of Pensacola*, 949 F.3d 1319, 1336 (11th Cir. 2020) (Newsom, J., concurring).

Offended-observer standing also is pernicious. Because it is an Establishment-Clause-only doctrine, it improperly skews the judicial playing field against religion. Courts generally summarily reject constitutional claims brought by distressed bystanders, *see Am. Legion*, 588 U.S. at 80 (Gorsuch, J.), yet many rely on offended-observer standing to entertain otherwise non-justiciable cases aimed at ridding society of religious symbolism. In doing so, these courts defy the principle that there is no "'sliding scale' of standing" depending on the right invoked, *City of Ocala*, 143 S. Ct. at 768 (Thomas, J.), and unnecessarily fan the flames of culture-war disputes.

At the same time, offended-observer standing bizarrely disadvantages viewers "offended" by *non*-religious content. For example, affirming standing here requires concluding that Plaintiffs have standing to challenge an H.B. 71 display, but a Black student would *not* have

standing to challenge a Confederate flag on a classroom wall. *Compare Moore v. Bryant*, 853 F.3d 245, 249–51 (5th Cir. 2017) (explaining lack of standing to sue over Confederate flag, and distinguishing "Establishment Clause case law"). That distinction is "utterly unjustifiable." *Am. Legion*, 588 U.S. at 81–82 (Gorsuch, J.).

Given all this, it is no wonder that Members of this Court have long criticized this anomalous standard. *See, e.g.*, *Mack*, 49 F.4th at 949 ("Undeniably, the law of Establishment Clause standing is hard to reconcile with the general principle that standing is absent where a plaintiff has only a 'generalized grievance shared in substantially equal measure by all or most citizens.'"); *Doe*, 494 F.3d at 500 (DeMoss, J., specially concurring) ("This double standard must be corrected because ... it opens the courts' doors to a group of plaintiffs who have no complaint other than they dislike any government reference to God."). Nor should it come as any surprise that the Supreme Court has never endorsed it.[2]

Offended-observer standing should be shelved—now.

---

[2]    The Supreme Court's implicit assumption of standing in certain Establishment Clause cases "ha[s] no precedential effect" on the district court's jurisdiction here. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998); *Doe*, 494 F.3d at 498; *City of Ocala*, 143 S. Ct. at 767 (Thomas, J.).

## C. Defendants Brumley and BESE members have sovereign immunity.

At the risk of piling on, it bears noting that sovereign immunity independently bars the claims against Brumley and BESE members. These official-capacity claims "are effectively suits against a state" barred by the Eleventh Amendment, absent the application of the equitable *Ex parte Young* exception. *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019).

**1.** *Ex parte Young*'s "straightforward inquiry" asks "whether [the] complaint alleges an ongoing violation of federal law." *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002). Only once "a state actor enforces an unconstitutional law" is he "stripped of his official clothing and becomes a private person subject to suit." *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010).

Here, there is no ongoing violation because no Defendant has implemented H.B. 71. The district court tried to sidestep this "ongoing violation" prerequisite by citing cases where threatened enforcement of a challenged law *against a plaintiff* suffices. *See* ROA.1671. But this case is entirely different because H.B. 71 does not apply to Plaintiffs, imposes no obligations on them, and by definition cannot be enforced *against*

them. Defendants are unaware of any case from this Court abridging a State's sovereign immunity as to a statute that has not been, and cannot be, enforced against a plaintiff.

**2.** Even setting that aside, Brumley and the BESE Defendants do not have the requisite enforcement authority. As this Court has repeatedly held, the "general duty to see that the laws of the state are implemented" is not enough to invoke *Ex parte Young. Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 671 (5th Cir. 2022). Officials must exercise some form of "compulsion or constraint." *Id.*; *see City of Austin*, 943 F.3d at 1001–02. But these Defendants lack any such authority.

For BESE members, the district court relied on their obligation to "adopt rules and regulations … to ensure the proper implementation of" H.B. 71. La. R.S. § 17:2124(6)(a); *see* ROA.1671. That BESE "might in the future promulgate" a rule is insufficient to invoke *Ex parte Young. Whole Women's Health v. Jackson*, 595 U.S. 30, 44 (2021). Moreover, even the exercise of such authority itself is not necessarily "compulsion or constraint." *Scott*, 28 F.4th at 671. The district court stretched the holding of *Book People, Inc. v. Wong*, 91 F.4th 318 (5th Cir. 2024), to cover BESE's rulemaking authority. *See* ROA.1671. But there, officials had authority

to "compel [plaintiffs] to submit ratings with which they disagree[d]," and "constrain [plaintiffs] from continuing to do business with school districts." *Id.* at 335. Of course, no such authority exists in H.B. 71. And when BESE handled a similar mandate concerning the display of the national motto in classrooms, BESE simply encouraged schools to adopt their own implementation policies. *See* La. Admin. Code § 28:337(B)(41).

For Brumley, the district court focused on his general duty under Louisiana law to "implement the policies and programs of the board and laws affecting schools under the jurisdiction of the board." La. R.S. § 17.22(3); *see* ROA.1672. But Brumley's only obligation to "implement" H.B. 71 is limited to "identify[ing] appropriate resources to comply" with H.B. 71 and "list[ing]" those resources online. La. R.S. § 17:2124(6)(b). That is a far cry from compulsion or constraint. Plaintiffs' inability to displace the State's sovereign immunity thus independently bars the claims against Brumley and the BESE Defendants.

## II.    PLAINTIFFS FAIL TO STATE A CLAIM FOR RELIEF.

The Court need not reach the merits—but if it does, reversal remains warranted on Plaintiffs' claims.

