No. 24-30706

## UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

DARCY ROAKE, REVEREND, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR
MINOR CHILDREN, REAL PARTY IN INTEREST A.V., REAL PARTY IN INTEREST S.V.;
ADRIAN VAN YOUNG, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR
CHILDREN, REAL PARTY IN INTEREST A.V., REAL PARTY IN INTEREST S.V.; MAMIE
BROADHURST, REVERED, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MI-
NOR CHILD, REAL PARTY IN INTEREST N.W.; RICHARD WILLIAMS, REVEREND, ON BE-
HALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTER-
EST N.W.; JEFF SIMS, REVEREND, ON BEHALF OF HIMSELF AND ON BEHALF OF HIS MI-
NOR CHILDREN, REAL PARTY IN INTEREST A.S., REAL PARTY IN INTEREST C.S. 1, REAL
PARTY IN INTEREST C.S. 2; JENNIFER HARDING, ON BEHALF OF THEMSELVES AND ON
BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST A.O.; BENJAMIN OWENS,
ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN-
TEREST A.O.; DAVID HAWLEY, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR
MINOR CHILDREN, REAL PARTY IN INTEREST A.H., REAL PARTY IN INTEREST L.H.; ERIN
HAWLEY, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILDREN,
REAL PARTY IN INTEREST A.H., REAL PARTY IN INTEREST L.H.; DUSTIN MCCRORY, ON
BEHALF OF THEMSELVES AND ON BEHALF OF HIS MINOR CHILDREN, REAL PARTY IN-
TEREST E.M., REAL PARTY IN INTEREST P.M., REAL PARTY IN INTEREST L.M.; GARY
SERNOVITZ, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD,
REAL PARTY IN INTEREST T.S.; MOLLY PULDA, ON BEHALF OF THEMSELVES AND ON
BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST T.S., CHRISTY ALKIRE, ON
BEHALF OF HERSELF AND ON BEHALF OF HER MINOR CHILD, REAL PARTY IN INTEREST
L.A.; JOSHUA HERLANDS, ON BEHALF OF HIMSELF AND ON BEHALF OF HIS MINOR CHIL-
DREN, REAL PARTY IN INTEREST E.H., REAL PARTY IN INTEREST J.H.,

*Plaintiffs-Appellees,*

v.

CADE BRUMLEY, IN HIS OFFICIAL CAPACITY AS THE LOUISIANA STATE SUPERINTEN-
DENT OF EDUCATION; CONRAD APPEL, IN HIS OFFICIAL CAPACITY AS A MEMBER OF
THE LOUISIANA STATE BOARD OF ELEMENTARY AND SECONDARY EDUCATION
(LSBESE); JUDY ARMSTRONG, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE
LSBESE; KEVIN BERKEN, IN HIS OFFICIAL CAPACITY AS A MEMBER OF LSBESE;
PRESTON CASTILLE, IN HIS OFFICIAL CAPACITY AS A MEMBER OF LSBESE; SIMON

CHAMPAGNE, IN HER OFFICIAL CAPACITY AS A MEMBER OF LSBESE; SHARON LATTEN-CLARK, IN HER OFFICIAL CAPACITY AS A MEMBER OF LSBESE; LANCE HARRIS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF LSBESE; PAUL HOLLIS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF LSBESE; SANDY HALLOWAY, IN HER OFFICIAL CAPACITY AS A MEMBER OF LSBESE; STACY MELERINE, IN HER OFFICIAL CAPACITY AS A MEMBER OF LSBESE; RONNIE MORRIS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF LSBESE; EAST BATON ROUGE PARISH SCHOOL BOARD; LIVINGSTON PARISH SCHOOL BOARD; VERNON PARISH SCHOOL BOARD; ST. TAMMANY PARISH SCHOOL BOARD,

*Defendants/Appellants.*

## BRIEF OF KENTUCKY AND 17 OTHER STATES AS *AMICI CURIAE* SUPPORTING APPELLANTS

Russell Coleman
*Kentucky Attorney General*

Matthew F. Kuhn
*Solicitor General*
John H. Heyburn
*Principal Deputy*
*Solicitor General*
OFFICE OF THE KENTUCKY
ATTORNEY GENERAL
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov
Jack.Heyburn@ky.gov

*Counsel for Amici Curiae*

## SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

*Amici Curiae* are governmental parties. Under Fifth Circuit Rule 28.2.1, a supplemental certificate of interested persons is not required.

# TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS ......................... i

TABLE OF AUTHORITIES ........................................................................ iii

INTERESTS OF AMICI CURIAE AND SUMMARY OF ARGUMENT ............... 1

ARGUMENT ........................................................................................... 3

    I. The law in *Stone* differs from Louisiana's law. ................................... 3

    II. While *Lemon* was good law, *Stone* became an outlier. ....................... 7

    III. Now that *Lemon* has been abrogated, *Stone* should not be applied here. ......... 12

CONCLUSION ....................................................................................... 16

ADDITIONAL COUNSEL ........................................................................ 18

CERTIFICATE OF COMPLIANCE ............................................................ 20

CERTIFICATE OF SERVICE .................................................................... 21

# TABLE OF AUTHORITIES

## Cases

*Am. Civil Liberties Union of Ky. v. Mercer Cnty.*,
432 F.3d 624 (6th Cir. 2005) ................................................................. 9, 11

*Am. Legion v. Am. Humanist Ass'n*,
588 U.S. 29 (2019) ...................................................................... *passim*

*Boudreaux v. La. State Bar Ass'n*,
3 F.4th 748 (5th Cir. 2021) ....................................................................... 14

*Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*,
938 F.3d 246 (5th Cir. 2019) ................................................................... 14

*Edwards v. Aguillard*,
482 U.S. 578 (1987) ..................................................................................... 9

*Freedom from Religion Found., Inc. v. Mack*,
49 F.4th 941 (5th Cir. 2022) ................................................................... 13

*Groff v. DeJoy*,
600 U.S. 447 (2023) ........................................................................ 1, 13, 15

*Kennedy v. Bremerton Sch. Dist.*,
597 U.S. 507 (2022) ..................................................................... 1, 2, 15, 16

*Lemon v. Kurtzman*,
403 U.S. 602 (1971) .................................................................... *passim*

*Lynch v. Donnelly*,
465 U.S. 668 (1984) ............................................................................... 8, 9

*Marsh v. Chambers*,
463 U.S. 783 (1983) ..................................................................................... 8

*McCreary Cnty. v. Am. Civ. Liberties Union of Ky.*,
545 U.S. 844 (2005) ....................................................................... 9, 10, 12, 14

*Moody v. NetChoice, LLC*,
144 S. Ct. 2383 (2024) ................................................................................ 6

*Roake v. Brumley*,
--- F. Supp. 3d ---, 2024 WL 4746342 (M.D. La. Nov. 12, 2024) ......................... 3, 13

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*,
490 U.S. 477 (1989) ......................................................................... 13, 14

*Shurtleff v. City of Boston*,
   596 U.S. 243 (2022) ................................................................ 1, 3

*Stone v. Graham*,
   449 U.S. 39 (1980) (per curiam) ....................................... *passim*

*Stone v. Graham*,
   599 S.W.2d 157 (Ky. 1980) ...................................................... 4

*Tex. Democratic Party v. Abbott*,
   961 F.3d 389 (5th Cir. 2020) .................................................. 15

*Texas v. Rettig*,
   993 F.3d 408 (5th Cir. 2021) .................................................. 14

*Town of Greece v. Galloway*,
   572 U.S. 565 (2014) ................................................................ 16

*Van Orden v. Perry*,
   545 U.S. 677 (2005) ........................................................... *passim*

## Statutes

Ky. Rev. Stat. § 158.178 ................................................... 3, 4, 6, 7

La. Rev. Stat. § 17:2124 ............................................. 6, 7, 13, 14

## Other Authorities

*In re Honorable Edward L. Fossett*,
   OAG 78-605, 1978 WL 26724 (Aug. 28, 1978) ........................... 4

