# United States Court of Appeals

*for the*

# Fifth Circuit

Case No. 24-30706

DARCY ROAKE, REVEREND, on behalf themselves and on behalf of their minor children, real party in interest A.V., real party in interest S.V.; ADRIAN VAN YOUNG, on behalf of themselves and on behalf of their minor children, real party in interest A.V., real party in interest S.V.; MAMIE BROADHURST, REVEREND, on behalf of themselves and on behalf of their minor child, real party in interest N.W.; RICHARD WILLIAMS, REVEREND, on behalf of themselves and on behalf of their minor child, real party in interest N.W.; JEFF SIMS, REVEREND, on behalf of himself and on behalf of his minor children, real party in interest A.S., real party in interest C.S. 1, real party in interest C.S. 2; JENNIFER HARDING, on behalf of themselves and on behalf of their minor child, real party in interest A.O.; BENJAMIN OWENS, on behalf of themselves and on behalf of their minor child, real party in interest A.O.; DAVID HAWLEY, on behalf of themselves and on behalf of their minor children real party in interest A.H., real party in interest L.H.; ERIN HAWLEY, on behalf of themselves and on behalf of their minor children, real party in interest A.H, real party in interest L.H.; DUSTIN McCRORY, on behalf of themselves and on behalf of his minor children, real party in interest E.M.; real party in interest P.M., real party in interest L.M.; GARY SERNOVITZ, on behalf of themselves and on behalf of their minor child, real party in interest T.S.; MOLLY PULDA, on behalf of themselves and on behalf of their minor child. real party in interest T.S.; CHRISTY ALKIRE, on behalf of herself and on hehalf of her minor child, real party in interest L.A.; JOSHUA HERLANDS, on behalf of himself and on behalf of his minor children, real party in interest E.H., real party in interest J.H.,

*Plaintiffs-Appellees,*

– v. –

CADE BRUMLEY, in his official capacity as the Louisiana State Superintendent of Education; CONRAD APPEL, in his official capacity as a member of the Louisiana State Board of Elementary and Secondary Education (LSBESE); JUDY ARMSTRONG, in her official capacity as a member of the LSBESE; KEVIN BERKEN, in his official capacity as a member of the LSBESE; PRESTON CASTILLE, in his official capacity as a member of LSBESE; SIMONE CHAMPAGNE, in her official capacity as a member of the LSBESE; SHARON LATTEN-CLARK, in her official capacity as a member of the LSBESE; LANCE HARRIS, in his official capacity as a member of LSBESE; PAUL HOLLIS, Louisiana State Board of Elementary and Secondary Education; SANDY HOLLOWAY, in her official capacity as a member of the LSBESE; STACEY MELERINE, in her official capacity as a member of the LSBESE; RONNIE MORRIS, in his official capacity as a member of the LSBESE;

EAST BATON ROUGE PARISH SCHOOL BOARD; LIVINGSTON PARISH
SCHOOL BOARD; VERNON PARISH SCHOOL BOARD; ST. TAMMANY
PARISH SCHOOL BOARD,

*Defendants-Appellants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA (BATON ROUGE)

## BRIEF FOR *AMICI CURIAE* DIRECTOR FOR THE CONSCIENCE PROJECT AND PROFESSOR MARK DAVID HALL IN SUPPORT OF APPELLANTS

ANDREA PICCIOTTI-BAYER, ESQ.
*Attorney for Amici Curiae*
1350 Beverly Road, Suite 115
McLean, Virginia 22101
(571) 201-6564

CP COUNSEL PRESS      (800) 4-APPEAL • (130789)

## STATEMENT OF INTERESTED PERSONS
## FIFTH CIRCUIT RULE 29.2

The undersigned counsel certifies that the following persons and entities have an interest in the outcome of this case. Andrea Picciotti-Bayer, Director for the Conscience Project and Professor Mark David Hall. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal. Andrea Picciotti-Bayer, Director for the Conscience Project. The undersigned counsel also certifies that Amici Curiae, the Conscience Project is a nonprofit corporation that has no parent corporations, is not publicly held corporation, and does not issue stock.

DATED: December 17, 2024    /s/Andrea Picciotti-Bayer
                            Andrea Picciotti-Bayer
                            Director, the Conscience Project

i

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTERESTED PERSONS FIFTH CIRCUIT
RULE 29.2.................................................................................... i

TABLE OF AUTHORITIES ............................................................ iii

INTEREST OF AMICI CURIAE ...................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................... 1

ARGUMENT................................................................................... 2

I.    COURTS MUST CONSIDER HISTORY AND
      TRADITION IN LIGHT OF ORIGINAL MEANING WHEN
      EVALUATING ESTABLISHMENT CLAUSE CLAIMS .................. 2

II.   HISTORICAL SUPPORT FOR PUBLIC RELIGIOUS
      DISPLAYS ......................................................................... 5

      A.    A Wall of Separation?.................................................. 6

      B.    The First Federal Congress and President Washington ........... 10

      C.    Religious Language and Symbols on Public Property ............. 12

            1.    A Protestant Version of the Ten
                  Commandments? ............................................ 13

            2.    Ten Commandments as a Source of Law ...................... 17

      D.    Ten Commandments in Public Schools? ................................. 20

III.  H.B. 71 IS CONSISTENT WITH RECENT SUPREME
      COURT PRECEDENT ....................................................... 23

IV.   EXCLUDING DISPLAYS OF THE TEN
      COMMANDMENTS BECAUSE THEY ARE RELIGIOUS
      OFFENDS PRINCIPLES OF FAIRNESS ....................................... 28

CONCLUSION ............................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*ACLU Nebraska Foundation v. City of Plattsmouth,*
  419 F.3d 772 (2005) ......................................................................17

*ACLU of Kentucky v. Mercer County,*
  432 F.3d 624 (6th Cir. 2005), *reh'g denied*, 446 F.3d 651 (6th Cir. 2006).........25

*Agostini v. Felton,*
  521 U.S. 203 (1997) ......................................................................24

*Am. Legion v. Am. Humanist Ass'n,*
  588 U.S. 19 (2019) ...................................................................*passim*

*Card v. City of Everett,*
  520 F.3d 1009 (9th Cir. 2008) ..................................................13, 17

