## No. 24-30706

# UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

REVEREND DARCY ROAKE and ADRIAN VAN YOUNG, on behalf of themselves and on behalf of their minor children, A.V. and S.V.; REVEREND MAMIE BROADHURST and REVEREND RICHARD WILLIAMS, on behalf of themselves and on behalf of their minor child, N.W.; REVEREND JEFF SIMS, on behalf of himself and on behalf of his minor children, A.S., C.S. 1, and C.S. 2; JENNIFER HARDING and BENJAMIN OWENS, on behalf of themselves and on behalf of their minor child, A.O.; ERIN HAWLEY and DAVID HAWLEY, on behalf of themselves and on behalf of their minor children, A.H. and L.H.; DUSTIN MCCRORY, on behalf of himself and on behalf of his minor children, E.M., P.M., and L.M; GARY SERNOVITZ and MOLLY PULDA, on behalf of themselves and on behalf of their minor child, T.S.; CHRISTY ALKIRE, on behalf of herself and on behalf of her minor child, L.A.; JOSHUA HERLANDS, on behalf of himself and on behalf of his minor children, E.H. and J.H.,

*Plaintiffs,*

v.

CADE BRUMLEY, in his official capacity as the Louisiana State Superintendent of Education; CONRAD APPEL, in his official capacity as a member of the Louisiana State Board of Elementary and Secondary Education ("LSBESE"); JUDY ARMSTRONG, in her official capacity as a member of the LSBESE; KEVIN BERKEN, in his official capacity as a member of the LSBESE; PRESTON CASTILLE, in his official capacity as a member of the LSBESE; SIMONE CHAMPAGNE, in her official capacity as a member of the LSBESE; SHARON LATTEN-CLARK, in her official capacity as a member of the LSBESE; LANCE HARRIS, in his official capacity as a member of the LSBESE; PAUL HOLLIS, in his official capacity as a member of the LSBESE;

SANDY HOLLOWAY, in her official capacity as a member of the LSBESE; STACEY MELERINE, in her official capacity as a member of LSBESE; RONNIE MORRIS, in his official capacity as a member of the LSBESE; EAST BATON ROUGE PARISH SCHOOL BOARD; LIVINGSTON PARISH SCHOOL BOARD; ORLEANS PARISH SCHOOL BOARD; VERNON PARISH SCHOOL BOARD; and ST. TAMMANY PARISH SCHOOL BOARD,

*Defendants.*

————————————————

On Appeal from the United States District Court for the
Middle District of Louisiana, 3:24-cv-00517,
The Honorable John W. deGravelles, United States District Judge

————————————————

**BRIEF OF *AMICUS CURIAE* PROFESSOR LORIANNE UPDIKE TOLER IN SUPPORT OF NEITHER PARTY**

————————————————

J. Carl Cecere
CECERE PC
6035 McCommas Blvd.
Dallas, TX 75206
Telephone: 469-600-9455
ccecere@cecerepc.com

*Counsel for Amicus Curiae*

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................ iv

TABLE OF AUTHORITIES .........................................................v

STATEMENT OF INTEREST ..................................................... 1

CERTIFICATE OF LENGTH ...................................................... 1

SUMMARY OF THE ARGUMENT .............................................. 1

ARGUMENT ......................................................................... 4

    A. DURING THE PERIOD LEADING UP TO AND FOLLOWING THE
       RATIFICATION OF THE FIRST AMENDMENT, IT WAS WIDELY
       ACCEPTED THAT RELIGION HAD A NECESSARY ROLE IN PROMOTING
       VIRTUE AND REPUBLICAN GOVERNMENT ......................................... 4

    B. THE ACTIONS OF THE CONTINENTAL AND CONFEDERATION
       CONGRESSES AND THE FIRST CONGRESS INDICATE THAT NON-
       COERCIVE, NON-MONETARY GOVERNMENT SUPPORT OF RELIGION
       WAS WIDELY ACCEPTED ..................................................... 9

    C. ALTHOUGH THOMAS JEFFERSON ASSERTED IN HIS LETTER TO THE
       DANBURY BAPTISTS THAT THE ESTABLISHMENT CLAUSE CREATED A
       "WALL OF SEPARATION BETWEEN CHURCH AND STATE," HIS VIEWS
       ON THE ROLE OF RELIGION IN GOVERNMENT CHANGED OVER TIME,
       SHOWING THAT THE LETTER EXPRESSED HIS OPPOSITION TO THE
       IMPOSITION OF UNIFORM RELIGIOUS PRACTICES ........................... 15

CONCLUSION ..................................................................... 19

CERTIFICATE OF COMPLIANCE .............................................. 20

CERTIFICATE OF SERVICE ...................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

## Constitutions

MASS. CONST., pt. 1, art. III (1780), available at
https://www.consource.org/document/constitution-of-massachusetts-
1780-10-25/. ...................................................................................... 5

OHIO CONST., art. VIII, § 3 (1803) ............................................... 18

## Statutes

Northwest Territory Ordinance, art. 1, 3 (July 13, 1787) ...................... 12

