No. 24-30706

## In the United States Court of Appeals for the Fifth Circuit

DARCY ROAKE, REVEREND, ON BEHALF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILDREN, et. al,

*Plaintiffs-Appellees*,

v.

CADE BRUMLEY, IN HIS OFFICIAL CAPACITY AS THE LOUISIANA STATE SUPERINTENDENT OF EDUCATION; et. al,

**Defendants-Appellants.**

————————————

**On Appeal from the United States District Court
for the Middle District of Louisiana
No. 3:24-cv-517, Hon. John W. deGravelles**

————————————

**BRIEF *AMICUS CURIAE* OF THE AMERICA FIRST POLICY
INSTITUTE IN SUPPORT OF DEFENDANTS-APPELLANTS**

————————————

*Michael Berry*
Executive Director
Center for Litigation
America First Policy Institute
1455 Pennsylvania Ave., N.W.
Suite 225
Washington, D.C., 20004
Telephone: (813) 952-8882

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

CERTIFICATE OF INTERESTED PARTIES . . . . . . . . . . . . . . . . vii

IDENTITY AND INTEREST OF AMICUS CURIAE . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.   The Establishment Clause Does Not Prevent The Government From Advancing Religious Values, Much Less Merely Acknowledging Religion . . . . . . . . . . . . . . . . . 3

    II.   The Supreme Court Has Repeatedly Disagreed With The District Court's Historical Analysis Of The Establishment Clause In *Lemon*-Era Cases . . . . . . . . . . . . . . . . . . . . . . . . . 6

    III.   The Supreme Court Has Recognized That American Society Is Greatly Influenced by Religious Practice And The Ten Commandments In Particular . . . . . . . . . . . . . 16

    IV.   America's Religious History And Tradition Demonstrate That Display Of The Ten Commandments Does Not Favor Religious Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    V.   The Courts Have Affirmed The Role Of Religious Teachings In Education . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

RULE 32(g) CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . 27

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

# <u>TABLE OF AUTHORITIES</u>

## *Cases*

*American Legion v. American Humanist Association,*

    588 U.S. 29 (2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Agostini v. Felton,*

    521 U.S. 203 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Aguilar v. Felton,*

    473 U.S. 402 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Board of Educ. of Westside Community Schools v. Mergens,*

    496 U.S. 226 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Carson v. Makin,*

    *596 U.S. 767 (2022)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Corporation of Presiding Bishop of Church of Jesus Christ of Latter—day Saints v. Amos,*

    483 U.S. 327 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*County of Allegheny v. ACLU,*

    492 U.S. 573, 652 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Davis v. Beason,*

    133 U.S. 333 (1890) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Elk Grove Unified Sch. Dist. v. Newdow,*

    542 U.S. 1 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 15

*Engel v. Vitale,* 370 U.S. 421 (1962)

    370 U.S. 421 (1962) . . . . . . . . . . . . . . . . . . . . . . 12, 14, 16

*Everson v. Board of Education,*

　　330 U.S. 1 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 7, 8

*Florey v. Sioux Falls School District,*

　　619 F.2d 1311, 1314 (8th Cir. 1980) . . . . . . . . . . . . . . . 23, 24

*Freedom from Religion Foundation, Inc. v. Mack,*

　　49 F.4th 941 (5th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . 10

*Good News Club v. Milford Central School,*

　　533 U.S. 98 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

*Kennedy v. Bremerton School Dist.,*

　　597 U.S. 507 (2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Lee v. Weisman,*

　　505 U.S. 577 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 21

*Lynch v. Donnelly,*

　　465 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Marsh v. Chambers,*

　　463 U.S. 783 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*McCreary v. ACLU,*

　　545 U.S. 844 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*McCullum v. Board of Ed.,*

　　333 U.S. 203, 237 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . 12

*McGowan v. Maryland,*

　　366 U.S. 420 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21, 23

*Mueller v. Allen,*

    463 U.S. 388 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Newdow v. U.S. Congress,*

    328 F.3d 466 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . 15

*Quick Bear v. Leupp,*

    210 U.S. 50 (1908) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Reynolds v. United States,*

    98 U.S. 145 (1879) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Rosenberger v. Rector and Visitors of University of Virginia,*

    515 U.S. 819 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*School Dist. of Abington Tp., Pa. v. Schempp,*

    374 U.S. 203 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7, 8, 16

*Stone v. Graham,*

    449 U.S. 39 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Town of Greece, N.Y. v. Galloway,*

    572 U.S. 565 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . 3, 21, 22

*Van Orden v. Perry,*

    545 U.S. 677 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 23

*Wallace v. Jaffree,*

    472 U.S. 38, 113-14 (1985) . . . . . . . . . . . . . . . . . . . . 5, 7, 8, 12

*Walz v. Tax Commission of City of New York,*

    397 U.S. 664 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 23

*Zelman v. Simmons–Harris,*

    536 U.S. 639 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Zobrest v. Catalina Foothills School Dist.,*

    509 U.S. 1 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Zorach v. Clauson,*

    343 U.S. 306 (1952) . . . . . . . . . . . . . . . . . . . . . . . 5, 14, 22, 24

**Statutes**

30 Stat. 62 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

36 U.S.C. § 172 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

36 U.S.C. § 185 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

36 U.S.C. § 302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

46 Stat. 1508 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Pub. L. 107-293 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Pub L. 107-293 § 1(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Pub L. 107-293 § 1(16) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Other Resources**

