## No. 24-30706

# United States Court of Appeals for the Fifth Circuit

DARCY ROAKE, REVEREND, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILDREN, REAL PARTY IN INTEREST A.V., REAL PARTY IN INTEREST S.V.; ADRIAN VAN YOUNG, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILDREN, REAL PARTY IN INTEREST A.V., REAL PARTY IN INTEREST S.V.; MAMIE BROADHURST, REVEREND, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST N.W.; RICHARD WILLIAMS, REVEREND, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST N.W.; JEFF SIMS, REVEREND, ON BEHALF OF HIMSELF AND ON BEHALF OF HIS MINOR CHILDREN, REAL PARTY IN INTEREST A.S., REAL PARTY IN INTEREST C.S. 1, REAL PARTY IN INTEREST C.S. 2; JENNIFER HARDING, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST A.O.; BENJAMIN OWENS, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST A.O.; DAVID HAWLEY, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILDREN REAL PARTY IN INTEREST A.H., REAL PARTY IN INTEREST L.H.; ERIN HAWLEY, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILDREN, REAL PARTY IN INTEREST A.H, REAL PARTY IN INTEREST L.H.; DUSTIN MCCRORY, ON BEHALF OF THEMSELVES AND ON BEHALF OF HIS MINOR CHILDREN, REAL PARTY IN INTEREST E.M.; REAL PARTY IN INTEREST P.M., REAL PARTY IN INTEREST L.M.; GARY SERNOVITZ, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST T.S.; MOLLY PULDA, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST T.S.; CHRISTY ALKIRE, ON BEHALF OF HERSELF AND ON BEHALF OF HER MINOR CHILD, REAL PARTY IN INTEREST L.A.; JOSHUA HERLANDS, ON BEHALF OF HIMSELF AND ON BEHALF OF HIS MINOR CHILDREN, REAL PARTY IN INTEREST E.H., REAL PARTY IN INTEREST J.H.,

*Plaintiffs-Appellees,*

v.

CADE BRUMLEY, IN HIS OFFICIAL CAPACITY AS THE LOUISIANA STATE SUPERINTENDENT OF EDUCATION; CONRAD APPEL, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE LOUISIANA STATE BOARD OF ELEMENTARY AND SECONDARY EDUCATION (LSBESE); JUDY ARMSTRONG, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; KEVIN BERKEN, IN HIS OFFICIAL CAPACITY AS A

MEMBER OF THE LSBESE; PRESTON CASTILLE, IN HIS OFFICIAL CAPACITY AS A
MEMBER OF LSBESE; SIMONE CHAMPAGNE, IN HER OFFICIAL CAPACITY AS A
MEMBER OF THE LSBESE; SHARON LATTEN-CLARK, IN HER OFFICIAL CAPACITY
AS A MEMBER OF THE LSBESE; LANCE HARRIS, IN HIS OFFICIAL CAPACITY AS A
MEMBER OF LSBESE; PAUL HOLLIS, LOUISIANA STATE BOARD OF ELEMENTARY
AND SECONDARY EDUCATION; SANDY HOLLOWAY, IN HER OFFICIAL CAPACITY AS
A MEMBER OF THE LSBESE; STACEY MELERINE, IN HER OFFICIAL CAPACITY AS A
MEMBER OF THE LSBESE; RONNIE MORRIS, IN HIS OFFICIAL CAPACITY AS A
MEMBER OF THE LSBESE; EAST BATON ROUGE PARISH SCHOOL BOARD;
LIVINGSTON PARISH SCHOOL BOARD; VERNON PARISH SCHOOL BOARD;
ST. TAMMANY PARISH SCHOOL BOARD,

*Defendants-Appellants*,

---

On Appeal from the United States District Court
for the Middle District of Louisiana
No. 3:24-cv-517, Hon. John W. deGravelles

---

### BRIEF FOR *AMICUS CURIAE*
### FRATERNAL ORDER OF EAGLES
### SUPPORTING APPELLANTS AND REVERSAL

---

CREIGHTON A. THURMAN
FRATERNAL ORDER OF EAGLES
409 Walnut Street
Yankton, SD 57078

GENE C. SCHAERR
   *Counsel of Record*
JUSTIN A. MILLER
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
gschaerr@schaerr-jaffe.com

*Counsel for Amicus Curiae Fraternal Order of Eagles*

DECEMBER 17, 2024

## SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES

No. 24-30706
*Roake, et al. v. Brumley, et al.*

Pursuant to 5th Cir. R. 29.2, the undersigned counsel of record hereby certifies that, in addition to the persons and entities listed in the Plaintiffs-Appellees' Response to Defendants-Appellants' Petition for Initial Hearing En Banc (Dkt. No. 87), the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Defendants-Appellants:
Cade Brumley, Louisiana State Superintendent of Education
Conrad Appel, member of the Louisiana State Board of Elementary and Secondary Education (LSBESE)
Judy Armstrong, member of the LSBESE
Kevin Berken, member of the LSBESE
Preston Castille, member of LSBESE
Simone Champagne, member of the LSBESE
Sharon Latten-Clark, member of the LSBESE
Lance Harris, member of LSBESE
Paul Hollis, LSBESE
Sandy Holloway, member of the LSBESE
Stacey Melerine, member of the LSBESE
Ronnie Morris, member of the LSBESE
East Baton Rouge Parish School Board
Livingston Parish School Board
Vernon Parish School Board

St. Tammany Parish School Board

<u>Counsel for Defendants-Appellants:</u>
LOUISIANA DEPARTMENT OF JUSTICE
Jorge Benjamin Aguinaga
Zachary Faircloth
Phyllis Esther Glazer
Caitlin A. Huettemann
BECKET FUND FOR RELIGIOUS LIBERTY
Joseph Charles Davis
Benjamin Fleshman
Kelsey Flores
Eric C. Rassbach
Amanda Leigh Salz

<u>*Amicus Curiae*</u>:
Fraternal Order of Eagles

<u>Counsel for *Amicus Curiae*</u>:
Gene C. Schaerr
Justin A. Miller
SCHAERR | JAFFE LLP
Creighton A. Thurman

In accordance with Federal Rule of Appellate Procedure 26.1, *amicus curiae* Fraternal Order of Eagles states that it is not publicly traded and has no parent corporations. No publicly traded corporation owns 10% or more of *amicus*.

