No. 24-30706

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

Darcy Roake, et al.,

Plaintiffs-Appellees,

v.

Cade Brumley, et al.,

Defendants-Appellants.

_____

On Appeal from the United States District Court
for the Middle District of Louisiana
No. 3:24-cv-517 before The Hon. John W. deGravelles

_____

**Brief of *Amicus Curiae* Foundation for Moral Law in
Support of Appellants and Reversal**

_____

John Eidsmoe*
*Counsel of Record*
Talmadge Butts
FOUNDATION FOR MORAL LAW
P.O. Box 148
Gallant, AL 35972
334-262-1245
eidsmoeja@juno.com
talmadge@morallaw.org

*Counsel for Amicus Curiae*

December 26, AD 2024

## CERTIFICATE OF INTERESTED PERSONS

*Roake, et al., v. Brumley, et al.*, No. 24-30706

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. American Civil Liberties Union Foundation of Louisiana–Firm representing Appellees

2. Americans United for Separation of Church & State—Firm representing Appellees

3. Ahmed, Nora—Counsel for Appellees

4. Alkire, Christy—Appellee

5. Appel, Conrad—Appellant

6. Armstrong, Judy—Appellant

7. Berken, Kevint—Appellant

8. Broadhurst, Mamie—Appellee

9. Brumley, Cade—Appellant

10. Butts, Talmadge—Counsel for *Amicus Curiae* Foundation for Moral Law

11. Castille, Preston—Appellant

12. Champagne, Simone—Appellant

13. East Baton Rouge Parish School Board—Appellant

14. Eidsmoe, John—Counsel for *Amicus Curiae* Foundation for Moral Law

15. Elliot, Patrick—Counsel for Appellees

16. Foundation for Moral Law—*Amicus Curiae*

17. Grover, Samuel Troxell—Counsel for Appellees

18. Harding, Jennifer—Appellee

19. Harris, Lance—Appellant

20. Hawley, David—Appellee

21. Hawley, Erin—Appellee

22. Herlands, Joshua—Appellee

23. Hollis, Paul—Appellant

24. Holloway, Sandy—Appellant

25. Latten-Clark, Sharon—Appellant

26. Livington Parish School Board—Appellant

27. Luchenitser, Alex J. —Counsel for Appellees

28. Mach, Daniel—Counsel for Appellees

29. McCrory, Dustin—Appellee

30. Melerine, Stacey—Appellant

31. Morris, Ronnie—Appellant

32. Orleans Parish School Board—Appellant

33.  Owens, Benjamin—Appellee

34.  Perry, Charles Andrew—Counsel for Appellees

35.  Pulda, Molly—Appellee

36.  Roake, Darcy—Appellee

37.  Simpson, Thacher & Bartlett, LLP—Firm representing Appellees

38.  Sims, Jeff—Appellee

39.  Sernovitz, Gary—Appellee

40.  St. Tammany Parish School Board—Appellant

41.  Vernon Parish School Board—Appellant

42.  Weaver, Heather—Counsel for Appellees

43.  Williams, Richard—Appellee

44.  Young, Adrian Van—Appellee

45.  Youngblood, Jonathan K.—Counsel for Appellees

/s/ Talmadge Butts
Talmadge Butts
*Counsel of Record*
Foundation for Moral Law
P.O. Box 148
Gallant, Alabama 35972
talmadge@morallaw.org

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .................................................... C-1

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES ........................................................................... ii

INTEREST OF THE *AMICUS* ..................................................................... 1

SUMMARY OF THE ARGUMENT ................................................................ 2

ARGUMENT .................................................................................................. 4

I.      The acknowledgement of God and His Law is not an establishment of religion ......................................................................................................... 4

II.     The Ten Commandments, and the Hebrew legal system they represent, are the foundation of western republican models of law and government ....................................................................................................................... 7

III.    The Ten Commandments, and the Hebrew legal system they represent, were the primary source used by early Western jurists as they developed models of republican government ............................................................... 10

IV.     The Hebrew Law symbolized by the Ten Commandments had a major formative influence on the Founders and early America ............................. 18

V.      The District Court erred in ruling that Louisiana HB 71 is unconstitutional on the basis that it requires the display of the Ten Commandments but does not require the display of other documents ......... 22

VI.     The requirement that schools use a particular wording of the Ten Commandments does not render HB 71 unconstitutional ............................. 22

CONCLUSION ............................................................................................... 24

CERTIFICATE OF COMPLIANCE ............................................................... 26

CERTIFICATE REGARDING SERVICE ....................................................... 27

# TABLE OF AUTHORITIES

**Cases**

*McGowan v. Maryland*,
    366 U.S. 420, 562 (1961) .................................................................................. 18

*Moore v. Strickling*,
    22 S.E. 274, 277 (1899) ..................................................................................... 4

*Seila Law v. Consumer Financial Protection Bureau,*
    591 U.S. 197 (2017) ................................................................................... 23-24

*Van Orden v. Perry*,
    545 U.S. 677 (2005) ............................................................................. 7, 23-24

**Constitutions and Statutes**

Louisiana HB 71 ........................................................................................... 22-23

**Other Authorities**

Abraham Lincoln, *Proclamation Appointing a National Fast Day*
    (1863) ................................................................................................................ 6

Althusius, *Politica* (1614) ............................................................................... 14

Baruch Spinoza, *Tractatus theologico-politicus* (1670) ........................................ 17

Carlos Sigonius, *The Hebrew Republic* (1582, (Jerusalem: Shalem
    Press, 2010) .................................................................................................... 13

Cecil B. DeMille, THE TEN COMMANDMENTS (Paramount Pictures
    1956) ............................................................................................................... 24

E.C. Wines, *Commentaries on the Laws of the Ancient Hebrews* (1853)
    ..................................................................................................................... 21

