No. 24-30706

# In the United States Court of Appeals for the Fifth Circuit

DARCY ROAKE, REVEREND, ON BEHALF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILDREN, REAL PARTY IN INTEREST A.V., REAL PARTY IN INTEREST S.V.; ADRIAN VAN YOUNG, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILDREN, REAL PARTY IN INTEREST A.V., REAL PARTY IN INTEREST S.V.; MAMIE BROADHURST, REVEREND, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST N.W.; RICHARD WILLIAMS, REVEREND, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST N.W.; JEFF SIMS, REVEREND, ON BEHALF OF HIMSELF AND ON BEHALF OF HIS MINOR CHILDREN, REAL PARTY IN INTEREST A.S., REAL PARTY IN INTEREST C.S. 1, REAL PARTY IN INTEREST C.S. 2; JENNIFER HARDING, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST A.O.; BENJAMIN OWENS, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST A.O.; DAVID HAWLEY, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILDREN REAL PARTY IN INTEREST A.H., REAL PARTY IN INTEREST L.H.; ERIN HAWLEY, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILDREN, REAL PARTY IN INTEREST A.H, REAL PARTY IN INTEREST L.H.; DUSTIN MCCRORY, ON BEHALF OF THEMSELVES AND ON BEHALF OF HIS MINOR CHILDREN, REAL PARTY IN INTEREST E.M., REAL PARTY IN INTEREST P.M., REAL PARTY IN INTEREST L.M.; GARY SERNOVITZ, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST T.S.; MOLLY PULDA, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST T.S.; CHRISTY ALKIRE, ON BEHALF OF HERSELF AND ON BEHALF OF HER MINOR CHILD, REAL PARTY IN INTEREST L.A.; JOSHUA HERLANDS, ON BEHALF OF HIMSELF AND ON BEHALF OF HIS MINOR CHILDREN, REAL PARTY IN INTEREST E.H., REAL PARTY IN INTEREST J.H.,

*Plaintiffs-Appellees,*

v.

CADE BRUMLEY, IN HIS OFFICIAL CAPACITY AS THE LOUISIANA STATE SUPERINTENDENT OF EDUCATION; CONRAD APPEL, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE LOUISIANA STATE BOARD OF ELEMENTARY AND SECONDARY EDUCATION (LSBESE); JUDY ARMSTRONG, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; KEVIN BERKEN, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; PRESTON CASTILLE, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; SIMONE CHAMPAGNE, IN HER

OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; SHARON LATTENCLARK, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; LANCE HARRIS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; PAUL HOLLIS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; SANDY HOLLOWAY, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; STACEY MELERINE, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; RONNIE MORRIS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; EAST BATON ROUGE PARISH SCHOOL BOARD; LIVINGSTON PARISH SCHOOL BOARD; VERNON PARISH SCHOOL BOARD; ST. TAMMANY PARISH SCHOOL BOARD,

*Defendants-Appellants.*

---

On Appeal from the United States District Court
for the Middle District of Louisiana
No. 3:24-cv-517, Hon. John W. deGravelles

---

## BRIEF OF AMICUS CURIAE AMERICAN ATHEISTS IN SUPPORT OF APPELLEES

Geoffrey T. Blackwell
American Atheists, Inc.
PO Box 58637
Philadelphia, PA 19102
(908) 603-8787
gblackwell@atheists.org

ii

## TABLE OF CONTENTS

Statement of Interest ................................................................. 1

Summary of the Argument ....................................................... 2

Argument ................................................................................... 4

   I.  The Court's analysis must be systematic and objective. ................ 4

   II.   The Supreme Court's Application of the History and Tradition Test ....................................................................................... 5

      A.   The nature of the constitutional principle at issue must be stated with a high degree of particularity. ....................................... 6

      B.   Historical analysis is unnecessary where existing precedent is on point. ....................................................................................... 8

      C.   Only if existing precedent is insufficient to resolve a question of Establishment Clause interpretation should the courts look to history for guidance ....................................................................... 11

Conclusion ............................................................................... 19

Certificate of Service .............................................................. 21

Certificate of Compliance ....................................................... 21

i

## TABLE OF AUTHORITIES

### Cases

*American Legion v. American Humanist Ass'n*, 588 U.S. 19 (2019) ........5

*Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753 (1995) 19

*Castro v. United States*, 540 U.S. 375 (2003)..........................................18

*Drummond v. Robinson Twp.*, 9 F.4th 217 (9th Cir. 2021)....................13

*Engel v. Vitale*, 370 U.S. 421 (1962)...........................................................9

