No. 24-30706

IN THE

# United States Court of Appeals for the Fifth Circuit

DARCY ROAKE, REVEREND, ON BEHALF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILDREN, REAL PARTY IN INTEREST A.V., REAL PARTY IN INTEREST S.V.; ADRIAN VAN YOUNG, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILDREN, REAL PARTY IN INTEREST A.V., REAL PARTY IN INTEREST S.V.; MAMIE BROADHURST, REVEREND, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST N.W.; RICHARD WILLIAMS, REVEREND, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST N.W.; JEFF SIMS, REVEREND, ON BEHALF OF HIMSELF AND ON BEHALF OF HIS MINOR CHILDREN, REAL PARTY IN INTEREST A.S., REAL PARTY IN INTEREST C.S. 1, REAL PARTY IN INTEREST C.S. 2; JENNIFER HARDING, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST A.O.; BENJAMIN OWENS, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST A.O.; DAVID HAWLEY, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILDREN REAL PARTY IN INTEREST A.H., REAL PARTY IN INTEREST L.H.; ERIN HAWLEY, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILDREN, REAL PARTY IN INTEREST A.H, REAL PARTY IN INTEREST L.H.; DUSTIN MCCRORY, ON BEHALF OF THEMSELVES AND ON BEHALF OF HIS MINOR CHILDREN, REAL PARTY IN INTEREST E.M.; REAL PARTY IN INTEREST P.M., REAL PARTY IN INTEREST L.M.; GARY SERNOVITZ, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN INTEREST T.S.; MOLLY PULDA, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD. REAL PARTY IN INTEREST T.S.; CHRISTY ALKIRE, ON BEHALF OF HERSELF AND ON BEHALF OF HER MINOR CHILD, REAL PARTY IN INTEREST L.A.; JOSHUA HERLANDS, ON BEHALF OF HIMSELF AND ON BEHALF OF HIS MINOR CHILDREN, REAL PARTY IN INTEREST E.H., REAL PARTY IN INTEREST J.H.,

*Plaintiffs-Appellees,*

v.

CADE BRUMLEY, IN HIS OFFICIAL CAPACITY AS THE LOUISIANA STATE SUPERINTENDENT OF EDUCATION; CONRAD APPEL, IN HIS OFFICIAL CAPACITY

AS A MEMBER OF THE LOUISIANA STATE BOARD OF ELEMENTARY AND SECONDARY EDUCATION (LSBESE); JUDY ARMSTRONG, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; KEVIN BERKEN, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; PRESTON CASTILLE, IN HIS OFFICIAL CAPACITY AS A MEMBER OF LSBESE; SIMONE CHAMPAGNE, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; SHARON LATTEN-CLARK, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; LANCE HARRIS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF LSBESE; PAUL HOLLIS, LOUISIANA STATE BOARD OF ELEMENTARY AND SECONDARY EDUCATION; SANDY HOLLOWAY, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; STACEY MELERINE, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; RONNIE MORRIS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; EAST BATON ROUGE PARISH SCHOOL BOARD; LIVINGSTON PARISH SCHOOL BOARD; VERNON PARISH SCHOOL BOARD; ST. TAMMANY PARISH SCHOOL BOARD,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Middle District of Louisiana
No. 3:24-cv-517, Hon. John W. de Gravelles

**BRIEF FOR *AMICI CURIAE* BAPTIST JOINT COMMITTEE FOR RELIGIOUS LIBERTY, EVANGELICAL LUTHERAN CHURCH IN AMERICA, THE GENERAL SYNOD OF THE UNITED CHURCH OF CHRIST, REVEREND JIHYUN OH, AND THE MOST REVEREND SEAN W. ROWE IN SUPPORT OF PLAINTIFFS-APPELLEES**

Douglas Laycock
727 E. Dean Keeton St.
Austin, TX 78705
(512) 364-9473

James R. McGuire
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
(415) 773-5700

K. Hollyn Hollman
BAPTIST JOINT COMMITTEE FOR
RELIGIOUS LIBERTY (BJC)
200 Maryland Ave N.E.
Washington D.C. 20002
(202) 544-4226

Brian Raphel
ORRICK, HERRINGTON &
 SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5392

*Counsel for Baptist Joint Committee for Religious Liberty,
Evangelical Lutheran Church in America, The General Synod of the
United Church of Christ, Reverend Jihyun Oh, and The Most
Reverend Sean W. Rowe, as Amici Curiae*

## SUPPLEMENTAL CERTIFICATION OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT

*Roake, et. al. v. Brumley, et al.,* No. 24-30706

Pursuant to Fifth Circuit Rule 26.1 and Federal Rule of Appellate Procedure 29(a)(4)(A), amici curiae Baptist Joint Committee for Religious Liberty, Evangelical Lutheran Church in America, and The General Synod of the United Church of Christ each state that they are nonprofit corporations with no parent corporations. No publicly held corporation owns 10 percent or more of their stock.

