No. 24-30706

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

DARCY ROAKE, REVEREND, ON BEHALF OF THEMSELVES AND ON BEHALF OF
THEIR MINOR CHILDREN, REAL PARTY IN INTEREST A.V., REAL PARTY IN
INTEREST S.V.; ADRIAN VAN YOUNG, ON BEHALF OF THEMSELVES AND ON
BEHALF OF THEIR MINOR CHILDREN, REAL PARTY IN INTEREST A.V., REAL
PARTY IN INTEREST S.V.; MAMIE BROADHURST, REVEREND, ON BEHALF OF
THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN
INTEREST N.W.; RICHARD WILLIAMS, REVEREND, ON BEHALF OF
THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN
INTEREST N.W.; JEFF SIMS, REVEREND, ON BEHALF OF THEMSELVES AND ON
BEHALF OF HIS MINOR CHILDREN, REAL PARTY IN INTEREST A.S., REAL
PARTY IN INTEREST C.S. 1, REAL PARTY IN INTEREST C.S. 2; JENNIFER
HARDING, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR
CHILD, REAL PARTY IN INTEREST A.O.; BENJAMIN OWENS, ON BEHALF OF
THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN
INTEREST A.O.; DAVID HAWLEY, ON BEHALF OF THEMSELVES AND ON
BEHALF OF THEIR MINOR CHILDREN, REAL PARTY IN INTEREST A.H., REAL
PARTY IN INTEREST L.H.; ERIN HAWLEY, ON BEHALF OF THEMSELVES AND
ON BEHALF OF THEIR MINOR CHILDREN, REAL PARTY IN INTEREST A.H, REAL
PARTY IN INTEREST L.H.; DUSTIN MCCRORY, ON BEHALF OF THEMSELVES
AND ON BEHALF OF HIS MINOR CHILDREN, REAL PARTY IN INTEREST E.M.,
REAL PARTY IN INTEREST P.M., REAL PARTY IN INTEREST L.M.; GARY
SERNOVITZ, ON BEHALF OF THEMSELVES AND ON BEHALF OF THEIR MINOR
CHILD, REAL PARTY IN INTEREST T.S.; MOLLY PULDA, ON BEHALF OF
THEMSELVES AND ON BEHALF OF THEIR MINOR CHILD, REAL PARTY IN
INTEREST T.S.; CHRISTY ALKIRE, ON BEHALF OF HERSELF AND ON BEHALF
OF HER MINOR CHILD, REAL PARTY IN INTEREST L.A.; JOSHUA HERLANDS,
ON BEHALF OF HIMSELF AND ON BEHALF OF HIS MINOR CHILDREN, REAL
PARTY IN INTEREST, E.H., REAL PARTY IN INTEREST J.H.,

*Plaintiffs-Appellees*,

V.

CADE BRUMLEY, IN HIS OFFICIAL CAPACITY AS THE LOUISIANA STATE
SUPERINTENDENT OF EDUCATION; CONRAD APPEL, IN HIS OFFICIAL

CAPACITY AS A MEMBER OF THE LOUISIANA STATE BOARD OF ELEMENTARY AND SECONDARY EDUCATION (LSBESE); JUDY ARMSTRONG, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; KEVIN BERKEN, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; PRESTON CASTILLE, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; SIMONE CHAMPAGNE, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; SHARON LATTEN-CLARK, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; LANCE HARRIS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; PAUL HOLLIS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; SANDY HOLLOWAY, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; STACEY MELERINE, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; RONNIE MORRIS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE LSBESE; EAST BATON ROUGE PARISH SCHOOL BOARD; LIVINGSTON PARISH SCHOOL BOARD; VERNON PARISH SCHOOL BOARD; ST. TAMMANY PARISH SCHOOL BOARD,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Middle District of Louisiana
No. 3:24-cv-517, Hon. John W. deGravelles

## BRIEF OF NATIONAL COUNCIL OF JEWISH WOMEN ET AL. AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES URGING AFFIRMANCE

Lindsay C. Harrison
*Counsel of Record*
Luke C. Platzer
Noah B. Bleicher
Sophia E. Arbess
Mary-Claire Spurgin
JENNER & BLOCK LLP
1099 New York Ave. NW #900
Washington, D.C. 20001
(202) 639-6000
lharrison@jenner.com
*Attorneys for National Council of Jewish Women-Amicus*

ii

# SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record provides this statement of those with an interest in this brief, in addition to those listed in the briefs of the parties and other *amici curiae*.

