# Simpson Thacher & Bartlett LLP

425 LEXINGTON AVENUE
NEW YORK, NY 10017-3954

———

TELEPHONE: +1-212-455-2000
FACSIMILE: +1-212-455-2502

Direct Dial Number                                                                    E-mail Address

+1-212-455-3539                                                        jyoungwood@stblaw.com

VIA ELECTRONIC FILING                          June 9, 2025

Re:   *Roake v. Brumley, 24-30706* Rule 28(j) Notice of
Supplemental Authority:

Mr. Lyle W. Cayce, Clerk of Court
U.S. Court of Appeals for the Fifth Circuit
600 S. Maestri Place
Suite 115
New Orleans, LA 70130

Dear Mr. Cayce:

Plaintiffs-Appellees submit as supplemental authority the Supreme Court's decision in *Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission*, No. 24-154, 605 U.S. ___ (June 5, 2025).

The Court's decision supports Plaintiffs-Appellees' position that H.B. 71 unconstitutionally discriminates based on religious denomination. *See* Plaintiffs-Appellees' Br., Doc. 156, at 51–53.

Relying on longstanding precedent, the Court unanimously affirmed the "clearest command of the Establishment Clause": that "the government may not 'officially prefe[r]' one religious denomination over another." Slip Op. at 8 (quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982)). In other words, the government must "maintain 'neutrality between religion and religion.'" *Id.* at 15 (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)). Thus, States are barred "from passing laws that 'aid or oppose' particular religions . . . or interfere in the 'competition between sects.'" *Id.* at 8 (quoting *Epperson*, 397 U.S. at 106; *Zorach v. Clauson*, 343 U.S. 306, 314 (1952)). And "[w]hen a state law establishes a denominational preference, courts must 'treat the law as suspect' and apply 'strict scrutiny in adjudging its constitutionality.'" *Id.* at 8–9 (quoting *Larson*, 456 U.S. at 246).

*Catholic Charities* also affirmed that such denominationally preferential laws impose serious harms: "Government actions that favor certain religions . . . convey to members of other faiths that 'they are outsiders, not full members of the political community.'"

Mr. Lyle W. Cayce, Clerk of Court          -2-          June 9, 2025

*Id.* at 8 (quoting *Santa Fe Independent Sch. Dist. v. Doe*, 530 U.S. 290, 309 (2000)). This is merely one of the injuries that the minor-child Plaintiffs-Appellees will suffer due to Louisiana's unavoidable imposition of scriptural displays for nearly every hour of the school day.

By relying on longstanding case law, including *Larson*, *Epperson*, and *Santa Fe*, *Catholic Charities* demonstrates that *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), did not disturb these precedents or the Establishment Clause's "clearest command." On the contrary, from the Founding through today, the "'fullest realization of true religious liberty requires that government' refrain from 'favoritism among sects.'" Slip Op. at 8 (quoting *Larson,* 456 U.S. at 246).

Respectfully,

*/s/ Jonathan K. Youngwood*

Jonathan K. Youngwood
SIMPSON THACHER & BARTLETT LLP

*Counsel for Plaintiffs-Appellees*

**Word Count: 342**

Enclosure

cc: Counsel of Record (via ECF)



LIZ MURRILL
ATTORNEY GENERAL

STATE OF LOUISIANA
DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 94005
BATON ROUGE, LA
70804–9005

May 5, 2025

**VIA CM/ECF**

Mr. Lyle W. Cayce
Clerk of Court
United States Court of Appeals for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA 70130-3408

Re:   ***Roake v. Brumley*, No. 24-30706**
         **Rule 28(j) Notice of Supplemental Authority:**

         *Hilsenrath v. School District of the Chathams*, No. 23-3030 (3d
         Cir. May 5, 2025)

Dear Mr. Cayce:

Although this Court and the district court lack jurisdiction to address the merits of Plaintiffs' claims, *Hilsenrath v. School District of the Chathams*, No. 23-3030 (3d Cir. May 5, 2025), is instructive on the merits because it confirms that a hallmarks analysis is required. There, as here, counsel for Plaintiffs resisted a hallmarks analysis. Op.14 n.54. But the Third Circuit rejected their view, holding that detailed instruction on Islamic religious beliefs in a public-school class did not violate the Establishment Clause because it did not "resemble a traditional hallmark of religious establishment." Op.3. And the Third Circuit expressly "agree[d] with" the Fourth Circuit in holding that "the plaintiff has the burden of proving a set of facts that would have historically been understood as an establishment of religion." Op.14 n.54 (citation omitted).

