

**STATE OF LOUISIANA**
DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
P.O. BOX 94005
BATON ROUGE, LA
70804-9005

LIZ MURRILL
ATTORNEY GENERAL

August 21, 2025

**VIA CM/ECF**

Mr. Lyle W. Cayce
Clerk of Court
United States Court of Appeals for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA 70130-3408

> **Re:** ***Roake v. Brumley*, No. 24-30706**
> **Rule 28(j) Notice of Supplemental Authority:**
>
> Order Concerning Plaintiffs' Mot. for Prelim. Inj. & Defs.' Mot. to Dismiss, *Nathan v. Alamo Heights Indep. Sch. Dist.*, Civ. Action No. SA-25-cv-00756-FB (W.D. Tex. Aug. 20, 2025), ECF No. 78, attached as an exhibit

Dear Mr. Cayce:

Yesterday, the Western District of Texas issued a preliminary-injunction order (attached) barring implementation of Texas's S.B. 10—a statute that, like Louisiana's H.B. 71, requires public schools to display the Ten Commandments in each classroom. The court deemed itself bound by the panel decision *in this case* to rule that, because the statute lacked a "'permissible state objective'" and there was "no tradition of permanently displaying the Ten Commandments in public-school classrooms," the statute is "plainly unconstitutional." Order at 43, 49; *see also id.* at 24 ("this Court must follow *Brumley*"), 53 ("*Brumley* is binding on this Court").

The Texas decision underscores the urgent need for en banc review. The panel's rejection of *Kennedy*'s hallmarks analysis and resurrection of *Lemon* has not only thrown this Court's Establishment Clause and Article III precedent into disarray, but has now resulted in the facial invalidation of statutes enacted by two of this Circuit's States.

On *Kennedy*, the court applied the panel's completely upside down standard, which rejected the Third and Fourth Circuits' view. Order at 46

1



**STATE OF LOUISIANA**
DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
P.O. BOX 94005
BATON ROUGE, LA
70804–9005

LIZ MURRILL
ATTORNEY GENERAL

("Plaintiffs must show that the practice at issue ... does not 'fit within' and is not 'consistent with' a broader tradition existing at the time of the founding.").

On *Lemon*, the court, among other things, mused that belief in "an afterlife" "developed" from "Homo sapiens[']" "[n]ot wanting their existence to end," *id.* at 5–6 & n.8; asserted that the "blessings" "religious institutions" "bestow" have been "neutralized by religious Homo sapiens who exhibit an historical and continuing pernicious and pervasive tendency to kill other humans," *id.* at 6; included a photograph of Hitler "greeting [the] Reich Bishop" to show "the danger of majoritarian government and religion joining hands," *id.* at 11 & n.38; and accused certain Texas legislators of "not" "sh[ying] away from addressing the religious purpose of S.B. 10," *id.* at 41; *see id.* at 43 ("These statements 'support a commonsense conclusion that a religious objective permeated the government's action.'" (quoting *Brumley*)). The court's discursive analysis well illustrates why it is profoundly important for this Court to keep the subjective, religion-hostile *Lemon* test in its grave.

Word Count: 350

Respectfully,

ERIC C. RASSBACH
JOSEPH C. DAVIS
BENJAMIN A. FLESHMAN
AMANDA L. SALZ
THE BECKET FUND FOR
   RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
   Suite 400
Washington, D.C. 20006

*Counsel for Appellants*
*Brumley and LSBESE*
*Officials*

*/s/ J. Benjamin Aguiñaga*
ELIZABETH B. MURRILL
Attorney General of Louisiana

J. BENJAMIN AGUIÑAGA
Solicitor General

ZACHARY FAIRCLOTH
Principal Deputy Solicitor General

OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

*Counsel for Appellants*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

RABBI MARA NATHAN, on behalf §
of herself and her minor §
child, M.N.; VIRGINIA GALVIZ §
EISENBERG, on behalf of herself and §
her minor child, R.E.; §
RON EISENBERG, on behalf of himself §
and his minor child, R.E.; §
CANTOR SETH ETTINGER, on behalf §
of himself and his minor child, R.E.; §
SARAH ETTINGER, on behalf of herself §
and her minor child, R.E.; ELIZABETH §
LEMASTER, on behalf of herself and her §
minor children, K.L. & L.L.; CARAH §
HELWIG, on behalf of herself and §
her minor children, J.P. & T.P.; §
ALYSSA MARTIN, on behalf of herself §
and on behalf of her minor child, H.B.M.; §
CODY BARKER, on behalf of himself §
and his minor child, H.B.M.; LAUREN §
ERWIN, on behalf of herself and her §
minor child, M.E.; PASTOR JAMES §
GRIFFIN MARTIN, on behalf of himself §
his minor children, J.M. & B.M.; §
ABIGAL MARTIN, on behalf of herself §
and her minor children, J.M. & B.M.; §
REBEKAH LOWE, on behalf of herself §
and her minor children, E.R.L. & E.M.L; §
THEODORE LOWE, on behalf of himself §
and his minor children, E.R.L. & E.M.L.; §
MARISSA NORDEN, on behalf of herself §
and her minor children, E.N. & A.N.; WILEY §
NORDEN, on behalf of himself and his minor §
children, E.N. & A.N.; RABBI JOSHUA §
FIXLER, on behalf of himself and his minor §
children, D.F., E.F. & F.F.; REVEREND §
CYNTHIA MOOD, on behalf of herself §
and her minor children, L.M. & C.M.; §
CHERYL REBECCA SMITH, on behalf §
of herself and her minor child, L.P.J.; §
ARVIND CHANDRAKANTAN, on §
on behalf of himself and his minor children, §

V.C., M.C. & A.C.; ALLISON             §
FITZPATRICK, on behalf of             §
herself and her minor children,       §
C.F. & H.F.; and MARA RICHARDS BIM,   §
on behalf of herself and her minor child, H.B.,   §
                                      §
     *Plaintiffs*,            §
                                      §
v.                                    §         CIVIL ACTION NO. SA-25-cv-00756-FB
                                      §
ALAMO HEIGHTS INDEPENDENT,            §
SCHOOL DISTRICT, NORTH EAST           §
INDEPENDENT SCHOOL DISTRICT,          §
LACKLAND INDEPENDENT SCHOOL           §
DISTRICT, NORTHSIDE INDEPENDENT       §
SCHOOL DISTRICT, AUSTIN               §
INDEPENDENT SCHOOL DISTRICT,          §
LAKE TRAVIS INDEPENDENT               §
SCHOOL DISTRICT, DRIPPING             §
SPRINGS INDEPENDENT SCHOOL            §
DISTRICT, HOUSTON INDEPENDENT         §
SCHOOL DISTRICT, FORT BEND            §
INDEPENDENT SCHOOL DISTRICT,          §
CYPRESS FAIRBANKS INDEPENDENT         §
SCHOOL DISTRICT, and PLANO            §
INDEPENDENT SCHOOL DISTRICT,          §
                                      §
     *Defendant*s.            §

## ORDER CONCERNING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND DEFENDANTS' MOTION TO DISMISS

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.  U.S. CONST. amend. I.  State legislatures are also bound pursuant to the Fourteenth Amendment.  *Everson v. Board of Ed.,* 330 U.S. 1, 8 (1947).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I.
## In The Beginning . . . .[1]

Rabbi Mara Nathan and other Plaintiffs request the Court to preliminarily enjoin the implementation of SB 10, a Texas statute requiring the posting of the allegedly Protestant version of the Ten Commandments in Texas public schools, arguing that the statute violates the higher law of the United States Constitution. The Government schools and the Attorney General of Texas say the statute is constitutional and that the preliminary injunction should be denied.  The Government schools and the Attorney General of Texas also move to dismiss Plaintiffs' complaint for lack of subject matter jurisdiction and failure to state a claim.

Presumably, Rabbi Nathan and Baptist Reverend Vickrey both try to follow their religions and to inculcate those values to their congregants and their own children. But they come from the different faith backgrounds of their childhood. Indeed, forty years ago a Methodist preacher told a then much younger judge, "Fred, if you had been born in Tibet, you would be a Buddhist."

By filing this case, Rabbi Nathan and Reverend Vickrey, through the latter's published statements, agree these matters of individual conscience and the soul should be free of government interference and coercion.

> Historically, Baptists were early advocates for church-state separation and religious freedom because of their experience of persecution. The American principle protected dissenters like themselves and had the additional benefits of protecting all religious minorities, including the non-religious. . . . The separation of church and state protects our spiritual integrity and keeps our democracy intact. . . .  Real religious freedom frees us from hatred and levels out hierarchies. [2]

---

[1]Genesis 1:1.

[2]Reverend Cameron Vickrey, *In Defense of Separation of Church and State* (San Antonio Express News, April 6, 2025).

-3-

Imagine the consternation and legal firestorm were the following fictional story to become reality:

Hamtramck, Michigan: Being a majority Muslim community, the Hamtramck city council and school board have decreed that, beginning September 1, 2025, the following teachings of the Quran, Surah Al-An'am 6:151 and Surah Al-Isra 17:23, shall be posted in all public buildings and public schools:

> Say, O Prophet, come! Let me recite to you what your Lord has forbidden to you: Do not associate others with Him in worship. Do not fail to honour your parents. Do not kill your children for fear of poverty. Do not come near indecencies, openly or secretly. Do not take a human life, except with legal right. This is what He has commanded . . .

> For your Lord has decreed that you worship none but Him. And honour your parents. If one or both of them reach old age in your care, never yell at them. Rather, address them respectfully.

While "We the people" rule by a majority, the Bill of Rights protects the minority Christians in Hamtramck and those 33 percent of Texans who do not adhere to any of the Christian denominations.[3]

It can be argued that the genesis of this controversy was about 4,000 years ago when Abraham "separated" from the "government" of his family history and traditions of many gods to proclaim the monotheistic belief in "the one true God." Abraham begat his descendants Moses, Jesus of Nazareth and Muhammad, who form the triad of the "desert religions" and the "peoples of the Book": Torah, Christian Bible and the Quran. On other parts of the Earth, different groups of humans developed their own spiritual, philosophical and religious belief systems, many of which have come to exist in the American experience and experiment of democracy and self-government.

---

[3]Pew Research statistics regarding population and religious composition. Religious Landscape Study 2023-2024.

In European culture, there was another "separation" from the "government" of the Vatican in Rome. It was the "protest" of Martin Luther, giving birth to numerous branches and versions of the Protestant Christian denominations.

II.
**Eternity is a Long Time**

**Diversity of Homo Sapiens Religious and Life After Death Beliefs**

Though most of the eight billion Homo sapiens[4] have no knowledge they are traveling 66,000 miles per hour around the sun,[5] they have evolved over several million years to be the only species which knows it will die.

Not wanting their existence to end, Homo sapiens developed a multitude of theories and hopes, encompassed in thousands of religions,[6] of how they can avoid returning to the Earth from whence they and other species came. Or, as the country western song says: "Everybody wanna go to heaven, but nobody wanna go now."[7] In the past 10,000 years of human societal development, those belief systems have included the multiple gods of the ancient Romans, Greeks and Egyptians, the monotheism of the Abrahamic religions of Judaism, Christianity and Islam, the reincarnation beliefs of Buddhism, and the various religious beliefs and practices of the Shintoists, Hindus, Mayans, Aztecs and Incas, to name but a few.

---

[4] United Nations Population Prospects: The 2024 Revision.

[5] EDUMOND LEDGER, THE SUN: ITS PLANETS AND THEIR SATELLITES 57 (Hazell, Watson and Viney 1882).

[6] LEWIS M. HOPFE AND MARK R. WOODWARD, RELIGIONS OF THE WORLD II (Prentice Hall, 7th ed. 1998) ("In the long period of human life on earth, there have been thousands of religions."); ENCYCLOPEDIA OF AMERICAN RELIGIONS (J. Gordon Melton, ed. 7th ed. 2002) (presenting coverage of more than 2,500 North American religious groups in the U.S. and Canada); *Adherents. corn: National & World Religion Statistics-Church Statistics- World Religions*, www.adherents.com ) (collecting "statistics for over 4,200 religions, churches, denominations, religious bodies, faith groups, tribes, cultures, movements, ultimate concerns, etc.").

[7] KENNY CHESNEY, EVERYBODY WANTS TO GO TO HEAVEN (BNA Records 2008).

Some monopolistically believe theirs is the one and only true religion and path to eternal life. On the other hand, some Homo sapiens, known as Atheists, believe they know the only truth: That there is nothingness after physical death.[8]  Still others postulate a parallel universe.[9]  And those called Agnostics do not claim to know what happens after the final breath is expelled.[10]

### Grace and Torture

While religious institutions bestow many blessings and try to alleviate suffering, those acts of Grace are neutralized by religious Homo sapiens who exhibit an historical and continuing pernicious and pervasive tendency to kill other humans and confiscate the property of those, sometimes even within the same religion, who do not believe as they do. Christians slaughtered other Christians.[11]  In

---

[8]Stephen Hawking, British physicist and author, dismisses belief in God and an afterlife. Ian Sample, Stephen Hawking: *"There is no Heaven: It's a Fairy Story,"* THE GUARDIAN (May 15, 2011) ("I regard the brain as a computer which will stop working when its components fail. There is no heaven or afterlife for broken down computers; that is a fairy story for people afraid of the dark."). Some Atheists do, however, believe in an afterlife. David Staume, THE ATHEIST AFTERLIFE: THE ODDS OF AN AFTERLIFE: REASONABLE. THE ODDS OF MEETING GOD THERE: NIL 159-60 (Agio 2009) ("being an atheist or rationalist does not prohibit belief in the possibility of an afterlife. . . . [A]n afterlife can be removed from its religious context and examined on its own merit").

[9]MICHAEL B. MENSKY, CONSCIOUSNESS AND QUANTUM MECHANICS: LIFE IN PARALLEL WORLDS 179-80 (World Scientific Publishing Co. 2010) ("when the consciousness of man being turned-off, his soul obtains access to parallel worlds").

