No. 24-30706

# In the United States Court of Appeals for the Fifth Circuit

DARCY ROAKE, REVEREND, ON BEHALF THEMSELVES AND ON BEHALF OF
THEIR MINOR CHILDREN, ET AL.,
*Plaintiffs-Appellees*

v.

CADE BRUMLEY, IN HIS OFFICIAL CAPACITY AS THE LOUISIANA STATE
SUPERINTENDENT OF EDUCATION, ET AL.,
*Defendants-Appellants*

———————————————

On Appeal from the United States District Court
for the Middle District of Louisiana
No. 3:24-cv-517, Hon. John W. deGravelles

———————————————

## APPELLANTS' SUPPLEMENTAL EN BANC BRIEF

———————————————

ERIC C. RASSBACH
JOSEPH C. DAVIS
BENJAMIN A. FLESHMAN
AMANDA L. SALZ
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, D.C. 20006

*Counsel for Appellants Brumley
and LSBESE Officials*

ELIZABETH B. MURRILL
Attorney General of Louisiana

J. BENJAMIN AGUIÑAGA
Solicitor General

ZACHARY FAIRCLOTH
Principal Deputy Solicitor General

CAITLIN HUETTEMANN
Assistant Solicitor General

OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

*Counsel for Appellants*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required here because, under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellants—as "governmental" parties—need not furnish a certificate of interested persons.

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA

## STATEMENT REGARDING ORAL ARGUMENT

The Court has scheduled en banc argument for January 20, 2026.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ................................... ii

TABLE OF AUTHORITIES .................................................................... v

INTRODUCTION ................................................................................. 1

JURISDICTIONAL STATEMENT ....................................................... 2

STATEMENT OF ISSUES PRESENTED ............................................ 3

STATEMENT OF THE CASE ............................................................... 4

    A.  The Ten Commandments ................................................... 4

    B.  Louisiana's H.B. 71 ........................................................... 5

    C.  Plaintiffs' Lawsuit ........................................................... 10

    D.  The District Court's Decision ......................................... 11

    E.  The Panel Decision ......................................................... 13

SUMMARY OF THE ARGUMENT ..................................................... 15

STANDARD OF REVIEW ................................................................... 17

ARGUMENT ....................................................................................... 18

I.  PLAINTIFFS' ESTABLISHMENT CLAUSE CHALLENGE IS
   NOT JUSTICIABLE. ...................................................................... 18

    A.  The Court's Existing Precedents Foreclose Jurisdiction ............. 18

        1. Plaintiffs' claims are not ripe under *Staley* ............................. 18

2. Plaintiffs have no Article III standing under *Barber* and *Doe* ......................................................... 21

B. The Court Should Reconsider Its Offended-Observer Standing Precedents. ................................................. 27

1. Offended-observer standing has no basis in law ..................... 27

2. Plaintiffs depend on offended-observer standing ..................... 31

II. H.B. 71 IS NOT FACIALLY UNCONSTITUTIONAL UNDER THE ESTABLISHMENT CLAUSE. ............................................. 36

A. H.B. 71 Is Constitutional Under *Kennedy*. ................................ 37

1. Kennedy establishes a hallmarks analysis. ........................... 38

2. H.B. 71 is constitutional under the hallmarks analysis. .......... 47

B. H.B. 71 Is Independently Constitutional Because It Is Supported by Longstanding Tradition. .............................. 49

C. *Stone* Does Not Compel a Different Result. ............................... 57

D. Reversal Automatically Requires Near-Universal Vacatur of the Preliminary Injunction ....................................... 68

CONCLUSION ........................................................................... 71

CERTIFICATE OF SERVICE .......................................................... 73

CERTIFICATE OF COMPLIANCE ...................................................... 74

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Abbott v. Biden,*
  70 F.4th 817 (5th Cir. 2023) ............................................................. 41

*Abraham Watkins Nichols Agosto Aziz & Stogner v Festeryga,*
  138 F.4th 252 (5th Cir. 2025) (en banc) .............................................. 69

*ACLU v. Mercer County,*
  432 F.3d 624 (6th Cir. 2005).......................................................... 26, 62

*Am. Legion v. Am. Humanist Ass'n,*
  588 U.S. 29 (2019) .................................................................... *passim*

*Barber v. Bryant,*
  860 F.3d 345 (5th Cir. 2017)................................................................ 21

*Books v. Elkhart County,*
  401 F.3d 857 (7th Cir. 2005)......................................................... 26, 62

*Braidwood Mgmt., Inc. v. EEOC,*
  70 F.4th 914 (5th Cir. 2023) ............................................................... 21

*Branch v. Harris Cnty. Sheriff's Off.,*
  No. 24-20120, 2025 WL 636313 (5th Cir. 2025) ................................. 59

*Braunfeld v. Brown,*
  366 U.S. 599 (1961) ........................................................................... 70

*Briggs v. Mississippi,*
  331 F.3d 499 (5th Cir. 2003)............................................................... 49

*Hilsenrath ex rel. C.H. v. Sch. Dist. of Chathams,*
  136 F.4th 484 (3d Cir. 2025) (Hardiman, J.), *petition for*
  *cert. filed*, No. 25-256 (U.S. Sept. 2, 2025) .............................. 40, 43, 46

*City of Grants Pass v. Johnson,*
603 U.S. 520 (2024) ............................................................ 59

*City of Ocala v. Riojas,*
143 S. Ct. 764 (2023) ...................................... 27, 28, 29, 31

*Croft v. Gov. of Tex.,*
562 F.3d 735 (5th Cir. 2009) ........................................ 64, 67

*Croft v. Perry,*
624 F.3d 157 (5th Cir. 2010) ............................. 36, 60, 61, 65

*Daves v. Dallas County,*
64 F.4th 616 (5th Cir. 2023) .............................................. 66

*Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan,*
938 F.3d 246 (5th Cir. 2019) ........................................ 59, 60

*Dobbs v. Jackson Women's Health Org.,*
597 U.S. 215 (2022) ...................................................... 40, 43

*Doe v. Tangipahoa Par. Sch. Bd.,*
494 F.3d 494 (5th Cir. 2007) (en banc) ...................... *passim*

*Edwards v. Aguillard,*
482 U.S. 578 (1987) ....................................... 42, 43, 61, 66

*El Paso County v. Trump,*
982 F.3d 332 (5th Cir. 2020) ............................................. 28

*FDA v. All. for Hippocratic Med.,*
602 U.S. 367 (2024) ...................................................... 41, 63

*Fed. Hous. Admin. v. Darlington, Inc.,*
358 U.S. 84 (1958) ............................................................ 59

*Firewalker-Fields v. Lee,*
58 F.4th 104 (4th Cir. 2023) ........................................ 39, 57

*Freedom From Religion Found., Inc. v. County of Lehigh,*
   933 F.3d 275 (3d Cir. 2019) ................................................................ 51

*Freedom From Religion Found., Inc. v. Mack,*
   49 F.4th 941 (5th Cir. 2022) ........................................................ *passim*

*Gibbons v. Ogden,*
   22 U.S. (9 Wheat.) 1, 186-89 (1824) ................................................. 40

*Glass v. Paxton,*
   900 F.3d 233 (5th Cir. 2018) ........................................................ 31, 35

*Groff v. DeJoy,*
   600 U.S. 447 (2023) ...................................................................... 38, 58

*Ingebretsen v. Jackson Public School District,*
   88 F.3d 274 (5th Cir. 1996) ............................................... 22, 23, 24, 25

*Jiao v. Xu,*
   28 F.4th 591 (5th Cir. 2022) .............................................................. 17

*Kennedy v. Bremerton School District,*
   597 U.S. 507 (2022) .................................................................... *passim*

*Kondrat'yev v. City of Pensacola,*
   949 F.3d 1319 (11th Cir. 2020) ........................................................ 31

*Koon v. United States,*
   518 U.S. 81 (1996) ............................................................................ 17

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,*
   508 U.S. 384 (1993) .......................................................................... 35

*Lee v. Weisman,*
   505 U.S. 577 (1992) ....................................................... 22, 23, 34, 35

*Lemon v. Kurtzman,*
   403 U.S. 602 (1971) .................................................................... *passim*

vii

*Lynch v. Donnelly*,
465 U.S. 668 (1984) ...................................................................... 50, 54

*Magnolia Marine Transp. Co. v. Laplace Towing Corp.*,
964 F.2d 1571 (5th Cir. 1992) ............................................................. 17

*Mahmoud v. Taylor*,
145 S. Ct. 2333 (2025) ........................................................... 69, 70, 71

*Marsh v. Chambers*,
463 U.S. 783 (1983) ........................................................................... 50

*McCreary County v. ACLU of Ky.*,
545 U.S. 844 (2005) ................................................................. *passim*

*McMahon v. Fenves*,
946 F.3d 266 (5th Cir. 2020) .............................................................. 30

*Miller v. Dunn*,
35 F.4th 1007 (5th Cir. 2022) ............................................................ 24

*Miss. Rising Coal. v. City of Ocean Springs*,
910 F.3d 191 (5th Cir. 2018) (per curiam) .......................................... 30

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ........................................................................... 36

*Moore v. Bryant*,
853 F.3d 245 (5th Cir. 2017) .............................................................. 30

*Murthy v. Missouri*,
603 U.S. 43 (2024) ............................................................................. 21

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022) ................................................................... 44, 46, 56

*Nathan v. Alamo Heights Indep. Sch. Dist.*,
No. 25-50695 (5th Cir.), ECF 34 ........................................................ 52

*Ring v. Grand Forks Public School District No. 1,*
   483 F. Supp. 272 (D.N.D. 1980) .................................................... 54, 55

*School District of Abington Township v. Schempp,*
   374 U.S. 203 (1963) ................................................................. *passim*

*Shurtleff v. City of Boston,*
   596 U.S. 243 (2022) ................................................................. *passim*

*Soc'y of Separationists, Inc. v. Herman,*
   939 F.2d 1207 (5th Cir. 1991) ............................................................ 70

*Staley v. Harris County,*
   461 F.3d 504 (5th Cir. 2006) .............................................. 18, 20, 34

*Staley v. Harris County,*
   485 F.3d 305 (5th Cir. 2007) (en banc) ..................................... *passim*

*Steel Co. v. Citizens for a Better Env't,*
   523 U.S. 83 (1998) .......................................................................... 34

*Stone v. Graham,*
   449 U.S. 39 (1980) .................................................................. *passim*

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2015) ........................................................................ 24

*Sw. Airlines Pilots Ass'n v. Sw. Airlines Co.,*
   120 F.4th 474 (5th Cir. 2024) ........................................................ 17

*Tilton v. Richardson,*
   403 U.S. 672 (1971) ........................................................................ 61

*Town of Greece v. Galloway,*
   572 U.S. 565 (2014) ................................................................. *passim*

*Turtle Island Foods, S.P.C. v. Strain,*
   65 F.4th 211 (5th Cir. 2023) .......................................................... 66

*United States v. Billingsley*,
  615 F.3d 404 (5th Cir. 2010) ............................................................. 17

*United States v. Runnels*,
  2022 WL 1010695 (5th Cir. Apr. 5, 2022) ......................................... 69

*United States v. Skrmetti*,
  145 S. Ct. 1816 (2025) ....................................................................... 57

*Utah Hwy. Patrol Ass'n v. Am. Atheists, Inc.*,
  132 S. Ct. 12 (2011) ........................................................................... 43

*Valley Forge Christian Coll. v. Ams. United for Separation of
  Church and State, Inc.*,
  454 U.S. 464 (1982) ..................................................................... 27, 33

