No. 24-30706

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

Darcy Roake, Reverend, on behalf themselves and on behalf of their minor children, *et al.*,

*Plaintiffs-Appellees*,

v.

Cade Brumley, in his official capacity as the Louisiana State Superintendent of Education, *et al.*,

*Defendants-Appellants*.

---

On Appeal from the United States District Court
for the Middle District of Louisiana
No. 3:24-cv-517 before The Hon. John W. deGravelles

---

## Brief of *Amicus Curiae* Foundation for Moral Law in Support of Appellants and Reversal En Banc

---

John Eidsmoe*
*Counsel of Record*
Talmadge Butts
FOUNDATION FOR MORAL LAW
P.O. Box 148
Gallant, AL 35972
334-262-1245
eidsmoeja@juno.com
talmadge@morallaw.org

November 11, AD 2025

*Counsel for Amicus Curiae*

**CERTIFICATE OF INTERESTED PERSONS**

*Roake, et al., v. Brumley, et al.*, No. 24-30706

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Cir. Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1.   American Civil Liberties Union Foundation of Louisiana–Firm representing Appellees

2.   Americans United for Separation of Church & State—Firm representing Appellees

3.   Ahmed, Nora—Counsel for Appellees

4.   Alkire, Christy—Appellee

5.   Appel, Conrad—Appellant

6.   Armstrong, Judy—Appellant

7.   Berken, Kevint—Appellant

8.   Broadhurst, Mamie—Appellee

9.   Brumley, Cade—Appellant

10.  Butts, Talmadge—Counsel for *Amicus Curiae* Foundation for Moral Law

11.  Castille, Preston—Appellant

12.  Champagne, Simone—Appellant

13.  East Baton Rouge Parish School Board—Appellant

14.  Eidsmoe, John—Counsel for *Amicus Curiae* Foundation for Moral Law

15.  Elliot, Patrick—Counsel for Appellees

16.  Foundation for Moral Law—*Amicus Curiae*

17.  Grover, Samuel Troxell—Counsel for Appellees

18.  Harding, Jennifer—Appellee

19.  Harris, Lance—Appellant

20.  Hawley, David—Appellee

21.  Hawley, Erin—Appellee

22.  Herlands, Joshua—Appellee

23.  Hollis, Paul—Appellant

24.  Holloway, Sandy—Appellant

25.  Latten-Clark, Sharon—Appellant

26.  Livington Parish School Board—Appellant

27.  Luchenitser, Alex J. —Counsel for Appellees

28.  Mach, Daniel—Counsel for Appellees

29.  McCrory, Dustin—Appellee

30.  Melerine, Stacey—Appellant

31.  Morris, Ronnie—Appellant

32.  Orleans Parish School Board—Appellant

33. Owens, Benjamin—Appellee

34. Perry, Charles Andrew—Counsel for Appellees

35. Pulda, Molly—Appellee

36. Roake, Darcy—Appellee

37. Simpson, Thacher & Bartlett, LLP—Firm representing Appellees

38. Sims, Jeff—Appellee

39. Sernovitz, Gary—Appellee

40. St. Tammany Parish School Board—Appellant

41. Vernon Parish School Board—Appellant

42. Weaver, Heather—Counsel for Appellees

43. Williams, Richard—Appellee

44. Young, Adrian Van—Appellee

45. Youngblood, Jonathan K.—Counsel for Appellees

/s/ John Eidsmoe
John Eidsmoe
*Counsel of Record*
Foundation for Moral Law
P.O. Box 148
Gallant, Alabama 35972

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................C-1

TABLE OF CONTENTS.................................................................................i

TABLE OF AUTHORITIES ...........................................................................ii

INTEREST OF THE *AMICUS* ......................................................................1

SUMMARY OF THE ARGUMENT .................................................................2

ARGUMENT ..............................................................................................3

I.     The District Court and the Fifth Circuit Panel erred by characterizing the Ten Commandments as just "clearly religious." ......................................3

II.    The District Court and the Fifth Circuit Panel erred in applying an overly-narrow scope to determine whether there is a tradition of using the Ten Commandments in early American education. ..................................9