### A.  H.B. 71 Does Not Facially Violate the Establishment Clause.

Start with the Establishment Clause claim. As Plaintiffs concede (and the district court agreed), this is a facial challenge to H.B. 71. ROA.1625. Plaintiffs thus bear the burden to "show that there is no set of circumstances under which [H.B. 71] is constitutional"—*i.e.*, that it is "unconstitutional in every application." *Croft v. Perry*, 624 F.3d 157, 164 (5th Cir. 2010).

Even in the *Lemon* era, that would be a heavy burden, since the Supreme Court never "purport[ed] to decide the constitutionality of every possible way the government might set out the Commandments." *McCreary*, 545 U.S. at 867. That burden is virtually insurmountable now because, under the Supreme Court's modern approach to the Establishment Clause, applications of H.B. 71 are plainly constitutional. And the district court's and Plaintiffs' arguments otherwise are unavailing.

### 1.  H.B. 71 does not implicate the historical hallmarks of a religious establishment.

For decades, the *Lemon* test haunted Establishment Clause jurisprudence, encouraging courts and plaintiffs to "purge" anything that "partakes of the religious." *Kennedy*, 597 U.S. at 535. In *Kennedy*, the Court "abrogated" the *Lemon* test. *Groff v. DeJoy*, 600 U.S. 447, 460 &

n.7 (2023). In its place, *Kennedy* emphasized "that the Establishment Clause must be interpreted by reference to historical practices and understandings." 597 U.S. at 510.

But the Court did not stop there. Rather, *Kennedy* also described what the key practices and understandings *are*—namely, "the hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Id.* at 537. The point of identifying these hallmarks, *Kennedy*'s author had previously explained, was to give guidance "localities and lower courts can rely on," ameliorating the "serious" and "challeng[ing]" work of reconstructing the history from scratch in every case. *Shurtleff v. City of Boston*, 596 U.S. 243, 285 (2022) (Gorsuch, J., concurring), *cited in Kennedy*, 597 U.S. at 537 n.5.

There are six hallmarks:

(1) "the government exerted control over the doctrine and personnel of the established church";

(2) "the government mandated attendance in the established church and punished people for failing to participate";

(3) "the government punished dissenting churches and individuals for their religious exercise";

(4) "the government restricted political participation by dissenters";

42

(5) "the government provided financial support for the estab-
lished church, often in a way that preferred the established
denomination over other churches"; and

(6) "the government used the established church to carry out
certain civil functions, often by giving the established
church a monopoly over a specific function."

*Id.* at 286 (Gorsuch, J.).

"[T]he *Kennedy* opinion adopts these six hallmarks as the touch-
stone for future Establishment Clause challenges." Daniel L. Chen, Ken-
nedy v. Bremerton School District*: The Final Demise of* Lemon *and the
Future of the Establishment Clause*, 21 Harv. J.L. & Pub. Pol'y Per Cu-
riam (Summer 2022); *accord Hilsenrath on behalf of C.H. v. Sch. Dist. of
the Chathams*, 698 F. Supp. 3d 752, 761–63 & n.14 (D.N.J. 2023). So after
*Kennedy*, Establishment Clause plaintiffs bear "the burden" of "proving
that th[e] facts align with a historically disfavored establishmentarian
practice." *Firewalker-Fields v. Lee*, 58 F.4th 104, 122 n.7 (4th Cir. 2023);
*see also, e.g.*, *Lozano v. Collier*, 98 F.4th 614, 628 (5th Cir. 2024) (per
curiam) (reviving Establishment Clause claim based on a "hallmark[] of
religious establishment[]"). And if they "fail to meet their burden to show
that these 'hallmarks' exist," their Establishment Clause claim fails. *Rog-
ers v. McMaster*, 696 F. Supp. 3d 193, 210–11 (D.S.C. 2023).

43

Worse still for Plaintiffs, to win this facial challenge, Plaintiffs must shoulder that burden with respect to *every* potential H.B. 71 display. *See Croft*, 624 F.3d at 164. But neither Plaintiffs nor the district court seriously contends that *any* H.B. 71 display implicates *Kennedy*'s hallmarks, much less that *all* of them do.

Nor could they, as "[n]o one at the time of the founding is recorded as arguing that the use of religious symbols in public contexts was a form of religious establishment." *Shurtleff*, 596 U.S. at 287 (Gorsuch, J.) (citation omitted). Indeed, one of Defendants' illustrations merely tracks one of the Supreme Court's own Ten Commandments displays, whose legality "no Member of the Court" has ever questioned. *Am. Legion*, 588 U.S. at 53; *see supra* p. 14.

Invoking Homer, the district court complained that the State was "leaving potential challengers like Menelaus trying to seize and hold the ever shape-shifting Proteus until Proteus eventually tires and divulges the hero's way of the island." ROA.1698. But this complaint lays bare the district court's fundamental misapprehension of facial challenges: They are "hard to win" *by design. Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2409 (2024). As even the district court purported to accept here,

ROA.1625, Plaintiffs must prove that every possible H.B. 71 display is unconstitutional. That they obviously cannot do so is not the State's fault. To borrow the district court's analogy, by bringing a facial challenge, Plaintiffs *themselves* elected to become Menelaus. *See Moody*, 144 S. Ct. at 2397 (the "decision" to bring a facial challenge "comes at a cost"). The obvious solution to the district court's concern is that Plaintiffs can bring an as-applied challenge to a discrete display when (and if) they see one. It is *not* to underrule settled facial-claim jurisprudence, as the district court did.