## INTERESTS OF AMICI CURIAE AND SUMMARY OF ARGUMENT

The Commonwealth of Kentucky and the 17 undersigned States have a profound interest in the proper interpretation of the Establishment Clause of the First Amendment. For decades, that provision was distorted by the Supreme Court's three-part test from *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971). That test "ambitiously attempted to find a grand unified theory of the Establishment Clause." *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 60 (2019) (plurality op.). Yet too often, *Lemon* led to "results more hostile to religion than anything a careful inquiry into the original understanding of the Constitution could contain." *See Shurtleff v. City of Boston*, 596 U.S. 243, 284 (2022) (Gorsuch, J., concurring in the judgment). Not only was *Lemon* "ahistorical," its test "invited chaos in lower courts, led to differing results in materially identical cases, and created a minefield for legislators." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 534 (2022) (cleaned up) (citation omitted). With good reason, *Lemon*'s methodology for interpreting the Establishment Clause has been "abrogated." *Groff v. DeJoy*, 600 U.S. 447, 460 & n.7 (2023).

This appeal concerns how to treat a Supreme Court decision that applied *Lemon*'s now-discarded test. That dated decision, which amicus curiae Kentucky remembers all too well, is *Stone v. Graham*, 449 U.S. 39 (1980) (per curiam). There, the Supreme Court tersely concluded that a Kentucky statute requiring the posting of the Ten Commandments in public-school classrooms violates the Establishment Clause. *Id.* at 40–43. There is no dispute that *Stone* turned on *Lemon*. As *Stone* put it, "[w]e conclude that

1

[Kentucky's law] violates the first part of the *Lemon v. Kurtzman* test, and thus the Establishment Clause of the Constitution." *Id.* at 42–43.

The amici States write to explain why *Stone* does not support a preliminary injunction as to Louisiana's law. Even before *Lemon* was overruled, the Supreme Court had narrowed *Stone* so that it stood for only a sliver of a proposition. Now that *Lemon* has been overturned, the Court should not extend *Stone*'s reasoning to Louisiana's law, which differs in meaningful respects from the law in *Stone*. When the Supreme Court overruled *Lemon*, it abrogated that case's methodology for interpreting the Establishment Clause. In *Lemon*'s place, the Supreme Court "instructed that the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" *Kennedy*, 597 U.S. at 535 (citation omitted). That approach—not *Stone*—is the proper way to judge the constitutionality of Louisiana's law.

That approach must account for the reality that "acknowledgements [on public property] of the role played by the Ten Commandments in our Nation's heritage are common throughout America." *Van Orden v. Perry*, 545 U.S. 677, 688 (2005) (plurality op.). More to the point, the Ten Commandments "have historical significance as one of the foundations of our legal system, and for largely that reason, they are depicted in the marble frieze in [the Supreme Court's] courtroom and other prominent public buildings in our Nation's capital." *Am. Legion*, 588 U.S. at 53. To be sure, the Decalogue has religious significance for many Americans. But a "close look" at our Nation's history reveals that "[n]o one at the time of the founding [was] recorded as arguing that the use

of religious symbols in public contexts was a form of religious establishment." *Shurtleff*, 596 U.S. at 287 (Gorsuch, J., concurring in the judgment).

## ARGUMENT

Louisiana offers several persuasive reasons why the preliminary injunction issued below should be lifted. The amici States focus on the district court's decision to apply *Stone*, which the court declared "legally indistinguishable" from this case. *Roake v. Brumley*, --- F. Supp. 3d ---, 2024 WL 4746342, at *4 (M.D. La. Nov. 12, 2024). The amici States make three points about *Stone*. First, they explain how the statute in *Stone* differs from Louisiana's law. Second, they summarize how the Supreme Court cabined *Stone*'s scope even before *Lemon* was overturned. And third, they urge the Court not to extend *Stone*'s narrowed holding to this case but instead to apply the standard mandated by *Kennedy*.

## I.    The law in *Stone* differs from Louisiana's law.

*Stone* arose in the Bluegrass State. In 1978, a Democratic legislator from Louisville introduced, and the Kentucky General Assembly passed, the statute that prompted the case. ROA.1245–47. That law, which remains on the books, instructs a Kentucky state official "to ensure that a durable, permanent copy of the Ten Commandments [is] displayed on a wall in each public elementary and secondary school classroom in the Commonwealth." Ky. Rev. Stat. § 158.178(1). The law also directs that each display contain the following text in "small print below the last commandment": "The secular application of the Ten Commandments is clearly seen in its adoption as the fundamental

legal code of Western Civilization and the Common Law of the United States." Ky. Rev. Stat. § 158.178(2). Louisiana's brief (at 51) provides a representative picture of a Ten Commandments display used in Kentucky in the lead up to *Stone*. ROA.1334. As even a quick glance confirms, seeing the "small print" at the bottom of that particular display requires squinting.