*County of Allegheny v. American Civil Liberties Union,*
  492 U.S. 573 (1989) ...................................................................... 5

*Edwards v. Aguillard,*
  482 U.S. 578 (1987) ......................................................................27

*Espinoza v. Mont. Dep't of Revenue,*
  591 U.S. 464 (2020) ....................................................4, 24, 28, 29

*Everson v. Board of Ed.,*
  330 U.S. 1 (1947) .......................................................................... 2

*Kennedy v. Bremerton School Dist.,*
  597 U.S. 507 (2022) .......................................................4, 5, 25, 29

*Lee v. Weisman,*
  505 U.S. 577 (1992) ...............................................................27, 29

*Lemon v. Kurtzman,*
  403 U.S. 602 (1971) ...................................................................*passim*

*Lynch v. Donnelly,*
  465 U.S. 668 (1984) ......................................................................24

*McCreary County v. American Civil Liberties Union of Ky.,*
  545 U.S. 844 (2005) ................................................................ 4, 24-25

*McGowan v. Maryland*,
366 U.S. 420 (1961) ......................................................19

*Reynolds v. United States*,
98 U.S. 145 (1879) ........................................................ 6

*Sch. Dist. of Abington Twp. v. Schempp*,
374 U.S. 203 (1963) .............................................3, 23, 27

*Sch. Dist. of Grand Rapids v. Ball*,
473 U.S. 373 (1985) ......................................................24

*Stone v. Graham*,
449 U.S. 39 (1980) ..............................................23, 24, 25

*Town of Greece v. Galloway*,
572 U.S. 565 (2013) ...................................................... 5

*Trinity Lutheran v. Comer*,
582 U.S. 449 (2017) ......................................................28

*United States v. Rahimi*,
602 U.S. __, 144 S. Ct. 1889 (2024) ................................. 3

*Van Orden v. Perry*,
545 U.S. 677 (2005) ................................................*passim*

**Statutes & Other Authorities:**

U.S. Const., art. I, § 7, cl. 2 ................................................19

H. Con. Res. 31, 105th Cong. (1997–1998) .........................18

La. R.S. § 17:2124(A)(3) ....................................................17

La. R.S. § 17:2124(A)(6) ....................................................14

Louisiana House Bill 71 ................................................*passim*

Daniel L. Dreisbach, READING THE BIBLE WITH THE FOUNDING FATHERS
(2016) ...........................................................................18

Daniel L. Dreisbach, THOMAS JEFFERSON AND THE WALL OF SEPARATION
BETWEEN CHURCH AND STATE (2002) ......................7, 9, 10

Daniel L. Dreisbach & Mark David Hall, SACRED RIGHTS OF CONSCIENCE
(2009) ..........................................................6, 11, 12, 20

David D. Hall, A REFORMING PEOPLE (2011) .......................................................19

Derek H. Davis, RELIGION AND THE CONTINENTAL CONGRESS, 1774 –
   1789: CONTRIBUTIONS TO ORIGINAL INTENT (2000) ............................................ 7

DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS, 1789–1791
   (Linda Grant De Pauw et al. eds., 1972) .............................................11

Eric Nelson, THE HEBREW REPUBLIC: JEWISH SOURCES AND THE
   TRANSFORMATION OF POLITICAL THOUGHT (2010) .............................................19

Henry Warner Bowden, AMERICAN INDIANS AND CHRISTIAN MISSIONS
   (1981) .............................................................................................................21

James Hutson, *Thomas Jefferson's Letter to the Danbury Baptists: A
   Controversy Rejoined*, THE WILLIAM AND MARY QUARTERLY, 56
   (Oct. 1999) ...................................................................................................10

Mark David Hall, DID AMERICA HAVE A CHRISTIAN FOUNDING?:
   SEPARATING MODERN MYTH FROM HISTORICAL TRUTH (2019)........................... 6

Mark David Hall, *Jeffersonian Walls and Madisonian Lines: The Supreme
   Court's Use of History in Religion Clause Cases,* 85 OREGON LAW
   REVIEW 563 (2006).............................................................................................3, 6

Mark David Hall, *Madison's Memorial and Remonstrance, Jefferson's
   Statute for Religious Liberty, and the Creation of the First Amendment*,
   3 AMERICAN POLITICAL THOUGHT 32 (Spring 2014)........................................... 6

Mark David Hall, PROCLAIM LIBERTY THROUGHOUT ALL THE LAND: HOW
   CHRISTIANITY HAS ADVANCED FREEDOM AND EQUALITY FOR ALL
   AMERICANS (2023) ................................................................................ 12-13, 22

Nathan S. Chapman, *Forgotten Federal-Missionary Partnerships: New
   Light on the Establishment Clause*, 96 NOTRE DAME LAW REVIEW 701
   (2020).............................................................................................................21

Nathan S. Chapman & Michael W. McConnell, AGREEING TO DISAGREE:
   HOW THE ESTABLISHMENT CLAUSE PROTECTS RELIGIOUS DIVERSITY AND
   FREEDOM OF CONSCIENCE (2023)....................................................................... 4

THE NEW ENGLAND PRIMER IMPROVED: FOR THE MORE EASY ATTAINING
   THE TRUE READING OF ENGLISH: TO WHICH IS ADDED THE ASSEMBLY OF
   DIVINES, AND MR. COTTON'S CATECHISM (1777)...............................................21

Paul Finkelman, *The Ten Commandments on Courthouse Laws and Elsewhere*, 73 FORDHAM LAW REVIEW 1486 (2005) .................................... 16-17

Sue A. Hoffman, IN SEARCH OF GOD AND THE TEN COMMANDMENTS: ONE PERSON'S JOURNEY TO PRESERVE A SMALL PART OF AMERICA'S GOD-GIVEN VALUES AND FREEDOMS (self-published, 2014) ...................................... 13

Steven Green, *The Fount of Everything Just and Right?, The Ten Commandments as a Source of American Law*, 13 THE JOURNAL OF LAW AND RELIGION 525 (2000) .................................................................. 18

Steven K. Green, THE SECOND DISESTABLISHMENT: CHURCH AND STATE IN NINETEENTH-CENTURY AMERICA (2010) .......................................................... 22

## INTEREST OF AMICI CURIAE[1]

**THE CONSCIENCE PROJECT** advances freedom of conscience and the right to practice one's faith free from interference by the government through public education that includes insightful commentary and legal analysis as well as in filing *amicus* briefs in key religious freedom cases.