Northwest Territory Ordinance, 1st Congress (Aug. 7, 1789) ................ 14

Rules and Articles, for the Better Government of Troops Raised, or to be
Raised, and Kept in Pay by and at Joint Expense of the Twelve United
English Colonies of North America, art. 2 (May 10, 1775) ..................... 12

Rules for the Regulation of the Navy of the United Colonies, art. I–III
(Nov. 28, 1775) ...................................................................................11–12

The Capitall Lawes of New-England, as They Stand Now in Force in the
Commonwealth, Massachusetts Great and General Court (1641) .......... 4

Virginia Statute for Religious Freedom, Virginia General Assembly
(1786) ................................................................................................... 9

## Cases

*Everson v. Bd. of Educ.*,
    330 U.S. 1 (1947) .............................................................................. 9, 15

*Engel v. Vitale*,
    370 U.S. 421 (1962) ........................................................................... 9, 15

*Kennedy v. Bremerton Sch. Dist.*,
    597 U.S. 507 (2022) ................................................................................ 9

*Lemon v. Kurtzman*,
    403 U.S. 602 (1971) ................................................................................ 9

*McCreary Cnty. v. American Civil Liberties Union*,
    545 U.S. 844 (2005) ................................................................................ 9

*Reynolds v. United States*,
98 U.S. 145 (1878)................................................................9, 15

*Sch. Dist. Of Abington Twp. v. Schempp*,
374 U.S. 203 (1963)................................................................. 9

*Van Orden v. Perry*,
545 U.S. 677 (2005)...........................................................9, 15

**Letters**

Draft Letter from Thomas Jefferson to the Danbury Baptists (Jan. 1, 1802), *in* INFORMATION BULLETIN, LIBR. OF CONG. (June 1998), https://www.loc.gov/loc/lcib/9806/danpost.html (last visited Dec. 16, 2024)................................................................................. 15

Letter from John Adams to Benjamin Rush (June 12, 1812), Massachusetts Historical Society, Adams Family Papers, Letterbooks, available at https://founders.archives.gov/documents/Adams/99-02-02-5807....................................................................................... 14

Letter from John Adams to the Massachusetts Militia (Oct. 11, 1798), Massachusetts Historical Society, Adams Papers, available at https://founders.archives.gov/documents/Adams/99-02-02-3102.............. 6

Letter from Thomas Jefferson to Augustus Elias Brevoort Woodward (March 24, 1824), Library of Congress, Papers of Thomas Jefferson, available at https://founders.archives.gov/documents/Jefferson/98-01-02-4139................................................................................... 17

Letter from Thomas Jefferson to the Danbury Baptists (Jan. 1, 1802) *in* 36 THE PAPERS OF THOMAS JEFFERSON, 258 (Barbara B. Oberg ed. 2009), available at https://founders.archives.gov/documents/Jefferson/01-36-02-0152-0006................................................................................ 15

Letter from Thomas Jefferson to James Fishback (Sept. 27, 1809) *in* 1 THE PAPERS OF THOMAS JEFFERSON, RETIREMENT SERIES 565–566 (J. Jefferson Looney ed. 2004), available at https://founders.archives.gov/documents/Jefferson/03-01-02-0437-0003...........................................16–17

Petition from Westmoreland County to Virginia General Assembly (Nov. 2, 1785) *in Legislative Petitions Digital Collection*, LIBR. OF VA., https://rosetta.virginiamemory.com:443/delivery/DeliveryManagerServl et?dps_pid=IE2906121 (last visited Dec. 8, 2024). .................................... 8

**Books**

*Isaiah* 49:23 (King James Version) ............................................................ 5

JAMES H. HUTSON, RELIGION AND THE FOUNDING OF THE AMERICAN REPUBLIC (1998) ...................................................................... 4–14, 16–19

THOMAS PAINE, COMMON SENSE (Jan. 10, 1776) *in* 1 THE WRITINGS OF THOMAS PAINE 67 (ed. Moncure Daniel Conway, G.P. Putnam's Sons 1894), https://books.google.com/books?id=QDRtep6MI74C&pg=PA67 &source=gbs_selected_pages&cad=1#v=onepage&q&f=false .................. 6

THOMAS PAINE, THE AGE OF REASON, pt. 1, ch. 1 (1794) *in* 4 THE WRITINGS OF THOMAS PAINE 21 (ed. Moncure Daniel Conway, G.P. Putnam's Sons 1908), https://books.google.com/books?id= wZ8rAQAAMAAJ&pg=PA21&source=gbs_selected_pages&cad=1#v=one page&q&f=false ...................................................................................... 6

**Other**

Andrew C. Skinner, *The Influence of the Hebrew Scriptures on the Founders and the Founding of the American Republic*, *in* LECTURES ON RELIGION AND THE FOUNDING OF THE AMERICAN REPUBLIC 39 (John W. Welch and Stephen J. Fleming eds., 2003) ............................................ 6–7

1 ANNALS OF CONG. 949–50 (1789) (Joseph Gales ed. 1834) ................... 14

Benjamin Franklin, Franklin's Proposal (Aug. 20, 1776) *in* 1 THE PAPERS OF THOMAS JEFFERSON, 494 (Julian P. Boyd ed. 1950), available at https://founders.archives.gov/documents/Jefferson/01-01-02-0206-0001 ........................................................................................................ 7