J. of the Sen. 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

J. of the Sen. 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

J. of the H.R. 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

1 J. of the Continental Cong. 26 (1774) . . . . . . . . . . . . . . . . . . 13

2 J. of the Continental Cong. 12 (1775) . . . . . . . . . . . . . . . . . . 13

5 J. of the Continental Cong. 530 (1776) . . . . . . . . . . . . . . . . . 13

6 J. of the Continental Cong. 887 (1776) . . . . . . . . . . . . . . . . . 13

13 *Encyclopedia of Religion* 9074 (2d ed.2005) . . . . . . . . . . . . . . 20

27 J. of the Continental Cong. 683 (1784) . . . . . . . . . . . . . . . . . 13

Act of June 7, 1897 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*From John Adams to Massachusetts Militia*, 11 October 1798

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Green, *Inventing a Christian America: The Myth of the Religious Founding* (2015)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 9, 10

H. Con. Res. 31, 105th Cong., 1st Sess. (1997) . . . . . . . . . . . . . 17

J. O'Neill, Religion and Education Under the Constitution 118–119 (1949)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Louisiana House Bill No. 71, Act No. 676 . . . . . . . . . . . . . . . . . 23

Public Papers of the Presidents, Harry S. Truman, 1950, p. 157 (1965)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

R. Cord, Separation of Church and State 61–82 (1982) . . . . . . . 25

S. Con. Res. 13, 105th Cong., 1st Sess. (1997) . . . . . . . . . . . . . 17

The Qur'an 104 (M. Haleem transl. 2004) . . . . . . . . . . . . . . . . . 20

U.S. Dept. of Commerce, Bureau of Census, Statistical Abstract of the United States: 2004–2005, p. 55 (124th ed. 2004) (Table No. 67)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## CERTIFICATE OF INTERESTED PARTIES

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that, in addition to those already listed in the parties' briefs, the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

*Amicus*:                America First Policy Institute

Counsel for *Amicus*:    Michael Berry, Executive Director, Center for Litigation, America First Policy Institute

*s/ Michael Berry*

Michael Berry
America First Policy Institute
1777 N. Kent Street, 14th Floor
Arlington, VA 22209
703.637.3690

## IDENTITY AND INTEREST OF *AMICUS CURIAE* [1]

America First Policy Institute ("AFPI") is a 501(c)(3) non-profit, non-partisan research institute dedicated to advancing policies that put the American people first. Its guiding principles are liberty, free enterprise, the rule of law, America-first foreign policy, and a belief that American workers, families, and communities are the key to our country's success.

AFPI's leadership includes many former leaders of the United States government. AFPI's leaders and members alike appreciate that our country was founded on Judeo-Christian principles and that those principles are reflected throughout U.S. history in our laws and, as relevant here, in public education.

AFPI believes that the court below erred when it held that Louisiana's law calling for the Ten Commandments to be displayed in public violated the Establishment Clause of the U.S. Constitution. The

---

[1]    The parties have consented in writing to AFPI's brief. No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

1

Ten Commandments are foundational to the American system of government, including public education.

## INTRODUCTION

AFPI submits this *amicus curiae* brief in support of Appellees to clarify the historical context of the Ten Commandments in public education as fundamental to the American government and legal system. The Ten Commandments are an instrumental pillar in the preparation of a morally sophisticated citizenry through public education. As the Supreme Court recognized, "[i]t is unsurprising that a Nation founded by religious refugees and dedicated to religious freedom should find references to divinity in its symbols, songs, mottoes, and oaths." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 35-36 (2004) (O'Connor, J., concurring in the judgment).

Appellees allege displays of the Ten Commandments infringe on their First Amendment rights; however, "diverse expressive activities ha[ve] always been 'part of learning how to live in a pluralistic society." *Kennedy v. Bremerton School Dist.*, 597 U.S. 507, 541 (2022) (citation omitted). The government and all citizens therefore have a vested interest in "advanc[ing] the student's knowledge and appreciation of the

role that our religious heritage has played in the social, cultural and historical development of civilization." *Stone v. Graham*, 449 U.S. 39, 44 (1980) (Rehnquist, J. dissenting) (citation omitted). Appellees fail to establish that display of the Ten Commandments in public schools is coercive; mere offense is not violative of the First Amendment. *See Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 589 (2014).