*/s/ Gene C. Schaerr*
Gene C. Schaerr

*Counsel of Record for Amicus Curiae*

# TABLE OF CONTENTS

SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES .............i

TABLE OF AUTHORITIES ...................................................................iv

INTRODUCTION, INTEREST OF *AMICUS CURIAE* AND
    SUMMARY OF ARGUMENT ................................................1

ARGUMENT ........................................................................................3

   I.    H.B. 71 Easily Avoids Categorization as a Religious
       "Establishment" as That Term Was Understood at the
       Founding. ...................................................................4

       A.    There were seven well-known features of religious
           "establishments" during the founding era. .......................5

       B.    H.B. 71 implicates none of those seven traditional
           hallmarks of religious establishment, and
           therefore cannot be considered to violate the
           Establishment Clause. ...................................................17

  II.   H.B. 71 Fits Well Within Our Nation's Long Tradition of
       Governmental Use of Religious Symbolism. ...........................20

       A.    Our Nation has a long practice of public
           institutions' using passive religious symbols...................21

       B.    H.B. 71 follows a long tradition of passive Ten
           Commandments displays. .................................................34

       C.    Because H.B. 71 fits well within this long tradition
           of passive religious symbology, it cannot constitute
           an unconstitutional establishment. ..................................40

CONCLUSION ....................................................................................41

CERTIFICATE OF SERVICE..............................................................43

CERTIFICATE OF COMPLIANCE......................................................44

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Am. Legion v. Am. Humanist Ass'n,*
  588 U.S. 29 (2019) ............................................................ 3

*Elk Grove Unified Sch. Dist. v. Newdow,*
  542 U.S. 1 (2004) ...................................................... 40, 41

*Freedom From Religion Found. v. Mack,*
  49 F.4th 941 (5th Cir. 2022) ........................................ 20

*Gallagher v. Crown Kosher Super Mkt. of Mass., Inc.,*
  366 U.S. 617 (1961) .................................................. 14, 18

*Holy Trinity Church v. United States,*
  143 U.S. 457 (1892) ...................................................... 18

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
  565 U.S. 171 (2012) ...................................................... 11

*Kennedy v. Bremerton Sch. Dist.,*
  597 U.S. 507 (2022) ................................................ *passim*

*Lautsi v. Italy* [GC],
  No. 30814/06, Eur. Ct. H.R. (2011) .............................. 4

*Lemon v. Kurtzman,*
  403 U.S. 602 (1971) ........................................................ 2

*Lynch v. Donnelly,*
  465 U.S. 668 (1984) .................................................... 4, 17

*Pleasant Grove City v. Summum,*
  555 U.S. 460 (2009) .................................................... 2, 10

*Santa Fe Indep. Sch. Dist. v. Doe,*
  530 U.S. 290 (2000) ........................................................ 4

*Sch. Dist. of Abington Twp. v. Schempp,*
  374 U.S. 203 (1963) ...................................................... 39

*Shurtleff v. City of Boston,*
     596 U.S. 243 (2022) ............................................................... 7

*Stone v. Graham,*
     449 U.S. 39 (1980) ................................................................ 39

*Torcaso v. Watkins,*
     367 U.S. 488 (1961) .............................................................. 15

*Town of Greece v. Galloway,*
     572 U.S. 565 (2014) .......................................................... 4, 20

*Van Orden v. Perry,*
     545 U.S. 677 (2005) ................................................................ 2

*Watson v. Jones,*
     80 U.S. (13 Wall.) 679 (1871) ......................................... 11, 19

**Constitutional Provisions**

U.S. Const. amend. I ................................................................... 5

S.C. Const. of 1778 ..................................................................... 8

**Statutes**

Ala. Code § 1-2-5...................................................................... 25

Md. Code, Gen. Provis., § 7-202 ............................................. 24

**Rule**

Fed. R. App. P. 29...................................................................... 1

**Other Authorities**

Aff. of David Barton,
     *Doe v. Harlan Cnty Sch. Dist.*, No. 99-508 (E.D. Ky. 2001) ............... 47

Gregory W. Alarcon,
     *Exploring the Stanley Mosk Courthouse,*
     J. Consumer Atty's Ass'ns S. Cal. (June 2022).................................... 44

Annals of Cong. (Aug. 15, 1789) (Joseph Gales ed., 1834) .................. 7, 8

Architect of Capitol,
  *Father Junipero Serra Statue* ............................................................. 35

Stephanie H. Barclay et al.,
  *Original Meaning and The Establishment Clause:*
  *A Corpus Linguistics Analysis,*
  61 Ariz. L. Rev. 505 (2018) .................................................................. 10

*The Burgundian Saltire—1565-1763*, Fla. Dep't of State ...................... 32

R. Freeman Butts & Lawrence A. Cremin,
  *A History of Education in American Culture* (1953) ........................... 48

Steven G. Calabresi,
  *"A Shining City on a Hill": American Exceptionalism and*
  *the Supreme Court's Practice of Relying on Foreign Law,*
  86 B.U. L. Rev. 1335 (2006) .................................................................. 36

*Cape Henry Memorial Cross,*
  Nat'l Park Serv. (Sept. 3, 2022) .......................................................... 39

Gilbert Chinard,
  *Thomas Jefferson: The Apostle of Americanism* (2d ed. 1975) ............ 28

*Encyclopedia of Mormonism* (Daniel H. Ludlow, ed. 1992). .................. 40

Carl H. Esbeck,
  *Dissent and Disestablishment: The Church-State*
  *Settlement in the Early American Republic,*
  2004 B.Y.U. L. Rev. 1385 (2004) ................................................. 9, 10, 11

Carl H. Esbeck,
  *Uses and Abuses of Textualism and Originalism*
  *in Establishment Clause Interpretation,*
  2011 Utah L. Rev. 489 (2011) ....................................................... 5, 7, 8

*Flag of Utah,*
  State Symbols USA ............................................................................... 40

*Hebrews* 6:19 (KJV) ................................................................................. 38

William Waller Hening,
  *The Statutes at Large, Being a Collection of All the
  Laws in Virginia* (N.Y., R. & W. & G. Bartow 1823) .......................... 17

*Hinds County Courthouse Fact Sheet*,
  Miss. Dep't of Archives & Hist. (May 27, 2009) .................................. 44

*Historical Flag Project, The Cross of Burgundy or
  St. Andrew Flag (The Flag of the Viceroyalty of New Spain)*,
  U.S. Dist. Ct. for the Dist. of P.R., ........................................................ 33

James H. Hutson,
  *Religion and the Founding of the American Republic*
  (1998) ................................................................ 28, 31, 36, 37

Alfredo Jiménez,
  *Spanish Missions in the United States: Cultural and
  Historical Significance*, Nat'l Park Serv. (Apr. 15, 2016) ................... 34

Clare D'Artois Leeper,
  *Louisiana Place Names: Popular, Unusual, and
  Forgotten Stories of Towns, Cities, Plantations,
  Bayous, and Even Some Cemeteries* (2012) ........................................ 30

Doug MacCash,
  *Where Did the Names of Louisiana's 64 Parishes
  Come From?*, Times-Picayune (Mar. 27, 2017) ................................... 30

*Maryland State Flag, Maryland at a Glance*,
  Maryland Manual On-Line .................................................................. 31

Michael W. McConnell,
  *Establishment and Disestablishment at the Founding,
  Part I: Establishment of Religion*,
  44 Wm. & Mary L. Rev. 2105 (2003) ........................................... *passim*

Peter Murray & Linda Murray,
  *The Oxford Dictionary of Christian Art & Architecture*
  (2d ed. 2013) ................................................................. *passim*

Off. of Curator,
    *Courtroom Friezes: South and North Walls* (May 8, 2003) ................ 45

*Origins of the Seal of the State of Rhode Island and
    Providence Plantations*, RI.gov ........................................................... 38

Richard S. Patterson & Richardson Dougall,
    *The Eagle and the Shield: A History of the Great Seal
    of the United States* (1976) .................................................................. 27