Edward J. White, *The Law in the Scriptures with Explanations of the Law Terms and Legal References in Both the Old and the New Testaments* (St. Louis: Thomas Law Book Co. 1935) ...................................21

Eran Shalev, *American Zion: The Old Testament as a Political Text from the Revolution to the Civil War* (Yale Univ. Press 2013)............... 19-21

Eric Nelson, *The Hebrew Republic: Jewish Sources and the Transformation of European Political Thought* (Harvard Univ. Press 2010).............................................................................. 16-18

George Washington, *National Day Thanksgiving Proclamation* (1789) .............. 5-6

H.B. Clark's *Biblical Law, Being a Test of the Statutes, Ordinances, and Judgments Established in the Holy Bible—with Many Allusions to Secular Laws—Ancient, Medieval, and Modern— Documented to the Scriptures, Judicial Decisions, and Legal Literature* (Binfords & Mort 1944) ...............................................21

Howard B. Rand's *Digest of the Divine Law* (Merrimac, Mass.: Destiny 1943) ...........................................................................................21

Hugo Grotius, *The Law of War and Peace,* (1625, Liberty Fund 2005) ................14

Hugo Grotius, *The Truth of the Christian Religion* (1627, reprinted London for J.F. and C. Rivington 1777) .......................................14

James Harrington, *The Art of Lawgiving* (1659) ....................................................17

John Berman, *Created Equal: How the Bible Broke with Ancient Political Thought* (Oxford: 2008)....................................................3

John B. Morrall, *Political Thought in Medieval Times* (Harper Torchbooks, 1962).........................................................................11

John Eidsmoe, *Historical and Theological Foundations of Law,* 3 vols. (Nordskog Publishing 2016)....................................................... 9-10

John Eidsmoe, <u>The Use of the Ten Commandments in American Courts</u>, Liberty University Law Review (III:1 Spring 2009, 15-46) ............................................................................................9

Joseph Story, *Commentaries on the Constitution* (1833) ..........................................6

J.W. Erlich's *The Holy Bible and the Law* (New York: Oceana Pub. 1962) ......................................................................................21

*Massachusetts Body of Liberties* (1641) ................................................19

Michael Broyde, <u>The Hidden Influence of Jewish Law on the Common Law: One Lost Example</u>, 57 Emory L.J. 1403 (2008) ..................................11

Michael Novak, *On Two Wings: Humble Faith and Common Sense at the American Founding* (Encounter Books 2003)................................. 20-21

Petrus Cunaeus, *The Hebrew Republic* (1617, Jerusalem: Shalem Press, 2006) ....................................................................................13

Richard S. Dunn and Laetitia Yeandle, *The Journal of John Winthrop* (Harvard University Press 1996) ....................................................19

Richard S. Sternberg, <u>The Jewish Roots of English Property Law</u>, 80 Conv. 41 (2018) .........................................................................11

Richard Tuck, *Philosophy and Government, 1572-1651* (Cambridge: 1993) ........................................................................................13

Robert J. Barth, <u>Philosophy of Government vs. Religion and the First Amendment</u>, Oak Brook College Journal of Law and Government Policy Vol. 5 (2006) .................................................8

Rousas J. Rushdoony, *The Institutes of Biblical Law* (Presbyterian and Reformed, Craig Press, 1973)............................................. 11, 21-22

Seumas McManus, *The Story of the Irish Race* (Old Greenwich, CT 1921, 1990) 133ff; cf Eidsmoe, *Historical and Theological Foundations of Law,* 410 ................................................................10

*The Reports of Committees of the Senate of the United States for the Second Session of the Thirty-Second Congress,* 1852-53 (Washington, D.C.: Robert Armstrong, 1853) pp. 1-4. Senate Rep. No. 32-376 (1853) ................................................................. 4-5

Thomas Hobbes, *Leviathan* (1651) .......................................................... 17

Walter J. Harrelson, *The Ten Commandments and Human Rights* (Mercer Univ. Press 1997) ................................................................. 22

*What Luther Says: An Anthology* 773 (Edward Plass ed. Concordia Pub. House 1986) ....................................................................................... 12

William Blackstone, *Commentaries on the Laws of England* (Philadelphia: Robert Bell, 1772) ........................................................ 15-16

William D. Bader, <u>Some Thoughts on Blackstone, Precedent, and Originalism,</u> 19 Vermont L. Rev. 5 (1994-1995) ............................... 15

William Floyd, *Floyd's Summary* (1789) ................................................ 5

Zoltan Haraszti, *John Adams and the Prophets of Progress* (Harvard University Press, 1952) ...................................................................... 2

# INTEREST OF THE *AMICUS*[1]

*Amicus curiae* Foundation for Moral Law ("the Foundation") (www.morallaw.org) is a 501(c)(3) non-profit, national public interest organization based in Alabama dedicated to the strict interpretation of the Constitution as written and intended by its Framers and the right to acknowledge God in the public arena.

The Foundation has an interest in this case because the Foundation believes America was founded as a constitutional republic based upon legal and moral principles set forth in the Bible, and the Ten Commandments are therefore the moral foundation of law. The Ten Commandments set forth the basic principles of our republic, including respect for life, respect for property, respect for truth, respect for family, and respect for God as the Creator of law and government and the Grantor of unalienable rights. The Foundation believes, and will present evidence to demonstrate, that Renaissance, Reformation, and Enlightenment concepts of republican government were based not so much on Greek and Roman models but rather primarily on the model of the Hebrew Republic.

---

[1] Appellants consented to the filing of this brief. Appellees did not consent. The Court has granted *amicus*' motion for leave to file this brief. No party or party's counsel authored this brief in whole or in part, or contributed money that was intended to fund its preparation or submission; and no person other than the *amicus curiae,* its members, or its counsel, contributed money that was intended to fund the preparation or submission of this brief.