*Everson v. Bd. of Educ.*, 330 U.S. 1 (1947) .............................................15

*Greenlaw v. United States*, 554 U.S. 237 (2008)....................................18

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012)...........................................................................................10

*Illinois ex rel McCollum v. Bd. of Educ.*, 333 U.S. 203 (1948) ...........9, 11

*Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022)................... passim

*Koons v. Platkin*, 673 F. Supp. 3d 515 (D.N.J. 2023) .............................14

*Lee v. Weisman*, 505 U.S. 577 (1992) ...................................................8, 9

*Lynch v. Donnelly*, 465 U.S. 668 (1984) .................................................10

*Marsh v. Chambers*, 463 U.S. 783 (1983) .................................10, 12, 16

*McGowan v. Maryland*, 366 U.S. 420 (1961) ...........................................5

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022) ........... passim

*Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000)...........................9

*Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203 (1963) ...............9

*Stone v. Graham*, 449 U.S. 39 (1980) ...................................................... 10

*Torcaso v. Watkins*, 367 U.S. 488 (1961) ................................... 5, 7, 9, 15

*Town of Greece v. Galloway*, 572 U.S. 565 (2014) ........................... 2, 7, 9

*United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000) ................................................................................................... 12

*United States v. Rahimi*, 602 U.S. 680 (2024) ............................... passim

*Walz v. Tax Comm'n of City of New York*, 397 U.S. 664 (1970) .............. 5

*Zorach v. Clauson*, 343 U.S. 306 (1952) ............................................... 8, 9

## Statutes

Statute for Establishing Religious Freedom, Virginia General Assembly (1786) .................................................................................................. 17

## Rules

Fed. R. App. P. 29 ..................................................................................... 21

Fed. R. App. P. 32 ..................................................................................... 21

Fed. R. Civ. P. 56 ..................................................................................... 18

## Constitutional Provisions

Va. Const. art V, § 11 .............................................................................. 17

## STATEMENT OF INTEREST[1]

Amicus American Atheists, Inc., is a national civil rights organization that works to achieve religious equality for all Americans by protecting what Thomas Jefferson called the "wall of separation" between government and religion created by the First Amendment. American Atheists works to defend the rights of nonreligious public school students; strives to promote understanding of atheists through education, advocacy, and community-building; works to end the stigma associated with atheism; and fosters an environment where bigotry against our community is rejected. As part of its mission, American Atheists seeks to ensure the robust, consistent, and objective application of the Establishment Clause by the judiciary.

Counsel for neither party contributed to the writing of this brief. Additionally, counsel for neither party nor any other person made a monetary contribution intended to fund the preparation or submission of this brief.

---

[1] Amicus received the written consent of all parties to file this brief.

1

## SUMMARY OF THE ARGUMENT

The Supreme Court, in *Kennedy v. Bremerton School District*, made clear that the *Lemon* test is not to be applied in future cases, stating that the courts must instead determine whether government actions challenged under the Establishment Clause comport with "'historical practices and understandings,'" 597 U.S. 507, 535 (2022) (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)), and "'faithfully reflect the understanding of the Founding Fathers,'" *id.* at 536 (quoting *Town of Greece*, 572 U.S. at 577)). The Supreme Court did not take the opportunity in *Kennedy* to elucidate how this inquiry should be undertaken in the Establishment Clause context, nor has it done so since. Amicus therefore seeks to assist this Court in navigating these murky waters by taking guidance from Second Amendment cases, a context in which the Supreme Court and lower courts regularly engage in this "history and tradition" analysis.

The courts do not *make* history. Officers of the court are not trained in historical analysis. Neither the judiciary nor parties to litigation are equipped to carry out the tasks of document collection, authentication, and review that are generally entrusted to entire university

2

departments, subject to peer review, and conducted cumulatively over centuries. And courts' factual conclusions, even those of the highest courts, apply only to the particular case at bar, not the historical record.

Nevertheless, the courts must, under certain circumstances, examine history to arrive at legal conclusions. *Kennedy*, 597 U.S. at 535; *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24-25 (2022). The courts must conducted this examination in a systematic and objective manner. This is necessary to ensure that the conclusions reached hew to the stated objective of the test: avoiding "chaos in the lower courts, . . . [and] differing results in materially identical cases," as well as providing clear guidance to legislators and other stakeholders. *Kennedy*, 597 U.S. at 534.