Pursuant to Rule 29.2, the undersigned counsel of record certifies that the following listed persons and entities have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**Amici Curiae**

> Baptist Joint Committee for Religious Liberty
> Evangelical Lutheran Church in America
> The General Synod of the United Church of Christ
> Reverend Jihyun Oh, as Stated Clerk of the General Assembly of the Presbyterian Church
> The Most Reverend Sean W. Rowe, as the 28th Presiding Bishop of The Episcopal Church

**Counsel for Amici Curiae**:    James R. McGuire, Brian Raphel, K. Hollyn Hollman, Douglas Laycock

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Brian Raphel*
Brian Raphel
*Counsel for Baptist Joint Committee for*
*Religious Liberty, Evangelical Lutheran*
*Church in America, The General Synod of*
*the United Church of Christ, Reverend*
*Jihyun Oh, and The Most Reverend Sean W.*
*Rowe*

# TABLE OF CONTENTS

**Page**

SUPPLEMENTAL CERTIFICATION OF INTERESTED
PARTIES AND CORPORATE DISCLOSURE STATEMENT........i

TABLE OF CONTENTS ........................................................................iii

TABLE OF AUTHORITIES...................................................................iv

INTEREST OF AMICI CURIAE............................................................. 1

PRELIMINARY STATEMENT AND SUMMARY OF THE
ARGUMENT ................................................................................. 5

ARGUMENT .......................................................................................... 7

I.    The Establishment Clause Prohibits Government
From Promoting Religious Indoctrination In
Public Schools.................................................................. 7

II.   Posting The Ten Commandments In Public
Schools Creates Unavoidable State-Sponsored
Religious Indoctrination. ............................................. 14

III.  HB 71 Imposes Religious Instruction On Captive
Audiences In Public Classrooms................................. 16

IV.   HB 71 Contains No Safeguards Against
Indoctrination.............................................................. 23

V.    HB 71 Favors Certain Faiths and Denominations
Over Others By Selecting A Preferred Version Of
The Ten Commandments............................................. 27

CONCLUSION .................................................................................... 33

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Legion v. American Humanist Association*,
   588 U.S. 29 (2019) ................................................................ 18

*Engel v. Vitale*,
   370 U.S. 421 (1962) ..................................................... *passim*

*Ingebretsen v. Jackson Public School District*,
   88 F.3d 274 (5th Cir. 1996) ................................................ 17

*Kennedy v. Bremerton School District*,
   597 U.S. 507 (2022) ......................................................... 6, 9

*Larson v. Valente*,
   45 U.S. 228 (1982) ............................................................. 28

*Lee v. Weisman*,
   505 U.S. 577 (1992) ..................................................... *passim*

*Lemon v. Kurtzman*,
   403 U.S. 602 (1971) ........................................................... 25

*Lynch v. Donnelly*,
   465 U.S. 668 (1984) ............................................. 11, 17, 19

*McCreary County v. ACLU*,
   545 U.S. 844 (2005) ..................................................... 20, 28

*Santa Fe Independent School District v. Doe*,
   530 U.S. 290 (2000) ..................................................... *passim*

*School Dist. of Abington Twp. v. Schempp*,
   374 U.S. 203 (1963) ..................................................... *passim*

*Stone v. Graham*,
   449 U.S. 39 (1980) ............................................... 18, 24, 25

*Town of Greece, N.Y. v. Galloway*,
   572 U.S. 565 (2014) ............................................................... 27

*Van Orden v. Perry*,
   545 U.S. 677 (2005) ............................................. 17, 18, 19

*Zorach v. Clauson*,
   343 U.S. 306 (1952) ............................................................. 6

## Statutes

HB 71 ................................................................ *passim*

La. R.S. § 17:154.1 ............................................................... 17

La. R.S. § 17:221 ................................................................. 16

La. R.S. § 17:2124 ............................................ 15, 16, 25, 26

La. R.S. § 40:1730.28(A)(1) ................................................. 22

## Other Authorities

A.L. Barry, "What about . . . The Ten Commandments",
   Faith Lutheran (2001),
   *https://www.faithlutherancorning.org/10-
   commandments* ...................................................... 29

Catholic Church, "Catechism of the Catholic Church:
   Revised in Accordance with the Official Latin Text
   Promulgated by Pope John Paul II", 496-97 (United
   States Catholic Conference, 2nd ed. 2000)
   *https://www.usccb.org/sites/default/files/flipbooks/
   catechism/498/* ......................................................... 29

James Madison, Memorial and Remonstrance (1785),
   https://founders.archives.gov/documents/Madison/01-08-
   02-0163 .................................................................... 33

Jason Valendy, "You Shall Have No Other Gods BEFORE
   Me?" *https://um-insight.net/in-the-church/practicing-
   faith/you-shall-have-no-other-gods-before-me/* ................ 31

"Judaism: The Ten Commandments", Jewish Virtual
  Library, *https://www.jewishvirtuallibrary.org/the-ten-
  commandments* ................................................................... 32

Office of the Curator, Supreme Court of the United States,
  <u>Courtroom Friezes: South and North Walls (May 8, 2003)</u>
  https://www.supremecourt.gov/about/northandsouthwalls.
  pdf.................................................................................... 20

Paul Finkelman, *The Ten Commandments on the Courthouse
  Lawn and Elsewhere*, 73 FORDHAM L. REV. 1477, 1483
  (2005).................................................................... 28, 29, 30

# INTEREST OF AMICI CURIAE[1]

## Baptist Joint Committee for Religious Liberty (BJC)

BJC serves more than a dozen supporting organizations, including state and national Baptist conventions and conferences, and churches and individuals across the country dedicated to the historic Baptist principle of religious freedom for all. It has vigorously supported both the free exercise of religion and freedom from religious establishments for all of its eighty years, including in numerous cases involving religion and the public schools.

## Evangelical Lutheran Church In America (ELCA)

The ELCA is the largest Lutheran denomination in North America. It has over eight thousand-member congregations which, in turn, have approximately 3.5 million individual members.