<u>*Amici Curiae* and Counsel</u>:

- National Council of Jewish Women, *Amicus Curiae*
- Bend the Arc: A Jewish Partnership for Justice, *Amicus Curiae*
- Central Conference of American Rabbis, *Amicus Curiae*
- Hadassah, the Women's Zionist Organization of America, Inc., *Amicus Curiae*
- Hindus for Human Rights, *Amicus Curiae*
- Interfaith Alliance, *Amicus Curiae*
- Jewish Council for Public Affairs, *Amicus Curiae*
- Jewish Women International, *Amicus Curiae*
- Keshet, *Amicus Curiae*
- Men of Reform Judaism, *Amicus Curiae*
- Muslims for Progressive Values, *Amicus Curiae*
- Rabbinical Assembly, *Amicus Curiae*
- Sadhana: Coalition of Progressive Hindus, *Amicus Curiae*
- The Sikh Coalition, *Amicus Curiae*
- Society for Humanistic Judaism, *Amicus Curiae*
- T'ruah, *Amicus Curiae*
- Union for Reform Judaism, *Amicus Curiae*
- Women of Reform Judaism, *Amicus Curiae*
- Women's Rabbinic Network, *Amicus Curiae*
- Zioness Movement, *Amicus Curiae*
- Lindsay C. Harrison, Counsel
- Luke C. Platzer, Counsel
- Noah B. Bleicher, Counsel

- Sophia E. Arbess, Counsel
- Mary-Claire Spurgin, Counsel

No *amicus* has either a parent corporation or a publicly held corporation that owns 10 percent or more of its stock.

Date: January 6, 2025    */s/ Lindsay C. Harrison*
Lindsay C. Harrison
JENNER & BLOCK LLP
1099 New York Ave. NW #900
Washington, D.C. 20001
(202) 639-6865
lharrison@jenner.com

iv

# TABLE OF CONTENTS

SUPPLEMENTAL CERTIFICATE OF INTERESTED PERSONS.......iii

TABLE OF AUTHORITIES..................................................................vii

INTERESTS OF AMICI ...........................................................................1

SUMMARY OF ARGUMENT....................................................................3

ARGUMENT............................................................................................4

A.  The Establishment Clause Protects Adherents of Minority
    Religions from Pressure to Conform to the Majority Faith.............4

B.  The Ten Commandments Are a Fundamentally Religious
    Text, and the Version Mandated by H.B. 71 is Contested. .............7

  1.  The Ten Commandments Are an Inherently and
      Historically Religious Text.......................................................8

    a.  The Ten Commandments Have Been Integrated Into
        Religious Traditions and Imagery for Centuries....................9

    b.  Legal Precedent Treats the Ten Commandments as
        Primarily Religious Text...........................................................11

  2.  The King James Version of the Ten Commandments
      Mandated by H.B. 71 Reflects Meaningful Differences
      Among Religions within the Jewish and Christian
      Traditions. ...............................................................................12

    a.  Numbering of Commandments............................................14

    b.  First Commandment.............................................................15

    c.  Second (or First) Commandment.........................................17

    d.  Second (or Third) Commandment.......................................17

    e.  Fifth, Sixth, or Eighth Commandment...............................18

3.     The Ten Commandments Are Inconsistent with Many
       Minority Faiths. ..........................................................................19

C.   The Louisiana Mandate Imposes Practices of a Majority Sect
     of a Majority Religion...................................................................20

     1.     School Children are Particularly Vulnerable to Social
            Pressure and Isolation. .............................................................21

     2.     H.B. 71 Impedes Parents' Ability to Direct the Religious
            Upbringing of their Children. ...................................................22

     3.     The Law was Passed with the Intent of Imposing
            Majoritarian Practices...............................................................25

CONCLUSION..................................................................................................26

# TABLE OF AUTHORITIES

**CASES**

*City of Elkhart v. Books*, 532 U.S. 1058 (2001)......................................11

*Doe v. School Board of Ouachita Parish*, 274 F.3d 289 (5th Cir. 2001)............................................................................................23

*Karen B. v. Treen*, 653 F.2d 897 (5th Cir. 1981)....................................12

*Kennedy v. Bremerton School District*, 597 U.S. 507 (2022)..............5, 20

*Lee v. Weisman*, 505 U.S. 577 (1992)...........................................5, 22, 24

*Illinois ex rel. McCollum v. Board of Education of School District No. 71*, 333 U.S. 203 (1948)............................................22, 23

*McCreary County v. ACLU of Kentucky*, 545 U.S. 844 (2005).................6

*People ex rel. Ring v. Board of Education of District 24*, 92 N.E. 251 (Ill. 1910) ........................................................................13

*Roake v. Brumley*, No. CV 24-517, 2024 WL 4746342 (M.D. La. Nov. 12, 2024)....................................................................19, 25, 26

*School District of Abington Township v. Schempp*, 374 U.S. 203 (1963)............................................................................22

*Stone v. Graham*, 449 U.S. 39 (1980)...............................................11, 23

*Van Orden v. Perry*, 545 U.S. 677 (2005)..............................................12

*West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943)..............................................................................5

**OTHER AUTHORITIES**

*Adults in Louisiana*, Pew Rsch. Ctr., https://www.pew research.org/religious-landscape-study/database/state/ louisiana/ (last visited Jan. 1, 2025)..................................................20

Catechism of the Catholic Church § 2070 (1994) ..................................10

*Destruction of the Second Temple in 70 CE*, Religion & Pub. Life, https://rpl.hds.harvard.edu/faq/destruction-second-temple-70-ce (last visited Jan. 2, 2025)................................................ 9-