*Hilsenrath* explained that after *Kennedy v. Bremerton School District*, 597 U.S. 508 (2022), the Establishment Clause "must be interpreted by reference to historical practices and understandings," so a plaintiff must show that the challenged action "resembles one of [the] hallmarks of religious establishment[.]" Op.12-14; *see also id.* at 13 (quoting hallmarks described by Justice Gorsuch). Applying the hallmarks, the court rejected the claim that the



Liz Murrill
Attorney General

STATE OF LOUISIANA
Department of Justice
Office of the Attorney General
P.O. Box 94005
Baton Rouge, La
70804-9005

challenged curriculum was religiously coercive because it—consistent with the Attorney General's H.B. 71 guidance here—was "presented in an academic rather than devotional context." Op.17.

This case is even easier than *Hilsenrath*, where students were actively instructed on "The 5 Pillars of Islam," while this case involves passive displays. *Cf.* Op.15 (assuming "students were compelled to watch" challenged videos); Op.7 (blank-filling exercise). Moreover, *Hilsenrath* explains that even when (unlike here) an "ostensibly religious activity" is at issue, "[c]ontext is key" in determining coercive effect. Op.15-16; *see* Op.16 ("recit[ing] the Ten Commandments" can be permissible). Yet Plaintiffs have facially challenged *every* potential H.B. 71 display—wherever placed, however context-rich, and regardless whether it is "'integrated into the school curriculum' as part of 'an appropriate study.'" Op.16 (quoting *Stone v. Graham*, 449 U.S. 39, 42 (1980)). That theory flagrantly violates "recent pathmarking decisions of the Supreme Court." Op.3.

Word Count: 347

Respectfully,

/s/ J. Benjamin Aguiñaga
Eric C. Rassbach                    Elizabeth B. Murrill
Joseph C. Davis                     Attorney General of Louisiana
Benjamin A. Fleshman
Amanda L. Salz                      J. Benjamin Aguiñaga
Kelsey Baer Flores                  Solicitor General
The Becket Fund for
   Religious Liberty                 Zachary Faircloth
1919 Pennsylvania Ave. NW           Principal Deputy Solicitor General
   Suite 400
Washington, D.C. 20006              Office of the Attorney General
                                    1885 N. 3rd St.
*Counsel for Appellants*            Baton Rouge, LA 70802
*Brumley and LSBESE*                (225) 506-3746
*Officials*                         AguinagaB@ag.louisiana.gov

                                    *Counsel for Appellants*

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 23-3030

_____

LIBBY HILSENRATH, on behalf of her minor child, C.H.,
Appellant

v.

SCHOOL DISTRICT OF THE CHATHAMS; BOARD OF
EDUCATION OF THE SCHOOL DISTRICT OF THE
CHATHAMS; MICHAEL LASUSA, In his official capacity
as the Superintendent of the School District of Chathams;
KAREN CHASE, In her official capacity as the Assistant
Superintendent of Curriculum and Instruction at the School
District of the Chathams; JILL GIHORSKI, In her official
capacity as the Principal of Chatham Middle School;
STEVEN MAHER, In his official capacity as the Supervisor
of Social Studies for the School District of the Chathams;
MEGAN KEOWN, In her official capacity as a Social
Studies teacher for Chatham Middle School; CHRISTINE
JAKOWSKI, In her official capacity as a Social Studies
teacher for Chatham Middle School

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2:18-cv-00966)

District Judge: Honorable Kevin McNulty

_____

Argued on October 29, 2024

Before: HARDIMAN, PHIPPS, and FREEMAN, *Circuit Judges*.

(Filed: May 5, 2025)

Michael P. Hrycak
316 Lenox Avenue
Westfield, NJ 07090

Richard Thompson [Argued]
Thomas More Law Center
24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, MI 48106
          *Counsel for Appellant*

Ruby Kumar-Thompson [Argued]
Cleary Giacobbe Alfieri & Jacobs
169 Ramapo Valley Road
Upper Level 105
Oakland, NJ 07436
          *Counsel for Appellees*

Noel J. Francisco
Christopher Pagliarella [Argued]
Jones Day
51 Louisiana Avenue NW
Washington, DC 20001

Eric C. Rassbach
The Becket Fund for Religious Liberty
1919 Pennsylvania Avenue NW
Suite 400
Washington, DC 20006
>*Counsel for Amicus Curiae Jewish Coalition for Religious Liberty in Support of Appellees*

Alexander J. Luchenitser
Sarah Taitz
Americans United for Separation of Church & State
1310 L Street NW
Suite 200
Washington, DC 20005
>*Counsel for Amicus Curiae Americans United for Separation of Church and State in Support of Neither Party*

—————

OPINION OF THE COURT
—————

HARDIMAN, *Circuit Judge*.

This appeal concerns the constitutionality of a middle school social studies curriculum. Libby Hilsenrath sued the Board of Education of the School District of the Chathams over instructional videos about Islam in her son's seventh-grade World Cultures and Geography class. She claimed the Board violated the Establishment Clause of the First Amendment by assigning the videos. Applying recent pathmarking decisions of the Supreme Court, the District Court disagreed and granted

summary judgment to the Board. Hilsenrath filed this appeal. Because the school's curriculum does not resemble a traditional hallmark of religious establishment, we will affirm.