[10]*See* ANTHONY KENNY, THE UNKNOWN GOD 9 (Continuum 2004).

[11]*See generally* CROSS, CROWN & COMMUNITY: RELIGION, GOVERNMENT AND CULTURE IN EARLY MODERN ENGLAND 1400-1800 (David J.B. Trim & Peter J. Balderstone, eds. 2004); PERSECUTION AND PLURALISM: CALVINISTS AND RELIGIOUS MINORITIES IN EARLY MODERN EUROPE 155-1700 (Richard Bomey & David J. B. Trim, eds. 2006). *See also* David J.B. Trim, *The Christian Persecutory Impulse: Part One in a Series*, LIBERTY, January/February 2011 (exploring history of persecution of Christians by Christians); David J.B. Trim, *The Christian Persecutory Impulse: The Medieval Not Quite Reformed: Part Two in a Series*, LIBERTY, March/April 2011; David J.B. Trim, *The Christian Persecutory Impulse: Tough Love: Part Three in a Series*, LIBERTY, May/June 2011; David J.B. Trim, *The Christian Persecutory Impulse: The Emergence of Toleration: Part Four in a Series*, LIBERTY, July/August 2011; David J.B. Trim, *The Christian Persecutory Impulse: Reformation, Tolerance, and Persecution, Part Five in a Series*, LIBERTY, November/December 2011.

Europe, the blood of Irish Protestants and Catholics flowed freely.[12]   Similar conflict between

Protestants and Catholics existed in the United States as well.[13]   In colonial Salem, Massachusetts,

Christians savagely punished women accused of being witches.[14]   Other Christians rejected the Church

of Jesus Christ of Latter-Day Saints as cultists, using brute force against them.[15]   Radical Islamic Sunni

and Shiites create chaos within their culture.[16]   Christians attempted to exterminate Jews.[17]   Some

---

[12]MARTIN N. MARGER, RACE AND ETHNIC RELATIONS: AMERICAN AND GLOBAL PERSPECTIVES 477-78 (Wadsworth, 9th ed. 2011) (describing incidents of sectarian violence between Catholics and Protestants in Ireland in the 1970s and 1980s); RICHARD ENGLISH, IRISH FREEDOM: THE HISTORY OF NATIONALISM IN IRELAND (Macmillan 2008) ("Political violence between Protestant and Catholic abounded in early and mid-seventeenth century Europe, [including] . . . the massacres of Irish Protestants by Irish Catholics in 1641 . . . [and] slaughter of thousands of Protestants by Catholics in Magdeburg in 1631.").

[13]JAY P. DOLAN, THE IRISH AMERICANS: A HISTORY 61 (Bloomsbury Press 2008) (describing outbreaks of riots and mob violence against Catholics in Boston, New York, and Philadelphia in the 1830's and 1840's).

[14]The role of religion in the Salem witch trials has been described as follows:

> [W]ithout religion these charges would never have been filed, much less acted on. Without a belief in the devil as a genuine corrupting force, no one would have believed in witches. Religion also influenced the trials in that the judges looked to the ministers for guidance, since the judges had no previous experience with witchcraft. . . . [The trials became] one of the largest outbreaks of religiously related legal prosecution in American history, with nearly a score executed, five score jailed, and another ten score accused.

SCOTT A. MERRIMAN, RELIGION AND THE LAW IN AMERICA: AN ENCYCLOPEDIA OF PERSONAL BELIEF AND PUBLIC POLICY 448 (ABC-CLIO, Inc. 2007).

[15]Richard L. Bushman, *Mormon Persecutions in Missouri*, 1883, 3 BYU STUDIES 11(1961) (describing mob violence against Mormons in Missouri). *See also* RICHARD ABANES, INSIDE TODAY'S MORMONISM 253 (Harvest House 2004) ("Most mainstream Christian denominations. . . are united in their outright rejection of Mormonism."); RICHARD LYMAN BUSHMAN, MORMONISM: A VERY SHORT INTRODUCTION 2 (Oxford Univ. Press 2008) ("Frequently Mormonism is labeled a cult rather than a church. Some say it is not Christian.").

[16]PETER LYON, ISLAM IN CONFLICT BETWEEN INDIA AND PAKISTAN: AN ENCYCLOPEDIA 86 (ABC-CLIO, Inc. 2008) (describing bloody conflict between extremist Sunni and Shia Muslim groups).

[17]ROBERT MICHAEL, HOLY HATRED: CHRISTIANITY, ANTISEMITISM, AND THE HOLOCAUST 3 (Palgrave MacMillan, 1st ed. 2006) ("During the Holocaust, . . . most Christian Churches and most Christians. . . stood by in silence, or collaborated, when Jews were taken away by other Christians to be tortured and murdered."); WILLIAM NICHOLLS, CHRISTIAN ANTISEMITISM: A HISTORY OF HATE (Rowman & Littlefield Publishers 1993) (In the Middle Ages, "Jews were massacred and tortured, and soon whole Jewish populations were expelled from countries where they had long resided.").

Muslims view non-Muslims as infidels.[18]  Christians crusaded against Muslims.[19]  Conflict between Orthodox Jews and secular Jews in Israel begets harsh and uncivil acts.[20]  "And you shall hear of wars and rumors of wars."  *See Matthew* 24:6.  Truly a prescient prediction from 2,000 years ago.

Even poor old Abraham was shunned by his own family for believing in one God and rejecting the multiple gods of his fathers.[21]  His descendants, the cousins Moses, Jesus and Mohammed, would be perplexed by the blood spilled by their followers against each other.  "Jesus wept."  *See John* 11:35.

That violent history gives rise to the question: "Haven't we evolved?"  Other than size and longevity, the answer clearly is: "Of course not."  "The Beat Goes On."[22]

---

[18]PATRICIA CRONE, GOD'S RULE: GOVERNMENT AND ISLAM: SIX CENTURIES OF MEDIEVAL ISLAMIC POLITICAL THOUGHT 358 (Columbia Univ. Press 2004) ("Humans were divided in Muslims and infidels. . . . A Muslim was someone who surrendered to God and lived as His servant in a society based on His law. Infidels were rebels against God whose societies could never be more than the robbers' nests with which St. Augustine had compared kingdoms devoid of justice."); RONALD A. PACHENCE, INFIDELS: AN INTRODUCTORY DICTIONARY OF THEOLOGY AND RELIGIOUS STUDIES 630 (Orlando O. Espin and James B. Nickoloff, eds. 2007) ("Today, some Muslim extremists apply the term infidel to all non-Muslims, especially those living in the Western world.").

[19]KAREN ARMSTRONG, ISLAM: A SHORT HISTORY 93-95 (Modern Library 2000) ("[I]n July 1099, . . the Christian Crusaders from western Europe attacked Jerusalem, . . . [and] massacred its inhabitants. . . . The Crusades were disgraceful . . . [and] devastating for the Muslims of the Near East.").

[20]OREN YIFTACHEL, ETHNOCRACY: LAND AND IDENTITY POLITICS IN ISRAEL/PALESTINE 118 (Univ. of Pennsylvania Press, 2006) ("During the 1990s, greater tensions surfaced between Orthodox and secular Jews [in Israel]. [F]or most Orthodox individuals, the Jewish nature of the state is clearly superior to its Western or democratic orientation [and] Orthodox parties support the increasing imposition of religious (Halacha) rule in Israel."). *See also* Joel Greenberg, *Religious Limits on Women Spur Controversy in Israel*, WASH. POST (December 27, 2011), www.washingtonpost.com. ("A community of 86,000 . . . Beit Shemesh has a growing ultra-Orthodox population. The town has become a cauldron of tension. . . [because of] Israeli media reports about ultra-Orthodox Jews in the town who hounded local religious schoolgirls, spitting and hurling abuse at them for what they deemed insufficiently modest dress.").

[21]*Quran* 19: 43-48 ("He (the father) said: 'Do you reject my gods, 0 Abraham? If you stop not (this), I will indeed stone you. So get away from me safely before I punish you.' Abraham said: 'Peace be on you! I will ask Forgiveness of my Lord for you. Verily! He is unto me, Ever Most Gracious. And I shall turn away from you and from those whom you invoke besides Allah.'"). Abraham's parents "were likely to have been worshipers of the moon-god Sin and his daughter Inanna, the patron deities of the city of Ur. . . . [T]he family names show a fairly standard homage to the Akkadianl Sumerian pantheon. . . [including] the goddess Ningal [and] Sin's daughter Malkatu." SUSAN WISE BAUER, THE HISTORY OF THE ANCIENT WORLD: FROM THE EARLIEST ACCOUNTS TO THE FALL OF ROME 128 (W. W. Norton & Company 2007).

[22]Sonny & Cher, The Beat Goes On (ATCO Records, 1975).

<u>**The American Colonial Religious Experience**</u>

Those who immigrated to Texas were neither the first nor the last group to come to America in search of freedom from government-controlled religion.[23]  Before them came the Pilgrims persecuted by the government-controlled Church of England,[24] the French Protestant Huguenots persecuted by the French Catholic government of Louis XIV,[25] and the European Jews persecuted by European Christian governments.[26]  And, "[s]o it goes."[27]

They voted with their feet for separation of church and state by coming to the new world.  But old practices die hard, and the American colonists themselves established official government religions.[28]  For instance, the Rhode Island Charter of 1663 promised to "preserve unto [its inhabitants]

---

[23]LEWIS M. HOPPE AND MARK R. WOODWARD, RELIGIONS OF THE WORLD II (Prentice Hall, 7th ed. 1998).

[24]BERKIN ET AL., MAKING AMERICA: A HISTORY OF THE UNITED STATES Volume I: to 1877 62 (Wadsworth, 6th ed. 2011) (describing Pilgrim voyage to America in search of religious freedom); SMITH & BURNHAM, OUR BEGINNINGS IN EUROPE AND AMERICA: HOW CIVILIZATION GREW IN THE OLD WORLD AND CAME TO THE NEW 293-94 (John C. Winston Co. 1936) (explaining Pilgrims who became the first settlers in New England were Separatists driven to America by the persecution of the English government based on the Separatists' refusal to join the Church of England).

[25]JACKSON J. SPIEL VOGEL, WESTERN CIVILIZATION SINCE 1300 456 (Wadsworth, 8th ed. 2011) ("In October 1685, Louis issued the Edict of Fontainebleu,... provid[ing] for the destruction of Huguenot churches and the closing of Protestant schools. It is estimated that 200,000 Huguenots defied the prohibition against their leaving France and sought asylum in England, the United Provinces, and the German states."). *See also* Bertrand Van Ruymbeke, *From Ethnicity to Assimilation: The Huguenots and the American Immigration History Paradigm*, in FROM STRANGERS TO CITIZENS: THE INTEGRATION OF IMMIGRANT COMMUNITIES IN BRITAIN, IRELAND AND COLONIAL AMERICA 1550-1750 332 (Randolph Vigne and Charles Littleton, eds. 2001).

[26]ANTI-IMMIGRATION IN THE UNITED STATES: AN HISTORICAL ENCYCLOPEDIA 295 (Kathleen Arnold, ed. 2011) ("The history of Jewish immigration to the United States highlights America's legacy as a safe haven for the oppressed from around the world. . . . Jews were among the earliest European settlers to arrive in North America during the 17th century."); JAMES S. OLSON AND HEATHER OLSON BEAL, THE ETHNIC DIMENSION IN AMERICAN HISTORY (Wiley Blackwell, 4th ed. 2010) ("Toward the end of the seventeenth century, groups of persecuted Ashkenazi Jews immigrated from central and eastern Europe... . Some came to America, and by 1776 nearly 3,000 Jews resided in the colonies.").

[27]KURT VONNEGUT, JR., SLAUGHTERHOUSE-FIVE (Delacorte 1969).

[28]*See* RUSSELL FREEDMAN, IN DEFENSE OF LIBERTY: THE STORY OF AMERICA'S BILL OF RIGHTS 26 (Holiday House 2003) ("Many [early Americans] sailed to the New World to escape religious persecution in the Old. . . . And yet [m]ost of the early colonies established official government-sponsored churches, which all residents were

-9-

that liberty in the true Christian faith and worship of God,"[29] notwithstanding President George Washington's support of the Hebrew communities.[30]  Other Rhode Island laws restricted admission to the colony to those professing the Christian religion.[31]  Similar laws existed in Massachusetts[32] and New York.[33]  In Virginia in 1776, although it was declared "all men are equally entitled to the free exercise of religion, according to the dictates of conscience," it was also declared that "it is the mutual duty of all to practice Christian forbearance, love, and charity towards each other."[34]  In Maryland, which was originally settled as a safe haven for Catholics, a Protestant majority became dominant and persecuted and marginalized Catholic residents.[35]  Seventh-Day Adventists were similarly persecuted by the

---

required by law to support and attend.").

[29] SHELDON J. GODFREY AND JUDITH C. GODFREY, SEARCH OUT THE LAND: THE JEWS AND THE GROWTH OF EQUALITY IN BRITISH COLONIAL AMERICA 1740-186747 (McGill Queens Univ. Press 1995) ("[t]he Rhode Island charter of 1663 . . . made the colony undeniably Christian.").

[30] "All possess alike, liberty of conscience and immunities of citizenship . . . .  The Government of the United States which gives to bigotry no sanction to persecution no assistance . . . .  May the children of the stock of Abraham who dwell in this land continue to merit and enjoy the good will of the other inhabitants, while everyone shall sit in safety under his own vine and fig tree and there shall be none to make him afraid." George Washington's letter to the Hebrew Congregation of Newport Rhode island 1790.

[31] Id.

[32] The 1780 Massachusetts Constitution required certain public officeholders to recite an oath "declar[ing] [they] believe the Christian religion, and have a firm persuasion of its truth." FRANCIS NEWTON THORPE, THE FEDERAL AND THE STATE CONSTITUTIONS, COLONIAL CHAPTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 1908 (Washington Government Printing 1909).