*Van Orden v. Perry*,
  2002 WL 32737462 (W.D. Tex. Oct. 2, 2002) .................................... 34

*Van Orden v. Perry*,
  351 F.3d 173 (5th Cir. 2003), *aff'd*, 545 U.S. 677 ...................... *passim*

*Van Orden v. Perry*,
  545 U.S. 677 (2005), 2005 WL 263790 ........................................ *passim*

*Wallace v. Jaffree*,
  472 U.S. 38 (1985) .............................................................................. 64

*Walz v. Tax Comm'n of N.Y.*,
  397 U.S. 664 (1970) ............................................................................ 45

## Statutes

28 U.S.C. § 1292(a)(1) ........................................................................ 2, 17

28 U.S.C. § 1331 ...................................................................................... 2

La. R.S. § 17:262(A)(2) ........................................................................... 51

La. R.S. § 17:2124 (2024) ................................................................. *passim*

**Other Authorities**

1 J. Story, Commentaries on the Constitution of the
   United States
   § 399, p. 383 (1833) .............................................................. 40

1 William Blackstone,
   *Commentaries on the Laws of England:*
   *Of the Rights of Persons* 54 (1765), t.ly/dNNnQ .................................. 4

Act of Mar. 3, 1865, ch. 100 § 5, 13 Stat. 518 .......................................... 51

*Courtroom Friezes: South and North Walls*,
   Office of the Curator, Supreme Court of the United
   States, https://perma.cc/BJV5-3GLL .................................................. 5

Fed. R. Civ. P. 12(b)(1) ................................................................. 11

Fed. R. Civ. P. 12(b)(6) ................................................................. 11

Fed. R. Evid. 702 ........................................................................ 57

James W. Fraser,
   *Between Church and State* 35 (2d ed. 2016) ....................................... 52

*Main Reading Room*, Library of Congress,
   https://perma.cc/PY3S-QZVX ........................................................... 5

Mark Storslee, *Church Taxes and the Original
   Understanding of the Establishment Clause,*
   169 U. Pa. L. Rev. 111 (2020) ........................................................ 42

*McGuffey's Readers* .................................................................... 52

*McGuffey's Second Eclectic Reader* vii (1836 ed.),
  https://perma.cc/95GY-359Y—H.B. 71...............................................53

Michael W. McConnell,
  *Establishment and Disestablishment at the Founding,*
  *Part I: Establishment of Religion,*
  44 Wm. & Mary L. Rev. 2105 (2003)...................................................42

Nathan S. Chapman & Michael W. McConnell,
  *Agreeing to Disagree: How the Establishment*
  *Clause Protects Religious Diversity and Freedom*
  *of Conscience* (2023) ...............................................................41

*The New England Primer*...............................................................52

Noah Webster's *American Spelling Book* ..............................................52

Stephanie H. Barclay, Brady Earley, & Annika Boone,
  *Original Meaning and the Establishment Clause:*
  *A Corpus Linguistics Analysis,* 61 Ariz. L. Rev. 505 (2019).........42, 47

U.S. Const., amend. I.................................................................40

## INTRODUCTION

Neither this Court nor the Supreme Court has ever held that Article III permits an Establishment Clause plaintiff to sue over a religious display that he has not seen. Yet here Plaintiffs are, offended by anticipatory exposure to displays of the Ten Commandments that do not exist and whose contents and contexts have not been determined. Article III ends this case—this Court need proceed no further.

But Plaintiffs equally lose on the merits. They do not have a single case from this Court or the Supreme Court holding that the mere display of the Ten Commandments (much less a display that may reflect avowedly pedagogical content) implicates what those at the Founding would have understood to be a traditional establishment of religion forbidden by the First Amendment. In fact, their facial challenge to non-existent displays was doomed from the jump—because it is impossible for them to demonstrate that there is *no* Ten Commandments display that can satisfy constitutional scrutiny.

On either jurisdiction or the merits, therefore, reversal of the district court's preliminary injunction is warranted.

## JURISDICTIONAL STATEMENT

The district court has subject matter jurisdiction under 28 U.S.C. § 1331, but it lacks Article III jurisdiction, *see infra* Argument Section I. The district court entered its order granting a preliminary injunction and denying Defendants' motion to dismiss on November 12, 2024. ROA.1794. Defendants appealed that order the same day. ROA.1795-96. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES PRESENTED

1.    Whether Plaintiffs' challenge is unripe where they have never seen an H.B. 71 display and do not know the essential context of any such future display in their schools.

2.    Whether, under this Court's existing precedent, Plaintiffs lack standing to challenge hypothetical H.B. 71 displays no one has seen, based solely on anticipated, potential offense.

3.    Whether offended-observer standing is no longer a valid theory of standing after *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), expressly abandoned *Lemon v. Kurtzman*, 403 U.S. 602 (1971).

4.    Whether the district court erred in determining that H.B. 71 likely facially violates the Establishment Clause.

5.    Whether the district court's injunction is otherwise invalid.

## STATEMENT OF THE CASE

### A.    The Ten Commandments

The Ten Commandments "have historical significance as one of the foundations of our legal system." *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 53 (2019). "Even those who" doubt their divine origin "cannot deny [their] influence upon the civil and criminal laws of this country," or on the "ethics and ideals of a just society" writ large. *Van Orden v. Perry*, 351 F.3d 173, 181 (5th Cir. 2003) (rejecting Establishment Clause challenge to Ten Commandments monument on grounds of Texas State Capitol), *aff'd*, 545 U.S. 677. The Ten Commandments not only undergird longstanding prohibitions on murder, theft, perjury, and the like,[1] but also substantiate the fundamental claim in one of our founding documents—that there is a transcendent and ultimate source of rights and duties that is not the government. *See* Decl. of Indep. ¶ 2.

Perhaps unsurprisingly, then, our Nation has long displayed the Ten Commandments in prominent public spaces. For example, for nearly

---

[1] *See, e.g.*, 1 William Blackstone, *Commentaries on the Laws of England: Of the Rights of Persons* 54 (1765), t.ly/dNNnQ (in proscribing *mala in se* crimes like murder, theft, and perjury, the legislature "acts only … in subordination to the great lawgiver, transcribing and publishing his precepts").

a century, a sculpture of Moses has adorned the Supreme Court's own courtroom as one of the "great lawgivers of history"—holding the Ten Commandments. *Courtroom Friezes: South and North Walls*, Office of the Curator, Supreme Court of the United States, https://perma.cc/BJV5-3GLL. And in the Library of Congress, a bronze statue of Moses holding the Ten Commandments stands tall over the Main Reading Room. *Main Reading Room*, Library of Congress, https://perma.cc/PY3S-QZVX. Today, similar Ten Commandments displays have been identified in "almost every state." Br. for United States as *Amicus Curiae* at *11, *1a-7a, *Van Orden v. Perry*, 545 U.S. 677 (2005), (No. 03-1500), 2005 WL 263790 ("non-exhaustive survey").

## B.    Louisiana's H.B. 71

In keeping with that tradition, Louisiana enacted H.B. 71, which requires public schools to display the Ten Commandments in each classroom. La. R.S. § 17:2124 (2024). H.B. 71 specifies that the Commandments' text must be "identical" to that upheld in *Van Orden*, in "large, easily readable font," on "a poster or framed document that is at least eleven inches by fourteen inches," and "the central focus" of the display. §§ 17:2124(A)(6), (B)(1), (C)(1). Each display must include a

"context statement" about the history of the Ten Commandments in American public education. § 17:2124(B)(3). It is up to "[e]ach governing authority" to determine "[t]he nature of the display," though H.B. 71 provides schools with examples of documents to consider displaying alongside the Ten Commandments, such as "the Mayflower Compact, the Declaration of Independence, and the Northwest Ordinance." §§ 17:2124(B)(1), (B)(4). No school governing board is required to pay for the displays but must accept either donated displays or donated funds. § 17:2124(B)(5).

H.B. 71 requires the Louisiana State Board of Elementary and Secondary Education (BESE) to "adopt rules and regulations in accordance with the Administrative Procedure Act" for the law's implementation; and the Department of Education (DOE) to "identify appropriate [compliance] resources" that are "free of charge" and list them on the Department's website. §§ 17:2124(B)(6)(a), (B)(6)(b).

When H.B. 71 was first enacted, "DOE staff members d[id] not yet know how DOE … w[ould] implement H.B. 71." ROA.477-78. DOE, however, submitted that it "w[ould] likely consider" certain "illustratives … or variations of them" as possibilities to suggest to

6

schools. ROA.477-78. Here are some of them (with full-page renderings at ROA.480-94), discussing, for example, Justice Ginsburg's thoughts on the Ten Commandments from a school paper that she republished in 2016 in *My Own Words*:






On January 3, 2025, the Attorney General issued guidance urging each Louisiana school to "select, and display at its discretion, the four displays attached to this guidance letter." *H.B. 71 Guidance for*

*Louisiana Schools*, Office of the Attorney General (Jan. 3, 2025), tinyurl.com/bdd3sutd. Those displays are here:









The guidance letter also states that "each display should be between the statutory minimum size, 11 inches by 14 inches, and 18 inches by 24 inches." *Id.* A school "should place its displays on any classroom wall other than behind a teacher's desk, podium, or location from which a

teacher ordinarily delivers instruction." *Id.* And a school should "place its displays among others reflecting educational content." *Id.*

### C.    Plaintiffs' Lawsuit

Five days after Governor Landry signed H.B. 71 into law in June 2024, Plaintiffs—public-school parents and their minor children—sued the Louisiana State Superintendent of Education, the BESE members in their official capacities, and five parish school boards. Plaintiffs claim that H.B. 71 violates the First Amendment's Establishment Clause and Free Exercise Clause. ROA.76-79.

As to the Establishment Clause, Plaintiffs charged H.B. 71 with "prescribing an official religious text for schoolchildren to venerate." ROA.77. And as to the Free Exercise Clause, Plaintiffs alleged that H.B. 71 "substantially burdens the religious exercise" of Plaintiffs by "pressuring them to suppress or limit expression of their religious or nonreligious backgrounds, beliefs, or practices" or to "adopt[] the state's favored religious scripture." ROA.78-79.

Two weeks later, Plaintiffs sought a preliminary injunction preventing Defendants (and several other persons and entities not before the Court) from enforcing and following H.B. 71. ROA.239-46. Plaintiffs

also submitted an "expert" report from law professor Steven Green, the former legal director of Plaintiffs' counsel, Americans United for Separation of Church and State, who opined, *contra American Legion*, that "the Ten Commandments are not a foundation of the American government or legal system" and "[t]here is no evidence of a longstanding … practice of widespread, permanent displays of the Ten Commandments in public-school classrooms." ROA.851-52, 858. In response, Defendants sought dismissal under Rules 12(b)(1) and 12(b)(6), opposed the preliminary injunction, and moved to exclude Professor Green's testimony as unreliable, wrong, and irrelevant. ROA.415-74, 1119-31.

## D.    The District Court's Decision

On November 12, 2024, the district court denied Defendants' motion to exclude, ROA.1595-1617, and issued an opinion denying Defendants' motion to dismiss and granting Plaintiffs' preliminary-injunction motion, ROA.1618-1794, finding H.B. 71 "FACIALLY UNCONSTITUTIONAL and UNCONSTITUTIONAL IN ALL APPLICATIONS," ROA.1793-94.

The court rejected Defendants' ripeness and standing arguments, reasoning that, although Plaintiffs have never seen an H.B. 71 display and none yet exists, "the risk of a future encounter" with H.B. 71 displays was "certainly impending." ROA.1651-52. On the merits, the court held that H.B. 71 "runs afoul of *Stone v. Graham*, 449 U.S. 39 (1980)," a decision in which the Supreme Court applied the *Lemon* test to strike down a Kentucky law requiring displays of the Ten Commandments in public-school classrooms. ROA.1623, 1729 (based on *Stone* "alone, the Court could deny AG Defs. MTD").