III.   The District Court and the Fifth Circuit Panel erred in ruling that *Stone v. Graham* is still a valid precedent. ..............................................14

IV.    The historical role of the Ten Commandments in American education is inextricable from the history of American education ..............................16

CONCLUSION ...........................................................................................17

CERTIFICATE OF COMPLIANCE ...................................................................19

CERTIFICATE REGARDING SERVICE .............................................................20

# TABLE OF AUTHORITIES

## Cases

*Masterpiece Cakeshop Ltd. v. Colo. Civil Rights Comm'n,*
    584 U.S. 617 (2018)................................................................8

*Edwards v. Aguillard,*
    482 U.S. 578 (1987)............................................................ 7-8

*Engel v. Vitale,*
    370 U.S. 421 (1962)................................................................5

*Epperson v. Arkansas,*
    393 U.S. 97 (1968) ............................................................... 7

*Fletcher v. Peck,*
    10 U. S. 130 (1810)................................................................7

*Kennedy v. Bremerton School District,*
    142 S. Ct. 2407 (2022) .................................................. 2, 3, 9, 14-15

*Lemon v. Kurtzman,*
    403 U.S. 602 (1971)...................................................... 2, 3, 8, 14-15

*Lynch v. Donnelly,*
    465 U.S. 668 (1984)................................................................5

*Marsh v. Chambers,*
    463 U.S. 783 (1983)................................................................5

*Palmer v. Thompson,*
    403 U.S. 217 (1971)................................................................7

*Roake v. Brumley,*
    141 F.4th 614 (5th Cir. June 20, 2025) (panel op.), reh'g en banc
    granted, Oct. 6, 2025............................................................9

*School District of Abington Township v. Schempp,*
    374 U.S. 203 (1963).............................................................4, 8

*Shurtleff v. City of Boston,*
    596 U.S. 243 (2022)......................................................................................8

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
    582 U.S. 449 (2018)......................................................................................8

*United States v. O'Brien,*
    391 U.S. 367 (1968)......................................................................................7

*Van Orden v. Perry,*
    545 U.S. 677 (2005)............................................................................ 7, 23-24

*Zorach v. Clauson,*
    343 U.S. 306 (1952)......................................................................................5

**Constitutions and Statutes**

Louisiana HB 71 ................................................................... 1-2, 6-7, 9, 15

**Other Authorities**

Alexis De Tocqueville, quoted in George W. Pierson, *Tocqueville in America*
    (Garden City, New York: Anchor Books, 1959)...........................................10

*Britannica,* "The New England Primer" https://www.britannica.com/topic/The-
    New-England-Primer.....................................................................................11

Daniel L. Dreisbach, *Reading the Bible with the Founding Fathers,*
    Oxford University Press, 2016 .....................................................................16

*Evangelical Primer* 1816 edition,
    https://babel.hathitrust.org/cgi/pt?id=hvd.32044102784428&se
    q=80 ..............................................................................................................12

JC Evans, *The relevance of John Adams: Combining liberal,
    republican and Christian ideals in early American political
    thought,* The University of Wisconsin-Madison 2006 .................................16

John Eidsmoe, *Historical and Theological Foundations of Law,* 3 vols. (Nordskog Publishing 2016) .......................................................................... 5

John Eidsmoe, <u>The Use of the Ten Commandments in American Courts</u>, Liberty University Law Review (III:1 Spring 2009, 15-46) ..................................................................................................... 6

John Eidsmoe, <u>Those Ten Commandments: Why Won't They Just Go Away?</u>, 31 Regent University Law Review 2018-19 ..................................... 6

*McGuffey Second Reader* .......................................................................... 13

Noah Webster, *American Spelling Book* ................................................... 13

Peter A. Lillback with Jerry Newcomb, *George Washington's Sacred Fire* (Bryn Mawr, PA: Providence Forum Press 2006) ................................ 11

Robert A. Peterson, "Our Christian Educational Heritage: McGuffey and His Readers," https://www.aacs.org/assets/Journal-Vol-12-No-3/Vol-10-NO-3/Our-Christian-Educational-Heritage.pdf ...................... 12

*The New England Primer* 1691 edition https://www.spiritualsalt.com/wp-content/uploads/2010/08/The-New-England-Primer.pdf ........................... 11

*The New England Primer* 1843 edition, https://en.wikisource.org/wiki/The_Ten_Commandments_(New _England_Primer,_1843) ...................................................................... 11-12

### INTEREST OF THE *AMICUS*[1]

*Amicus Curiae* Foundation for Moral Law ("The Foundation") (www.morallaw.org) respectfully submits this brief to address the significant constitutional, historical, and educational questions presented by the Fifth Circuit's panel ruling enjoining enforcement of Louisiana House Bill 71 (H.B. 71).