### 2. Separately, H.B. 71 fits within longstanding tradition.

H.B. 71 also is constitutional for a separate and independent reason: It is "consistent with a broader tradition of" religious imagery on public property. *Mack*, 49 F.4th at 950–51. Hallmarks or not, "any test the Court adopts must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and social change." *Town of Greece v. Galloway*, 572 U.S. 565, 577 (2014). That is, regardless of whether it implicates the hallmarks, a challenged practice "does not violate the First Amendment" if it "fits within [a] tradition long followed," such that history shows it can "'coexis[t] with the principles of

disestablishment and religious freedom.'" *Id.* at 576–78 (quoting *Marsh v. Chambers*, 463 U.S. 783, 786 (1983)).

That is precisely the case here. "There is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984). That tradition includes prayer and other religious acknowledgments—like the Thanksgiving proclamations issued by President Washington and his successors, *id.* at 676 & nn.2–3, and like the legislative and courtroom prayer practices at issue in *Galloway*, *Marsh*, and *Mack*. But it also includes "graphic manifestations" of "our religious heritage," *id.* at 676—like the national seal proposed by Jefferson and Franklin in 1776, which featured "Moses leading the Israelites across the Red Sea," *Shurtleff*, 596 U.S. at 288 n.11 (Gorsuch, J.); like the national seal ultimately adopted in 1782, likewise including religious imagery, *id.*; like the many "State and municipal seals and flags throughout our Republic that include religious symbols or mottos," *Freedom From Religion Foundation, Inc. v. County of Lehigh*, 933 F.3d 275, 284 (3d Cir. 2019); and like the motto "In God We Trust" on our currency, *see* Act of March 3,

1865, ch. 100 § 5, 13 Stat. 518, and displayed in each Louisiana class-room, *see* La. R.S. § 3351(O)(1).

"[D]isplays … of the Ten Commandments" are part of this "rich American tradition of religious acknowledgments." *Van Orden*, 545 U.S. at 689–90. As both the Supreme Court and this Court have recognized, the Commandments "have historical significance as one of the founda-tions of our legal system." *Am. Legion*, 588 U.S. at 53; *see Van Orden*, 351 F.3d at 182. "[F]or largely that reason, they are depicted in the marble frieze in our courtroom and in other prominent public buildings in our Nation's capital." *Am. Legion*, 588 U.S. at 53. And not just there: The U.S. Solicitor General has "identified displays of the Ten Commandments in almost every State." *Amicus* Br. for the United States, *Van Orden*, 2005 WL 263790, at *11, *1a–*7a.

Even more specifically, the Ten Commandments have long been presented to *students* as an integral part of a curriculum. As H.B. 71 re-counts, "[t]he Ten Commandments were a prominent part of American public education for almost three centuries," featuring in some of the most widely used textbooks in early American education: *The New Eng-land Primer*, *McGuffey's Readers*, and Noah Webster's *American Spelling*

*Book.* §17:2124(B)(3). *McGuffey's Readers* in particular were "omnipresent" in the early public schools that arose after disestablishment—"[p]erhaps the most consistent element in the nineteenth-century common school classroom." James W. Fraser, *Between Church and State* 35 (2d ed. 2016); *accord* ROA.934–935, 938 (Plaintiffs' expert agreeing that "free, common" or "public" schools arose "in the early 1800s" and *McGuffey's Readers* "were … used in many common schools throughout much of the nineteenth century").[3] And as record evidence reflects, the Ten Commandments played a significant role in the *Readers*—sometimes set out verbatim, *e.g.*, ROA.1347–1352; sometimes transposed into rhyming verse, *e.g.*, ROA.1353–1354; and sometimes incorporated into stories, in ways that underscore their usefulness for secular ends, *e.g.*, ROA.1355–1366.[4]

---

[3]    *See also* Letter from Chief Justice William H. Taft to Henry Ford re: *McGuffey's Readers* (Oct. 31, 1924), https://perma.cc/B8XG-WVX5 ("I attended the public schools … and began with the first of the McGuffey readers and continued clear through them to the sixth.").

[4]    For example, in "The Young Witness" (ROA.1359–1363), a nine-year-old girl's citation to the Commandment proscribing "bear[ing] false witness against thy neighbor" convinces a judge that she "understand[s] the nature of an oath" sufficiently to testify in a criminal proceeding. *Cf. Watts v. Gerking*, 228 P. 135, 141 (Or. 1924) ("'Thou shalt not bear false witness' is a command of the Decalogue, and that forbidden act is denounced by statute as a felony." (citation omitted)).

H.B. 71 fits comfortably within this tradition. Indeed, the usage of the Commandments contemplated by H.B. 71 is far *more* passive and contextual than in the early textbooks. Unlike in (for example) the *Readers*—which called on teachers to "fix the attention of their pupils" on each lesson and "never" allow pupils to "refuse" to provide "answers and explanations" for the lesson, *see*, *e.g.*, *McGuffey's Second Eclectic Reader* vii (1836 ed.), https://perma.cc/9FFM-978R—H.B. 71 displays will simply appear on a wall for students to observe or ignore as they wish. Plaintiffs have thus failed to carry their burden to show—or even plausibly allege—that H.B. 71 conflicts with "historical practices and understandings." *Kennedy*, 597 U.S. at 510.

### 3. The district court's reasoning is mistaken.

The district court resisted this straightforward reasoning only by misapplying Supreme Court precedent.