Shortly after the law's passage, Kentucky's Attorney General issued a legal opinion allowing private parties to donate Ten Commandments displays to public schools. *In re Honorable Edward L. Fossett*, OAG 78-605, 1978 WL 26724, at *2 (Aug. 28, 1978). By the time *Stone* made it to Kentucky's high court, a private foundation had reportedly "financed 15,000 framed copies [of the Ten Commandments] which ha[d] been placed in all classrooms in 55 counties and in some classrooms in 48 other counties." *Stone v. Graham*, 599 S.W.2d 157, 159 (Ky. 1980) (Lukowsky, J., for reversal); *see also* ROA.1245–47. Kentucky's courts upheld the Ten Commandments law. After a state trial court found the law constitutional, the Supreme Court of Kentucky affirmed by an equally divided vote. 599 S.W.2d at 157 (per curiam). (The vote was equally divided because a Justice recused due to his previous role as the Kentucky Attorney General who issued the above-described legal opinion.)

The Supreme Court summarily reversed in a 5–4 per curiam opinion.[1] From beginning to end, the Court applied *Lemon*—in particular, its first prong. *Stone*, 449 U.S. at 40–43. *Stone* can be read no other way. As the Court summarized at the top of its decision: "We conclude that Kentucky's statute requiring the posting of the Ten Commandments in public schoolrooms had no secular purpose, and is therefore unconstitutional." *Id.* at 41. So *Stone* was all about—and only about—*Lemon*.

In applying *Lemon*, *Stone* rejected Kentucky's "'avowed' secular purpose," expressed through the statutorily required statement at the bottom of each Ten Commandments display. *Id.* The Court summarily declared that "[t]he pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature."[2] *Id.* The Court, however, qualified that it was not holding that the Ten Commandments can never be displayed or discussed in public schools. It emphasized that "[t]his is not a case in which the Ten Commandments are integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like." *Id.* at 42. At the end of its decision, the Court returned to *Lemon*, reiterating that Kentucky's law "violates the first

---

[1] Two of the dissenters would have granted certiorari and given the case plenary consideration. *Stone*, 449 U.S. at 43 (Burger, C.J., Blackmun, J., dissenting).

[2] In dissent, then-Justice Rehnquist observed that the Court's declaration about Kentucky's purpose has "no support beyond [the Court's] own *ipsie dixit*." *Stone*, 449 U.S. at 43 (Rehnquist, J., dissenting).

part of the *Lemon v. Kurtzman* test, and thus the Establishment Clause of the Constitution." *Id.* at 42–43.

As this summary shows, *Stone* tailored its analysis to Kentucky's law. That matters because Louisiana's law differs in key respects. True, Louisiana's law requires a Ten Commandments display in each public-school classroom in the Pelican State. La. Rev. Stat. § 17:2124(B)(1), (C)(1). But it gives "each public school governing authority" latitude to determine "[t]he nature of the display." *Id.* at (B)(1). That is unlike Kentucky's law, which provides for a "durable, permanent copy of the Ten Commandments" and nothing else. *See* Ky. Rev. Stat. § 158.178(1). It follows that the Ten Commandments displays in Louisiana need not look anything like the Decalogue-only displays in *Stone*, especially in the context of this facial challenge to Louisiana's law. *See Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024).

The mockups in Louisiana's brief (at 13–15) show some of the (many) ways that public schools can comply with its law. For example, the statute permits a Ten Commandments display that explains the Supreme Court's post-*Stone* decision in *Van Orden*, which rejected an Establishment Clause challenge to a Ten Commandments monument on Texas's Capitol grounds. As written, Louisiana's law also permits a display that compares the Ten Commandments to other documents formative to modern law, like Blackstone's *Commentaries* and the Supreme Court's decision in *Marbury v. Madison*. Either hypothetical display would fit neatly within *Stone*'s carve-out allowing the Ten

Commandments to be used in public schools "in an appropriate study of history, civilization, comparative religion, or the like." 449 U.S. at 42.