**MARK DAVID HALL** is a Professor in Regent University's Robertson School of Government, Director of Religious Liberty in the States, Senior Fellow at the Center for the Study of Law and Religion at Emory University, and a Senior Fellow at Baylor University's Institute for Studies of Religion. He is an expert in the history of religious liberty and church-state relations in the United States. He is the author or co-editor of numerous books and articles on religious liberty and church-state relations in the United States.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Walk into any public school in America today and you will find posters promoting kindness, friendship and generosity. In many school districts, there will also be signs celebrating racial, sexual orientation, and gender equality. Why not add to this visual feast a list of "rules to live by," an acknowledgment of a

---

[1] All parties have consented to the filing of this brief. Neither party's counsel authored this brief in whole or in part, and no one other than *amici* or their counsel contributed money to fund the preparation or submission of this brief.

document whose precepts are embraced by more than a billion people around the world?

Exposing young learners to the Ten Commandments is not something new. Since our nation's founding, it has been common to include religious language and images on public property. And since the mid-twentieth century, the Ten Commandments have regularly been displayed on land and in buildings owned by local, state, and the national government.

Public schools in the United States today are not "neutral" spaces. They include a wide range of ideas and acknowledgments of citizens' viewpoints on their walls. Adding the Ten Commandments to the conversation is a far cry from the government establishing a religion. On the contrary, excluding their display because of their religious origins evinces a hostility to religion that offends the general nondiscrimination principles of the Constitution.

## ARGUMENT

I.     COURTS MUST CONSIDER HISTORY AND TRADITION IN LIGHT OF ORIGINAL MEANING WHEN EVALUATING ESTABLISHMENT CLAUSE CLAIMS

The Establishment Clause is best understood through the prism of history and tradition. As Justice Black explained, the "meaning and scope of the First Amendment" have been interpreted in "light of its history and the evils it was designed forever to suppress." *Everson v. Board of Ed.*, 330 U.S. 1, 14–15 (1947).

2

This proposition has been widely embraced by Supreme Court justices across the ideological spectrum, including those who viewed the Constitution's meaning as changing over time. See Mark David Hall, *Jeffersonian Walls and Madisonian Lines: The Supreme Court's Use of History in Religion Clause Cases*, 85 OREGON LAW REVIEW 563-614 (2006). Justice Brennan, for example, asserted that "the line we must draw between the permissible and the impermissible is one which accords with history and faithfully reflects the understanding of the Founding Fathers." *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 294 (1963) (Brennan, J., concurring).

As Justice Kavanaugh recently explained the relevant principle, the reason for making history an interpretive anchor, particularly when it comes to broadly stated principles in the Bill of Rights, is that the alternative entails a court that "implement[s] its own policy judgments" about the underlying right. *United States v. Rahimi*, 602 U.S. __, 144 S. Ct. 1889, 1910 (2024) (Kavanaugh, J., concurring). More specifically, a court must engage in constitutional interpretation in such cases "by examining text, pre-ratification and post-ratification history, and precedent." *Id.* Justice Kavanaugh asserted the operative central principle as an originalist one: "The first and most important rule in constitutional interpretation is to heed the text—that is, the actual words of the Constitution—and to interpret that text according to its ordinary meaning as originally understood." *Id.* at 1910–11.

There have, of course, been widely recognized, significant fluctuations in the Supreme Court's holdings on the Establishment Clause over the years, but they are a product of a "history of religious establishment relied on by the Court" that was "radically incomplete and often misleading." NATHAN S. CHAPMAN & MICHAEL W. MCCONNELL, AGREEING TO DISAGREE: HOW THE ESTABLISHMENT CLAUSE PROTECTS RELIGIOUS DIVERSITY AND FREEDOM OF CONSCIENCE, 5–6 (2023). For too long, that distorted interpretation pitted the Establishment Clause against the Free Exercise Clause and led to unfounded judicial hostility toward religion— trends that more recent decisions have been correcting. *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 494–96 (2020) (Thomas, J., concurring); CHAPMAN & MCCONNELL, *supra*, at 3–5, 188.

The Court's distortions resulted from reliance on the ahistorical test of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), and its "endorsement test offshoot," which the more recent Court has accordingly rejected in favor of "[a]n analysis focused on original meaning and history." *Kennedy v. Bremerton School Dist.*, 597 U.S. 507, 534–36 (2022). Tellingly, even during the era of the endorsement test, five justices on the Court agreed in *Van Orden v. Perry*, 545 U.S. 677 (2005), that a granite monument commemorating the Ten Commandments on the Texas State House grounds did not violate the Establishment Clause, though another five-justice majority in *McCreary County v. American Civil Liberties Union of Ky.*, 545

U.S. 844 (2005), decided the same day, reached the opposite conclusion on the posting of the Ten Commandments in courthouses.

As *Kennedy* made clear, *id.* at 535, the *Lemon* and endorsement tests have given way to a requirement "that the Establishment Clause must be interpreted 'by reference to historical practices and understandings.'" *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2013) (quoting *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 670 (1989) (Kennedy, J., concurring in judgment in part and dissenting in part)). See also *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 19, 61 (2019) (plurality opinion).

*Kennedy* also left no doubt that the Establishment Clause, Free Exercise Clause, and Free Speech Clause "have 'complementary' purposes, not warring ones where one Clause is always sure to prevail over the others." 597 U.S. at 533. In a case involving prayer by a public school football coach, the Court found "no conflict between the constitutional commands" of the First Amendment, and to contend otherwise would be to present "a false choice premised on a misconstruction of the Establishment Clause." *Id.* at 543.