Charles Oscar Paullin, *The Administration of the Continental Navy of the American Revolution*, 31 PROC. OF THE U.S. NAVAL INST. 625 (July 1905), https://www.usni.org/magazines/proceedings/1905/ july/administration-continental-navy-american-revolution ................... 11

David W. Scott, *Religious Liberties: The Ohio Constitution of 1803, Jefferson's Danbury Letter, and Religion in Education*, 13 FEDERALIST SOC'Y REV. 121 .................................................................... 13, 17–18

James Hutson, *"A Wall of Separation": FBI Helps Restore Jefferson's Obliterated Draft*, LIBR. OF CONG. (June 1998), https://www.loc.gov/loc/lcib/9806/danbury.html (last visited Dec. 16, 2024)........................................................................................ 14

James Madison, Memorial and Remonstrance against Religious Assessments (June 20, 1785) *in* 8 THE PAPERS OF JAMES MADISON, 295–306 (Robert A. Rutland & William M. E. Rachal. ed. 1973), available at https://founders.archives.gov/documents/Madison/01-08-02-0163 ........... 8

John W. Welch, *Biblical Law in America, in* LECTURES ON RELIGION AND THE FOUNDING OF THE AMERICAN REPUBLIC 49 (John W. Welch and Stephen J. Fleming eds., 2003) .................................................. 4

1–2, 23, 28, 33 JOURNALS OF THE CONTINENTAL CONGRESS (Worthington Chauncey Ford ed., Wash. United States Gov't Printing Office 1904–1936) (1774–1787)......................................................... 10, 12–13

Lorianne Updike, *The "Wall of Separation Between Church and State": Constitutional Fact or Fiction?*, 22 SUTHERLAND J. OF L. & PUB. POL'Y 1 (2005)...............................................................................16–17

Mark David Hall, *The Myth of the Founders' Deism, in* MARK DAVID HALL, DID AMERICA HAVE A CHRISTIAN FOUNDING?: SEPARATING MODERN MYTH FROM HISTORICAL TRUTH 1 (2019), available at https://digitalcommons.georgefox.edu/cgi/viewcontent.cgi?article=1097&context=hist_fac ........................................................... 7

GEORGE WASHINGTON, FAREWELL ADDRESS (Sept. 19, 1796) *in* 20 THE PAPERS OF GEORGE WASHINGTON, PRESIDENTIAL SERIES, 703–722 (David R. Hoth & William M. Ferraro eds., 2019), available at https://founders.archives.gov/documents/Washington/05-20-02-0440-0002 ........................................................................................ 6

THOMAS JEFFERSON, JEFFERSON'S PROPOSAL (Aug. 20, 1776) *in* 1 THE PAPERS OF THOMAS JEFFERSON, 495 (Julian P. Boyd ed. 1950), available at https://founders.archives.gov/documents/Jefferson/01-01-02-0206-0002 ........................................................................................ 7

W. Cole Durham Jr. & Elizabeth A. Sewell, *Virginia Founders and the Birth of Religious Freedom*, *in* LECTURES ON RELIGION AND THE FOUNDING OF THE AMERICAN REPUBLIC 67 (John W. Welch and Stephen J. Fleming eds., 2003) ................................................................... 8

## STATEMENT OF INTEREST

Amicus Curiae Lorianne Updike Toler is a professor at Northern Illinois University College of Law and teaches a Constitutional History seminar wherein students write neutral historical appellate amicus briefs. As part of the course, this brief was written by NIU student Richard Kato as part of that course, with minor assistance and approval from Professor Updike Toler.

Professor Updike Toler has a Masters Degree in History from Oxford and a JD. She built the first digital archive of constitutional primary sources, ConSource, and helped to start another, Quill, which are both now housed at Oxford University. Amicus has an interest in helping the Court obtain an informed understanding of the constitutional history of the Establishment Clause and of providing students the opportunity to present descriptive historical arguments to the Court. This brief is filed with the written consent of all parties.

Counsel for neither party contributed to the writing of this brief. Additionally, counsel for neither party nor any other person made a monetary contribution intended to fund the preparation or submission of this brief.

## SUMMARY OF THE ARGUMENT

This case concerns the application of the Establishment Clause to Louisiana's law requiring that privately funded or donated displays of the Ten Commandments be posted in public and charter school classrooms, accompanied by a three-paragraph statement of historical context. Amicus does not take a position on the constitutionality of Louisiana's law, but instead makes certain conclusions about the history of the Establishment Clause to help the Court determine how best to use that history.

At the time of the Establishment Clause's ratification, despite the opposition to the General Assessment tax in Virginia, it was widely accepted that religion was necessary for public virtue and republican government. Furthermore, the Continental and Confederation Congresses and the First Congress supported non-coercive, non-monetary government support of religion, demonstrating that this kind of support was also widely accepted. While Thomas Jefferson asserted in his letter to the Danbury Baptists that the Establishment Clause created a "wall of separation between church and state," his views on the role of

religion in government changed over time, and his letter expressed his opposition to prescribing participation in uniform religious practices rather than indiscriminate government provision of support for religion in general.