"Where monuments, symbols, and practices with a longstanding history follow in the tradition of the First Congress in respecting and tolerating different views, endeavoring to achieve inclusivity and nondiscrimination, and recognizing the important role religion plays in the lives of many Americans, they are likewise constitutional." *American Legion v. American Humanist Association*, 588 U.S. 29, 32-33 (2019). The true meaning of the Establishment Clause can only be seen through examination of its history, purpose, and text. *See Walz v. Tax Commission of City of New York,* 397 U.S. 664, 671-673 (1970)*; Lynch v. Donnelly,* 465 U.S. 668, 673-678 (1984). In the instant case, the District Court relied on historical errors, including those of Appellees' expert.[2]

---

[2]    Appellees' expert cites numerous examples of the founding fathers using religious rhetoric as neither pertinent nor intended to establish a policy motivation; however, the use of religious rhetoric in the context of

**ARGUMENT**

I.  **The Establishment Clause Does Not Prevent The Government From Advancing Religious Values, Much Less Merely Acknowledging Religion**

The Framers included the Establishment Clause in the Bill of Rights to prohibit the designation of a "national" church and stop the Federal Government from asserting a preference for one religious denomination or sect. Given the incorporation of the Establishment Clause against the States via the Fourteenth Amendment, States too are prohibited from establishing an official religion and from discriminating between sects. *Everson v. Board of Education*, 330 U.S. 1 (1947). As its history shows, however, nothing in the Establishment Clause requires the government to be strictly neutral between religion and irreligion. Nor does that Clause prohibit Congress or the States from pursuing

_____

the drafting and debate regarding the Establishment and Free Exercise Clauses is informative. One cannot presume that religious statements regarding the import of religious freedom within the First Amendment were not motivated by sincerely held beliefs.

Dr. Green warns of the same "straw man" that troubled Justice Stevens in *Van Orden v. Perry* and *McCreary v. ACLU. See* Green, *Inventing a Christian America: The Myth of the Religious Founding* (2015). However, the Court has always relied on mere "proclamations and statements" of the Founders. *McCreary*, 545 U.S. at 895 (Scalia, J. dissenting).

4

legitimate secular ends through nondiscriminatory sectarian means. *Wallace v. Jaffree*, 472 U.S. 38, 113-14 (1985) (Rehnquist, J., dissenting). After all, "[w]e are a religious people whose institutions presuppose a Supreme Being." *Zorach v. Clauson,* 343 U.S. 306 (1952), repeated with approval in *Lynch,* 465 U.S. at 675; *Marsh v. Chambers,* 463 U.S. 783, 792 (1983); *School Dist. of Abington Tp., Pa. v. Schempp,* 374 U.S. 203, 213 (1963).

Nothing outside of the Supreme Court's jurisprudence has ever stood behind the assertion that governmental affirmation of American society's belief in God is unconstitutional. *See McCreary v. ACLU*, 545 U.S. 844, 889-90 (2005) (Scalia, J., dissenting). Even *Lemon*-era the Supreme Court approved government action with the specific intention of improving the position of religion. *Corporation of Presiding Bishop of Church of Jesus Christ of Latter—day Saints v. Amos*, 483 U.S. 327, 338 (1987) (exemption from federal prohibition of religious discrimination by employers); *Walz*, 397 U.S. at 673 (property tax exemption for church property); *Zorach*, 343 U.S., at 308 (upholding law permitting students to leave public school for the purpose of receiving religious education). Indeed, the Court has even approved government-led prayer. *See Marsh*,

463 U.S. at 792 ("To invoke Divine guidance on a public body entrusted with making the laws is not . . . an 'establishment' of religion or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country."). The District Court's holding should be reversed because it conflicts with longstanding precedent of the Supreme Court permitting government actions that support religion.

## II.    The Supreme Court Has Repeatedly Disagreed With The District Court's Historical Analysis Of The Establishment Clause In *Lemon*-Era Cases.

According to the District Court, "the evidence demonstrates that the practice at issue does not fit within and is otherwise not consistent with a broader historical tradition during those time periods." Dkt. 86 at 12. Critical to the District Court's decision was *Stone v. Graham*, 449 U.S. 39 (1980), which it recognized was based on the faulty reasoning of the since abrogated *Lemon* test. *See id*. at 13. Like *Lemon*, *Stone* is based on historical errors and mischaracterization of the concept of separation between church and state. Members of the Supreme Court have

6

repeatedly pointed out that *Lemon* and its forebearers are based on this poor historical evidence.[3]

Not only has the Supreme Court recognized America's rich tradition of religious heritage, but justices have also pointed out the lack of historical basis on which rulings for violations of the Establishment Clause have been rationalized. For example, in *Everson v. Board of Education*, the Court traced the roots of the separation of church and state to Thomas Jefferson's "wall of separation." 330 U.S. 1, 16 (1947) ("In the words of Jefferson, the clause against establishment of religion by law was intended to erect a wall of separation between church and State.") (citation omitted). As Justice Rehnquist explained, "[i]t is impossible to build sound constitutional doctrine upon a mistaken understanding of constitutional history, but unfortunately the Establishment Clause has been expressly freighted with Jefferson's