S. Journal, 1st Cong., 1st Sess. (Sept. 3, 1789) ....................................... 7

S. Journal, 1st Cong., 1st Sess. (Sept. 9, 1789) ....................................... 7

*Sacred Pipe*, Encyclopedia Britannica (June 5, 2013) ........................... 42

*Santa Fe, New Mexico, United States*,
    Encyclopedia Britannica (Oct. 17, 2024), ......................................... 35

J. Thomas Scharf,
    *History of Maryland: From the Earliest Period to
    the Present Day* (Traditional Press 1967) (1879) ............................... 10

Benjamin F. Shearer & Barbara S. Shearer,
    *State Names, Seals, Flags, and Symbols:
    A Historical Guide* (3d ed. 2002) ................................................. 33, 34

*The Shorter Catechism*, *in* The New England Primer (1777) ............... 49

Charles A. Stansfield,
    *A Geography of New Jersey: The City in the Garden*
    (2d ed. 1998) ......................................................................................... 37

*State Flag*, Fla. Dep't of State ................................................................ 32

George R. Stewart,
    *American Place-Names: A Concise and Selective
    Dictionary for the Continental United States of America*
    (1970) ..................................................................................................... 38

*The Ten Commandments*
    (Paramount Pictures 1956) ..................................................................... 1

Town of Groton Massachusetts ............................................................. 36

Stephanie B. Turner,
*The Case of the Zia: Looking Beyond Trademark
Law to Protect Sacred Symbols,*
11 Chi.-Kent J. Intell. Prop. 116 (2012) ............................................. 41

Linda D. Wilson, Okla. Hist. Soc'y,
*Fluke, Louise Funk (1900–1986)* ........................................................ 42

John Witte Jr.,
*God's Joust, God's Justice: Law and Religion in the
Western Tradition* (2006) ................................................................. 11

John Witte Jr.,
*Religion and the American Constitutional Experiment:
Essential Rights and Liberties* (2000) ......................................... 29, 43

U.S. Dep't of State, Bureau Pub. Affs.,
*The Great Seal of the United States* (2003) ...................................... 28

*U.S. Supreme Court,*
Cass Gilbert Soc'y ............................................................................ 45

*Utah Beehive Flag, Utah Values, Pride, and Unity,*
State of Utah ................................................................................... 40

## INTRODUCTION, INTEREST OF *AMICUS CURIAE*[1] AND SUMMARY OF ARGUMENT

Early this summer, the Louisiana Legislature passed and the governor signed a statute known as H.B. 71, which requires Louisiana schools to post displays of the Ten Commandments and to include, as part of those displays, the Commandments' historical significance. Before H.B. 71 was implemented, however, it was immediately enjoined—based in part on an erroneous understanding of the Establishment Clause.

But while the injunction is on shaky legal ground, it is hardly novel. *Amicus* the Fraternal Order of Eagles, a nonprofit civic organization with nearly 800,000 members and 1,500 chapters across the United States and Canada, has for decades been fighting such injunctions—and the faulty view of the Establishment Clause that inevitably justifies them.

Indeed, in the 1950s, the Order partnered with Cecil B. DeMille, director of *The Ten Commandments* (Paramount Pictures 1956), to

---

[1] *Amicus* is authorized to file this brief by Federal Rule of Appellate Procedure 29(a)(2) because all parties have consented to its filing. No party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund the preparation or submission of the brief, and no person other than *amicus*, its members, or its counsel contributed money to fund the preparation or submission of the brief. Fed. R. App. P. 29(a)(4)(E).

commission more than 10,000 Ten Commandments monuments for display on public lands nationwide. The goal of the project was to encourage citizens to use the Commandments as guidelines for treating others well and for building strong communities. Many of those monuments still stand today.

But the Order's project was not without controversy, and its monuments repeatedly—though often unsuccessfully—came under legal attack under the now-abandoned regime of *Lemon v. Kurtzman*, 403 U.S. 602 (1971). *See, e.g.*, *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) (monument donated by the Order); *Van Orden v. Perry*, 545 U.S. 677 (2005) (same).

Given the Order's history both donating Ten Commandments monuments to public lands and defending them against legal challenges, this case, as well as any case whose resolution may turn on the proper application of the Establishment Clause, is enormously important to the Order. And, while the Order agrees with Appellants (at 25–40) that Plaintiffs lack standing to challenge H.B. 71, it writes separately to expand on Appellants' showing (at 40–59) that H.B. 71 is not an "establishment of religion" for two complementary reasons. First, H.B. 71

lacks the "hallmarks of religious establishment" that "the framers sought to prohibit when they adopted the First Amendment." *Kennedy v. Bremerton Sch. Dist.,* 597 U.S. 507, 537 (2022). Second, H.B. 71 follows a long history and tradition of American governments' using passive religious symbols to remember and represent the people and ideas that brought them into being. For both reasons, if this Court reaches the merits, it should hold that Plaintiffs have not carried their burden of showing a likelihood of success on their claim that H.B. 71 is an invalid establishment of religion.

## ARGUMENT

Under current Establishment Clause doctrine, the Supreme Court employs two complementary approaches to decide whether a particular government arrangement is an invalid "establishment of religion." Under one approach, the Court asks whether the arrangement as a whole possesses the elements of what would have been viewed as a governmentally "established" church at the founding. *See, e.g., Kennedy*, 597 U.S. at 535–36 (citing *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 60 (2019) (plurality)). Second, the Court asks whether the arrangement is consistent with and analogous to practices that have

historically been considered consistent with the Establishment Clause. *Id.* (citing *Town of Greece v. Galloway*, 572 U.S. 565, 576–77 (2014)). As shown below, application of these two complementary approaches leads to the same answer: The use of a passive religious symbol—as compared to didactic speech or participation in symbolic religious *activities*—is not an "establishment" as that term was originally understood. *See Lynch v. Donnelly*, 465 U.S. 668, 686 (1984).[2] H.B. 71 thus does not run afoul of the Establishment Clause.

## I. H.B. 71 Easily Avoids Categorization as a Religious "Establishment" as That Term Was Understood at the Founding.

The Establishment and Free Exercise Clauses work together to "restrain[] the government" and "enlarge religious freedom."[3] Their "common purpose … is to secure religious liberty." *See Santa Fe Indep. Sch. Dist. v. Doe,* 530 U.S. 290, 313 (2000) (cleaned up). But the Establishment Clause does not require courts to "purge" from public life

---

[2] *Cf. Lautsi v. Italy* [GC], No. 30814/06, ¶72, Eur. Ct. H.R. (2011), https://tinyurl.com/3zvmhuxt ("[A] crucifix on a wall is an essentially passive symbol.").

[3] Carl H. Esbeck, *Uses and Abuses of Textualism and Originalism in Establishment Clause Interpretation*, 2011 Utah L. Rev. 489, 494 (2011) (Esbeck, *Uses and Abuses*).

everything that "partakes of the religious." *Kennedy*, 597 U.S. at 535 (cleaned up). Instead, "the Establishment Clause must be interpreted by reference to historical practices and understandings." *Id.* at 510. And an examination of those historical practices and understandings reveals both that H.B. 71 lacks the "hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment," *id.* at 537, and is consistent with the Establishment Clause's long history of protecting religious autonomy.