## SUMMARY OF THE ARGUMENT

From whence come the roots of the American Republic? Many look to Greece and Rome. But as John Adams wrote,

> As much as I love, esteem and admire the Greeks, I believe the Hebrews have done more to civilize the world. Moses did more than all their legislators and philosophers.[2]

Moses was a prophet, but he was much more: he was a judge, military commander, statesman, and lawgiver whose legal code has exerted great influence on the Western world. As the Foundation will demonstrate in this brief, the Ten Commandments and other portions of Biblical law became the basis for the Anglo-Saxon common law. As Rabbi Moses ben Maimon (Maimonides) (c. AD 1125-1204) codified the Old Testament Law, it became the commercial code for much of Europe.

As the Renaissance began and the modern absolutist state emerged, Western political philosophers sought to develop, as an alternative, the ideal of a republic. As they did so, they searched the ancient world for a model. The Greek democracies were unstable and short-lived, and the Roman republic degenerated into an empire. And so, as Western thinkers looked for a model of republican government, they

---

[2] John Adams, handwritten comments on his copy of *Outline of an Historical View of the Progress of the Human Mind;* reprinted in Zoltan Haraszti, *John Adams and the Prophets of Progress* (Harvard University Press, 1952) p. 246.

turned to a republic more ancient than those of Greece and Rome: the Hebrew Republic.

And the Hebrew Republic was different from Greek and Roman government and from other ancient societies. As Joshua Berman of Bar-Ilam University demonstrates in *Created Equal: How the Bible Broke with Ancient Political Thought* (Oxford: 2008), Hebrew thought and Hebrew law were egalitarian in the relationships of kings to commoners, of classes, and of property. Berman states:

> If there was one truth the ancients held to be self-evident it was that all men were not created equal. If we maintain today that, in fact, they are endowed by their Creator with certain inalienable rights, then it is because we have inherited as part of our cultural heritage notions of equality that were deeply entrenched in the ancient passages of the Pentateuch.

The Ten Commandments therefore stand as an expression of the Hebrew political philosophy of human law based on the "laws of nature and of nature's God," of human equality based on having been created equal, of unalienable God-given rights, and of government by consent of the governed. Without denying that the Ten Commandments have religious significance, the Foundation will establish that the Decalogue stands at the very heart of our legal system, and the State of Louisiana's decision to place them within classrooms is firmly rooted in our Nation's history and the understanding of the Founders.

## ARGUMENT

These commandments, which, like a collection of diamonds, bear testimony to their own intrinsic worth, in themselves appeal to us as coming from a superhuman or divine source, and no conscientious or reasonable man has yet been able to find a flaw in them. Absolutely flawless, negative in terms, but positive in meaning, they easily stand at the head of our whole moral system, and no nation or people can long continue a happy existence in open violation of them.

*Moore v. Strickling,* 22 S.E. 274, 277 (1899).

## I. The acknowledgement of God and His Law is not an establishment of religion.

When the First Congress adopted the First Amendment and sent it to the states

for ratification, it did not intend to prohibit the public acknowledgment of God and

His Law, as the evidence below demonstrates.

In 1853, both houses of Congress undertook detailed studies of the meaning

of the establishment clause of the First Amendment and came to similar conclusions.

The Senate Judiciary Committee report concerning the constitutionality of the

Congressional chaplaincy concluded:

> The clause speaks of "an establishment of religion." What is meant by that expression? It referred, without doubt, to that establishment which existed in the mother country, its meaning is to be ascertained by ascertaining what that establishment was. It was the connection with the state of a particular religious society, by its endowment, at the public expense, in exclusion of, or in preference to, any other, by giving to its members exclusive political rights, and by compelling the attendance of those who rejected its communion upon its worship, or religious observances. These three particulars constituted that union of church and state of which our ancestors were so justly jealous, and against which they so wisely and carefully provided.

4

. . .

Our fathers were true lovers of liberty, and utterly opposed to any constraint upon the rights of conscience. They intended, by this amendment, to prohibit "an establishment of religion" such as the English church presented, or anything like it. But they had no fear or jealousy of religion itself, nor did they wish to see us an irreligious people; *they did not intend to prohibit a just expression of religious devotion by the legislators of the nation, even in their public character as legislators;* they did not intend to send our armies and navies forth to do battle for their country without any national recognition of that God on whom success or failure depends; they did not intend to spread over all the public authorities and the whole public action of the nation the dead and revolting spectacle of "atheistical apathy'" Not so had the battles of the revolution been fought, and the deliberations of the revolutionary Congress conducted. On the contrary, all had been done with a continual appeal to the Supreme Ruler of the world, and an habitual reliance upon His protection of the righteous cause which they commended to His care.[3]

James Madison explained on the floor of Congress that "he apprehended the meaning of the words to be that Congress should not establish a religion and enforce the observation of it by law, nor compel men to worship God in any matter contrary to their conscience." *Floyd's Summary*, 1789. President George Washington, who chaired the Constitutional Convention and served as President while the Bill of Rights was being considered, declared in his October 3, 1789 *National Day of*

---

[3] *The Reports of Committees of the Senate of the United States for the Second Session of the Thirty-Second Congress,* 1852-53 (Washington, D.C.: Robert Armstrong, 1853) pp. 1-4. Senate Rep. No. 32-376 (1853) (emphasis added).

*Thanksgiving Proclamation*, "Whereas it is *the duty of all nations to acknowledge the providence of Almighty God*, to obey His will, to be grateful for his benefits, and humbly to implore His protection and favor." (emphasis added).

President Abraham Lincoln's March 30, 1863 *Proclamation Appointing a National Fast Day* was even more explicit:

> And whereas it is the *duty of nations as well as of men, to own their dependence upon the overruling power of God*, to confess their sins and transgressions, in humble sorrow, yet with assured hope that genuine repentance will lead to mercy and pardon; and to recognize the sublime truth, announced in the Holy Scriptures and proven by all history, that those nations only are blessed whose God is the Lord . . . .