Beyond *Kennedy*, the Supreme Court *has* provided some guidance as to how this analysis is to be conducted. First, the courts should narrowly define the scope of the historical question with a high degree of particularity. Second, if that historical question has already been addressed by existing precedent, the courts should rely on those precedents and need not reinvent the wheel by conducting the analysis anew. Third, if necessary, the courts should examine the historical

3

record, giving particular weight to federal practice at the time of the founding. Fourth, if the historical record provides unequivocal guidance in the form of affirmative, consistent government practices, the courts should determine whether the challenged government action is in line with the historical practices. The government fails to meet this burden if it is unable to provide evidence of a robust tradition that is relevantly analogous to the challenged act.

## ARGUMENT

## I.    The Court's analysis must be systematic and objective.

The Supreme Court set aside the test announced in *Lemon v. Kurtzman* in order to institute a test that, in the Court's view, does not suffer from the *Lemon* test's "shortcomings." *Kennedy*, 597 U.S. at 534. Namely, the Court highlighted several longstanding criticisms of the test, including that it "invited chaos in lower courts, led to differing results in materially identical cases, and created a minefield for legislators." *Id.* (cleaned up). If the historical analysis now required of the judiciary when addressing purported Establishment Clause violations is to succeed in correcting the *Lemon* test's shortcomings, it must be conducted in a systematic manner that objectively examines relevant primary sources

4

for historical precedents and ensures that the challenged government action conforms to those precedents. To do otherwise would inject the same chaos into this analysis as that which resulted from the inconsistent application of the *Lemon* test.

## II. The Supreme Court's Application of the History and Tradition Test

In *Kennedy*, the Supreme Court expressly set aside the Establishment Clause test laid out in *Lemon v. Kurtzman*. *Id.* In its place, where the courts lack guidance from existing precedent, their interpretation of the Establishment Clause should be guided "by 'reference to historical practices and understandings.'" *Id.* at 535. The Court provided no specific guidance in *Kennedy* as to how this analysis should be conducted.[2] However, the Court did favorably cite the historical analysis conducted in several prior opinions, including *American Legion v. American Humanist Association*, 588 U.S. 19 (2019), *Torcaso v. Watkins*, 367 U.S. 488 (1961), *McGowan v. Maryland*, 366 U.S. 420 (1961), and *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664 (1970).

---

[2] *Kennedy* concerned a Free Exercise Clause claim and the Supreme Court's discussion of the Establishment Clause was limited to a brief explanation why the respondent school district's Establishment Clause concerns were misplaced. *Kennedy*, 597 U.S. at 354-56.

The analysis employed in these cases comports with the historical analysis performed in *New York Rifle & Pistol Association v. Bruen*. Although *New York Rifle* concerned a Second Amendment claim rather than a claim under the First Amendment's Establishment Clause, it is nonetheless the Court's most recent and most concrete explication of the history and tradition analysis and thus helps illuminate how this analysis should be carried out.

## A.    The nature of the constitutional principle at issue must be stated with a high degree of particularity.

The analysis should begin by narrowly defining the constitutional question to be decided. In order to best ensure that the analysis is as rigorous and objective as possible—thereby limiting the risk that subsequent similar cases will arrive at conflicting results—the scope should be defined with a high degree of particularity. Both the judiciary and litigators are already familiar with this approach. *United States v. Rahimi*, 602 U.S. 680, 692 (2024).

The cases cited by the Supreme Court in *Kennedy* provide substantial guidance as to the appropriate scope of the inquiry. In *Town of Greece*, the Supreme Court limited its historical inquiry to whether a legislative prayer that lacks any compelled participation or attendance

and which favors no particular religion "fits within the tradition long followed in Congress and the state legislatures" of opening legislative proceedings with a prayer. *Town of Greece*, 572 U.S. at 575 (citing *Marsh v. Chambers*, 463 U.S. 783 (whether "legislative invocations are compatible with the Establishment Clause")). In *Torcaso v. Watkins*, the Court examined the narrow history of religious tests for office that existed prior to the Founding and the steps undertaken by those in the former colonies to eliminate such tests from the fledgling United States. 367 US at 490-92; *see also Kennedy*, 597 U.S. at 536.