The ELCA and its predecessor denominations have continually supported religious freedom. In 2017, the Church Council of the ELCA

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a), Amici certify that the parties have consented to the filing of this amicus brief. No counsel for a party authored the brief in whole or in part. No party, counsel for a party, or any person other than amici and their counsel, made a monetary contribution intended to fund the preparation or submission of this brief.

adopted a social message on Human Rights, in which it states that the ELCA will "advocate for the U.S. government to protect and promote the equal rights of all people, as enshrined in the U.S. Constitution and Bill of Rights," which include the First Amendment rights of freedom of religion and to be free from government favoritism of one religion over another.

<u>The General Synod of the United Church of Christ</u>

The General Synod of the United Church of Christ is the representative body of the national denomination of the United Church of Christ (UCC). The UCC was formed in 1957, by the union of the Evangelical and Reformed Church and The General Council of the Congregational Christian Churches of the United States, in order to express more fully the oneness in Christ of the churches composing it. The UCC has five thousand churches in the United States, with a membership of approximately 944,000.

The General Synod of the UCC, various local churches and regional bodies of the UCC, and its predecessor denominations, have a rich heritage of promoting religious freedom and tolerance. The UCC has long acknowledged its responsibility to protect the right of all to believe and

worship voluntarily as conscience dictates, and to oppose efforts to have government at any level support or promote the views of one faith community more than another. At its twentieth gathering, the General Synod continued this legacy by encouraging the involvement of the United Church of Christ in a national campaign to promote the principle of the separation of church and state and the proper role of religion in society.

<u>Reverend Jihyun Oh</u>

Reverend Jihyun Oh, as Stated Clerk of the General Assembly of the Presbyterian Church (U.S.A.) (PCUSA), joins this brief as the senior ecclesiastical officer of the PCUSA. The PCUSA is a national Christian denomination with nearly 1.1 million members in over 8,500 congregations, organized into 166 presbyteries under the jurisdiction of 16 synods. Through its antecedent religious bodies, it has existed as an organized religious denomination within the current boundaries of the United States since 1706.

The General Assembly opposes the permanent or unattended display of religious symbols on public property as a violation of the religious neutrality required of government. The General Assembly does

not claim to speak for all Presbyterians, nor are its policies binding on the membership of the Presbyterian Church. However, the General Assembly is the highest legislative and interpretive body for the denomination, and it is the final point of decision in all disputes. As such, its statements are considered worthy of the respect and prayerful consideration of all the denomination's members.

<u>The Most Reverend Sean W. Rowe</u>

The Most Reverend Sean W. Rowe is the 28th Presiding Bishop of The Episcopal Church, a hierarchical religious denomination in the United States and 17 other countries. Under the Church's polity, the Presiding Bishop is charged with "speak[ing] God's words to the Church and to the world, as the representative of [the] Church."

The Episcopal Church has consistently supported religious freedom in a variety of contexts. In 1994, the Church urged State Legislatures considering "moment of silence" statutes for public schools to "assure Constitutional balance" in their treatment of the issue by "carefully considering the First Amendment's Free Exercise clause as well as its Establishment clause."

## PRELIMINARY STATEMENT AND SUMMARY OF THE ARGUMENT

If Louisiana were to require that every public-school teacher begin every class with an instruction that the Ten Commandments require worshipping the God of the Hebrew Bible and forbid worshipping any other god (or no god at all), there is little doubt that such a law would violate the First Amendment. For decades, the Supreme Court repeatedly has rejected various forms of such religious indoctrination in public school settings. *See e.g., Engel v. Vitale*, 370 U.S. 421 (1962); *School Dist. of Abington Twp. v. Schempp*, 374 U.S. 203 (1963); *Lee v. Weisman*, 505 U.S. 577 (1992); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000). The essential boundary between religious instruction and state activity in public schools protects not only nonbelievers but also religion, because "history showed that many people had lost their respect for any religion that had relied upon the support for [sic] government to spread its faith." *Engel*, 370 U.S. at 431. This case asks the narrow question of whether a breach of that boundary is permissible when the instruction is delivered not orally, but instead through printed materials that are prominently and permanently displayed throughout the nearly 14,000 hours Louisiana children will remain in public schools.

HB 71 requires that the Ten Commandments permanently be displayed in every classroom of every public school in Louisiana. To Amici, the Ten Commandments represent the original law handed down by God to Moses, with explicitly religious instructions to, *inter alia*, worship God, forsake all other religions, and observe the Sabbath. HB 71's posting requirement ensures that these religious instructions will be conveyed continuously, without exception, to every student in Louisiana's public schools throughout their formative years. This compelled observance by children of religious tenets stated in the Ten Commandments violates the Establishment Clause. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 537 (2022) ("[T]his Court has long held that government may not, consistent with a historically sensitive understanding of the Establishment Clause, 'make a religious observance compulsory.'") (quoting *Zorach v. Clauson*, 343 U.S. 306, 314 (1952)).

Additionally, HB 71 grants preferential treatment to a single version of the Ten Commandments. No single religion owns the Ten Commandments, nor can any single denomination claim authority over their proper translation or interpretation. There are multiple versions of

the Commandments, and theological debate continues among (and even within) different denominations about the correct translation and interpretation of the Commandments. Through HB 71, the Louisiana legislature declares a victor in this debate by selecting a single "correct" version to be imposed on every child in the Louisiana public school system, regardless of their religious beliefs.

The Establishment Clause prohibits Appellants from selecting a preferred version of the Ten Commandments and compelling every student in every public school to receive religious instruction from that preferred version at every hour of every school day. Because HB 71 does exactly this, the District Court correctly held that HB 71 violates the Establishment Clause. That decision should be affirmed.