Diarmaid MacCulloch, *The Reformation: A History* (2004)....................11

Exodus 34:27-28....................................................................................9, 16

Exodus 34:27-28 (King James Version)....................................15, 17, 18

Fed. R. App. P. 29 ...................................................................................1

Noah Feldman, *Non-sectarianism Reconsidered*, 18 J.L. & Pol. 65 (2002)....................................................................................14

Paul Finkelman, *The Ten Commandments on the Courthouse Lawn and Elsewhere*, 73 Fordham L. Rev. 1477 (2005)....................................................................13, 15, 17, 18, 19

Frederick Mark Gedicks & Roger Hendrix, *Uncivil Religion: Judeo-Christianity and the Ten Commandments*, 110 W. Va. L. Rev. 275 (2007) ...............................................................12, 17

James Madison, *Memorial and Remonstrance Against Religious Assessments* (1785) (collected in *Selected Writings of James Madison* 21 (Ralph Ketcham ed., 2006))...............6

Patrick D. Miller, *The Ten Commandments* 1 (2009).......................10, 11

Mishnah Tamid 5:1...................................................................................9

W. Gunther Plaut, *The Torah: A Modern Commentary to Exodus* 220 (1983) .......................................................................9, 16

Qur'an 4:154, 2:255, 6:160....................................................................19

G.B. Sarfati, *The Tablets as a Symbol of Judaism, in The Ten Commandments in History and Tradition* 383-85 (Ben-Tsiyon Segal & Gershon Levi eds., 1990)..........................................10

viii

E. Summers Sheffey, Note, *The First Amendment and Distribution of Religious Literature in the Public Schools,* 41 Va. L. Rev. 789 (1955) ...................................................................13

*Ten Commandments*, Catholic Encyc., https://newadvent.org/cathen/04153a.htm (last visited Dec. 31, 2024) ...............................10

Patrick Wall, *Jeff Landry Vows to Defend 'Judeo-Christian Values' After Ten Commandments Lawsuit,* Times-Picayune (June 25, 2024) ...............................................................26

# INTERESTS OF AMICI[1]

*Amici curiae* are organizations, representing or affiliated with a range of religious traditions, that affirm the right of individuals to freely choose and practice their religion without government interference.

National Council of Jewish Women ("NCJW") is a grassroots organization composed of volunteers and advocates dedicated to the pursuit of equity and justice through a powerful combination of community organizing, education, direct service, and advocacy. We carry with us the tradition of safeguarding the individual rights of freedoms for women, children, and families. United by our Jewish values, we mobilize our network of 50 local sections and over 225,000 advocates to make this vision a reality at all levels of government and in communities across the United States.

The additional *amici* are faith-based organizations that espouse a wide range of religious traditions and beliefs:

- Bend the Arc: A Jewish Partnership for Justice
- Central Conference of American Rabbis

---

[1]  All parties consent to the filing of this brief. No party's counsel authored this brief in whole or in part, and no money intended to fund preparing or submitting this brief was contributed by a party or party's counsel or anyone other than *amici*, their members, or their counsel. *See* Fed. R. App. P. 29.

- Hadassah, the Women's Zionist Organization of America, Inc.
- Hindus for Human Rights
- Interfaith Alliance
- Jewish Council for Public Affairs
- Jewish Women International
- Keshet
- Men of Reform Judaism
- Muslims for Progressive Values
- Rabbinical Assembly
- Sadhana: Coalition of Progressive Hindus
- The Sikh Coalition
- Society for Humanistic Judaism
- T'ruah
- Union for Reform Judaism
- Women of Reform Judaism
- Women's Rabbinic Network
- Zioness Movement

Together representing a diverse array of faiths both within and outside of the Judeo-Christian traditions, *amici* offer a perspective shared by millions of Americans on how the posting of the Ten Commandments in Louisiana classrooms would impact students and families from minority faith communities. *Amici* also offer perspective on the different meanings, interpretations and understandings of the Ten Commandments within the Jewish and Christian traditions, highlighting how the Louisiana statute at issue here has the effect of

endorsing an interpretation of those Commandments that is not universally shared.

## SUMMARY OF ARGUMENT

*Amici* write in support of Plaintiffs, and in support of affirmance, to provide this Court with additional context regarding the historical and religious significance of the Ten Commandments within different faith traditions, and to explain how H.B. 71 would affect members of religious communities outside the majority Protestant Christian tradition.

The Founding Fathers envisioned the Establishment Clause as a bulwark against religious favoritism, including the protection for adherents of minority religions (as well as non-believers) from pressures to conform to the majority faith. Those pressures, and related persecution, had plagued many European nations at the time.

Contrary to the Founders' intent, H.B. 71 would put the government in the position of favoring certain religious traditions over others. Although the Ten Commandments have historical significance, they are, at heart, a religious text with different meanings, interpretations, and significance across different faiths, including within and among faiths within the Jewish and Christian traditions. Differences

among religious faiths in how the Commandments are worded, and which text is included, represent meaningful and important elements of the religious beliefs of several faiths. H.B. 71, however, would privilege the language for the Ten Commandments observed by some Protestant Christians, which is not shared within Jewish or even certain other Christian denominations.