I

A

During the 2016–2017 school year, C.H. was a seventh-grade student at Chatham Middle School. He was enrolled in a mandatory World Cultures and Geography class taught in part by long-term substitute Christine Jakowski. The class canvassed world regions to help students "gain a greater sense of the world around them" and "become active and informed global citizens."[1] Many resources for the class, such as "calendars, handouts, assignment and project directions, and grading guidelines," were located on Google Classroom.[2]

The class was organized into seven units, six of which focused on a different region of the world. Within each of these units, students explored the history and culture of the highlighted region, which sometimes included studying its predominant religion. During the Latin America unit, students learned about Christianity. And in the East Asia unit, students viewed PowerPoint slides and videos about Buddhism and Hinduism. The curriculum implemented state standards, including that students will be able to "[c]ompare and contrast the tenets of various world religions."[3]

Students encountered Islam during two class periods

---

[1] App. 439.

[2] App. 441.

[3] App. 127.

within the "Middle East and North Africa" (MENA) unit, both taught by Ms. Jakowski. The first lesson was presented through a set of PowerPoint slides entitled "Teaching Critical Thinking[:] Making Generalizations with Content."[4] That presentation instructed students that "[a] generalization is a broad, universal statement of understanding based on specific facts and data" and cautioned that "[s]ome are valid" and "others are invalid or faulty."[5] To test students' understanding, the final slide directed them to identify generalizations in a hyperlinked YouTube video and to label them either "valid or faulty."[6]

That five-minute video, entitled "Intro to Islam," contains images and written text. Instead of a voiceover, the video features background music and Arabic chants.[7] The first half of the video alternates between quotations from the Quran and a series of questions and answers about Islam, including:

- "What is Islam?" "Faith of divine guidance for Humanity, based on peace, spirituality and the oneness of God."[8]

- "Who is Allah?" "Allah is the one God who created the heavens and the earth, who has no equal and is all

---

[4] App. 407.

[5] App. 409, 413.

[6] App. 416.

[7] Since filing this lawsuit, Hilsenrath has produced what she believes to be the English translation of the Arabic chants sung in the Intro to Islam video. But neither she nor C.H. speaks Arabic, so they did not understand the meaning of the chants when they first watched the video.

[8] Intro to Islam at 0:17.

powerful."[9]

- "Who is Muhammad (S)?" "Muhammad (Peace be upon him) is the last & final Messenger of God. God gave him the Noble Quran."[10]

- "What is the Noble Quran?" "Divine revelation sent to Muhammad (S) last Prophet of Allah. A Perfect guide for Humanity."[11]

- "What does history say about Islam?" "Muslims created a tradition of unsurpassable splendor, scientific thought and timeless art."[12]

After about two minutes, the video turns to a discussion of "Islamic Art and Architecture," as well as other Muslim contributions to society.[13] Finally, text on the last substantive slide reads "May God help us all find the true faith, Islam . . . Ameen."[14]

The second class in the MENA unit introduced students to "the 5 Pillars of Faith" and the "impact/significance of them in the Muslim culture."[15] This lesson included a different PowerPoint presentation, entitled "Introduction to Islam."[16] The slides gave students a broad overview of Islam, including:

---

[9] *Id.* at 0:29.
[10] *Id.* at 1:01.
[11] *Id.* at 1:38.
[12] *Id.* at 2:10.
[13] *Id.* at 2:13.
[14] *Id.* at 4:40.
[15] App. 461.
[16] App. 224, 386.

the symbol of Islam; key figures in Islam; the Quran; demographic statistics about Muslims; and a summary of the Five Pillars of Islam. The slides also included a hyperlink to a YouTube video entitled "The 5 Pillars of Islam."[17]

"The 5 Pillars of Islam" is an animated cartoon. The video features a conversation between two children, a non-Muslim named Alex and a Muslim named Yusuf. Curious, Alex asks Yusuf a series of questions about Islam. Yusuf responds by explaining that "Muslims believe that there is only one God," whose name is "Allah" and who "is the creator of everything."[18] After describing the Five Pillars, Yusuf invites Alex to join him in prayer. The video closes by providing an email address and a website through which viewers can "organise a mosque tour, or order an information pack."[19]

At the end of the second lesson, students completed a "Scavenger Notes Activity," a worksheet instructing them to "[t]ake notes using the slides" and to "[f]ill in the blanks AND correct the false information" scattered throughout.[20] One section of the worksheet read as follows:

Pillar 1: Belief/Faith (Shahadah)

The basic statement of the Islamic faith:

"There is no god but _____ and _____ is his messenger."