[33] The 1777 New York State Constitution guaranteed free exercise of religion, but its laws required an oath for government office that excluded Roman Catholics. CONSTITUTIONAL DEBATES ON FREEDOM OF RELIGION 30 (John J. Patrick and Gerald P. Long, eds. 1999).

[34] THE FOUNDING FATHERS AND THE DEBATE OVER RELIGION IN REVOLUTIONARY AMERICA: A HISTORY IN DOCUMENTS 60 (Matthew L. Harris and Thomas S. Kidd, eds. 2012) (citing the Virginia Declaration of Rights of 1776).

[35] "The colonial history of Maryland is one of religious unrest between Catholics and Protestants. While the colony was settled as a safe haven for English Catholics, Protestants made up a large number of the initial settlers and soon were a majority." ENCYCLOPEDIA OF RELIGION IN AMERICAN POLITICS 155 (Jeffrey D. Schultz, et al., eds. 1999). When Protestants "took control of the colony, [they] disenfranchised Catholics." Id. See also THE ENDURING

majority for their beliefs.[36]

Recognizing the danger of the integration of church and state, Reverend Isaac Backus wrote in

1773:

> [W]here [church and state] and the weapons which belong to them are well distinguished and improved according to the true nature and end of their institutions, the effects are happy, and they do not at all interfere with each other. But where they have been confounded together no tongue nor pen can fully describe the mischiefs that have ensued of which the Holy Ghost gave early and plain warnings.[37]

### Government and Religion Joining Hands

One picture from the modern era speaks silently and poignantly of the danger of majoritarian

government and religion joining hands:[38]



---

VISION: A HISTORY OF THE AMERICAN PEOPLE Volume 1: to 1877 55 (Boyer et al., eds. 2011).

[36]Ronald Lawson, *Tensions, Religious Freedom, and the Courts: The Seventh-day Adventist Experience*, in RELIGION AND SOCIAL POLICY 73 (Paula D. Nesbitt, ed. 2001).

[37]Rev. Isaac Backus, *An Appeal to the Public for Religious Liberty*, 1773, in READINGS IN BAPTIST HISTORY: FOUR CENTURIES OF SELECTED DOCUMENTS 19 (Joseph Early, Jr., ed. 2008).

[38]David J.B. Trim, *The Christian Persecutory Impulse: Reformation, Tolerance, and Persecution*, LIBERTY, November/December 2011 (citing BPK Art Resources New York) (depicting Hitler greeting Reich Bishop Ludwig Muller and Abbott Albanus Schachleitner as honorary guests at the "Reich Party Rally for Unity and Strength" in 1934).

If government-run public schools also joined hands with religion and had the power to impose religious views, questions arise: Which holy books and prayers would be preferred? The Torah? The Book of Mormon? The Catholic Bible? The New Testament? The Bible as edited by Thomas Jefferson?[39]  The Quran? Would Christians be required to face Mecca or observe Hebrew prayer? Would Jews and Muslims be obligated to stand and recite the Lord's Prayer?

One need only look at the states of Israel and Iran to see the conflicts which arise when government and religion become closely intertwined.[40]

## The Debate Continues Through American History

"Leave the matter of religion to the family altar, the church, and the private school, supported entirely by private contribution. Keep the church and state forever separate."

–President Ulysses S. Grant[41]

"80 percent of the American people want Bible readings and prayer in the schools. . . . Why should the majority be so severely penalized by the protests of a handful?"

–Reverend Billy Graham[42]

[*With all due respect to Reverend Graham, it is the 20 percent who are protected by the Bill of Rights.*]

"Those who would renegotiate the boundaries between church and state must therefore answer

---

[39]THOMAS JEFFERSON, THE JEFFERSON BIBLE: THE LIFE AND MORALS OF JESUS OF NAZARETH: EXTRACTED TEXTUALLY FROM THE GOSPELS, TOGETHER WITH A COMPARISON OF HIS DOCTRINES WITH THOSE OF OTHERS (N.D. Thompson Publishing Co. 1902).

[40]*See generally* S.I. Strong, *Law and Religion in Israel and Iran: How the Integration of Secular and Spiritual Laws Affects Human Rights and the Potential for Violence*, 19 MICH. J. INT'L LAW 109 (1997).

[41]PHILIP HAMBURGER, SEPARATION OF CHURCH AND STATE 322 (Harvard Univ. Press 2004) (quoting President Ulysses S. Grant's 1875 speech given "to rally his troops for the coming election [and warn] of the danger of a second civil war").

[42]*Billy Graham Voices Shock Over Decision*, N.Y. TIMES  June 18, 1963, at 17.

a difficult question: Why would we trade a system that has served us so well for one that has served others so poorly?"

–Supreme Court Justice Sandra Day O'Connor[43]

"God and the Ten Commandments and school prayer have all been expelled from the public schools. Pass a constitutional amendment to allow voluntary prayer."

–Presidential Candidate Pat Buchanan[44]

"I'm a Catholic and I hope a devout one, but I think that the public school classroom is no place for me to try and impose my world formula for prayer on children who don't share it, and for that very reason, I don't want my children in a public school classroom to be exposed to someone else's religion or formula."

–Senator Philip A. Hart (D-Michigan)[45]

"We can change education in America if you put Christian principles in and Christian pedagogy in."

–Reverend Pat Robertson[46]

---

[43] *McCreary Cnty v. American Civil Liberties Union,* 545 U.S. 844, 882 (2005) (O'Connor, J., concurring).

[44] Pat Buchanan, Remarks at Bob Jones University (Sept. 18, 2000), available at Pat Buchanan on Education, http://www.issues2000.org/Celeb/Pat_Buchanan_Education.htm.

[45] R. MURRAY THOMAS, GOD IN THE CLASSROOM: RELIGION AND AMERICA'S PUBLIC SCHOOLS 125 (Praeger Publishers 2007) (quoting Senator Phillip A. Hart).

[46] JAMES W. FRASER, BETWEEN CHURCH AND STATE: RELIGION AND PUBLIC EDUCATION IN MULTICULTURAL AMERICA 187 (Palgrave MacMillan 2000) (quoting Pat Robertson on The 700 Club).

"When the government puts its imprimatur on a particular religion, it conveys a message of exclusion to all those who do not adhere to the favored beliefs. A government cannot be premised on the belief that all persons are created equal when it asserts that God prefers some."

–Supreme Court Justice Harry Blackman[47]

"As many of you know, I strongly support an amendment that will permit our children to hold prayer in our schools. The amendment would allow communities to determine for themselves whether voluntary prayer should be permitted in their public schools."

–President Ronald Reagan[48]

### **The United States Has No King: The People Are Sovereign**

The Constitution invokes, and is based upon, the people as having ultimate sovereignty and power over the three branches of government through the electoral and amendment processes vested in them. That power, for example, has been exercised to allow women to vote, to prohibit, and then allow, liquor and to limit the President of the United States to two terms.[49]

The people could exercise that same power to amend the Constitution to favor a particular religion, to turn the United States into a religious theocracy such as Israel or Iran or to suppress religion as in the Soviet Union,[50] China[51] or Cambodia under the Khmer Rouge.[52]

---

[47]*Lee v. Weisman*, 505 U.S. 577, 606-07 (1992) (Blackmun, J., concurring).

[48]Ronald Reagan, Radio Address to the Nation on Domestic Social Issues (Jan. 22, 1983), available at Ronald Reagan Presidential Library Archives, Http://www.reagan.utexas.edu/archives/speeches/1983/12283a.htm.

[49]U.S. CONST. amend. XIX ("The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex."); *id*. at amend. XVIII (prohibiting "manufacture, sale, or transportation of intoxicating liquors"); *id*. at amend. XXI (repealing amend. XVIII); *id*. at amend. XXII (setting term limits for persons elected to the office of the President).

[50]*See generally* CHRISTOPHER MARSH, RELIGION AND THE STATE IN RUSSIA AND CHINA: SUPPRESSION, SURVIVAL AND REVIVAL (Continuum Int'l Publishing 2011). *See also* RELIGIOUS POLICY IN THE SOVIET UNION 4 (Sabrina Petra Ramet, ed. 1993) ("A fundamental tenet of Marxism-Leninism is that religion will ultimately

Thus far, that power has not been exercised in such a manner, and this Court's obligation is to follow the Constitution as written, as intended by the Framers and as interpreted by the Supreme Court of the United States.

### Original Intent of the Framers of the United States Constitution

### History and Tradition

Reasonable minds differ on the Constitution as a living, evolving document or one to be interpreted strictly as the Framers originally intended.[53]  Some issues not foreseen by the leaders of an agrarian slave holding nation do not lend themselves to providing insight into the intent of those authors.

Religion though and its relationship to government was one on which the Founders did speak clearly and is a part of the history and tradition of our constitutional republic. Having witnessed and learned from the bloodshed and persecution of European church-state partnerships the Founders wrote:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.[54]

---

disappear. If it began to seem unlikely to do so, the authorities would naturally adopt measures to promote its disappearance, since its continued presence was a rebuke to the claims of the ideology.").

[51]FENNANG, YANG, RELIGION IN CHINA: SURVIVAL & REVIVAL UNDER COMMUNIST RULE 6 (Oxford Univ. Press 2011) ("China went even further, experimenting with a ban on all religions for more than a decade. Despite the best efforts of the Party-state, religion survived. The Chinese government has also failed to keep religion at a reduced level during the reform era since 1979. All kinds of religions are thriving in China today.").

[52]Jeffrey Haynes, *Conflict, Conflict Resolution and Peace-Building: The Role of Religion in Mozambique, Nigeria and Cambodia*, Vol. 47, No. 1 COMMONWEALTH AND COMP. POL. 52, 68 (2009) (explaining how the Khmer Rouge regime of the 1970's "tried energetically to exterminate religion in the country . . . while killing millions of Cambodians as a central facet of state policy.").

[53]*Considering the Role of Judges Under the Constitution of the United States: Hearing Before the Sen. Comm. on the Judiciary*, 112th Cong. 20-21(2011) (statements of Supreme Court Justices Scalia and Breyer).

[54]U.S. CONST. amend. I.

Known as the Father of the Constitution, James Madison expressed his intent this way:

> Whilst we assert for ourselves a freedom to embrace, to profess, and to observe the religion which we believe to be of divine origin, we cannot deny an equal freedom to those whose minds have not yet yielded to the evidence which has convinced us. If this freedom be abused, it is an offense against God, not against man.[55]

In an 1802 letter to members of the Danbury Baptist Association, Thomas Jefferson wrote:

> Believing with you that religion is a matter which lies solely between man and his God, that he owes account to none other for his faith or his worship, that the legitimate powers of government reach actions only, and not opinions, I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should "make no law respecting an establishment of religion, or prohibiting the free exercise thereof," thus building a wall of separation between Church and State. Adhering to this expression of the supreme will of the nation in behalf of the rights of conscience, I shall see with sincere satisfaction the progress of those sentiments which tend to restore to man all his natural rights, convinced he has no natural right in opposition to his social duties.[56]

Mr. Jefferson reaffirmed his intent in an 1822 letter: "And a strong proof of the solidity of the primitive faith, is its restoration, as soon as a nation arises which vindicates to itself the freedom of religious opinion, and its external divorce from the civil authority."[57]

Similarly, in 1817, John Adams wrote to Thomas Jefferson, warning of the dangers of state religion:

> Oh! Lord! Do you think a Protestant Popedom is annihilated in America? Do you recollect, or have you ever attended to the ecclesiastical strifes in Maryland Pennsylvania, New York, and every part of New England? What a mercy it is that these People cannot whip and crop, and pillory and roast, as yet in the U.S.! If they could they would. . . . Quakers, Anabaptists, Moravians, Swedenborgians, Methodists, Unitarians,

---

[55] James Madison, *Memorial and Remonstrance Against Religious Assessments*, in THE AMERICAN CONSTITUTIONAL EXPERIENCE: SELECTED READINGS & SUPREME COURT 151 (Curry et al., eds. 2000).

[56] THE WRITINGS OF THOMAS JEFFERSON: BEING HIS AUTOBIOGRAPHY, CORRESPONDENCE, REPORTS, MESSAGES, ADDRESSES, AND OTHER WRITINGS, OFFICIAL AND PRIVATE Vol. VIII 113 (H.A. Washington, ed. 1854).

[57] THE LIFE AND SELECTED WRITINGS OF THOMAS JEFFERSON 703 (Adrienne Koch & William Peden, eds. 1972).

Nothingarians in all Europe are employing underhand means to propagate their sectarian Systems in these States.

The multitude and diversity of them, you will say, is our security against them all. God grant it. But if we consider that the Presbyterians and Methodists are far more numerous and the most likely to unite; let a George Whitefield arise, with a military cast, like Mahomet, or Loyola, and what will become of all the other Sects who can never unite?[58]

Benjamin Franklin also expressed a desire for separation of church and state, writing in 1780:

When a Religion is good, I conceive that it will support itself; and, when it cannot support itself, and God does not take care to support, so that its Professors are oblig'd to call for the help of the Civil Power, it is a sign, I apprehend, of its being a bad one. But I shall be out of my Depth, if I wade any deeper in Theology.[59]

Thomas Paine likewise called for this separation, explaining "To God, and not to man, are all men accountable on the score of religion."[60] To Paine, "[p]ersecution is not an original feature in any religion; but it is always the strongly-marked feature of all law-religions, or religions established by law."[61]

The Framers' own religious beliefs were quite diverse. According to Arthur Schlesinger, Jr.:

George Washington was a nominal Anglican who rarely stayed for Communion. John Adams was a Unitarian, which Trinitarians abhorred as heresy. Thomas Jefferson, denounced as an [A]theist, was actually a [D]eist who detested organized religion and who produced an expurgated version of the New Testament with the miracles eliminated. Jefferson and James Madison, a nominal Episcopalian, were the architects

---

[58] THE WRITINGS OF THOMAS JEFFERSON: BEING HIS AUTOBIOGRAPHY, CORRESPONDENCE, REPORTS, MESSAGES, ADDRESSES, AND OTHER WRITINGS, OFFICIAL AND PRIVATE Vol. VII 69 (H.A. Washington, ed. 1854).