The court claimed to be avoiding "the now-defunct *Lemon* test" itself. ROA.1714. But it nevertheless concluded that "any purported secular purpose [of H.B. 71] was not sincere but rather a sham," and that the actual purpose was "overtly religious," as demonstrated by "the legislative history and fundraising efforts of the Governor." ROA.1623 & n.5, 1712-14. The court also concluded that, "even if [it] did examine [Plaintiffs'] Establishment Clause claim under" the Supreme Court's current approach, the motion to dismiss would still be denied and Plaintiffs would still be entitled to a preliminary injunction. ROA.1729, 1768-78. On this point the court relied extensively on Professor Green's

report and testimony, which it found "convincing, logical, and consistent with the Court's own review of the evidence." ROA.1777.

The court further held that Plaintiffs were likely to succeed on their free-exercise claims because Plaintiffs' "testimony confirms, among other things, their religious or nonreligious beliefs, the manner in which the Act substantially burdens those beliefs, and the Act's inconsistencies with any historical tradition by being discriminatory and coercive." ROA.1778.

With these determinations, the court enjoined Defendants' enforcement of H.B. 71 and ordered them "to provide notice of this ruling"—not just to the schools falling within the geographical jurisdiction of the Defendant school boards, but to "all Louisiana public elementary, secondary, and charter schools, and all public post-secondary education institutions." ROA.1630.

### E.    The Panel Decision

Defendants appealed. ECF 1. They sought and secured an administrative stay of the district court's notice provision. ECF 12, 32. They also sought a stay of the district court's order in its entirety pending this appeal, and to expedite the appeal given H.B. 71's upcoming

compliance deadline. ECF 38, 39. The motions panel carried the stay motion with the case and entered a partial administrative stay. ECF 59.

The next day, the merits panel (Panel) denied the stay pending appeal and dissolved the administrative stay (ECF 68), set an expedited briefing schedule (ECF 64), and calendared the appeal for argument on January 23, 2024 (ECF 70). Defendants moved for initial hearing en banc, ECF 75, which the Court denied over the votes of three judges, ECF 155-1.

On June 20, 2025, the Panel affirmed the district court's preliminary injunction. Although the Panel acknowledged that no parent or student had seen an H.B. 71 display, the Panel concluded that it had "sufficient information for a fact-intensive and context-specific analysis," that "Plaintiffs demonstrated standing to assert their Establishment Clause claims" based solely on H.B. 71's text, and that it "must follow binding precedent" authorizing offended-observer standing. Op.10, 19, 22-23. Proceeding to the merits, the Panel concluded that "*Stone v. Graham* is controlling" and that, even if it were not, "H.B. 71 violates the Establishment Clause under *Kennedy*." *Id.* at 36. The Panel did not address Plaintiffs' Free Exercise Clause claim. *Id.* at 26 n.16.

Judge Dennis wrote separately to defend both offended-observer standing and the continuing vitality of the *Lemon* test. *See id.* at 44-50 (Dennis, J., concurring). Dismissing *Kennedy*'s express acknowledgment that "th[e] Court long ago abandoned *Lemon* and its endorsement test offshoot," *id.* at 49 (quoting *Kennedy*, 597 U.S. at 510), Judge Dennis claimed that "*Lemon*'s component parts … remain alive," *id.* at 50.

## SUMMARY OF THE ARGUMENT

**(I)** Plaintiffs' Establishment Clause challenge is not justiciable, both because it is not ripe and because they lack standing to raise it.

As for ripeness, Plaintiffs' claim is not fit for judicial decision because no Plaintiff has ever seen an H.B. 71 display and no one knows what the displays in Plaintiffs' classrooms will look like or what context may surround them. This Court has already held that an Establishment Clause challenge to the future display of a monument was unripe given the fact- and context-specific analysis required by the Supreme Court's Ten Commandments precedents. That holding is binding here.

Plaintiffs' lack of any actual confrontation with an H.B. 71 display also renders them without standing. This Court has expressly refused to stretch the offended-observer theory of standing to permit Establishment

15

Clause challenges based solely on anticipated future offense at seeing religion in public. More fundamentally, the offended-observer theory itself has no basis in the law, contradicts fundamental Article III principles, skews the playing field against governmental acknowledgments of religion, and entangles the judiciary in political questions. The Court should take this opportunity to scrap it entirely.

**(II)** Plaintiffs' Establishment Clause claim also fails on the merits—far from showing a likelihood of success, they have failed even to state a claim for relief.

Because Plaintiffs have asserted a facial challenge, they bore the burden of proving that *every* application of H.B. 71 is unconstitutional. They can do nothing of the sort. The Supreme Court has abandoned the *Lemon* test and replaced it with the hallmarks approach. Under that approach, the question here is whether every potential H.B. 71 display bears a historical hallmark of a religious establishment. They do not; indeed, neither the district court nor the Panel suggested otherwise.

Even if the displays implicated the hallmarks, they (or at least some of them) would be independently constitutional because they fall within a longstanding tradition of similar religious acknowledgments. And

although the district court and Panel claimed this case was controlled by the Supreme Court's *Lemon*-era precedent of *Stone v. Graham*, that decision does not govern here both because it is no longer good law and because to apply it to these facts would be to extend it—which this Court cannot do when a decision is built on faulty and expressly abandoned foundations.

## STANDARD OF REVIEW

This Court reviews the grant of a preliminary injunction for abuse of discretion, *United States v. Billingsley*, 615 F.3d 404, 408-09 (5th Cir. 2010), which occurs when a district court "makes an error of law," *Koon v. United States*, 518 U.S. 81, 100 (1996).

Because the district court's "order[] … granting" the "injunction[]," 28 U.S.C. § 1292(a)(1), also denied Defendants' motion to dismiss, that denial is before this Court—so this Court can reverse and render a judgment of dismissal, *see Jiao v. Xu*, 28 F.4th 591, 596 (5th Cir. 2022); *Magnolia Marine Transp. Co. v. Laplace Towing Corp.*, 964 F.2d 1571, 1580 (5th Cir. 1992). This Court reviews de novo the denial of a motion to dismiss. *Sw. Airlines Pilots Ass'n v. Sw. Airlines Co.*, 120 F.4th 474, 481 (5th Cir. 2024).

# ARGUMENT

## I. PLAINTIFFS' ESTABLISHMENT CLAUSE CHALLENGE IS NOT JUSTICIABLE.

This case begins and ends with Article III jurisdiction. Applying the Court's existing precedents, Plaintiffs' Establishment Clause claim is not ripe—and even if it were, they lack Article III standing to sue over anticipated offense. But more fundamentally, this case vividly illustrates the severely misguided nature of the offended-observer standing doctrine. Accordingly, the Court should reconsider its precedents adopting that doctrine.

### A. The Court's Existing Precedents Foreclose Jurisdiction.

#### 1. Plaintiffs' claims are not ripe under *Staley*.

Plaintiffs seek to enjoin displays they have never seen and whose form and appearance have not yet been determined. Under *Staley v. Harris County*, 485 F.3d 305 (5th Cir. 2007) (en banc), such claims cannot be ripe.

*Staley* involved a Bible monument at the Harris County Civil Courthouse. *Id.* at 307. A panel of this Court initially held that the display violated the Establishment Clause. *See Staley v. Harris County*, 461 F.3d 504, 515 (5th Cir. 2006). "[O]nly days before oral argument in

18

[the] en banc case," however, "the County removed the monument from the public grounds and placed it in storage, to permit the ongoing renovation of the Courthouse and its grounds." *Staley*, 485 F.3d at 307. But the County "specifically … asserted that it will display the monument again after the renovations are complete." *Id.* at 307-08.

The en banc Court held that "any dispute over a probable redisplay of the [Bible] monument is not ripe because there are no facts before us to determine whether such a redisplay might violate the Establishment Clause." *Id.* at 309. The court was thus "unable to conduct the fact-intensive and context-specific analysis required by" the Establishment Clause. *Id.*

*Staley* is on all fours here. Just as in *Staley*, because "no decision has been made regarding any aspect of the future" H.B. 71 displays in Plaintiffs' schools, Plaintiffs' claims are not ripe. *Id.* No Plaintiff has seen any H.B. 71 display; they do not know what any given display might look like, nor do they know what context might accompany it. Without these details, there is no way "to conduct the fact-intensive and context-specific analysis required." *Id.*; *see id.* at 308 ("[U]nder the Establishment Clause

detail is key." (quoting a Ten Commandments case, *McCreary County v. ACLU of Ky.*, 545 U.S. 844, 867-68 (2005)).

The Panel tried to distinguish *Staley* by misreading the statement in *Staley* that "no decision ha[d] been made regarding any aspect of the future display of the [stored] monument." Op.10 (citation omitted). But the *Staley* Court knew (a) the monument's dimensions; (b) its engravings; (c) its shape (like a lectern); (d) its central feature (an open Bible in a display case); (e) the Bible's dimensions; (f) its details (like being surrounded by a red neon light); (g) its yearly cost to the government to illuminate the Bible; and (h) the practice of turning pages of the Bible. *See Staley*, 461 F.3d at 506-07. The only information the Court lacked (on which "no decision ha[d] been made regarding any aspect") was the *context* of the potential future display, not the *contents* of the monument itself. *See Staley*, 485 F.3d at 309.

The same is true here. H.B. 71 lays out only certain minimum requirements regarding the text and size of the displays—their *contents*. *See* La. R.S. § 17:2124(B). But what any given display may look like—including, critically, the *context* in and around the posters—is missing at this stage. And that missing context prevents this Court from doing the

"fact-intensive and context-specific analysis" required (as the Court has emphasized) by the Supreme Court's Ten Commandments cases. *Staley*, 485 F.3d at 309 (citing *Van Orden* and *McCreary*). Because Plaintiffs cannot give any details about the context surrounding the Ten Commandments in future displays in their schools, their claims are not yet "fit[] … for judicial decision," *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 930 (5th Cir. 2023) (citation omitted), and thus are unripe.

### 2.    Plaintiffs have no Article III standing under *Barber* and *Doe*.

Similar problems point up Plaintiffs' lack of standing. Standing requires a plaintiff to show that they have suffered or will suffer an injury that is "concrete, particularized, and actual or imminent." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (citation omitted). "In cases involving religious displays and exercises," this Court has "required an encounter with the offending item or action to confer standing." *Barber v. Bryant*, 860 F.3d 345, 353 (5th Cir. 2017). Even then, a simple encounter "'represent[s] the outer limits' of what is constitutionally cognizable." *Freedom From Religion Found., Inc. v. Mack*, 49 F.4th 941, 949 (5th Cir. 2022) (citation omitted). Yet Plaintiffs have never seen an H.B. 71 display, much less been injured by one. *See, e.g.*, *Doe v. Tangipahoa Par.*

*Sch. Bd.*, 494 F.3d 494, 497 (5th Cir. 2007) (en banc) (requiring proof that plaintiffs "were exposed to, and may thus claim to have been injured by, invocations" at public meetings to establish Article III injury).

Nevertheless, the Panel held that Plaintiffs have standing to challenge displays they have never encountered. *See* Op.18-19. To reach that conclusion, the Panel reasoned that Plaintiffs' children "*will* confront *a* display of the Ten Commandments" in their classrooms, and this *future* injury is enough to confer standing now. Op.18 (emphases added). But the Panel relied heavily on misreadings of Supreme Court precedent and on one of this Court's cases—*Ingebretsen v. Jackson Public School District*, 88 F.3d 274 (5th Cir. 1996)—that is flatly inconsistent with this Court's subsequent en banc precedent in *Doe* and *Staley*. *See* Op.18-19.