The Foundation is an Alabama-based nonprofit organization committed to defending religious liberty and promoting a faithful interpretation of the Constitution consistent with the intent of the Framers. It advocates for an Establishment Clause jurisprudence grounded in the Nation's historical experience and moral traditions, and for the preservation of the States' rightful authority to shape their own educational policies in accordance with those traditions.

This case presents a critical opportunity to reaffirm that the First Amendment does not compel government to erect a wall of hostility toward religion. The Ten Commandments, though undeniably rooted in religious tradition, have shaped American legal thought, moral instruction, and civic identity for centuries, not because they serve a sectarian purpose, but because they express enduring principles

---

[1] All parties have consented to the filing of this brief. No party or party's counsel authored this brief in whole or in part, or contributed money that was intended to fund its preparation or submission; and no person other than the *amicus curiae,* its members, or its counsel, contributed money that was intended to fund the preparation or submission of this brief.

of justice, duty, and human dignity. To banish such heritage from public education is to misread both the Constitution and the Nation's history.

## SUMMARY OF THE ARGUMENT

The Panel decision rested on the conclusion that the Ten Commandments, as required to be displayed by H.B. 71, are "clearly religious," thus leaving little room for consideration of their equally indisputable historical, moral, and legal significance. However, longstanding Supreme Court precedent and the foundational legal history of the United States recognize that the Ten Commandments are not only religious precepts, but also a critical source of ancient moral and legal codes, which have informed and shaped the structure of Western, and particularly American, law.

Chief Justice Rehnquist's controlling plurality in *Van Orden v. Perry* directly addressed this duality, affirming that the Ten Commandments, while religious in origin, function as a foundational moral and legal text that has been historically acknowledged in civic spaces. 545 U.S. 677 (2005). By adopting a rigid dichotomy, categorizing the Ten Commandments as solely religious and thus forbidden, the Fifth Circuit panel in the present case overlooked the Supreme Court's emphasis, not only on context but also on the historical integration of such material into the civic and educational structure of the country.

Recent Supreme Court jurisprudence, especially *Kennedy v. Bremerton School District*, directs courts to focus on "historical practices and understandings,"

rather than mechanically applying formulas like the now-discredited *Lemon test*. 142 S. Ct. 2407, 2450 (2022). Accordingly, when a state seeks to acknowledge the historical and civic importance of the Ten Commandments within its educational framework, the Establishment Clause does not require a categorical ban. Instead, such initiatives should also be evaluated by reference to the nation's traditions and the underlying purposes of the Constitution's religion clauses.

Under this approach, long-standing practices of religious acknowledgment in public life, including education, carry great weight. Here, Louisiana's interest in acknowledging the Commandments' historical role in American law and morality plainly has a legitimate secular purpose, and its display scheme reflects that history.

Nothing in the First Amendment requires courts to impose a blanket ban on such displays; instead, the State's action should be judged in light of our Nation's traditions and the Framers' intent. *Id*.

## ARGUMENT

### I.    The District Court and the Fifth Circuit panel erred by characterizing the Ten Commandments as just "clearly religious."

The Fifth Circuit panel held that the Ten Commandments "come from religious texts," "have clear religious import," and therefore "qualifies as a religious display." But as Chief Justice Rehnquist wrote in *Van Orden v. Perry*,

> Of course, the Ten Commandments are religious—they were so viewed at their inception and so remain. The monument, therefore, has religious significance. According to Judeo-Christian belief, the Ten

> Commandments were given to Moses by God on Mt. Sinai. But Moses was a lawgiver as well as a religious leader. And the Ten Commandments have an undeniable historical meaning, as the foregoing examples demonstrate. Simply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause.