**a. *Stone.*** The district court principally held that H.B. 71 "runs afoul of" the Supreme Court's per curiam decision in *Stone*, which struck down a Kentucky law requiring Ten Commandments displays in public-

school classrooms. ROA.1623, 1706–1709. Indeed, the district court emphatically insisted that *Stone* "alone" was "controlling," invoking that decision over 100 times. ROA.1715, 1729.

The problem is that *Stone* is *Lemon* to its core—and the *Lemon* era "is now over." *Mack*, 49 F.4th at 954 n.20. *Stone* concluded that Kentucky's law "had no secular legislative purpose" as required by "the first part of the *Lemon v. Kurtzman* test." 449 U.S. at 41, 43. *Kennedy*, however, expressly disapproved of *Lemon*'s "call[] for an examination of a law's purposes." 597 U.S. at 534. And *Kennedy* said the Court has "abandoned" not only *Lemon* itself but also its "progeny" and "offshoot[s]"—a category undoubtedly including *Stone*. *Id.* In short, "*Lemon* and its ilk"—*Stone* included—"are not good law." *Firewalker-Fields*, 58 F.4th at 121 n.5.[5]

At minimum, *Stone* was "built upon" a test (*i.e.*, *Lemon*) the Supreme Court has "walked back from." *Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 259 (5th Cir. 2019). So even

---

[5]    The district court stated that, "at oral argument, AG Defendants conceded that *Stone* remains binding on this Court." ROA.1714. As the transcript demonstrates, they did not. ROA.2519:8-16 ("accept[ing]" that notion "for purposes of this discussion"). Defendants' position, then and now, is that "*Stone* is dead" and "not good law." ROA.562 (memorandum in support of motion to dismiss).

ignoring the Supreme Court's express abandonment of *Lemon* and its progeny, if this Court had to follow *Stone* in a case exactly like it, this Court certainly cannot "extend [that decision's] reasoning" to other facts. *Id.* at 257–59 & n.11. And *Stone* is distinguishable here, for two reasons.

One, in *Stone*, the displays "stood alone" as an "isolated exhibition" "not part of an arguably secular display." *McCreary*, 545 U.S. at 867–68:



ROA.1334 (full-page rendering). Even in the *Lemon* era, the Supreme Court understood this as critical to *Stone*'s scope. That is why it discussed *Stone* with respect to a later *standalone* Commandments display, *McCreary*, 545 U.S. at 867–68, but resolved a dispute over another dis-

play presenting the Commandments "in the company of other documents" on different grounds, *id.* at 871. Here, no display has actually gone up in Plaintiffs' schools. But consistent with H.B. 71's text, those currently under consideration (*see supra*) depict the Ten Commandments surrounded by a variety of other content that indicates a wide array of pedagogical purposes—which is worlds away from the displays in *Stone*.

Two, *Stone* rejected Kentucky's proffered secular purpose as a sham—explaining that it was based solely on a one-sentence "notation" untethered to the educational context (and indeed, which did not even claim that the secular purpose was *the legislature's*). 449 U.S. at 41–42. In contrast, H.B. 71 requires that each display include a three-paragraph "context statement" explaining "The History of the Ten Commandments in American Public Education." La. R.S. § 17:2122(B)(3). And it explicitly articulates the Legislature's secular historical and educational purposes for displaying the Commandments. *Id.* § 17:2122(A)(1)–(9).

These distinctions mattered even *before Lemon*'s overruling. *See Wallace v. Jaffree*, 472 U.S. 38, 74–75 (1985) (O'Connor, J., concurring in judgment) (stating the *Lemon*-era standard: "[i]f a legislature expresses a plausible secular purpose," "courts should generally defer"); *Mercer*

*County*, 432 F.3d at 634 ("Whatever is left of *Stone* is limited to circumstances involving public displays of the Ten Commandments in isolation."). But the district court rejected them, instead second-guessing the Legislature's "purported secular purpose" based on extra-textual statements by "H.B. 71's primary sponsor" and a "fundraising email" from "Governor Landry," which the court took judicial notice of as reported in "the local paper." ROA.1712–1713. Not even *Stone* adverted to such dubious sources in its search for the Kentucky legislature's true "purpose." So the district court's reasoning is not merely a rote application of *Stone*—it is an aggressive resurrection of *Lemon* that thumbs its nose at *Kennedy*.

    **b. *Kennedy*.** Speaking of *Kennedy*, the court wrongly claimed in the alternative that H.B. 71 "would be unconstitutional under *Kennedy*." ROA.1627. This is so, according to the district court, because H.B. 71 does not "fit[] within a broader tradition" of "permanently displaying the Decalogue in public-school classrooms at the time of the Founding or of incorporation." ROA.1773.

    But this misunderstands *Kennedy*'s framework. A display or practice is, of course, constitutional if it is supported by a sufficiently lengthy

tradition. *E.g.*, *Town of Greece*, 572 U.S. at 575–76. But to hold that it *must* be so supported "confuses a sufficient condition for a necessary one." *Mack*, 49 F.4th at 950. Under *Kennedy*, the threshold question is whether the challenged practice implicates the historical "hallmarks of religious establishments." 597 U.S. at 537 & n.5. If not, it does not violate the Establishment Clause—regardless of whether a specific tradition affirmatively *supports* it. *See Kennedy*, 597 U.S. at 534–42 (upholding challenged practice without inquiry into whether it was a longstanding tradition dating back to the Founding).