Louisiana law also requires a three-paragraph "context statement" to be part of every Ten Commandments display. La. Rev. Stat. § 17:2124(B)(3). That required statement provides discrete examples of the Ten Commandments being "a prominent part of American public education for almost three centuries." *Id.* Such a detailed explanation is unlike the generic sentence that Kentucky's statute required to be printed in "small print" at the foot of each display. Ky. Rev. Stat. § 158.178(2). In this simple way, Louisiana's law does far more to convey the educational function of each Ten Commandments display. On top of that, Louisiana's law empowers public schools to make a Ten Commandments display part of a larger display including "the Mayflower Compact, the Declaration of Independence, and the Northwest Ordinance." La. Rev. Stat. § 17:2124(B)(4).

For all these reasons, even accepting *Stone* on its own terms, the decision does not require sustaining a facial challenge to a law like Louisiana's that plainly allows Ten Commandments displays that are fully in line with *Stone.*

## II.    While *Lemon* was good law, *Stone* became an outlier.

Even before the Supreme Court overturned *Lemon*, *Stone* did not age well as a judicial precedent. Following *Stone*, the Supreme Court distinguished it again and again, each time giving it less reach.

The narrowing of *Stone* began shortly after its issuance. Not even three years later, the Supreme Court rejected an Establishment Clause challenge to a state legislature's "practice of opening each legislative day with a prayer by a chaplain paid by the State." *Marsh v. Chambers*, 463 U.S. 783, 784, 795 (1983). The majority did not once cite *Stone*. Nor did it apply *Lemon*. Both failures drew the ire of the principal dissent. Invoking *Stone*, the dissent found it "self-evident" that the "'purpose' of legislative prayer is preeminently religious rather than secular." *Id.* at 797 & n.4 (Brennan, J., dissenting). As to *Lemon*, the dissent criticized the Court for "mak[ing] no pretense of subjecting Nebraska's practice of legislative prayer" to that "formal 'test[].'"[3] *Id.* at 796. In short, out of the gate, *Stone*'s holding and methodology carried no weight.

Things did not improve for *Stone* after *Marsh*. In *Lynch v. Donnelly*, the Supreme Court found that a municipality could display a "Nativity scene[] in its annual Christmas display." 465 U.S. 668, 670–71, 687 (1984). Whereas *Stone* treated *Lemon* as the end-all-be-all, *Lynch* countered that "we have repeatedly emphasized our unwillingness to be confined to any single test or criterion in this sensitive area." *Id.* at 679. In fact, the Court admitted that in two recent cases (one of which was *Marsh*) it "did not even apply the *Lemon* 'test.'" *Id.* As to *Stone*, *Lynch* understood the case to stand for the slim proposition that the Ten Commandments displays there were problematic because they

---

[3] Later decisions have stressed that *Marsh* declined to apply *Lemon*. *E.g.*, *Am. Legion*, 588 U.S. at 60 (plurality op.) (noting that in *Marsh* "the Court conspicuously ignored *Lemon* and did not respond to Justice Brennan's argument in dissent that the legislature's practice could not satisfy the *Lemon* test").

"were posted purely as a religious admonition" or "were motivated wholly by religious considerations." *Id.* at 679, 680. Taking *Lynch* at its word, *Stone* governs only if the posting of the Ten Commandments is "wholly" or "purely" motivated by religious considerations. Any secular rationale—even a partial one—suffices to distinguish *Stone*.

The Supreme Court finished its narrowing of *Stone* in a pair of 2005 decisions, each of which considered a Ten Commandments display on public property. In the first decision, the Supreme Court characterized *Stone* as involving extreme facts: It was an "unusual case[]" in which there was either "an apparent sham" by the government or a "secondary" secular purpose. *McCreary Cnty. v. Am. Civ. Liberties Union of Ky.*, 545 U.S. 844, 865 (2005). As the Court saw it, *Stone* turned on the "isolated exhibition" of the Ten Commandments "not leav[ing] room even for an argument that secular education explained their being there." *Id.* at 867. *Stone*, the Court clarified, "did not purport to decide the constitutionality of every possible way the Commandments might be set out by the government, and under the Establishment Clause detail is key."[4] *Id.* So under *McCreary County*, *Stone* stands at best for the limited proposition that a standalone Ten Commandments display can raise constitutional concerns. *Am. Civil Liberties Union of Ky. v. Mercer Cnty.*, 432 F.3d 624, 634 (6th Cir. 2005) ("Whatever is left of *Stone* is limited to circumstances involving public displays of the Ten Commandments in isolation.").