## II.    HISTORICAL SUPPORT FOR PUBLIC RELIGIOUS DISPLAYS

In *Everson*, both Justice Black, in his majority opinion, and Justice Rutledge, in his dissent, sought to interpret the Establishment Clause in light of the founders' views. But they erred by primarily focusing on select texts by Thomas Jefferson

and James Madison and concluding that the First Amendment requires the strict
separation of church and state. See MARK DAVID HALL, DID AMERICA HAVE A
CHRISTIAN FOUNDING?: SEPARATING MODERN MYTH FROM HISTORICAL TRUTH,
57–120 (2019); Mark David Hall, *Madison's Memorial and Remonstrance,
Jefferson's Statute for Religious Liberty, and the Creation of the First
Amendment*," 3 AMERICAN POLITICAL THOUGHT 32–63 (Spring 2014); Mark David
Hall, *Jeffersonian Walls and Madisonian Lines,* at 563–614. America's founders
understood the Establishment Clause to prohibit the creation of a national church,
but they did not understand it to require a religion-free public square.

A. A Wall of Separation?

In 1802, Thomas Jefferson wrote to the Danbury Baptist Association
suggesting that the First Amendment created a "wall of separation between Church
& State." DANIEL L. DREISBACH & MARK DAVID HALL, SACRED RIGHTS OF
CONSCIENCE, 528 (2009). The letter was first referenced by the Supreme Court in
the Free Exercise Clause case of *Reynolds v. United States*, 98 U.S. 145 (1879), but
lay dormant with respect to the Supreme Court's Establishment Clause
jurisprudence until *Everson*. DREISBACH & HALL, SACRED RIGHTS OF CONSCIENCE,
533–34.

As appealing as the wall metaphor is to contemporary activists, it obscures
far more than it illuminates. Jefferson did not help draft or ratify the First

Amendment, so it is not clear why his understanding of it should be privileged. As well, the letter was a profoundly political document, not a principled statement of Jefferson's constitutional views. Indeed, the metaphor did not originate with Jefferson, and he used it only once in his life. DANIEL L. DREISBACH, THOMAS JEFFERSON AND THE WALL OF SEPARATION BETWEEN CHURCH AND STATE, 21–22 (2002). And in his public life, he did not act as if there was a wall of separation between church and state—certainly not one that prohibited any recognition of religion in the public square.

In 1776, the Continental Congress appointed Benjamin Franklin, John Adams, and Thomas Jefferson to a committee to begin the process of creating a national seal. Jefferson proposed that the Nation adopt one with the images of:

> Pharaoh sitting in an open chariot, a crown on his head & a sword in his hand, passing through the divided waters of the Red Sea in pursuit of the Israelites: rays from a pillar of fire in the cloud, expressive of the divine presence & command, reaching to Moses who stands on the shore &, extending his hand over the sea, causes it to overwhelm Pharaoh.

*Id.* at 229. His motto for the new Nation would have been: "Rebellion to tyrants is obedience to God." *Id.* Jefferson "later suggested it as an alternative motto for the Great Seal of Virginia, and he later added it to his personal seal." DEREK H. DAVIS, RELIGION AND THE CONTINENTAL CONGRESS, 1774 – 1789: CONTRIBUTIONS TO ORIGINAL INTENT, 138 (2000).



Jefferson's proposed national seal was drawn by Benjamin J. Lossing and

originally published in the July 1856 issue of Harpers' *New Monthly Magazine*.

Note that Jefferson thought it appropriate to portray a miraculous event

involving the prophet Moses *on the national seal*. According to Exodus 19–20, it

was Moses who received the Ten Commandments from God on Mount Sinai. It

thus seems unlikely that Jefferson would have a principled objection to a state

erecting a monument commemorating the Ten Commandments or putting posters of them in school classrooms.

As governor of Virginia, Jefferson encouraged "the good people of this commonwealth" to set apart a day for "public and solemn thanksgiving and prayer to Almighty God" and urged "ministers of religion to meet their respective societies . . . to assist them in their prayers, edify them with their discourses, and generally to perform the sacred duties of their function, proper for the occasion." See DREISBACH, THOMAS JEFFERSON, 138–39. He also drafted bills stipulating when the governor could appoint "days of public fasting and humiliation, or thanksgiving." DREISBACH & HALL, SACRED RIGHTS OF CONSCIENCE, 251–52.

Unlike Washington, Adams, and Madison, Jefferson did not issue formal calls for prayer when he was president of the United States. Yet in more than one speech he invited his audiences to pray. For instance, Jefferson closed his second inaugural address by asking his listeners to "join with me in supplications, that he [the "Being in whose hands we are, who led our forefathers, as Israel of old"] will enlighten the minds of your servants . . ." *Id.* at 530.

Remarkably, for someone supposedly committed to a "wall of separation between church and state," in 1803 Jefferson sent a treaty concerning the Kaskaskia Indians to the Senate for approval. The third article in the treaty stipulated that:

> *whereas*, the greater part of the said tribe have been baptized and
> received into the Catholic church to which they are much attached, the
> United States will give annually for seven years one hundred dollars
> towards the support of a priest of that religion, who will engage to
> perform for the said tribe the duties of his office and also to instruct as
> many of their children as possible in the rudiments of literature.  And
> the United States will further give the sum of three hundred dollars to
> assist the said tribe in the erection of a church.

*Id.* at 476.

When he was president, Jefferson regularly worshipped in the Capitol and,
in addition, "made executive-branch buildings—the Treasury and the War
Office—available for church services." James Hutson, *Thomas Jefferson's Letter
to the Danbury Baptists: A Controversy Rejoined*, THE WILLIAM AND MARY
QUARTERLY, 56 (Oct. 1999). After he "retired from the presidency, he resumed his
earlier habit of worshiping in the Albemarle County Courthouse." *Id.* at 788.

Jefferson's private letters make it clear that he was not an orthodox
Christian, and his public arguments and actions demonstrate that he favored a
stricter separation between church and state than virtually any other founder.  Yet
even Jefferson, at least in his actions, did not attempt to remove religion from the
public square. And what Jefferson did not completely exclude, most founders
embraced.

B.  The First Federal Congress and President Washington

When the first federal Congress met in 1789, one of its first acts was to
agree to appoint and pay congressional chaplains. Shortly after doing so, it

reauthorized the Northwest Ordinance, which holds that "Religion, Morality, and knowledge being necessary to good government and the happiness of mankind, Schools and the means of education shall forever be encouraged." DREISBACH & HALL, SACRED RIGHTS OF CONSCIENCE, 471–73, 238.