# ARGUMENT

**I. DURING THE PERIOD LEADING UP TO AND FOLLOWING THE RATIFICATION OF THE FIRST AMENDMENT, IT WAS WIDELY ACCEPTED THAT RELIGION HAD A NECESSARY ROLE IN PROMOTING VIRTUE AND REPUBLICAN GOVERNMENT.**

From the foundation of the colonies through the early 19th century, America was deeply religious. [1] Many people came from Europe to America in the seventeenth century seeking freedom from religious persecution, but outside of Pennsylvania and Rhode Island, those fleeing persecution permitted others little toleration. [2] During this period, the colonists, particularly in New England, based many of their laws on the Bible, with direct quotes from, and citations to, Old Testament laws. [3] Spurred on by the Great Awakening of the 1740's, religion maintained its dominance in America into the eighteenth century. [4] Four states—Rhode Island, New Jersey, Pennsylvania, and Delaware—did not establish religions, yet the New England states established

---

[1] *See generally* JAMES H. HUTSON, RELIGION AND THE FOUNDING OF THE AMERICAN REPUBLIC (1998).

[2] *Id.* at 3–18.

[3] JOHN W. WELCH, *Biblical Law in America*, *in* LECTURES ON RELIGION AND THE FOUNDING OF THE AMERICAN REPUBLIC 49, 53–57 (John W. Welch and Stephen J. Fleming eds., 2003); *see e.g.* The Capitall Lawes of New-England, as They Stand Now in Force in the Commonwealth, Massachusetts Great and General Court (1641).

[4] HUTSON, *supra* n.1, at 19–36.

Congregationalism and Maryland and the southern states established Anglicanism.[5] Supporters of state establishment of religion held that the states had a biblically-derived duty to be "nursing fathers" of the church.[6] For example, the Massachusetts Constitution of 1780 justified requiring town sponsorship of "Protestant teachers of piety, religion, and morality" on the grounds that "the happiness of a people and the good order and preservation of civil government essentially depend upon piety, religion, and morality, and . . . these cannot be generally diffused through a community but by the institution of the public worship of God and of the public instructions in piety, religion, and morality."[7] This syllogism— that religion promoted public virtue and that public virtue was required for republicanism, thus making religion necessary to republicanism— expressed what was then a widely held belief, even among non-establishmentarians.[8] This belief is illustrated by John Adam's famous statement, "[o]ur Constitution was made only for a moral and religious

---

[5] *Id.* at 60.

[6] *Id.* at 60; *see also Isaiah* 49:23 (King James Version) ("And kings shall be thy nursing fathers, and their queens thy nursing mothers: they shall bow down to thee with their face toward the earth, and lick up the dust of thy feet; and thou shalt know that I am the Lord: for they shall not be ashamed that wait for me.").

[7] MASS. CONST., pt. 1, art. III (1780), available at https://www.consource.org/document/constitution-of-massachusetts-1780-10-25/.

[8] HUTSON, *supra* n.1, at 62–64.

People. It is wholly inadequate to the government of any other."[9] It is also reflected in George Washington's Farewell Address, wherein he stated "'Tis substantially true, that virtue or morality is a necessary spring of popular government. . . . Promote, then, as an object of primary importance, institutions for the general diffusion of knowledge. In proportion as the structure of a government gives force to public opinion, it is essential that public opinion should be enlightened."[10]

The Old Testament was especially influential in early America, and opposition to the British government was often justified based on it.[11] For example, in *Common Sense*, Thomas Paine, a deist, used Old Testament examples to support his argument that monarchy gives to kings the honor of God.[12] And while Thomas Jefferson and Benjamin Franklin

---

[9] Letter from John Adams to the Massachusetts Militia (Oct. 11, 1798), Massachusetts Historical Society, Adams Papers, available at https://founders.archives.gov/documents/Adams/99-02-02-3102.

[10] HUTSON, *supra* n.1, at 80–81; GEORGE WASHINGTON, FAREWELL ADDRESS (Sept. 19, 1796) *in* 20 THE PAPERS OF GEORGE WASHINGTON, PRESIDENTIAL SERIES, 703–722 (David R. Hoth & William M. Ferraro eds., 2019), available at https://founders.archives.gov/documents/Washington/05-20-02-0440-0002.

[11] ANDREW C. SKINNER, *The Influence of the Hebrew Scriptures on the Founders and the Founding of the American Republic*, *in* LECTURES ON RELIGION AND THE FOUNDING OF THE AMERICAN REPUBLIC 39, 39–44 (John W. Welch and Stephen J. Fleming eds., 2003).