---

[3]     The *Lemon* Court cited *Board of Education v. Allen*, as the source of the "purpose" and "effect" prongs of the three-part test. *Wallace v. Jaffree*, 472 U.S. 38, 108 (1985) (Rehnquist, J. dissenting) ("The *Allen* opinion explains, however, how it inherited the purpose and effect elements from *Schempp* and *Everson* . . . Thus, the purpose and effect prongs have the same historical deficiencies . . . they are in no way based on either the language or intent of the drafters.").

misleading metaphor for nearly 40 years." *Wallace*, 472 U.S. at 92 (Rehnquist, J., dissenting). Rehnquist explained that the letter describing the "wall" was sent 14 years *after* the passage of the Bill of Rights, and thus provides "a less than ideal source of contemporary history as to the meaning of the Religion Clauses of the First Amendment." *Id*. Thus, Jefferson's views have been erroneously associated with the religious amendments proposed by Madison while drafting the Bill of Rights. *Id*. at 108.

This historical error was often repeated by the Court,[4] and eventually helped bring about the end for the *Lemon* test, which has "no more grounding in the history of the First Amendment than does the wall [of separation] theory upon which it rests." *Id*. at 110. Whether due to lack of historical support or practical unworkability, the *Everson* "wall" has proved all but useless as a guide to sound constitutional adjudication. *Id*. at 107. These same problems are evident in *Stone,* which implicitly invoked the "wall" as prohibiting any manner of state sanction for public

---

[4]     In *Schempp*, "the Court made the truly remarkable statement that the views of Madison and Jefferson, preceded by Roger Williams, came to be incorporated not only in the Federal Constitution but likewise in those of most of our States." *Wallace*, 472 U.S. at 91-92 (Rehnquist, J. dissenting) (citation omitted).

display of the Ten Commandments. *See Stone*, 449 U.S. at 42 (asserting that the mere "posting of the copies under the auspices of the legislature provides the official support of the State . . . Government that the Establishment Clause prohibits.") (alteration in original) (quotation marks and citation omitted). Accordingly, the District Court erred in relying on *Stone* to enjoin H.B.71.

The faulty evidence in support of the "wall" between church and state is especially noteworthy because Appellees' expert—in whom the District Court placed misguided faith—relied on much of the same 'evidence' in the instant case. *See* Dkt. 50-2 at 9. Dr. Green's historical interpretation is not only contrary to history, it is also fundamentally flawed.[5] In his book, *Inventing a Christian America: The Myth of the*

---

[5] Professor Green has previously submitted *amicus* briefs in support of his flawed positions on religious liberty. Both this Court and the Supreme Court have rejected those arguments; thus, the court below in the present case erred in relying on his "expert" testimony to overturn Louisiana's law.

In *Carson v. Makin*, 596 U.S. 767 (2022), the Supreme Court considered a Maine law that provided state funding for children to attend nonsectarian private schools. Petitioners challenged the law's bar on using the funds for sectarian schools. Professor Green joined a group of *amici* who argued that the Maine law does not violate the Free Exercise Clause and therefore should be subject to rational basis and not strict scrutiny, and that Maine's interest in providing public education allows for the exclusion of religious schools. In a 6-3 decision, the Supreme Court

*Religious Founding*, Green cites a plethora of religious imagery used by the founders, which he subsequently dismisses by arguing "it is always possible that any person may have said anything about any subject at some time[,]" that "[t]he significance of any religious statement should always be tempered . . ." and "[r]ather than indicating a level of personal piety, the frequency of religious discourse indicates the high degree of biblical literacy and the common use of popular idioms." *Supra.* Green fails to see the forest through the trees, and in the process seemingly

---

rejected these arguments, holding that strict scrutiny was applicable and that limiting parents from using state funds for private secular education is unconstitutional.

Professor Green also made a losing argument as an *amicus* in a case before this court. In *Freedom from Religion Foundation, Inc. v. Mack*, 49 F.4th 941 (5th Cir. 2022), the plaintiffs sought an injunction to stop a Texas Justice of the Peace from opening his courtroom with a prayer every morning. The *amicus* brief argued that the practice violated the Establishment Clause. This Court disagreed, holding that the prayer was permissible and noncoercive so long as Defendant has a policy of denominational nondiscrimination and that there were no consequences for anyone who chose not to participate.

Finally, he joined an *amicus* brief arguing that Coach Kennedy's conduct was coercive in *Kennedy v. Bremerton*, 597 U.S. 507 (2022). The brief argued that such "conduct was neither private nor inoffensive, but rather coercively put students to the very religious dilemma that the Constitution rightly forbids." Meanwhile the Court held that "Mr. Kennedy's private religious exercise did not come close to crossing any line one might imagine separating protected private expression from impermissible government coercion." *Id*. at 537.

argues that politicians cannot be taken at their word, even in the context of legislative drafting. The 'high degree of biblical literacy' that Dr. Green brushes aside as coincidental, is in fact more evidence that "[o]ur constitution was made only for a moral and religious people." *From John Adams to Massachusetts Militia*, 11 October 1798.