### A.    There were seven well-known features of religious "establishments" during the founding era.

The Establishment Clause directs that "Congress shall make no law respecting an establishment of religion[.]" U.S. Const. amend. I. Unlike other First Amendment clauses that prohibit infringing or abridging preexisting *rights*, the text of the Establishment Clause strips the federal government of a *power* governments had long exercised—the power to establish religion.[4]

Examining draft language that the first Federal Congress rejected shows that it sought to avoid extreme approaches to non-establishment.

---

[4] *See* Esbeck, *Uses and Abuses*, 2011 Utah L. Rev. at 583–87.

On the unduly narrow side, the Senate ultimately rejected an early version that prohibited only a "law establishing one Religious Sect or Society in preference to others[.]"[5] It also rejected a narrow provision excluding only laws "establishing articles of faith or a mode of worship[.]"[6] As to the House, it refused even to consider a proposal stating only that "no religious *doctrines* shall be established by law."[7] On the other hand, the House for a time embraced very broad language forbidding Congress from enacting "laws *touching* religion."[8] Congress ultimately rejected both the narrower and the broader versions.

The final version—"no law respecting an establishment of religion"—was much more tailored. As discussed below, the public at ratification understood it to at least prohibit Congress from mandating specific religious doctrines, articles of faith, or modes of worship, or from preferring one religious group over others. Yet the Clause's history

---

[5] *Id*. at 556 (bold font omitted) (quoting S. Journal, 1st Cong., 1st Sess. 116 (Sept. 3, 1789)).

[6] *Id*. at 559 & n.289 (bold font omitted) (quoting S. Journal, 1st Cong., 1st Sess. 129 (Sept. 9, 1789)).

[7] *Id*. at 539 & n.211 (emphasis added, bold font omitted) (quoting 1 Annals of Cong. 757 (Aug. 15, 1789) (Joseph Gales ed., 1834)).

[8] *Id*. at 546 & n.241 (emphasis added, bold font omitted) (quoting 1 Annals of Cong. 759 (Aug. 15, 1789) (Joseph Gales ed., 1834)).

refutes a reading that government is barred from legislating on any subject "touching on religion," such as laws that protect, accommodate, or honor the history and tradition of religious exercise that led to the founding of this Nation.[9]

By design, the Clause refers to "an establishment of religion"—a concept familiar to 18th-century Americans. They had experience, either directly or through studying history, with Europe's established churches, and they knew well the religious establishments in the colonies and fledgling states.[10] They thus understood that an "establishment of religion" consisted of one or more of the following seven elements. *See Kennedy*, 597 U.S. at 537 & n.5 (citing *Shurtleff v. City of Boston*, 596 U.S. 243, 285–86 (2022) (Gorsuch, J., concurring)).[11] None of these

---

[9] *Id.* at 593–96.

[10] *See* Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2110–30 (2003); Carl H. Esbeck, *Dissent and Disestablishment: The Church-State Settlement in the Early American Republic*, 2004 B.Y.U. L. Rev. 1385, 1395–1401 (2004) (Esbeck, *Dissent and Disestablishment*).

[11] Justice Gorsuch explained that "[b]eyond a formal declaration that a religious denomination was in fact the established church," there were six other "hallmarks." *Shurtleff*, 596 U.S. at 285–86 (Gorsuch, J., concurring). Our brief counts the "formal declaration" as a hallmark in addition to the six discussed in Defendants' brief. Defs.' Br. 41–45.

elements resembles the passive religious symbols that H.B. 71 contemplates here.

1.     To the founding generation, the most obvious establishment of religion was the recognition or designation in law of a jurisdiction's official church.[12] For example, in 1692, after Maryland had served for a time as a haven for persecuted Catholics, the Maryland colonial assembly passed "an act making the Church of England the established church of the province."[13] During the Revolutionary War, South Carolina jettisoned the Anglican establishment and instead provided that "[t]he Christian Protestant religion … is hereby constituted and declared to be, the established religion of this State."[14]

Such statutory declarations threatened all "dissenting" churches or religions: Their members would have to worry about religious discrimination if they ran for government office, participated in litigation, or faced trial for an alleged crime. Even if such discrimination

---

[12] Stephanie H. Barclay et al., *Original Meaning and The Establishment Clause: A Corpus Linguistics Analysis*, 61 Ariz. L. Rev. 505, 559 (2018).

[13] Esbeck, *Dissent and Disestablishment*, 2004 B.Y.U. L. Rev. at 1487 n.350 (quoting 1 J. Thomas Scharf, *History of Maryland: From the Earliest Period to the Present Day* 343 (Traditional Press 1967) (1879)).

[14] *Id.* at 1493 n.371 (quoting S.C. Const. of 1778, art. XXXVIII).

never materialized, the mere *potential* that members of "dissenting" faiths might face such discrimination would discourage citizens from joining or participating actively in those communities.

2.    State establishments of religion also frequently involved governmental intrusion into or entanglement with ecclesiastical affairs.[15] For example, establishing Anglicanism in England "led to all manner of state controls of the internal affairs of the established Church."[16] Acts of Parliament even set the established church's official doctrine and liturgy, such as the Book of Common Prayer.[17]

Colonial Massachusetts, in turn, enforced "Puritan orthodoxy" by "barr[ing] any person from public preaching without the approval of the elders of the four neighboring churches, or of the county court."[18] Even after independence, as part of establishing the "Christian Protestant religion," South Carolina allowed a church to be considered part of the

---

[15] McConnell, 44 Wm. & Mary L. Rev. at 2131.

[16] John Witte Jr., *God's Joust, God's Justice: Law and Religion in the Western Tradition* 186 (2006).

[17] McConnell, 44 Wm. & Mary L. Rev. at 2132.

[18] *Id.* at 2135.

establishment only if it adopted five specific articles of faith.[19] And in 1783, clergymen in Maryland's established church needed to seek "legislative approval of changes in the liturgy eliminating references to the king and making other changes 'to adapt the same to the Revolution.'"[20]

Religious establishments also controlled the appointment and removal of ministers.[21] So widespread was that aspect of religious establishments that in 18th-century England, "the appointment of the ecclesiastical hierarchy became exceptionally political[.]"[22] And in colonial New England, first the town, then later councils of neighboring churches, and then courts had to approve a minister selected by the local congregation.[23]

Control over appointment of ministers opened the door to government interference with the church itself. When the royal governor

---

[19] *Id.* at 2135–36.

[20] *Id.* at 2136 (citation omitted).

[21] *See id.* at 2136 ("The power to appoint and remove ministers and other church officials is the power to control the church.").

[22] *Id.* at 2136–37.

[23] *Id.* at 2137–38.

of North Carolina maintained that only the Bishop of London could select ministers, the colonial Assembly passed laws allowing vestries to make such selections, only to have those laws rescinded by English authorities. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 183 (2012). South Carolina's colonial government also created "an ecclesiastical court" with power to "remove ministers 'for cause'—a flagrant violation of the episcopal governing structure of the Church of England."[24]. In Maryland, disciplinary authority over the established church's ministers was vested in the Assembly, "ma[king] day-to-day governance of the Church a political affair."[25]

Because of these colonial and founding-era intrusions, non-establishment was widely understood to include church autonomy to govern their ecclesiastical affairs free of government intrusion or entanglements. *See, e.g.*, *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 727 (1871).