And Justice Joseph Story, in his *Commentaries on the Constitution* (1833), likewise noted that,

> *Probably at the adoption of the Constitution, and of [the First Amendment], the general, if not the universal sentiment, was that Christianity ought to receive encouragement from the state*, so far as was not incompatible with the private right of conscience and the freedom of religious worship. An attempt to level all religions, and to make it a matter of state policy to hold all in utter indifference, would have created universal disapprobation, if not universal indignation. . . . *The real object of the First Amendment was* not to countenance, much less to advance, Mohammedanism, or Judaism, or infidelity, by prostrating Christianity; but *to exclude all rivalry among Christian sects, and to prevent any national ecclesiastical establishment which should give to a hierarchy the exclusive patronage of the national government.*

(Emphasis added).

These Framers and their immediate posterity clearly believed that the acknowledgement of God is more than the nation's right—it is the nation's duty.

II.    **The Ten Commandments, and the Hebrew legal system which they represent, are the foundation of western republican models of law and government.**

Those who advocate an absolute separation of church and state often see an absolute distinction between the sacred and the secular; they view everything simplistically as either 100% religious or 100% nonreligious.  But as Chief Justice Rehnquist said in the plurality opinion in *Van Orden v. Perry,* 545 U.S. 677, __ (2005), "Of course, the Ten Commandments are religious. . . . But Moses was a lawgiver as well as a religious leader. And the Ten Commandments have an undeniable historical meaning."  And Justice Breyer said in his concurring opinion in *Van Orden* at ___,

> In certain contexts, a display of the tablets of the Ten Commandments can convey not simply a religious message but also a secular moral message (about proper standards of social conduct). And in certain contexts, a display of the tablets can also convey a historical message (about a historic relation between those standards and the law)–a fact that helps to explain the display of those tablets in dozens of courthouses throughout the Nation, including the Supreme Court of the United States.

The Foundation contends that the display of the Ten Commandments constitutes a recognition of the political philosophy upon which this nation was founded, as articulated in the Declaration of Independence: that governmental authority is based upon "the laws of nature and of nature's God," that God has created all persons in a state of legal and political equality, that God has endowed all persons

with "unalienable rights" that government may not abrogate, that the purpose of government is "to secure these rights," that government "derives its just powers from the consent of the governed," and whenever government becomes destructive of these ends, the people may alter or abolish it.

Robert J. Barth, Academic Dean and Professor of the Oak Brook College of Law and Government Policy, has written,

> [I]f you combine the philosophy of government of our Founders with the form of government chosen, you create a republican form of government that presupposes a Creator as the source of unalienable rights and the definer of human dignity and equality. This form of government acknowledges the existence of the Creator as a self-evident truth and yet recognizes the distance differences between the jurisdiction of the church and the civil government. While the existence of God may be part of one's personal faith, the Founders made a distinction between acknowledging the Creator as a matter of political philosophy and the manner in which one chooses to worship or fulfill his or her duty to that God. This jurisdictional separation between the acknowledgement of God as an essential presupposition of good government (unalienable rights, equal protection, due process) and matters of worship, faith, and religious practices, is the essence of the legitimate separation of church and state.[4]

The Ten Commandments embody the basic source and philosophy of American government, including the following:

(1) Respect for life, as reflected in the Commandment "Thou shalt not

kill" and homicide laws.

---

[4] Robert J. Barth, <u>Philosophy of Government vs. Religion and the First Amendment</u>, Oak Brook College Journal of Law and Government Policy Vol. 5 (2006) 75-76.

(2) Respect for property, as reflected in the Commandments "Thou shalt not steal" and "Thou shalt not covet" and property laws.

(3) Respect for family, as reflected in the Commandments "Honor thy father and thy mother" and "Thou shalt not commit adultery" and family laws.

(4) Respect for truth as reflected in the Commandments "Thou shalt not take the name of the Lord thy God in vain" and "Thou shalt not bear false witness" and perjury and fraud laws.

(5) Respect for God as reflected in the first four Commandments and the recognition of God as the Source of governmental authority and the Source of human rights.[5]

By 2002, at least 1,106 cases of record in which the term "Ten Commandments," "Decalogue," or individual commandments by number are cited by American courts of record.[6] If the Ten Commandments are of such legal and historical significance that the courts may and do frequently cite them as legal authority in judicial opinions, they certainly are of such legal and historical significance that they may be displayed in public places.

---

[5] For a detailed analysis of the precepts of Hebrew law, *see* John Eidsmoe, *Historical and Theological Foundations of Law,* 3 vols. (Nordskog Publishing 2016) 369-95.

[6] A detailed analysis of these cases may be found in Eidsmoe, *id.* 431-68; see also, Eidsmoe, The Use of the Ten Commandments in American Courts, Liberty University Law Review (III:1 Spring 2009, 15-46).

### III. The Ten Commandments and the Hebrew Law they represent were the primary source used by early Western jurists as they developed models of republican government.

As early Western jurists developed models of republican government, they looked not primarily to Greece and Rome, but nearly a thousand years earlier to the Hebrew Republic. When Patricius (St. Patrick, AD 5th century) evangelized Ireland, he left his converts with a writing called *Liber ex Lege Moisi* (The Book of the Law of Moses). When the High King of Ireland ordered Patrick to lead a commission to draft the *Senchus Mor* or written legal code of Ireland, his commission employed Druid law but only to the extent it was consistent with the Old and New Testaments.[7] When Alfred the Great drafted the Book of Dooms (AD 890), the first written legal code to govern all of England, he began it with the Ten Commandments and integrated it with Scriptural passages from the Old and New Testaments.[8]

---

[7] Seumas McManus, *The Story of the Irish Race* (Old Greenwich, CT 1921, 1990) 133ff; cf Eidsmoe, *Historical and Theological Foundations of Law,* 410, 766-73.