Last term, in *Rahimi*, the Supreme Court reiterated that the analysis must be framed in such a way as to encompass only "relevantly similar" practices. Thus, in examining whether the federal statute prohibiting the possession of a firearm while subject to a domestic violence restraining order violated the Second Amendment, the Court's historical analysis was narrowly limited to the question of whether it was constitutional to restrict the possession of firearms "to mitigate demonstrated threats of physical violence." *Rahimi*, 602 U.S. at 698. The Court contrasted this formulation of the question with that addressed by the Court previously in *United States v. Heller*: whether it was

constitutional to restrict the possession of firearms absent a "judicial determination[]" specific to the individual in question. *Id.* at 698-99 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)).

## B. Historical analysis is unnecessary where existing precedent is on point.

Once the court has identified the appropriate scope of the Establishment Clause inquiry, the court must determine whether a historical analysis is necessary at all. Even as it set aside the *Lemon* test, the Supreme Court reiterated that certain classes of government conduct are presumptively invalid and cited numerous Establishment Clause cases that remain good law. This includes government action that makes religious observance compulsory or coerces anyone to attend a house of worship, *Kennedy*, 597 U.S. at 536-37 (citing *Zorach v. Clauson*, 343 U.S. 306, 314 (1952)), or put coercive pressure on individuals to engage in religious activities, *id.* (citing *Lee v. Weisman*, 505 U.S. 577, 589 (1992)). "[C]oercion along these lines was among the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Id.*

The Supreme Court's discussion of the history-and-tradition test demonstrates that lower courts should not reinvent the wheel in every

8

case. The government may not support religious instruction in school but may, under the right circumstances, accommodate the religious instruction of students by religious entities off of school grounds and free of government support, *Zorach*, 343 U.S. at 315,[3] nor impose prayers or other religious observances on students in class, *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 205 (1963), at school ceremonies, *Weisman*, 505 U.S. at 577, nor at school athletic events, *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 301 (2000); *see also Kennedy*, 597 U.S. at 541-42. The government may not impose religious tests on employees or officers. *Torcaso*, 367 U.S. at 496. In addition to these cases that the Supreme Court specifically cited in *Kennedy*, historical analysis was conducted in a similar manner in *Engel v. Vitale*, 370 U.S. 421, 425-30 (1962) (examining English and colonial history of state-controlled prayer

---

[3] It is noteworthy that, while the Court set aside the *test* announced in *Lemon*, it did not raise any issue with the actual *holding* in *Lemon* that "providing state aid to church-related elementary and secondary schools" violated the Establishment Clause. *Lemon v. Kurtzman*, 403 U.S. 602, 606-07 (1971). This holding was consistent with *Illinois ex rel McCollum v. Bd. of Educ.*, 333 U.S. 203, 212 (1948). The *Kennedy* majority's favorable discussion of *Zorach*, which contrasted a permissible "released time" program with the unconstitutional program at issue in *McCollum*, shows that the outcome of *Lemon* remains valid, though the Court now takes issue with the manner in which it arrived at that conclusion. *Kennedy*, 597 U.S. at 559.

practices), *Town of Greece*, 572 U.S. at 575-77 (examining legislative prayer practices since ratification of the First Amendment), *Marsh v. Chambers*, 463 U.S. 783, 786-92 (1983) (same), *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 182-85 (2012) (examining the English practice of appointing church ministers prior to the founding), *Lynch v. Donnelly*, 465 U.S. 668, 674-77 (1984) (examining the history of ceremonial deism since the founding era), and numerous others.

One such precedent, on all fours with the present case, is *Stone v. Graham*, in which the Supreme Court found unconstitutional Kentucky's statute mandating the display of the Ten Commandments in every public school classroom, funded by private, voluntary contributions. 449 U.S. 39, 42 (1980) (per curiam). The Court had little trouble concluding that Kentucky's statute, substantively indistinguishable from the Louisiana statute challenged in the case at bar, violated the Establishment Clause:

> If the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments. However desirable this might be as a matter of private devotion, it is not a permissible state objective under the Establishment Clause.

*Id.* Though the Court in *Stone v. Graham* applied the then-operative *Lemon* test, the holding, and its reasoning, fit squarely within the scope of Establishment Clause. By "inducing schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments," the state coerces them to engage in religious activity. The Supreme Court in *Kennedy* reiterated that the Establishment Clause prohibits the government from doing exactly that, stating directly that "a State cannot use 'its public school system to aid any or all religious faiths or sects in the dissemination of their doctrines and ideals.'" 597 U.S. at 559 (quoting *McCollum*, 333 U.S. at 211).

Where, as here, the challenged government action is already addressed by existing precedent, conducting the historical analysis anew would only invite the same chaotic "minefield" that the Court sought to avoid by requiring application of the history-and-tradition test. This approach also avoids placing a substantially greater burden on the judicial system by limiting the circumstances in which the court must devote time and resources to a deep historical analysis.