## ARGUMENT

### I. The Establishment Clause Prohibits Government From Promoting Religious Indoctrination In Public Schools.

The Establishment Clause exists not only to protect nonbelievers and believers in minority faiths from proselytization by the state, but also to protect religion from being undermined by state action. As the Supreme Court has recognized for decades, the "first and most immediate purpose" of the Establishment Clause "rested on the belief that a union

of government and religion tends to destroy government *and to degrade religion*." *Engel*, 370 U.S. at 431 (emphasis added). "[H]istory showed that many people lost their respect for any religion that had relied upon the support for [sic] government to spread its faith." *Id.*; *see also Lee*, 505 U.S. at 589 (the Establishment Clause and Free Exercise Clause "exist to protect religion from government interference"); *Schempp*, 374 U.S. at 259 (Brennan, J., concurring) ("It is not only the nonbeliever who fears the injection of sectarian doctrines and controversies into the civil polity, but in as high degree it is the devout believer who fears the secularization of a creed which becomes too deeply involved with and dependent upon the government.").

Government sponsorship of religion can undermine true faith in many ways. It can bend religion to its own political or other purposes. Further, efforts to deny that the government is doing anything that might offend or exclude adherents of other faiths can cause it to secularize religious observance or misstate religious teachings because the government does not understand them or take them seriously.

This case presents an egregious example. The "illustrations" offered by Appellants as acceptable means of meeting HB 71's requirements

actually denigrate the Ten Commandments by suggesting that the Commandments could be plastered on posters replete with "jokes" and "internet memes" or could be used as a prop for targeted attacks against certain special interest groups. *See* ROA.489-492. In one astonishing example, Appellants suggest contradicting and undermining the Commandment "Thou shalt not kill" by pairing it with song lyrics that glorify the act of murdering another person by shooting them in the head during a duel. ROA.485.

One of the ways in which the Establishment Clause protects both believers and nonbelievers is through the "long held" understanding that the "government may not . . . make a religious observance compulsory." *Kennedy*, 597 U.S. at 537.[2] In particular, the Supreme Court has for decades been particularly vigilant about keeping religious indoctrination out of the nation's public schools. More than sixty years ago, the Court prevented New York from requiring each school day to begin with the following prayer: "Almighty God, we acknowledge our dependence upon

---

[2] In *Kennedy*, the Supreme Court held that a private act of prayer by a football coach acting outside of his official duties, where no student was compelled to participate, was private speech. *Kennedy* bears no similarity to the present matter, where the practice at issue is a law requiring state officials to post religious indoctrination in every classroom.

Thee, and we beg Thy blessings upon us, our parents, our teachers and our Country." *Engel*, 370 U.S. at 422, 424-25. Although the school district assured the Court that this language was "nondenominational" and "observance on the part of the students is voluntary," the Court concluded that this practice was "wholly inconsistent with the Establishment Clause." *Id*. at 424, 430. "It is no part of the business of government to compose official prayers for any group of the American people to recite as part of a religious program carried on by government." *Id*. at 425.

The following year, the Court struck down laws in a pair of cases that required portions of the Bible to be read without comment in public schools. *Schempp*, 374 U.S. at 223. Consistent with *Engel*, the Court concluded "that in both cases the laws require religious exercises and such exercises are being conducted in direct violation of the rights of the appellees and petitioners." *Id*. at 224. The fact that "individual students may absent themselves upon parental requests" was irrelevant because it "furnishes no defense to a claim of unconstitutionality under the Establishment Clause." *Id*. at 224-25.

The Supreme Court reiterated these same principles in 1992, when it struck down a Rhode Island public school's practice of inviting clergy

to offer prayer at graduation ceremonies. *See Lee*, 505 U.S. 577. The Court observed that the Establishment Clause "at a minimum . . . guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a state religion or religious faith, or tends to do so.'" *Id.* at 587 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 678 (1984)). The Court found that a school official violated these "central principles" when he directed that a prayer should occur "as if a state statute decreed that the prayers must occur" and then "directed and controlled the content of the prayers." *Id.* at 587-588. Even though the invited clergy were asked to offer "non-sectarian" prayer, which the school characterized as a "good-faith attempt by the school to ensure that . . . sectarianism . . . be removed from the graduation ceremony," the Supreme Court observed that "[t]he question is not the good faith of the school in attempting to make the prayer acceptable to most persons, but the legitimacy of its undertaking that enterprise at all when the object is to produce a prayer to be used in a formal religious exercise which students, for all practical purposes, are obliged to attend." *Id.* at 588.

Eight years later, in *Santa Fe*, the Supreme Court again addressed school-based prayer, but this time the prayer occurred at extracurricular football games, where an elected student was invited to provide an invocation over the school's public address system before each game. The School District sought to defend this policy, *inter alia*, "because attendance at an extracurricular event, unlike a graduation ceremony, is voluntary." 530 U.S. at 310. The Court promptly disposed of this argument because attendance *was* mandatory for "some students . . . such as cheerleaders, members of the band, and, of course, the team members themselves." *Id.* at 311. But even for students who were not required to attend, the Court noted that "law reaches past formalism" and so it could not discount "the importance to many students of attending and participating in extracurricular activities as part of a complete educational experience." *Id.* "[T]he choice between attending these games and avoiding personally offensive religious rituals" is not a choice that the State may force on students because "'it is a tenet of the First Amendment that the State cannot require one of its citizens to forfeit his or her rights and benefits as the price of resisting conformance to state-sponsored religious practice.'" *Id.* at 312 (quoting *Lee* at 596).