More broadly, whether students subscribe to a faith that observes some version of the Ten Commandments or not, centering the text as an object of veneration—as H.B. 71 would do—would pressure students from faiths other than the majority Protestant Christian religion into conforming to the beliefs of the majority faith, impeding parents' interest in directing the religious upbringing of their children, and running counter to the Establishment Clause's text and historic intent. For that reason, *Amici* urge the Court to affirm.

## ARGUMENT

### A.    The Establishment Clause Protects Adherents of Minority Religions from Pressure to Conform to the Majority Faith.

One of the animating purposes behind the Establishment Clause was to protect all Americans—particularly adherents of minority religions—from pressures to conform to the majority faith. The Supreme

Court has advised that the permissibility of government action under the Establishment Clause should look to, *inter alia*, whether it "accord[s] with history and faithfully reflect[s] the understanding of the Founding Fathers." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 535-36 (2022) (citing *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014) (citation omitted)); *see also id.* at 535 ("[t]he Establishment Clause must be interpreted by 'reference to historical practices and understandings."). Among those "historical . . . understandings" was the desire to protect religious liberty from the danger posed by the government choosing among different faiths and pressuring members of other faith communities to conform.

The Founders understood that to "'make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary,' the government must not align itself with any one of them." *Lee v. Weisman*, 505 U.S. 577, 608 (1992) (Blackman, J., concurring) (internal citation omitted). Indeed, the Establishment Clause is rooted, in part, in an understanding of the importance of protecting adherents of minority religions against the imposition of majority-faith beliefs. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943) ("The very purpose of

5

a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts."); *see also McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 884 (2005) (O'Connor, J., concurring) ("It is true that many Americans find the Commandments in accord with their personal beliefs. But we do not count heads before enforcing the First Amendment.").

Further, James Madison, writing in opposition to a bill proposing to levy a tax in support of teachers of religion, explained:

> The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may dictate. . . . Who does not see that the same authority which can establish Christianity, in exclusion of all other Religions, may establish with the same ease any particular sect of Christians, in exclusion of all other Sects? That the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever?

James Madison, *Memorial and Remonstrance Against Religious Assessments* (1785) (collected in *Selected Writings of James Madison* 21 (Ralph Ketcham ed., 2006)). And as the expert Steven K. Green testified before the district court, no individual had a greater impact on the First Amendment's enactment than did James Madison. ROA.857. More, to

6

Thomas Jefferson, "a mere governmental 'recommendation' of religious practice, even without the backing of legal force, was no 'less a law of conduct for those to whom it is directed.'" ROA.858 (internal citation omitted).

**B.    The Ten Commandments Are a Fundamentally Religious Text, and the Version Mandated by H.B. 71 is Contested.**

The Ten Commandments are, first and foremost, a religious text. While many religious groups within the Jewish and Christian traditions recognize some version of the Commandments as a significant religious text, the specific wording of what the Commandments require and what they prohibit—as well as their meaning and significance—vary meaningfully even within those faith traditions. By mandating the posting in every school classroom of the specific version of the Commandments recognized by many Protestant Christians (the King James Version), H.B. 71 puts the government in the position of choosing sides in meaningful religious differences among and between Jewish and Christian faith communities.

This history and context undermines any claim that H.B. 71 can be justified with reference to the Ten Commandments' purported "indisputable secular and historical importance." Def.Br.55. Whatever

historic secular significance the Commandments may have acquired distinct from their religious origins, H.B. 71 requires the Commandments to be posted continuously, untethered from integration into any curriculum or lesson plan that would reference or invoke their role in history or legal tradition. This requirement to post a particular version of the Commandments continuously and ubiquitously signals to students that their school views those Commandments as beliefs to be honored and rules to obey, and not just a historic document to learn about. It thus (a) involves the government in endorsing what is fundamentally a religious text that is not followed by members of many faith traditions; (b) and even among students who are members of Jewish and Christian denominations that recognize some version of the Ten Commandments, creates pressure to venerate a distinctly different version from the text observed by the students' religious communities.

1.    The Ten Commandments Are an Inherently and Historically Religious Text.

The Ten Commandments, or the Decalogue, are an inherently and historically religious text. The continuous placement of the text in public school classrooms, without any integration into a curriculum that focuses on the role they have played in history or the development of legal

tradition, thus inherently sends a message to students, regardless of their faiths, that their school views the text as something that should be an object of veneration and reflection, if not obedience.

    a.    *The Ten Commandments Have Been Integrated Into Religious Traditions and Imagery for Centuries.*

The extent to which the Ten Commandments are woven into religious traditions and imagery illustrates the text's inherent religious nature and historical understanding as such. The Commandments are a significant part of both the Jewish and Christian traditions.