This statement is the centrifugal force to their

---

[17] App. 395.

[18] 5 Pillars of Islam at 1:20–1:29.

[19] *Id.* at 5:18.

[20] App. 418–22, 461.

religion.[21]

Although Ms. Jakowski presented both sets of PowerPoint slides to the students, she did not show either video in class or explicitly instruct the students to view them. C.H. nonetheless watched the "Intro to Islam" and "5 Pillars" videos at home with his mother, Libby Hilsenrath. Concerned about the MENA curriculum, Hilsenrath emailed administrators and aired her complaints at a school board meeting in February 2017. At a later meeting, the Board defended its curriculum as a proper application of the school's policy on religion in the classroom. But citing "disruption," the school ultimately removed the video links from the MENA unit PowerPoint slides.[22]

## B

Hilsenrath sued the District, the Board, and several teachers and administrators on behalf of her minor son, C.H., claiming that the school's MENA curriculum violated the Establishment Clause of the First Amendment. She sought an injunction, a declaratory judgment, nominal damages, and attorney's fees.

After denying the Defendants' motion to dismiss, the District Court considered the parties' cross-motions for summary judgment. The Court first determined that Hilsenrath lacked standing to seek injunctive and declaratory relief because her son was no longer enrolled in the World Cultures and Geography class. It then dismissed the claims against all defendants except the Board, finding that the Board alone is

---

[21] App. 420.
[22] App. 358.

"the legal entity responsible for the decisions that are challenged here."[23] On the merits, the District Court applied *Lemon v. Kurtzman*,[24] found no Establishment Clause violation, and granted the Board's motion for summary judgment. Hilsenrath timely appealed. After hearing oral argument, this Court vacated the District Court's judgment and remanded in view of the Supreme Court's decision in *Kennedy v. Bremerton School District*.[25]

On remand, the District Court again considered the parties' cross-motions for summary judgment. The Court first noted that its holdings concerning standing and proper parties were "not implicated by *Kennedy* and therefore remain[ed] intact," leaving it to decide only "Ms. Hilsenrath's Establishment Clause claim for nominal damages."[26] Turning to the merits, the District Court observed that *Kennedy* "clearly reject[ed] the *Lemon* test" in favor of a "historical analysis."[27] Under that new standard, the Court concluded that none of the materials in the MENA unit resembled the "hallmarks associated with establishment of religion."[28] In particular, the Court found "no evidence of significant coercion," which the

---

[23] *Hilsenrath v. Sch. Dist. of Chathams*, 500 F. Supp. 3d 272, 287–89 (D.N.J. 2020), *vacated and remanded*, 2022 WL 2913754 (3d Cir. July 20, 2022).

[24] 403 U.S. 602 (1971).

[25] 597 U.S. 507 (2022).

[26] *Hilsenrath v. Sch. Dist. of the Chathams*, 698 F. Supp. 3d 752, 760 & n.11 (D.N.J. 2023). Because Hilsenrath waived the standing and proper parties issues in her brief and at oral argument, we likewise consider only her nominal damages claim against the Board.

[27] *Id.* at 761 (cleaned up).

[28] *Id.* at 765 (cleaned up).

*Kennedy* Court had called one of the "foremost hallmarks of religious establishments."[29] So the District Court granted summary judgment for the Board on Hilsenrath's nominal damages claim. Hilsenrath timely appealed.

## II

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3). We have jurisdiction under 28 U.S.C. § 1291. Summary judgment may be granted only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[30] "We review de novo the District Court's resolution of cross-motions for summary judgment."[31]

## III

### A

The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion."[32] Since the ratification of the First Amendment in 1791, Congress has obeyed that straightforward prohibition. But things started to get complicated in 1947 when, in *Everson v. Board of Education*, the Supreme Court applied the Establishment Clause to the States through the Fourteenth Amendment.[33] Once the Court applied the Clause—which seemed to honor a

---

[29] *Id.* at 763 (cleaned up).

[30] Fed. R. Civ. P. 56(a).

[31] *Spivack v. City of Phila.*, 109 F.4th 158, 165 (3d Cir. 2024) (cleaned up).

[32] U.S. Const. amend. I.

[33] 330 U.S. 1, 15 (1947).

rudimentary federalism principle[34]—to interactions between local governments and religion, the federal courts were beset with complaints of unconstitutional conduct.[35]

Those cases led to the Supreme Court's decision in *Lemon v. Kurtzman*,[36] which tried "to distill from the Court's existing case law a test that would bring order and predictability to Establishment Clause decisionmaking."[37] *Lemon* created a three-part test to assess the constitutionality of a practice by asking whether: (1) "the government practice had a secular purpose"; (2) "its principal or primary effect advanced or inhibited religion"; and (3) "it created an excessive entanglement of the government with religion."[38]

The *Lemon* test had a short shelf life. In a concurring opinion in *Lynch v. Donnelly*, Justice O'Connor opined that the constitutionality of a religious practice depended on whether a reasonable observer would conclude that the government was

---

[34] *See, e.g.*, *Elk Grove Unified Sch. Dist. v. Newdow*, <u>542 U.S. 1, 49</u>–51 (2004) (Thomas, J., concurring in the judgment) (citing Akhil Reed Amar, The Bill of Rights 36–39 (1998)).