[59] THE PAPERS OF BENJAMIN FRANKLIN 389-90 (Barbara Oberg, ed. 1997).

[60] ALFRED OWEN ALDRIDGE, THOMAS PAINE'S AMERICAN IDEOLOGY 87 (Associated Univ. Press 1984) (describing Thomas Paine's address as "a fundamental statement on the doctrine of the separation of church and state").

[61] THOMAS PAINE, RIGHTS OF MAN: BEING AN ANSWER TO MR. BURKE'S ATTACK ON THE FRENCH REVOLUTION Vol. 181 (J.S. Jordan, ed. 1791).

of the Virginia Statute of Religious Freedom. James Monroe was another Virginia Episcopalian. John Quincy Adams was another Massachusetts Unitarian.[62]

### American Legal History

The United States Supreme Court recently surveyed significant historical events relevant to the development of First Amendment jurisprudence in our country, noting that "[c]ontroversy between church and state . . . is hardly new."[63] Indeed, legal controversy concerning the promotion and support of a particular religious viewpoint in public schools dates back to as early as 1890, when the Wisconsin Supreme Court grappled with the issue of whether public school teachers should be permitted to read to students from the Bible as a textbook. *State ex rel. Weiss v. District Bd.*, 44 N.W. 967 (1890). In concluding that such reading of the Bible was prohibited, the court wrote:

> The priceless truths of the Bible are best taught to our youth in the church, the Sabbath and parochial schools, the social religious meetings, and, above all, by parents in the home circle. There, these truths may be explained and enforced, the spiritual welfare of the child guarded and protected, and his spiritual nature directed and cultivated, in accordance with the dictates of the parental conscience. The constitution does not interfere with such teaching and culture. It only banishes theological polemics from the district schools. It does this, not because of any hostility to religion, but because the people who adopted it believed that the public good would thereby be promoted, and they so declared in the preamble. Religion teaches obedience to law, and flourishes best where good government prevails. The constitutional prohibition was adopted in the interests of good government; and it argues but little faith in the vitality and power of religion to predict disaster to its progress because a constitutional provision, enacted for such a purpose, is faithfully executed.

*Id*. at 976.

---

[62]JAMES LARUE, THE NEW INQUISITION: UNDERSTANDING AND MANAGING INTELLECTUAL FREEDOM CHALLENGES 9 (Libraries Unlimited 2007) (citing Arthur Schlesinger, Jr.). See also Separation of Church and State, http://www.theocracywatch.org/separationchurch_state2.htm.

[63]*See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 182 (2012) (describing religious controversy pertaining to the Magna Carta, the English monarchy, the escape of Puritans to New England, religious establishment in the colonies, and the drafting of the First Amendment).

Though the court's holding in *Weiss* was based on the Wisconsin state constitution, the underlying principles espoused in that early decision remained relevant in later federal cases challenging religious practices in public schools. The early 1960's brought two landmark Establishment Clause decisions by the Supreme Court of the United States. First, in 1962, the Court held a public school district's practice of daily classroom invocation of God's blessings as prescribed in a prayer promulgated by its Board of Regents was an impermissible use of the public school system inconsistent with the Establishment Clause. *Engel v. Vitale*, 370 U.S. 421, 424-425 (1962). Then, in 1963, when parents like Madalyn Murray O'Hair[64] objected to a public school's practice of requiring Bible reading at the opening of the school day and recitation of the Lord's Prayer by the students in unison, the Court held such practices violated the Establishment Clause. *School Dist. of Abington Twp. v. Schempp*, 374 U.S. 203, 223 (1963).

In the half century that has passed since these important decisions, the Supreme Court of the United States and the Court of Appeals for the Fifth Circuit have attempted to more clearly define the contours of the Establishment Clause as it relates to prayer in public schools, and more specifically, as it relates to prayer at graduation. In *Lee v. Weisman*, 505 U.S. 577, 587, (1992), the Court granted permanent injunctive relief to prevent the inclusion of clergy-led invocations in the form of prayer in graduation ceremonies of city public schools. That same year, the Court of Appeals for the Fifth Circuit held student-led prayer that was approved by a vote of the students and was non-sectarian and non-proselytizing was permissible at high school graduation ceremonies. *Jones v. Clear Creek Indep.*

---

[64]Madalyn Murray O'Hair was the leader of the American Atheist movement. JAMES S. OLSON, HISTORICAL DICTIONARY OF THE 1960S 349 (Greenwood Publishing 1999). She opposed the practice of mandatory prayers in public schools, and in the 1962 case of Engel v. Vitale, "the Supreme Court essentially agreed with O'H[air]'s position." Id. The "decision. . . made Madalyn Murray [O"]Hair], in the words of one journalist, '[t]he most hated woman in America.'" *Id. See also* BRYAN F. LE BEAU, THE ATHEIST: MADALYN MURRAY O'HAIR 2 (N.Y.U. Press 2003) ("O'Hair became American [A]theism's leading proponent, educator, spokesperson, and symbol.").

*Sch. Dist.*, 977 F.2d 963, 969 (5th Cir. 1992). Other Fifth Circuit cases relied on *Jones* for similar

holdings. *See Ingebretsen on Behalf of Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274 (5th Cir.

1996). However, in *Santa Fe Independent School District v. Doe*, 530 U.S. 290, 310-12 (2000), the

Supreme Court granted injunctive relief to prevent the inclusion of student-led prayer invocations before

football games at Texas public schools. *Sante Fe* has been interpreted as implicitly overruling the Fifth

Circuit's *Jones* decision to the extent that it approves a majoritarian election on prayer. *See Does 1-7

v. Round Rock Indep. Sch. Dist.*, 540 F. Supp. 2d 735, 747-50 (W.D. Tex. 2007).

Courts outside of the Fifth Circuit have provided further guidance. *See Lassonde v. Pleasanton

Unified Sch. Dist.*, 320 F.3d 979, 983-85 (9th Cir. 2003) (ruling that school could not constitutionally

allow student who was selected as graduation speaker based on his academic standing to give

proselytizing religious speech at graduation); *Deveney v. Board of Educ.,* 231 F. Supp. 2d 483, 485-88

(S.D. W. Va. 2002) (issuing TRO against offering of prayer by student at graduation pursuant to vote

of student class officers); *Skarin v. Woodbine Cmty. Sch.*, 204 F. Supp. 2d 1195, 1198 (S.D. Iowa 2002)

(issuing injunction prohibiting school choir from singing Lord's Prayer at graduation ceremony);

*Appenheimer v. School Bd.,* No. 01-1226, 2001 WL 1885834, at *69 (C.D. Ill. May 24, 2001) (issuing

TRO against offering of prayer by student at graduation pursuant to vote of senior class student board);

*Cole v. Oroville Union High Sch. Dist.*, 228 F.3d 1092, 1101-03(9th Cir. 2000) (ruling that sectarian

and proselytizing valedictory speech at graduation would violate the Establishment Clause); *ACLU v.

Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1488 (3d Cir. 1996) (en banc) (invalidating school

policy under which prayers could be given at graduations if approved by student vote).

-20-

III.
**The Current Case Before the Court and Recent Developments in Church-State Law**

The Court finds the issues before it can be distilled as follows:

1.       Exposure v. coercion.

2.       Is *Roake v. Brumley*, 756 F. Supp. 3d 93, 119 (M.D. La. 2024), *aff'd* 141 F.4th 614 (5th Cir. 2025), *motion for rehearing en banc* filed on June 27, 2025, binding on this Court?

The document at the center of this dispute is popularized in the imagination by Rembrandt Harmenszoon von Rijn,[65] Cecil B. DeMille,[66] and Charlton Heston:

     

Parents and religious leaders, individually and on behalf of their minor children, bring this action against certain school districts in Texas asserting facial challenges under the Establishment Clause and the Free Exercise Clause to Senate Bill No. 10 ("S.B. 10" or the "Act"), the Texas statute requiring the display of a specific version of the Ten Commandments in public school classrooms.

Plaintiffs filed a motion for preliminary injunction to enjoin enforcement of the statute and displays of the Ten Commandments in the classrooms.  School districts represented by the Texas

---

[65](1606-1669).

[66](1881-1959) The Ten Commandments is an epic American religious drama film produced, directed and narrated by Cecil B. DeMille and released by Paramount Pictures on November 8, 1956. Https://www.cecilbdemille.com.

Attorney General's Office ("the Government schools") move to dismiss Plaintiffs' complaint for lack of subject matter jurisdiction and failure to state a claim. The Court held a hearing on August 15, 2025, and August 18, 2025.

Before turning to the posting of Ten Commandments displays in school classrooms, the Court notes that jurisprudential themes can be gleaned from the Supreme Court in early school prayer decisions. As discussed above, the Supreme Court struck the recitation of the Regents' Prayer in public schools in 1962. *Engel v. Vitale*, 370 U.S. 421 (1962). And, the Supreme Court struck down Bible reading and the recitation of the Protestant version of the Lord's Prayer in public schools in 1963. *Abington Sch. Dist. v. Schempp*, 374 U.S. 203 (1963).

Additionally, the Supreme Court has held that the posting of the biblical Ten Commandments on a public school wall is unconstitutional. The Supreme Court in *Stone v. Graham*, 449 U.S. 39 (1980), held that a Kentucky statute requiring such posting violated the Establishment Clause of the First Amendment because the law had no secular legislative purpose. The statute also provided that each of the required 16 by 20 inch copies of the Ten Commandments was to bear a notation in small print stating that the secular application of the Ten Commandments could be clearly seen in its adoption as the fundamental legal code of western civilization and the common law of the United States. *Stone v. Graham*, 599 S.W.2d 157, 159 & n.1 (Ky. 1980). The statute further provided that the posted copies were to be purchased with private voluntary contributions. *Id.*

The Supreme Court concluded that the statute was unconstitutional, notwithstanding the requirement of the notation concerning secular application of the Commandments and the provision for voluntary private financing. *Stone*, 449 U.S. at 41. The preeminent purpose for posting the Ten Commandments on schoolroom walls, said the Court, was plainly religious in nature. *Id.* The Court

reasoned that the Ten Commandments were undeniably a sacred text in the Jewish and Christian faith, and that no legislative recitation of a supposed secular purpose could blind the Court to that fact. *Id.* The Commandments, observed the Court, did not confine themselves to arguably secular matters, such as killing or murder, since the first few Commandments concerned the religious duties of believers: worshiping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath day. *Id.* at 41-42 (citing portions of the Bible). The Court explained that this was not a case in which the Ten Commandments were integrated into the school curriculum, or where the Bible could constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion or the like. *Id.* at 43. The Court also concluded that it was not significant that the Bible verses involved in this case were merely posted on the wall, rather than read aloud, and that it was no defense to urge that the religious practices here might be relatively minor encroachments on the First Amendment. *Id.*

Recently, in *Brumley*, 141 F.4th at 614, the Fifth Circuit struck down a Louisiana statute requiring public schools to display a specific Protestant version of Ten Commandments in public school classrooms, along with a context statement. The Plaintiffs, parents and minor public school children, alleged: (1) there was no broader tradition of using the Ten Commandments in public school education at time of the Founding or incorporation of the First Amendment, (2) the statute was discriminatory because it failed to select a version of Ten Commandments without regard for belief, and (3) the display requirement was coercive because the parents by law were required to send their minor children to school and ensure their regular attendance. *Id.*

There, as here, Plaintiffs filed a motion for preliminary injunction and Defendants filed a motion to dismiss under Rules 12(b)(1) and 12(b)(6). *Brumley*, 756 F. Supp. 3d at 112, 148. The district court in *Brumley* held that Plaintiffs' facial constitutional challenges were fit for judicial decision, as an

element for ripeness, though no students had yet seen the Ten Commandments displays; Plaintiffs stated a claim that the statute violated the Establishment Clause, as being inconsistent with broader historical tradition; and Plaintiffs sufficiently alleged a lack of narrow tailoring as an element for stating a claim for violation of the Free Exercise Clause. *Id.* at 171, 176, 188-91, 208-09, 211, 214. The motion to dismiss was denied, and the motion for preliminary injunction was granted. *Id.* at 219.

The Fifth Circuit affirmed the district court. *Brumley*, 141 F.4th at 626. Specifically, the Fifth Circuit found that Plaintiffs' claims were ripe, the Ten Commandments display required by the Louisiana statute qualified as a religious display, Plaintiffs had Article III standing, Plaintiffs stated a claim for violation of the Establishment Clause under *Stone* and the standard in *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022). *Id.* In affirming the denial of defendants' motion to dismiss, the Fifth Circuit also held that Louisiana's Ten Commandments statute was coercive and facially violated the Establishment Clause as being inconsistent with broader historical tradition. *Id.* The Fifth Circuit also found that Plaintiffs had a substantial likelihood of success on the merits of their Establishment Clause claims which favored a preliminary injunction. *See id.* at 649.

Because this Court must follow *Brumley*,[67] and given that this case is in the same procedural posture as was *Brumley*, the Court begins with a comparison between the Louisiana statute (sometimes "H.B. 71") and the Texas statute, S.B. 10. The Court then turns to the motions to dismiss and for preliminary injunction.

Moreover, a federal district court in Arkansas recently issued a preliminary injunction prohibiting the school district defendants from implementing a state law requiring all public schools to permanently display the Ten Commandments in every classroom and library. *Stinson v. Fayetteville*

---

[67] *United States v. Vega*, 960 F.3d 669, 675 (5th Cir. 2020).

*Sch. Dist. No. 1*, Case No. 5:25-CV-5127, 2025 WL 2231053 (W.D. Ark. Aug. 4, 2025).  The analysis in *Stinson* is also instructive.