Start with the Supreme Court precedent the Panel primarily relied on: *School District of Abington Township v. Schempp*, 374 U.S. 203 (1963), and *Lee v. Weisman*, 505 U.S. 577 (1992). Neither case is applicable here because both involved past and ongoing personal interactions with religious exercises. *Cf. Mack*, 49 F.4th at 949 (holding standing existed only where plaintiff had "established an ongoing

confrontation"). In *Schempp*, the plaintiffs' children "testified that all of the doctrines to which they referred were read to them at various times." 374 U.S. at 208; *see id.* at 211 ("it was the practice under the rule to have a reading on each school morning"). And in *Lee*, the plaintiff had *already encountered*—and been coerced to participate in—prayer at a prior ceremony and was all but "certain," based on stipulated facts, to encounter it again. 505 U.S. at 584. Thus, contrary to the Panel's conclusion, neither *Schempp* nor *Lee* is "a future injury case," Op.17, that can support standing where there has been no past encounter with a religious display, *see Doe*, 494 F.3d at 498 & n.7 (noting the Supreme Court in *Lee* "did not reach the issue" of standing where there had been no encounter).

Next, consider *Ingebretsen*, which held that a plaintiff had standing to challenge a Mississippi statute permitting prayer during school events because "the statute 'ma[de] inappropriate government involvement in religious affairs inevitable.'" 88 F.3d at 278 (citation omitted). That case was wrong the day it was decided. *See id.* at 284 (Jones, J., dissenting from denial of rehearing en banc). And, like *Schempp* and *Lee*, it involved a religious *ceremony*, not a religious *display*. Regardless, even if

*Ingebretsen* authorized standing based on anticipatory offense, this Court's later en banc opinions in *Staley* and *Doe* overrode that view. Both of those decisions require "proof" that the plaintiffs "were exposed to, and may thus claim to have been injured by," a religious display or exercise to establish standing. *Doe*, 494 F.3d at 497; *Staley*, 485 F.3d at 309 (reaching similar conclusion on ripeness grounds).

The Panel's reasons for sidestepping *Doe* and *Staley* are unconvincing. *See* Op.17-18. *Doe*'s core holding is that, where there has been no actual encounter, there can be no injury, and thus no standing. *See* 494 F.3d at 497. That necessarily overturns *Ingebretsen*'s opposite conclusion. And although *Staley* addresses ripeness, not standing *per se*, the "issues in this case 'boil down to the same question.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2015) (citation omitted). The conclusions drawn in *Staley* and *Doe* entirely undermine the reasoning and result in *Ingebretsen*. Thus, *Ingebretsen*'s "inevitable encounter" standard is no longer binding. *See, e.g.*, *Miller v. Dunn*, 35 F.4th 1007, 1012 (5th Cir. 2022). To the extent the Court believes *Ingebretsen* was not abrogated previously, it should overrule *Ingebretsen* now.

Even if *Ingebretsen* were still good law, however, it would authorize standing only where an encounter with an "inappropriate" display is "inevitable." 88 F.3d at 278 (citation omitted). That is not this case. The Supreme Court's own context-dependent Ten Commandments cases illustrate that such displays are not inevitably unconstitutional. *Compare Van Orden v. Perry*, 545 U.S. 677, 691-92 (2005) (plurality op.) (upholding Ten Commandments display sited among other monuments representing "political and legal history"), *with McCreary*, 545 U.S. at 869-70 (striking down Ten Commandments display standing first "alone" and then as part of a religiously focused display). Indeed, even Justice Souter's dissent in *Van Orden* acknowledged that "a display of the Commandments accompanied by an exposition of how they have influenced modern law would most likely be constitutionally unobjectionable" and that the "Decalogue could, as *Stone* suggested, be integrated constitutionally into a course of study in public schools." 545 U.S. at 741-42 (Souter, J., dissenting).

Yet the Panel found that Plaintiffs have standing only because they would inevitably "confront a display of the Ten Commandments." Op.18. Under that reasoning, *any* display of the Ten Commandments

25

(regardless of the surrounding context) must inevitably be "inappropriate," conferring standing on all who are offended. Because courts must "conduct [a] fact-intensive and context-specific analysis" in display cases, *Staley*, 485 F.3d at 309, that reasoning cannot be correct—particularly given the likelihood of H.B. 71 displays with additional historical or educational context, as contemplated by H.B. 71 and as demonstrated by the context-rich displays Defendants are considering. *See, e.g.*, *ACLU v. Mercer County*, 432 F.3d 624, 637-38 (6th Cir. 2005) (approving Ten Commandments display that was "placed on a level with other documents" with "unquestioned civil, legal, and political influence"); *Books v. Elkhart County*, 401 F.3d 857, 864-66 (7th Cir. 2005) (upholding Ten Commandments situated within display of many documents).

There are innumerable displays that would satisfy the Establishment Clause, *see infra* Section II, and neither Plaintiffs nor Defendants know which among countless variations might be posted in their schools. Thus, an unconstitutional encounter is not "inevitable," and Plaintiffs cannot establish any concrete injury.

**B.    The Court Should Reconsider Its Offended-Observer Standing Precedents.**

Resolving the problems above would end this case under existing precedents. But there is a more fundamental Article III problem embedded within those precedents: Mere "offense" at seeing something disagreeable cannot "qualif[y] as a 'concrete and particularized' injury sufficient to confer standing." *Am. Legion*, 588 U.S. at 80 (Gorsuch, J., joined by Thomas, J., concurring in the judgment). Now that *Lemon* is dead, the full Court should also lay offended-observer standing to rest.

**1.    Offended-observer standing has no basis in law.**

Long ago, the Supreme Court articulated the rule that should be dispositive here: "the psychological consequence presumably produced by observation of conduct with which one disagrees" is not an injury-in-fact "sufficient to confer standing under Art[icle] III." *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 485 (1982). By respecting Article III's authorization to "'adjudge the legal rights of litigants in actual controversies,' not hurt feelings," *City of Ocala v. Riojas*, 143 S. Ct. 764, 767 (2023) (Thomas, J., dissenting from denial of certiorari) (citation omitted), *Valley Forge*'s established rule "confine[d] the federal courts to a properly judicial role" in all contexts,

*El Paso County v. Trump*, 982 F.3d 332, 341 (5th Cir. 2020) (citation omitted).

But *Lemon* enticed courts to expand that role. In *Lemon v. Kurtzman*, 403 U.S. 602 (1971), and its progeny, the Supreme Court "suggested that 'the Establishment Clause forbids anything a reasonable observer would view as an endorsement of religion.'" *City of Ocala*, 143 S. Ct. at 764-65 (Gorsuch, J., respecting the denial of certiorari) (citation omitted). That led lower courts to "deduce such an observer must be able to sue." *Id.* at 765 (cleaned up); *accord Am. Legion*, 588 U.S. at 84 (Gorsuch, J., concurring in the judgment) ("Lower courts invented offended-observer standing for Establishment Clause cases in the 1970s in response to this Court's decision in *Lemon*."). But the Supreme Court has never endorsed the lower courts' Establishment-Clause-specific exception to Article III. *City of Ocala*, 143 S. Ct. at 764 (Gorsuch, J., respecting the denial of certiorari). And members of this Court have long criticized it. *See, e.g., Mack*, 49 F.4th at 949 ("Undeniably, the law of Establishment Clause standing is hard to reconcile with the general principle that standing is absent where a plaintiff has only a 'generalized grievance shared in substantially equal measure by all or most citizens.'"

(citation omitted)); *Doe*, 494 F.3d at 500 (DeMoss, J., specially concurring) ("This double standard must be corrected because … it opens the courts' doors to a group of plaintiffs who have no complaint other than they dislike any government reference to God.").

Members of the Supreme Court have long echoed that criticism—reasoning that, if this exception "ever made sense, it no longer does." *City of Ocala*, 143 S. Ct. at 765 (Gorsuch, J., respecting the denial of certiorari). For the "'offended observer' theory of standing has no basis in law," *Am. Legion*, 588 U.S. at 80 (Gorsuch, J., concurring in the judgment), and "appears to warp the very essence of the judicial power vested by the Constitution," *City of Ocala*, 143 S. Ct. at 767 (Thomas, J., dissenting from denial of certiorari). And "with the demise of *Lemon*'s reasonable observer test, little excuse now remains for the anomaly," meaning "the gaping hole it tore in standing doctrine in the lower courts should now begin to close." *Id.* at 765 (Gorsuch, J., respecting the denial of certiorari) (cleaned up).

Until this Court (and others) closes that hole, offended-observer standing will continue to wreak havoc in at least two ways. *First*, it will continue to create absurdly inconsistent results between Establishment

Clause cases and all others. For example, if Plaintiffs had standing here, that would mean a black student would *not* have standing to sue over a Confederate flag poster, yet Plaintiffs *would* have standing to sue if the Ten Commandments appeared on the same poster. *See Moore v. Bryant*, 853 F.3d 245, 249-51 (5th Cir. 2017) (explaining lack of standing to sue over Confederate flag, and distinguishing "Establishment Clause case law"); *cf. McMahon v. Fenves*, 946 F.3d 266, 271-72 (5th Cir. 2020) ("offense" at removal of monument, however "acutely" felt, is a "generalized psychological injury" insufficient to support standing). That distinction is "utterly unjustifiable." *Am. Legion*, 588 U.S. at 81-82 (Gorsuch, J., concurring in the judgment); *see Miss. Rising Coal. v. City of Ocean Springs*, 910 F.3d 191, 193 (5th Cir. 2018) (per curiam) ("If exposure to a flag does not injure a plaintiff for equal protection purposes, exposure to the same flag does not injure a plaintiff for [Fair Housing Act] purposes either.").

*Second*, the playing field will remain skewed against acknowledgments of religion, inviting courts to entertain otherwise non-justiciable cases—but only those aimed at purging the public square of symbolism with religious associations. In doing so, these courts will

continue invoking offended-observer standing to defy the principle that there is no "sliding scale of standing" depending on the right invoked, *City of Ocala*, 143 S. Ct. at 767 (Thomas, J., dissenting from the denial of certiorari) (cleaned up), and unnecessarily fanning the flames of culture-war disputes. That is "just plain wrong." *Kondrat'yev v. City of Pensacola*, 949 F.3d 1319, 1335 (11th Cir. 2020) (Newsom, J., concurring). By limiting jurisdiction over Establishment Clause claims to "actual cases and controversies," *Glass v. Paxton*, 900 F.3d 233, 242 (5th Cir. 2018), as the Constitution demands, this Court would not only realign these cases with Article III but "bring with it the welcome side effect of rescuing" courts in this circuit "from the sordid business of having to pass aesthetic judgment" on religious displays for their "perceived capacity to give offense," *Am. Legion*, 588 U.S. at 87 (Gorsuch, J., concurring in the judgment).

## 2. Plaintiffs depend on offended-observer standing.

Perhaps recognizing that this case is an ideal vehicle for "reconsider[ing] [this Court's] offended observer precedents en banc," *City of Ocala*, 143 S. Ct. at 768 (Thomas, J., dissenting from the denial of

certiorari), Plaintiffs have tried to disclaim reliance on offended-observer standing, to no avail.