*Van Orden*, 545 U.S. at 690. Justice Rehnquist wrote in detail of the role of religion in American public life and the recognition of God as the "Supreme Lawgiver of the Universe." *Id.*, quoting *School District of Abington Township v. Schempp,* 374 U.S. 203, 212-13 (1963).  Further, he wrote,

> Such acknowledgments of the role played by the Ten Commandments in our Nation's heritage are common throughout America. We need only look within our own Courtroom. Since 1935, Moses has stood, holding two tablets that reveal portions of the Ten Commandments written in Hebrew, among other lawgivers in the south frieze. Representations of the Ten Commandments adorn the metal gates lining the north and south sides of the Courtroom as well as the doors leading into the Courtroom. Moses also sits on the exterior east facade of the building holding the Ten Commandments tablets.

*Id.* at 688. The District Court and the Fifth Circuit panel erred when they adopted the simplistic rationale that the Ten Commandments must be either "religious" or "non-religious."

The Ten Commandments, and the Mosaic Law which they represent, are the foundation of Western law. The late Harvard Law Professor Harold J. Berman wrote,

> The Laws of Alfred (about A.D. 890) start with a recitation of the Ten Commandments and excerpts from the Mosaic Law; and in restating and revising the native Anglo-Saxon laws, Alfred includes such great principles as "doom (i.e., judge) very evenly; doom not one doom to

the rich, another to the poor, nor doom one to your friend, another to your foe."[2]

This principle was affirmed in *Engel v. Vitale*, 370 U.S. 421, 434 (1962), which observed that "*the history of man is inseparable from the history of religion*," and in *Zorach v. Clauson*, 343 U.S. 306, 313 (1952), where the Court declared, "*we are a religious people whose institutions presuppose a Supreme Being*." (Emphases added). That acknowledgment of cultural and religious tradition remains constitutionally permissible when it does not involve coercion.

The panel, by treating the Decalogue as automatically forbidden, effectively elevated a strict secularism that the Constitution does not require. The Founders themselves made regular reference to the divine in public life: Congress opens with prayer (*Marsh v. Chambers*, 463 U.S. 783 (1983)); Presidents have issued religious proclamations (*Lynch v. Donnelly*, 465 U.S. 668, 674–75 (1984)); and national buildings bear inscriptions such as "*In God We Trust*" and "*Laus Deo*." These expressions have endured for centuries, not as religious mandates, but as cultural recognitions. As the Court explained in *Marsh*, they have "*become part of the fabric of our society*" and are "*a tolerable acknowledgment of beliefs widely held among the people of this country*." 463 U.S. at 783 (emphasis added).

---

[2] Harold J. Berman, *The Interaction of Law and Religion,* (Parthenon Press, 1974) 55. To further establish that Alfred's *Book of Dooms* began with the Ten Commandments and included other references to the Mosaic Law, *see* John Eidsmoe, *Historical and Theological Foundations of Law* (Nordskog 2016) I:412-14, II:823-32.

To measure the influence of the Ten Commandments to American law, in March 2002 the primary author of this brief conducted a Lexis search of their use in American judicial decisions. The search revealed that courts of record (federal courts and state supreme courts) used the term "Ten Commandments" in at least 515 cases, "Decalogue" in at least 331 cases, and individual commandments in many other cases. Altogether, the search revealed citations to the Ten Commandments in at least 1,105 cases.[3] Today, searching Westlaw's database for the term "Ten Commandments" returns over 1200 cases citing the Decalogue—more than double in the last twenty years. This demonstrates that the Ten Commandments have been and continue to be a major, enduring influence in American law.

The Fifth Circuit panel also cited the testimony of Professor Stephen K. Green to the effect that the wording of the Ten Commandments specified by HR 71 is more Protestant than Catholic. We respond that the State of Louisiana, in drafting HB 71, has mandated language that is similar to the King James Version of the Bible used by many Protestants but is also similar to the Douay-Rheims Bible commonly used by Roman Catholics. There are three common numberings of the Ten Commandments, one used by Jews, one by Catholics, and another by most

---

[3] John Eidsmoe, The Use of the Ten Commandments in American Law, Liberty University Law Review (III:1 Spring 2009) 15-46; reprinted in Eidsmoe, *Historical and Theological Foundations of Law* I:431-68. See also, Eidsmoe, Those Ten Commandments: Why Won't They Just Go Away? 31 Regent University Law Review 2018-19.