Moreover, as explained above, Ten Commandments displays like those contemplated by H.B. 71 *are* consistent with longstanding tradition. *Supra* Section II.A(2). In holding otherwise, the district court reasoned that although early American textbooks indisputably featured the Ten Commandments, "the references to the Decalogue … in the McGuffey *Readers*" were too "scattered and infrequent" to "show a 'widespread practice' of using the Ten Commandments in public schools." ROA.1777–1778.

That reasoning is mistaken. One, it disregards how H.B. 71 displays are still "consistent with a broader tradition," *Mack*, 49 F.4th at

951—including "graphic manifestations" of "our religious heritage," *Lynch*, 465 U.S. at 677. Indeed, Ten Commandments displays—with their nationwide prevalence, indisputable secular and historical importance, and religious resonance across multiple faith traditions—are perhaps the quintessential example of such a manifestation. *See id.* at 677 (upholding nativity scene based in part on Court's "permanent … symbol of religion: Moses with Ten Commandments").

Two, the district court's reasoning fails on its own terms. Its reasoning derived from Plaintiffs' "expert" Green's analysis, which consisted largely of tallying up the number of lessons involving the Commandments and comparing it to the total number of lessons in the *Readers*. ROA.1777–1778. But in *Mack*, this Court rejected an identical argument. *See* 49 F.4th at 963 n.4 (Jolly, J., concurring in part and dissenting in part) (although there have been "tens of thousands of" American judges, only "a few" have "engaged similar judicial prayers"). Indeed, *Mack* explained that even a few examples can suffice to satisfy the "standard for

consistency," noting that in *Galloway*, the Supreme Court upheld "sectarian" legislative prayer after "identif[ying] only three historical instances of" it. *Id.* at 951 (majority).[6]

As *Mack* demonstrates, the question is whether, as a historical matter, use of the Commandments "occurred regularly," 49 F.4th at 957—not whether they appeared on every page of the relevant textbooks. After all, nothing in H.B. 71 contemplates that H.B. 71 displays would be the *only* item on school walls.

Alternatively, the district court held that "[e]ven if there were a broader tradition," H.B. 71 would not be "consistent with" it because the statute is "discriminatory and coercive." ROA.1748–1750, 1778. The court said H.B. 71 was "discriminatory" because it "requires a version of the Ten Commandments that many Protestants use" and therefore "fails to select … versions of the Ten Commandments … 'without regard for belief.'" ROA.1748 (quoting *Mack*, 49 F.4th at 958).

---

[6] Green submitted an *amicus* brief in *Mack*, taking the position (rejected by this Court) that "[h]istorical analysis confirms that Judge Mack's prayer practice is unconstitutional." *Amicus* Br. of Scholars of Religion and History, *Mack*, 2021 WL 574463, at *15–33.

But the quoted language—taken from a case about a government official's selection of *outside* prayer-givers to deliver their own prayers—does not translate to a case about the government's *own speech*. If governmental religious acknowledgments must be limited to imagery all faiths share, then there could be no such acknowledgments at all. *But see Am. Legion*, 588 U.S. at 38 (upholding Latin cross, "preeminent Christian symbol").

More importantly, the district court's theory defies precedent: In *Van Orden*, both this Court and the Supreme Court upheld a Ten Commandments display featuring a "version" of the Commandments that is identical to that used here. La. R.S. § 17:2122(A)(6); *see* 545 U.S. at 707 (Stevens, J., dissenting). So whatever limits there are on "discriminatory" display designs, H.B. 71 does not transgress them.[7]

As for "coercive," the district court adopted Plaintiffs' allegations that "posting the Ten Commandments" would "unconstitutionally pressure[] students" into "veneration." ROA.1628, 1749. But particularly in

---

[7]     The *Van Orden* (and therefore H.B. 71) Commandments language was chosen after "consultation with a committee composed of members of several faiths in order to find a nonsectarian text." 545 U.S. at 701 (Breyer, J., concurring in the judgment).

the context of a facial challenge like this one, this theory falls flat. Even on the loosest view of what counts as "coercion," discussions of the Supreme Court's architecture (ROA.483) do not plausibly cry out to be "venerated."

In all events, under binding precedent, the relevant coercion is coercion "to engage in 'a *formal religious exercise*,'" like prayer or devotional Bible reading. *Kennedy*, 597 U.S. at 536–37 (emphasis added; quoting *Lee v. Weisman*, 505 U.S. 577, 589 (1992)). Indeed, even before *Kennedy*, this Court drew this very line, explaining that "the Court has limited its concern about psychological coercion to religious exercises, specifically prayer." *Croft*, 624 F.3d at 170–71 (discussing *Lee*).

A passive display, meanwhile, "does not constitute a religious exercise," and so "does not violate the coercion test." *Doe v. Beaumont Indep. Sch. Dist.*, 240 F.3d 462, 470 (5th Cir. 2001). That is why this Court has held that "the mere display on public property of [a religious symbol] is in no meaningful sense either a religious activity or coercive." *Briggs v. Mississippi*, 331 F.3d 499, 505 (5th Cir. 2003); *see also Doe*, 240 F.3d at 470 ("presence of a minister" does not make program a "religious exercise"). So here, while it is indisputable that students are required to *go to*

*school*, *cf.* ROA.1627, that misses the point—they are not required to do anything *with the Ten Commandments*. And as this en banc Court has squarely held, "if no religious *activity* is at issue, any speculation as to whether students might feel pressured to participate is irrelevant." *Doe*, 240 F.3d at 470.

### 4. The district court's reliance on "expert" history underscores the flaws in the decision below.

Lurking in the shadows here is the district court's overt decision to outsource the Article III judicial role to an "expert"—a decision that underscores how much went wrong in the district court's analysis. *See* ROA.1629, 1770–1778 (citing Green).