---

[4] The Supreme Court made a similar point about *Stone* nearly 20 years earlier. *Edwards v. Aguillard*, 482 U.S. 578, 593–94 (1987) (observing that *Stone* "did not mean that no use could ever be made of the Ten Commandments, or that the Ten Commandments played an exclusively religious role in the history of Western Civilization").

Indeed, although *McCreary County* considered three different Ten Commandments displays in a courthouse, it cited *Stone* only while considering the one in which the Ten Commandments were displayed alone. 545 U.S. at 868–73.

The second Supreme Court decision from 2005 hemmed in *Stone* even more. As noted above, in *Van Orden*, the Supreme Court rejected an Establishment Clause challenge to a monument of the Ten Commandments on the grounds of the Texas state Capitol. 545 U.S. at 681 (plurality op.). In so doing, the plurality found *Lemon* "*not useful* in dealing with the sort of passive monument that Texas has erected on its Capitol grounds." *Id.* at 686 (emphasis added); *see also id.* at 703–04 (Breyer, J., concurring in the judgment) (likewise not relying on *Lemon*). It is hard to imagine a more direct repudiation of *Stone*'s methodology. To *Stone*, *Lemon* was everything. To *Van Orden*, *Lemon* was irrelevant to the constitutionality of a Ten Commandments display on public property.

Rather than apply *Lemon*, the *Van Orden* plurality focused on "the nature of the monument" and "our Nation's history." *Id.* at 686. In this respect, the Court pointed out the obvious: "[A]cknowledgements [on public property] of the role played by the Ten Commandments in our Nation's heritage are *common throughout America.*" *Id.* at 688 (emphasis added). In fact, the Court noted that the Ten Commandments are displayed several places in its own building. The Decalogue appears with Moses in the Supreme Court's "own Courtroom"; it "adorn[s]" the gates on both sides of the Courtroom and the "doors leading into the Courtroom"; and "Moses . . . sits on the exterior east facade of the building holding the Ten Commandments tablets." *Id.* And the Supreme Court's

building is no exception when compared to other government buildings in our Nation's capital. *Id.* at 689 ("Similar acknowledgements can be seen throughout a visitor's tour of our Nation's Capital."). The Supreme Court later affirmed that "[i]n *Van Orden* and *McCreary*, no Member of the Court thought that these depictions [of the Ten Commandments] are unconstitutional." *Am. Legion*, 588 U.S. at 53.

Against this backdrop of Ten Commandments displays "common throughout America," the *Van Orden* plurality turned to *Stone*. And it made short work of the decision. *Mercer Cnty.*, 432 F.3d at 634 (noting that *Van Orden* "simply dismissed *Stone* as inapplicable"). The district court here countered that the *Van Orden* plurality noted that *Stone* arose in the "classroom context." 545 U.S. at 690. But the plurality did not suggest that the Ten Commandments can never be displayed or used in public schools. *Stone* itself refutes such an implication. 449 U.S. at 42. Instead, the *Van Orden* plurality highlighted that nothing "suggest[s] that *Stone* would extend to displays of the Ten Commandments that lack a 'plainly religious,' 'pre-eminent purpose.'" 545 U.S. at 691 n.11 (citation omitted). In other words, the *Van Orden* plurality wrote off *Stone* as a case in which the displays contained not even a hint of a secular purpose. *See id.* That can only be a rare circumstance. After all, in nearly the same breath, the *Van Orden* plurality held that "the Ten Commandments have an undeniable historical meaning" and that "[s]imply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause." *Id.* at 690.

In the nearly two decades since *McCreary County* and *Van Orden*, the Supreme Court has not cited *Stone* again in a majority decision. It simply goes unmentioned in the Court's modern Establishment Clause jurisprudence. This is true even when the Court discusses Ten Commandments displays. Most notably, *Stone* did not make an appearance in the governing decision in *American Legion*, despite the Court explaining that the Ten Commandments "have historical significance as one of the foundations of our legal system, and for largely that reason, they are depicted in the marble frieze in our courtroom and in other prominent buildings in our Nation's capital." 558 U.S. at 53.