Significantly, on the day after the House approved the final wording of the Bill of Rights, Elias Boudinot, later president of the American Bible Society, proposed that Congress ask the President to recommend a day of public thanksgiving and prayer. In response to objections that these practices mimicked European customs and that such calls were properly issued by States, Founding Father Roger Sherman "justified the practice of thanksgiving, on any signal event, not only as a laudable one in itself, but as warranted by a number of precedents in holy writ: for instance, the solemn thanksgivings and rejoicings which took place in the time of Solomon, after the building of the temple, was a case in point. This example, he thought, worthy of Christian imitation on the present occasion; and he would agree with the gentleman who moved the resolution." DOCUMENTARY HISTORY OF THE FIRST FEDERAL CONGRESS, 1789–1791 11: 1500–1501 (Linda Grant De Pauw et al. eds., 1972).

The House approved the motion and appointed Boudinot, Sherman, and Peter Silvester of New York to a committee to consult Senators about the matter. The Senate concurred with the House, and Congress requested that President

11

Washington issue his famous and theologically robust 1789 Thanksgiving Proclamation. DREISBACH & HALL, SACRED RIGHTS OF CONSCIENCE, 453–54; see also *Van Orden v. Perry*, 545 U.S. 677, 686–87 (2005).

It would appear that the first Congress and the first president of the United States did not think it inappropriate for the chief executive to encourage his fellow citizens to pray and to recognize the importance of faith.

The founding and early national eras reveal almost no support for the proposition that America's founders desired to build a "high and impregnable" wall of separation between church and state. Few civic leaders desired the strict separation of church and state. To be sure, many had concluded that States should not have official, established churches, and they were against government coercion in matters of faith. But none understood the Establishment Clause to prohibit civic officials from incorporating religious language or symbols into public buildings and monuments.

C. Religious Language and Symbols on Public Property

In some cases, as with crosses and Stars of David, images are clearly identifiable with a particular religion. In others, as with the Ten Commandments, they are connected to more than one faith but may also have multiple meanings (much as a rainbow can symbolize God's covenant with Noah or LGBTQ Pride). See MARK DAVID HALL, PROCLAIM LIBERTY THROUGHOUT ALL THE LAND: HOW

CHRISTIANITY HAS ADVANCED FREEDOM AND EQUALITY FOR ALL AMERICANS, 141–63 (2023) (documenting religious language and images on public property throughout the nation).

The following sections address displays of the Ten Commandments on public property:

### 1. A Protestant Version of the Ten Commandments?

In the mid-twentieth century, "Minnesota Judge E. J. Ruegemer proposed that the Ten Commandments be widely disseminated as a way of combating juvenile delinquency." *Am. Legion*, 588 U.S. at 53. He formed a committee to develop a "version of the Ten Commandments which was not identifiable to any particular religious group." *Card v. City of Everett,* 520 F.3d 1009, 1012 (9th Cir. 2008). He eventually partnered with Cecil B. DeMille and the Fraternal Order of Eagles to help place granite monuments inscribed with the Ten Commandments throughout the United States. *Id.* at 1012–13. See also SUE A. HOFFMAN, IN SEARCH OF GOD AND THE TEN COMMANDMENTS: ONE PERSON'S JOURNEY TO PRESERVE A SMALL PART OF AMERICA'S GOD-GIVEN VALUES AND FREEDOMS, 76–79 (self-published, 2014).

Ruegemer's committee attempted to create a version of the Ten Commandments that could not be identified with any particular tradition, but after the first monuments were erected "people who were not Catholic or Lutheran were

quick to point out that the numbering sequence was inconsistent with their religious background." *Id.* at 71. Although English translations of the original Hebrew text differ in the placement of textual pauses and thought-breaks, there is little disagreement among Jewish and Christian traditions as to the overall substance of the Ten Commandments. Nevertheless, in response to such comments, the Eagles altered the way in which the Commandments were presented to overcome "any possible objection to the version of the Ten Commandments." *Id.* at 73. The most significant change involved removing the numbers before each commandment. Most post-1958 Ten Commandments monuments include this version of the text—including the monuments at issue in *Van Orden v. Perry*, 545 U.S. 677 (2005), and the text that would be included on posters in Louisiana (hereinafter "Louisiana text"). Indeed, Louisiana House Bill 71 requires the text used in classrooms to be "identical" to the text upheld in *Van Orden*. La. R.S. § 17:2124(A)(6).

Because the lines of this text are not numbered, it is possible to read them with thought-breaks in different places. For instance, a Jewish citizen may read the line, "I AM the Lord thy God," as the First Commandment, while a Protestant might read the lines "I AM the Lord thy God. Thou shalt have no other gods before me" as the First Commandment (or as a preface and the First Commandment).

Similarly, one could understand the phrase "Thou shalt not take the name of the Lord thy God in vain" to be either the Second or the Third Commandment.

Presentations of the Ten Commandments are usually drawn from Exodus 20, but in no display of which we are aware is the chapter copied verbatim. The King James version contains 561 words, whereas the Louisiana text contains 121 words. Obviously, many passages were removed.

For instance, the King James 1611 version begins:

And God spake all these words, saying, **I am the Lᴏʀᴅ thy God**, which have brought thee out of the land of Egypt, out of the house of bondage. **Thou shalt have no other gods before me** (Exodus 20:1–3).

Whereas the Catholic Douay-Rheims 1899 American edition begins:

And the Lord spoke all these words: **I am the Lord thy God**, who brought thee out of the land of Egypt, out of the house of bondage. **Thou shalt not have strange gods before me** (Exodus 10:1–3).

The Jewish Publication Society's 1917 translation of these verses reads:

And God spoke all these words, saying: **I am the LORD thy God**, who brought thee out of the land of Egypt, out of the house of bondage. **Thou shalt have no other gods before Me**.

The Louisiana text condenses these verses as follows:

I AM the LORD thy God

Thou shalt have no other gods before me

Note that the text adopted by Louisiana is very similar to the bolded phrases from each edition above.

15

Plaintiffs' proffered expert Professor Steven K. Green contended that one can tell that the Louisiana text is taken from the King James version of the Bible because it "uses the words 'Thou,' which we don't use very often these days unless you're reading from the King James Bible." ROA. 2391 (Green Testimony at 67). But note that all three versions quoted above use the word "Thou." There are minor differences in the English translations of Exodus 20, but it is not clear that the committee used language from the King James Bible; certainly the use of "Thou" offers no proof that they did.