[12] THOMAS PAINE, THE AGE OF REASON, pt. 1, ch. 1 (1794) *in* 4 THE WRITINGS OF THOMAS PAINE 21 (ed. Moncure Daniel Conway, G.P. Putnam's Sons 1908), https://books.google.com/books?id=wZ8rAQAAMAAJ&pg=PA21&source=gbs_selected_pages&cad=1#v=onepage&q&f=false ("I believe in one God, and no more.");

expressed deist sympathies, they proposed official seals for the United States which depicted the Exodus vignette of Pharaoh drowning in the Red Sea with the motto, "Rebellion to Tyrants is Obedience to God."[13]

After the Revolutionary War, states began to pass "general assessment" laws.[14] These laws, seen by their proponents as ways to support religion generally without dictating specific religious practices or even endorsement of any one religion, allowed religious taxes to be paid to a church of the taxpayer's choice.[15] These laws permitted those with no religion to apply their tax to public education and exempted Jews and Muslims.[16] General assessment laws were spurred on by the exodus of more than half of America's Anglican priests during the War, and by

THOMAS PAINE, COMMON SENSE (Jan. 10, 1776) *in* 1 THE WRITINGS OF THOMAS PAINE 67 (ed. Moncure Daniel Conway, G.P. Putnam's Sons 1894), https://books.google.com/books?id=QDRtep6MI74C&pg=PA67&source=gbs_selected _pages&cad=1#v=onepage&q&f=false.
[13] HUTSON, *supra* n.1, at 50–51; SKINNER, *supra* n.11, at 43–44; Mark David Hall, *The Myth of the Founders' Deism*, *in* MARK DAVID HALL, DID AMERICA HAVE A CHRISTIAN FOUNDING?: SEPARATING MODERN MYTH FROM HISTORICAL TRUTH 1, 4, 6– 7 (2019), available at https://digitalcommons.georgefox.edu/cgi/viewcontent.cgi? article=1097&context=hist_fac; BENJAMIN FRANKLIN, FRANKLIN'S PROPOSAL (Aug. 20, 1776) *in* 1 THE PAPERS OF THOMAS JEFFERSON, 494 (Julian P. Boyd ed. 1950), available at https://founders.archives.gov/documents/Jefferson/01-01-02-0206-0001; THOMAS JEFFERSON, JEFFERSON'S PROPOSAL (Aug. 20, 1776) *in* 1 THE PAPERS OF THOMAS JEFFERSON, 495 (Julian P. Boyd ed. 1950), available at https://founders.archives.gov/documents/Jefferson/01-01-02-0206-0002.
[14] HUTSON, *supra* n.1, at 65.
[15] *Id.* at 65–66.
[16] *Id.*

religious minorities calling for disestablishment as their just reward for contributing to the War.[17]

An attempt to pass a general assessment law failed in Virginia, opposed primarily by civil libertarians and evangelical Baptists, the latter of whom believed the church was harmed by taking money from the government.[18] Virginia's proposed law was opposed by some Presbyterians as well, possibly because they opposed any new taxes.[19] Though relatively less important than other remonstrances circulated in the campaign against the tax,[20] James Madison wrote an anonymous "Memorial and Remonstrance" against Virginia's proposed law as infringing on the natural right to freedom of conscience[21] (later to become famous when cited by the Supreme Court in *Reynolds v. United States*,

---

[17] *Id.* at 47, 65.

[18] *Id.* at 66–70.

[19] *Id.* at 68.

[20] *Id.* at 69–70. The Westmoreland County petition received more signatures than any other petition against the Virginia general assessment bill. *Id.*; Petition from Westmoreland County to Virginia General Assembly (Nov. 2, 1785) *in Legislative Petitions Digital Collection*, LIBR. OF VA., https://rosetta.virginiamemory.com:443/delivery/DeliveryManagerServlet?dps_pid=IE2906121 (last visited Dec. 8, 2024).

[21] W. COLE DURHAM JR. & ELIZABETH A. SEWELL, *Virginia Founders and the Birth of Religious Freedom*, *in* LECTURES ON RELIGION AND THE FOUNDING OF THE AMERICAN REPUBLIC 67, 70–72 (John W. Welch and Stephen J. Fleming eds., 2003); James Madison, Memorial and Remonstrance against Religious Assessments (June 20, 1785) *in* 8 THE PAPERS OF JAMES MADISON, 295–306 (Robert A. Rutland & William M. E. Rachal. ed. 1973), available at https://founders.archives.gov/documents/Madison/01-08-02-0163.

and in later cases such as *Everson v. Board of Education*, *Engel v. Vitale*, and *School District Of Abington Township v. Schempp*).[22] The failure of the law was followed in 1786 by the passage of Jefferson's Virginia Statute for Religious Freedom, which prohibited compulsory church attendance or support of religion, and protected the freedom to publicly profess religious beliefs without facing adverse treatment.[23]

Despite its defeat in Virginia, general assessment laws were successfully enacted by Massachusetts, Connecticut, and New Hampshire, and passed both houses of the state legislatures of Maryland and Georgia. [24] These examples show that religion was, outside of Virginia, generally considered necessary to public morality and good government.

---

[22] Reynolds v. U.S., 98 U.S. 145, 163 (1878); Everson v. Bd. of Educ., 330 U.S. 1, 12 (1947); Engel v. Vitale, 370 U.S. 421, 431–32, n.13–15 (1962); Sch. Dist. Of Abington Twp. v. Schempp, 374 U.S. 203, 213, 225 (1963); *see also* Lemon v. Kurtzman, 403 U.S. 602, 632, n.18 (1971) (Douglas, J., concurring); McCreary Cnty. v. American Civil Liberties Union, 545 U.S. 844, 882 (2005) (O'Connor, J., concurring); McCreary Cnty. v. American Civil Liberties Union, 545 U.S. at 895–96 (Scalia, J., dissenting) Van Orden v. Perry, 545 U.S. 677, 737 (2005) (O'Connor, J., dissenting); Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 524 (2022).
[23] Virginia Statute for Religious Freedom, Virginia General Assembly (1786).
[24] Hutson, *supra* n.1, at 66.