Even if Green were correct about the motivations of our Founding Fathers, it is impossible to argue that they did not have a different view of religion and its place in society and government. The historical events that Green cites as proof that America is a secular country do not hold up when placed in proper context. For example, on July 21, 1789—the same day that it approved the Establishment Clause—the First Congress of the United States also passed the Northwest Ordinance, providing for a territorial government for lands northwest of the Ohio River, which declared: "*Religion*, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." Pub. L. 107-293 (*emphasis added*).

As explained above, the Court has repeatedly recognized the contribution that religion has made to our nation's legal and

governmental heritage, and its important role in public and private life. Members of the Supreme Court have detailed the degree to which religious belief pervaded the national government during the founding era. *See Lynch*, at 674–678; *Marsh*, at 786–788; *Lee v. Weisman*, 505 U.S. 577, 633-636 (1992) (Scalia, J., dissenting); *Wallace*, 472 U.S. at 100-106, (Rehnquist, J., dissenting); *Engel v. Vitale*, 370 U.S. 421, 446-450, and n. 3 (1962) (Stewart, J., dissenting).

Display of the Ten Commandments is well within this mainstream practice of acknowledgment of our religious and moral fabric. Federal, state, and local governments across the nation have long engaged in such display. The pervasiveness of America's religious tradition was well summed up in *McCullum v. Board of Ed.*:

> The fact is that, for good or for ill, nearly everything in our culture worth transmitting, everything which gives meaning to life, is saturated with religious influences, derived from paganism, Judaism, Christianity—both Catholic and Protestant—and other faiths accepted by a large part of the world's peoples.

333 U.S. 203, 237 (1948). Notably, when Justice Jackson penned this passage, the Supreme Court was only a year removed from its first-ever finding of an Establishment Clause violation. *See generally Everson*, 330

12

U.S. 1. Since *Everson*, the Court has demonstrated the myriad of ways in which "[o]ur history is replete with official references to the value and invocation of Divine guidance in deliberations and pronouncements of the Founding Fathers and contemporary leaders." *Lynch*, 465 U.S. at 675. In 1952, the Court recognized the "unambiguous and unbroken history of more than 200 years," in which the opening of legislative sessions with prayer became "part of the fabric of our society." *Marsh*, 463 U.S. at 792.[6][7]

Congress has also repeatedly affirmed America's religious underpinnings.[8] In 1931, when Congress made 'The Star-Spangled

---

[6]    In 1774, Congress adopted the traditional procedure of opening its sessions with a prayer offered by a paid chaplain. *See e.g.*, 1 J. of the Continental Cong. 26 (1774); 2 J. of the Continental Cong. 12 (1775); 5 J. of the Continental Cong. 530 (1776); 6 J. of the Continental Cong. 887 (1776); 27 J. of the Continental Cong. 683 (1784).

[7]    During the Constitutional Convention, the First Congress selected a chaplain to open each session with prayer. In 1789, the Senate appointed a committee "to take under consideration the manner of electing Chaplains." J. of the Sen. 10. Weeks later a similar committee was appointed by the House of Representatives. On April 25, 1789, the Senate elected its first chaplain, J. of the Sen. 16; the House followed suit on May 1, 1789, J. of the H.R. 26.

[8]    In 2002, Congress passed a law to "reaffirm the reference to one Nation under God in the Pledge of Allegiance." Pub L. 107-293. Congress made numerous findings about America's strong traditions of religious influence in government. *Id.* (citing language in the Mayflower Compact, the Declaration of Independence, Thomas Jefferson's *Notes on the State*

Banner' our National Anthem, the legislature included the following stanza:

> Blest with victory and peace, may the heav'n rescued land
> Praise the Pow'r that hath made and preserved us a nation!
> Then conquer we must, when our cause it is just,
> *And this be our motto 'In God is our Trust.'*

*See Engel*, 370 US at 449, n. 5 (*emphasis added*).[9] In 1954, Congress added "*one Nation under God*, indivisible, with liberty and justice for all" to the Pledge of Allegiance. *Id.* at 449, n. 6 (*emphasis added*). In 1952, Congress enacted legislation calling upon the President each year to proclaim a National Day of Prayer. *Id.* 370 US at 449, n. 6 (citing 36 U.S.C. § 172). Furthermore, since 1865 the words 'IN GOD WE TRUST' have been impressed on American coins. *Id.* 370 US at 449, n. 6 (citing 36 U.S.C. § 185); *see also*, 36 U.S.C. § 302.

When the courts have grappled the import of our religious heritage, Congress has taken note. After school children were excused from public schools for religious observances and education in *Zorach*, Congress

---

*of Virginia*, the Northwest Ordinance, and the establishment of a National Day of Thanksgiving).