3.    Compulsory attendance or participation in religious services or ordinances was another common hallmark of religious establishments.

---

[24] McConnell, 44 Wm. & Mary L. Rev. at 2142 (footnote omitted).
[25] *Id.*

In England and at least some American colonies (Virginia, Massachusetts, and Connecticut), missing Sunday worship in the established church resulted in fines and sometimes whippings.[26] Likewise, Baptist dissenters in New England were prosecuted for refusing to baptize their children in the established church.[27]

Even where worship in dissenting churches was not prohibited, such laws put those churches at a substantial disadvantage compared to the established church: While some believers in a non-established religion might be willing to attend services in both the established church *and* their preferred church, others might well lack the faith, character, time, or means to worship twice over.

4.    Another hallmark of establishment was the punishment of dissenters to coerce conformity. At one point, English penal statutes "inflict[ed] harsh sanctions on Catholics, Puritans, and others who attempted the open exercise of religious faith outside the official church."[28] This practice eased in the wake of the Glorious Revolution for

---

[26] *See* McConnell, 44 Wm. & Mary L. Rev. at 2144–46.

[27] *Id.* at 2145.

[28] *Id.* at 2160.

various Protestant dissenters, but matters worsened for Catholics who, in addition to the previous sanctions, "were barred from buying or inheriting land[.]"[29]

And while *some* American colonies were more tolerant than England, others continued such coercive practices. For example, Massachusetts' early laws banished, imprisoned, fined, whipped, mutilated, and hung religious dissenters.[30] And, in the early 1700s, Connecticut imposed "serious fines and penalties against dissenters."[31] Virginia simply banned the "unreasonable and turbulent sort of people, commonly called Quakers."[32]

A related feature of religious establishments that undermined non-established faith communities was the enactment of laws that prohibited otherwise lawful conduct that would not have been engaged in by faithful members of the established church but were common among "dissenters." For example, some jurisdictions enacted laws that prohibited working on

---

[29] *Id*. at 2160–61.

[30] *Id*. at 2162.

[31] *Id*. at 2162–63.

[32] *Id*. at 2163 & n.370 (quoting 1 William Waller Hening, *The Statutes at Large, Being a Collection of All the Laws in Virginia* 532 (N.Y., R. & W. & G. Bartow 1823)).

Sunday—even within the confines of one's own property and without selling to the public—as a means of penalizing religious minorities and in the interest of promoting Christian piety. Jewish communities were especially hard-hit by laws prohibiting Sunday labor, which often used Christian terms such as "the Lord's Day," thereby excluding Jews. *Gallagher v. Crown Kosher Super Mkt. of Mass., Inc.*, 366 U.S. 617, 625–26 (1961) (collecting colonial statutes).

5.    The next hallmark of established religion was that dissenters from the established church would often lose privileges because of their religious beliefs. In England, public office could be held only by those belonging to the Church of England, which included both active participation in Anglican communion and swearing an oath against the Catholic doctrine of transubstantiation.[33] Additionally, Catholics for a time "were excluded from the militia."[34]

So too in America, "[r]eligious restrictions on the right to vote were imposed in almost every colony."[35] And, "[e]ven after Independence, every

---

[33] *See* McConnell, 44 Wm. & Mary L. Rev. at 2176.

[34] *Id.* at 2161.

[35] *Id.* at 2177.

state other than Virginia restricted the right to hold office on religious grounds."[36]

Such restrictions put non-established churches at a significant disadvantage. *Cf. Torcaso v. Watkins*, 367 U.S. 488, 489 (1961) (voiding a Maryland constitutional provision requiring a notary public to sign "a declaration of belief in the existence of God"). Many believers in "dissenting" faith communities would not be willing to endure the social and economic costs imposed on those who refused to be members of an established church.

6.    Disparities in public financial support also regularly attended established religions. Religious establishments in England and the colonies, for example, often depended on government land grants consisting of income-producing property.[37] Parishes of the Church of England were also supported in part "by compulsory tithes," which "tithe payments constituted the majority of most ministers' incomes in the eighteenth century," and "were deeply resented by those who had to

---

[36] *Id*. at 2178.

[37] *See* McConnell, 44 Wm. & Mary L. Rev. at 2148–51.

pay."[38] Compulsory taxes filling similar functions existed in "all nine of the American colonies with established churches … for the support of churches and ministers."[39] Even during the Revolution, most states continued religious taxes in some form, with New England states continuing the practice beyond the war.[40]

This public financial support for the established church put non-established churches at a substantial disadvantage: While some believers in a non-established religion might be willing to endure the hardship of paying offerings to two churches, others might well lack the faith or character to endure that hardship and would abandon their non-established faith as a result.

7.    Another common element of an established church was a virtual monopoly over certain "important civil functions, especially social welfare functions."[41] Such functions included providing medical care,

---

[38] *Id.* at 2146–47.

[39] *Id.* at 2152.

[40] *Id.* at 2157–59.

[41] *Id.* at 2169.

paying for the burial of the poor, and giving other forms of poor relief, funded (in part) by religious taxes.[42]

Similarly, in New England "clergy generally were charged with conducting or controlling the schools."[43] In Virginia, the church rector was charged by law with keeping public records, such as births, marriages, and burials, and could be fined if he failed his duty.[44] And in the Anglican colonies, only Anglican ministers were licensed to perform weddings.[45]

### B. H.B. 71 implicates none of those seven traditional hallmarks of religious establishment, and therefore cannot be considered to violate the Establishment Clause.

Viewing these traditional hallmarks of religious establishment against H.B. 71 reveals a sharp disconnect: H.B. 71 does not purport to create an official or preferred faith beyond simply "acknowledg[ing] … the role of religion in American life" or "the use of … one passive symbol." *Lynch*, 465 U.S. at 686.

---

[42] *Id*. at 2170–71.

[43] *Id*. at 2172.

[44] *Id*. at 2175.

[45] *Id*.

1.     For example, H.B. 71 does not require religious organizations to believe any official dogma or to act according to government mandate. It requires no one to attend or join *any* church, let alone a government church. It forbids no one from belonging to or worshiping according to any religious tradition. H.B. 71 is no more coercive than the Constitution's Sundays Excepted Clause, which simply *acknowledges* the Christian Sabbath. *See Holy Trinity Church v. United States*, 143 U.S. 457, 470 (1892) ("this is a religious nation"); *cf. Gallagher*, 366 U.S. at 625–26 (collecting laws *prohibiting* work on Christian Sabbath).

Similarly, H.B. 71 precludes no one from political participation. It funds no church. Nor does it predicate the receipt of government benefits on a person's receiving a religious group's imprimatur. Accordingly, the passive religious symbols that H.B. 71 requires public schools to display do not reflect an establishment of religion as that term was understood by the founding generation.