[8] *Ancient Laws and Institutes of England,* printed by command of His Late Majesty King William IV under the direction of the Commissioners of the Public Records of the Kingdom 1846, I;45. Although Thomas Jefferson argued in a 1764 essay "Whether Christianity Is Part of the Common Law?" that the Decalogue was a monk's later addition to the Book of Dooms, *Amicus* believes that is not a tenable position because (1) Scholars including Justice Joseph Story, Edward Gibbon, Harold Berman, and others believe the Decalogue was part of Alfred's original code; (2) Alfred himself was a consummate Christian scholar who translated many Christian works into the Anglo-Saxon tongue; (3) the Book of Dooms includes not only the Decalogue but also other portions of the Old and New Testaments interspersed throughout the Code; (4) a later monk would have used the Latin Vulgate but Alfred took the Decalogue from the Syriac; and (5) no version of the Book of Dooms without the Decalogue has ever been found or quoted or alluded to. *See* Eidsmoe, *Historical and Theological Foundations of Law* II:825-28.

10

The Rabbi Moses ben Maimon (Maimonides) (A.D. 1135 - 1204) was a towering medieval intellect who pioneered thought in Talmudic studies. His *Mishneh Torah* was the codification of Jewish law taken from the Torah, the Talmud, and the writings of early medieval Jewish scholars. Maimonides' works made the Jewish law more readily available to Western scholars and they formed the basis for the commercial codes of much of Europe.[9]

All of this and much more led to a rebirth of Hebrew juridical studies in the 1500s. The Renaissance led to the rebirth of the modern absolutist state. The fall of Rome led to the decline of the Roman concept of *imperium* or right to rule; medieval kings and lords ruled based upon a complex system of vassal/lord relationships that shared governmental authority with trading guilds, civic councils, cathedrals, monasteries, and other institutions. But during the Renaissance and Enlightenment the theory began to re-emerge that the king and his government stood above all other forms of authority.[10] This fit well with the English Stuart kings' view of divine right of kings, the declaration attributed to French King Louis XIV "L'etat, c'est moi" ("I am the state"), and the absolutist ideology of Thomas Hobbes as expressed in his classic *Leviathan.*

---

[9] Michael Broyde, The Hidden Influence of Jewish Law on the Common Law: One Lost Example, 57 Emory L.J. 1403 (2008); Richard S. Sternberg, The Jewish Roots of English Property Law, 80 Conv. 41 (2018); Rousas J. Rushdoony, *The Institutes of Biblical Law* (Presbyterian and Reformed, Craig Press, 1973) 788-89.
[10] John B. Morrall, *Political Thought in Medieval Times* (Harper Torchbooks, 1958, 1962) 60-61.

In opposition to this rise of the absolute state, jurists in the West sought to develop a republican model of government. As they did so, they looked to the Judeo-Christian tradition, the Hebrew laws, and especially the Ten Commandments. The Reformation led the way toward this republican thinking, and America's first English colonists and later the Framers were mostly children of the Reformation. Martin Luther (AD 1483-1546) had studied law and advocated the old Teutonic Anglo-Saxon common law that emphasized decentralized government and was based upon natural law and natural rights. Luther believed the Ten Commandments were the perfect expression of natural law:

> Natural law is the Ten Commandments.  It is written in the heart of every human being by creation.  It was clearly and comprehensively put on Mount Sinai, finer indeed than any philosopher has ever stated it. Natural law, then, is created and written in the heart; it does not come from men but is a created Law to which everyone who hears it cannot but consent.[11]

On another occasion he wrote,

> The Decalog is not of Moses, nor did God give it to him first.  On the contrary, the Decalog belongs to the whole world; it was written and engraved in the minds of all human beings from the beginning of the world.[12]

Carlos Sigonius (c. 1524-1584) was an Italian Renaissance scholar. Besides writing on Roman and Greek political systems, he wrote a treatise titled *The Hebrew*

---

[11] Luther, W 49, 1 f; quoted in *What Luther Says: An Anthology* 773 (Edward Plass ed. Concordia Pub. House 1986)
[12] Luther, W 39 I, 478; quoted in Plass, 748.

*Republic*[13] which enjoyed circulation and profoundly influenced later writers. A Dutch legal scholar, Petrus Cunaeus (1586-1638) is remembered for *De Republica Hebraeorum (The Hebrew Republic)*[14], described as "the most powerful statement of republican theory in the early years of the Dutch Republic."[15] In this work Cunaeus described Moses as the great lawgiver who preceded Homer by many centuries and who was the "first to write and publish laws so that the people might learn what was right and what was wrong, and which sanctions might steady the state Almighty God had ordered to be set up in Palestine."[16]

Another was Johannes Althusius (c. 1557-1638), professor of law, theology, and philosophy whose classic *Politica*[17] was both a legal and theological justification for the Dutch secession from Spain and a grand design for federalism based on Scripture and natural law. As he wrote in the Preface to his 1614 edition,

> The precepts of the Decalogue are included to the extent that they infuse a vital spirit into the association and symbiotic life that we seek, and that they prescribe and constitute a way, rule, guiding star, and boundary for human society.  If anyone would take them out of politics, he would destroy it; indeed, he would destroy all symbiosis and social life among men.  For what would human life be without the piety of the first table of the Decalogue, and without the justice of the second?  What would a commonwealth be without communion and communication of things useful and necessary to human life?  By

---

[13] Carlos Sigonius (Sigonio), *The Hebrew Republic* (1582, (Jerusalem: Shalem Press, 2010).
[14] Petrus Cunaeus, *The Hebrew Republic* (1617, Jerusalem: Shalem Press, 2006).
[15] Richard Tuck, *Philosophy and Government, 1572-1651* (Cambridge: 1993) 169.
[16] Cunaeus 12.
[17] Johannes Althusius, *Politica* (1603, 1610, 1614, 1617, Liberty Fund 1997).