**C.    Only if existing precedent is insufficient to resolve a question of Establishment Clause interpretation should the courts look to history for guidance.**

Where no precedent is sufficiently on point to provide reliable guidance to the Court, it will be necessary to conduct an inquiry into relevant historical practices. This analysis must be rigorous in its approach and carefully conducted to avoid giving a particular historical source too much or too little weight in the inquiry. Again, this deliberate approach is necessary to avoid the chaos of reaching conflicting results.

    1.    *The government bears the burden of proof that its challenged action comports with historical understanding.*

Before turning fully to the method of historical analysis now required by the Supreme Court, it is important to note that in this inquiry "the [g]overnment bears the burden of proving the constitutionality of its actions." *N.Y. State Rifle & Pistol Ass'n*, 597 U.S. at 24 (quoting *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 816 (2000)); *see also Rahimi*, 602 U.S. at 691. Where a plaintiff has challenged a government action and existing precedent does not clearly resolve the question, "the government must generally point to historical evidence about the reach of the [First] Amendment's protections." *N.Y. State Rifle & Pistol Ass'n*, 597 U.S. at 24-25. This evidence must be sufficient to "affirmatively prove" that its action is part of the relevant historical

tradition, *id.* at 19, and that tradition must be of an "unambiguous and unbroken" nature, *Marsh*, 463 U.S. at 792.

This burden entails more than identifying one or a few supporting examples from history. *N.Y. State Rifle & Pistol Ass'n*, 597 U.S. at 46 ("we doubt that *three* colonial regulations could suffice to show a tradition" (emphasis in original)). The courts should no less "stake [their] interpretation of the [First] Amendment upon a single law, in effect in a single State, that contradicts the overwhelming weight of other evidence" than they should the Second Amendment. *Id.* at 65-66 (cleaned up). "[C]ourts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risks endorsing outliers that our ancestors would never have accepted.'" *Id.* at 30 (quoting *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (9th Cir. 2021)) (cleaned up). The government's burden is to show that the challenged action conforms to "longstanding" history and tradition. *Id.* at 30; *see also Rahimi*, 602 U.S. at 692 ("A court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern

circumstances.'" (quoting *N.Y. State Rifle & Pistol Ass'n*, 597 U.S. at 29, and n.7)).

The lower courts have already begun to take this warning to heart. In *Koons v. Platkin*, the trial court examined whether a statute banning the carrying of a firearm on private property without the express consent of the property owner met the test laid out in *N.Y. State Rifle. Koons v. Platkin*, 673 F. Supp. 3d 515, 607 (D.N.J. 2023). Although New Jersey pointed to a trio of "relevantly similar" Reconstruction-era statutes from Louisiana, Oregon, and Texas, in support of its own statute, the court determined that this was insufficient to "establish a *representative* historical tradition to justify" the challenged statute. *Id.* at 622.

  2. *The court must carefully delineate between historical practices based on the era from which they originate.*

   i. *Practices that predate the First Amendment*

In *N.Y. State Rifle*, the Court was careful to distinguish between the examination of historical practices that contribute to the understanding of a right that the people *already possessed* under pre-existing legal principles on the one hand—such as the Second Amendment's right to bear arms—and historical practices that impact the interpretation of constitutional clauses that "lay down a *novel*

principle." *N.Y. State Rifle & Pistol Ass'n*, 597 U.S. at 20. Thus, while accepted practices that predated the adoption of the Second Amendment can be used to infer that like practices today are valid, the same cannot be said for the Establishment Clause. Both the Establishment and Free Exercise Clauses were *novel* developments in the law, adopted in direct response to, and in departure from, the status quo under English rule and the colonial governments. *Torcaso*, 367 U.S. at 492. These provisions, like the others contained in the First Amendment, "broke *new* constitutional ground in the protection it sought to afford to freedom of religion, speech, press, petition and assembly." *Id.* (emphasis added).

As the Supreme Court noted in *Everson v. Board of Education*, the practices of established churches "shock[ed] the freedom-loving colonials into a feeling of abhorrence" and "aroused their indignation." 330 U.S. 1, 8-11 (1947). The colonists' objections to practices such as taxing the public to pay government-approved ministers and build and maintain churches, compelling tithes and church attendance, and other hallmarks of established churches "found expression in the First Amendment." *Id.* at 11.