These cases have a consistent throughline. Each time, state officials introduced policies requiring religious indoctrination in public schools and then sought to defend those policies on the grounds that the policies were nondenominational and each student had an opportunity to opt out. Yet the Supreme Court held each of those practices to be unconstitutional because imposing overt religious activity on students in a public school was a religious practice and any opportunity to "opt out" was illusory.

Appellants would have this Court believe the grave constitutional concerns expressed in each of these cases could have been avoided if the school officials had simply posted the religious messaging on the walls of the classrooms, rather than reading them aloud to the students. But none of these opinions suggest that the spoken nature of the attempted indoctrination was a relevant consideration, or that the outcome would have been any different with printed text. Instead, these cases reflect a clear and consistent understanding that there is no constitutionally valid way for the government to pursue or support religious indoctrination in public schools. As summarized in *Schempp*:

> The place of religion in our society is an exalted one, achieved through a long tradition of reliance on the home, the church and the inviolable citadel of the individual heart and mind. We have come to recognize through bitter experience that it

is not within the power of government to invade that citadel, whether its purpose or effect be to aid or oppose, to advance or retard.

*Schempp*, 374 U.S. at 226.

## II.   Posting The Ten Commandments In Public Schools Creates Unavoidable State-Sponsored Religious Indoctrination.

The Ten Commandments are particularly significant Bible verses because they list a set of rules to be followed in order to live a holy life in the eyes of God. As recognized by Appellants, the Commandments are "*rules* given by God to Moses for the children of Israel . . ." Appellant Br. at 7 (emphasis added). The Bible explains that God delivered these rules to Moses so that the people could be "taught" to follow them. *See Exodus* 24:12-13 (King James) ("And the Lord said unto Moses, 'Come up to me into the mount, and be there; and I will give thee tables of stone, and a law, and commandments which I have written; that thou mayest teach them.'").[3] For Amici and other Christians, the Bible is holy and authoritative. References to its teachings provide direction for believers in daily life. Religious communities meet regularly to interpret and

---

[3] All references to the Bible refer to the King James version.

14

understand those religious teachings. It is not the province of the state to supplant that education.

To be sure, several of the rules stated in the Ten Commandments—such as the prohibition against killing—have analogues that have been codified in the laws of this and other nations. But it is equally certain that the following instructions from the first half of the Decalogue, mandated by HB 71, are *purely religious* in nature and have *never* been law in the United States:[4]

> I AM the Lord thy God.
> Thou shalt have no other god before me.
> Thou shalt not make to thyself any graven images.
> Thou shalt not take the Name of the Lord thy God in vain.
> Remember the Sabbath day, to keep it holy.

La. R.S. § 17:2124(B)(2). At a minimum, these instructions are *at least* as overtly religious in nature as the prayer in *Engel*, which could not constitutionally be read to students in New York's public schools: "Almighty God, we acknowledge our dependence upon Thee, and we beg Thy blessings upon us, our parents, our teachers and our Country." *Engel*, 370 U.S. at 422. HB 71 is a call to religious action, mandated by

---

[4] Many states prohibited certain commercial activity on Sundays well into the twentieth century, but such laws did not prescribe religious activity and did not require that any citizen "keep" the day "holy."

15

the state, that is precisely the type of "religious observance" in schools that the Establishment Clause prohibits.

## III. HB 71 Imposes Religious Instruction On Captive Audiences In Public Classrooms.

HB 71 mandates that "each public school" in Louisiana post the State's preferred version of the Ten Commandments in "each classroom." La. R.S. § 17:2124(B)(1). These posters must be "at least eleven inches by fourteen inches" in size and the actual text of the Commandments must be "the central focus of the poster . . . and shall be printed in a large, easily readable font." *Id*. Although the statute requires inclusion of a "context statement" and permits references to other materials, none of these extraneous materials are subject to the same rule that they be printed in a "large, easily readable font" and none may usurp the Commandments' position as the "central focus." *Id*.

Louisiana law further requires that parents send their children to public or private school between the ages of 5 and 18, unless the child graduates early. La. R.S. § 17:221(A)(1)(b). Failure to ensure the child's attendance, without habitual tardiness, can result in financial penalties and/or imprisonment. *Id*. at (A)(1)(c), (A)(2). Children must attend school for 360 minutes of "instructional time" per day, at least 177 days per year,

for each of these thirteen years. La. R.S. § 17:154.1(A)(1). This amounts to a total of 828,360 minutes (13,806 hours) during which HB 71 requires every student to be reminded *continuously* of the religious imperatives stated in the Ten Commandments. This religious instruction cannot be ignored or avoided. *See, e.g., Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 279-80 (5th Cir. 1996) (prayer at "school functions where attendance is compulsory" is more coercive because "students will be a captive audience that cannot leave without being punished by the state or School Board for truancy or excessive absences").

The classroom setting for the instruction is a critical distinction from other instances where public displays of religious material have been upheld. The Supreme Court's decisions that refer to passive displays that were upheld as constitutional involve religious displays in open, outdoor, park-like settings that are encountered only in passing or at the will of those who *voluntarily* visit them. *See, e.g. Lynch v. Donnelly*, 465 U.S. 668, 671 (1984) (nativity scene located in park in a public shopping district); *Van Orden v. Perry*, 545 U.S. 677, 681 (2005) (one of several monuments on the "22 acres surrounding the Texas State Capitol"); *Am. Legion v. Am. Humanist Ass'n.*, 588 U.S. 29, 44 (2019) (cross located on a

"traffic island . . . at the center of a busy intersection"). They do not involve captive audiences of children in public schools.