In Judaism, the Ten Commandments are the text reflecting God's Covenant with Israel—a fundamental principle and recurring theme of Judaism. *See* W. Gunther Plaut, *The Torah: A Modern Commentary to Exodus* 220 (1983) ("The Ten Commandments are rooted in the covenant relationship"); *see also* Exodus 34:27-28. As an illustration of the longstanding significance of the text to Judaism, the Ten Commandments were recited daily in the Second Temple as part of the morning prayer; the Second Temple was in use from c. 516 BCE until its destruction in 70 CE. *See* Mishnah Tamid 5:1; *see also Destruction of the Second Temple in 70 CE*, Religion & Pub. Life, https://rpl.hds.harvard.edu/faq/destruction-second-temple-70-ce (last visited Jan. 2, 2025).

Today, many synagogues display the Ten Commandments inscribed in the sacred Ark housing the Torah. Further, the Ten Commandments are a central theme of Shavuot, and they are often read aloud in synagogues around the world on that holiday. *See* G.B. Sarfati, *The Tablets as a Symbol of Judaism*, *in The Ten Commandments in History and Tradition* 383-85 (Ben-Tsiyon Segal & Gershon Levi eds., 1990). Indeed, Shavuot is a holiday that, for Jews, celebrates the giving of the Torah to Moses on Mount Sinai. *See* Sarfati, *supra*, at 383-85.

In Christian practice, in contrast to Jewish tradition, the Ten Commandments are thought to represent universal commands for all of mankind, and "to embody God's will for human life" as much as any other text or teaching. Patrick D. Miller, *The Ten Commandments* 1 (2009). Within the Catholic tradition, they form the basis for the concept of sacred natural law. *Catechism of the Catholic Church* § 2070, at 502-03 (1994). The Catholic Council of Trent "condemn[ed] those who deny that the Ten Commandments are binding on Christians." *Ten Commandments*, Catholic Encyc., https://www.newadvent.org/cathen/04153a.htm (last visited Dec. 31, 2024). In the Lutheran and Calvinist traditions, too, the Commandments are seen as "universal, eternal law."

10

Miller, *supra*, at 2. After the Reformation, Protestant churches began to include singing or reading of the Ten Commandments after confession, "as a guide to living according to God's instruction." Miller, *supra*, at 11. Also in reformed Protestant churches, Biblical texts, including the Commandments, replace the images of saints that are common in Catholic worship. Diarmaid MacCulloch, *The Reformation: A History* 541 (2004). The Commandments have thus been foundational to Christian worship and practice for centuries, but with understood religious meanings that differ from their understanding within the Jewish faith.

      b.    *Legal Precedent Treats the Ten Commandments as Primarily Religious Text.*

The historical understanding of the Ten Commandments as a fundamentally religious text is firmly entrenched and memorialized in our Nation's legal precedent. As the Supreme Court has recognized, the Ten Commandments do not address only "secular matters." *Stone v. Graham*, 449 U.S. 39, 41 (1980). Instead, they establish "the religious duties of believers." *Id.* at 42; *City of Elkhart v. Books*, 532 U.S. 1058, 1061 (2001) (Stevens, J., concurring in denial of certiorari). This Court has confirmed that "[t]he Ten Commandments [are] undeniably a [sacred] text . . . and no legislative recitation of a supposed secular

11

purpose can blind us to that fact." *Karen B. v. Treen*, 653 F.2d 897, 900 (5th Cir. 1981) (quotation marks omitted). Specifically, the Commandments prohibit "unbelief, polytheism, the worship of icons and images, blasphemy, coveting, Sabbath-breaking, parental disrespect, and adultery"—the realm of religious, not secular, law. Frederick Mark Gedicks & Roger Hendrix, *Uncivil Religion: Judeo-Christianity and the Ten Commandments*, 110 W. Va. L. Rev. 275, 294 (2007).

Since "[a]ttempts to secularize what is unquestionably a sacred text defy credibility and disserve people of faith," this Court should acknowledge that the Ten Commandments are, and always have been, key religious text. *Van Orden v. Perry*, 545 U.S. 677, 717 (2005).

2.   The King James Version of the Ten Commandments Mandated by H.B. 71 Reflects Meaningful Differences Among Religions within the Jewish and Christian Traditions.

As noted above, while the Ten Commandments are viewed as significant within a wide number of faith traditions, there are consequential differences in the meanings and significance ascribed to them. Those differences extend to the text of the Commandments themselves. H.B. 71's requirement to post the text of the Commandments in public school classrooms thus inherently involves the government in

picking sides among these different traditions, on issues of religious significance.