[35] *See, e.g.*, *Zorach v. Clauson*, <u>343 U.S. 306</u> (1952) (released time religious instruction); *Engel v. Vitale*, <u>370 U.S. 421</u> (1962) (school prayer); *Bd. of Ed. v. Allen*, <u>392 U.S. 236</u> (1968) (publicly funded textbooks in parochial schools); *Walz v. Tax Comm'n*, <u>397 U.S. 664</u> (1970) (tax exemptions for religious organizations).

[36] <u>403 U.S. 602</u> (1971).

[37] *Am. Legion v. Am. Humanist Ass'n*, <u>588 U.S. 29, 48</u> (2019) (plurality opinion).

[38] *Doe v. Indian River Sch. Dist.*, <u>653 F.3d 256, 271</u> (3d Cir. 2011) (citing *Lemon*, <u>403 U.S. at 612</u>–13).

"endors[ing]" religion.[39] This "endorsement test" became the law in *County of Allegheny v. American Civil Liberties Union*.[40] But even after the endorsement test gained currency, the *Lemon* test sometimes reared its head like "some ghoul in a late-night horror movie."[41] "[I]nstead of bringing clarity to" the Supreme Court's Establishment Clause jurisprudence, "*Lemon* produced only chaos."[42] Over time, *Lemon* has been criticized,[43] amended,[44] and altogether ignored.[45]

Out of this chaos came *Kennedy*, where the Supreme Court clarified that it "long ago abandoned *Lemon* and its endorsement test offshoot."[46] Building on decisions such as *Town of Greece v. Galloway*[47] and *American Legion v. American Humanist Ass'n*,[48] the Court "instructed that the Establishment Clause must be interpreted by reference to historical practices and understandings."[49]

This kind of historical inquiry "requires serious

---

[39] 465 U.S. 668, 687–89 (1984) (O'Connor, J., concurring).

[40] 492 U.S. 573, 592–94 (1989).

[41] *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 398 (1993) (Scalia, J., concurring in the judgment).

[42] *Shurtleff v. City of Bos.*, 596 U.S. 243, 277 (2022) (Gorsuch, J., concurring in the judgment).

[43] *See, e.g.*, *Lamb's Chapel*, 508 U.S. at 398 (Scalia, J., concurring in the judgment).

[44] *See, e.g.*, *Cnty. of Allegheny*, 492 U.S. at 593.

[45] *See, e.g.*, *Marsh v. Chambers*, 463 U.S. 783, 793–94 (1983).

[46] 597 U.S. at 534.

[47] 572 U.S. 565 (2014).

[48] 588 U.S. 29 (2019).

[49] *Kennedy*, 597 U.S. at 535 (cleaned up).

work."[50] And that work is especially challenging here because "free public education was virtually nonexistent at the time the Constitution was adopted."[51] But "[h]istorical tradition can be established by analogical reasoning,"[52] and history teaches that established churches often bore certain "telling traits":

> First, the government exerted control over the doctrine and personnel of the established church. Second, the government mandated attendance in the established church and punished people for failing to participate. Third, the government punished dissenting churches and individuals for their religious exercise. Fourth, the government restricted political participation by dissenters. Fifth, the government provided financial support for the established church, often in a way that preferred the established denomination over other churches. And sixth, the government used the established church to carry out certain civil functions, often by giving the established church a monopoly over a specific function.[53]

So to prevail on her Establishment Clause claim, Hilsenrath

---

[50] *Shurtleff*, 596 U.S. at 285 (Gorsuch, J., concurring in the judgment).

[51] *Edwards v. Aguillard*, 482 U.S. 578, 583 n.4 (1987).

[52] *Range v. Att'y Gen.*, 124 F.4th 218, 228 (3d Cir. 2024) (en banc).

[53] *Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring in the judgment) (citing Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2110–12, 2131–81 (2003)).

must show that the Board's MENA curriculum resembles one of these hallmarks of religious establishment.[54]

## B

Hilsenrath proffers two constitutional flaws in the MENA curriculum, likening each to a hallmark of religious establishment. The first is coercion: she claims that the Board did something like "mandat[ing] attendance in the established church" by requiring C.H. to view "religious indoctrination videos."[55] The second is non-neutrality: by emphasizing Islam in its curriculum, she reasons, the Board effectively "provided financial support for the established church . . . in a way that preferred the established denomination over other churches."[56] Neither argument is persuasive.