<u>The Texas and Louisiana Ten Commandments Statutes</u>

The Texas and Louisiana statutes require the display of the same specific version of the Ten Commandments in public school classrooms.  The text shall read:

The Ten Commandments

I AM the LORD thy God.

Thou shalt have no other gods before me.

Thou shalt not make to thyself any graven images.

Thou shalt not take the Name of the Lord thy God in vain.

Remember the Sabbath day, to keep it holy.

Honor thy father and thy mother, that thy days may be long upon the

land which the Lord thy God giveth thee.

Thou shalt not kill.

Thou shalt not commit adultery.

Thou shalt not steal.

Thou shalt not bear false witness against thy neighbor.

Thou shalt not covet thy neighbor's house.

Thou shalt not covet thy neighbor's wife, nor his manservant, nor

his maidservant, nor his cattle, nor anything that is thy

neighbor's.

*Brumley*, 141 F.4th at 626-27; (S.B. 10 [docket no. 14-1] at page 2).

Both statutes provide that  the Ten Commandments displays must be posted in each classroom in each public school, on a poster or framed document, in a conspicuous place, in a large, easily readable font.

Both statutes also provide that school districts are not required to pay for the displays, but they may elect to do so, or instead accept donated displays.

Yet, there are differences.  The Louisiana statute required that the Ten Commandments displays be a minimum of 11 by 14 inches, while the Texas displays must be at least 16 by 20 inches.

The Louisiana law also tasked each governing authority with adopting rules and regulations to ensure the statute's proper implementation.  *Brumley*, 141 F.4th at 627.  Texas has no such requirement.

The Louisiana statute further required that the Ten Commandments be displayed with an accompanying context statement that purported to explain the historical relevance and use of the Ten Commandments.  *Brumley*, 756 F. Supp. 3d 93, 113 (M.D. La. 2024).  S.B. 10 does not include a similar provision.

Finally, the Texas statute provides that "[t]he attorney general shall defend a public elementary or secondary school in a cause of action relating to any claims arising out of a school's compliance" with the Act.  (PI Appx. [docket no. 4-1] at page 4).  "In a cause of action defended by the attorney general under this subsection, the state is liable for the expenses, costs, judgments, or settlements of the claims arising out of the representation."  (*Id.*).  The Louisiana statute had no such provision.

### Motion to Dismiss for Lack of Subject Matter Jurisdiction

The Government schools move to dismiss under Rule 12(b)(1), contending this Court lacks subject matter jurisdiction.  Plaintiffs, "as the party asserting jurisdiction," bear the burden of proof. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

-26-

The Government schools argue Plaintiffs cannot satisfy standing and ripeness because none of the Plaintiffs currently have any information, nor have they alleged any, regarding how, when or even if the Ten Commandments may be displayed.  The Fifth Circuit rejected these arguments in *Brumley*, 141 F.4th at 629-38; *see also id.* at 649-53 (Dennis, J., concurring).

The Government schools suggest this Court should reach a different result because, unlike the Ten Commandments display law at issue in *Brumley*, S.B. 10 does not state that it will be displayed for historical reasons.  They imply the absence of this evidence is fatal to subject matter jurisdiction because the Court cannot answer why the Ten Commandments are to be displayed.

Like *Brumley*, Plaintiffs' suit targets the state statute's 'minimum requirements, which reflect 'when, where, or under what circumstance[s]' the Ten Commandments are to be displayed." 141 F.4th at 630; *see also* (PI Motion [docket no. 3] at page 6) (challenging minimum requirements of S.B. 10).  S.B. 10 provides:

* *What will be displayed?*  "The text of the Ten Commandments"–the exact version of which is provided by the statute;

* *How will it be displayed?*  As a "poster or framed document" that is at least 16 by 20 inches and printed in a size and typeface that is legible to every person with average vision;

* *When will it be displayed?*  No later than September 1, 2025, and for the duration of the entire school year; and

* *Where will it be displayed?*  In every Texas public school classroom, regardless of class subject matter, student age, or student grade, in a "conspicuous place" where it can be seen by every person in the classroom.

Although S.B. 10 does not state why the Ten Commandments will be displayed, the text of the Act provides sufficient information "for a fact-intensive and context-specific analysis" regarding several aspects of the displays.  *See Brumley*, 141 F.4th at 630.  "This case is not like *Staley* where 'no decision

ha[d] been made regarding *any* aspect of the future display of the [stored] monument.'" *Id.* (quoting *Staley v. Harris County*, 485 F.3d 305, 307 (5th Cir. 2007)). Plaintiffs' claims are therefore "fit for judicial decision." *Id.* For these and the reasons set forth in *Brumley*, the Government schools' motion to dismiss for lack of subject matter jurisdiction is denied.

### Plaintiffs' Allegations

Plaintiffs subscribe to a wide range of religious and non-religious views including Unitarian Universalism, Judaism, Reform Judaism, Presbyterian Christianity, atheism, non-religiousness and agnostic atheism. They allege that the version of the Ten Commandments set out in Texas' Ten Commandments law differs from the version observed by some Protestant faiths, and most adherents of the Catholic and Jewish faiths. Plaintiffs further assert that many other religions do not regard the Ten Commandments as part of their belief systems at all.

Plaintiffs bring this suit alleging that S.B. 10's Ten Commandments displays violate the Establishment Clause and the Free Exercise Clauses of the First Amendment. (Compl. [docket no. 1] at ¶¶ 227-44). Suing on behalf of themselves and their minor children, who are enrolled in public schools operated by the Defendant school districts, the parent-Plaintiffs assert objections to S.B. 10 and identify harms that they and their children allegedly will suffer as a result of the statute. Plaintiffs assert the displays will: (1) forcibly subject the minor-child Plaintiffs to religious doctrine and beliefs in a manner that conflicts with their families' religious and non-religious beliefs and practices; (2) send a marginalizing message to the minor-child Plaintiffs and their families that they do not belong in their own school community because they do not subscribe to the state's preferred religious text; (3) religiously coerce the minor-child Plaintiffs by pressuring them to observe, meditate on, venerate, and follow the state's favored religious text, and by pressuring them to suppress expression of their own

-28-

religious or nonreligious beliefs and backgrounds at school; and (4) substantially interfere with the religious development of the minor-child Plaintiffs and threaten to undermine the beliefs, practices, and values regarding matters of faith the parents wish to instill in their children, thereby usurping the parents' authority to direct their children's religious education and religious or nonreligious upbringing.

Plaintiff Mara Nathan is Jewish. She is a rabbi at a San Antonio temple. Rabbi Nathan and her husband are raising their minor child, M.N., in the Jewish faith. On behalf of herself and on behalf of M.N., Rabbi Nathan objects to the school displays mandated by S.B. 10 because the displays will promote and forcibly impose on M.N. a specific version of the Ten Commandments to which the family does not subscribe, in a manner that is contrary to Jewish teachings and the family's faith. She alleges the version of the Ten Commandments does not align with her family's Jewish belief and tradition because:

*      The text required under S.B. 10 is not found in any Jewish tradition;

*      By directing, "I AM the LORD thy God," the first Commandment set forth in S.B. 10 also conflicts with the family's Jewish belief that God has no gender;

*      By summarizing some Commandments instead of including the text as found in the Torah in its entirety, S.B. 10's displays present a truncated, decontextualized, and inaccurate version of scripture; and

*      The displays mandated by S.B. 10 conflict with Jewish teachings that oppose proselytizing.

(Compl. [docket no. 1] at ¶¶ 86-91).

Plaintiffs Virginia Galaviz Eisenberg and Ron Eisenberg are Jewish and are raising their minor child, R.E., in the Jewish faith tradition. They are members of a local temple, where R.E. has attended religious school and participates in various other religious educational events and activities. On behalf of themselves and R.E., the Eisenbergs object to the school displays mandated by S.B. 10. The

-29-

minimum requirements set forth in S.B. 10 for the displays will render the displays unavoidable for

R.E., ensuring that R.E. will be subjected to the Ten Commandments every day, in every classroom,

throughout R.E.'s public-school education. The displays will impose on R.E. a Christian version of the

Ten Commandments in which the family does not believe.  Specifically, the Eisenbergs allege:

* The displays' first Commandment, "I AM the LORD thy God," eliminates an important part of the Hebrew text, which acknowledges God freeing the Israelites from slavery and the Commandments as a covenant between God and the Jewish people. This covenant is core to Jewish practice, and deleting it is deeply offensive to the Eisenbergs because it erases the Commandments' Jewish significance;

* S.B. 10's Commandment pertaining to the Sabbath leaves out Torah text that, the Eisenbergs believe, compels Jews to observe the Sabbath (Shabbat) from Friday evening through Saturday evening. This is a central Commandment for the family, and the version required by S.B. 10 misrepresents it; and

* Jewish faith tenets that oppose proselytizing are especially important for Jews, who have suffered persecution under governments that endorsed a dominant religion.

(Compl. [docket no. 1] at ¶¶ 96-100).

Plaintiffs Seth and Sarah Ettinger are Jewish and are raising their minor child, R.E., in the

Jewish faith tradition. Mr. Ettinger is the cantor at a synagogue in San Antonio. On behalf of themselves

and R.E., the Ettingers object to the school displays mandated by S.B. 10 because the displays will

promote and forcibly impose on R.E. a specific version of the Ten Commandments to which their

family does not subscribe, in a manner that is contrary to Jewish teachings and the family's faith.  The

Ettingers allege:

* S.B. 10's mandatory version of the Ten Commandments directs: "Thou shalt have no other gods before me." From a Jewish perspective, the use of the word "before" in this Commandment is highly problematic. In the Hebrew Bible, the translated text directs followers to "Have no other god but me." The Christian interpretation of this Commandment recited in S.B. 10 suggests that all gods recognized before Christianity's recognition of the Christian God–including the Jewish God of the Torah–are invalid;

&ast; Another theologically significant example of differences in wording between the Torah's and S.B. 10's versions of the Ten Commandments can be found in S.B. 10's directive that "Thou shalt not kill." In Jewish doctrine, this Commandment centers on the concept of "murder," not killing. The Ettingers believe that the former speaks to intent and is a more nuanced understanding of what it means to cause a death in a manner that is religiously forbidden;

&ast; By using Old English terminology, such as "manservant" and "maidservant," S.B. 10's version of the Ten Commandments conflicts with the egalitarian Jewish values that the Ettingers follow and teach R.E. This language suggests an endorsement of slavery, while the text's prohibition on coveting "thy neighbor's wife" and its demand that students "honor thy mother and father" buy into discriminatory gender roles and exclude families that may have same-sex parents. It is precisely because outdated language and provisions in any version or translation of scripture could be misunderstood to convey messages antithetical to the present-day religious community that the Ettingers believe (and their religious practice requires) that R.E.'s religious education should occur at home and in their faith community, where they can contextualize and ground scriptural instruction in their core Jewish values.

(*Id.* at ¶¶ 107-112).

Plaintiff Elizabeth Lemaster is Christian and is raising her minor children, K.L. and L.L., in a Christian household and tradition. Ms. Lemaster and her children regularly attend church, and K.L. and L.L. attend Sunday School classes. In addition, Ms. Lemaster and her husband provide K.L. and L.L. with religious education at home. On behalf of herself and on behalf of K.L. and L.L., Ms. Lemaster objects to the school displays mandated by S.B. 10 because the displays will forcibly subject K.L. and L.L. to religious instruction that she believes she and her husband should oversee and guide.

Ms. Lemaster worries about how the Ten Commandments displays will be interpreted and explained to K.L. and L.L., and she is concerned about the appropriateness of the displays for her young children:.

&ast; The displays will include references to "adultery" and "coveting" a neighbor's "manservant" or "maidservant." Ms. Lemaster believes that K.L. and L.L. are too young to understand what these references mean, and she does not want her children to be forcibly exposed to, or instructed on, these concepts at school. Rather, Ms. Lemaster and

her husband want to teach K.L. and L.L. about these concepts according to their faith and when they believe the children are ready;

*   The displays' references to "manservants" and "maidservants" convey that people can be treated as property, which Ms. Lemaster and her husband strongly disagree with as a matter of faith. Ms. Lemaster believes, and is teaching K.L. and L.L., that all people are equal and should be treated as such. Ms. Lemaster does not want K.L. and L.L. subjected to contrary messaging or instruction in school; and

*   Putting up the version of the Ten Commandments required by S.B. 10 will send a discriminatory and exclusionary message to students, including K.L. and L.L., who do not believe in the religious dictates that will be featured in the displays. The displays will signal to K.L. and L.L. that they are "bad" if they do not believe in and comply with the promoted religious beliefs. This, in turn, could lead to peer-to-peer harassment and proselytization of K.L. and L.L. because they hold different religious beliefs from the ones preferred by the state.

(*Id.* at ¶¶ 118-23).

Plaintiff Carah Helwig is agnostic and is raising her minor children, J.P. and T.P., with the space and autonomy to develop their own beliefs and views about religion. Ms. Helwig and her husband discuss religion generally if J.P. and T.P. ask questions, but the family does not consistently observe or adhere to any religious text, practice, or ritual. On behalf of herself and on behalf of J.P. and T.P., Ms. Helwig objects to S.B. 10 because the required displays will promote and forcibly subject J.P. and T.P. to religious scripture that the family does not believe in and that Ms. Helwig does not teach her children. (Compl. [docket no. 1] at ¶¶ 124-28).

Plaintiffs Alyssa Martin and Cody Barker are atheists and are raising their minor child, H.B.M., in a nonreligious household and tradition. Ms. Martin and Mr. Barker allow H.B.M. to independently develop decisions on religious matters and do not want H.B.M.'s public school to interfere with those decisions. On behalf of themselves and on behalf of H.B.M., Ms. Martin and Mr. Barker object to S.B. 10 because the required displays will promote and forcibly subject H.B.M. to religious scripture that

their family does not subscribe to. Specifically, Ms. Martin and Mr. Barker believe that the displays will impose one set of religious values and beliefs on H.B.M. over their family's values, which include the importance of personal freedom in matters of religion. (*Id.* at ¶¶ 130-35).