*First*, Defendants' challenge to offended-observer standing is squarely presented. Before the district court and the Panel, Plaintiffs relied on anticipated exposure, arguing "the child-Plaintiffs will be directly exposed to the Act's mandatory displays." ECF 156-1 at 33. The district court and Panel were duty-bound to—and did—conclude that merely encountering a passive display confers standing. ROA.1624 ("these Plaintiffs face an *imminent*" "encounter with the offending display" that "is real and not hypothetical or speculative"); Op.18-19 ("In Establishment Clause cases, the injury is being personally exposed to a *government's* religious message with which a plaintiff disagrees." (cleaned up)). Meanwhile, Defendants challenged offended-observing standing at every step. ROA.436 n.1 (district court); ECF 92 at 34, 37 (panel); ECF 226 at 4 (en banc petition).

*Second*, Plaintiffs' reimaginations of their claims do not change their putative status as future offended observers; rather, Plaintiffs just illustrate the semantic hairsplitting that offended-observer standing invites. Plaintiffs have admitted that they challenge children being

32

"directly exposed to the Act's mandatory displays." ECF 156-1 at 33. But they contend their purported injuries also "go far beyond the right of 'observers' to be free from 'offense.'" *Id.* at 34. Specifically, they claim that, if students see *any* H.B. 71 displays, (1) the students will be "pressur[ed] to observe, meditate on, venerate, and follow the state's favored religious text" and "to suppress expression of their own religious beliefs and backgrounds at school," and (2) their parents will suffer harm to their "ability … to direct their children's religious education and upbringing." *Id.* at 8-9.

That position is implausible as a matter of common sense, given the kinds of displays Defendants are considering. But it also reveals a more fundamental problem with offended-observer standing: Plaintiffs manufacture "injuries" by playing word games. Here, for example, Plaintiffs replace "offense" with "coercive injury" and "observer" with "captive audience." ECF 156-1 at 34. But slapping a different label on "psychological consequence presumably produced by observation of conduct with which one disagrees" does not produce "an injury-in-fact sufficient to confer standing under Art. III." *Am. Legion*, 588 U.S. at 82 (Gorsuch, J., concurring in the judgment) (quoting *Valley Forge*, 454 U.S.

at 485); *see, e.g.*, *Staley*, 461 F.3d at 507 (alleging injury stemmed from encountering Bible display's "advance[ment of] Christianity"); *Van Orden v. Perry*, 2002 WL 32737462, at *2 (W.D. Tex. Oct. 2, 2002) (alleging injury stemmed from observing Ten Commandments monument "symboliz[ing] a state policy to favor the Jewish and Christian religions over other religions and over non-believers").

*Third*, no Supreme Court precedent gives Plaintiffs standing. Plaintiffs have argued that the Supreme Court's opinions in *Stone*, 449 U.S. 39, and *American Legion*, 588 U.S. 29, confer standing to sue here. *See* ECF 156-1 at 35-36. But *sub silentio* assumptions of jurisdiction like those have no binding effect on this Court. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) ("[D]rive-by jurisdictional rulings … have no precedential effect."). And the en banc Court has already rejected exactly that sort of inference. *See Doe*, 494 F.3d at 498 (rejecting dissent's view "that lower courts can infer standing from the Supreme Court's decision[s] in similar Establishment Clause cases where the issue was not ruled on by the Court").

Plaintiffs also argued—and the Panel accepted—that *Lee* and *Schempp* supply standing. ECF 156-1 at 30-31, 35; Op.16. But unlike this

case, *Lee* and *Schempp* did not involve anticipated future harms, did not address religious displays, and were brought by individuals required to participate in religious ceremonies (not offended observers of passive displays). *See supra* Section I.A.2. Those cases thus have nothing to say about alleged harms inflicted on those who observe (or expect to observe) passive religious displays—which explains why the district court included neither case in its standing analysis.

\* \* \*

After decades "sit[ting] up in its grave and shuffl[ing] abroad, after being repeatedly killed and buried," *Lemon*'s ghost is gone—leaving no good reason why offended-observer standing should be left to haunt the courts in this circuit. *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 398 (1993) (Scalia, J., concurring in the judgment). *Contra* Op.50 (Dennis, J.) ("*Lemon*'s component parts … remain alive."). This Court should overrule its offended-observer precedents, confirming that—in Establishment Clause cases, like all others—only plaintiffs presenting "actual cases and controversies" have standing to sue. *Glass*, 900 F.3d at 242.

## II.   H.B. 71 Is Not Facially Unconstitutional Under the Establishment Clause.

If the Court reaches the merits of Plaintiffs' Establishment Clause claim, it should reject that claim. As the Panel, the district court, and Plaintiffs all have conceded, this is a facial challenge to H.B. 71—*i.e.*, an attack on the statute itself rather than any particular application of it. Op.26; ROA.1625. "[T]hat matters" because "facial challenges are disfavored" and "hard to win." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723, 743-44 (2024).

As this Court has held specifically in the Establishment Clause context, to "successfully mount a facial challenge," Plaintiffs must demonstrate "that there is no set of circumstances under which [the implementation of H.B. 71] is constitutional." *Croft v. Perry*, 624 F.3d 157, 164 (5th Cir. 2010). Put otherwise, Plaintiffs must "show [H.B. 71] to be unconstitutional in every application." *Id.*

Plaintiffs cannot carry that burden, not least because, even in the *Lemon* era, the Supreme Court never "purport[ed] to decide the constitutionality of every possible way the Commandments might be set out by the government." *McCreary*, 545 U.S. at 867. H.B. 71 is constitutional principally under the modern "hallmarks" analysis set out

by the Supreme Court in *Kennedy*. It is likewise constitutional even if a *Town of Greece v. Galloway*, 572 U.S. 565 (2014)-style analysis were necessary. And contrary to Plaintiffs' and the Panel's protestations, *Stone* does not compel a different result. All this requires vacatur of the injunction below and dismissal of Plaintiffs' Establishment Clause claim.

## A.   H.B. 71 Is Constitutional Under *Kennedy*.

The governing Establishment Clause standard is the "hallmarks" analysis, which the Supreme Court adopted in *Kennedy*, 597 U.S. at 537. Under that approach, the question is whether the challenged practice implicates "the hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Id.* H.B. 71 does not—which ends the inquiry.

Notably, the Panel never contended H.B. 71 was unconstitutional under the hallmarks test, instead rejecting that analytical framework altogether in favor of a theory that H.B. 71 is constitutional only if "the permanent posting of the Ten Commandments in public school classrooms fits within, or is consistent with, a broader tradition of using the Ten Commandments in public education." Op.38. But that is wrong—

departing from binding Supreme Court precedent and the holdings of two of this Court's sister circuits.

### 1. *Kennedy* establishes a hallmarks analysis.

a. For decades, the *Lemon* test haunted Establishment Clause jurisprudence, encouraging courts and plaintiffs to "purge" anything that "partakes of the religious." *Kennedy*, 597 U.S. at 535 (citation omitted). In *Kennedy*, however, the Court "abrogated" the *Lemon* test. *Groff v. DeJoy*, 600 U.S. 447, 460 & n.7 (2023). In its place, *Kennedy* emphasized "that the Establishment Clause must be interpreted by reference to historical practices and understandings." 597 U.S. at 535 (citation omitted).

But the Court did not stop there. *Kennedy* also described what the key practices and understandings *are*—namely, "the hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Id.* at 537. In a prior opinion, *Kennedy*'s author had listed these hallmarks as an "alternative" to *Lemon*'s "ahistoric test." *Shurtleff v. City of Boston*, 596 U.S. 243, 279, 285-86 (2022) (Gorsuch, J., joined by Thomas, J., concurring in the judgment). In *Kennedy*, after deeming *Lemon* "abandoned" and insisting on the

importance of "historical practices and understandings," the Court (through Justice Gorsuch) invoked "the hallmarks" and cited the relevant portions of Justice Gorsuch's own *Shurtleff* concurrence. 597 U.S. at 534-37 & n.5 (citation omitted).

The hallmarks are these:

1. "the government exerted control over the doctrine and personnel of the established church";

2. "the government mandated attendance in the established church and punished people for failing to participate";

3. "the government punished dissenting churches and individuals for their religious exercise";

4. "the government restricted political participation by dissenters";

5. "the government provided financial support for the established church, often in a way that preferred the established denomination over other churches"; and

6. "the government used the established church to carry out certain civil functions, often by giving the established church a monopoly over a specific function."

*Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring in the judgment).

After *Kennedy*, as two other circuits have already recognized, Establishment Clause plaintiffs bear "the burden" of "proving that th[e] facts align with a historically disfavored establishmentarian practice." *Firewalker-Fields v. Lee*, 58 F.4th 104, 122 n.7 (4th Cir. 2023)

39

(Richardson, J.). "So to prevail on [an] Establishment Clause claim, [the plaintiff] must show that the [defendant's action] resembles one of these hallmarks of religious establishment." *Hilsenrath ex rel. C.H. v. Sch. Dist. of Chathams*, 136 F.4th 484, 491 (3d Cir. 2025) (Hardiman, J.), *petition for cert. filed*, No. 25-256 (U.S. Sept. 2, 2025). And if the government's action "does not bear any of the hallmarks of religious establishment," the claim fails. *Id.* at 494.

b. The hallmarks framework not only is binding but also has many virtues. *First*, unlike the *Lemon* test, this framework is tied to what ought to be the starting point for any Establishment Clause analysis—the Clause's text. "Constitutional analysis must begin with 'the language of the instrument,' which offers a 'fixed standard' for ascertaining what our founding document means." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 235 (2022) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 186-89 (1824), and 1 J. Story, Commentaries on the Constitution of the United States § 399, p. 383 (1833)).

So it is under the hallmarks analysis. At the Establishment Clause's heart is the concept of an "establishment of religion." U.S. Const., amend. I. While "we have almost forgotten what one is," at the

Founding, "virtually every American knew from experience what those words meant," since the "Church of England was established by law in the mother country, nine of the thirteen colonies had established churches on the eve of the Revolution, and about half of the states continued to have some form of official religious establishment when the First Amendment was adopted." Nathan S. Chapman & Michael W. McConnell, *Agreeing to Disagree: How the Establishment Clause Protects Religious Diversity and Freedom of Conscience* 9 (2023). The hallmarks approach begins with what an "establishment of religion" was and then compares the challenged government action to it—thus heeding "the precise text of the Constitution." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024).

*Second*, the hallmarks approach is rooted in history. A court's "duty" is always "'to interpret the Constitution in light of its text, structure, and original understanding'—as informed by history and tradition." *Abbott v. Biden*, 70 F.4th 817, 827 (5th Cir. 2023) (citation omitted). *Lemon* paid no heed to history or tradition, instead focusing on "abstract" inquiries into "a law's purposes, effects, and potential for entanglement with religion." *Kennedy*, 597 U.S. at 534. *Lemon* even led

41

courts so far astray as "to consider only the motives of the legislators who supported [the challenged statute]." *Edwards v. Aguillard*, 482 U.S. 578, 612 (1987) (Scalia, J., joined by Rehnquist, C.J., dissenting).

The hallmarks approach corrects that error. When it comes to what an established church was at the Founding, there is a wealth of history available—and the hallmarks approach specifically focuses courts on that history. *See, e.g.*, Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion,* 44 Wm. & Mary L. Rev. 2105 (2003); Mark Storslee, *Church Taxes and the Original Understanding of the Establishment Clause,* 169 U. Pa. L. Rev. 111 (2020); Stephanie H. Barclay, Brady Earley, & Annika Boone, *Original Meaning and the Establishment Clause: A Corpus Linguistics Analysis,* 61 Ariz. L. Rev. 505 (2019). In identifying "telling traits" of "founding-era religious establishments" *ex ante*, this historical approach also provides a traditional legal test judges and officials "can rely on" to reach predictable results. *Shurtleff*, 596 U.S. 285-86 (Gorsuch, J., concurring in the judgment).