Protestants. To avoid favoring one religious tradition over another, the drafters of the HB 71 mandated that the Commandments are not numbered. Other than using the Hebrew original which few could read, Louisiana has gone as far as it possibly can to avoid giving preference to one religious tradition. They settled upon this language because it is the language most commonly used by Louisianans in speaking about the Ten Commandments.

The Ten Commandments have both religious and secular significance. The Legislature clearly articulated its secular purposes in adopting HR 71, and that statement of purpose is entitled to substantial deference. A few isolated statements by supporters of HB 71 are not determinative of the legislative intent as a whole. Such statements go to motive rather than purpose; for example, the purpose of a school construction bill might be to improve education, even though the motives of many legislators for supporting it might be to gain votes in the next election. As Justice Scalia noted in his *Edwards v. Aguillard* dissent,

> …[T]his Court has recognized from Chief Justice Marshall, *See Fletcher v. Peck,* 6 Cranch 87, 10 U.S. 130 (1810), to Chief Justice Warren, *United States v. O'Brien, supra,* at 391 U.S. 383-384, that determining the subjective intent of legislators is a perilous enterprise. *See also Palmer v. Thompson,* 403 U.S. 217, 224-225 (1971); *Epperson v. Arkansas,* 393 U.S. at 393 U. S. 113 (Black, J., concurring). It is perilous, I might note, not just for the judges who will very likely reach the wrong result, but also for the legislators who find that they must assess the validity of proposed legislation—and risk the condemnation of having voted for an unconstitutional measure—not on the basis of what the legislation contains, nor even on the basis of what they themselves intend, but on the basis of what *others* have in mind.

7

482 U.S. 578, 638-39 (1987).

Furthermore, even the discarded "Lemon test" of *Lemon v. Kurtzman,* 403 U.S. 602 (1971), required only that a statute have "a secular purpose." It did not require that this secular purpose be the only purpose, that there can be no religious purpose, or even that the secular purpose must be the primary purpose, only that the secular purpose not be a "sham purpose." There is no reason to conclude that the Legislature's articulated secular purpose is a "sham," other than the panel's preconceived notion that the Ten Commandments are solely "religious" and therefore no secular purpose could possibly exist.

Finally, we note that the panel's determination that the Ten Commandments "qualifies as a religious display" implies hostility toward religion. The Supreme Court has repeatedly held that government may not show hostility toward religion, *Masterpiece Cakeshop Ltd. v. Colorado Civil Rights Commission,* 584 U.S. 617 (2018) (slip op. at 17-18), or discriminate against religion, *Trinity Lutheran Church of Columbia, Inc. v. Comer,* 582 U.S. 449 (2018); *Shurtleff v. City of Boston,* 596 U.S. 243 (2022). As the Court said in *School District of Abington Township v. Schempp,* 374 U.S. 203 (1963):

> [I]t might be said that the State should not be permitted to adopt a particular religion of secularism, in the sense of affirmatively opposing or showing hostility to religion, thus preferring those who believe in no religion over those who do believe.

8

But that is exactly what the Fifth Circuit panel has done: they have singled out an allegedly "religious" display for censorship. If HR71 had mandated a display of a quotation from George Washington or Abraham Lincoln (so long as they didn't mention religion) or of one of our founding documents, there would be no problem. But because the Ten Commandments have religious as well as secular applications, the panel believes their display must be prohibited in public schools.

## II.    The District Court and the Fifth Circuit panel erred in applying an overly-narrow scope to determine whether there is a tradition of using the Ten Commandments in early American education.