Expert testimony about the Constitution, of course, is of limited value in federal judicial proceedings since judges themselves must decide those legal questions. *See, e.g.*, *Renfroe v. Parker*, 974 F.3d 594, 598 (5th Cir. 2020). That sometimes means assessing historical questions—including questions of precedent—without deference to expert testimony. *See, e.g.*, *Ortiz v. United States*, 585 U.S. 427, 439 (2018) (discussing Article III jurisdiction in light of history of courts-martial). So for constitutional issues—like, as Green opined on here, "the fundamental concerns and principles animating the Religion Clauses," ROA.852–858—federal

courts must particularly assure themselves of the history intertwined with the law rather than outsourcing that job to experts.

The decision below illustrates how things can go sideways when a district court ignores these guardrails. For example, an ordinary (and correct) relevance analysis under Federal Rule of Evidence Rule 702 would have doomed Green's status as an "expert." "Clearly, expert testimony does not 'help' if it is unrelated to facts at issue or is based on factual assumptions that are not supported by the evidence." 29 Wright & Miller, Fed. Prac. & Proc. Evid. § 6265.2 & nn.2–3 (2d ed. 2023) (quoting Fed. R. Evid. 702 and collecting cases); *see Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003) (Rule 702 "requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." (quoting *Daubert v. Merrell Dow Pharms. Co.,* 509 U.S. 579, 592 (1993)). But Green's testimony was unrelated to the points at issue, which are (1) what Ten Commandments displays will be shown in Louisiana schools and (2) whether those displays evince any of the historical hallmarks of a religious establishment. *See* ECF 39 at 24–33. Green did not address (and could not have addressed) these questions. Right out of

the gate, therefore, it is bizarre to treat him as a relevant expert and rest the case on his testimony.

Moreover, Green simply *characterized* the historical record—a task unquestionably reserved for courts, not experts. Green agreed with Louisiana that the Ten Commandments appeared in *McGuffey's Readers*, the *New England Primer*, and other historic classroom documents, and that those documents were used in "many" schools for decades. ROA.868–873. His only quibble was with whether that means the Ten Commandments were "prominent" or "widespread." But that is a question of characterizing the historical evidence, not establishing historical facts. And such characterization is for the courts. *See, e.g.*, *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 565 (11th Cir. 1998) ("characterizations of documentary evidence" are improper for expert testimony "because the trier of fact is entirely capable of determining whether or not to draw such conclusions without any technical assistance from" experts).

And what about his (un)reliability? Chief among the many facts[8] undercutting his reliability is that he willfully announced that he was

---

[8] As Defendants explained below, Green's testimony also was unreliable because (1) he provided no objective, independent validation of his methodology, and (2) his background prevents him from providing a reliable opinion. ROA.1124–1128.

expressly contradicting the Supreme Court and this Court. *See* ROA.2376:13–24; ROA.2419:6–21 (agreeing that his opinions are "inconsistent with those statements [of the Supreme Court] and established law," opining that "[m]any Justices of the Supreme Court are not historians," and commenting on *American Legion*'s discussion of the Ten Commandments: "It's just his [Justice Alito's] opinion, I guess."); *cf. Am. Legion*, 588 U.S. at 35, 53 (Ten Commandments discussion joined by Roberts, C.J., and Breyer, Kagan, and Kavanaugh, JJ.). And this would not be the first time he appears on the wrong side of history and the law. *See* ROA.1127 (Green on losing side of every case cited on his faculty website in which he filed an *amicus* brief over the past 20 years).

The Court should reject such attempts to wrap First Amendment decisions in gestures at an expert who speaks to irrelevant issues and actively contradicts binding Fifth Circuit and Supreme Court precedent. Again, Defendants do not need to prevail on this issue to obtain reversal—but the unprecedented nature of the handling of Green warrants special caution for future cases.

### B.    H.B. 71 Does Not Facially Violate the Free Exercise Clause.

Plaintiffs' effort to repackage their Establishment Clause claim into a Free Exercise Clause claim can be treated more briefly: passive displays of religious imagery simply do not implicate anyone's Free Exercise rights. Neither the district court nor Plaintiffs have cited a single case from any court ever holding that a passive religious display violates the Free Exercise Clause. This case should not be the first.

To start, several Plaintiffs allege that they do not practice any religion at all, ROA.64, 68, 72, so their claims fail from the jump. *See Wisconsin v. Yoder*, 406 U.S. 205, 216 (1972). But even for the Plaintiffs with religion, their problem is that H.B. 71 does not hinder them from *exercising* it. As its name suggests, the Free Exercise Clause protects religious *exercise*—believing, professing, and engaging in "conduct motivated by religious belief." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993). It does not "demand that the Government join in [citizens'] chosen religious practices," or require the State to write its laws to "comport with the religious beliefs of particular citizens." *Bowen v. Roy*, 476 U.S. 693, 699–700 (1986).

So here, while the district court emphasized that H.B. 71's statutory requirements alone were "at odds with" Plaintiffs' "views," "tradition," and "teachings," ROA.1760, that is not the question. The question is whether passive displays like those contemplated by H.B. 71 impose any "burden" on Plaintiffs' or their children's "religious exercise," *Fulton v. City of Philadelphia*, 593 U.S. 522, 532 (2021)—and they do not.

In fact, this Court has already held as much. The district court's reasoning hinged on the notion that mere non-participatory exposure to passive religious imagery could coerce or otherwise burden Plaintiffs' or their children's religious exercise. But this Court flatly rejected that understanding in *Murray v. City of Austin*, 947 F.2d 147 (5th Cir. 1991).