As this summary shows, *Stone* did not fare well as a precedent even while *Lemon* was good law. *Stone*'s methodology for considering the constitutionality of a Ten Commandments display lost the day in *Van Orden. See* 545 U.S. at 686 (plurality op.); *id.* at 703–04 (Breyer, J., concurring in the judgment). And over time, *Stone* became a one-off decision that applied only in extreme circumstances. In the words of *McCreary County*, *Stone* was an "unusual case[]" in which the "isolated exhibition [of the Ten Commandments] did not leave room even for an argument that secular education explained their being there." 545 U.S. at 865, 867. At bottom, even while *Lemon* was on the books, *Stone* was a vanishing precedent.

## III.    Now that *Lemon* has been abrogated, *Stone* should not be applied here.

Although *Stone* had little import before *Lemon* was overruled, *Stone* has no applicability in this case now that *Lemon* is no more. The Supreme Court left no doubt

that *Lemon* has been "abrogated." *Groff*, 600 U.S. at 460 & n.7. Two years ago, the Court emphasized that it "long ago abandoned *Lemon* and its endorsement test offshoot." *Kennedy*, 597 U.S. at 534. Going forward, *Lemon* is no longer an appropriate test to interpret the Establishment Clause. *Freedom from Religion Found., Inc. v. Mack*, 49 F.4th 941, 954 n.20 (5th Cir. 2022) (citing *Kennedy* for the conclusion that *Lemon*'s "long Night of the Living Dead is now over." (internal citation omitted)).

That *Lemon* has been abrogated raises the question of how to treat a Supreme Court precedent like *Stone* that rests on *Lemon* and nothing else. No one disputes that this Court cannot simply declare *Stone* overruled. To quote the well-known rule, "[i]f a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989).

The district court applied this rule to conclude that *Stone* "directly controls" here. *Roake*, 2024 WL 4746342, at *4. That could not be more wrong. Even before *Lemon* was upended, the Supreme Court had hollowed out *Stone*. And Louisiana's law is by no means a carbon copy of the law in *Stone*, especially in the context of this facial challenge. Most importantly, unlike Kentucky's statute, Louisiana's law expressly gives school officials discretion in fashioning the "nature of the display." La. Rev. Stat. § 17:2124(B)(1). In other words, a Ten Commandments display in Louisiana need not look anything like

the "isolated exhibition" in *Stone. See McCreary Cnty.*, 545 U.S. at 867. In fact, Louisiana's

law specifically allows school officials to include a Ten Commandments display as part

of a larger display of historical documents. La. Rev. Stat. § 17:2124(B)(4). And unlike

the "implausible disclaimer" in statutorily mandated "small" text at the bottom of the

displays in *Stone*, *McCreary Cnty.*, 545 U.S. at 869, Louisiana's law requires a three-para-

graph "context statement" that situates the historical use of the Ten Commandments

"as a prominent part of American public education for almost three centuries," La. Rev.

Stat. § 17:2124(B)(3).

All these differences prove up a simple point: *Stone* is not on all fours here. To

apply *Stone* to Louisiana's law would require *extending* the decision. The Court should

decline to apply *Stone* in these new circumstances. Although a court of appeals cannot

declare a Supreme Court decision to be overruled based on its weakened foundations,

*Rodriguez de Quijas*, 490 U.S. at 484, this rule does not bind a circuit court to extend a

discredited precedent like *Stone*. To the contrary, the "weakened foundations" of a Su-

preme Court decision "counsel[] against expanding [its] application." *Boudreaux v. La.

State Bar Ass'n*, 3 F.4th 748, 755 (5th Cir. 2021); *accord Dialysis Newco, Inc. v. Cmty. Health

Sys. Grp. Health Plan*, 938 F.3d 246, 259 & n.11 (5th Cir. 2019).[5] As a result, the Court

---

[5] In a similar vein, several members of this Court have argued that courts "should re-
solve questions about the scope of [Supreme Court] precedents in light of and in the
direction of the constitutional text and constitutional history." *Texas v. Rettig*, 993 F.3d
408, 417 (5th Cir. 2021) (Ho, J., dissenting from the denial of rehearing en banc) (cita-
tion omitted).

need not ignore *Stone*'s lack of jurisprudential footing. It should treat *Stone*'s status as a poorly reasoned outlier whose methodology has been discredited as a reason not to extend it. Stated differently, the Court should refuse to extend *Stone* an inch farther and should apply the history-focused test mandated by *Kennedy*.