There is no doubt that editorial decisions were made, and Professor Green may well be correct that a Jewish version of the Ten Commandments extracted from Exodus 20 would contain the language about God's role in rescuing His people from Egypt in the First Commandment. ROA. 875 (Green Report at 28). Similarly, Professor Green may be correct that some Catholic translations do not warn against making "graven images," see ROA. 876 (Green Report at 29), although the Catholic Douay-Rheims version utilized above does. Professor Green may be unaware of this fact as he seems to rely on an article by Paul Finkelman rather than comparing English versions of Exodus 20 that would have been readily available to drafters of the text in question in the 1950s. Interestingly, Finkelman characterizes the text of the Texas Ten Commandments monument as "Lutheran," see Paul Finkelman, *The Ten Commandments on Courthouse Laws and Elsewhere*,

73 FORDHAM LAW REVIEW 1486 (2005), rather than "Protestant," as Green claims. ROA. 873-74 (Green, Report at 26–27). Lutherans are Protestants, but they list the Commandments differently than other Protestants. Nevertheless, both interpretations are incorrect—the text (in both translation and presentation) is non-sectarian.

Much like Judge Ruegemer and company, see *Card*, 520 F.3d at 1012, the goal of those drafting H.B. 71 was to adopt a version not readily identifiable to any particular religious group. In fact, the United States Court of Appeals for the Eighth Circuit found that a monument with this text in question contains "a nonsectarian version of the Ten Commandments." *ACLU Nebraska Foundation v. City of Plattsmouth*, 419 F.3d 772, 773 (2005)*; see also* Brief of the Fraternal Order of Eagles as *amicus curiae* in Support of Respondents. *Van Orden*, 2005 WL 263789, 2005 U.S. S. Ct. Briefs LEXIS 134 (Supreme Court of the United States January 31, 2005), 5–9. Plaintiffs' expert gives no good reason to doubt this conclusion.

### 2. Ten Commandments as a Source of Law

In H.B. 71, Louisiana notes the Court's acknowledgment that the Ten Commandments are "one of the foundations of our legal system." La. R.S. § 17:2124(A)(3). Plaintiffs' expert asserts that this is "contradicted by the historical record," ROA. 858 (Green Report at 11), although in an earlier law review article

Green wrote that "[i]t is axiomatic that many of the principles contained in the Ten Commandments are fundamental to the Western legal tradition . . . of which the American legal system is part." See Steven Green, *The Fount of Everything Just and Right?, The Ten Commandments as a Source of American Law*, 13 THE JOURNAL OF LAW AND RELIGION 525 (2000).

Professor Green may well have changed his mind, but it is indisputable that many civic leaders and jurists have viewed the Ten Commandments as a foundation of American law.  To give just a few of many examples, John Quincy Adams wrote to his son that:

> The law given from Sinai was a civil and municipal as well as a moral and religious code; it contained many statutes adapted to that time only, and to the particular circumstances of the nation to whom it was given; but many others were of universal application—laws essential to the existence of men in society, and most of which have been enacted by every nation which ever professed any code of laws.

See DANIEL L. DREISBACH, READING THE BIBLE WITH THE FOUNDING FATHERS, 46 (2016). In 1997, the House of Representatives recognized that "the Ten Commandments set forth a code of moral conduct, observance of which is universally acknowledged to promote respect for our system of laws and the good of society." H.Con.Res. 31, 105th Cong. (1997–1998).

In attempting to prove that the Ten Commandments are not a source of American law, Professor Green makes the remarkable assertion that "Puritans believed they were bound by the New Testament, rather than the Old Testament, in

which the Ten Commandments are introduced." See ROA. 859 (Green Report at

12). This is simply false. Calvinists—including the American Puritans—took

Levitical law seriously, and it had a major impact upon their societies and laws.

See ERIC NELSON, THE HEBREW REPUBLIC: JEWISH SOURCES AND THE

TRANSFORMATION OF POLITICAL THOUGHT (2010); DAVID D. HALL, A REFORMING

PEOPLE (2011).

The influence of the Ten Commandments on American law is particularly

evident with respect to legislation concerning the Ten Commandments' admonition

to "Remember the sabbath day, to keep it holy" (Exodus 20:8). Colonial and State

legislatures regularly prohibited work on Sunday. Indeed, 49 of 50 states retained

statutes as late as 1961 when they were found to be constitutionally permissible.

*McGowan v. Maryland*, 366 U.S. 420, 420-543 (1961).

Although Plaintiffs' expert asserts that it is significant that the Ten

Commandments were not cited at the Constitutional Convention or the ratification

debates, see ROA. 862-63 (Green Report at 16-17), he neglects to note that the

Constitutional Convention met every day of the week except Sunday, and that the

delegates assumed that Congress would not conduct business on Sunday. See

Article I, Section 7, Clause 2 of the United States Constitution. In short, there can

be no doubt that the Third or Fourth Commandment, depending on the numbering

scheme, was a source for a great deal of legislation and a constitutional provision.

19

D. Ten Commandments in Public Schools?

In H.B. 71, Louisiana requires that the Ten Commandments be displayed with a "context statement" that notes that the Commandments have long been a prominent part of American public education. They appear in some editions of textbooks such as *The New England Primer, McGuffey's Readers,* and *The American Spelling Book.*

The Plaintiffs' expert challenges aspects of the context statement, and he makes some valid points. For instance, K–12 schools run by governments did not really exist before the 1820s. However, colonies like Massachusetts Bay required parents to ensure that their children and apprentices learn how to read and have "knowledge of the Capital laws." DREISBACH & HALL, SACRED RIGHTS OF CONSCIENCE, 94. These laws were replete with references to biblical laws and included citations to the Hebrew Scriptures. Moreover, the colony required masters of families to "catechize their children and servants in the grounds & principles of Religion." *Id.* Other New England colonies had similar statutes.

Professor Green is correct that "[e]ducation at the time of the Founding occurred in *private* academies or through tutors and generally had a strong religious component due to the dominance of clergy as teachers." ROA. 865 (Green Report at 18).