## II.   THE ACTIONS OF THE CONTINENTAL AND CONFEDERATION CONGRESSES AND THE FIRST CONGRESS INDICATE THAT NON-COERCIVE, NON-MONETARY GOVERNMENT SUPPORT OF RELIGION WAS WIDELY ACCEPTED.

At its first meeting in September of 1774, the Continental Congress appointed an Anglican priest to lead Congress in prayer as its chaplain.[25] On June 12, 1775, the Continental Congress declared a national day of "public humiliation, fasting, and prayer."[26] Congress communicated both this fast and its later assessments of the political and military situation of the Country to churches across the country.[27] Congress scheduled the fast for July 20, 1775, and, in order to avoid charges of favoritism, Members of Congress attended services at both Presbyterian and Anglican churches on that day.[28] Congress later attended services at Catholic and Lutheran churches in 1779 and 1781.[29] Congress went on to

---

[25] HUTSON, *supra* n.1, at 51; CONT'L CONG., 1 JOURNALS OF THE CONTINENTAL CONGRESS 26 (Worthington Chauncey Ford ed., United States Gov't Printing Office 1904) (1774), https://www.loc.gov/resource/llscdam.lljc001/?sp=1&st=pdf&pdfPage=25.

[26] HUTSON, *supra* n.1, at 51–52; CONT'L CONG., 2 JOURNALS OF THE CONTINENTAL CONGRESS 87–88 (Worthington Chauncey Ford ed., United States Gov't Printing Office 1905) (June 12, 1775), https://www.loc.gov/resource/llscdam.lljc002/?st=pdf&pdfPage=88.

[27] HUTSON, *supra* n.1, at 52.

[28] *Id.* at 52; 2 JOURNALS OF THE CONTINENTAL CONGRESS 87 (Worthington Chauncey Ford ed., United States Gov't Printing Office 1905) (June 12, 1775), https://www.loc.gov/resource/llscdam.lljc002/?st=pdf&pdfPage=88.

[29] HUTSON, *supra* n.1, at 52.

proclaim at least one day of fasting and one day of thanksgiving every year from 1775 until 1784. [30] Congress's fasting and thanksgiving proclamations were motivated by "covenant theology," which held that the Revolutionary War was God's punishment for America's sins, requiring the nation to collectively recognize and repent of its transgressions in order to win independence. [31]

Covenant theology led Congress to seek to bolster religion in other ways as well. Congress was especially concerned about ensuring religious morality in the miliary, believing that God might punish an irreligious army with defeat. [32] Thus, Congress required the Navy to hold services twice a day and to have a sermon preached each Sunday on its ships. [33] It directed commanders to set "a good example of honor and virtue to their officers and men" and to "suppress all dissolute, immoral, and disorderly practices," specifically creating punishments for swearing and

---

[30] *Id.* at 53, 96.

[31] *Id.* at 53–55.

[32] *Id.* at 54–56.

[33] *Id.* at 55; Rules for the Regulation of the Navy of the United Colonies, art. II (Nov. 28, 1775); *See generally* Charles Oscar Paullin, *The Administration of the Continental Navy of the American Revolution*, 31 PROC. OF THE U.S. NAVAL INST. 625 (July 1905), https://www.usni.org/magazines/proceedings/1905/july/administration-continental-navy-american-revolution (describing the history of the Continental Navy).

blasphemy.[34] Similar regulations were enacted for troops. Congress "earnestly recommended" that all soldiers attend church services and created punishments for soldiers who behaved "indecently or irreverently" while at a church.[35] In 1782, concerns about a Bible shortage led Congress to endorse the publication of Robert Aitken's edition of the Bible, the first English language Bible published in North America.[36]

Congress also sought to support religion in the Northwest Territory. On July 13, 1787, Congress passed the Northwest Ordinance, which both prohibited any person in the Northwest Territory from being "molested on account of his mode of worship or religious sentiments," and announced, "[r]eligion, morality, and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged."[37] Two weeks after the passage of

---

[34] HUTSON, *supra* n.1, at 55; Rules for the Regulation of the Navy of the United Colonies, art. I, III (Nov. 28, 1775).

[35] HUTSON, *supra* n.1, at 54; Rules and Articles, for the Better Government of Troops Raised, or to be Raised, and Kept in Pay by and at Joint Expense of the Twelve United English Colonies of North America, art. 2, Continental Congress, (May 10, 1775).

[36] HUTSON, *supra* n.1, at 56–57; 23 JOURNALS OF THE CONTINENTAL CONGRESS 574 (Gaillard Hunt ed., United States Gov't Printing Office 1914) (Sept. 12, 1782), https://www.loc.gov/resource/llscdam.lljc023/?st=pdf&pdfPage=116.