[9]    "The Star-Spangled Banner" as written by Congress, 46 Stat. 1508, is not identical to Francis Scott Key's "Defence of Fort M'Henry."

14

proclaimed its agreement that the First Amendment does not mandate a strict separation of church and state. *See* Pub L. 107-293 § 1(8). In 2002, Congress cited the Ninth Circuit's opinion in *Newdow v. U.S. Congress*, saying the court's "erroneous rationale . . . in *Newdow* would lead to [an] absurd result." *Id.*, § 1(16).[10]

Here, the District Court's decision was based on flawed historical reasoning and misinterpretations of the doctrine of separation of church and state. The Court's reliance on *Stone*, which erroneously invoked the "wall of separation," is contrary to the Supreme Court's repeated recognition of our religious traditions. Justices have repeatedly pointed out that America's legal and governmental heritage is deeply rooted in religious traditions, and the display of the Ten Commandments aligns with this heritage. Historical evidence also shows that religious expressions have been a consistent part of American public life. The Supreme Court has upheld such practices and recognized the nation's

---

[10]     The Supreme Court would respond in 2004, reviewing a consolidated appeal of *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, by reversing the Ninth Circuit. *Compare*, 328 F.3d 466. Chief Justice Rehnquist, concurring in the judgment, wrote that "[a] policy that requires teachers to lead willing students in reciting the Pledge of Allegiance, which includes the words 'under God,' does not violate the Establishment Clause of the First Amendment." *Id.* at 18.

religious foundations. The display at issue in this case is therefore consistent with our broad historical tradition of interweaving our religious moral fabric with the ideals of our legal system and government.

### III. The Supreme Court Has Recognized That American Society Is Greatly Influenced by Religious Practice And The Ten Commandments In Particular.

The Ten Commandments have profoundly influenced both the formation of Western legal thought and the formation of our country. As the Supreme Court explained in *Lynch v. Donnelly,* "[t]here is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." 465 U.S. at 674. "Religion has been closely identified with our history and government," *School Dist. of Abington Township v. Schempp,* 374 U.S. at 212, and "[t]he history of man is inseparable from the history of religion." *Engel,* 370 U.S. at 434.

The District Court explicitly adopted Appellees' view that the display of the Ten Commandments is not "consistent with a broader tradition," under *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022). *See* Dkt. 86 at 10. This holding ignores that "there is nothing unconstitutional in a State's favoring religion generally, honoring God

through public prayer and acknowledgment, or, in a non-proselytizing manner, venerating the Ten Commandments." *McCreary County v. American Civil Liberties Union of Ky.*, 545 U.S. at 885–894 (Scalia, J., dissenting).

The Executive and Legislative Branches have also acknowledged the historical role of the Ten Commandments. *See, e.g.*, Public Papers of the Presidents, Harry S. Truman, 1950, p. 157 (1965); S. Con. Res. 13, 105th Cong., 1st Sess. (1997); H. Con. Res. 31, 105th Cong., 1st Sess. (1997). These displays and recognitions speak to the rich American tradition of religious acknowledgments. The Ten Commandments can be found prominently placed throughout the nation's capital, including:

- A Depiction of Moses with the Ten Commandments within the chamber of the Supreme Court, and on the east facade of the Supreme Court building.

- A painting of a woman praying, with the Ten Commandments by her side, within the main reading room of the Library of Congress.

- A statue of Moses holding the Ten Commandments in the rotunda of the Library of Congress.

- A monument at the Ronald Reagan International Trade Building depicts a female figure, her hands clasped in prayer, reclining against a tablet bearing the Ten

17

Commandments, with the inscription "Liberty of Worship
is Not a Concession nor a Privilege but an Inherent Right."

- The National Archives has embossed on the marble floor of
  its main display room a bronze seal that includes the image
  of two arched stones, representing the Ten
  Commandments.

In fact, a non-exhaustive survey identified displays of the Ten
Commandments in almost every state. *See ACLU v. McCreary County*,
354 F.3d 438, 482 (6th Cir. 2003) (Ryan, J., dissenting) (noting "[t]he
history and ubiquity of the Ten Commandments in public buildings
throughout the country"). As a symbol of law, of religious influences on
the development of American law, and of religious freedom, the image of
the Ten Commandments is so commonly employed and so widely
recognized that it has become "part of the fabric of our society." *Marsh*,
463 U.S. at 792; *see also County of Allegheny v. ACLU*, 492 U.S. 573, 652
(1989) (Stevens, J., concurring in part and dissenting in part) (a display
of "Moses holding the Ten Commandments, [even] if that is the only
adornment on a courtroom wall, conveys an equivocal message, perhaps
of respect for Judaism, for religion in general, or for law").

In light of such public acknowledgment for the Ten
Commandments, it is not clear how the Louisiana law is anything but

"consistent with a broader tradition." The Ten Commandments are recognized as an integral part of our nation's identity; eradicating public references to them "would sever ties to a history that sustains this Nation even today." *Elk Grove Unified School Dist.*, 542 U.S. at 35-36 (O'Connor, J. concurring).