2.     Nor does H.B. 71 interfere with the Establishment Clause's protection of religious autonomy. As explained, many specific features of religious establishments before the adoption of the First Amendment were a direct threat, not just to individual religious liberty, but to the

health—and in some cases the existence—of non-established churches and faith groups. By mandating institutional separation between church and state, state neutrality among religions, and governmental non-intrusion into ecclesiastical affairs, the Establishment Clause ensures the self-governance and autonomy of religious organizations and faith communities—thereby protecting the ability of religious organizations and faith communities of all stripes to define and preserve themselves.

Louisiana's adoption here of passive religious symbols that reflect its history and traditions does not—and could not—intrude into the constitutionally protected autonomy of these faith and religious communities. Even if H.B. 71 were allowed to go into effect, every religious organization in Louisiana could teach its faith and govern itself without state interference.

H.B. 71 thus poses no conflict with the principles which the Supreme Court has held form the core of church autonomy—matters of "theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them." *Watson*, 80 U.S. (13 Wall.) at 733. H.B. 71 does not offend the Establishment Clause.

19

## II. H.B. 71 Fits Well Within Our Nation's Long Tradition of Governmental Use of Religious Symbolism.

H.B. 71 is also fully "consistent with" with our Nation's "broader tradition of" passive religious symbols on public property and in public education. *See Freedom From Religion Found. v. Mack*, 49 F.4th 941, 950–51 (5th Cir. 2022). This is important because the Supreme Court has held that a practice "accepted by the Framers" that "has withstood the critical scrutiny of time and social change" is at least presumptively permissible. *Town of Greece*, 572 U.S. at 577. This Court has likewise held that proper interpretation of the Establishment Clause "depends on 'original meaning and history,' with particular attention paid to 'historical practices.'" *Mack*, 49 F.4th at 951 (quoting *Kennedy*, 597 U.S. at 535–36). Here, the "historical practices" evidence shows that H.B. 71 follows a storied tradition of governments' depicting and discussing passive religious symbols in public buildings, publications, symbols, and education, and therefore confirms that the law is not an invalid "establishment of religion."

**A.    Our Nation has a long practice of public institutions' using passive religious symbols.**

Since the beginning, American governments have used religious symbols to reflect American ideals.

1.    Indeed, one of the first things the American government did upon declaring independence was to create a Great Seal—to celebrate the peoples and events that led to independence. This task fell to Benjamin Franklin, Thomas Jefferson, and John Adams on July 4, 1776.[46]

Both Jefferson and Franklin proposed seals that showed images taken from the Hebrew Bible: Franklin's depicted Moses causing the Red Sea to "overwhelm Pharoah [sic]" while Jefferson's depicted "the children of Israel in the wilderness, led by a cloud by day and a pillar of fire by night."[47] Both sought to memorialize "the favorite contention of the settlers" of the United States, "that they were a chosen people" like the biblical Israelites.[48] And, while the Great Seal ultimately took a different

---

[46] Richard S. Patterson & Richardson Dougall, *The Eagle and the Shield: A History of the Great Seal of the United States* 6 (1976).

[47] *Id.* at 13–14, 16.

[48] Gilbert Chinard, *Thomas Jefferson: The Apostle of Americanism* 86 (2d ed. 1975); *see also* James H. Hutson, *Religion and the Founding of the American Republic* 51 (1998).

form, it too includes overt religious imagery, featuring an eye of "Providence" under a Latin motto meaning "He (God) has favored our undertakings."[49] Fig. 1.



Fig. 1

Since then, numerous state and local governments have followed the Founders' lead in including religious elements in passive government symbols to commemorate history and culture and to acknowledge their settlers' motivating beliefs. For example, the words "In God We Trust" and "similar confessions" widely appear "on governmental seals and stationery."[50]

2.    Louisiana is no exception. A French and largely Catholic colony until 1803, both its flag and its seal show a "pelican in her piety"—

---

[49] U.S. Dep't of State, Bureau Pub. Affs., *The Great Seal of the United States* 4 (2003), https://tinyurl.com/4srbxws4.

[50] John Witte Jr., *Religion and the American Constitutional Experiment: Essential Rights and Liberties* 97 (2000) ("Witte, *Religion*")

a symbol of Jesus' self-sacrifice long used to illustrate how "Christians are nourished by the Eucharist."[51] Figs. 2, 3.




Fig. 2               Fig.3

During French rule, moreover, "the colony's civil (governmental) boundaries were the same as the church's ecclesiastical boundaries."[52] And thus, today, Louisiana's county equivalents are called "parishes" and many are named after saints (*e.g.*, St. Bernard, St. John the Baptist) or Catholic feast days (*e.g.*, Ascension, Assumption).[53]

The French Catholic influence extends not just to modern-day Louisiana but throughout the much larger former Louisiana territory that stretches up the Mississippi River Valley. For instance, a major city

---

[51] Peter Murray & Linda Murray, *The Oxford Dictionary of Christian Art & Architecture* 64–65 (2d ed. 2013).

[52] Clare D'Artois Leeper, *Louisiana Place Names: Popular, Unusual, and Forgotten Stories of Towns, Cities, Plantations, Bayous, and Even Some Cemeteries* 3 (2012).

[53] Doug MacCash, *Where Did the Names of Louisiana's 64 Parishes Come From?*, Times-Picayune (Mar. 27, 2017), https://tinyurl.com/y22jx9v2.

in Missouri and the capital of Minnesota, St. Louis and St. Paul, both bear the name of saints.

3.     Overt religious imagery in public displays predates both the Louisiana purchase and the Revolution. In the original colonies, Maryland was chartered by George Calvert, Lord Baltimore, who was driven by what he viewed as his "sacred duty of finding a refuge for his Roman Catholic brethren."[54] Today, a version of Calvert's coat of arms—reflecting the family's faith by including a cross in two of its quadrants—makes up the Maryland state flag. Md. Code, Gen. Provis., § 7-202(c). Fig. 4, *Maryland State Flag, Maryland at a Glance*, Maryland Manual On-Line, https://tinyurl.com/ycxcddjt.



Fig. 4.

Other regions were also heavily influenced by Catholic explorers and settlers—but from Spain rather than France or England. For

---

[54] Hutson, *supra* note 48, at 12 (citation omitted).

instance, the state flags of both Alabama and Florida feature a Cross of St. Andrew—so named for the Christian apostle believed to have been crucified by the Romans on an X-shaped cross.[55] Figs. 5, 6.



Fig. 5                    Fig. 6

The flags resemble the Spanish flag flown over Florida and coastal Alabama during colonial days—the Burgundian Saltire.[56] That flag was introduced into Spain by the Duke of Burgundy, for whom Andrew was patron saint.[57]

Still further south, Puerto Rico's coat of arms features abundant religious imagery: at its center is a Lamb of God figure surrounded by

---

[55] Murray & Murray, *supra* note 51, at 16, 136; *see also* Ala. Code § 1-2-5; *State Flag*, Fla. Dep't of State, http://dos.myflorida.com/florida-facts/floridastate-symbols/state-flag/.

[56] *The Burgundian Saltire—1565-1763*, Fla. Dep't of State, https://tinyurl.com/zse27tsb.