means of these precepts, charity becomes effective in various good works.[18]

Hugo Grotius (1583-1645) is often called the "father of international law," but along with his classic *The Rights [Law] of War and Peace*[19] he also published a first Protestant work of Christian apologetics, *The Truth of the Christian Religion*.[20] In this latter work he argues for "the undoubted Antiquity of Moses's Writings," that "the most ancient Attick Laws, from whence the Roman were afterwards taken, owe their Origins to the Law of Moses."[21] In *War and Peace* he argued that international law could be binding on both Christian and non-Christian nations because of their common understanding of natural law, but he says the Mosaic Law can be useful in understanding natural law because

> . . . what it [the Law of Moses] enjoins is not contrary to the law of nature. For since the law of nature is perpetual and unchangeable, nothing contrary to it could be commanded by God, who is never unjust. Besides, the Law of Moses is called in the xix Psalm an undefiled and right law, and St. Paul, Romans Vii. 12, describes it to be holy, just, and good.[22]

An English jurist who carried this idea forward was John Selden (1584-1654), described by John Milton as "the chief of learned men reputed in this land." A member of Parliament, he drafted the Petition of Right in 1628, and is well known

---

[18] Althusius, *Politica;* Preface to 1614 edition.
[19] Hugo Grotius, *The Law of War and Peace,* (1625, Liberty Fund 2005).
[20] Hugo Grotius, *The Truth of the Christian Religion* (1627, reprinted London for J.F. and C. Rivington 1777).
[21] *The Truth* I:24-26.
[22] *The Law of War and Peace* 1:1:xvii.

for his works on English legal history and constitutionalism.  But he was first and foremost a Hebrew scholar; among his foundational writings were *De Successionibus in bona Secundum Leges Ebraeorum [Hebrews]* (1631), *De Successione in Pontificatum Ebraeorum* (1631),  *De Jure Naturali et Gentium Juxta Disciplinam Ebraeorum* (1640) (developing a theory of international law based upon the laws of Noah in Genesis), and *De Synedriis et Prefecturus Juridicis Veterum Ebraeorum* (his trilogy on the Jewish Sanhedrin). All of this laid the groundwork for his belief that the English common law reflected eternal principles of common law; Selden's scholarship provided a Hebrew basis upon which later jurists could build their republican thought.

Sir William Blackstone  (1723-1780), whose *Commentaries on the Laws of England*[23] sold almost as widely in America as in England,[24] saw the English common law as ancient, rooted in the Anglo-Saxon laws and much earlier, and having "in great measure weathered the rude shock of the Norman conquest."[25]  He believed that human law, to be valid, had to conform to the higher law of God, which consisted of "the revealed or divine law, and they are to be found only in the Holy Scriptures."[26]  He also recognized the "law of nature, being coeval with mankind,

---

[23] William Blackstone, *Commentaries on the Laws of England* (Philadelphia: Robert Bell, 1772).
[24] Edmund Burke, Speech on Conciliation with America, 1775; quoted by William D. Bader, <u>Some Thoughts on Blackstone, Precedent, and Originalism</u>, 19 Vermont L. Rev. 5 (1994-1995).
[25] *Commentaries,* Introduction 1:17.
[26] *Commentaries,* Introduction 2:42.

and dictated by God himself."[27] The revealed law and the law of nature, he said, are of "equal strength and perpetuity." However,

> [U]ndoubtedly the revealed law is of infinitely more authenticity than the moral system which is framed by ethical writers, and denominated the natural law; because one is the law of nature, expressly declared so to be by God himself; the other is only what, by the assistance of human reason, we imagine to be that law. If we could be as certain of the latter as we are of the former, both would have an equal authority; but, till then, they can never be put in any competition together.[28]

Blackstone emphasized that the revealed law and the law of nature are the foundation of law: "Upon these two foundations, the law of nature and the law of revelation depend all human laws; that is to say, no human law should be suffered to contradict these."[29]

Harvard Professor of Government Eric Nelson details the influence of Hebrew law in *The Hebrew Republic: Jewish Sources and the Transformation of European Political Thought.*[30] Dr. Nelson surveys the Hebrew influence upon European political thought, beginning with Flavius Josephus who, he says, "first suggested to Europeans that Israelite society could be regarded as a *politeia*—a political constitution of the sort familiar to Greek philosophy—and that Moses could be understood as its lawgiver *(nomothetes)*."[31] He traces the development of European

---

[27] *Commentaries,* Introduction 2:41.
[28] *Commentaries* Introduction 2:42.
[29] *Commentaries* Introduction 2:42.
[30] Eric Nelson, (Harvard University Press 2010).
[31] *Id.* at 89.

16

political thought based on the Hebrew model from Maimonides to the *Catalogus omnium praeceptorum legis Mosaicae (Cataloue of All of the Precepts and Laws of Moses)* (1533) through the works of Edward Lively, Henry Ainsworth, John Lightfood, Edward Pococke, Thomas Colemen, John Spencer, John Selden, Jean Bodin, Hugo Grotius, Bonaventure Cornelius Bertram, Franciscus Junius, Wilhelm Zepper, Joachim Stephani, James Harrington, Baruch Spinoza, and Thomas Hobbes.[32] He explains that earlier jurists saw good and bad aspects of monarchy, oligarchy, and democracy, but "In the middle of the seventeenth century, however, we find republican authors making a new and revolutionary argument: they now begin to claim that monarchy per se is an illicit constitutional form and that all legitimate constitutions are republican."[33]  "[T]his rupture," he says, "was provoked by the Protestant reception of a radical tradition of rabbinic Biblical exegesis, which understood the Israelite request for a king in I Samuel as an instance of the sin of idolatry. This embrace of 'republican exclusivism' heralded the decline of

---

[32] Because Harrington, Spinoza, and Hobbes are not regarded as Judeo-Christian thinkers, their study of the Hebrew republic is even more significant.  In Harrington's *The Art of Lawgiving* (1659) he includes volume two titled *The Commonwealth of the Hebrews*. Part Three of Hobbes's *Leviathan* (1651) is titled "Of a Christian Commenwealth" and Chapter 35, "Of the Significance of the Kingdom of God," concludes that the New Testament phrase "kingdom of God" refers to the Hebrew commonwealth. Spinoza's *Tractatus theologico-politicus* (1670) likewise discusses the *respublica Hebraeorum* at length.