15

Any effort to interpret the Establishment Clause and apply it to new circumstances must take into account its origin as a culmination of colonists' efforts to *break* from prior English practices. As a result, practices predating the states' ratification of the First Amendment are relevant only insofar as they may illustrate practices from which the fledgling United States sought to depart.

     ii.    *Federal practices that originate in the wake of the adoption of the First Amendment*

Federal practices immediately following the ratification of the First Amendment are highly relevant to any inquiry into the proper application of the Establishment Clause. Actions taken by the First Congress are strong indicators of the Founders' understanding of the scope of that provision. *See Marsh*, 463 U.S. at 787-90. When examining such actions, however, it is important to focus the inquiry on primary sources in order to avoid polluting the inquiry with subsequent writers' and historians' biases and self-serving glosses on the historical record.

Just as colonial practices in place before the Establishment Clause came into operation should not be relied on to justify current practices, state practices in place prior to the incorporation of that Clause to the states through the Fourteenth Amendment's Due Process Clause are of

little, if any, value in determining what government practices are permitted.

To be sure, some states' constitutions and statutes contained provisions that mirrored the Establishment Clause. Virginia, with its Act for Establishing Religious Freedom, Virginia General Assembly (1786) (later folded into the state's 1830 constitution, Va. Const. art V, § 11 (1830)) is one such example. Although practices under such state constitutional provisions may be helpful in guiding the analysis, the Court should nonetheless always bear in mind that in many instances, states' interpretation of their constitutional provisions would not necessarily have mirrored the interpretation of the Establishment Clause, and such parallel interpretations should not be assumed where the record is silent on the issue.[4]

> 3.  *The test neither requires nor justifies violations of the rules of civil procedure.*

The history-and-tradition test, as outlined above as well as in *Rahimi*, *N.Y. State Rifle & Pistol Ass'n*, does not require the court to deviate materially from the normal manner of developing a factual

---

[4] Again, the government bears the burden of showing that such historic examples in fact support upholding the challenged act.

record. In keeping with the adversarial nature of our judicial system, this inquiry must rely on the record as it has been developed by the parties. This allows those most interested in the outcome of the case to "frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). As Justice Scalia pointed out, the courts proceed from the premise that "the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." *Castro v. United States*, 540 U.S. 375, 386 (2003), Scalia, J., concurring.

The government, as the party bearing the burden of proof and persuasion, must produce sufficient admissible historical evidence in its filings. Where the historical evidence presented by the parties is in conflict, it may be necessary for the court to obtain the opinions of expert historians to elucidate the relative weight and reliability of the parties' conflicting historical evidence.[5] Should the court independently become

---

[5] It is possible that the parties produce conflicting historical evidence of the same general credibility and relevance. Rather than creating a genuine dispute as to a material fact necessitating a trial to resolve the matter, Fed. R. Civ. P. 56(a), such conflicting evidence likely demonstrates that the government has failed to meet its obligation to show that its challenged action conforms to longstanding, unambiguous, and unbroken historical tradition.

aware of relevant historical evidence, it must similarly give the parties a reasonable opportunity to respond to such evidence through a supplemental brief. Examining history and tradition does not justify deviations from the rules of procedure governing civil litigation.

## CONCLUSION

The Supreme Court set aside the *Lemon* test in order to avoid the chaos it invited in lower courts, the specter of reaching "'differing results' in materially identical cases," and the "minefield" it created "for legislators." *Kennedy*, 597 U.S. at 534 (quoting *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 768 n.3 (1995)). The history-and-tradition analysis that the courts are directed to use in its place must be conducted in a consistent and objective manner, lest the new test succumb to the same infirmities as its predecessor. Both because existing precedent is directly on point and because the government has failed to show the existence of an unambiguous and unbroken tradition of mandating the display of the Ten Commandments in public school classrooms, the methodical application of the history-and-tradition analysis in the case at bar supports affirmance of the preliminary injunction entered by the court below.

19

Respectfully submitted,

Geoffrey T. Blackwell
AMERICAN ATHEISTS, INC.
PO Box 58637
Philadelphia, PA 19102
(908) 603-8787
gblackwell@atheists.org

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

On January 6, 2025, this document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

*/s/ Geoffrey T. Blackwell*
Geoffrey T. Blackwell

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume restriction set forth in Fed. R. App. P. 29(a)(5). This brief contains 3839 words, excluding the parts of the document that are exempted by Fed. R. App. P. 32(f).

In addition, this response complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

*/s/ Geoffrey T. Blackwell*
Geoffrey T. Blackwell