Appellants make much of the fact that the Supreme Court upheld the display of the Ten Commandments on one of 17 monuments and 21 historical markers located on the Texas State Capitol Grounds in *Van Orden*, 545 U.S. at 678. *See, e.g.,* Appellants Br. at 9, 29, 32, and 57. But Appellants fail to recognize that the *Van Orden* Court *expressly recognized that the capitol grounds were not analogous to a classroom setting*. The plurality opinion (joined by four of the nine justices) observes that there are "of course, limits to the government's display of religious messages or symbols" and reiterates that "posting of the Ten Commandments in every public schoolroom" was "unconstitutional." *Van Orden*, 545 U.S. at 678 (citing *Stone v. Graham*, 449 U.S. 39 (1980)). The plurality opinion further elaborates that "Texas' placement of the Commandments monument on its capitol grounds is a far more passive use of those texts than was the case in *Stone, where the text confronted elementary school students every day*." *Id.* (emphasis added). Justice Breyer's concurring opinion also suggests that he may have sided with the dissent (which would have reversed the ruling) if Texas had

attempted to place the Commandments in public school classrooms: "This case . . . is distinguishable from instances where the Court has found Ten Commandments displays impermissible. The display is not on the grounds of a public school, where, given the impressionability of the young, government must exercise particular care in separating church and state." *Id.* at 703 (Breyer, J., concurring).

Aside from the Ten Commandments display approved in *Van Orden*, which recognized that its holding would not apply in the context of a public-school classroom, every other display of the Commandments cited by Appellants involves *purely symbolic* depictions. *See* Appellants' Br. at 7-8 (discussing symbolic displays at the Supreme Court, the Library of Congress, and the Boston Public Library); *id.* at 55 (citing *Lynch*, 465 U.S. at 677 for its recognition that "Moses with the Ten Commandments" is a "symbol" depicted at the Supreme Court). These depictions *do not show the text* of the Ten Commandments, which provides the religious instruction at issue here. Indeed, the frieze on the southern wall of the Supreme Court was designed intentionally to show the text (in Hebrew) only of Commandments six through ten, thus *omitting* the purely religious instructions found in the first half of the

Decalogue.[5] The absence of the actual text that HB 71 imposes on children throughout the school year makes these symbols completely unlike the displays at issue here. As the Supreme Court explained:

> Displaying that text is . . . different from symbolic representation, like tablets with 10 roman numerals, which could be seen as alluding to a general notion of law, not a sectarian conception of faith. Where the text is set out, the insistence of the religious message is hard to avoid in the absence of a context plausibly suggesting a message going beyond an excuse to promote the religious point of view.

*McCreary Cnty. v. ACLU*, 545 U.S. 844, 847 (2005).

If HB 71's proponents had wanted to reference the Ten Commandments symbolically, they could have done so by depicting them without their text. Instead, they chose to provide *explicit religious instruction* by posting their preferred version of the text in every classroom. This is not merely a display of a passive symbol that may be subject to multiple interpretations; it is indoctrination of a singular religious directive to worship a particular God and to forsake all other religions. That is what the text says, and Appellants do not offer *any*

---

[5] Office of the Curator, Supreme Court of the United States, <u>Courtroom Friezes: South and North Walls (May 8, 2003)</u> https://www.supremecourt.gov/about/northandsouthwalls.pdf

alternate interpretation for these instructions that they wish to post in every classroom.

Nevertheless, Appellants attempt to defend HB 71's indoctrination by suggesting that students "are not required to do anything with the Ten Commandments," which "will simply appear on a wall for students to observe or ignore as they wish." Appellant Br. at 49, 59. Of course, whether or not a student chooses to *follow* the posted instructions is irrelevant. *See Engel*, 370 U.S. at 430 ("Voluntary" nature of religious "observance" will not "free it from the limitations of the Establishment Clause."). In any event, Appellants' argument that the posters can simply be ignored is the exact same argument that was rejected in *Engel, Schempp, Lee*, and *Santa Fe*; school prayer is not permissible simply because students could choose to ignore it. *See supra. Lee*, in particular, noted that there must be "heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools" before rejecting the argument that students should be expected to simply ignore a religious practice. *Lee*, 505 U.S. at 592-93.

Moreover, the suggestion that no student will feel compelled to follow instructions posted on the walls of every classroom ignores reality. It is exceptionally rare for Louisiana to mandate that a set of instructions be posted on classroom walls. The only other example of which Amici are aware is the requirement in Section 1004.9 of the International Business Code, adopted by the Louisiana legislature in Section 103 of the Louisiana Uniform Construction Code, that the maximum occupancy of "the room or space [be] posted in a conspicuous place, near the main exit or exit access doorway from the room or space" in "an approved legible permanent design."[6] Maximum occupancy limits are posted on the walls of each classroom because they must be read, understood, *and followed*. Now, Louisiana schools must also post religious instruction on the same walls so they may similarly be read, understood, and followed.

In fact, Appellants have conceded that students *cannot* avoid engaging with these posters. Appellants argue that parents are unable "to opt students out of participating in specific lessons, activities, or

---

[6] *See* La. R.S. § 40:1730.28(A)(1) (adopting International Building Code to provide "applicable standards … for regulation of construction within this state"); International Building Code Section 1004.9 (requiring posting of maximum occupancy limit).

observances" when those "lessons, activities, or observances" are posted on a classroom wall, instead of delivered orally. Appellant Br. at 65-66. In Appellants' view "there is nothing to opt out from." *Id*. at 66. That is exactly the point. Students will be confronted with the State's religious instruction every minute of every day and cannot "opt out" from this pervasive messaging. They cannot avoid routinely seeing the Commandments, and they cannot realistically avoid routinely reading parts of the Commandments, even if they do not read all the way through. If anything, the fact that the Ten Commandment's religious instruction remains in full view at all hours of the school day makes it *more* pervasive than the limited amounts of prayer found unconstitutional in *Engel, Schempp, Lee,* and *Santa Fe*, each of which was over in a few minutes or less.