H.B. 71 does not mandate the posting of a non-sectarian or nondenominational version of the Ten Commandments—it cannot, because there is no such thing. Rather, "any display of the Commandments is inherently sectarian, because it must choose a translation, ordering, and numbering system that will favor[] one or more religions, and therefore disfavor other religions." Paul Finkelman, *The Ten Commandments on the Courthouse Lawn and Elsewhere*, 73 Fordham L. Rev. 1477, 1479 (2005); *see also* ROA.874 (same).  H.B. 71, specifically, requires the posting of a particular rendition of the Decalogue: the King James Version of the Ten Commandments, which is observed by many Protestant Christians, but differs from the versions observed by Catholics and members of the Jewish faith.  *See, e.g.*, *People ex rel. Ring v. Board of Education of Dist. 24*, 92 N.E. 251, 251 (Ill. 1910) (noting that the Catholic Church views the King James Version as "an incorrect and incomplete translation"); *see also* E. Summers Sheffey, Note, *The First Amendment and Distribution of Religious Literature in the Public Schools,* 41 Va. L. Rev. 789, 798 (1955) ("Religious leaders are

almost unanimous in the view that the complete King James Version is sectarian.").

The public endorsement and display of one version of the Decalogue is thus to the detriment of others. *See, e.g.*, Noah Feldman, *Non-sectarianism Reconsidered*, 18 J.L. & Pol. 65, 85 (2002) (noting that Catholics may view the King James Version as a symbol of the "Protestant tradition of anti-Catholicism"). In particular, faith traditions differ with respect to which text is included within the Commandments, how they are numbered, and how they are worded, and those discrepancies reflect meaningful religious differences across faith groups.

    a.    *Numbering of Commandments.*

The numbering system for the relevant verses of the Torah and Bible differs between versions. As discussed below, the Jewish Torah and Christian Bibles each contain different formulations of the First and Second Commandments, which, in turn, impacts the numbering scheme. The Jewish and King James translations of Exodus employ the same numbering for the third through tenth Commandments. The Catholic and Lutheran versions use a different one. Finkelman, *supra*, at 1488 (citing *The Torah: A Modern Commentary* (W. Gunther Plaut ed., Union

of American Hebrew Congregations 1981) (1962) ("[W]e cannot conclude from the text itself what comprises the first commandment, what the second, and so forth.")). These differences give rise to varying interpretations of the Decalogue. *E.g.*, Finkelman, *supra*, at 1488 ("[A]n admonition from a Catholic to 'remember the Seventh Commandment' (don't steal) would have a very different meaning for a Protestant or a Jew (don't commit adultery).")

   b. *First Commandment.*

  In the Christian Bible, including the King James Version, the First Commandment is "Thou shalt have no other gods *before* Me." Exodus 20:3 (King James Version) (emphasis added); *see also* Finkelman, *supra*, at 1496 (noting that one Catholic translation reads, "You shall have no gods except me" and the Lutheran catechism directs, "You shall have no other gods").

  One Jewish translation, in contrast, interprets this directive as "You shall have no other gods *beside* Me," which lacks the exclusivity requirement of Christian interpretations and allows for the possibility of worshipping other deities. Finkelman, *supra*, at 1496 (emphasis added). Moreover, the Torah labels this as the Second, not First, Commandment.

Additionally, the first Jewish Commandment consists of the statement, "I the LORD am your God who brought you out of the land of Egypt, the house of bondage." Plaut, *The Torah*, *supra*, at 539. This differs from the Christian Bible (including the King James Version and Catholic and Lutheran translations), which incorporates that identification into the prohibition on polytheism. *See* Exodus 20:2-3.

This distinction is meaningful because the omitted text frames the Jewish understanding of the Commandments as God's Covenant with the Israelites: it suggests that the Commandments were directed towards the Israelites, who shared a historical experience of oppression and suffering, and of subsequent redemption. *See* ROA.875 (describing this language as a "critical recognition" of Jews' "special relationship and covenant with God" and explaining how "erasing this text may be considered deeply offensive" as a spiritual matter). This understanding is a critical and recurring theme in Judaism—so much so that displaying the First Commandment *without* the prologue violates the intent of the Jewish Commandments by divorcing it from its key context. *Id.*

There are therefore at least separate Jewish and Christian versions of the First Commandment, and any public posting of the Decalogue

16

inherently involves the government in endorsing one of those interpretations over the others.

c.    *Second (or First) Commandment.*

The Second Commandment also underscores differences between interpretations of the Decalogue. In the King James Version, the Second Commandment is a prohibition on "graven image[s]." Exodus 20:4 (King James Version). In the Jewish, Catholic, and Lutheran versions of Exodus, on the other hand, that prohibition is not a separate commandment. *See* Finkelman, *supra*, at 1486. And the Catholic directive, to "not carve idols," has a different meaning from the King James Version's ban on all "graven images." *Id.* at 1494. The King James Version, in fact, would prohibit the veneration of icons, a practice which is common in Catholic and Eastern Orthodox traditions. Gedicks & Hendrix, *supra*, at 297. Additionally, as noted above, the statement, "You shall have no other gods before Me" is part of the Jewish Second—not First—Commandment.

d.    *Second (or Third) Commandment.*

Next, the Commandment regarding the use of God's name takes on different meanings across faiths. The King James version of the Bible