### 1

Hilsenrath first argues that the Board coerced her son into religious practice when it subjected him to "direct

---

[54] Hilsenrath and Amicus Americans United insist that *Shurtleff* did not enumerate an exhaustive list of practices that violate the Establishment Clause under a historical approach. True enough. But we agree with our sister circuit that under *Kennedy*, "the plaintiff has the burden of proving a set of facts that would have historically been understood as an establishment of religion." *Firewalker-Fields v. Lee*, 58 F.4th 104, 122 n.7 (4th Cir. 2023). So even if *Shurtleff* does not cabin the Establishment Clause inquiry, it was Hilsenrath's burden to expand its reach.

[55] Reply Br. 11 (citation omitted).

[56] Reply Br. 17 (citation omitted).

proselytizing."[57] To be sure, coercion was one of the "foremost hallmarks of religious establishments" at the founding,[58] and it has played a prominent role in many of the Court's school prayer cases. For instance, in *Lee v. Weisman*, the Court invalidated a public school district's practice of inviting a member of the clergy to recite a nonsectarian benediction at its graduation ceremonies, explaining that the benediction imposed a "subtle and indirect" coercive effect on the students.[59] And in *Santa Fe Independent School District v. Doe*, the Court held that a public high school violated the Establishment Clause when it permitted a student to recite a prayer over a public address system before each varsity football game, again concluding that the prayer coerced spectators into a religious practice.[60] History and precedent therefore make clear that schools may not "force [students] to engage in a formal religious exercise."[61]

But not all school activities touching on religion amount to "formal religious exercise."[62] While there may be circumstances in which public schools violate the Establishment Clause by subjecting students to proselytizing materials, the Supreme Court has cautioned against "[f]ocus[ing] exclusively on the religious component of any activity."[63] Instead, we must look at the whole record to discern the "proper context" in which an ostensibly religious activity

---

[57] Hilsenrath Br. 23.

[58] *Kennedy*, 597 U.S. at 537 (citations omitted).

[59] 505 U.S. 577, 586–87, 593 (1992).

[60] 530 U.S. 290, 311–12 (2000).

[61] *Kennedy*, 597 U.S. at 537 (cleaned up).

[62] *Id.*

[63] *Lynch*, 465 U.S. at 680.

took place.[64] For example, while a teacher might recite the Ten Commandments as an act of worship, she could also use them to introduce students to the fundamental tenets of a major world religion.[65] Context is key.

The record here shows that the Board did not proselytize. Even assuming students were compelled to watch the "Intro to Islam" and "5 Pillars" videos—a point which the parties dispute—they did so "as part of a secular program of education."[66] The videos were embedded in PowerPoint slides entitled "Introduction to Islam" and "Making Generalizations with Content," which were presented during two sessions of a year-long class that also covered Christianity, Judaism, Buddhism, and Hinduism.[67] In short, the MENA lesson was "integrated into the school curriculum" as part of "an appropriate study of history, civilization," and "comparative religion."[68]

That context distinguishes this case from the Supreme Court's decisions addressing proselytization in public schools. For instance, the "released time" program invalidated in *Illinois ex rel. McCollum v. Board of Education* was established to instruct public school students in religious

---

[64] *Id.*

[65] *See Stone v. Graham*, 449 U.S. 39, 42 (1980) ("This is not a case in which the Ten Commandments are integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like.").

[66] *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 225 (1963).

[67] App. 386, 407.

[68] *Stone*, 449 U.S. at 42.

truth.[69] The Bible readings invalidated in *Schempp* were designed for "the promotion of moral values . . . ."[70] In *Lee*, the unconstitutional benediction sought to "give thanks to [the] Lord[] for keeping us alive, sustaining us and allowing us to reach this special, happy occasion."[71] And in *Santa Fe*, the school offered pre-game prayer "to solemnize the event . . . ."[72]

Here, by contrast, the Board assigned videos to help students "understand what a generalization is and the benefits and consequences of using them" and to "explore the 5 Pillars of Faith and be able to explain the impact/significance of them in the Muslim culture."[73] Because the "Intro to Islam" and "5 Pillars" videos were presented in an academic rather than devotional context, they do "not come close to crossing any line" separating permissible curricular materials from impermissible proselytization.[74]

2

Hilsenrath next argues that, even if the Board did not coerce students or otherwise proselytize, its curriculum still matches a hallmark of religious establishment because it favors Islam over other faiths. But even assuming the Establishment Clause requires equal treatment in primary and secondary

---

[69] 333 U.S. 203, 231 (1948).
[70] 374 U.S. at 223.
[71] 505 U.S. at 582 (citation omitted).
[72] 530 U.S. at 306 (citation omitted).
[73] App. 460–61.
[74] *Kennedy*, 597 U.S. at 537.