Plaintiff Lauren Erwin is Reform Jewish and is raising her minor child, M.E., in the same tradition. They are members and attenders of a local temple, where M.E. receives religious education. On behalf of herself and on behalf of M.E., Ms. Erwin objects to the school displays mandated by S.B. 10 because the displays will promote and forcibly impose on M.E. a Christian version of the Ten Commandments that does not align with the Jewish teachings and values she seeks to instill in M.E. She alleges:

> \* The text of the Ten Commandments set forth in S.B. 10 does not match the text in the Torah. By tearing the Ten Commandments out of their original Jewish context, the displays will, from Ms. Erwin's perspective as a Jewish person, present an inaccurate and incomplete version of scripture. The version of the Commandments required by S.B. 10 also intentionally eliminates specifically Jewish beliefs.

(*Id.* at 136-37).

Plaintiffs James Griffin Martin and Abigail Martin are Baptists and are raising their minor children, J.M. and B.M., in the Baptist tradition. Reverend Martin is Senior Pastor at a local Baptist church. J.M. and B.M.'s religious education in Christianity has occurred primarily through the Martins, and through their church and faith community. J.M. and B.M. attend church weekly and attend youth camps through their church. On behalf of themselves, and on behalf of J.M. and B.M., the Martins object to the school displays mandated by S.B. 10 because the displays will: promote and will forcibly subject their children to religious doctrine in a manner that violates the family's religious beliefs and practices; usurp the Martins' parental role in directing their children's religious education, religious values, and religious upbringing; send an improper message to the Martins, their children, and their

community that people of some religious denominations or faith systems are superior to others; and

pressure their children to doubt and suppress their own religious beliefs.  The Martins allege:

      \*        While the Ten Commandments are a sacred text in the Baptist faith, the version required by S.B. 10 does not align with the Baptist values the Martins are teaching J.M. and B.M. The text in the Act is antiquated, treats some people as property, and includes patriarchal and gendered language—all of which conflict with the Martins' Baptist beliefs, which value equality and respect for all people;

      \*        Furthermore, the Ten Commandments on their own do not sum up the Martins' Baptist faith, and having them posted in a public school undermines what they are teaching their children about Christianity. The Martins believe that scripture, including the Ten Commandments, must be taught—especially to children—within the context of a family's church and particular faith tradition. Learning about and navigating scripture within the context of their faith is critical to ensuring that the children's understanding of religious texts aligns with the Martins' Baptist teachings, religious beliefs, and values;

      \*        One may think that the Commandment not to take the Lord's name in vain means to not say "God damn it." However, Pastor Martin's interpretation–and how he teaches this Commandment to his congregation–is that it is about living a life that is centered on the values of God, such as welcoming the stranger, caring for the needy, feeding the hungry, healing the sick, sheltering the unhoused, sharing resources, and loving all; and

      \*        Baptist faith tenets oppose the imposition of religious doctrine in schools and counsel instead that it be taught at church and within the family. Indeed, separation of church

             and state is a core Baptist principle and one of the Four Fragile Freedoms of the Baptist tradition.

(Compl. [docket no. 1] at ¶¶ 144-47).

      Plaintiffs Rebekah and Theodore Lowe are an interfaith couple who are raising their minor

children, E.R.L. and E.M.L., with a combination of Christian beliefs and Jewish cultural traditions. Ms.

Lowe was raised in multiple Christian traditions and is now affiliated with the Presbyterian Church

U.S.A., while Mr. Lowe is religiously agnostic and culturally Jewish. E.R.L. and E.M.L. identify as both

Christian and Jewish. Ms. Lowe oversees curriculum development for a church-resource organization

that sells Sunday School curricula, liturgy writing, and other materials used by faith leaders. As part of this work, Ms. Lowe creates resources focused on empowering Christian faith leaders to be inclusive, so that people who traditionally have been excluded and harmed by Christian practices can find belonging. Ms. Lowe's background in religious education informs how she and her husband teach and guide their children on religious matters.  On their own behalf, and on behalf of E.R.L. and E.M.L., the Lowes object to the displays required by S.B. 10 because the displays will promote and forcibly subject E.R.L. and E.M.L. to overtly religious classroom content in a manner that violates the Lowes' religious, spiritual, and moral beliefs and practices.  In religious discussions with E.R.L. and E.M.L, Ms. Lowe uses "The Inclusive Bible: First Egalitarian Translation," which refrains from using gendered language to discuss God and highlights the role of women in the Bible. It is important to Ms. Lowe that the children are taught an expansive image of God and the divine, one that includes everyone.  (*Id.* at ¶¶ 152-55).

Plaintiff Marissa Norden is Jewish  and Plaintiff Wiley Norden is nonreligious. They are raising their minor children, A.N. and E.N., in the Jewish faith. On behalf of themselves and on behalf of A.N. and E.N., the Nordens object to the school displays mandated by S.B. 10 because the displays will promote and forcibly impose on A.N. and E.N. a specific version of the Ten Commandments to which their family does not subscribe, in a manner that is contrary to the children's Jewish teachings.  The Nordens' allege the version of the Ten Commandments required by S.B. 10 does not reflect their beliefs, Jewish principles more generally, or the religious beliefs they are teaching A.N. and E.N. Rather, they assert that it is a Christian interpretation of the Commandments that is exclusionary of non-Christians, including Jews who believe in the Ten Commandments.  (*Id.* at ¶¶ 165-67).

Plaintiff Joshua Fixler is Jewish and raising his minor children, D.F., E.F., and F.F in the Jewish faith tradition. Mr. Fixler is the rabbi at a temple in Houston. D.F., E.F., and F.F.'s religious education in Judaism has occurred primarily through Rabbi Fixler's family, his synagogue, and his faith community.  On behalf of himself, and on behalf of D.F., E.F., and F.F., Rabbi Fixler objects to the school displays mandated by S.B. 10 because the displays will promote and forcibly impose on D.F., E.F., and F.F. a specific version of the Ten Commandments to which the family does not subscribe, in a manner that is contrary to Jewish teachings and the family's Jewish faith. The version of the Ten Commandments required by S.B. 10 does not align with Rabbi Fixler's beliefs or with Jewish belief and tradition more generally. He alleges:

* The rabbinic understanding is that "thou shall not kill" does not pertain to killing in contexts like self-defense or capital punishment;

* Early debate over the Ten Commandments involved Christian scholars who argued that all the legislation in the Hebrew Bible could be reduced to the Ten Commandments. However, Jewish scholars interpret these commandments as being ten important obligations among the 613 commandments in the Hebrew Bible. For example, "Love your neighbor as yourself" is one of the most important commandments in Judaism, but it will not be represented in the school displays; and

* Even within the Hebrew Bible, there are at least two versions of the Ten Commandments, and the wording differs between them. Displaying a single version of the Ten Commandments will suggests to D.F., E.F., and F.F. that the Commandments are clear and unambiguous, whereas Rabbi Fixler believes they are not.

(Compl. [docket no. 1] at ¶¶ 174-79).

Plaintiff Cynthia Mood is Presbyterian and is raising her minor children, C.M. and L.M., in the Christian faith. She is an ordained pastor at a Presbyterian Church. As a matter of faith, it is important to Reverend Mood that C.M. and L.M. be exposed to multiple denominations and faith traditions so that her children understand that there is not one dominant religion or belief system. As such, C.M. and L.M.

-36-

attend worship services, Bible study, and other religious programming at multiple churches of various denominations on a weekly basis.  On her own behalf, and on behalf of C.M. and L.M., Reverend Mood objects to the school displays mandated by S.B. 10 because the displays will promote and forcibly subject C.M. and L.M. to overtly religious doctrine in a manner that violates Reverend Mood's religious beliefs and practices.  Pastor Mood asserts:

* S.B. 10 elevates one Christian value system over other belief systems;

* The version of the Ten Commandments in the Act undermines what Pastor Mood is teaching her children about respecting other people's beliefs and their lived experiences; and

* The version of the Ten Commandments in S.B. 10 repeatedly uses "thou shalt not," focusing on what not to do. When Reverend Mood teaches religious scripture to her children, she focuses on an individual's strength–what one can do, not what they cannot do. Reverend Mood believes that focusing on positive actions, rather than what a child cannot do, encourages expression of feelings and connection with community, both of which are important values rooted in her Presbyterian faith that she is trying to instill in C.M. and L.M.

(Compl. [docket no. 1] at ¶¶ 181-89).

Plaintiff Arvind Chandrakantan is a lifelong Hindu and is raising his minor children, A.C., M.C., and V.C., as Hindu. Because the children are fourth-generation Americans, it is very important to Dr. Chandrakantan that they are raised in the Hindu tradition and that they stay connected to their Indian heritage.  On behalf of himself, and on behalf of his children, Dr. Chandrakantan objects to the school displays mandated by S.B. 10 because the displays will promote and forcibly impose on A.C., M.C., and V.C. religious scripture that contradicts the family's religious beliefs. The Chandrakantan family does not subscribe to the religious dictates of the Ten Commandments. In particular, they object to the first four commandments–stating that there is only one God, prohibiting idol worship, prohibiting use

of the Lord's name in vain, and requiring observing the Sabbath–because they are at odds with Hindu teachings. (*Id.* at ¶¶ 189-93).

Plaintiff Cheryl Rebecca Smith is a member of a Unitarian Universalist church and is raising her minor child, L.P.J., in the Christian faith. Ms. Smith and L.P.J. regularly attend services at the church and L.P.J. attends Presbyterian summer camp. On behalf of herself and on behalf of L.P.J., Ms. Smith objects to the school displays mandated by S.B. 10 because the displays elevate one belief system over others in violation of the Unitarian Universalist tradition. Ms. Smith further objects to the displays mandated by S.B. 10 because the displays allegedly will promote and forcibly impose on L.P.J. a version of the Ten Commandments that the family does not follow. For example, Ms. Smith finds the reference to "manservants" and "maidservants" in the displays morally troubling and contrary to her faith and the faith values she teaches L.P.J. about equality and humanity. (Compl. [docket no. 1] at ¶¶ 201-03).

Plaintiff Allison Fitzpatrick is spiritual but does not identify with or support any organized religion. Along with her husband, who is an atheist, Ms. Fitzpatrick is raising her minor children, C.F. and H.F., in a household and tradition that seeks to provide the children with autonomy to develop their own beliefs about religion. The Fitzpatrick family does not subscribe to the religious dictates of the Ten Commandments generally or the specific version that S.B. 10 mandates. On behalf of herself, and on behalf of C.F. and H.F., Ms. Fitzpatrick objects to the displays mandated by S.B. 10 because they will promote and forcibly subject C.F. and H.F. to religious scripture that Ms. Fitzpatrick does not believe in and does not teach her children. (*Id.* at ¶¶ 208-09).

Finally, Plaintiff Mara Richards Bim is a faith leader in an Alliance of Baptists Church and is set to be ordained as a minister in the fall of 2025. She is raising her minor child, H.B., in the Baptist

faith. H.B.'s religious education has primarily occurred through Ms. Bim's instruction and through Ms. Bim's church, faith community, and family. H.B. attends Sunday School and is attending a vacation Bible school at their Baptist church. In any given week, H.B. receives some form of Christian education six out of seven days. On behalf of herself and on behalf of H.B., Ms. Bim objects to the displays mandated by S.B. 10 because they will promote and forcibly subject H.B. to overtly religious doctrine in a manner that violates the family's religious beliefs and practices. Specifically, Ms. Bim's family and her Baptist church do not emphasize the Ten Commandments to children at H.B.'s stage in life and instead emphasize the Commands of Jesus: to love God and to love our neighbors just as we love ourselves. While the Ten Commandments are part of the text that Baptists hold sacred, they are not the central focus of the Baptist faith. Ms. Bim believes the displays required by S.B. 10 will emphasize the Ten Commandments as a pillar of faith and American citizenship, in a way that conflicts with her family's faith. (Compl. [docket no. 1] at ¶¶ 215-19).

As noted, all Plaintiffs allege that, by mandating that a state-sanctioned version of the Ten Commandments be displayed in every public elementary and secondary school classroom in Texas, S.B. 10 impermissibly prefers a set of distinct religious beliefs and dictates and will impose those preferred religious beliefs and dictates on Texas's public-school children, including the minor-child Plaintiffs. They also allege that as a result of the Ten Commandments displays mandated by S.B. 10, Texas students, including the minor-child Plaintiffs, will be unconstitutionally coerced into religious observance, meditation on, veneration, and adoption of the state's favored religious scripture, and they will be pressured to suppress expression of their personal religious and nonreligious beliefs and practices, especially in school, to avoid the potential disfavor, reproach, and/or disapproval of school officials and/or their peers. In addition, Plaintiffs assert that, by mandating that a specific version of

the Ten Commandments be displayed in every public elementary and secondary school classroom and prescribing an official religious text for schoolchildren to venerate, S.B. 10 adopts an official position on religious matters in violation of the Establishment Clause and the Free Exercise Clause.

## Motion to Dismiss for Failure to State a Claim

The Government schools next move to dismiss Plaintiffs' Establishment Clause and Free Exercise claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure. "To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The parties agree that Plaintiffs have asserted a facial challenge to S.B. 10. "To successfully mount a facial challenge, the plaintiffs must show that there is no set of circumstances under which [S.B. 10] is constitutional." *Croft v. Perry*, 624 F.3d 157, 164 (5th Cir. 2010).

In moving to dismiss, the Government schools argue the Ten Commandments displays do not: (1) violate the Establishment Clause, (2) bear any of the historic hallmarks of an establishment, (3) implicate any coercion, and (4) *Stone v. Graham*, 449 U.S. 39 (1980), cannot be considered good law. The Fifth Circuit rejected each of these arguments in *Roake v. Brumley*, 141 F.4th 614, 640-46 (5th Cir. 2025). The Fifth Circuit also found that, even if *Stone* were overruled today, there was a substantial likelihood of insufficient evidence of a broad tradition in place at the time of the Founding, or within the history of public education, to justify the statute requiring the display of the Ten Commandments in public school classrooms. *Brumley*, 141 F.4th at 645-47.