*Third*, and relatedly, the hallmarks approach is administrable. *Lemon* was "chaotic" and a "judicial morass" because it required courts to

ponder imponderables. *Utah Hwy. Patrol Ass'n v. Am. Atheists, Inc.*, 132 S. Ct. 12, 15 n.3 (2011) (Thomas, J., dissenting from denial of certiorari) (citations omitted). As for the first prong, "discerning the subjective motivation of those enacting [a] statute is … almost always an impossible task," *Edwards*, 482 U.S. at 636-39 (Scalia, J., joined by Rehnquist, C.J., dissenting), especially since "[w]hat motivates one legislator to vote for a statute is not necessarily what motivates scores of others to enact it," *Dobbs*, 597 U.S. at 253-54 (citation omitted). The second prong asked courts to evaluate the display or practice's putative "effect" from the perspective of a "reasonable observer," a "malleable" test inviting judges to "pick [their] own 'reasonable observer' avatar." *Shurtleff*, 596 U.S. at 278-79 (Gorsuch, J., concurring in the judgment). And both prongs asked courts to look for the "advancement" or "inhibition" of religion without ever identifying the baseline from which these concepts were to be measured.

Meanwhile, applying the hallmarks is straightforward. The Supreme Court has identified what the hallmarks are; the question is whether a challenged display or practice looks like them. *Hilsenrath*, 136 F.4th at 491. That sort of "reasoning by analogy" is "a commonplace task

for any lawyer or judge." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 28 (2022).

*Fourth*, and finally, the hallmarks approach is open to religious acknowledgments in the public square, which promote an accurate understanding of our Nation's history and culture and encourage the sort of "tolerat[ion]" of "diverse expressive activities" that is essential to "liv[ing] in a pluralistic society." *Kennedy*, 597 U.S. at 541 (citation omitted). Here again, the hallmarks approach redresses one of *Lemon*'s flaws—namely, its inability to "explain the Establishment Clause's tolerance, for example, of" legislative "prayer"; "public references to God on coins, decrees, and buildings; or the attention paid to the religious objectives of certain holidays." *Am. Legion*, 588 U.S. at 49-50 (plurality op.). Indeed, *Lemon* presented "particularly daunting problems in cases," like this one, "involv[ing] the use, for ceremonial, celebratory, or commemorative purposes, of words or symbols with religious associations." *Id.* at 51.

Meanwhile, the hallmarks approach does not treat every hint of religion as a proverbial boogeyman to be avoided at all costs. Rather, it accounts for the fact that an "establishment of religion" is a discrete and

44

limited concept—one whose prohibition is perfectly reconcilable with government acknowledgments of religious aspects of the Nation's history and culture.

c. The Panel's reasons for rejecting the hallmarks analysis—throwing the Court into a direct circuit split with the Third and Fourth Circuits—are groundless.

*First*, the Panel noted that "the *Shurtleff* concurrence is non-binding." Op.37. Of course that opinion was not binding in its own right—but *Kennedy* is binding, and in *Kennedy*, Justice Gorsuch, now writing for the Court, adopted by reference his *Shurtleff* concurrence's reasoning. *Kennedy*, 597 U.S. at 533-35, 537 & n.5. Moreover, while the *Shurtleff* list of hallmarks is helpfully precise, other binding precedents had articulated versions of that list long before. *See Walz v. Tax Comm'n of N.Y.*, 397 U.S. 664, 668 (1970) ("It is sufficient to note that for the men who wrote the Religion Clauses of the First Amendment the 'establishment' of a religion connoted sponsorship, financial support, and active involvement of the sovereign in religious activity.").

*Second*, the Panel said *Kennedy* "did not adopt these 'hallmarks' as the exclusive Establishment Clause test." Op.37. No—but it *did* adopt

them as an *essential* Establishment Clause test, such that, if a plaintiff fails to "show that the [challenged action] resembles one of these hallmarks of religious establishment," she cannot "prevail." *Hilsenrath*, 136 F.4th at 491. The Panel not only did not "exclusive[ly]" consider the hallmarks; it did not consider them at all.

*Third*, the Panel interpreted *Kennedy* to say that an action challenged under the Establishment Clause is constitutional only if it "fits within, or is consistent with, a broader tradition of" such actions "at the time of the Founding or incorporation." Op.37. But the Panel was confused about a separate line of Supreme Court cases including *Town of Greece* that discusses when a longstanding tradition alone defeats an Establishment Clause challenge. *See infra* Section II.B. While such a tradition is indeed *sufficient* to defeat an Establishment Clause claim, it is not *necessary*. Rather, if the action does not "bear any of the hallmarks of religious establishment," *Hilsenrath*, 136 F.4th at 494, then it is not an establishment, whether it is young, old, or middle-aged. *Cf. Bruen*, 597 U.S. at 32-34 (looking to consistency with regulatory tradition only *after* concluding that "the plain text of the Second Amendment protects [plaintiffs'] proposed course of conduct").

In *Kennedy* itself, for example, the Court blessed Coach Kennedy's prayer on the football field without inquiring into whether it was supported by a longstanding tradition dating back to the Founding. *See* 597 U.S. at 534-42. The reason the school district's claimed "Establishment Clause concerns" were unavailing was that his prayers did not "cross[] any line" implicating the relevant "hallmark." *Id.* at 536-37 (citation omitted). So it was irrelevant whether a longstanding tradition was independently necessary to sustain his practice.

## 2. H.B. 71 is constitutional under the hallmarks analysis.

Applying the hallmarks framework here, passive displays of the Ten Commandments in classrooms do not qualify. Indeed, "a close look at these hallmarks and our history reveals" that "no one at the time of the founding is recorded as arguing that the use of religious symbols in public contexts was a form of religious establishment." *Shurtleff*, 596 U.S. at 287 (Gorsuch, J., concurring in the judgment) (cleaned up); *see* Barclay, 61 Ariz. L. Rev. at 543 (corpus-linguistics analysis finding no "results for the *establishment of religion* phrase … that involved discussion of a religious establishment simply by virtue of a government display of religious symbols").

47

In brief, H.B. 71 does not "exert[] control over" any religious organization's "doctrine and personnel"; "mandate[] attendance" of any religious service; punish dissenting "churches and individuals for their religious exercise" or restrict their "political participation"; provide "financial support" to any religious organization; or enlist any religious organization to carry out any "civil functions." *Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring in the judgment). It simply makes available to Louisiana students—for them to engage with or ignore as they wish—a document the Supreme Court has recognized as "one of the foundations of our legal system." *Am. Legion*, 588 U.S. at 53. And (cue the facial-standard problems) it does so by giving schools discretion to decide what pedagogical content to include in and around H.B. 71 displays, such as the context reflected in the Attorney General's guidance. *See supra* pp.7–10.

For Plaintiffs' part, when finally forced to confront the hallmarks in their opposition to rehearing, they claimed the Panel opinion could be reconciled with the hallmarks because *Kennedy* supposedly said that "coercion … was among the foremost hallmarks of religious establishments." ECF 233 at 17. But what *Kennedy* actually said was

48

that—consistent with the *Shurtleff* list—coercion "to engage *in 'a formal religious exercise*,'" like prayer, devotional Bible reading, or church attendance, was a forbidden hallmark. 597 U.S. at 537 (emphasis added) (citation omitted). This case does not involve a formal religious exercise, or indeed any exercise; it involves purely passive posters on the wall.

And indeed, this Court has already held that "the mere display on public property of [a religious symbol] is in no meaningful sense either a religious activity or coercive." *Briggs v. Mississippi*, 331 F.3d 499, 505 (5th Cir. 2003); *see Doe*, 240 F.3d at 470 ("presence of a minister" does not make program a "religious exercise"). So here. While it is indisputable that Louisiana students are required to *go to school*, *cf.* Op.18-19, that misses the point—they are not required to do anything *with the posters* when they arrive. And as this en banc Court has squarely held, "[i]f no religious *activity* is at issue, any speculation as to whether students might feel pressured to participate is irrelevant." *Doe*, 240 F.3d at 470 (emphasis added). The hallmarks analysis ends Plaintiffs' claim.

## B.    H.B. 71 Is Independently Constitutional Because It Is Supported by Longstanding Tradition.

1. H.B. 71 is also constitutional for a separate and independent reason: It is "consistent with a broader tradition of" religious imagery on

public property. *Mack*, 49 F.4th at 950-51. As explained above, even if a practice otherwise would implicate a hallmark, "[a]ny test the Court adopts must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change." *Town of Greece*, 572 U.S. at 577. Thus, even assuming a plaintiff gets past the hallmarks threshold (Plaintiffs do not), a challenged practice does not violate the First Amendment if it "fits within [a] tradition long followed," such that history shows it can "coexis[t] with the principles of disestablishment and religious freedom." *Id.* at 576-78 (quoting *Marsh v. Chambers*, 463 U.S. 783, 786 (1983)).

That is precisely the case here. "There is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984). That tradition includes prayer and other religious acknowledgments—like the Thanksgiving proclamations issued by President Washington and his successors, *id.* at 675 & nn.2-3, and like the legislative and courtroom prayer practices at issue in *Town of Greece*, *Marsh*, and *Mack*. But it also includes "graphic manifestations" of "our religious heritage," *id.* at 677—like the national seal proposed by

Jefferson and Franklin in 1776, which featured "Moses leading the Israelites across the Red Sea," *Shurtleff*, 596 U.S. at 287 n.11 (Gorsuch, J., concurring in the judgment); like the national seal ultimately adopted in 1782, likewise including religious imagery, *id.*; like the many "State and municipal seals and flags throughout our Republic that include religious symbols or mottos," *Freedom From Religion Found., Inc. v. County of Lehigh*, 933 F.3d 275, 284 (3d Cir. 2019); and like the motto "In God We Trust" on our currency, *see* Act of Mar. 3, 1865, ch. 100 § 5, 13 Stat. 518, and displayed in each Louisiana classroom, *see* La. R.S. § 17:262(A)(2).

"[D]isplays … of the Ten Commandments" are part of this "rich American tradition of religious acknowledgments." *Van Orden*, 545 U.S. at 689-90 (plurality op.). As both the Supreme Court and this Court have recognized, the Commandments "have historical significance as one of the foundations of our legal system." *Am. Legion*, 588 U.S. at 53; *see Van Orden*, 351 F.3d at 182. "[F]or largely that reason, they are depicted in the marble frieze in [the Supreme Court's] courtroom and in other prominent public buildings in our Nation's capital." *Am. Legion*, 588 U.S. at 53. And not just there: The U.S. Solicitor General has "identified

displays of the Ten Commandments in almost every State." *Amicus* Br. for the United States, *Van Orden*, 2005 WL 263790, at *11, *1a-*7a.

Even more specifically, the Ten Commandments have long been presented to *students* as an integral part of a curriculum. As H.B. 71 recounts, the Ten Commandments "were a prominent part" of American education from the dawn of public schools and stretching back "for almost three centuries," featuring in some of the most widely used textbooks in early American education: *The New England Primer*, *McGuffey's Readers*, and Noah Webster's *American Spelling Book*. La. R.S. § 17:2124(B)(3). *McGuffey's Readers* in particular were "omnipresent" in the early public schools that arose after disestablishment—"[p]erhaps the most consistent element in the nineteenth-century common school classroom." James W. Fraser, *Between Church and State* 35 (2d ed. 2016); *accord* ROA.934-935, 938 (Plaintiffs' expert agreeing that "free, common" or "public" schools arose "in the early 1800s" and *McGuffey's Readers* "were … used in many common schools throughout much of the nineteenth century"); *see* Expert Report of Prof. Mark David Hall, *Nathan v. Alamo Heights Indep. Sch. Dist.*, No. 25-50695 (5th Cir.), ECF 34 at App.165-170. And as record evidence reflects, the Ten

Commandments played a significant role in the *Readers*—sometimes set out verbatim, *e.g.*, ROA.1347-52; sometimes transposed into rhyming verse, *e.g.*, ROA.1353-54; and sometimes incorporated into stories, in ways that underscore their usefulness for secular ends, *e.g.*, ROA.1355-66.