As the panel correctly noted, "*Kennedy* shed light on the proper standard for interpreting Establishment Clause claims, holding that 'the Establishment Clause must be interpreted by 'reference to historical practices and understandings,'" and that court rulings must "accord with history and faithfully reflect the understanding of the Founding Fathers." *Roake v. Brumley*, 141 F.4th 614, 645 (5th Cir. June 20, 2025) (panel op.), reh'g en banc granted, Oct. 6, 2025. As the panel said, "the district court framed the 'broader tradition' as the use of the Ten Commandments in public education, and the challenged practice as 'the permanent posting of the Ten Commandments in public [] school classrooms." *Id.* at 646. The panel added, "No one challenges that framing. Therefore, the question before us is whether the permanent posting of the Ten Commandments in public school classrooms fits

within, or is consistent with, a broader tradition of using the Ten Commandments in public education." *Id.*

The Foundation suggests that this is an overly-narrow and unhelpful statement of the issue. During the colonial era, and at the time the First Amendment was adopted, public education as we know it today was virtually nonexistent in America. Children were educated at home, in church schools, and in private schools. As Alexis De Tocqueville wrote,

> The general principle in the matter of public education is that anyone is free to found a public school and to direct it as he pleases. It's an industry like other industries, the consumers being the judges and the state taking no hand whatever.[4]

In early America, then, "public" schools were not government schools; they were referred to as public schools because they were open to the general public rather than only to members of a church or other select groups.

Limiting the scope of inquiry to public education which was virtually nonexistent is an unworkable framework of analysis. Instead, it makes more sense to broaden the inquiry to the role of the Ten Commandments in colonial education generally. Children who attended schools that were run by churches or that met in church buildings would often be exposed to the Ten Commandments through "reredos." Churches in the colonial era and in early America commonly displayed

---

[4] Alexis De Tocqueville, quoted in George W. Pierson, *Tocqueville in America* (Garden City, New York: Anchor Books, 1959) 293-94.

reredos in the chancel which usually included the Ten Commandments, the Lord's Prayer, and either the Apostles Creed or the Nicene Creed. The congregation would be facing the reredos and would commonly read them in unison as part of the worship service.[5]

In home schools, private schools, and church schools, by far the most common textbook, besides the Bible, was the *New England Primer.* Compiled and published about 1688 by Benjamin Harris, the *New England Primer* was used by millions of colonial and early American children for over 150 years, until well into the 1800s. Often called "the little Bible of New England," the *New England Primer* was used not only in New England but throughout the American colonies and states. By 1830, an estimated six to eight million copies had been sold.[6]

The Ten Commandments were a prominent feature of the *New England Primer.* Sometimes they were simply printed, sometimes as in the 1691 edition they were part of the *Westminster Catechism* which included forty questions about the Ten Commandments,[7] sometimes they were the subject of stories to inculcate morality, and an 1843 edition presented the Ten Commandments as a poem:

> THOU shalt have no more gods but me.
> Before no idol bend thy knee.

---

[5] Peter A. Lillback with Jerry Newcomb, *George Washington's Sacred Fire* (Bryn Mawr, PA: Providence Forum Press 2006) 44, 45, 85, 223.

[6] *Britannica,* "The New England Primer" https://www.britannica.com/topic/The-New-England-Primer

[7] *The New England Primer* 1691 edition pp. 50-59 https://www.spiritualsalt.com/wp-content/uploads/2010/08/The-New-England-Primer.pdf

Take not the name of God in vain.
Dare not the Sabbath day profane,
Give both thy parents honor due.
Take heed that thou no murder do.
Abstain from words and deeds unclean.
Steal not, though thou be poor and mean.
Make not a willful lie, nor love it.
What is thy neighbor's dare not covet.[8]

The *Evangelical Primer,* first published in 1809, was similar to the *New England Primer* and contained the Ten Commandments as part of the Assembly's Catechism.[9] By 1820 at least ten editions of the *Evangelical Primer* had been printed.