The plaintiff in *Murray* alleged that a cross on a city seal violated his Free Exercise rights by "subtly coercing" him to "adhere to the majoritarian faith" and "forcing him to support" the cross. 947 F.2d at 152 (cleaned up). This Court "quickly dispose[d] of" the plaintiff's claim, noting he had "fail[ed] to articulate a sufficient burden or restriction imposed on the free exercise of his religion." *Id.* That case—like this one, and others involving exposure to passive religious symbolism—was "a 'far cry from cases dealing with actual interference … or actual compulsion.'" *Id.*;

*see, e.g.*, *New Doe Child #1 v. United States*, 901 F.3d 1015, 1019, 1026 (8th Cir. 2018) (statutes requiring "In God We Trust" on currency "do no direct the Plaintiffs to do anything," and even if they carry money, the laws do not "compel citizens to engage in a religious observance"); *cf. Kennedy*, 597 U.S. at 539 ("Offense does not equal coercion.").

*Murray*'s principle is no less applicable in the classroom context. For example, the mere recitation of the Pledge of Allegiance in classrooms does not offend the Free Exercise Clause. *Croft*, 624 F.3d at 170. Nor does the mere teaching of religiously controversial content. *See Wright v. Houston Indep. Sch. Dist.*, 486 F.2d 137, 138 (5th Cir. 1973) (per curiam) (creationists' unsuccessful Free Exercise challenge to science lessons on evolution); *Cal. Parents for the Equalization of Educ. Materials v. Torlakson*, 973 F.3d 1010, 1020 (9th Cir. 2020) (Hindus' unsuccessful Free Exercise challenge to history lessons about who settled India and when). The same result applies even more obviously with respect to the mere display of religious symbolism that does not require students' participation.

Of course, "traditional concepts of parental control over the religious upbringing and education of their minor children" may entitle parents to opt students out of participating in specific lessons, activities, or

65

observances that would require them to violate their faith—or even to opt out of school entirely. *Yoder*, 406 U.S. at 232; *see, e.g.*, *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 629, 642 (1943) (students may opt out of standing for or reciting the Pledge for religious reasons). The problem for Plaintiffs here is that there is nothing to opt out *from*. Unlike the Pledge context, in which students are generally statutorily "required to recite" "one nation under God," *Croft*, 624 F.3d at 162, H.B. 71 does not require students to *do* anything. And just as the creationist parents in *Wright*, 486 F.2d 137, and the Hindu parents in *Torlakson*, 973 F.3d 1010, were not entitled to remove content from public-school curricula, Plaintiffs cannot demand the removal of content from the State's classroom walls.

In any event, even if some passive displays of the Ten Commandments could conceivably burden or coerce religious exercise, plenty of H.B. 71-compliant displays plainly do not. As the State's fifteen illustrations show, Louisiana schools could comply with H.B. 71 by mounting a variety of displays that would have no imaginable tendency to "pressur[e] [students] to suppress or limit expression of their religious or nonreligious backgrounds, beliefs, or practices" or to "pressur[e] them into ob-

servance, veneration, and adoption of the state's favored religious scripture." ROA.78–79. Yet, based on its overreliance on *Stone* and underanalysis of the Commandments in context, the district court concluded that *every* H.B. 71 display will inevitably coerce students to violate their religious beliefs. This conclusion cannot survive even a glance at the State's diverse set of illustratives.

Finally, even if Plaintiffs could get over the "burden" hurdle (they cannot), H.B. 71 does not discriminate based on religion—it is both neutral and generally applicable. H.B. 71 does not "restrict[] practices because of their religious nature." *Lukumi*, 508 U.S. at 543. It is not "intolerant of religious beliefs." *Id.* And it does not discriminate against any Plaintiffs' religious conduct while favoring, or providing individualized exemptions for, other conduct. *See Fulton*, 593 U.S. at 553.

Nevertheless, the district court concluded that H.B. 71 is not neutral and applied strict scrutiny. ROA.1762–1765. It based its neutrality determination on the Legislature's choice of a single version of the Ten Commandments, and on some cherry-picked statements from two of the 79 Louisiana Representatives and 30 Louisiana Senators who voted

to pass the bill. ROA.1762–1764. But H.B. 71's version of the Ten Commandments is the exact version that this Court and the Supreme Court already upheld in *Van Orden*. And a few legislators' floor statements are "not the law" and cannot "muddy" the State's "clear statutory intent" to improve its public education by exposing students to one of the foundations of our nation's legal system. *Airlines for Am. v. Dep't of Transp.*, 110 F.4th 672, 676 (5th Cir. 2024). Thus, H.B. 71 is subject only to rational-basis review, and neither the district court nor Plaintiffs have ever claimed that H.B. 71 would fail rational-basis review.

## III. THE DISTRICT COURT ERRED BY ENTERING A PRELIMINARY INJUNCTION.

Defendants are entitled to outright dismissal on both jurisdictional and merits grounds—and dismissal would moot the preliminary-injunction issue. But, even if the Court believed that outright dismissal is inappropriate, the district court *at least* abused its discretion by entering a preliminary injunction. Plaintiffs are unlikely to succeed on the merits for the reasons just explained. And they have no serious argument on the remaining factors.