Although the Court need not reach this issue, the amici States end by pointing out that there is a serious argument that the Supreme Court has itself overruled *Stone*. No doubt, the Supreme Court "abrogates its cases with a bang, not a whimper." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 405 (5th Cir. 2020). Here, the Supreme Court has not said the magic words "*Stone* is overruled." The Supreme Court, however, left no question as to *Lemon*'s demise. As of 2022, the Supreme Court had "long ago abandoned *Lemon*." *Kennedy*, 597 U.S. at 534. And last year, the Supreme Court confirmed that *Lemon* is "abrogated." *Groff*, 600 U.S. at 460 & n.7.

When the Supreme Court overruled *Lemon*, it rejected the case's methodology for interpreting the Establishment Clause in any and all circumstances. For example, in *Kennedy*, the Supreme Court weighed the lower court's reliance on *Lemon* "and *its progeny*." 597 U.S. at 534 (emphasis added). Of course, *Stone* is part of *Lemon*'s progeny. *Kennedy* also spoke broadly about *Lemon*'s distorting effects across the waterfront of Establishment Clause litigation, explaining that *Lemon* "invited chaos in lower courts, led to differing results in materially identical cases, and created a minefield for legislators." *Id.* (cleaned up) (citation omitted). *American Legion* similarly discussed the intractable problems with *Lemon* across "a great array of laws and practices." 588 U.S. at 50;

*accord Town of Greece v. Galloway*, 572 U.S. 565, 575–77 (2014). These across-the-board holdings about *Lemon*'s shortcomings expressly sweep up a case like *Stone* that rests only on *Lemon*. The same is true of *Kennedy*'s directive that going forward courts applying the Establishment Clause "*must*" focus on our Nation's history. 597 U.S. at 535–36 (emphasis added). That categorical mandate leaves no room for a *Lemon*-driven precedent like *Stone*.

## CONCLUSION

The Court should reverse the preliminary injunction entered below.

Dated: December 17, 2024

Respectfully submitted,

Russell Coleman
  *Kentucky Attorney General*

*/s/ Matthew F. Kuhn*
Matthew F. Kuhn
  *Solicitor General*
John H. Heyburn
  *Principal Deputy Solicitor General*
OFFICE OF THE KENTUCKY
ATTORNEY GENERAL
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
(502) 696-5300
Matt.Kuhn@ky.gov
Jack.Heyburn@ky.gov

*Counsel for Amici Curiae*

## ADDITIONAL COUNSEL

Steve Marshall
Attorney General of Alabama

Tim Griffin
Attorney General of Arkansas

Ashley Moody
Attorney General of Florida

Raúl R. Labrador
Attorney General of Idaho

Brenna Bird
Attorney General of Iowa

Theodore E. Rokita
Attorney General of Indiana

Lynn Fitch
Attorney General of Mississippi

Andrew Bailey
Attorney General of Missouri

Austin Knudsen
Attorney General of Montana

Michael T. Hilgers
Attorney General of Nebraska

Dave Yost
Attorney General of Ohio

Alan Wilson
Attorney General of South Carolina

Marty Jackley
Attorney General of South Dakota

Jonathan Skrmetti
Attorney General and Reporter of Tennessee

Ken Paxton
Attorney General of Texas

Sean D. Reyes
Attorney General of Utah

Patrick Morrisey
Attorney General of West Virginia

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 29(a)(5). This brief contains 4,107 words, including all headings, footnotes, and quotations, and excluding the parts of the response exempted under Fed. R. App. P. 32(f).

In addition, this response complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Garamond font.

Dated: December 17, 2024

*/s/ Matthew F. Kuhn*
Matthew F. Kuhn
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on December 17, 2024, I electronically filed this document using the Court's CM/ECF system, which will serve all counsel of record.

*/s/ Matthew F. Kuhn*
Matthew F. Kuhn
*Counsel for Amici Curiae*