Although schools were not generally run by governments, at least in New England education was required by them. Teachers or tutors often utilized editions of the *New England Primer* that included the Ten Commandments. The 1777 edition of the *Primer*, for instance, included the entire Westminster Shorter Catechism, which contains 40 questions (41–81) concerning the Ten Commandments. See THE NEW ENGLAND PRIMER IMPROVED: FOR THE MORE EASY ATTAINING THE TRUE READING OF ENGLISH: TO WHICH IS ADDED THE ASSEMBLY OF DIVINES, AND MR. COTTON'S CATECHISM (1777).

Until the 20th century, the federal government had little to do with K–12 education; except when it came to Native Americans. The federal government routinely partnered with Christian missionaries to run and teach in these schools. See Nathan S. Chapman, *Forgotten Federal-Missionary Partnerships: New Light on the Establishment Clause*, 96 *Notre Dame Law Review* 701, 677–748 (2020); see also HENRY WARNER BOWDEN, AMERICAN INDIANS AND CHRISTIAN MISSIONS, 191-221 (1981). Again, it would be shocking if they did not teach the Ten Commandments—not just as a matter of history, but as religious truth.

When states finally got involved in running public schools, one of their major goals was to inculcate morality, including through religious texts. Horace Mann of Massachusetts, sometimes called the father of the public school system, wrote that a nonsectarian public school "earnestly inculcates all Christian morals; it

21

founds its morals on the basis of religion; it welcomes the religion of the Bible; and, in receiving the Bible, it allows it to do what it is allowed by no other system—*to speak for itself*." See STEVEN K. GREEN, THE SECOND DISESTABLISHMENT: CHURCH AND STATE IN NINETEENTH-CENTURY AMERICA, 262 (2010) (emphasis in original).

To Roman Catholics, this was a very Protestant way of teaching religion. So, too, was the common practice of using the King James version of the Bible rather than the Douay-Rheims version favored by Catholics. When Catholics objected to funding what they considered to be Protestant schools and asked for a share of state funds or that the Douay-Rheims Bible be read to their children, they were accused of being "sectarian." On more than one occasion, such requests were met with violence. See HALL, PROCLAIM LIBERTY, 117–40.

As Professor Green points out, the insistence on utilizing the King James Version of the Bible in public schools led to conflicts well into the twentieth century. Some states voluntarily removed Bible teaching and religious exercises from public schools, but the point remains that there is a long history and tradition of reading and teaching about the Bible in American schools—from the early colonies to the 1960s. ROA. 866-67 (Green Report at 19-20).

Even as the Supreme Court declared devotional exercises in public schools to be unconstitutional, justices made it clear that "[t]he holding of the Court today

plainly does not foreclose teaching about the Holy Scriptures or about the differences between religious sects in classes in literature or history." *Schempp,* 374 US 203, 300 (1963) (Brennan, J., concurring); see also 374 U.S. at 225. If it is constitutional to teach about Ten Commandments in public schools, surely it is permissible to post copies of this important text along with other texts and a context statement in public school classrooms.

### III.   H.B. 71 IS CONSISTENT WITH RECENT SUPREME COURT PRECEDENT

Plaintiffs insist that Supreme Court precedent is on their side. Look more closely, however, and it is clear they are relying on old cases from an era in which the Court misunderstood and trivialized religion.

In 1980, the Supreme Court struck down a Kentucky law mandating the display of the Ten Commandments in public school classrooms. The 5–4 majority in *Stone v. Graham*, 449 U.S. 39 (1980), however, applied the now-discredited *Lemon* test. *Lemon v. Kurtzman*, 403 U.S. 602 (1971), called for an examination of a law's purposes, effects, and potential for entanglement with religion—in effect, creating an ahistorical new barrier between church and state. Applying this test, the Court in *Stone* concluded that "[t]he pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature." *Stone*, 449 U.S. at 41.

One of the four dissenters, then-Justice William Rehnquist, was not convinced. "The Establishment Clause does not require that the public sector be insulated from all things which may have a religious significance or origin." *Id.* at 45–46. Rehnquist agreed with Kentucky lawmakers that the Ten Commandments "have had a significant impact on the development of secular legal codes of the Western World." *Id.* at 45. He also observed: "The fact that the asserted secular purpose may overlap with what some may see as a religious objective does not render it unconstitutional." *Id.* at 44.

*Stone*'s inapplicability to H.B. 71 is clear from two levels of jurisprudential development. First, the Court handed the decision down at a time when the prevailing "separationist interpretation" under the *Lemon* test "sometimes bordered on religious hostility," *Espinoza*, 591 U.S. at 494 (Thomas, J., concurring), and years before Justice O'Connor first proposed the endorsement test in *Lynch v. Donnelly*, 465 U.S. 668, 687–89 (1984) (O'Connor, J., concurring). By 1997, the Court was applying the endorsement test and paring down (while not eliminating) its earlier hostility. See *Agostini v. Felton*, 521 U.S. 203 (1997), *overruling Sch. Dist. of Grand Rapids v. Ball*, 473 U.S. 373 (1985). The difference under the endorsement test was illustrated by the Court reaching different outcomes on the same day in 2005 regarding the Ten Commandments displays in *McCreary County*

and *Van Orden*. The Sixth Circuit observed later that year the growing

inapplicability of *Stone* as precedent:

> The *McCreary County* majority rejected the notion that *Stone* controls
> simply because the Ten Commandments are involved. 125 S. Ct. at
> 2737-38 ("*Stone* did not purport to decide the constitutionality of
> every possible way the Commandments might be set out by the
> government . . . ."). In fact, *McCreary County* cites *Stone* for support
> only in its discussion of the Counties' original standalone display. *See
> id.* at 2738, n.17. It did not endorse *Stone*'s reasoning in its analysis of
> the Counties' second or third displays. The *Van Orden* plurality
> simply dismissed *Stone* as inapplicable. See *Van Orden*, 125 S. Ct. at
> 2864, n.11 (plurality opinion). Whatever is left of *Stone* is limited to
> circumstances involving public displays of the Ten Commandments in
> isolation.

*ACLU of Kentucky v. Mercer County*, 432 F.3d 624, 634 (6th Cir. 2005),

*reh'g denied*, 446 F.3d 651 (6th Cir. 2006).