[37] HUTSON, *supra* n.1, at 56–57; Northwest Territory Ordinance, art. 1, 3 (July 13, 1787).

the Northwest Ordinance, Congress voted to give 10,000 acres of land in present-day Ohio to a religious society, the Moravian Brethren.[38] None of these actions by Congress gave rise to any controversy.[39] However, a Congressional proposal to give land in each town in the Northwest Territory "for the support of religion" with "[t]he profits arising therefrom . . . to be applied to forever according to the will of the majority" failed in the face of objections to granting land to a single denomination for religious purposes.[40]

The First Congress maintained the Continental and Confederation Congress's religious practices. After Washington's inauguration, the members of Congress attended an Episcopalian church service.[41] In addition, Congress appointed two chaplains from different Protestant denominations as chaplains, and repassed the Northwest Ordinance and

---

[38] HUTSON, *supra* n.1, at 57; 33 JOURNALS OF THE CONTINENTAL CONGRESS 429–30 (Roscoe R. Hill ed., United States Gov't Printing Office 1936) (July 27, 1787), https://www.loc.gov/resource/llscdam.lljc033/?st=pdf&pdfPage=47.
[39] HUTSON, *supra* n.1, at 57–58; David W. Scott, *Religious Liberties: The Ohio Constitution of 1803, Jefferson's Danbury Letter, and Religion in Education*, 13 FEDERALIST SOC'Y REV. 121, 122.
[40] HUTSON, *supra* n.1, at 57; 28 JOURNALS OF THE CONTINENTAL CONGRESS 293–95 (John C. Fitzpatrick ed., United States Gov't Printing Office 1933) (Apr. 23, 1785), https://www.loc.gov/resource/llscdam.lljc028/?st=pdf&pdfPage=305.
[41] *Id.* at 79.

the requirements for Christian morality in the Army and Navy.[42] On September 25, 1789, the day after the final approval of the First Amendment in the House of Representatives, both houses of the First Congress passed a resolution requesting that President Washington call a national day of thanksgiving and prayer, with only two recorded votes against the resolution.[43] Washington set this day of thanksgiving and prayer for November 26, 1789.[44] As President, John Adams also proclaimed two national fasts, while President Madison declared four days of thanksgiving.[45] The Democratic Republicans opposed Adam's fasts as an attempt to politicize religion, leading Adams to later blame the fasts for his loss in the Presidential election of 1800.[46] Additionally, church services began to be held in the House of Representatives when the government moved to Washington in 1800.[47] Hence, the popularity of

---

[42] *Id.* at 79; Northwest Territory Ordinance, 1st Congress (Aug. 7, 1789).

[43] HUTSON, *supra* n.1, at 79–80; 949–950; 1 ANNALS OF CONG. 949–50 (1789) (Joseph Gales ed. 1834).

[44] HUTSON, *supra* n.1, at 80.

[45] *Id.* at 81–82.

[46] Letter from John Adams to Benjamin Rush (June 12, 1812), Massachusetts Historical Society, Adams Family Papers, Letterbooks, available at https://founders.archives.gov/documents/Adams/99-02-02-5807; James Hutson, *"A Wall of Separation": FBI Helps Restore Jefferson's Obliterated Draft*, LIBR. OF CONG. (June 1998), https://www.loc.gov/loc/lcib/9806/danbury.html (last visited Dec. 16, 2024).

[47] HUTSON, *supra* n.1, at 84.

non-coercive, non-monetary support for religion can be seen in the acts of the Continental Congress and the First Congress.

## III.   ALTHOUGH THOMAS JEFFERSON ASSERTED IN HIS DANBURY BAPTISTS LETTER THAT THE ESTABLISHMENT CLAUSE CREATED A "WALL OF SEPARATION BETWEEN CHURCH AND STATE," HIS VIEWS ON THE ROLE OF RELIGION IN GOVERNMENT CHANGED OVER TIME AND SHOWED THAT THE LETTER EXPRESSED HIS OPPOSITION TO THE IMPOSITION OF UNIFORM RELIGIOUS PRACTICES.

Thomas Jefferson famously stated in his letter to the Danbury Baptists that the Establishment Clause created a "wall of separation between church and state."[48] The Supreme Court has repeatedly invoked this phrase (often alongside Madison's Memorial and Remonstrance), beginning in *Reynolds v. United States*, and more recently in *Everson v. Board of Education*, and *Engel v. Vitale*.[49] However, the historical context to this letter is important to understand Jefferson's meaning.

---

[48] Letter from Thomas Jefferson to the Danbury Baptists (Jan. 1, 1802) *in* 36 THE PAPERS OF THOMAS JEFFERSON, 258 (Barbara B. Oberg ed. 2009), available at https://founders.archives.gov/documents/Jefferson/01-36-02-0152-0006; *See also* Draft Letter from Thomas Jefferson to the Danbury Baptists (Jan. 1, 1802), *in* INFORMATION BULLETIN, LIBR. OF CONG. (June 1998), https://www.loc.gov/loc/lcib/9806/danpost.html  (last visited Dec. 16, 2024).
[49] Reynolds v. U.S., 98 U.S. 145, 164 (1878); Everson v. Bd. of Educ., 330 U.S. 1, 16, 18 (1947); Engel v. Vitale, 370 U.S. 421, 425 (1962); *see also* Van Orden v. Perry, 545 U.S. at 708–709, 730 (Stevens, J., dissenting).