## IV. America's Religious History And Tradition Demonstrate That Display Of The Ten Commandments Does Not Favor Religious Doctrine.

Appellees' expert opines that "historical events and writings" support the proposition that "Government should not take a position on any religious doctrine or promote any denomination or denominational belief or practice as favored or preferred." *See* Dkt. 50-2, at 10-11. This argument presumes erroneously that display of the Ten Commandments discriminates against some group of Americans.

First, the three most popular religions in the United States, Christianity, Judaism, and Islam (collectively, the "Abrahamic Religions")—which combined account for 97.7% of all believers—are monotheistic. *See* U.S. Dept. of Commerce, Bureau of Census, Statistical Abstract of the United States: 2004–2005, p. 55 (124th ed. 2004) (Table No. 67). All these religions believe that the Ten Commandments were

given by God to Moses, and that they are divine prescriptions for a virtuous life. *See* 13 Encyclopedia of Religion 9074 (2d ed.2005); The Qur'an 104 (M. Haleem transl. 2004); *McCreary*, 545 U.S. at 894 (Scalia, J. dissenting).

Second, even for those who do not adhere to one of the Abrahamic Religions, public display of the Ten Commandments does not marginalize their belief systems. The beliefs of those citizens are entirely protected by the Free Exercise Clause, and by those aspects of the Establishment Clause that do not relate to government acknowledgment of the Creator. *See McCreary,* 545 U.S. at 899-900 (Scalia, J. dissenting) 899-900. Furthermore, our national tradition has resolved this conflict in favor of "the overwhelming majority of religious believers in being able to give God thanks and supplication as a people, and with respect to our national endeavors." *Id.* at 900. "The 'Establishment' Clause does not ban federal or state regulation of conduct whose reason or effect merely happens to coincide or harmonize with the tenets of some or all religions." *McGowan v. Maryland,* 366 U.S. 420, 442 (1961)

"In many instances, the Congress or state legislatures conclude that the general welfare of society, wholly apart from any religious

considerations, demands such regulation." *Id.* The fact that a law agrees with the dictates of the Abrahamic Religions does not invalidate the regulation. *See id.* (citing *Davis v. Beason*, 133 U.S. 333 (1890); *Reynolds v. United States*, 98 U.S. 145, 164 (1879)). To argue otherwise would be to eschew regulations against theft, fraud, and murder simply because those offenses were also proscribed in the Ten Commandments. As the Court illustrated in *McGowan*, a regulation which promotes religion is not unconstitutional when it is not coercive. *Id.* at 453 (citing *McCollum* as "the only case in this Court finding a violation of the 'Establishment' Clause.").

In its modern jurisprudence, the Supreme Court has held that "permitting private speech is not the same thing as coercing others to participate in it." *Kennedy v. Bremerton School Dist.*, 597 U.S. 507, 541 (2022) (citing *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 589 (plurality opinion)). This remains true in the classroom, where even subtle coercive pressures on students to engage in or be exposed to religious activities can be problematic. *Lee v. Weisman*, 505 U.S. 577, 592 (1992). The passive display of the Ten Commandments bears no resemblance to the coercive state establishments that existed at the

founding. "The coercion that was a hallmark of historical establishments of religion was coercion of religious orthodoxy and of financial support by force of law and threat of penalty." *Town of Greece,* 572 U.S., at. 608 (Thomas, J. concurring in part) (citation omitted). Furthermore, the Supreme Court has also reaffirmed that there is "no historically sound understanding of the Establishment Clause that begins to 'mak[e] it necessary for government to be hostile to religion.'" *Kennedy*, 597 U.S. at 541 (alteration original) (quoting *Zorach*, 343 U.S. at 314).

There is nothing in the Supreme Court's jurisprudence that signals the Framer's intent that whenever the "reasonable observer" feels "subtle pressure," or perceives governmental "endors[ement]," the Establishment Clause is violated. *Town of Greece,* 572 U.S., at. 608 (Thomas, J. concurring in part).   Furthermore, "diverse expressive activities ha[ve] always been part of learning how to live in a pluralistic society." *Kennedy,* 597 U.S. at 541 (citation omitted). Simply put, "[o]ffense . . . does not equate to coercion." *Town of Greece,* 572 U.S. at 589. Appellees make no case that the mere display of the Ten Commandments in public schools is coercive.

22

Accordingly, the Louisiana law at issue is permissible. Religious content or the promotion of a message consistent with a religious doctrine does not in and of itself run afoul of the Establishment Clause. *See Van Orden v. Perry*, 545 U.S. 677 (2005) (citing *Lynch*, 465 U.S. at 680, 687; *Marsh*, 463 U.S. at 792; *McGowan*, at 437–440; *Walz*, 397 U.S. at 676–678). The Louisiana legislature's desire to "educate and inform the public as to the history and background of American and Louisiana law," House Bill No. 71, Act No. 676, does not conflict with the Establishment Clause.