[57] *Historical Flag Project, The Cross of Burgundy or St. Andrew Flag (The Flag of the Viceroyalty of New Spain)*, U.S. Dist. Ct. for the Dist. of P.R., https://tinyurl.com/3v3tkvxp.

gold Jerusalem crosses, which sits atop a book with seven seals representing the biblical Book of Revelation. The biblical author's name appears on a banner quote taken from the Latin Vulgate.[58] Fig. 7.



Fig. 7

Both the Lamb of God and the Bible quote are references to the original Spanish name for the island, which survives in the name of its capital city: San Juan Bautista, or St. John the Baptist.[59]

The influence of Spanish Catholics continued westward—often led by clergy who built the West's iconic, cross-topped mission churches.[60] These settlers and missionaries memorialized their faith with place

---

[58] Benjamin F. Shearer & Barbara S. Shearer, *State Names, Seals, Flags, and Symbols: A Historical Guide* 24 (3d ed. 2002).

[59] *Id.*; *see also* Murray & Murray, *supra* note 51, at 301–02.

[60] *See generally* Alfredo Jiménez, *Spanish Missions in the United States: Cultural and Historical Significance*, Nat'l Park Serv. (Apr. 15, 2016), https://tinyurl.com/2t6f4f82.

names reflecting aspects of Catholicism, from saints (San Francisco, San Diego, San Antonio), to the Eucharist (Sacramento ("Sacrament"), California; Corpus Christi ("Body of Christ"), Texas), to the claim that Christianity is a "Holy Faith" (Santa Fe, New Mexico, short for *La Villa Real de la Santa Fe de San Francisco de Asis* ("The Royal City of the Holy Faith of Saint Francis of Assisi")).[61] And today one of California's two contributions to the United States Capitol's Statuary Hall is the famous missionary St. Junipero Serra.[62] Fig. 8.



Fig. 8.

---

[61] *Santa Fe, New Mexico, United States*, Encyclopedia Britannica (Oct. 17, 2024), https://tinyurl.com/2krv25tr.

[62] Architect of Capitol, *Father Junipero Serra Statue*, https://tinyurl.com/yh7x66zz.

4.     Similar passive religious symbols were adopted in New England, much of which was settled by Puritans who crossed the Atlantic pursuing the freedom to live according to their understanding of Scripture.[63] Their motivation for settling in America is reflected on the town seal of Groton, Massachusetts, which depicts the "Holy Bible" under the word "Faith." Fig. 9, Town of Groton Massachusetts, https://tinyurl.com/4hvkvxx4.



Fig. 9

The very names of New England's cities illustrate the Puritan "vision of America as a new promised land."[64] Some of them directly assert this idea (*e.g.*, New Canaan, Connecticut; New Salem, Massachusetts); others nod to places in the original Promised Land (*e.g.*,

---

[63] Hutson, *supra* note 48, at 4, 7.

[64] Steven G. Calabresi, *"A Shining City on a Hill": American Exceptionalism and the Supreme Court's Practice of Relying on Foreign Law*, 86 B.U. L. Rev. 1335, 1347–48 (2006).

Connecticut's Bethany, Bethel, and Bethlehem). And still others reflect the Puritans' belief in the religious nature of their project (*e.g.*, Newark, New Jersey, founded by Connecticut Puritans, is short for "New Ark of the Covenant").[65]

Rhode Island, too, was founded by a dissenter from the established English church—the Baptist minister Roger Williams, who founded the colony to serve as a "shelter for persons distressed for conscience."[66] Since 1664, Williams's experiment in religious freedom has been symbolized on the state seal by an anchor—a Christian symbol of hope deriving from the New Testament's assertion that "hope" in God's promises is an "anchor of the soul."[67] Today the anchor appears on Rhode Island's state flag and seal, with the word "Hope." Figs. 10, 11.

---

[65] Charles A. Stansfield, *A Geography of New Jersey: The City in the Garden* 76 (2d ed. 1998).

[66] Hutson, *supra* note 48, at 8 (citation omitted).

[67] *Hebrews* 6:19 (KJV); *see also Origins of the Seal of the State of Rhode Island and Providence Plantations*, RI.gov, https://tinyurl.com/v5a2krxb; Murray & Murray, *supra* note 51, at 15.



Fig. 10              Fig. 11

And Williams's belief in the divine guidance behind his mission is reflected in the name of Rhode Island's capital city, Providence.[68]

5.    Unlike the Puritan North and Rhode Island, the southern colonies were settled by Anglicans, who established America's first permanent English settlement at Jamestown. But before reaching Jamestown, the colonists landed at Cape Henry, where they planted a wooden cross on the shoreline in gratitude for their successful voyage.[69] That cross—a version of which still stands—is today memorialized on the seal of Virginia's largest city, Virginia Beach.[70] Fig. 12.

---

[68] George R. Stewart, *American Place-Names: A Concise and Selective Dictionary for the Continental United States of America* 389 (1970).

[69] *Cape Henry Memorial Cross*, Nat'l Park Serv. (Sept. 3, 2022), https://tinyurl.com/ysseujm9.

[70] *Id.*

30



Fig. 12

6.    But it would be wrong to assume that America's history of passive religious symbols is limited to Protestant and Catholic Christianity. Utah traces its history to the mid-19th century, when Brigham Young led members of The Church of Jesus Christ of Latter-day Saints—driven west by religious persecution—into the Salt Lake Valley in search of a place to practice their religion freely. Recently, Utah adopted a new flag, with a blue field to represent Utah's core principles, including "faith," linking it to Utah's "historic flag."[71] That historic flag had "the year the Mormons came to Utah" (1847) emblazoned across it.[72] The centerpiece of both the new and historic state flags, as well as Utah's state seal and nickname (the "Beehive State") is the beehive—a Latter-day Saint symbol representing the community values and

[71] *Utah Beehive Flag, Utah Values, Pride, and Unity*, State of Utah, https://tinyurl.com/w48876ve.

[72] *Flag of Utah*, State Symbols USA, https://tinyurl.com/2s36jatu.

31

industriousness of the early pioneers, and deriving from a passage in the Book of Mormon.[73] Figs. 13, 14.



Fig. 13             Fig. 14

And the state itself is dotted with city names honoring Latter-day Saint leaders and scripture, including Lehi, Moroni, and Nephi (Book of Mormon prophets); Bountiful and Manti (Book of Mormon cities); and Iosepa (Hawaiian rendering of "Joseph," for Joseph Smith).

7.    For its part, New Mexico adopted the religious iconography of Native Americans to convey and memorialize their history. The state flag depicts the sun symbol of the indigenous Zia people—the Zia's most important sacred symbol, which signifies the four "sacred obligations" of

---

[73] *Beehive Symbol, Encyclopedia of Mormonism* 99 (Daniel H. Ludlow, ed. 1992).

Zia belief and has been used in religious ceremonies for nearly a millennium.[74] Fig. 15.



Fig. 15

8.     Other government symbols memorialize the confluence of European and Native American religious traditions in the New World. Oklahoma's flag symbolizes Native American and non-Native American Oklahomans "united … in peace."[75] It combines symbols of peace from two different religious traditions: the peace pipe, which is "an object of profound veneration" used in the religious ceremonies of many Native American tribes[76] and the olive branch, a Christian symbol of peace

---

[74] Stephanie B. Turner, *The Case of the Zia: Looking Beyond Trademark Law to Protect Sacred Symbols*, 11 Chi.-Kent J. Intell. Prop. 116, 119 & n.19 (2012).