[33] Nelson, 3.

constitutional pluralism and therefore marks a crucial turning point in the history of European political thought."[34]  Nelson concludes:

> For roughly 100 years—from the time of Bertram until the time of Spinoza—European Protestants made the Hebrew Bible the measure of their politics. They believed that the same God who thundered from Sinai, and who later sent his son into the world, had revealed to Israel the form of a perfect republic. They labored with the help of their rabbinic authorities to interpret his design and attempted in their own societies to replicate it as closely as possible. In the process, they made crucial contributions to the political thought of the modern world. Republican exclusivism, redistribution, and toleration have all been defended on different grounds in the intervening centuries; but in the beginning, all were authorized by the divine will made manifest in the constitution of the Hebrew republic.[35]

The Ten Commandments, then, stand for a view of law and government that many Americans regard as central to the American system. That is why huge majorities favor the display of the Ten Commandments.

## IV.   The Hebrew Law symbolized by the Ten Commandments had a major formative influence on the Founders and early America.

Justice Douglas declared in *McGowan v. Maryland*, 366 U.S. 420, 562 (1961) (dissenting opinion):

> The institutions of our society are founded on the belief that there is an authority higher than the authority of the State; that there is a moral law which the State is powerless to alter; that the individual possesses rights, conferred by the Creator, which government must respect.

---

[34] Nelson, 3.
[35] Nelson, 139.

This view of human rights did not derive from Greek philosophy or Roman jurisprudence. It comes from the laws of the ancient Hebrews. It was the political philosophy of most if not all of America's Founding Fathers, and it is the belief of a large segment of the American people today.

The early English colonists in America used the Mosaic Law as the basis for their legal codes. Possibly the first written law code in the English language in the Western Hemisphere was Jamestown's *Articles, Lawes, and Orders, Divine, Politique, and Martial for the Colony in Virginia* (1611) which contains each of the Ten Commandments except that against graven images.

The Massachusetts Body of Liberties (1641) was drafted by Rev. Nathaniel Ward, a clergyman who had some legal training, and served as model for legal codes throughout New England. Numerous sections were taken directly from the Mosaic Law.[36] As the Journal of John Winthrop demonstrates, when Indian nations sought to come under the protection of the Massachusetts colony, the colony did not demand that the Indians become Christians but did ask them to agree to follow the Ten Commandments, to which they assented.[37]

In *American Zion: The Old Testament as a Political Text from the Revolution to the Civil War*, Dr. Eran Shalev of the University of Haifa demonstrates that early

---

[36] *Massachusetts Body of Liberties* Article 94 Sec. 1-3.
[37] Richard S. Dunn and Laetitia Yeandle, *The Journal of John Winthrop* (Harvard University Press 1996) 232-35.

Americans saw Israel in a special light and believed America to be in some way a model of Israel in its God, its morality, its laws, and even its geography. Some compared the thirteen American colonies to the twelve (or by various counts the thirteen) tribes of Israel and saw those tribes, like the American colonies, as independent states joined into a confederate republic. Puritans and other Christians strongly emphasized the Old Testament and the relevance of the Mosaic Law for today. As Shalev says, the Puritans

> introduced the 'chosen people' doctrine into the New World and viewed themselves as the successors of the Children of Israel and the bearers of a renewed covenant with God. ...[M]any European and Atlantic communities similarly felt themselves to be the new Israel in the seventeenth century. ...One of its lasting intellectual legacies was the central role that the Old Testament played in American public life.

> ...And it was after the bible's primacy began to corrode in Europe that Americans performed a last great act of political Hebraism, as the citizens of the young American republic witnessed a remarkable effort to construct their newly established polity as an Old Testament nation, an American Zion.

As Shalev concludes,

> The fingerprints of the Old Testament were—still are—particularly evident in the language of chosenness, itself, of course, a Hebrew concept. What has widely become known as the American 'mission,' the idea that the United States is endowed with an errand to promote liberty, was formed closely related to the belief that the United States was the Israel of its time.

> Those who insist that the American republic was founded upon a Greco-Roman model rather than a Hebraic model would do well to study *On Two Wings:*

*Humble Faith and Common Sense at the American Founding* by Michael Novak. Novak dispassionately demonstrates that America's founders drew from both the Judeo-Christian and the Greco-Roman traditions and did not consider them incompatible; pastoral sermons frequently quoted from the Bible and Greco-Roman sources in the same paragraph.

The relevance of Hebrew law to America is further articulated in E.C. Wines's *Commentaries on the Laws of the Ancient Hebrews* (1853), a 640-page treatise that focused first on the Hebrew Republic and then the Hebrew Monarchy. Subsequent works include Edward J. White's *The Law in the Scriptures with Explanations of the Law Terms and Legal References in Both the Old and the New Testaments*, which goes through the Bible book-by-book and identifies and explains legal concepts therein; J.W. Erlich's *The Holy Bible and the Law*, which presents specific legal topics arranged in alphabetical order (Adoption, Agriculture, Aliens, Animals, Bailments, etc.) and the Biblical bases for each of them; H.B. Clark's *Biblical Law, Being a Test of the Statutes, Ordinances, and Judgments Established in the Holy Bible—with Many Allusions to Secular Laws—Ancient, Medieval, and Modern— Documented to the Scriptures, Judicial Decisions, and Legal Literature*, which divides Biblical legal concepts into general subjects (political, civil, economic, penal, and procedural); Howard B. Rand's *Digest of the Divine Law*, which is a detailed explanation of the Old Testament law in theory and in practice, and R.J.