## IV.    HB 71 Contains No Safeguards Against Indoctrination.

"[T]o withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion." *Schempp*, 374 U.S. at 222. Although Appellants suggest the displays mandated by HB 71 are only for "secular

historical and educational purposes" (Appellants Br. at 52),[7] they offer no credible explanation of how children as young as five years old might be expected to understand those purposes. Evidently, Appellants believe young children can be instructed in every classroom to worship the God of the Hebrew Bible and "thou shalt have no other god before me," *without* interpreting those explicit instructions to mean they should favor the Bible's depiction of God over all other conceptions of God or religion. And the children will somehow reach this counter-textual conclusion on their own because HB 71 does *not* provide any change to the curriculum that might explain this intended context to them.

This suggestion is a farce. To be sure, the Supreme Court recognized in *Stone v. Graham* that passages from the Bible "may constitutionally be used in appropriate study of history, civilization, ethics, comparative religion or the like" *when such use has been "integrated into the school curriculum."* 449 U.S. 39, 42 (1980) (emphasis added). But absent such integration, the only effect that posting the Ten Commandments conceivably could have is "to induce the schoolchildren

---

[7] They do so despite conceding that the Ten Commandments have "religious resonance across multiple faith traditions" (Appellants Br. at 55).

to read, meditate upon, perhaps to venerate and obey, the Commandments." *Id.*[8] This makes sense. When *religious instruction* is posted in every classroom—where students go to *receive educational instruction*—it is not credible to suggest that young students will be able to distinguish instruction from non-instruction, and obvious religious meaning from alleged but invisible secular meaning, when no effort is made to explain any of this to them.

Appellants appear to believe that a three paragraph "context statement," mandated by HB 71, will allay any potential confusion here. Initially, it must be noted that unlike the Commandments, the context statement is *not* required to be printed in a "large, easily readable font." La. R.S. § 17:2124. Indeed, the "context statement" is nearly illegible in the majority of "illustrations" that Appellants suggest are under consideration for approval, especially when viewed from across a room where students may be sitting. ROA.480-494. But even if a student actually managed to read the context statement, it would do nothing to

---

[8] Although the Supreme Court has abrogated the legal test stated in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), which the *Stone* court relied upon to reach its holding, *Stone* has never been overturned and the Court's observations about the role of the Ten Commandments in public classrooms exist independently from its *Lemon* analysis.

dispel the religious nature of the instruction on the mandated poster. If anything, the context statement *enhances* the coercive nature of the posted text.

According to the context statement, the Ten Commandments "were a prominent part of American public education for almost three centuries" because they appeared in certain textbooks. La. R.S. § 17:2124. Even if this statement were accurate,[9] it is difficult to conceive how this "context" would dissuade any student from interpreting the Ten Commandments posted in their classroom as providing spiritual truth. If a student is already inclined to follow the instruction on the wall literally, which is likely given the lack of context suggesting otherwise, being told those instructions were a "prominent" part of education for hundreds of years is not going to correct that misunderstanding. If anything, being told the Commandments have been a "prominent" part of public education in the United States for centuries is likely only to enhance the pressure students will feel to comply with their instruction.

---

[9] By arguing that the context statement would fail to resolve Establishment Clause concerns *even if the statement were accurate*, Amici do not imply any agreement with Appellant's claims about the historical record.

This confusion seems to be the point. Despite suggesting that the posters are just meant to provide historical context about the educational system, rather than behavioral instructions, one of the "illustrations" that Appellants have suggested would be acceptable is a poster bearing the Ten Commandments under the title "Statements About How You Should Behave." ROA.482. Nothing in the context statement or the curriculum will suggest to children who receive religious instructions every day in every classroom that there is no expectation that the instructions be followed literally. To the contrary, HB 71 was tailor-made—in the words of its principal author—to allow the Ten Commandments to serve as a "visual aid" in every classroom so that "children learn what God says is right and what He says is wrong." ROA.1763.

## V.    HB 71 Favors Certain Faiths and Denominations Over Others By Selecting A Preferred Version Of The Ten Commandments.

In addition to violating the Establishment Clause's prohibition on compelled religious observance, HB 71 also violates the Clause by preferring certain religious beliefs over others. *See, e.g., Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 581 (2014) ("Our Government is

prohibited from prescribing prayers to be recited in our public institutions in order to promote a preferred system of belief or code of moral behavior."); *McCreary Cnty.*, 545 U.S. at 876 (observing that the "Religion Clauses" "guard against the civic divisiveness that follows when the government weighs in on one side of religious debate"); *Larson v. Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.").

There is no singular, universally accepted version of the Ten Commandments. Instead, "[t]here are at least four separate versions of the ordering of the Ten Commandments: Jewish, Catholic, Lutheran, and general Protestant. Furthermore, these faiths, as well as different denominations within these faiths, use different translations of the Commandments." *See* Paul Finkelman, *The Ten Commandments on the Courthouse Lawn and Elsewhere*, 73 FORDHAM L. REV. 1477, 1482-83 (2005) ("Finkelman"). This is because the Ten Commandments are not numbered in any of the three passages in the Bible where they appear: Exodus 20, Exodus 34, and Deuteronomy 5. Further complicating the issue, these Bible verses actually contain *more* than ten instructions,

which have led different faiths to reach different interpretations as to what the "ten" Commandments actually include. Finkleman at 1488 ("There are in fact at least thirteen separate admonitions in these verses to 'do' something, or 'not do' something . . . Different faiths divide these verses in different ways.").