17

instructs that "[t]hou shalt not take the name of the LORD thy God in vain." Exodus 20:7 (King James Version). Some Jewish translations interpret this command as "You shall not swear falsely by the name of the LORD your God." Finkelman, *supra*, at 1496-97. A Catholic version translates it as "[T]hou shalt not take the name of the Lord thy God lightly on thy lips." *Id.* at 1497. This difference is not merely semantic: the Jewish interpretation focuses on a perjury-like use of God's name, whereas the King James Version sweeps more broadly and may include swearing. *Id.*

      e.    *Fifth, Sixth, or Eighth Commandment.*

Finally, the King James Version of the Bible contains a verse that "[t]hou shalt not kill." Exodus 20:13 (King James Version). Jewish translations, on the other hand, translate this command as "[y]ou shall not murder." Finkelman, *supra*, at 1495. This is a substantive discrepancy that has been invoked in contentious political issues like abortion access, opposition to capital punishment, and conscientious objection to military service. *Id.* Again, the differences in interpretations of the Decalogue are not merely semantic, but bear upon meaningful and

significant religious questions, and H.B. 71 places the government in the position of endorsing one set of religious beliefs over others.

3. The Ten Commandments Are Inconsistent with Many Minority Faiths.

The Ten Commandments hold no significance in many faith traditions; indeed, some of their directives openly forbid the practice of other religions. In Islam, for example, the Qur'an recognizes the Commandments but does not treat them as important. *See* Qur'an 4:154, 2:255, 6:160. Additionally, atheists and followers of non-monotheistic religions like Hinduism, Buddhism, Shintoism, Confucianism, Jainism, Taoism, and Native American faiths, *cannot* ascribe to the Commandments. *See Roake v. Brumley*, No. CV 24-517, 2024 WL 4746342, at *65 (M.D. La. Nov. 12, 2024). The Commandment that "[t]hou shalt have no other Gods before me," for example, cannot apply to polytheistic religion or to a worldview that does not recognize gods. *See* Finkelman, *supra*, at 1499. By the same token, the instruction to "remember the Sabbath day and keep it holy" has no import to the millions of Americans who do not observe a Sabbath. *See id.*

The Supreme Court noted in *Kennedy* that there is "[n]o historically sound understanding of the Establishment Clause that . . . 'mak[es] it

necessary for government to be hostile to religion," *Kennedy*, 597 U.S. at 541 (citing *Zorach v. Clauson*, 343 U.S. 306, 314 (1952)), and that "[r]espect for religious expressions is indispensable to life in a free and diverse Republic…." *Id.* at 543. This directive cuts both ways: precisely because the Ten Commandments are a religious text containing directives that differ from (and are inconsistent with) the precepts of some minority faiths, a requirement that they be posted in every public school classroom puts the government in the position of signaling hostility to students and faiths that do not, or cannot, adhere to the Commandments' requirements.

**C.    The Louisiana Mandate Imposes Practices of a Majority Sect of a Majority Religion.**

Most Louisianans are Protestant Christians. *Adults in Louisiana*, Pew Rsch. Ctr., https://www.pewresearch.org/religious-landscape-study/database/state/louisiana/ (last visited Jan. 1, 2025). However, the State includes substantial populations of members from a diverse array of faith communities, including other Christian religions (such as Catholics and Orthodox Christians) as well as a wide variety of non-Christian faiths, including practitioners of Jewish, Muslim, Buddhist, Hindu, and Native American religions, among others. *Id.* Given the

Founders' concerns with protecting religious liberty and adherents of minority religions underlying the Establishment Clause described in Section I, it is particularly concerning that the Louisiana Act requires the display of the Protestant King James Version of the Ten Commandments in the state's public schools.

By centering the Ten Commandments as an object of veneration— and by mandating the specific text favored by Protestant Christians— H.B. 71 impedes the interest of parents from other religions in guiding their children's religious upbringing. Indeed, the legislative history and contemporaneous statements around the Act's enactment suggest the promotion of Protestant Christianity among schoolchildren was among its purposes.

1.    School Children are Particularly Vulnerable to Social Pressure and Isolation.

The risk that government promotion of one set of religious beliefs will have coercive effects on members of minority faiths is particularly salient in the school context, where children are especially vulnerable to the effects of social pressure. The Supreme Court has recognized that "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public

schools." *Lee*, 505 U.S. at 592. Indeed, "when the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 221 (1963) (quoting *Engel v. Vitale*, 370 U.S. 421, 431 (1962)).

It is easy to imagine a young child seeing the Decalogue displayed alongside a list of classroom rules and equating the religious Commandments with the school's own rules. That child might fear social alienation—from both peers and teachers—if they do not adhere to the posted rules. More, they may be compelled to conform to the majority's beliefs and to suppress their own: "The law of imitation operates, and nonconformity is not an outstanding characteristic of children." *Illinois ex rel. McCollum v. Bd. of Educ. of Sch. Dist. No. 71*, 333 U.S. 203, 227 (1948). This sense of exclusion can foster an unhealthy "feeling of separatism" among students of minority faiths. *Id*.