school curricula,[75] the record does not show favoritism here. Besides Islam, C.H. and his classmates were introduced to Christianity, Judaism, Buddhism, and Hinduism. And the World Cultures and Geography course represented only a sampling of the expansive world religions curriculum offered at the School District of the Chathams. As early as kindergarten, students learn about religious holidays such as Hanukkah and Christmas. That instruction continues through high school, when students analyze, among other things, "the doctrinal disputes . . . that fueled the Protestant Reformation."[76]

Hilsenrath counters that, unlike the instruction on other religions, the MENA lesson "extol[led] Islam over all other faiths and encourage[d] conversion to the religion."[77] This argument once again ignores context. It is true that the creator of the Intro to Islam video described Allah as "the one God"

---

[75] The parties and amici disagree over whether preferential treatment itself constitutes an Establishment Clause violation after *Kennedy*. Hilsenrath argues that "*Kennedy* did not alter the fundamental demand of the Establishment Clause that the government not prefer one religion over another." Hilsenrath Br. 49. Amicus Jewish Coalition counters that a free-floating neutrality "standard" would cause "phantom constitutional violations"; it urges tighter alignment with traditional hallmarks of religious establishment, such as preferential government funding. Jewish Coalition Br. 21 (cleaned up). Because world religions were treated equally in C.H.'s World Cultures and Geography class, we leave for another day whether curricular non-neutrality violates the Establishment Clause.

[76] App 189.

[77] Reply Br. 19.

and Islam as "the true faith."[78] But the videos were embedded within PowerPoint slides that refer to Muslims exclusively in the third person, repeatedly describing what "Muslims believe."[79] The "Introduction to Islam" worksheet did the same, detailing Muslim beliefs and practices only from the perspective of a nonbeliever. Even apart from instructional materials, the record contains no evidence that Ms. Jakowski is a Muslim or that she ever tried to convert her students to Islam. So assuming the Establishment Clause required the Board to treat religions equally, the record shows that it satisfied that requirement here.

\*      \*      \*

The United States of America is not Sparta, where children were considered wards of the state. Parents are the first and most important teachers of their children. But once children enter public school, the curriculum is dictated by local government policy, typically by an elected school board. That local arena is the proper place for debate and discussion about curricular matters. Our role as a federal court is limited to upholding constitutional rights. So we express no opinion about the propriety of the curriculum at issue, except to hold that it does not bear any of the hallmarks of religious establishment. For that reason, we will affirm the District Court's judgment.

---

[78] Intro to Islam at 0:29, 4:40.
[79] App. 389–91.

PHIPPS, *Circuit Judge*, concurring in the judgment.

This Establishment Clause challenge comes at a time when the "one-size-fits-all test" from *Lemon v. Kurtzman*, 403 U.S. 602 (1971), has been emphatically rejected,[1] and there is no longer any lurking constitutional mandate of secularism in governmental affairs.[2]   To fill the jurisprudential void occasioned by *Lemon*'s demise, the Majority Opinion uses a 'hallmarks' test: whether the challenged action bears any characteristics historically associated with an established church.   That approach has the salutary feature of being grounded in this nation's history and tradition, but I posit that history and tradition are more effective as exegetical tools for construing the text and structure of the Constitution than as freestanding constitutional norms.   In addition, the use of the hallmarks test by the Majority Opinion leaves at least two critical questions unanswered: (i) whether governmental action that offends only one of the hallmarks is sufficient for an Establishment Clause violation, or whether the hallmarks should be considered in the aggregate; and (ii) if one or more of the hallmarks of an established church are present, whether that is dispositive of an Establishment Clause violation, or

---

[1]   *Shurtleff v. City of Boston*, 596 U.S. 243, 277 (2022) (Gorsuch, J., concurring in the judgment); *see also Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 534–36 (2022).

[2]   *See Shurtleff*, 596 U.S. at 261 (Kavanaugh, J., concurring) ("[A] government *violates* the Constitution when . . . it *excludes* religious persons, organizations, or speech because of religion from public programs, benefits, facilities, and the like."); *accord Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 488–89 (2020); *Carson ex rel. O.C. v. Makin*, 596 U.S. 767, 779, 789 (2022).

1

whether the government can justify its offending practice as comporting with history and tradition.[3]

In my view, a hallmarks test applied to states through incorporation[4] is not needed to conclude that the materials about Islam assigned to seventh-grade students at Chatham

---

[3] If the hallmarks test becomes this Court's "grand unified theory" of the Establishment Clause, *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 60 (2019) (plurality opinion), then I submit that the hallmarks should be considered in the aggregate, *see* Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2111 (2003) ("No single law created the established church. Rather, it was constituted by a *web of legislation*, common law, and longstanding practice." (emphasis added)), and that a unit of government may use history and tradition to justify conduct that offends one or more hallmarks, *see Town of Greece v. Galloway*, 572 U.S. 565, 577 (2014) ("[I]t is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific practice is permitted.").