In *Brumley*, the Government schools moved to dismiss under Rule 12(b)(6), arguing the Louisiana Legislature allegedly had a valid "secular and historical and educational purpose" for

displaying the Ten Commandments in classrooms, which was reflected in the statute. *Id.* at 643. The

Fifth Circuit, however, looked behind the articulated purpose of the Act and declined to dismiss because

the "legislative history reveal[ed] signs of a 'sham' legislative purpose." *Id.* (quoting *Wallace v.*

*Jaffree*, 472 U.S. 38, 64 (1985) (Powell, J, concurring)). Here, there is no stated legislative purpose of

S.B. 10, so there can be no sham legislative purpose.

However, while the Act shies away from addressing the religious purpose of S.B. 10, Texas'

legislators did not:

* In support of S.B. 10, the Lieutenant Governor stated: "In every classroom in Texas,
[students] are going to see the Ten Commandments, and they are going to know about
God." (Compl. [docket no. 1] at ¶ 73 & n.3) (quoting interview of Lt. Gov. Dan Patrick
on Washington Watch with Tony Perkins, Tony Perkins, at 11:05–11:10 (May 27,
2025), https://www.tonyperkins.com/get.cfm?i=LR25E20#gsc.tab=0).

* S.B. 10's lead Senate sponsor and author said: "[W]e want every kid, [kindergarten]
through twelve, every day, in every classroom they sit in to look on the wall
and read . . . those words [] that God says because we want them to understand how
important that those statements of God, those rules of God are that they see them in their
classroom every single day of their public education." (*Id.* at ¶ 74 & n.4) (citing
Kimberly Watts, king audio 20250618toddstarnes, YouTube, at 3:40–4:14 (June 21,
2025), https://www.youtube.com/watch?v=Kbll35APGTs (video directly linked from
Sen. King's official website in Action on Iran; New Laws for Securing Borders,
https://www.philking.com/2025/06/23/action-on-iran-new-laws-for-securing-borderst
exas-land-our-citizens-and-elections/ (June 23, 2025)).

* The lead House sponsor and author said: "It is incumbent on all of us to follow God's
law, and I think that we would be better off if we did." (*Id.* at ¶ 75 & n. 5) (quoting S.B.
10 H. Floor Debate, 2025 Leg., 89th Reg. Sess. 5:06:43–5:06:49 (May 24, 2025),
https://house.texas.gov/videos/22257.

* This representative went on to praise "some amazing teachers out there that are showing
an awful lot of Christian behavior and love and concern to their students." (*Id.* at n.6)
(citing *id.* at 5:07:15–5:07:37).

* Thanking the House sponsor for introducing S.B. 10, another representative stated: I
appreciate her bringing this to us because I think, again, to teach our children to better
their behavior and that there is something in all of us that God has placed in each and

-41-

every one of us. And the only way to get that out is to follow His commands. And His commands, the Ten Commandments set that out. And the best way to teach children is to find a means in which they are willing to learn. (*Id.* at ¶ 76) (citing *id.* at 5:56:28–5:56:57).

* A primary author of S.B. 10 explained: "God tells us in Joshua 1:9 to be strong and courageous. Don't be afraid. Don't be discouraged, because the Lord, thy God is with us throughout our life. There is an afterlife. There is eternal life. And if we don't expose–or introduce is a better word–our children and others to that, when they die, they had one birth, two deaths, because they will know nothing about the afterlife, the eternity with God. But exposing them or introducing them to Ten Commandments [and] prayer, it asks other questions, and they then have a choice in their future. Two births, and one death. And this is what we're doing. Prayer gives us our faith. The Ten Commandments, while they are laws, actually expand our freedoms. That's what we're about." (*Id.* at ¶ 77) (quoting S.B. 10 Hearing Before S. Comm. on Educ. K-16, 2025 Leg., 89th Reg. Sess. 2:11:53–2:13:12 (Mar. 4, 2025), https://www.senate.texas.gov/videoplayer.php?vid=21245&lang=en.

* During the same hearing, another senator addressed a Baptist reverend who testified against a separate bill that would authorize public schools to institute official periods of prayer. She said: "Perhaps the nationally accredited chaplaincy provides you the foundation for your beliefs in your testimony here, but the Baptist doctrine is Christ-centered. Its purpose is not to go around trying to defend this or that. It is to be a disciple and a witness for Christ. That includes the Ten Commandments, that's prayer in schools. It is not a fight for separation between church and state." (Compl. [docket no. 1] at ¶ 78 & n.9) (quoting id. at 2:47:00–2:47:27).

* Reacting to testimony supporting S.B. 10 and the school-prayer bill, a primary author of S.B. 10 revealed: "I'm in shock . . . that only twenty-five percent of our kids today in schools have been in a church. That should make everybody listening absolutely scared to death. I mean, obviously, only the Lord can save us, and we need to engage in prayer. But to realize only twenty-five percent of our kids in schools today have been in a church is absolutely horrific and something we all need to work on to address." (*Id.* at ¶ 79 & n. 10) (quoting *id.* at 2:02:23–2:02:50).

* Dismissing concerns that S.B. 10 would spiritually burden non-Christian students, a primary author of the Act explained: "Christians have been intimidated and afraid to talk about or express their faith at work and in school in this country. Christians are the majority, pretty clearly. We, with our faith, but more importantly in this context as Texans, the majority needs to look out for the minority, I understand, and be careful not to trample them. But we've gone too far there . . . So, I think it's important that we're able to have the freedom to express our faith . . . through the Ten Commandments." (*Id.* at ¶ 80 & n. 11) (quoting https://www.tonyperkins.com/get.cfm?i=LR25E20#gsc.tab=0).

* After one legislator pointed to "Muslim students that are being bullied in Texas public schools" and "Jewish students being bullied" as a reason to avoid imposing Christian scripture in classrooms, another representative stated: "Oh, then we really need the Ten Commandments in there on how to treat others kindly." (Comp. [docket no. 1] at ¶ 81 & n. 12) (quoting S.B. 10 Hearing Before H. Comm. on Pub. Educ., 2025 Leg., 89th Reg. Sess. 6:41:41–6:41:45 (Apr. 29, 2025) https://house.texas.gov/videos/21958.

* After being advised that Texas public "schools also serve students of other faith backgrounds," including "Muslim students, Hindu students, Buddhist students, Sikh students, [and] atheist students"–and asked how it will make "a Hindu student feel to have a poster in every classroom that says, 'thou shalt not worship any God before me?'"–a representative replied: "I don't know. I haven't asked one. Have you?" (Compl. [docket no. 1] at ¶ 81 & n. 13) (quoting 6:40:31–6:40:44).

* This representative went on to say: "I assume they're Americans now? I think that they would find it interesting to see what was important and foundational to our forefathers that made this nation a place that they wanted to come and live and raise a family and be part of it." (*Id.* at n. 14) (quoting *id.* at 6:40:51–6:41:05).

These statements "support a commonsense conclusion that a religious objective permeated the government's action." *Brumley*, 141 F.4th at 644 (internal quotation omitted); *see also Edwards v. Aguillard*, 482 U.S. 578, 591–92 (1987) (concluding that the "preeminent purpose of the [state legislature] was clearly to advance [a] religious viewpoint" based on statements by legislators and testimony presented during legislative hearings). Because "[t]his is not a permissible state objective under the Establishment Clause, . . . [S.B. 10] is plainly unconstitutional" under *Stone*. *Brumley*, 141 F.3d at 645.

The Fifth Circuit alternatively found that, even if *Stone* were overturned tomorrow, Plaintiffs had sufficiently alleged the Ten Commandments statute violates the Establishment Clause under *Kennedy v. Bremerton School District*, 597 U.S. 507, 535 (2022). The Government schools argue otherwise. However, as in *Brumley*, Plaintiffs allege the permanent posting of the Ten Commandments in public school classrooms does not fit within and is not consistent with a broader tradition of using

-43-

the Ten Commandments in public education. *Compare Brumley*, 141 F.4th at 646 *with* Compl. [docket no. 1] at ¶¶ 46, 233. Accepting these allegations as true, Plaintiffs have adequately pleaded an Establishment Clause violation under *Kennedy*. *See Brumley*, 141 F.4th at 646.

The Government schools contend the Ten Commandments displays are merely passive based on the Supreme Court's decision in *Van Orden v. Perry*, 545 U.S. 677, 691 (2005), which found that a stone monument of the Ten Commandments on the grounds of the Texas State Capitol was a "passive" display. The Supreme Court in *Van Orden*, however, explicitly distinguished its holding from that in *Stone*, the public school Ten Commandments case. *Id.* ("The placement of the Ten commandments monument on the Texas State Capitol grounds is a far more passive use of those texts than was the case in *Stone*, where the text confronted elementary school students every day."). The Supreme Court in *Van Orden* also explained that a stone monument on the grounds of the Texas Capitol "is . . . also quite different from the prayers involved in *Schempp* and *Lee*," both of which involved the public school context. *Id.*

Contrary to the Government schools' contention, "the Ten Commandments are not passive because students in public schools are forced to engage with them and cannot look away." *Stinson v. Fayetteville Sch. Dist. No. 1*, Case No. 5:25-CV-5127, 2025 WL 2231053, at *11 (W.D. Ark. Aug. 4, 2025). As the Supreme Court recently stated in *Mahmoud*, "[t]he government's operation of the public schools . . . implicates direct, coercive interactions between the State and its young residents" which means "[t]he public school imposes rules and standards of conduct on its students and holds a limited power to discipline them for misconduct." *Mahmoud v. Taylor*, 145 S. Ct. 2332, 2357 (2025).

Moreover, the Supreme Court has rejected the Government schools' argument that exposure is not religious activity. In *Schempp*, the Court recognized that daily scriptural readings constituted

"religious exercise," 374 U.S. at 224-25, and in *Stone*, the Court held that it is not "significant that the Bible verses involved in this case are merely posted on the wall, rather than read aloud as in *Schempp* and *Engel*." 499 U.S. at 42. Government school promoted religious activity is no less unconstitutional merely because it is silent. *See Wallace v. Jaffree*, 472 U.S. 38, 60-61 (1985) (holding that state law improperly encouraged students to engage in silent prayer).

The Government schools agree that the Ten Commandments is a religious document based on Judeo-Christian scripture and that some of the Commandments concern the religious duties of believers, rather than merely secular matters. Plaintiffs affirm in their declarations that they will suffer personal spiritual offense as a result of the posting of the Ten Commandments mandated by S.B. 10. The student-Plaintiffs allege they will be subjected to a state-mandated, religiously preferential version of the Ten Commandments in every classroom for the remainder of their elementary and secondary public-school education. According to the complaint, which the Court must accept as true at this stage of the litigation, the displays will: (1) substantially burden the parent-Plaintiffs' religious exercise by usurping their parental authority to direct their children's religious upbringing and education; (2) forcibly subject their children to religious doctrine and beliefs in a manner that conflicts with the families' own religious beliefs and practices; (3) send a message to their children that they do not belong in their own school community because they do not subscribe to the State's preferred religious doctrine; and (4) religiously coerce their children by pressuring them to observe, meditate on, venerate, and follow the State's favored religious text, and to suppress expression of their own religious beliefs and backgrounds at school. For these and the reasons stated in *Brumley*, the Court finds Plaintiffs have sufficiently stated their Establishment Clause and Free Exercise claims. The Government schools' Rule 12(b)(6) motion to dismiss is denied.

-45-

**Preliminary Injunction**

A preliminary injunction is proper if Plaintiffs can show "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm absent the injunction, (3) that the harm [Plaintiffs] will suffer without the injunction outweighs the cost to comply with the injunction, and (4) that the injunction is in the public interest." *Harrison v. Young*, 48 F.4th 331, 339 (5th Cir. 2022).

The Government schools argue Plaintiffs are unlikely to succeed on the merits of their Establishment Clause claims for the same reasons asserted in their motion to dismiss: lack of subject matter jurisdiction and because S.B. 10 is constitutional under *Kennedy*. In light of guidance provided by *Brumley*, this Court has found that Plaintiffs' claims are ripe, Plaintiffs have shown standing to bring their Establishment Clause claims, and Plaintiffs have sufficiently alleged that S.B. 10 violates the Establishment Clause under *Stone*, which remains good law and controlling in this case.

As discussed above, to succeed on the merits under *Kennedy*, Plaintiffs must show that the practice at issue–permanently displaying the Ten Commandments in public school classrooms–does not "fit within" and is not "consistent with" a broader tradition existing at the time of the founding. *Brumley*, 141 F.4th at 647 (quoting *Kennedy*, 597 U.S. at 535).

The Court heard from and is very appreciative of the testimony of Dr. Steven Green and Dr. Mark Hall, which was an extensive augmentation of the Court's 20 years of Methodist Sunday School and theology, political philosophy and constitutional history courses at Texas Lutheran University. The Court finds Dr. Green's opinions concerning the intent of the Founders regarding the First Amendment to be more persuasive than Dr. Hall's testimony.

In *Brumley*, and in this case, the Government schools argue historical practices and understandings justify the Act's existence. In both cases, in support of their motion for a preliminary

injunction, Plaintiffs presented the expert testimony of Dr. Steven Green, a religious and constitutional legal historian. Dr. Green testified that the public school system did not exist at the founding; rather, public education originated sometime around the late 1820s. Dr. Green also found no evidence that the Ten Commandments were permanently displayed in early American public schools. He testified that no state enacted a law allowing the display of the Ten Commandments in public schools until North Dakota did so in 1927, and that court later stuck down the statute. *See Ring v. Grand Forks Pub. Sch. Dist. No. 1*, 483 F. Supp. 272 (D.N.D. 1980).