H.B. 71 fits comfortably within this tradition. Indeed, the usage of the Commandments contemplated by H.B. 71 is far *more* passive and contextual than in the early textbooks. Unlike in (for example) the *Readers*—where reading each lesson prepared students for the next, *see, e.g.*, *McGuffey's Second Eclectic Reader* vii (1836 ed.), https://perma.cc/95GY-359Y—H.B. 71 displays are simply posted on the wall for students to observe or ignore as they wish.

2. The Panel's grounds for resisting this conclusion are meritless. The Panel invoked Plaintiffs' expert for the proposition "that the public school system did not exist at the founding" but rather "originated sometime around the late 1820s." Op.40. But even a challenged practice that did not exist at the Founding can have a historical foundation sufficient to trigger *Town of Greece* and *Mack*. After all, the relevant question is whether a practice can "coexist with the principles of

disestablishment and religious freedom," *Town of Greece*, 572 U.S. at 578 (cleaned up)—and the process of disestablishment in the States was not completed at the Founding but rather lasted well into the 19th century, *see id.* at 606 (Thomas, J., concurring in part and concurring in the judgment) ("the last State to disestablish" did "so in 1833").

Next, the Panel invoked Plaintiffs' expert's claim that the first law mandating the display of the Ten Commandments in public schools was passed in 1927 and "later struck down" in *Ring v. Grand Forks Public School District No. 1*, 483 F. Supp. 272 (D.N.D. 1980). Op.40. This, of course, defines the relevant tradition far too narrowly. *See, e.g.*, *Van Orden*, 545 U.S. at 689-90 (plurality op.) (upholding Ten Commandments *monument* on state capitol grounds based on, *inter alia*, "recognitions of the Ten Commandments" in judicial opinions and congressional resolutions); *Lynch*, 465 U.S. at 676-77 (upholding crèche in public park based on, *inter alia*, Thanksgiving proclamations, the national motto, and "religious paintings" in public art galleries).

But even on its own terms, this argument only proves that the *Lemon* era was an aberration: In the *Ring* example, the displays were required nearly a century ago, *cf. Town of Greece*, 572 U.S. at 576 (citing

early 20th-century "historical precedent" for municipal prayer), and struck down only after the Supreme Court decades later articulated the ahistorical "three criteria" of "*Lemon v. Kurtzman.*" *Ring*, 483 F. Supp. at 273; *cf. Shurtleff*, 596 U.S. at 287 (Gorsuch, J., concurring in the judgment) ("it appears that, until *Lemon*, th[e Supreme] Court had never held the display of a religious symbol to constitute an establishment of religion").

The Panel also adopted uncritically Plaintiffs' and their expert's claim that H.B. 71 employs a "Protestant version of" the Ten Commandments. Op.9. But H.B. 71's text is "identical" to the text found on the monument upheld in *Van Orden*, La. R.S. § 17:2124(A)(6), which itself was arrived at following "consultation with a committee composed of members of several faiths in order to find a nonsectarian text," *Van Orden*, 545 U.S. at 701 (Breyer, J., concurring in the judgment). Meanwhile, Plaintiffs' theory that H.B. 71's text is "Protestant" relies largely on their expert's blatantly anti-Catholic view that "the Catholic version [of the Ten Commandments] omits the graven images aspect" because "in Catholicism … you do have idols." ROA.2394.

In any event, the Supreme Court has already held that a display is not unlawful simply because it consists of one religion's "preeminent" symbol. *Am. Legion*, 588 U.S. at 38. This case is far easier since, in addition to their historical significance, the Ten Commandments "are recognized across such a broad and diverse range of the population—from Christians to Muslims—that they cannot be reasonably understood as a government endorsement of a particular religious viewpoint." *McCreary*, 545 U.S. at 894 (Scalia, J., dissenting).

More broadly, the Panel's and district court's heavy reliance on Plaintiffs' expert only underscores how far their analysis strayed. The expert did not address the hallmarks, nor should he have, since a practice's fit with history is a "*legal* inquiry." *Bruen*, 597 U.S. at 25 n.6 (emphasis added). And on topics the expert did address, he willfully announced that he was expressly contradicting the Supreme Court and this Court. *See* ROA.2376, 2419 (agreeing that his opinions are "inconsistent with those statements [of the Supreme Court] and established law," opining that "[m]any Justices of the Supreme Court are not historians," and commenting on *American Legion*'s discussion of the Ten Commandments: "It's just his [Justice Alito's] opinion, I guess."); *cf.*

*Am. Legion*, 588 U.S. at 35, 53 (Ten Commandments discussion joined by Roberts, C.J., and Breyer, Kagan, and Kavanaugh, JJ.).

An expert is neither relevant nor reliable if his testimony goes to factors relevant to the wrong legal inquiry and openly defies binding Supreme Court precedent. *See* Fed. R. Evid. 702. But the en banc Court need not wade into the rules of evidence to reject the Panel's outsourcing of the determinative questions here to the former legal director of Plaintiffs' law firm. "The views of self-proclaimed experts do not 'shed light on the meaning of the Constitution.'" *United States v. Skrmetti*, 145 S. Ct. 1816, 1840 (2025) (Thomas, J., concurring) (citation omitted)

### C.   *Stone* **Does Not Compel a Different Result.**

Perhaps because H.B. 71 is plainly lawful under the Supreme Court's modern precedents, Plaintiffs' principal submission—embraced by the Panel and district court—is that "*Stone v. Graham* is controlling" and that, "[u]nder *Stone*, H.B. 71 is plainly unconstitutional." Op.36; ROA.1623, 1706-09. They are wrong on both counts.

1. The most fundamental reason *Stone* is not controlling is that *Stone* is *Lemon* to its core—and "*Lemon* and its ilk are not good law." *Firewalker-Fields*, 58 F.4th at 121 n.5.

In *Stone*, a 5-4 Court struck down a Kentucky statute requiring Ten Commandments displays in Kentucky classrooms. 449 U.S. at 39-43. In so doing, the Court identified the rule of decision as the "three-part test" "announced" in "*Lemon v. Kurtzman*," which required the statute to have "a secular legislative purpose"; to have a "principal or primary effect … that neither advances nor inhibits religion"; and to "not foster 'an excessive government entanglement with religion.'" *Id.* at 40 (quoting *Lemon*, 403 U.S. at 612-13). And the *Stone* Court rested its decision entirely on *Lemon* prong one: "We conclude that Kentucky's statute requiring the posting of the Ten Commandments had no secular legislative purpose, and is therefore unconstitutional." *Id.* at 40-41.

Today, however, *Lemon*, has been "abrogated." *Groff*, 600 U.S. at 460 & n.7. After "criticiz[ing] or ignor[ing]" *Lemon* for "two decades," the Supreme Court in *Kennedy* deemed that "'ambitiou[s],' abstract, and ahistorical approach" definitively "abandoned." 597 U.S. at 534-35 & n.4. *Kennedy* specifically disapproved of *Lemon*'s "call[] for an examination of a law's purposes"—*i.e.*, *Lemon* prong one, the sole analysis conducted in *Stone*. *Id.* at 534. And *Kennedy* said the Court has "abandoned" not only

*Lemon* itself but also its "progeny" and "offshoot[s]"—an ignoble group undoubtedly counting *Stone* as a member. *Id.*

So with *Lemon*'s "long Night of the Living Dead … now over," *Mack*, 49 F.4th at 954 n.20, *Stone*'s should be too. *Cf. Branch v. Harris Cnty. Sheriff's Off.*, No. 24-20120, 2025 WL 636313, at *2 n.3 (5th Cir. 2025) (per curiam) (rejecting reliance on "*Lochner*-era case" because "[t]he doctrine recognizing such liberty interests … 'has long since been discarded'" (citation omitted)). Allowing Plaintiffs' "[i]nvocation" of *Stone* to stand "would make the ghost of [*Lemon*] walk again." *Fed. Hous. Admin. v. Darlington, Inc.*, 358 U.S. 84, 91-92 (1958).

2. Even if *Stone* remained good law, however, there is an independent reason why the Court should not apply it here. This Court has recognized that even where a questionable precedent technically is not "bad law," the Court nonetheless should decline to "extend [that decision's] reasoning" insofar as the decision "was built upon" a test the Supreme Court has "walked back from." *Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 259 & n.11 (5th Cir. 2019); *see City of Grants Pass v. Johnson*, 603 U.S. 520, 549-50 (2024).

Here, *Stone* plainly "was built upon" *Lemon*—a test the Supreme Court has not just "walked back from," but jettisoned entirely. *Dialysis*, 938 F.3d at 259. So the question is whether applying *Stone* here would "extend" it, or, alternatively, whether *Stone* is "directly control[ling]" here. *Id.* at 259 & n.11 (citation omitted). Moreover, since this is a facial challenge, that means *Stone* must be directly controlling as to "*every application*" of H.B. 71. *Croft*, 624 F.3d at 164 (emphasis added). It is not, for at least three reasons.

*First*, the law challenged in *Stone* applied only to "elementary and secondary" schools. 449 U.S. at 39 n.1. But H.B. 71, which Plaintiffs challenged (and the district court enjoined) in its entirety, also applies to "postsecondary" institutions—colleges like Louisiana State University, Louisiana Tech University, and the University of Louisiana at Lafayette. La. R.S. § 17:2124(C)(1); *see* ROA.1793-1794 ("House Bill No. 71, Act No. 676, is FACIALLY UNCONSTITUTIONAL and UNCONSTITUTIONAL IN ALL APPLCIATIONS.").

The Panel simply ignored this difference. The Panel repeatedly emphasized H.B. 71's supposed harms to "young, impressionable, captive public-school students" in "elementary, middle, and high school." Op.6,

60

18; *see* Op.21, 27, 28, 35-36, 43 (emphasizing the "special context" of "elementary and secondary public schools"); *see also* Op.15, 16, 18, 21, 27-28 (young "schoolchildren" are "impressionable"); Op.18, 28 (schoolchildren "must attend school"). But it did not even try to establish that "there is no set of circumstances under which [H.B. 71] is constitutional" as to *postsecondary* institutions where these considerations are not relevant, *Croft*, 624 F.3d at 164—*i.e.*, where students are full-grown adults and attendance is not compulsory.

Nor could it, since, even in the *Lemon* era, the Supreme Court found "substance to the contention that college students are less impressionable and less susceptible to religious indoctrination" and thus refused to strike down government actions relating to postsecondary institutions under its precedents governing "elementary and secondary schools." *Tilton v. Richardson*, 403 U.S. 672, 685-86 (1971). As the Supreme Court put it, "[t]his distinction warrants a difference in constitutional results." *Edwards*, 482 U.S. at 584 n.5 (citation omitted).