In 1836 the first edition of the *McGuffey Readers* was published. Produced by university president and professor William McGuffey, the Readers in their various editions gradually replaced the *New England Prime,* and sold about 120 million copies, remained popular in public schools well into the twentieth century, and are still used in some private schools and home schools. McGuffey said of his *Readers:*

> From no other source has the author drawn more copiously in his selections than from the Sacred Scriptures. For this, he certainly apprehends no censure. In a Christian country, that man is to be pitied who, at this day, can honestly object to imbuing the minds of youth with the language and the spirit of the Word of God.[10]

---

[8] *New England Primer* 1843, quoted in
https://en.wikisource.org/wiki/The_Ten_Commandments_(New_England_Primer,_1843)
[99] *Evangelical Primer* 1816 edition, pp. 55-61,
https://babel.hathitrust.org/cgi/pt?id=hvd.32044102784428&seq=80
[10] Robert A. Peterson, "Our Christian Educational Heritage: McGuffey and His Readers,"
https://www.aacs.org/assets/Journal-Vol-12-No-3/Vol-10-NO-3/Our-Christian-Educational-Heritage.pdf

The *McGuffey Readers* contained the Ten Commandments,[11] and Dr. Elton Trueblood sad they "became an integral part of our culture by appearing in verse form in one of McGuffey's famous *Readers*." The verse mentioned by Dr. Trueblood appears to be the same cited above in the *New England Primer.*[12]

Likewise, early American schoolchildren used the *American Spelling Book,* by Noah Webster, often called "America's Schoolmaster." First published around 1809, Webster's spelling book was used throughout the 1800s and sold around 100 million copies. At least some of the editions contained or referred to the Ten Commandments as part of the Moral Catechism found in the appendix.[13]

The issue, then, is not whether the Ten Commandments were commonly placed on the walls of virtually nonexistent early American schools, but whether the Ten Commandments played a prominent role in early American education. Their presence in four of the most commonly-used textbooks in early American education—the *New England Primer,* the *Evangelical Primer,* the *American Spelling Book,* the *McGuffey Readers,* in addition to the Bible itself—clearly demonstrates

---

[11] *McGuffey Second Reader* pp. 160-61

[12] Dr. Elton Trueblood, quoted in "Teaching Children the Ten Commandments" by Michael Snow, https://textsincontext.wordpress.com/2012/09/06/teaching-children-the-ten-commandments/

[13] Noah Webster, *American Spelling Book,* numerous editions from about 1809 to at least 1843. 1831 edition p 168: "Fear God and keep his commandments, for this is the whole duty of man. 1833 edition p. 98: "God is the divine legislator. He proclaimed his 10 commandments from Mount Sinai."

that the Ten Commandments played a prominent role in early American education. The Fifth Circuit Panel's overly-narrow framing of this issue was error.

## III. The District Court and the Fifth Circuit panel erred in ruling that *Stone v. Graham* is still a valid precedent.

In *Kennedy v. Bremerton School District,* the Supreme Court expressly overruled *Lemon v. Kurtzman* and its three-part *Lemon* test. 142 S. Ct. at 2450. Despite the Fifth Circuit panel's legal gymnastics trying to say *Kennedy* actually overruled only one prong of the test, the Court in *Kennedy* made no such limitation upon its ruling. The normal rule is that, when the Court overrules a previous case, that does not automatically invalidate or unravel all subsequent decisions based on that case. However, it does mean that those subsequent decisions are no longer valid precedents for future cases. *See Agostini v. Felton*, 521 U.S. 203, 236 (1997) (recognizing prior Establishment Clause holdings as "no longer good law" after doctrinal shift).

Of course, *Kennedy* did not mention *Stone v. Graham,* 449 U.S. 39 (1980). *Kennedy* did not list all of the *Lemon*-based cases that were no longer valid precedent, and there was no reason to mention *Stone* because that was a Ten Commandments case while *Kennedy* was a prayer case. But *Stone* was expressly based on *Lemon*: "If a statute violates any of [the *Lemon*] principles, it must be struck down." 449 U.S. at 40. In fact, *Stone* probably stretched the "secular purpose" prong of the *Lemon* test further than any other court had ever stretched it.

14

A bare five-Justice majority held that the Ten Commandments are "undeniably religious" and that there was no secular purpose in displaying them, even though the Legislature had clearly stated a secular purpose (although the Louisiana Legislature stated its secular purpose for HR71 in much greater detail), even though the lower courts had held that there was a secular purpose, and even though four Justices dissented. *Stone*, 449 U.S. at 39-43. The five-Justice majority held that the effect of posting the Ten Commandments might be to "induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments." *Id.* at 42. To say there is no secular purpose in inducing children to read, meditate upon, venerate and obey the Decalogue that is the basis for American law and that forbids murder, theft, adultery, dishonoring parents, lying, perjuring (taking the Lord's Name in vain), and coveting, is hardly a precedent worth following and is certainly a precedent impliedly overruled by *Kennedy*.