"[C]ritical[ly]," they have not shown there is *any* threat that they will suffer *any* harm absent an injunction. *Career Colls. & Schs. of Tex.*

*v. U.S. Dep't of Educ.*, 98 F.4th 220, 233 (5th Cir. 2024) (citation omitted). Plaintiffs' single-sentence irreparable-harm argument (adopted wholesale by the district court, ROA.1779) hinged on their success on the merits: "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." ROA.275. But as explained, Plaintiffs have experienced no loss of First Amendment freedoms. *See supra* Section II. And without knowing how H.B. 71 will be implemented, they cannot know whether any particular display would give rise to their constitutional concerns. *See id.* Thus, there is certainly no imminent threat of irreparable harm to Plaintiffs or their children.

In contrast, the injunction will significantly harm both the State and the public, whose "interests merge" for purposes of the preliminary-injunction inquiry. *See United States v. Abbott*, 110 F.4th 700, 707 (5th Cir. 2024) (en banc) ("consider[ing] the last two factors together"). "When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *E.T. v. Paxton*, 19 F.4th 760, 770 (5th Cir. 2021) (quoting *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017)). That harm has already begun, as Defendants are barred from implementing H.B. 71. And this injury will hit another

peak on January 1, 2025, when Plaintiffs' schools will be in violation of State law. Because this Court declined to stay the preliminary injunction pending appeal, ECF 68, only reversal will stop the irreparable harm to the State and the public.

## IV.   AT MINIMUM, THE INJUNCTION IS OVERBROAD.

Finally, as Defendants explained at the stay stage, ECF 12 at 6–15, the district court's Notice Provision is plainly unlawful. It states:

> **IT IS FURTHER ORDERED** that Defendants Brumley and BESE Members shall be responsible for providing notice of this order and H.B. 71's unconstitutionality to all Louisiana public elementary, secondary, and charter schools, and all public post-secondary education institutions.

ROA.1794. To be clear: Plaintiffs have nothing to do with these non-party schools, and they have nothing to gain from this notice. Rather, the only apparent purpose of the Notice Provision is to impose an *in terrorem* effect on non-party schools by scaring them—in the State's voice—into complying with an injunction that cannot legally bind them.

The Notice Provision is blatantly unlawful—and it is exactly the sort of conduct that the Supreme Court rejected in *Labrador v. Poe*, 144 S. Ct. 921 (2024) (granting stay of statewide injunction "except as to the provision *to the plaintiffs* of the treatments they sought below" (emphasis

added)). Or, in the words of Justices Gorsuch, Thomas, and Alito, this is an example of "certain district courts across the country [that] have not contented themselves with issuing equitable orders that redress the injuries of the plaintiffs before them, but have sought instead to govern an entire State ... from their courtrooms." *Id.* at 926 (Gorsuch, J., concurring in the grant of stay).

The Court should vacate the Notice Provision on the ground that it plainly exceeds the district court's equitable authority. The Supreme Court has long made clear that "a federal court may not issue an equitable remedy 'more burdensome to the defendant than necessary to [redress]' the plaintiff's injuries." *Labrador*, 144 S. Ct. at 923 (Gorsuch, J., concurring in the grant of stay) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). For example, the Supreme Court has embraced "the rule that a 'remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established.'" *Gill v. Whitford*, 585 U.S. 48, 68 (2018).[9]

---

[9] As these authorities suggest, there are certainly cases where statewide and nationwide injunctions are necessary and appropriate because of the nature of the plaintiff (*e.g.*, a sovereign State) or the nature of the harm that must be remedied. This is plainly not that case. This case also does not implicate the scope of remedies under the Administrative Procedure Act, which are statutory, rather than equitable,

The Notice Provision violates this rule. To recount, it is undisputed that Plaintiffs sued for an injunction against only five Louisiana school boards—those whose schools the Plaintiff children allegedly attend. They did so because (in their view) an H.B. 71 display posted in one of their classrooms would violate their constitutional rights. It thus goes without saying that an H.B. 71 display in the classrooms governed by the dozens of other Louisiana school boards and colleges that Plaintiffs did not sue (and could not sue) would not affect Plaintiffs at all. And all this is to say nothing of the constitutional concerns that would be implicated by the district court's abuse of its equitable authority. *See* ECF 12 at 9–12 (explaining free speech and commandeering problems).

If nothing else, therefore, the Court should vacate the Notice Provision.

## CONCLUSION

The Court should vacate the preliminary injunction and reverse and render.

---

and thus present unique considerations. *See Labrador*, 144 S. Ct. at 932 (Kavanaugh, J., concurring in the grant of stay) (citing *Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1, 2 & n.1 (2023) (Kavanaugh, J., respecting denial of application for stay)).

Respectfully submitted,

Eric C. Rassbach
Joseph C. Davis
Benjamin A. Fleshman
Amanda L. Salz
Kelsey Baer Flores
The Becket Fund for
 Religious Liberty
1919 Pennsylvania Ave. NW
 Suite 400
Washington, D.C. 20006

*Counsel for Appellants*
*Brumley and LSBESE Officials*

Dated:   December 10, 2024

Elizabeth B. Murrill
Attorney General of Louisiana

*J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga
Solicitor General

Zachary Faircloth
Principal Deputy Solicitor General

Office of the Attorney General
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

*Counsel for Appellants*

## CERTIFICATE OF SERVICE

I certify that on December 10, 2024, I filed the foregoing brief with the Court's CM/ECF system, which will automatically send an electronic notice of filing to all counsel of record.


*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA

# CERTIFICATE OF COMPLIANCE

Pursuant to Fifth Circuit Rule 32, the undersigned certifies that this brief complies with:

(1) the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7) because it contains 12,907 words; and

(2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016 (the same program used to calculate the word count).

*/s/ J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga

Dated:    December 10, 2024