Those observations came at a time when the endorsement test was still

operative, and given that the Ten Commandments displays here are not in

isolation, that would be enough to render *Stone* irrelevant here. Still, a second

relevant post-*Stone* development in the Court's Establishment Clause

jurisprudence merits recognition: the rejection of the endorsement test itself.

As *Kennedy* made clear, it was not only the *Lemon* test that the Court had

abandoned, but also its "endorsement test offshoot." 597 U.S. at 534. That

development sealed the coffin of *Stone* as controlling precedent in Ten

Commandments cases and rendered *McCreary County*'s rejection of the displays

involved in that case similarly inapplicable today.

Today the Court interprets the Establishment Clause in light of what it was originally understood to prohibit and "by reference to historical practices and understandings." Freed from the limitations of *Lemon* and its progeny, the Court has repeatedly vindicated government appeals to public displays with religious significance.

Take, for example, *American Legion*, where the Court concluded that the Bladensburg Cross, a 32-foot Latin Cross World War I Memorial that stands on public property in Maryland, did not violate the Establishment Clause. Justice Samuel Alito's opinion for the Court noted that a Cross had significance in addition to being a Christian symbol, and that the passage of time "imbues a religiously expressive monument, symbol, or practice with this kind of familiarity and historical significance, removing it may no longer appear neutral, especially to the local community for which it has taken on particular meaning." 588 U.S. at 30.

Interestingly, Alito pointed to the Ten Commandments to bolster his point: "For believing Jews and Christians, the Ten Commandments are the word of God handed down to Moses on Mount Sinai, but the image of the Ten Commandments has also been used to convey other meanings. They have historical significance as one of the foundations of our legal system, and for largely that reason, they are

depicted in the marble frieze in our courtroom and in other prominent public buildings in our Nation's capital." *Id.* at 53.

Justice Thomas similarly observed that the commission that erected the cross had done "something that the founding generation, as well as the generation that ratified the Fourteenth Amendment, would have found commonplace: displaying a religious symbol on government property." *Id.* at 76 (Thomas, J., concurring in judgment). He also emphasized that "the *sine qua non* of an establishment of religion is 'actual coercion.'" *Id.* at 75.

Granted, this Court should be "particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." See *Edwards v. Aguillard*, 482 U.S. 578, 583–84 (1987). But unlike mandatory religious activity as part of a public school's curriculum, such as Bible readings and the recitation of the Lord's Prayer found by the Court to violate the Constitution, *Schempp*, 374 U.S. 203 (1963), or religious prayer led by clergy during a middle school graduation, *Lee v. Weisman*, 505 U.S. 577 (1992), H.B. 71 mandates only that the Ten Commandments be *displayed*. Students are not compelled to recite them, study them, look at them, or do anything else with them; nor are teachers required to read them aloud to their pupils.

IV.    EXCLUDING DISPLAYS OF THE TEN COMMANDMENTS
BECAUSE THEY ARE RELIGIOUS OFFENDS PRINCIPLES OF
FAIRNESS

H.B. 71 is not intolerant of religious beliefs. Offering schoolchildren the

opportunity to consider the role of the Ten Commandments in the history of the

nation and the world, if anything, is tolerant to those faith traditions that embrace

them. By contrast, a ruling by this Court to ban displays of the Ten

Commandments in Louisiana schools has blatantly anti-Jewish and anti-Christian

implications. Recent Supreme Court cases reaffirm the nondiscrimination

principles of the First Amendment.

For example, in *Trinity Lutheran v. Comer*, 582 U.S. 449 (2017), the Court

ruled unconstitutional a Missouri playground resurfacing program that offered

grants to qualifying nonprofits but excluded those owned or controlled by a church.

"[T]he exclusion of Trinity Lutheran from a public benefit for which it is otherwise

qualified, solely because it is a church, is odious to our Constitution all the same,

and cannot stand," explained Chief Justice John Roberts for the majority. *Id.* at

467. This principle was also applied in *Espinoza* where the Court ruled

unconstitutional Montana's exclusion of religious schools from a state-sponsored

tuition-assistance program. Roberts, again writing for the Court, explained that "[a]

State need not subsidize private education. But once a State decides to do so, it

cannot disqualify some private schools solely because they are religious." 591 U.S. at 487.

In *Kennedy*, the Court observed that "learning how to tolerate speech or prayer of all kinds is 'part of learning how to live in a pluralistic society,' a trait of character essential to 'a tolerant citizenry.'" 597 U.S. at 38 (quoting *Lee*, 505 U.S. at 590. And finally, the Court in *American Legion* warned of the weaponization of the Establishment Clause. "A government that roams the land, tearing down monuments with religious symbolism and scrubbing away any reference to the divine will strike many as hostile to religion." 588 U.S. at 56.

Banning the display of the Ten Commandments, whose historical significance is undeniable, in Louisiana public schools because it also has religious significance offends the nondiscrimination principles of the First Amendment repeatedly reaffirmed by the Court in recent years.

## CONCLUSION

In light of the aforementioned, we urge this Court to reverse the lower court's injunction.

Respectfully submitted,

/s/ ANDREA PICCIOTTI-BAYER
ANDREA PICCIOTTI-BAYER, ATTORNEY AT LAW
1350 Beverly Rd., Suite 115
Mclean VA 22101
(571) 201-6564
amariepicciotti@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 17, 2024, a true and correct copy of the foregoing Brief for Amici Curiae Director for the Conscience Project and Professor Mark David Hall in Support of Appellants was served via electronic filing with the Clerk of Court and all registered ECF users.


Dated: December 17, 2024

/s/ ANDREA PICCIOTTI-BAYER
ANDREA PICCIOTTI-BAYER, ATTORNEY AT LAW
1350 Beverly Rd., Suite 115
Mclean VA 22101
(571) 201-6564
amariepicciotti@gmail.com

## CERTIFICATE OF COMPLIANCE

This brief has been prepared using 14-point, proportionately spaced, serif typeface, in Microsoft Word.  Excluding the parts of the brief exempted by Fed. R. App. P. 32(f), this brief contains 6496 words.

/s/ ANDREA PICCIOTTI-BAYER
ANDREA PICCIOTTI-BAYER, ATTORNEY AT LAW
1350 Beverly Rd., Suite 115
Mclean VA 22101
(571) 201-6564
amariepicciotti@gmail.com