Jefferson's views on religion changed throughout his life. In the 1770s and 1780s, he was a "theist," believing that God directed human affairs but rejecting many aspects of Christian theology, such as organized religion and belief in miracles and the Trinity. [50] Jefferson nonetheless believed that religion was "sufficient to preserve peace and order," but not necessary. [51] In about 1793, after reading Joseph Priestley's *An History of the Corruptions of Christianity*, Jefferson came to believe that his philosophy fit within Christianity while maintaining both his disbelief of Christ's miracles and his belief that Christ's true teachings did not extend beyond basic morality. [52] Jefferson's new interpretation of his religious views led him to become more supportive of non-discriminatory support of religion by government, believing that "the interests of society require the observation of those moral precepts . . . in which all religions agree, (for all forbid us to murder, steal, plunder, or bear false witness)" but still opposing interference with "the particular dogmas in which all religions differ." [53] After encountering Priestley

---

[50] LORIANNE UPDIKE, *The "Wall of Separation Between Church and State": Constitutional Fact or Fiction?*, 22 SUTHERLAND J. OF L. & PUB. POL'Y 1, 8-9 (2005).
[51] HUTSON, *supra* n.1, at 73.
[52] *Id.* at 83.
[53] *Id.* at 84; Letter from Thomas Jefferson to James Fishback (Sept. 27, 1809) *in* 1 THE PAPERS OF THOMAS JEFFERSON, RETIREMENT SERIES 565–566 (J. Jefferson

around 1793, Jefferson, like the other Founders, believed that religion promoted public virtue, and that such was necessary to support republicanism and self-government.[54]

Motivated by fear that the letter's implicit condemnation of Presidential fasts would trigger a political backlash against him as insufficiently supportive of religion, two days after sending his letter to the Danbury Baptists, Jefferson began regularly attending the non-denominational Church services held each Sunday in the House of Representatives.[55] This was as public a statement as Jefferson's letter, and the first time in his life that Jefferson began to attend weekly

---

Looney ed. 2004), available at https://founders.archives.gov/documents/Jefferson/03-01-02-0437-0003.

[54] HUTSON, *supra* n.1, at 84; UPDIKE, *supra*, n.50, at 26–27; Letter from Thomas Jefferson to James Fishback (Sept. 27, 1809) *in* 1 THE PAPERS OF THOMAS JEFFERSON, RETIREMENT SERIES 565–566 (J. Jefferson Looney ed. 2004), available at https://founders.archives.gov/documents/Jefferson/03-01-02-0437-0003 ("[T]he practice of morality being necessary for the well-being of society, he has taken care to impress it's precepts so indelibly on our hearts that they shall not be effaced by the subtleties of our brain."); Letter from Thomas Jefferson to Augustus Elias Brevoort Woodward (March 24, 1824), Library of Congress, Papers of Thomas Jefferson, available at https://founders.archives.gov/documents/Jefferson/98-01-02-4139 (Noting that Jefferson considered "Ethics, as well as Religion, as supplements to law, in the government of man").

[55] HUTSON, *supra* n.1, at 84, 93; Scott, *supra*, n.39, at 124. Perhaps Jefferson's fear of popular backlash to the letter suggests that his "wall of separation" metaphor did not reflect a widely accepted belief.

services.[56] It was at this time that Jefferson also allowed the War Office and Treasury buildings to be used for church services each Sunday—a practice that continued for the duration of his presidency.[57]

Four months after sending his letter to the Danbury Baptists, Jefferson further demonstrated his willingness to accept government involvement with religion by approving Ohio's statehood under the Ohio Constitution of 1803.[58] The religion section of the Bill of Rights of the Ohio Constitution of 1803 used parallel language to the education provision of the Northwest Ordinance, and was written by Ohio's Democratic-Republican-dominated constitutional convention.[59] It was approved by the Democratic-Republican Congress and President Jefferson with no evidence of controversy.[60]

Jefferson's words and actions show that his objection to national days of fasting as insinuated in his letter to the Danbury Baptists was based on his belief that the government could not impose any kind of

---

[56] Scott, *supra*, n.39, at 124.
[57] HUTSON, *supra* n.1, at 89, 91.
[58] Scott, *supra* n.39, at 123.
[59] Scott, *supra* n.39, at 123; OHIO CONST., art. VIII, § 3 (1803).
[60] Scott, *supra* n.39, at 123–25.

uniform religious practice, but could support voluntary, non-discriminatory religious activity.[61]

## CONCLUSION

Based on the historical evidence provided, non-coercive, non-monetary government support of religion was widely accepted both before and up through the time of the Establishment Clause's ratification.

Respectfully submitted,

J. Carl Cecere
CECERE PC
 6035 McCommas Blvd.
Dallas, TX 75206
Telephone: 469-600-9455
ccecere@cecerepc.com

*Counsel for Amicus Curiae*

---

[61] HUTSON, *supra* n.1, at 89, 93.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this motion contains 3,861 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Century Schoolbook 14-point font produced by Microsoft Word software.

*/s/ J. Carl Cecere*

**J. Carl Cecere**

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 16, 2024, a true and correct copy of the foregoing was served via the Court's CM/ECF system to all parties who are deemed to have consented to ECF electronic service.

*/s/ J. Carl Cecere*

**J. Carl Cecere**