## V.    The Courts Have Affirmed The Role Of Religious Teachings In Education.

In addition to the important role that religion plays in our government and society, one of the most crucial functions of religious teaching has been in the preparation of future generations. Religious dogma—in particular Judeo-Chrisitan morality—has been the ethical goalpost in the raising of children in the United States. The courts have repeatedly recognized and protected the importance of religious observances in the school setting. Here, the threshold need not even reach such level as this case involves mere passive displays.

In *Florey v. Sioux Falls School District*, the Eighth Circuit upheld District rules permitting public school Christmas observances with

23

religious elements. 619 F.2d 1311, 1314 (8th Cir. 1980), cert. denied. 449 U.S. 987. These rules "advanc[ed] the student's knowledge and appreciation of the role that our religious heritage has played in the social, cultural and historical development of civilization." *Id.* In *Zorach v. Clausen*, the Supreme Court upheld a statute providing for the release of public-school pupils from school attendance to attend religious classes. 343 U.S. 306. Justice Douglas wrote: "[w]hen the state encourages religious instruction or cooperates with religious authorities . . . it then respects the religious nature of our people and accommodates the public service to their spiritual needs." *Id.* at 313-14.

Courts have not only supported the practices of religion in education, they have also defended religious liberty and ensured that religious voices are heard in public schools. In *Board of Educ. of Westside Community Schools v. Mergens*, the Supreme Court ruled that public high schools receiving federal financial assistance must allow religious groups to use school facilities if they allow other noncurricular-related student groups to do so. 496 U.S. 226, 241 (1990). In *Good News Club v. Milford Central School*, the Court found that excluding a Christian children's club from meeting at a public school after hours constituted

viewpoint discrimination and was not required to avoid violating the Establishment Clause. 533 U.S. 98, 111-12 (2001). In *Rosenberger v. Rector and Visitors of University of Virginia*, the Court found that a student's rights were violated when the University refused to provide him funding for his publication that "promotes or manifests a particular belief in or about a deity" on an equal basis with other student publications. 515 U.S. 819, 845-46 (1995).

Congress has acted similarly in supporting the proliferation of religious teaching. For much of the country's early history, Congress appropriated public funds in support of Indian education carried out by religious organizations.[11] The Supreme Court has also dealt extensively with funding for private religious institutions, repeatedly ensuring that private religious schools have access to grant funding on an equal basis as public schools. *See, e.g., Zelman v. Simmons–Harris*, 536 U.S. 639 (2002) (upholding school voucher program); *Agostini v. Felton*, 521 U.S. 203 (1997) (approving a program that provided public employees to teach

---

[11] Congress ceased appropriating such money for education in sectarian schools in 1897. *See* Act of June 7, 1897, 30 Stat. 62, 79; *cf., Quick Bear v. Leupp*, 210 U.S. 50, 77–79, (1908); J. O'Neill, Religion and Education Under the Constitution 118–119 (1949). *See generally,* R. Cord, Separation of Church and State 61–82 (1982).

remedial classes at religious and other private schools), *overruling Aguilar v. Felton*, 473 U.S. 402 (1985); *Zobrest v. Catalina Foothills School Dist.*, 509 U.S. 1 (1993) (allowing a public school district to provide a sign-language interpreter to a deaf student at a Catholic high school as part of a federal program for the disabled); *Mueller v. Allen*, 463 U.S. 388 (1983) (upholding tax deduction for certain expenses incurred in sending one's child to a religious school). Accordingly, when analyzed through the lens of properly understood history, the Establishment Clause does not prohibit any generalized "endorsement" of religious teaching.

## <u>CONCLUSION</u>

For the foregoing reasons, the decision of the District Court should be REVERSED.

December 17, 2024.                     Respectfully submitted,

*s/ Michael Berry*

_____

Michael Berry
America First Policy Institute
1777 N. Kent Street, 14th Floor
Arlington, VA 22209
703.637.3690

*Attorney for amicus curiae the America First Policy Institute*

## RULE 32(g) CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certifies that this document complies with the requirements of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,468 words, not including the items excluded by Federal Rule of Appellate Procedure 32(f), according to the count of Microsoft Word. Undersigned counsel further certifies that this brief complies with typeface and style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in Microsoft Word using 14-point Century Schoolbook font.

December 17, 2024.

*s/ Michael Berry*

_____

Michael Berry
America First Policy Institute
1777 N. Kent Street, 14th Floor
Arlington, VA 22209
703.637.3690

*Attorney for amicus curiae the America First Policy Institute*

CERTIFICATE OF SERVICE

Undersigned counsel hereby certifies that the foregoing brief was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Undersigned counsel further certifies that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

December 17, 2024.

*s/ Michael Berry*

Michael Berry
America First Policy Institute
1777 N. Kent Street, 14th Floor
Arlington, VA 22209
703.637.3690

*Attorney for amicus curiae the America First Policy Institute*

28