[75] Linda D. Wilson, Okla. Hist. Soc'y, *Fluke, Louise Funk (1900–1986)*, https://tinyurl.com/54wnfsvt.

[76] *Sacred Pipe*, Encyclopedia Britannica (June 5, 2013), https://tinyurl.com/pkyc8cvr.

deriving from its role in the Book of Genesis, in which Noah realizes that the flood waters have receded because a dove brings him "a freshly plucked olive leaf."[77] Fig. 16.



Fig. 16

In sum, as these examples show, American governments have always used passive religious symbols to convey what makes their history unique—even if it happens to be religious. H.B. 71 merely continues this long tradition.

## B.    H.B. 71 follows a long tradition of passive Ten Commandments displays.

H.B. 71 also continues a more specific tradition of American governments passively using the Ten Commandments—by "inscrib[ing] [them] on the walls of court houses, public schools, and other public

---

[77] Murray & Murray, *supra* note 51, at 419.

buildings."[78] The United States' largest trial courthouse in Los Angeles, California, for example, depicts Moses holding the Commandments above its entrance.[79] Fig. 17.



Fig. 17

Moses and the Commandments similarly appear on the roof of the county courthouse in Jackson, Mississippi.[80] Fig. 18.

---

[78] Witte, *Religion*, *supra* note 50, at 97.

[79] Gregory W. Alarcon, *Exploring the Stanley Mosk Courthouse*, J. Consumer Atty's Ass'ns S. Cal. 2 (June 2022), https://tinyurl.com/55mersp4.

[80] *Hinds County Courthouse Fact Sheet*, Miss. Dep't of Archives & Hist. (May 27, 2009), https://tinyurl.com/3h7byrrv.



Fig. 18

The Ten Commandments are likewise found on the monument on the grounds of the Texas State Capitol which the Supreme Court upheld in *Van Orden v. Perry*, Fig. 19. And they also appear on the roof, the doors, and in the courtroom of the very Supreme Court where that case was heard.[81] Figs. 20–22.

---

[81] Off. of Curator, *Courtroom Friezes: South and North Walls* (May 8, 2003), https://tinyurl.com/s3tnuz8n; *U.S. Supreme Court*, Cass Gilbert Soc'y, https://tinyurl.com/ydytrd7m.



Fig. 19





Fig. 20                    Fig. 21



Fig. 22

The Ten Commandments also adorn the entryway of the National Archives—an image viewed by every D.C. school child who visits the Archives on a field trip on their way to see our Nation's founding documents.[82] Fig. 23.



Fig. 23

---

[82] *See* Aff. of David Barton ¶ 103, *Doe v. Harlan Cnty Sch. Dist.*, No. 99-508 (E.D. Ky. 2001), https://tinyurl.com/2wes85mx.

Such passive imagery has always been considered constitutional. Even under the now-defunct *Lemon* test, the Supreme Court recognized that the Ten Commandments and the Bible generally "may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like." *Stone v. Graham*, 449 U.S. 39, 42 (1980) (citing *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 225 (1963)).

And no one disputes here that the Commandments appeared in schoolbooks that "many" schools used for decades. ROA.868–873. One such book containing the Commandments, the *New England Primer*, was "the most widely read schoolbook in America for 100 years."[83] And it went much further towards inculcating religion than the passive religious symbols like those at issue here: It encouraged students to contemplate the Commandments as a comprehensive moral code:

> *Q. 39.*     *What is the duty which God requires of man?*
>
> A.     The duty which God requires of man is obedience to his revealed will.

---

[83] R. Freeman Butts & Lawrence A. Cremin, *A History of Education in American Culture* 69 (1953) (3,000,000 copies of the *Primer* were sold between 1700 and 1850).

> Q. 40.    *What did God at first reveal to man for the rule of his obedience?*
>
> A.    The rule which God at first revealed to man for his obedience was the moral law.
>
> Q. 41.    *Where is the moral law summarily comprehended?*
>
> A.    The moral law is summarily comprehended in the ten commandments.[84]

**C.    Because H.B. 71 fits well within this long tradition of passive religious symbology, it cannot constitute an unconstitutional establishment.**

H.B. 71 rests comfortably within the long tradition of passive religious symbols in this Nation; indeed, it comes nowhere near the active discussion of the Commandments that was upheld when *Lemon* stated the controlling test. Even under that regime, Justice O'Connor noted that "[c]ertain ceremonial references to God and religion in our Nation are the inevitable consequence of the religious history that gave birth to our founding principles of liberty." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 44 (2004) (O'Connor, J., concurring).

Exactly right. And because such references are inevitable, it would be the ultimate irony if courts were "to wield our constitutional

---

[84] *The Shorter Catechism*, *in* The New England Primer (1777), https://tinyurl.com/bdhyvzyc.

40

commitment to religious freedom so as to sever our ties to the traditions developed to honor it." *Id.* at 44–45 (O'Connor, J., concurring).

Thankfully, for the reasons addressed above, this Court can both protect religious freedom and allow Louisiana to give homage to our Nation's religious history. H.B. 71 does just that by honoring the founding principles and ideals that gave birth to the Religion Clauses themselves. Should this Court reach the merits, it should hold that the Ten Commandments displays H.B. 71 requires do not involve an establishment of religion.

## CONCLUSION

H.B. 71 contains none of the traditional hallmarks of religious establishment, preserves the autonomy of religious organizations, and fits squarely within our Nation's history of allowing public display of religious symbols, including the Ten Commandments. The Court should thus vacate the preliminary injunction.

December 17, 2024            Respectfully submitted,

                            */s/ Gene C. Schaerr*
                            GENE C. SCHAERR
                               *Counsel of Record*
                            JUSTIN A. MILLER
                            SCHAERR | JAFFE LLP
                            1717 K Street NW, Suite 900
                            Washington, DC 20006
                            Telephone: (202) 787-1060
                            Facsimile: (202) 776-0136
                            gschaerr@schaerr-jaffe.com

                            CREIGHTON A. THURMAN
                            FRATERNAL ORDER OF EAGLES
                            409 Walnut Street
                            Yankton, SD 57078

                            *Counsel for Amicus Curiae*
                            *Fraternal Order of Eagles*

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d) and 5th Cir. R. 25.2.5, I hereby certify that on December 17, 2024, I filed the foregoing Brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the Court's CM/ECF system; service on counsel for all parties was accomplished by service through the Court's electronic filing system.

*/s/ Gene C. Schaerr*
Gene C. Schaerr

## CERTIFICATE OF COMPLIANCE

The foregoing brief contains 6,436 words excluding the parts of the brief exempted by Fed. R. App. P. 32(f), and complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word Office 2016 in 14-point Century Schoolbook font.

Additionally, I certify that (1) any required redactions have been made in compliance with 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of Microsoft Defender virus detector and is free of viruses.

December 17, 2024                    */s/ Gene C. Schaerr*
                                     Gene C. Schaerr

44