21

Rushdoony's three-volume *Institutes of Biblical Law*, which is an extended commentary on Biblical law including the Ten Commandments; and also Dr. Walter Harrelson's *The Ten Commandments and Human Rights*, which demonstrates the relevance of the Decalogue to modern issues of human rights. These and countless other works demonstrate the relevance of the Ten Commandments and Old Testament law in general throughout American history and continuing today.

## V.   The District Court erred in ruling that Louisiana H.B. 71 is unconstitutional on the basis that it requires the display of the Ten Commandments but does not require the display of other documents.

The District Court held that H.B. 71 is unconstitutional because it singles out the Ten Commandments for display but does not require other documents like the Magna Carta or the Declaration of Independence. The reason Louisiana legislators singled out the Ten Commandments is obvious:  There has been a concerted drive to remove the Ten Commandments from public display and public life.  There has been no similar drive to remove the Magna Carta, the Declaration of Independence or other documents. Nothing in H.B. 71 prohibits public schools from posting other documents as well.

## VI.   The requirement that schools use a particular wording of the Ten Commandments does not render HB 71 unconstitutional.

The Legislature had valid reasons for requiring this wording of the Ten Commandments. First, this is the most common and best-known wording of the Commandments, even by those who do not use the King James Version of the Bible.

22

Second, the Commandments are not numbered in the Legislature's wording. Numbering the Commandments leads to denominational differences. Jews generally treat "I am the Lord thy God" as the First Commandment, which affects the numbering of the others. Roman Catholics and most Lutherans combine "Thou shalt have no other gods before me" and "nor worship a graven image" as the First Commandment, and then list "Thou shalt not covet thy neighbor's wife" and "Thou shalt not covet thy neighbor's goods" as the Ninth and Tenth Commandments. Most Protestants treat the "graven image" prohibition as the Second Commandment and "Thou shalt not covet" as the Tenth Commandment. By listing the commandments as stated in Exodus 20, the Legislature has avoided favoring one religion over others and has prohibited schools and school districts from favoring one religion over others.

Third, the Legislature has required the Commandments to be stated as they were in the monument on the grounds of the Texas Statehouse, which display was upheld by the Supreme Court in *Van Orden*, thus increasing the likelihood that a Decalog display thus worded would be upheld as constitutional.

Finally, if this Court were to determine that this provision of H.B. 71 is unconstitutional, it should apply the principle of severability to uphold the rest of the statute. As Chief Justice Roberts wrote in *Seila Law v. Consumer Financial*

*Protection Bureau,* 591 U.S. 197 (2017), the Court has a duty to save statutes if possible, so judicial review should be "a scalpel rather than a bulldozer."

## CONCLUSION

The 1956 epic film *The Ten Commandments* is so etched upon American public consciousness that Moses will always be thought to resemble Charlton Heston and Pharaoh Ramses like Yul Brenner. But many have forgotten that in the original uncut version, producer Cecil B. DeMille stepped out on stage and addressed the cinema audience with these words:

> Ladies and Gentlemen, young and old. This may seem an unusual procedure, but we have an unusual subject: The birth of freedom. The story of Moses. The theme of this picture is whether men ought to be ruled by God's laws or whether they are to be ruled by the whims of a dictator like Ramses. Are men the property of the State or are they free souls under God? This same battle continues throughout the world today.[38]

This Court recognized in *Van Orden* that the Ten Commandments have both religious and secular implications. The Ten Commandments posted in public school classrooms represents the secular implications of the Decalogue for America today. The monument stands for an American philosophy of law and government: That civil governments are ordained by the "laws of nature and of nature's God," that God has created us in a state of equality and has endowed us with unalienable rights, that

---

[38] Cecil B. DeMille, THE TEN COMMANDMENTS (Paramount Pictures 1956).

God has a special plan for America that includes blessing and prosperity, and that plan will be realized if we are faithful to Him and His Laws.

The people of Louisiana are entitled to express this philosophy of law and government in public places, including the public schools. The Ten Commandments represent the laws of the Hebrew Republic which was instrumental in the development of Western republican thought and which played a pivotal role in the settlement and development of American law and constitutional institutions. Courts have repeatedly cited the Ten Commandments as authoritative and illustrative of American legal principles. This Court should reverse the district court's decision.

Respectfully submitted,

John Eidsmoe*
*Counsel of Record*
Talmadge Butts
FOUNDATION FOR MORAL LAW
P.O. Box 148
Gallant, AL 35972
334-262-1245
eidsmoeja@juno.com
talmadge@morallaw.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

1. This document complies with the word limit of Rule 32(a)(7), Fed. R. App. P., because, excluding the parts of the document exempted by Rule 32(f), Fed. R. App. P., and 6th Cir. R. 32(b)(1), this document contains 6,498 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared using Microsoft Word in 14-point Times New Roman.

December 26, AD 2024.

Talmadge Butts
FOUNDATION FOR MORAL LAW
P.O. Box 148
Gallant, AL 35972
334-262-1245
talmadge@morallaw.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed via the Court's ECF filing system, and therefore service will be effectuated by the Court's electronic notification system upon all counsel or parties of record.

December 26, AD 2024.

Talmadge Butts
FOUNDATION FOR MORAL LAW
P.O. Box 148
Gallant, AL 35972
334-262-1245
talmadge@morallaw.org

*Counsel for Amicus Curiae*