For example, consider the second Commandment identified in HB 71: "Thou shalt not make to thyself any graven images." This is *not* a Commandment under the Catholic and Lutheran understanding of scripture.[10] These distinctions in translation, codification, and interpretation are neither minor nor insignificant. To the contrary, they have led to substantial differences in belief and practice, resulting in (sometimes violent) sectarian conflict. Because the Protestant version of the Commandments includes a prohibition on worshiping graven images, "[t]he Protestant reformation made it a point to destroy statues in Catholic churches and cathedrals, as the Reformationists turned those

---

[10] *See* A.L. Barry, "What about . . . The Ten Commandments", Faith Lutheran (2001), *https://www.faithlutherancorning.org/10-commandments* (Lutheran)*;* Catholic Church, "Catechism of the Catholic Church: Revised in Accordance with the Official Latin Text Promulgated by Pope John Paul II", 496-97 (United States Catholic Conference, 2nd ed. 2000) *https://www.usccb.org/sites/default/files/flipbooks/catechism/498/* (Catholic).

buildings into Protestant churches." Finkelman at 1494. On the other hand, Catholics—who reject the worship of idols but do not treat religious art as a graven image—"retained statutes of saints, of the Virgin Mary, and of course of Jesus." *Id.*

Additionally, the first Commandment in HB 71—"Thou shalt have no other god before me"— has been the subject of *many* disagreements over the correct translation and interpretation. A review of various translations reveals at least nine alternate versions of this Commandment:

- "You shall not have other gods besides me."

- "You shall have no gods except me."

- "Thou shalt not have strange gods before me."

- "You shall have no other gods besides me."

- "You shall have no other god beside Me."

- "You may worship no other god than me."

- "You must never have any other gods against my face."

- "You must not have any other gods except me."

- "You shall have no other gods."

*See* Finkelman at 1496 (summarizing text in Catholic *New American Bible*, Catholic *Jerusalem Bible*, the *Tanakh*, the Protestant *Living Bible*, the *International Children's Bible*, *Luther's Small Catechism*, and various other versions of the Bible). These differences may seem small on first impression, but each version carries different implications on the existence of other gods and the role they may (and may not) play in the lives of the faithful. For example, translations suggesting no "other god" may come "before" or "beside" God appear to acknowledge (or at least allow for) the potential existence of other gods who may fall behind God, whereas the statement "you shall have no other gods" prohibits such a possibility. *Id*. Some Christians interpret this Commandment as the basis for an exclusivist understanding of religion, while others focus on the primacy of one's duties to God, warning against temptations of greed, materialism, nationalism, and any other thing that may interfere with one's relationship with the Divine.[11]

---

[11] *See, e.g.,* Jason Valendy, "You Shall Have No Other Gods BEFORE Me?" *https://um-insight.net/in-the-church/practicing-faith/you-shall-have-no-other-gods-before-me/* (First Commandment could mean "abolishing any other god from our lives" or it could mean "You can have other gods, but they shall not come first.").

Further, consider the sixth Commandment in HB 71: "Thou shalt not kill." Under Jewish tradition and interpretation, this Commandment is translated as "Thou shalt not murder."[12] "Killing" and "murdering" are substantially different concepts that carry different legal and ethical implications. There also are substantial differences in the ways in which different denominations have interpreted the Commandment against blasphemy. *See* Finkelman at 1496-97.

HB 71 wades into these theological debates and selects a single interpretation of the Ten Commandments as the "winner" to be posted in every public classroom. The statute does not merely require that *some* version of the Ten Commandments be posted, it requires that a very specific version be posted, even specifying the exact text that should be included. This lack of nuance or appreciation for theological differences highlights the problem: the State may not express preferences for the beliefs of specific denominations in public schools. As James Madison warned shortly after the Founding of this Country, the suggestion that "the Civil Magistrate is a competent Judge of Religious Truth" is "an

---

[12] "Judaism: The Ten Commandments", Jewish Virtual Library, *https://www.jewishvirtuallibrary.org/the-ten-commandments*.

arrogant pretension, falsified by the contradictory opinions of Rulers in all ages, and throughout the world." Madison, James, <u>Memorial and Remonstrance</u> (1785).[13]

## CONCLUSION

The District Court correctly recognized that HB 71 violates the Establishment Clause. That decision should be affirmed.

Respectfully submitted,

*/s/ Brian Raphel*

Douglas Laycock
727 E. Dean Keeton St.
Austin, TX 78705
(512) 364-9473

James R. McGuire
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
(415) 773-5700

K. Hollyn Hollman
BAPTIST JOINT COMMITTEE FOR
RELIGIOUS LIBERTY (BJC)
200 Maryland Ave N.E.
Washington D.C. 20002
(202) 544-4226

Brian Raphel
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5392

---

[13] *Available at* https://founders.archives.gov/documents/Madison/01-08-02-0163.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a) because this motion contains 6,464 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/Brian Raphel*

Brian Raphel
*Counsel for Baptist Joint Committee for Religious Liberty, Evangelical Lutheran Church in America, The General Synod of the United Church of Christ, Reverend Jihyun Oh, and The Most Reverend Sean W. Rowe*

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on January 6, 2025.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Brian Raphel*
Brian Raphel
*Counsel for Baptist Joint Committee for Religious Liberty, Evangelical Lutheran Church in America, The General Synod of the United Church of Christ, Reverend Jihyun Oh, and The Most Reverend Sean W. Rowe*