2.    <u>H.B. 71 Impedes Parents' Ability to Direct the Religious Upbringing of their Children.</u>

The social pressures of the school context create particular challenges for parents from minority faith traditions, and H.B. 71, were

it to go into effect, would risk meaningfully impeding parents' ability to direct the religious upbringing of their children. The Supreme Court "has repeatedly recognized the right of children and their parents to receive public education that is compliant with the Establishment Clause." *Doe v. Sch. Bd. of Ouachita Parish*, 274 F.3d 289, 292 (5th Cir. 2001) (citing *Schempp*, 374 U.S. at 224 n.9; *McCollum*, 333 U.S. at 206). By requiring the continuous posting of a majoritarian religious text untethered from any secular educational purpose, H.B. 71 inherently sends a signal to students that their school, and their government, expect them to honor and even obey the Commandments' directives, and to do so as a religious text. As the Supreme Court recognized in *Stone*, the posting of the Ten Commandments in classrooms will induce "schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments." *Stone*, 449 U.S. at 42.

Here, the continuous posting of the Decalogue in classrooms "might be thought to raise special concerns regarding state interference with the liberty of parents to direct the religious upbringing of their children," particularly where those parents and children are members of faiths that adhere to versions of the Decalogue that differ from the King James

23

Version, or that either do not observe the Ten Commandments at all or observe religious practices that the Commandments prohibit. *Cf. Lee*, 505 U.S. at 643-44 (Scalia, J., dissenting) (noting that families trust schools, conditioned "on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family" (quoting *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987))).

For instance, parents of a Jewish child who is compelled to continuously observe a version of the Ten Commandments stripped of its Jewish context every day and framed as a universal set of rules for all mankind, are faced with a much more daunting task in passing along their religious traditions and teachings that interpret the Decalogue as a special covenant between God and the Jewish people. And parents of a Hindu child are faced with added challenges in passing along their faith traditions when their child is required to continuously observe a school-sponsored message that polytheism is unacceptable, and that monotheism is the only permissible faith structure.

3.     The Law was Passed with the Intent of Imposing
       Majoritarian Practices.

H.B. 71's legislative history and surrounding messaging appear to confirm the concern that it was animated at least in substantial part by a desire to encourage and promote a specific set of religious beliefs among Louisiana's schoolchildren. As the district court pointed out, this is not "a case in which the Ten Commandments are integrated into the school curriculum…." *Roake*, 2024 WL 4746342, at *43 (quoting *Stone*, 449 U.S. at 42 (citation omitted)). Rather, Louisiana has mandated the posting of the Commandments because of their religious—not educational—significance. The continuous and ubiquitous display, which places the Commandments in front of every student, all day long, including when they are studying entirely unrelated subjects, communicates that schools are adopting and endorsing the Commandments as rules to follow, rather than as a subject to learn about.

Indeed, H.B. 71's legislative history makes clear that its proponents intended to use it as a vehicle to establish what its proponents viewed as a "Judeo-Christian" worldview. Representative Dodie Horton, the bill's primary author and sponsor, argued that "It is so important that our children learn what God says is right and what He says is wrong…."

25

*Roake*, 2024 WL 4746342, at *45. Her co-sponsor, Sylvia Taylor, agreed, saying, "I really believe that we are lacking in direction. A lot of people . . . are not attending churches . . . [so] we need to do something in the schools to bring people back to where they need to be." *Id.*

Moreover, Jeff Landry, the governor of Louisiana, sent a fundraising email urging supporters to help "ADVANCE [] the Judeo-Christian values that this nation was built upon." Patrick Wall, *Jeff Landry Vows to Defend 'Judeo-Christian Values' After Ten Commandments Lawsuit*, Times-Picayune (June 25, 2024), https://www.nola.com/news/politics/jeff-landry-lawsuit-ten-commandments-judeo-christian/article_0555d6e6-3314-11ef-863e-1b07594ff87c.html.     When Landry signed the law, he called Moses the "original lawgiver." *Id.*

Evidence suggesting that the driving factor behind H.B. 71 was, in fact, to impose majoritarian religious values, makes it all the more offensive to our nation's Founding values.

## CONCLUSION

The judgment below should be affirmed.

January 6, 2025

Respectfully submitted,
/s/ Lindsay C. Harrison
Lindsay C. Harrison
   *Counsel of Record*
Luke C. Platzer
Noah B. Bleicher
Sophia E. Arbess
Mary-Claire Spurgin
JENNER & BLOCK LLP
1099 New York Ave. NW #900
Washington, D.C. 20001
(202) 639-6000
lharrison@jenner.com

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 29 and Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Circuit Rule 32.2, the brief contains 4,949 words.

This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6) and Circuit Rule 32.1, respectively, because this brief has been prepared in proportionately spaced typeface using Microsoft Word, with Century Schoolbook 14-point font for the main text and Century Schoolbook 12-point font for the footnotes.

January 6, 2025                    */s/ Lindsay C. Harrison*
                                  Lindsay C. Harrison

# CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of January, 2025, I caused the foregoing brief to be filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. Counsel for all parties will be served via the Court's CM/ECF system at the email addresses on file.

*/s/ Lindsay C. Harrison*
Lindsay C. Harrison