[4] There remain grounds for questioning the incorporation of the Establishment Clause. *See, e.g.*, *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 49 (2004) (Thomas, J., concurring in the judgment) ("The text and history of the Establishment Clause strongly suggest that it is a federalism provision intended to prevent Congress from interfering with state establishments. Thus, unlike the Free Exercise Clause, which does protect an individual right, it makes little sense to incorporate the Establishment Clause."); *Sch. Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 310 (1963) (Stewart, J., dissenting) ("I accept too the proposition that the Fourteenth Amendment has somehow absorbed the Establishment Clause, although it is not without irony that a constitutional provision evidently designed to leave the States free to go their own way should now have become a restriction upon their autonomy.").

Middle School do not establish a religion.  Instead, all that is needed is a recognition that teaching on matters of religion or even encouraging religious belief or practice in public school does not constitute a "law respecting an establishment of religion."  U.S. Const. amend. I.  Indeed, one of the other organic documents of the United States, the Northwest Ordinance of 1787, encouraged the teaching of religion in schools: "Religion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged."  *An Ordinance for the Government of the Territory of the United States North-west of the River Ohio*, Act of July 13, 1787, art. III.[5]  Thus, with the lifting of the constitutional mandate of secularism, teaching about religious matters in a public school does not violate the Establishment Clause.  For that reason, the instructional materials about Islamic beliefs, practices, and

---

[5] Similarly, in his *Commentaries on the Constitution*, Justice Story emphasized that governmental promotion of religion was not, as a general matter, inconsistent with the Constitution.  *See, e.g.*, 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1867 (1833) ("[E]very American colony, from its foundation down to the revolution, with the exception of Rhode Island, (if, indeed, that state be an exception,) did openly, by the whole course of its laws and institutions, support and sustain, in some form, the Christian religion; and almost invariably gave a peculiar sanction to some of its fundamental doctrines.  And this has continued to be the case in some of the states down to the present period, without the slightest suspicion, that it was against the principles of public law, or republican liberty." (footnote omitted)); *id.* § 1868 ("Probably at the time of the adoption of the constitution, and of the amendment to it, now under consideration, the general, if not the universal, sentiment in America was, that Christianity ought to receive encouragement from the state, so far as was not incompatible with the private rights of conscience, and the freedom of religious worship.").

modes of worship do not offend that constitutional provision,[6] and I respectfully concur in the judgment.

---

[6] Libby Hilsenrath alleges only a violation of the Establishment Clause; she does not claim, for instance, that she had insufficient notice of the instructional materials such that the school's opt-out provision, *see* School District of the Chathams, Policy 5250 Excusal from Class or Program (Nov. 5, 2007), did not meaningfully protect her parental rights to educate her son on matters of faith and morals. *See generally* N.J. Stat. Ann. § 18A:35-4.7 ("Any child whose parent or guardian presents to the school principal a signed statement that any part of the instructions in health, family life education or sex education is in conflict with his conscience, or sincerely held moral or religious beliefs shall be excused from that portion of the course where such instruction is being given and no penalties as to credit or graduation shall result therefrom."); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925) (recognizing "the liberty of parents and guardians to direct the upbringing and education of children under their control" as "rights guaranteed by the Constitution"); *Meyer v. Nebraska*, 262 U.S. 390, 401 (1923) (describing "the power of parents to control the education of their own"); *Wisconsin v. Yoder*, 406 U.S. 205, 233–34 (1972) (requiring Wisconsin to "accommodat[e] the religious objections of the Amish" to compulsory education in light of "the rights of parents to direct the religious upbringing of their children"); *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (plurality opinion) (recognizing that "the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children"); *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 185 n.26 (3d Cir. 2005) ("[W]e do not hold . . . that the right of parents under the *Meyer-Pierce* rubric 'does not extend beyond the threshold of the school door.'" (quoting *Fields v. Palmdale Sch. Dist.*, 427 F.3d 1197, 1207 (9th Cir. 2005))); *Gruenke v. Seip*,

4

---

225 F.3d 290, 305 (3d Cir. 2000) ("It is not unforeseeable, therefore, that a school's policies might come into conflict with the fundamental right of parents to raise and nurture their child. But when such collisions occur, the *primacy of the parents' authority* must be recognized and should yield *only* where the school's action is tied to a *compelling interest*." (emphasis added)). *But cf. Mahmoud v. McKnight*, 102 F.4th 191 (4th Cir. 2024), *cert. granted sub nom.*, *Mahmoud v. Taylor*, 145 S. Ct. 1123 (2025) (mem.).