Based on Dr. Green's testimony, the district court in *Brumley* "found a substantial likelihood that there is insufficient evidence of a broader tradition in place at the time of the founding, or within the history of public education, so as to justify H.B. 71." 141 F.4th at 647-48. The Fifth Circuit affirmed, finding that the district court "did not err in finding that Plaintiffs showed a substantial likelihood of success on the merits of their Establishment Clause claims." *Id.* at 648. But, Louisiana did not present any expert testimony in *Brumley*. *Id.*

Here, the Government schools present the expert testimony of Dr. Hall, also a religious and constitutional legal scholar. (Motion [docket no. 46-1] (Report of Mark David Hall) (hereinafter Hall Report). Dr. Hall reviewed Dr. Green's report, and reached some of his own independent conclusions. *Id.* Dr. Hall found virtually no evidence that the Founders understood the Establishment Clause to require the strict separation of church and state. *Id.* He agrees with Dr. Green that the public school system did not exist at the founding, but testified that children have always been instructed on capital laws and scriptures, which overlap with the Ten Commandments. *Id.* Dr. Hall also reports that the Ten Commandments are often displayed in and around public buildings. *Id.*

-47-

With respect to the first part of the historical practices and understandings test, Dr. Hall testified at the hearing that S.B. 10's mandate is compatible with the Founding Fathers' conception of religious liberty. He also testified that "in no way, shape or form, can an original understanding of the First Amendment say that this Amendment was intended to remove religion from the public square." Here, however, we are talking about public schools, not the public square.

Moreover, the district court in *Stinson* granted Plaintiffs' request for a preliminary injunction in their case challenging Arkansas' newly-enacted law requiring that the Ten Commandments be displayed in every public school classroom in the state. *Stinson*, 2025 WL 2231053, at *14. Although the school district defendants did not present the expert testimony of Dr. Hall, the district court indirectly addressed Dr. Hall's conclusions concerning the Founding Fathers' understanding of the separation of church and state in issuing its preliminary injunction. *Id.* As the Arkansas court noted, "[t]he Founders were deeply committed to the principle that government must not compel religious observance or endorse religious doctrine, and that commitment is reflected in multiple foundational texts, such as the Declaration of Independence and the Virginia Statute for Religious Freedom, both of which were authored by Thomas Jefferson." *Id.* at *13 (citing Report of Steven Green) (hereinafter Green Report). "Indeed, Jefferson and the Enlightenment writers on whom he relied made a point of differentiating between natural law and Old Testament law; the Declaration itself proclaims that "Governments are instituted among Men, deriving their just Powers from the Consent of the Governed." *Id.* (citing Green Report). Moreover, James Madison's Memorial and Remonstrance Against Religious Assessments, which he wrote in 1785, expressed his vehement opposition to government support for religious instruction. *See id.* "Madison wrote: 'The religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these may

dictate. This right is in its nature an unalienable right.'" *Id.* (quoting Memorial and Remonstrance Against Religious Assessments).

There is also insufficient evidence of a broader tradition of using the Ten Commandments in public education, and there is no tradition of permanently displaying the Ten Commandments in public-school classrooms. *See Stinson*, 2025 WL 2231053, at *13. In the instant case, Dr. Hall agrees with Dr. Green that public schools did not exist at the time of the Founding, (Hall Report at page 5), but does not dispute that, back then, education occurred in private academies or through tutors, and it generally incorporated a strong religious component because tutors were mostly composed of local clergy. (Green Report at ¶ 38). And, "[a]s the nineteenth century drew to a close, fewer and fewer public schools were engaging in any religious practices." *Stinson*, 2025 WL 2231053, at *13 (citing Green Report). Moreover, the first state law permitting public schools to hang the Ten Commandments was not passed until 1927–and immediately struck down. *Id.* (citing Green Report) (citing *Ring v. Grand Forks Pub. Sch. Dist.*, 483 F. Supp. 272 (D. N.D. 1980)).

The second part of the historical practices and understandings test asks whether evidence suggests that displaying the Ten Commandments in the manner mandated by S.B. 10 will be religiously coercive. In *Kennedy*, the majority affirmed that it remains "problematically coercive" for public schools to impose religious messages on a "captive audience" of students. 597 U.S. at 541–42 (citing *Lee v. Nathan Bishop Middle Sch.*, 505 U.S. 577, 580, 598 (1992); *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 294, 311 (2000)); *see also Mahmoud,* 145 S. Ct. at 2355 (recognizing "the potentially coercive nature" of public school classrooms). "Coercion is rife in such an environment 'because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure.'" *Stinson*, 2025 WL 2231053, at *14 (quoting *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987)). In

addition, mandatory attendance requirements create a legal obligation for parents "to send their children to public school unless they find an adequate substitute." *Mahmoud*, 145 S. Ct. at 2359 (discussing Maryland's compulsory-education laws). As a result, "[t]here are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools.'" *Id*. at 2355 (quoting *Lee*, 505 U.S. at 592). Indeed, "[t]hat is why a religious practice may be deemed unconstitutional in the 'special context of the public elementary and secondary school system,' but deemed constitutional elsewhere." *Brumley*, 141 F.4th at 641 (quoting *Edwards*, 482 U.S. at 583).

To the extent Dr. Hall relies on public displays to justify displaying the Ten Commandments in classrooms, the Fifth Circuit explained in *Brumley* that the public school classroom implicates certain protections that other contexts, like the Texas State Capital grounds, does not. 141 F.4th at 640-42. "The Supreme Court said as much in *Van Orden* [*v. Perry*, 545 U.S. 677, 690-91 (2005) (plurality opinion)] ('There are, of course, limits to the display of religious messages or symbols. . . . *Stone* . . . was a consequence of the particular concerns that arise in the context of public elementary and secondary schools. . . . The placement of the Ten Commandments monument on the Texas State Capitol grounds is a far more passive use of those texts than was the case in *Stone*, where the text confronted elementary school students every day.'" *Id*. at 642. As the Court in *Stinson* summarized:

> Once students are at school, staff control their movements and often their expression. Students may not move around freely to avoid official religious indoctrination or to contest it beyond certain limits. This is especially true in the classroom context.

2025 WL 2231053, at *14. Therefore, notwithstanding Dr. Hall's testimony, this Court finds there is is insufficient evidence of a broad tradition in place at the time of the Founding, and within the history of public education, to justify S.B. 10.

-50-

As to the second element, a substantial threat of irreparable harm absent the injunction, the Government schools argue that Plaintiffs cannot show any harm because they do not know what the posters will look like and therefore cannot know whether any poster will violate the First Amendment. This argument fails for the same reasons Texas' ripeness argument fails. S.B. 10's minimum requirements provide sufficient details about how the Ten Commandments must be displayed. As in *Brumley*, "Plaintiffs have shown that those displays will cause an irreparable deprivation of their First Amendment rights." 141 F.4th at 648-49; *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

The third element is whether the harm that Plaintiffs will suffer absent the injunction "outweighs the cost to comply with the injunction. *Harrison*, 48 F.4th at 339. Texas will "suffer[] the irreparable harm of denying the public interest in the enforcement of its laws." (Motion [docket no. 46] at page 36). "But it does not have a genuine 'interest in enforcing a regulation that violates federal law.'" *Brumley*, 141 F.4th at 649 (quoting *Book People, Inc. v. Wong*, 91 F.4th 318, 341 (5th Cir. 2024)). Instead, "[i]njunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279 , 298 (5th Cir. 2012) (brackets and citation omitted). And, "courts must be 'particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools.'" *Brumley*, 141 F.4th at 649 (quoting *Edwards*, 482 U.S. at 583-84).

S.B. 10 also impermissibly takes sides on theological questions and officially favors Christian denominations over others. The Supreme Court recently reaffirmed that the Establishment clause requires that the "government maintain 'neutrality between religion and religion.'" *Catholic Charities Bureau, Inc. v. Wisconsin Lab. & Indus. Rev. Comm'n,* 605 U.S. 238, 254 (2025) (quoting *Epperson*

*v. Arkansas*, 393 U.S. 97, 104 (1968)). The "'[t]he clearest command of the Establishment Clause' is that the government may not 'officially prefe[r]' one religious denomination over another. . . . This principle of denominational neutrality bars States from passing laws that 'aid or oppose' particular religions . . . or interfere in the 'competition between sects.'" *Id*. at 247-48 (quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982); *Epperson*, 393 U.S. at 106)).

With regard to the Free Exercise Clause, S.B. 10 is not neutral with respect to religion. By design, and on its face, the statute mandates the display of expressly religious scripture in every public school classroom. The Act also requires that a Judeo-Christian version of that scripture be used, that is exclusionary of other faiths. "[T]he government may not favor one religion over another, or religion over irreligion, religious choice being the prerogative of individuals under the Free Exercise Clause." *McCreary Cnty v. American Civil Liberties Union,* 545 U.S. 844, 875-76 (2005).

And, the Act is likely to burden Plaintiffs' exercise of their sincere religious or nonreligious beliefs in substantial ways. The displays are likely to interfere with and usurp the fundamental rights of the parent-Plaintiffs "as contrasted with that of the State, to guide the religious future . . . of their children." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972). The displays are likely to send an exclusionary and spiritually burdensome message to the child-Plaintiffs–who do not subscribe to the approved version of the Ten Commandments–that they "are outsiders who do not belong in their own school community." *Santa Fe Indep. Sch. Dist*., 530 U.S. at 309 (observing that school sponsorship of a religious message causes members of other faiths to feel "that they are outsiders, not full members of the political community") (citation modified)). Moreover, the displays are likely to pressure the child-Plaintiffs into religious observance, meditation on, veneration, and adoption of the State's favored religious scripture, and into suppressing expression of their own religious or nonreligious backgrounds

and beliefs while at school.  *See Stinson*, 2025 WL 2231053 at *14; *Brumley*, 756 F. Supp. 3d at 204. And, these impositions on Plaintiffs' religious beliefs and practices cannot be sustained under strict scrutiny. The Government schools have not established that burdening Plaintiffs' Free Exercise rights "serve[s] a compelling interest and [is] narrowly tailored to that end."  *See Kennedy*, 597 U.S. at 532; *see also Stinson*, 2025 WL 2231053, at *15; *Brumley*, 756 F. Supp. 3d at 202.

Even if the Government schools were to meet their burden of showing a compelling interest, it would fail the "narrowly tailored" prong. There are ways in which students could be taught any relevant history of the Ten Commandments without the state selecting an official version of scripture, approving it in state law, and then displaying it in every classroom on a permanent basis.  "For example, the Ten Commandments might be taught 'objectively as part of a secular program of education,' *Schempp*, 374 U.S. at 225, through 'an appropriate study of history, civilization, ethics, comparative religion, or the like,' *Stone*, 449 U.S. at 42." *Stinson*, 2025 WL 2231053 at *14.  The Government schools have "made no effort to do this, nor have they attempted to limit the Ten Commandments' use to relevant course curricula, such as civics or world religious studies."  *Id.*  Accordingly, the Court concludes that Plaintiffs have satisfied the preliminary injunction elements.  The motion is granted.

In sum, the Court finds:

1.     Children can be cruel to their classmates perceived to be "the other."

2.     The testimony of Dr. Green is more persuasive.

3.     S.B. 10 crosses the line from exposure to coercion.

4.     *Brumley* is binding on this Court.

IV.

## Conclusion

Ultimately, in matters of conscience, faith, beliefs and the soul, most people are Garbo-esque.[68] They just want to be left alone, neither proselytized nor ostracized, including what occurs to their children in government run schools.

Even though the Ten Commandments would not be affirmatively taught, the captive audience of students likely would have questions, which teachers would feel compelled to answer. That is what they do. Teenage boys, being the curious hormonally driven creatures they are, might ask: "Mrs. Walker, I know about lying and I love my parents, but how do I do adultery?" Truly an awkward moment for overworked and underpaid educators, who already have to deal with sex education issues, *Mahmoud,* 145 S. Ct. at 2355, and a classic example of the law of unintended consequences in legislative edicts.

Notwithstanding the sausage making process[69] of legislation, to avoid religious rancor and legal wrangling the Texas Legislature alternatively could require the posting of:

1.  Multiple versions of lessons of behavior from many cultures melded into the American motto of "E pluribus unum," a concept currently in decline. For example, the Five Moral Precepts of Buddhism: abstain from killing, stealing, engaging in sexual misconduct, lying and intoxicants[70]; or

---

[68] Greta Garbo is attributed as saying "I want to be alone" in the movie *Grand Hotel*, directed by Edmund Goulding. (Metro-Goldwyn-Mayer 1932).

[69] The phrase "Laws are like sausages, its better not to see them being made" is often attributed to Otto von Bismarck.

[70] Https://buddho.org/buddhism-and-morality-the-five precepts.

2. Do unto others as you would have them do unto you. Be kind. Be respectful.; or

3. **All I Really Need to Know I Learned in Kindergarten**: "Share everything. Play Fair. Don't hit people. . . . Clean up your own mess. Don't take things that aren't yours. Say you're sorry when you hurt somebody. . . . Live a balanced life. . . . When you go out into the world, . . . hold hands, and stick together."[71]

IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss (contained within docket no. 46) is DENIED.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Preliminary Injunction (docket no. 3) is GRANTED such that Defendants and their officers, agents, affiliates, subsidiaries, servants, employees, successors, and all other persons or entities in active concert or privity or participation with them, are PRELIMINARILY ENJOINED from displaying the Ten Commandments pursuant to S.B. 10. The Federal Rule of Civil Procedure 65(c) security bond requirement is waived.

It is so ORDERED.

For those who disagree with the Court's decision and who would do so with threats, vulgarities and violence, Grace and Peace unto you. May humankind of all faiths, beliefs and non-beliefs be reconciled one to another.

Amen.

SIGNED this 20th day of August, 2025.

_____
FRED BIERY
UNITED STATES DISTRICT JUDGE

---

[71]Robert Fulghum, a Unitarian Universalist minister, published his first book, *All I Really Need to Know I Learned in Kindergarten*, in 1986. Https://www.robertleefulghum.com.