*Second*, in *Stone*, the displays "stood alone" as an "isolated exhibition" and "not part of an arguably secular display." *McCreary*, 545 U.S. at 867-68:



ROA.1334 (full-page rendering). And the Supreme Court has understood this as critical to *Stone*'s scope. That is why it relied on *Stone* with respect to a later *standalone* Commandments display, *McCreary*, 545 U.S. at 867-68, but resolved a dispute over another display presenting the Commandments "in the company of other documents" on different grounds, *id.* at 871; *see id.* at 868 ("The display in *Stone* had no context that might have indicated an object beyond the religious character of the text[.]"). Lower courts agreed, recognizing, even before *Kennedy*'s ultimate overruling of *Lemon*, that "[w]hatever is left of *Stone* is limited to circumstances involving public displays of the Ten Commandments *in isolation.*" *Mercer County*, 432 F.3d at 634 (emphasis added); *see Books*,

401 F.3d at 864-66 (distinguishing "singular" depiction of Ten Commandments from "the inclusion of the Ten Commandments in a display of many documents," and upholding the latter).

Here, of course, no display has actually gone up in Plaintiffs' schools (or any others). But, unlike in *Stone*, H.B. 71's text expressly contemplates that other documents "may also" be displayed "along with the Ten Commandments," listing three examples—"the Mayflower Compact, the Declaration of Independence, and the Northwest Ordinance." La. R.S. § 17:2124(B)(4). Consistent with this, unrefuted declarations from the Defendant school boards expressly state that they "will not likely consider" posting H.B. 71 displays that are simply "stand-alone cop[ies] of the Ten Commandments." ROA.501, 505, 509, 513. To the contrary, *all* the displays that are currently under consideration and included in the Attorney General's guidance depict the Ten Commandments surrounded by a variety of other content that indicates a wide array of pedagogical purposes. *Supra* pp.7–10. That is worlds away from the displays in *Stone*.

*Third*, *Stone* rejected Kentucky's proffered secular purpose as a sham—explaining that it was based solely on a one-sentence "notation"

untethered to the educational context (and indeed, which did not even claim that the secular purpose was *the legislature's*). 449 U.S. at 41-42. In contrast, H.B. 71 requires that each display include a three-paragraph "context statement" explaining "The History of the Ten Commandments in American Public Education." La. R.S. § 17:2124(B)(3). And it articulates the Legislature's secular historical and educational purposes for displaying the Commandments, explicitly claiming them as "the Legislature's intent." *Id.* § 17:2124(A)(1)-(9).

Even in the *Lemon* era, "[i]f a legislature expresse[d] a plausible secular purpose," "courts" were to "generally defer to that stated intent." *Wallace v. Jaffree*, 472 U.S. 38, 74-75 (1985) (O'Connor, J., concurring in the judgment); *see Croft v. Gov. of Tex.*, 562 F.3d 735, 749 (5th Cir. 2009). Such a purpose was expressed here, but not in *Stone*. And since nothing "suggest[s] that *Stone* would extend to displays of the Ten Commandments that lack a 'plainly religious,' 'pre-eminent purpose,'" *Van Orden*, 545 U.S. at 691 n.11 (plurality op.), *Stone* is not directly controlling here—leaving this Court free to consider H.B. 71 under current (rather than zombie) Establishment Clause precedents.

3. The Panel's contrary views fail. *First*, the Panel declined to consider whether the context-rich displays Defendants are actually considering violate the Establishment Clause, instead basing its facial determination on a hypothetical H.B. 71 display reflecting *only* "H.B. 71's minimum requirements." Op.32. But that maneuver is no different than assuming "a vehicle with at least two tires" must mean a generic motorcycle—never mind the differences between a bicycle, a tricycle, and a Harley Davidson, or the fact that a John Deere tractor, a Tesla car, a Greyhound bus, and a Boeing 747 all equally fit the bill. And that maneuver defies this Court's facial standard: Plaintiffs have to show that H.B. 71 is "unconstitutional" not only in *one* conceivable application (*e.g.*, standalone Commandments surrounded by nothing else) but in "*every* application" (*e.g.*, the ones Defendants are actually considering). *Croft*, 624 F.3d at 164 (emphasis added).

The Panel attempted to justify ignoring Defendants' contextual displays on the ground that they "fail to satisfy H.B. 71's minimum requirements" of, for example, rendering the Ten Commandments' text in a "'large, easily readable font'" and as "the 'central focus'" of the display. Op.32 n.20. But whether a poster satisfies H.B. 71's minimum

requirements is, of course, a question of Louisiana law—and federal courts "may not grant injunctive relief against [state] defendants on the basis of state law." *Daves v. Dallas County*, 64 F.4th 616, 635 n.40 (5th Cir. 2023). Indeed, in adjudicating a facial challenge like this one, courts must "lend … weight to the State's interpretation of the [state] statute," even (if necessary) "accept[ing]" a "narrowing construction" that would "preserve its constitutionality," provided an alternative construction is not "the *only* way to read the Act." *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 220-21 (5th Cir. 2023) (citation omitted). The Panel's construction of readability and centrality plainly is not the "only" one; indeed, it is not even a reasonable one, as the Court can see for itself simply by reviewing the displays.

*Second*, the Panel deemed H.B. 71's stated purpose a "sham" based on a handful of statements from "H.B. 71's legislative history." Op.34. But not even *Stone* looked to sources like these to determine the government's purpose—making this an application of the defunct *Lemon* test itself rather than *Stone. See, e.g.*, *Edwards*, 482 U.S. at 612 (Scalia, J., dissenting) (disapproving the majority's conclusion that the statute

"fail[ed] [*Lemon*'s] 'purpose' prong" by "consider[ing] only the motives of the legislators" as expressed in "its legislative history" (among others)).

In any event, it is not even a legitimate application of *Lemon*. Even under *Lemon*, the purportedly "religious motives of some legislators should not deflect us from the secular purposes contained in the plain text of [the challenged statute] and espoused by the legislature to justify" it. *Croft*, 562 F.3d at 749. That is especially so where, as here, cited statements from the legislative history reflect a purpose the Supreme Court has explicitly called "secular." *Compare, e.g.*, Op.34 (quoting "co-author of the bill"), *with Am. Legion*, 588 U.S. at 53 (explaining that "the Ten Commandments [were] widely disseminated" to "school groups" in the 1950s "as a way of combating juvenile delinquency," a "secular motivation[]").

And while the Panel also found it "unclear how H.B. 71 ensures that students … 'understand and appreciate the foundational documents of [its] state and national government' when it makes displaying those 'foundational' documents," unlike the Ten Commandments, "optional," Op.35, this misses the mark. The whole idea behind H.B. 71 is that the Ten Commandments *is* such a "foundational" document. La. R.S.

§ 17:2124(A)(9). Nor was this a novel idea by the Louisiana Legislature. Rather, that is just what the Supreme Court has said: "the Ten Commandments" "have historical significance as one of the foundations of our legal system." *Am. Legion*, 588 U.S. at 53. It is therefore unsurprising that Louisiana would want its students to have the opportunity to see those documents. And that underscores that H.B. 71 does not violate the Establishment Clause.

### D.    Reversal Automatically Requires Near-Universal Vacatur of the Preliminary Injunction.

If the Court agrees with Defendants on the merits, that would require vacatur of the district court's preliminary injunction insofar as the district court purported to enjoin both the State Defendants and the parish Defendants across the board from enforcing H.B. 71. Plaintiffs' failure to assert a viable Establishment Clause claim means that such a universal injunction is improper.

Faced with this reality, Plaintiffs may attempt to offer their separate Free Exercise Clause claim as a basis for upholding the preliminary injunction. The Panel refused to reach that claim, Op.26 n.16, perhaps because (in Defendants' view) it is baseless, *see* Br.63-68; Reply.23-31. Cognizant of the Court's ordinary en banc practice,

*Abraham Watkins Nichols Agosto Aziz & Stogner v. Festeryga*, 138 F.4th 252, 263 (5th Cir. 2025) (en banc); *id.* (Ho, J., concurring), Defendants believe that the Panel is well positioned to summarily reject the Free Exercise Claim on remand—or require the district court in the first instance to apply an important intervening decision, *Mahmoud v. Taylor*, 145 S. Ct. 2333 (2025). *See, e.g.*, *United States v. Runnels*, 2022 WL 1010695, at *3 & n.21 (5th Cir. Apr. 5, 2022) (per curiam) ("When relevant binding decisions are issued after a district court has ruled, we have, in many cases, vacated and remanded for reconsideration by the district court in light of the intervening decisions.")

Defendants note briefly, however, that *even if* Plaintiffs' free-exercise argument were viable, near-universal vacatur of the preliminary injunction still would be required because the Free Exercise Clause would limit Plaintiffs to much narrower relief.

Although the Establishment and Free Exercise Clauses "may in certain instances overlap, they forbid two quite different kinds of governmental encroachment upon religious freedom." *Schempp*, 374 U.S. at 221 (citation omitted). Put simply, the Establishment Clause forbids religious establishments regardless of their effect on a plaintiff's religious

beliefs or exercise; the Free Exercise Clause forbids impermissible restrictions on a plaintiff's religious exercise regardless whether they constitute a religious establishment. *See, e.g., Braunfeld v. Brown*, 366 U.S. 599, 600-01 (1961); *Soc'y of Separationists, Inc. v. Herman*, 939 F.2d 1207, 1210, 1213, 1217-18 (5th Cir. 1991).

Thus, in *Mahmoud*, while the Court protected the parents' "specific religious beliefs and practices" by requiring opt-outs from the objected-to curriculum, 145 S. Ct. at 2353, it did not strike down the curriculum itself. To the contrary, *Mahmoud* "emphasized that what the parents seek here is not the right to micromanage the public school curriculum, but rather to have *their* children opt out of a particular educational requirement." *Id.* at 2363 (emphasis added).

Under *Mahmoud*, then, the most Plaintiffs could obtain under the Free Exercise Clause is a ruling that H.B. 71 cannot be applied in such a way that it burdens *their* religious exercise. They could not obtain a ruling that H.B. 71 cannot be applied anywhere in the State, including in the many thousands of Louisiana classrooms in which Plaintiffs' children will never set foot. So even if Plaintiffs' understanding of the Free Exercise Clause were correct (it is not), this Court would

70

nonetheless be required to vacate the district court's preliminary injunction prohibiting Defendants from engaging in *any* application of H.B. 71 in *any* Louisiana classroom.

## CONCLUSION

The Court should reverse and render judgment on Article III grounds. Alternatively, the Court should dismiss the Establishment Clause claim and vacate the preliminary injunction, remanding the Free Exercise claim to the Panel or the district court for consideration in light of *Mahmoud*.

Respectfully submitted,

ERIC C. RASSBACH
JOSEPH C. DAVIS
BENJAMIN A. FLESHMAN
AMANDA L. SALZ
THE BECKET FUND FOR
  RELIGIOUS LIBERTY
1919 Pennsylvania Ave. NW
  Suite 400
Washington, D.C. 20006

*Counsel for Appellants*
*Brumley and LSBESE Officials*

ELIZABETH B. MURRILL
Attorney General of Louisiana

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA
Solicitor General

ZACHARY FAIRCLOTH
Principal Deputy Solicitor General

CAITLIN HUETTEMANN
Assistant Solicitor General

OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

Dated:   November 5, 2025

*Counsel for Appellants*

## CERTIFICATE OF SERVICE

I certify that on November 5, 2025, I filed the foregoing brief with the Court's CM/ECF system, which will automatically send an electronic notice of filing to all counsel of record.

*/s/ J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga

## CERTIFICATE OF COMPLIANCE

Pursuant to Fifth Circuit Rule 32.3, the undersigned certifies that this motion complies with:

(1) the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,874 words; and

(2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016 (the same program used to calculate the word count).

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA

Dated:    November 5, 2025