Nevertheless, *Stone* rested entirely on *Lemon*. *Id.* at 40. And because *Kennedy* has fully repudiated *Lemon*, *Stone* likewise has no precedential value. The District Court and Fifth Circuit panel erred by attempting to resurrect *Lemon* using *Stone v. Graham* rather than adjudicate the case based on the "historical practices and understanding" standard articulated in *Kennedy*.

**IV.    The historical role of the Ten Commandments in American education is inextricable from the history of American education.**

For nearly three centuries, the Ten Commandments were a fixture of American public education and civic life. Early colonial and state schools commonly taught biblical principles as moral and historical lessons. In fact, the text of Louisiana's law explicitly notes that the Ten Commandments "*were a prominent part of American public education for almost three centuries.*" Learning this "*common cultural heritage*" was understood as a way to instill virtue and discipline.

Our Founding Fathers likewise drew on biblical precepts in their political discourse. Scholars observe that Americans from the colonial era onward "*looked to the Bible for guiding principles on political order, civil authority, [and] civic virtue,*" and that the Bible was "*one of the most important sources of influence on our political culture.*"[14] John Adams, for example, described the Bible as "*the most perfect morality*" and "*the most republican book in the world*" because it nurtures the virtues necessary for self-government.[15] Thus, long before modern debates over church and state, the Ten Commandments were viewed as a historical and cultural influence on American democracy, not as an attempt to coerce religious worship.

---

[14] Dreisbach, Daniel L. Reading the Bible with the Founding Fathers. Oxford University Press, 2016.
[15] Evans JC. The relevance of John Adams: Combining liberal, republican and Christian ideals in early American political thought. The University of Wisconsin-Madison; 2006.

## CONCLUSION

The Ten Commandments have been an integral part of American law and culture, largely because they were a central feature of early American education. The Louisiana Legislature properly determined that exposing schoolchildren to the Ten Commandments would make them better citizens and better people. The First Amendment does not forbid this—certainly not in the days of George Washington and James Madison, certainly not in the days of Abraham Lincoln, and certainly not today when they are needed more than ever.

The District Court and the Fifth Circuit panel erred in ruling that the Ten Commandments display is "clearly religious," in narrowly ruling that there is no early American history of displaying the Ten Commandments in public schools, and in ruling that *Stone v. Graham* is still a valid precedent.

The Foundation commends the Fifth Circuit for voting to consider this case *en banc,* and we urge the Court to reverse the panel and rule in favor of the State of Louisiana.

Respectfully submitted,

s/John Eidsmoe
John Eidsmoe*
*Counsel of Record*
Talmadge Butts
FOUNDATION FOR MORAL LAW
P.O. Box 148
Gallant, AL 35972
334-262-1245

17

eidsmoeja@juno.com
talmadge@morallaw.org

*Counsel for Amicus Curiae*

**CERTIFICATE OF COMPLIANCE**

1. This document complies with the word limit of Rule 32(a)(7), Fed. R. App. P., because, excluding the parts of the document exempted by Rule 32(f), Fed. R. App. P., and 6th Cir. R. 32(b)(1), this document contains 4,139 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared using Microsoft Word in 14-point Times New Roman.

November 11, AD 2025.

s/John Eidsmoe
John Eidsmoe
FOUNDATION FOR MORAL LAW
P.O. Box 148
Gallant, AL 35972
334-262-1245
eidsmoeja@juno.com

*Counsel for Amicus Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed via the Court's ECF filing system, and therefore service will be effectuated by the Court's electronic notification system upon all counsel or parties of record.

November 11, AD 2025.

s/John Eidsmoe
John Eidsmoe
FOUNDATION FOR MORAL LAW
P.O. Box 148
Gallant, AL 35972
334-262-1245
eidsmoeja@juno.com

*Counsel for Amicus Curiae*