# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 20, 2026

Lyle W. Cayce
Clerk

---

No. 24-30706

---

DARCY ROAKE, REVEREND, ON BEHALF THEMSELVES and *on behalf of their minor children*, REAL PARTY IN INTEREST A.V., REAL PARTY IN INTEREST S.V.; ADRIAN VAN YOUNG, *on behalf of themselves and on behalf of their minor children*, REAL PARTY IN INTEREST A.V., REAL PARTY IN INTEREST S.V.; MAMIE BROADHURST, REVEREND, *on behalf of themselves and on behalf of their minor child*, REAL PARTY IN INTEREST N.W.; RICHARD WILLIAMS, REVEREND, *on behalf of themselves and on behalf of their minor child*, REAL PARTY IN INTEREST N.W.; JEFF SIMS, REVEREND, *on behalf of himself and on behalf of his minor children*, REAL PARTY IN INTEREST A.S., REAL PARTY IN INTEREST C.S. 1, REAL PARTY IN INTEREST C.S. 2; JENNIFER HARDING, *on behalf of themselves and on behalf of their minor child*, REAL PARTY IN INTEREST A.O.; BENJAMIN OWENS, *on behalf of themselves and on behalf of their minor child*, REAL PARTY IN INTEREST A.O.; DAVID HAWLEY, *on behalf of themselves and on behalf of their minor children* REAL PARTY IN INTEREST A.H., REAL PARTY IN INTEREST L.H.; ERIN HAWLEY, *on behalf of themselves and on behalf of their minor children*, REAL PARTY IN INTEREST A.H, REAL PARTY IN INTEREST L.H.; DUSTIN MCCRORY, *on behalf of themselves and on behalf of his minor children*, REAL PARTY IN INTEREST E.M.; REAL PARTY IN INTEREST P.M., REAL PARTY IN INTEREST L.M.; GARY SERNOVITZ, *on behalf of themselves and on behalf of their minor child*, REAL PARTY IN INTEREST T.S.; MOLLY PULDA, *on behalf of themselves and on behalf of their minor child*. REAL PARTY IN INTEREST T.S.; CHRISTY ALKIRE, *on behalf of herself and on hehalf of her minor child*, REAL PARTY IN INTEREST L.A.; JOSHUA HERLANDS, *on behalf of himself and on behalf of his minor children*, REAL PARTY IN INTEREST E.H., REAL PARTY IN INTEREST J.H.,

*Plaintiffs—Appellees,*

*versus*

CADE BRUMLEY, *in his official capacity as the Louisiana State Superintendent of Education*; CONRAD APPEL, *in his official capacity as a member of the Louisiana State Board of Elementary and Secondary Education (LSBESE)*; JUDY ARMSTRONG, *in her official capacity as a member of the LSBESE*; KEVIN BERKEN, *in his official capacity as a member of the LSBESE*; PRESTON CASTILLE, *in his official capacity as a member of LSBESE*; SIMONE CHAMPAGNE, *in her official capacity as a member of the LSBESE*; SHARON LATTEN-CLARK, *in her official capacity as a member of the LSBESE*; LANCE HARRIS, *in his official capacity as a member of LSBESE*; PAUL HOLLIS, LOUISIANA STATE BOARD OF ELEMENTARY and SECONDARY EDUCATION; SANDY HOLLOWAY, *in her official capacity as a member of the LSBESE*; STACEY MELERINE, *in her official capacity as a member of the LSBESE*; RONNIE MORRIS, *in his official capacity as a member of the LSBESE*; EAST BATON ROUGE PARISH SCHOOL BOARD; LIVINGSTON PARISH SCHOOL BOARD; VERNON PARISH SCHOOL BOARD; ST. TAMMANY PARISH SCHOOL BOARD,

*Defendants—Appellants.*

---

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:24-CV-517

---

Before ELROD, *Chief Judge*, JONES, SMITH, STEWART, DENNIS, RICHMAN, SOUTHWICK, HAYNES, GRAVES, HIGGINSON, WILLETT, HO, DUNCAN, ENGELHARDT, OLDHAM, WILSON, DOUGLAS, and RAMIREZ, *Circuit Judges*.

PER CURIAM:

Courts do not decide constitutional questions in the abstract. Nor is constitutional adjudication an exercise in imagination. Our role is more

No. 24-30706

modest—and more demanding: to resolve concrete disputes grounded in real facts and an actual record.

Louisiana House Bill 71 (H.B. 71) requires public schools to display the Ten Commandments in each classroom. *See* LA. STAT. ANN. § 17:2124(B)(1). The question before us, however, is not whether H.B. 71 is constitutional, but whether that issue is fit for judicial resolution at this time.

A group of parents sued to enjoin H.B. 71's implementation, arguing that the statute is facially unconstitutional under both the Establishment and Free Exercise Clauses of the First Amendment. The district court granted a preliminary injunction, concluding that the parents' claims were ripe and meritorious. A panel affirmed, and we voted to rehear the case en banc. Because the parents' challenge turns on unresolved factual and contextual questions, equitable relief was premature, and we VACATE the preliminary injunction.

Article III limits federal courts to resolving "Cases" and "Controversies." U.S. CONST. art. III, § 2. Because of that limitation, the issues we decide "must be 'ripe'—not dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Trump v. New York*, 592 U.S. 125, 131 (2020) (per curiam) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)).

This case illustrates why that limitation matters. There can be no doubt that the Ten Commandments bear immense religious significance. "For believing Jews and Christians," they are "the word of God handed down to Moses on Mount Sinai." *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 53 (2019). But they also "have historical significance as one of the foundations of our legal system." *Id.* That dual character forecloses any categorical rule against their display on public property. *See Van Orden v. Perry*, 545 U.S. 677 (2005) (upholding a Ten Commandments monument on

No. 24-30706

the Texas State Capitol grounds). Instead, constitutionality turns on "the context of the display" and "how the text is *used*." *Id.* at 701 (Breyer, J., concurring in the judgment) (emphasis in original).[1]

While H.B. 71 sets certain "minimum requirement[s]" regarding the text, size, and accompanying "context statement" of the displays, it leaves "[t]he nature of the display" entirely to the discretion of local school boards. La. Rev. Stat. § 17:2124(B)(1)-(3). That delegation—and those minimum requirements—necessarily leave numerous essential questions unanswered. We do not know, for example, how prominently the displays will appear, what other materials might accompany them, or how—if at all—teachers will reference them during instruction. More fundamentally, we do not even know the full content of the displays themselves. Although the statute requires inclusion of the Commandments and a context statement, it expressly permits additional content—such as "the Mayflower Compact, the Declaration of Independence, and the Northwest Ordinance"—to appear alongside them. *Id.* § 2124(B)(4).

Simply put, we cannot evaluate "how the text is used," *Van Orden*, 545 U.S. at 701 (Breyer, J., concurring in the judgment) (emphasis omitted), because we do not yet know—and cannot yet know—how the text will be used. And "[i]n the absence of this evidence, we are not able to conduct the fact-intensive and context-specific analysis required by" the Supreme Court's Ten Commandments cases. *Staley v. Harris Cnty.*, 485 F.3d 305, 309 (5th Cir. 2007) (en banc).[2] That same evidentiary gap

---

[1] As we have previously recognized, "Justice Breyer's concurrence is the controlling opinion in *Van Orden*." *Staley v. Harris Cnty.*, 485 F.3d 305, 308 n.1 (5th Cir. 2007) (en banc).

[2] As an adjunct to their main Establishment Clause argument, the parents contend that H.B. 71 imposes a denominational preference by prescribing a version of the Commandments they characterize as uniquely Protestant. The plaintiffs do not allege,

No. 24-30706

forecloses the parents' Free Exercise claims, because "the question whether a law 'substantially interfer[es] with the religious development' of a child will always be fact-intensive," requiring courts to "consider the specific context in which the instruction or materials at issue are presented." *Mahmoud v. Taylor*, 606 U.S. 522, 550 (2025) (alteration in original) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 218 (1972)). Moreover, "the plaintiffs suffer no concrete harm from the challenged policy itself, which does not require them 'to do anything or to refrain from doing anything.'" *Trump*, 592 U.S. at 134 (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)).

The panel concluded that "[t]his case is not like *Staley* where '*no* decision ha[d] been made regarding *any aspect* of the future display of the [stored] monument," reasoning that here certain aspects of the future displays are known. *Roake v. Brumley*, 141 F.4th 614, 630 (5th Cir. 2024) (emphasis and alterations in original) (quoting *Staley*, 485 F.3d at 309). But "the language of an opinion is not always to be parsed as though we were dealing with [the] language of a statute." *Brown v. Davenport*, 596 U.S. 118, 141 (2022) (alteration in original) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979)). The panel's unduly cramped reading of *Staley*—limiting it to cases in which literally no aspect of a future display is known—does precisely that. Properly understood, *Staley* does not turn on whether *some* details of a future display are known, but on whether courts can evaluate constitutionality without resorting to conjecture. There, the challenged monument was known in considerable detail. *See Staley v. Harris Cnty.*, 461 F.3d 504, 506 (5th Cir. 2006) (describing the monument), *dismissed as*

---

however, that H.B. 71 imposes any formal disadvantage on adherents of a particular faith. "Properly phrased," their claim is instead that H.B. 71 "works a de facto discrimination among religions." *Gillette v. United States*, 401 U.S. 437, 451–52 (1971). In the context of a religious display, such a claim necessarily turns on how the allegedly discriminatory text is presented and employed—facts not yet developed here.

No. 24-30706

*moot on reh'g en banc*, 485 F.3d 305. If those facts were insufficient to present a ripe controversy, it is difficult to understand how today's record does so.[3]

The parents (and the principal dissent) seek to sidestep this difficulty by framing the case as an attack on H.B. 71's minimum requirements alone. But an unripe challenge does not become ripe merely because a party asserts that the challenged action would be unlawful on any conceivable set of facts. The Supreme Court has squarely rejected that approach. In *Texas v. United States*, the challengers—no differently than the challengers here—asked the Court "to hold that under no circumstances" would the challenged action be lawful. 523 U.S. at 301. The Court made swift work of that argument, explaining that the Justices lacked "sufficient confidence in [their] powers of imagination to affirm such a negative." *Id.* It reiterated that, even when a plaintiff insists that a law can never be constitutionally applied, "'[d]etermination of the scope . . . of legislation in advance . . . involves too remote and abstract an inquiry for the proper exercise of the judicial function.'" *Id.* (brackets and first ellipsis in original) (quoting *Int'l Longshoremen's & Warehousemen's Union, Loc. 37 v. Boyd*, 347 U.S. 222, 224 (1954)). That admonition applies with particular force here, where constitutionality turns on context that does not yet exist.

---

[3] Shortly before argument, Louisiana notified us that the Vernon Parish School Board—one of the defendants—adopted a resolution stating that, if the district court's injunction is lifted, it "intends to direct all schools within its jurisdiction to immediately implement H.B. 71 in accordance with" guidance issued by the state Attorney General. That guidance includes model displays and other implementation suggestions. Although the resolution provides additional detail regarding how H.B. 71 may be implemented within the Vernon Parish School District, neither party contends that it alters the ripeness analysis. While ripeness is jurisdictional, *see Shields v. Norton*, 289 F.3d 832, 835 (5th Cir. 2002), we are not required to consider "arguments in favor of jurisdiction" that the parties have not raised, *E.T. v. Paxton*, 41 F.4th 709, 717 (5th Cir. 2022). We decline to do so here.

No. 24-30706

Asking us to declare—here and now, and in the abstract—that every possible H. B. 71 display would violate the Establishment Clause would require precisely what *Texas* forbids: the substitution of speculation for adjudication. It would oblige us to hypothesize an open-ended range of possible classroom displays and then assess each under a context-sensitive standard that depends on facts not yet developed and, indeed, not yet knowable. That exercise exceeds the judicial function. It is not judging; it is guessing. And because it rests on conjecture rather than a concrete factual record, it does not cure the ripeness defect—it compounds it. Facial challenges, no less than as-applied challenges, may "degenerate into conjecture rather than rulings on concrete controversies." *La Union del Pueblo Entero v. Abbott*, ___ F.4th ___, 2026 WL 391215, at *2 (5th Cir. Feb. 12, 2026).

That does not mean, of course, that every facial challenge (whether under the Establishment Clause or otherwise) requires specific facts about implementation. On the contrary, we have long acknowledged that "[a]nticipatory constitutional challenges . . . 'play a most vital role'" in modern constitutional litigation. *Red Bluff Drive-In, Inc. v. Vance*, 648 F.2d 1020, 1033 n.18 (5th Cir. 1981) (quoting *Int'l Soc'y for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 817 (5th Cir. 1979)). But that role is not unlimited. Ripeness does not demand unqualified certainty—but it does demand facts sufficient to permit judicial judgment rather than speculation. Because there is no "unqualified right to pre-enforcement review of constitutional claims in federal court," *Whole Woman's Health v. Jackson*, 595 U.S. 30, 49 (2021), we must "insist that an anticipatory challenge to a statute's constitutionality grow out of a 'real, substantial controversy between parties . . . a dispute definite and concrete.'" *Int'l Soc'y for Krishna Consciousness*, 601 F.2d at 817 (ellipsis in original) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). Anticipatory review

No. 24-30706

therefore turns not on the scope of a plaintiff's legal theory, but on the existence of a dispute concrete enough to be judged rather than imagined.

Many statutes provide far greater detail than H.B. 71, and many constitutional provisions require far less contextual inquiry than the Establishment Clause. If H.B. 71 were such a statute, or if the Establishment Clause demanded less contextual sensitivity, this case might well be ripe. But H.B. 71 confers sweeping discretion on local school boards, and the Establishment Clause demands close attention to context. That incongruity is dispositive: it forecloses judicial review at this stage and renders the plaintiffs' claims nonjusticiable. We add, however, that nothing in today's narrow holding prevents future as-applied challenges once the statute is implemented and a concrete factual record exists.

*　　*　　*

"As this case comes to us . . . it does not—at this time—present a dispute 'appropriately resolved through the judicial process.'" *Trump*, 592 U.S. at 131 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014)). Article III judicial power stops there. Accordingly, we VACATE the preliminary injunction.

No. 24-30706

James C. Ho, *Circuit Judge*, concurring in the judgment:

A new Louisiana law requires the display of the Ten Commandments in public schools. The law is constitutional and consistent with our Founding traditions. I would vacate the preliminary injunction for that reason.

The court today vacates the preliminary injunction on ripeness grounds instead. But the important thing is that the decision vacates the preliminary injunction—and allows us to uphold the Louisiana law against constitutional attack in the future. So I'm content to concur in the judgment.

That said, I would avoid ripeness and vacate on the merits. Ordinarily, we must decide jurisdiction first. But in an appeal of a preliminary injunction, there is no order of operations—we may vacate on the merits, without ruling on jurisdiction at all. *See Munaf v. Geren*, 553 U.S. 674, 691 (2008). Indeed, "[a]djudication of the merits is most appropriate if the injunction rests on a question of law and it is plain that the plaintiff cannot prevail." *Id.* If "the Government is entitled to judgment as a matter of law, it is appropriate for us to *terminate the litigation now*." *Id.* at 692 (emphasis added).

We last confronted these issues in *United States v. Abbott*, 110 F.4th 700 (5th Cir. 2024). The majority vacated the preliminary injunction on the merits, and remanded for further proceedings, without deciding jurisdiction. *Id.* at 722. I wrote separately to note that I would vacate on jurisdictional grounds instead—specifically, the political question doctrine. I believed that was not only correct, but would "preclude further litigation entirely," *id.* at 727 n.2—and thus "terminate the litigation now." *Munaf*, 553 U.S. at 692.

I mention this, not to relitigate *Abbott*, but to say that, if it was proper to vacate on the merits in *Abbott*, then it's *a fortiori* proper to do so here too. No further facts are needed to vacate the preliminary injunction here on the merits. Moreover, upholding Louisiana law would "terminate the litigation" entirely. *Id.* That's what I sought to do in *Abbott*. And I'd do the same here.

No. 24-30706

## I.

Plaintiffs contend that their constitutional objection to the Louisiana Ten Commandments law "may properly begin and end" with *Stone v. Graham*, 449 U.S. 39 (1980).

That's telling, because *Stone* turns entirely on *Lemon v. Kurtzman*, 403 U.S. 602 (1971)—and everyone agrees that *Lemon* is no longer good law after *Kennedy v. Bremerton School District*, 597 U.S. 507, 534 (2022) (noting that "this Court long ago abandoned *Lemon*").

*Stone* begins by observing that, under the first prong of the *Lemon* test, statutes "must have a secular legislative purpose." *Stone*, 449 U.S. at 40. It then rests its holding explicitly—and exclusively—on the first prong of *Lemon*: "We conclude that Kentucky's statute requiring the posting of the Ten Commandments in public schoolrooms had no secular legislative purpose, and is therefore unconstitutional." *Id.* at 41. In the ensuing paragraphs, *Stone* focuses entirely on the secular legislative purpose test. And it ends by reprising its holding: "We conclude that [the Kentucky law] violates the first part of the *Lemon v. Kurtzman* test, and thus the Establishment Clause of the Constitution." *Id.* at 42–43. Moreover, the Supreme Court has repeatedly reaffirmed that *Stone* is premised on the legislative purpose prong of *Lemon*. *See, e.g.*, *Van Orden v. Perry*, 545 U.S. 677, 690 (2005) (plurality opinion of Rehnquist, C.J.) (*Stone* turned on the law's "plainly religious purpose"); *McCreary County v. American Civil Liberties Union of Ky.*, 545 U.S. 844, 859 (2005) ("*Stone* found a predominantly religious purpose").

Plaintiffs nevertheless insist that *Stone* remains good law, never mind the Court's "abandon[ment]" of *Lemon*. *Kennedy*, 597 U.S. at 534. After all, it's well established that, "[i]f a precedent of [the Supreme] Court . . . appears to rest on reasons rejected in some other line of decisions, [the lower

No. 24-30706

court] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Exp., Inc.*, 490 U.S. 477, 484 (1989).

But *Stone* doesn't rely on "reasons" that the Supreme Court has later "rejected." *Stone* relies on *precedent* that the Supreme Court has *overturned*.

What Plaintiffs may really be suggesting is that *Stone* is still binding because the Supreme Court hasn't yet explicitly overturned it *by name*.

But under that rule, Asian children could still be subject to racial segregation in public schools. After all, the Supreme Court hasn't overturned *Gong Lum v. Rice*, 275 U.S. 78 (1927), by name, either.

Of course, that isn't how we apply Supreme Court precedent. *Gong Lum* plainly rests on *Plessy v. Ferguson*, 163 U.S. 537 (1896)—just as *Stone* plainly rests on *Lemon*. And *Plessy* is no longer good law after *Brown v. Board of Education*, 347 U.S. 483 (1954)—just as *Lemon* is no longer good law after *Kennedy*.

In short, *Plessy* is gone, so *Gong Lum* is gone. *See, e.g.*, *Ho v. San Francisco Unified Sch. Dist.*, 147 F.3d 854, 862–63 (9th Cir. 1998) (noting that *Gong Lum* was "repudiated" in *Brown*). And so too here: *Lemon* is gone, so *Stone* is gone. We're not bound by *Stone* any more than we're bound by *Gong Lum*.

## II.

Plaintiffs offer a backup argument. They hope to reanimate *Stone* by reconceptualizing it as a coercion case.

But nothing in *Stone* holds—or even suggests—that a passive display of the Ten Commandments is somehow coercive. Indeed, the word "coercion" appears nowhere in *Stone*. There's a perfectly reasonable

No. 24-30706

explanation for that omission, of course:  *Stone* turned on purpose, not coercion.  It focused on legislative motive, not public impact.

Later Supreme Court opinions have further affirmed that passive religious displays are not coercive.  *See*, *e.g.*, *Lee v. Weisman*, 505 U.S. 577, 618 (1992) (Souter, J., concurring) (observing that a "prominent display of a nativity scene on public property . . . coerced no one into accepting or supporting whatever message it proclaimed"); *Van Orden v. Perry*, 545 U.S. 677, 694 (2005) (Thomas, J., concurring) ("The mere presence of [a Ten Commandments] monument along [the plaintiff's] path involves no coercion and thus does not violate the Establishment Clause."). So have we.  *See*, *e.g.*, *Briggs v. Mississippi*, 331 F.3d 499, 505 (5th Cir. 2003) ("[a] mere display on public property . . . is in no meaningful sense . . . coercive").

Moreover, we couldn't regard a passive display of the Ten Commandments as coercive, without overturning established precedent permitting the daily recitation of the Pledge of Allegiance in public schools.  *See*, *e.g.*, *Croft v. Perry*, 624 F.3d 157 (5th Cir. 2010).  After all, if a mere display is coercive, then surely an audible daily recitation of the Pledge of Allegiance every morning for one's entire public school education is, too.

Notably, counsel for Plaintiffs conceded during oral argument that the daily recitation of the Pledge of Allegiance would indeed present "a problem" under their theory of coercion.  Oral Arg. at 53:01.  "Both are issues," counsel acknowledged.  Oral Arg. at 53:30.

Counsel nevertheless intimated that there's a difference "of degree" between the daily recitation of the Pledge of Allegiance and the passive display of the Ten Commandments.  Oral Arg. at 53:48.

But for what it's worth, I agree:  Passive displays are even less coercive than being forced to listen every morning to the monotheistic and anti-atheist Pledge of Allegiance.  *Stone* itself confirms this—"the Bible verses involved

No. 24-30706

in this case are *merely* posted on the wall, rather than read aloud." 449 U.S. at 42 (emphasis added). *Cf. Lee*, 505 U.S. at 639 (Scalia, J., dissenting) ("[S]ince the Pledge of Allegiance . . . include[s] the phrase 'under God,' recital of the Pledge would appear to raise the same Establishment Clause issue as the invocation and benediction.").

So there's no coercion in this case. And that conclusion is fatal to all of Plaintiffs' First Amendment claims.

## III.

Once *Stone* is removed, this case should be easy to dismiss. Plaintiffs present no historical evidence that remotely suggests that our Founders would have regarded a passive display of the Ten Commandments as an impermissible "establishment of religion." U.S. Const. amend I. *See*, *e.g.*, *Kennedy*, 597 U.S. at 537 & n.5 (noting the "hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment") (citing, *inter alia*, *Shurtleff v. City of Boston*, 596 U.S. 243, 285–86 (2022) (Gorsuch, J., concurring)). To the contrary, our Nation's history proves precisely the opposite.

Our Nation's Founders didn't just permit religion in education—they *presumed* that there would be religion in education. Indeed, our Founders firmly believed that our Constitution wouldn't work without a religious people.

John Adams famously observed that "[o]ur Constitution was made only for a moral and religious People. It is wholly inadequate to the government of any other." John Adams, Letter to the Massachusetts Militia (Oct. 11, 1798). John Jay similarly wrote that "Providence has been pleased to give this one connected country, to one united people, . . . professing the same religion, attached to the same principles of government." The Federalist No. 2, at 9 (John Jay) (J. Cooke ed. 1961). The Massachusetts

No. 24-30706

Declaration of Rights, contained in the 1780 Massachusetts Constitution, proclaimed that "the happiness of a people, and the good order and preservation of civil government, essentially depend upon piety, religion and morality." Mass. Const. pt. I, art. III.

Given the centrality of religion in our Founders' conception of good citizenship, it's not surprising that religion was a cornerstone of American education from the beginning. The First Congress understood religious instruction to be a necessary element of education, providing in the Northwest Ordinance of 1789 that "[r]eligion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." 1 Stat. 50, 52 (1789).[1] Samuel Adams implored fellow Americans to educate their children in "the Study, and Practice of the exalted Virtues of the Christian system, which will happily tend to subdue the turbulent passions of Men, and introduce that Golden Age beautifully described in figurative language; when the Wolf shall dwell with the Lamb, and the Leopard lie down with the Kid—the Cow, and the bear shall feed; their young ones shall lie down together, and the Lyon shall eat straw like the Ox—none shall then hurt, or destroy; for the Earth shall be full of the Knowledge of the Lord." Samuel Adams, Letter to John Adams (Oct. 4, 1790).

During the Founding era, American children were typically educated in church-supported schools or by private tutors. *See* Expert Report of Steven K. Green at 18, *Roake v. Brumley*, No. 3:24-cv00517 (M.D. La. Aug. 26, 2024). And one of the most popular textbooks used in that education was

---

[1] The Continental Congress adopted the Northwest Ordinance of 1787, and the First Congress reaffirmed it in the Northwest Ordinance of 1789. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 577–78 (2021) (Alito, J., concurring); Tara Ross and Joseph C. Smith Jr., Under God 88–89 (2008).

No. 24-30706

the *New England Primer*, which features extensive religious material including poems, prayers, and lessons, including the Ten Commandments. *See* Westminster Assembly, The New England Primer Improved: For the more easy attaining the true reading of English: To Which is Added the Assembly of Divines, and Mr. Cotton's Catechism (Bos., Edward Draper 1777). *See also* Mark David Hall & Andrea Picciotti-Bayer, *Ten Commandments in the Public Square and Public Schools*, 34 Wm. & Mary Bill Rts. J. 175, 219 (2025). From 1680 to 1830, more than 6.5 million copies of the *New England Primer* were sold. *Id.* So it's safe to say that that textbook was in common use in early American education. *See*, *e.g.*, *Morgan v. Plano Independent School Dist.*, 612 F. Supp. 2d 750, 754 n.3 (E.D. Tex. 2009) ("The founding fathers would have been familiar with the *New England Primer* used by students in colonial society."). Other textbooks used in early American education, such as *McGuffey's Readers* and Noah Webster's *American Spelling Book*, likewise featured religious material including the Ten Commandments. *See* Hall & Picciotti-Bayer, 34 Wm. & Mary Bill Rts. J. at 223.

\* \* \*

We can vacate the preliminary injunction without addressing jurisdiction, because "it is plain that the plaintiff cannot prevail" on "the merits." *Munaf*, 553 U.S. at 691. So we can "terminate the litigation now." *Id.* at 692. No further facts are needed to uphold the Louisiana Ten Commandments law against Plaintiffs' constitutional attacks.

The Louisiana law violates neither the Establishment Clause nor the Free Exercise Clause. It is fully consistent with the Constitution, and what's more, it reinforces our Founders' firm belief that the children of America should be educated about the religious foundations and traditions of our country.

No. 24-30706

We must never forget that, as Americans, "[w]e are a religious people whose institutions presuppose a Supreme Being." *Zorach v. Clauson*, 343 U.S. 306, 313 (1952). So "[w]hen the state encourages religious instruction," it "respects the religious nature of our people," "accommodates . . . their spiritual needs," and "follows the best of our traditions." *Id.* at 313–14.

In sum, the Louisiana Ten Commandments law is not just constitutional—it affirms our Nation's highest and most noble traditions.

No. 24-30706

James L. Dennis, *Circuit Judge*, joined by Graves, Higginson, Douglas, and Ramirez, *Circuit Judges*, dissenting:

The Ten Commandments—here, a version from the King James Bible—are a sacred text, drawn verbatim from scripture and not a mere moral code or historical relic. By placing that text on permanent display in public school classrooms, not in a way that is curricular or pedagogical, the State elevates words meant for devotion into objects of reverence, exposing children to government-endorsed religion in a setting of compulsory attendance. That is precisely the kind of establishment the Framers anticipated and sought to prevent.

More than forty-five years ago, the Supreme Court confirmed this in *Stone v. Graham*, 449 U.S. 39, 42 (1980), holding that classroom postings of the Ten Commandments, when unincorporated into the curriculum, serve only "to induce . . . schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments," and cannot stand under the Establishment Clause. The Court has never retreated from that holding. To the contrary, it reaffirmed *Stone*'s core reasoning in *McCreary County v. Am. C.L. Union*, 545 U.S. 844 (2005), and *Van Orden v. Perry*, 545 U.S. 677 (2005).

Today, the Fifth Circuit deploys ripeness as a calculated stratagem to evade these precedents in the Louisiana case. That maneuver is as unfortunate as it is incorrect for the reasons ably explained by Judge Ramirez.[1] Because I would affirm the district court's judgment in full, I dissent.

_____

[1] Not only does the statute specify the posters' size, placement, and minimum content, but nearly every public school in Louisiana has already received posters designed by the Louisiana Attorney General. *See* Patrick Wall, *Louisiana Public Schools Receive Donated Ten Commandments Posters Amid Legal Battle*, NOLA.com (Jan. 17, 2026),

No. 24-30706

\*      \*      \*

In *Stone v. Graham*, the Supreme Court struck down a Kentucky statute virtually identical to H.B. 71, holding that it violated the Establishment Clause by requiring the Ten Commandments to be displayed in classrooms. *See* 449 U.S. at 42–43. Louisiana contends that we may disregard *Stone* because it relied on *Lemon v. Kurtzman*, 403 U.S. 602 (1971),[2] which Louisiana claims the Supreme Court effectively abandoned in *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022). Louisiana concedes, however, that *Kennedy* did not mention *Stone* or *Lemon*'s secular purpose requirement, on which *Stone* relied in part. *Stone* controls for two reasons.

I

First, even adopting Louisiana's gloss on *Kennedy*, lower courts are bound to follow directly on-point Supreme Court precedent, leaving no room to question the ruling merely because it "appears to rest on reasons rejected in some other line of decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989); *see also* Nathan S. Chapman & Michael W. McConnell, Agreeing to Disagree 92 (Geoffrey R. Stone ed., 2023) (similar). That command reflects the obligation of

_____

https://perma.cc/2ZXW-JPBK; *see also* Ho, J., concurrence (contending there is no requirement that we resolve this appeal on ripeness grounds).

[2] *Lemon* formalized a three-part test for evaluating Establishment Clause violations: state action is unconstitutional if it (1) lacks a secular legislative purpose; (2) has the primary effect of advancing or inhibiting religion; or (3) fosters an excessive entanglement between government and religion. 403 U.S. at 612–13. Over time, courts interpreting the second prong began asking whether a "reasonable observer" would view the government's challenged action as an "endorsement" of religion, giving rise to the so-called "endorsement test." *See, e.g.*, *County of Allegheny v. Am. C.L. Union*, 492 U.S. 573, 593 (1989).

No. 24-30706

vertical fidelity that defines the role of an inferior court. No special exception exists for Fifth Circuit judges.

To be sure, *Stone* is directly on point. H.B. 71 and the Kentucky statute both:

1. Require the Ten Commandments to be displayed in every public school classroom;
2. Mandate minimum poster size and placement requirements;
3. Include "contextual" statements describing the "historical basis" for each display;
4. Make the Ten Commandments the central focus;
5. Permit private financing;
6. Task the superintendent with implementation; and
7. Do not integrate the Ten Commandments into an educational curriculum.

*Compare* La. R.S. § 17:2124(B), *with Stone*, 449 U.S. at 39 n.1 (citing Ky. Rev. Stat. § 158.178 (1980)).

Under H.B. 71, other foundational documents may be displayed, but only the Ten Commandments are mandatory, prominently displayed, and printed in large, legible text. La. R.S. § 17:2124(B)(1), (4)(a). A display meeting H.B. 71's requirements is materially indistinguishable from those struck down in *Stone*.

*Stone*'s reasoning applies equally here. The Supreme Court rejected Kentucky's claimed secular purpose because the Ten Commandments were not integrated into the curriculum—"where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like." 449 U.S. at 42 (citing *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 225 (1963)). Posting the Ten Commandments on classroom

walls served no educational function. The same is true under H.B. 71. The posters must be displayed indiscriminately in every classroom, regardless of subject matter, and without curricular integration. La. R.S. § 17:2124(B)(1).

Louisiana claims its Legislature had a valid secular purpose: to promote understanding of the Ten Commandments as part of the state's historical and educational tradition. Courts are normally deferential to such legislative purposes, but the purpose must be sincere, not a sham. *See Croft v. Governor of Tex.*, 624 F.3d 157, 166 (5th Cir. 2010) (first quoting *Edwards v. Aguillard*, 482 U.S. 578, 587 (1987), and then quoting *Wallace v. Jaffree*, 472 U.S. 38, 64 (1985) (Powell, J., concurring)). Here, the legislative record demonstrates that a religious objective dominated. Sponsors repeatedly invoked teaching children "what God commands," lamented the decline of Christianity, and openly framed opposition to H.B. 71 as an "attack on Christianity." Another co-sponsor touted the law as a religious counterbalance to secular education.

The statutory text reinforces this pretext. The Ten Commandments must be displayed prominently and legibly, while other foundational documents are optional and may remain hidden. La. R.S. § 17:2124(A)(9). As in *Stone*, "[i]f the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments." 449 U.S. at 42. That objective is unconstitutional.

## II

Second, and independently, *Stone* remains controlling because Louisiana vastly overstates *Kennedy*'s significance. *Kennedy* repudiated only the endorsement test—an offshoot of *Lemon*'s second prong—and left intact the broader framework of Establishment Clause doctrine: the requirement of a secular legislative purpose, the prohibition on policies whose primary effect

No. 24-30706

advances religion, and the concern about excessive entanglement between church and state. These principles predate *Lemon* and remain binding. *See* Ira C. Lupu & Robert W. Tuttle, *The Ten Commandments in Louisiana Public Schools: A Study in the Survival of Establishment Norms*, 100 Chi.-Kent L. Rev. 601 (2025).

Consider *School District of Abington Township v. Schempp*, the Court's seminal school prayer case decided nearly a decade before *Lemon*. There, the Schempp family challenged a Pennsylvania law requiring students to read the Bible at the start of each school day. The Court held that a law must have a secular legislative purpose to withstand the strictures of the Establishment Clause. 374 U.S. at 222 (citing *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 15 (1947)); *McGowan v. Maryland*, 366 U.S. 420, 442 (1961). That foundational principle still binds us. Unless *Schempp* and its progeny are overruled—which Louisiana has never sought—the inquiry into the purpose of a state-sponsored religious display remains mandatory. Abandoning *Stone* would mark a first and perilous step toward unraveling decades of school prayer jurisprudence, grounded in the special need to protect young, impressionable public school students from state-sponsored indoctrination.

Louisiana's reliance on *Kennedy* as overruling *Stone* underscores the error. *Kennedy* turned on whether Coach Kennedy's personal post-game prayers were protected private speech. The Court held that they were and that the school district could not restrict them. The Ten Commandments display here, by contrast, is indisputable state action undertaken for religious reasons. Yet Louisiana contends that *Kennedy* swept away *Lemon* entirely, along with *Stone*, replacing the established framework with a singular focus on history and tradition.

That is wrong, and I refuse to go along with it. True, *Kennedy* states that "this Court long ago abandoned *Lemon* and its endorsement test

No. 24-30706

offshoot." 597 U.S. at 510. But only the endorsement test—the reasonable-observer inquiry—was addressed. *Kennedy* did not revisit the secular-purpose requirement, the analysis of primary effects, or the concern with excessive entanglement. These requirements predate *Lemon*, and they remain binding. As Professors Lupu and Tuttle explain, *supra* at 629, "*Lemon*'s component parts thus remain alive, and function in a variety of contexts, even if citations to *Lemon* now will disappear."

\*    \*    \*

Bound by *Stone v. Graham* and its progeny, and mindful that we are not the Supreme Court, I conclude that permanently posting the Ten Commandments in every public school classroom, without curricular incorporation and with compulsory attendance, violates the Establishment Clause. Our court avoids confronting that conclusion only through procedural artifice. I dissent.

No. 24-30706

Haynes, *Circuit Judge*, dissenting:

I concur with the conclusion of Judge Ramirez's dissent that this case is ripe. Simply stated, the Louisiana statute clearly requires the posting of the Ten Commandments, which is what the Plaintiffs are challenging, so there is nothing to wait on in that arena, as we explained in our panel opinion filed on June 20, 2025. I also concur with the last paragraph in Judge Ramirez's dissent that the preliminary injunction was proper, and we should affirm the district court as we explained in our panel opinion. I respectfully note that we must follow what the Supreme Court requires; thus, my determination is not based on what I think of the Ten Commandments but following the Constitution as the Supreme Court has explained.

No. 24-30706

Stephen A. Higginson, *Circuit Judge*, joined by Dennis, Graves, Douglas, and Ramirez, *Circuit Judges*, dissenting:

I join Judge Ramirez's principal dissent, disagreeing with the court majority that we cannot examine state-compelled scriptural text at this juncture because H.B. 71's legislative command to all public schools "leave[s] numerous essential questions unanswered." I also join Judge Dennis's dissent, emphasizing that it is not our role to overturn *Stone v. Graham*, 449 U.S. 39 (1980), a particularly stark Fifth Circuit usurpation given Chief Justice Rehnquist's two-paragraph reiteration of *Stone* in *Van Orden v. Perry*, 545 U.S. 677, 691 (2005) (plurality opinion), a decision our court today correctly embraces.[1]

I write separately to further disagree with the court majority that the biblical scripture that all Louisiana schoolchildren now must "confront[]," *id.*, is indeterminately religious—that the state law command that students stare at the King James Version of the Decalogue all day, every day, for every year of their compulsory education "turns on" facts to be determined.

Although the court majority opines that no "categorical rule" prohibits the display of the Commandments on public property, over the ebb and flow of First Amendment interpretation, the Supreme Court has been constant with one fixed star: prohibiting government orthodoxy and

---

[1] Determinatively, in *Van Orden*, Chief Justice Rehnquist juxtaposed the history of religious displays *on* monuments with displays and practices *in* school classrooms, from which schoolchildren cannot withdraw. 545 U.S. at 690–91; *see also id.* at 703 (Breyer, J., concurring in judgment) ("This case, moreover, is distinguishable from instances where the Court has found Ten Commandments displays impermissible. The display is not on the grounds of a public school, where, given the impressionability of the young, government must exercise particular care in separating church and state."). Despite this, our court majority asserts that in-class displays remain subject to variation; regardless of context and location, every parent knows a child's curiosity does not always train in the teacher's direction.

No. 24-30706

denominational discrimination. *See Cath. Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*, 605 U.S. 238, 247 (2025); *see also W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). That prohibition is paramount against government placement of a preferred religion in schools and classrooms. *See Van Orden*, 545 U.S. at 691 ("We have been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools." (cleaned up)).[2]

We know from Louisiana lawmakers the chosen scriptural text was not happenstance. The legislators had definitive religious motivation when they selected a Protestant version of the Decalogue to display.[3] As one of the "country's most distinguished scholars of the Religion Clauses,"[4] Professor Michael W. McConnell, has stated about H.B. 71, "the state legislature is

---

[2] *Town of Greece v. Galloway*, 572 U.S. 565, 577 (2014); *see also Rowan County v. Lund*, 585 U.S. 1035, 1037–38 (2018) (Thomas, J., dissenting from denial of certiorari) (explaining that *Town of Greece*'s historical inquiry concerns the "specific practice" at issue).

[3] The primary author and sponsor of the law was clear: "It is so important that our children learn what God says is right and what He says is wrong." And another co-author and co-sponsor described the law's opponents as waging an "attack on Christianity."

[4] *Fulton v. City of Philadelphia*, 593 U.S. 522, 554 (2021) (Alito, J., concurring in judgment); *see also Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 537 n.5 (2022) (citing Professor McConnell's scholarship in explaining the "hallmarks of religious establishment the framers sought to prohibit"); *Shurtleff v. City of Boston*, 596 U.S. 243, 277, 286 (2022) (Gorsuch, J., concurring in judgment) (same); *Hilsenrath v. Sch. Dist. of Chathams*, 136 F.4th 484, 491 (3d Cir. 2025) (same). The other "distinguished scholar[]" recognized by the Supreme Court in *Fulton* for scholarship that has assisted its recent Establishment Clause jurisprudence, 593 U.S. at 554, Professor Douglas Laycock, notably serves as amicus counsel for a group of religious amici that submitted a brief in support of plaintiffs here, *see* En Banc Brief of Amicus Curiae Baptist Joint Committee for Religious Liberty, et al. at 28 (No. 24-30706).

No. 24-30706

singling out a particular religious text to be displayed in a way that is not curricular or pedagogical but rather reverential." [5]

Indeed, *every* faith-based organization before us—on behalf of thousands of members—and *every* clergy and devout plaintiff agree that Louisiana must not pick and post specific scripture that the state commands will confront children in state classrooms. All religious voices submitted to us, barring one individual, oppose Louisiana's attempt to select, inculcate, and enforce this version of gospel text in compulsory public education.

History confirms that the Supreme Court has been especially vigilant against denominational discrimination inside the schoolhouse gate. *See Barnette*, 319 U.S. at 637 ("Free public education, if faithful to the ideal of secular instruction and political neutrality, will not be partisan or enemy of any class, creed, party, or faction."); *see also Lee v. Weisman*, 505 U.S. 577, 592 (1992) ("As we have observed before, there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools.").

To us, Jewish plaintiffs and organizations voice that it violates their faith to make Jewish children stare at a Protestant "misappropriat[ion]" of their most sacred text.[6] As one Jewish parent plaintiff swore to in district court, "I believe that H.B. 71 (1) misappropriates a Jewish text, ripping it from its Jewish context, (2) selectively edits that text by altering its meaning

---

[5] Mark Walsh, *Posting Ten Commandments in Schools Was Struck Down in 1980. Could That Change?*, Educ. Wkly. (Jul. 11, 2024), https://www.edweek.org/policy-politics/posting-ten-commandments-in-schools-was-struck-down-in-1980-could-that-change/2024/07.

[6] Two centuries ago, classroom use of the King James Bible was bitterly opposed by Catholics. *See* Joan DelFattore, *The Fourth R: Conflicts Over Religion in America's Public Schools* 46–49 (2007) (describing Catholic opposition to the King James Version of the Ten Commandments in Massachusetts schools).

No. 24-30706

and obscuring or erasing its Jewish significance, and (3) then mandates the display of the altered text to non-Jews, in violation of core Jewish tenets that oppose proselytizing." Another Jewish parent insists on the unique importance of the first commandment for Jews. Louisiana's version omits a "key piece of the Ten Commandments and of the Jewish story"—that is, the deliverance of Jews from slavery in Egypt, after which the God of Israel entered into his contractual relationship, through the Decalogue, with his chosen people.[7]

The same violation is inflicted on plaintiffs and amici who ascribe to other Abrahamic faiths. For example, one Presbyterian minister and parent plaintiff explains how Louisiana's "stamp of approval" for a specific version of the Ten Commandments "sends the message" to him, his children, and his community "that people of some religious denominations or faith systems are superior to others" and conveys a state-endorsed "religious hierarchy." Likewise, a group of Baptist, Evangelical Lutheran, and United Church of Christ amici notes that there "is no singular, universally accepted version of the Ten Commandments." *See* En Banc Brief of Amicus Curiae Baptist Joint Committee for Religious Liberty, et al. at 28 (No. 24-30706).

Needless to say, any child who adheres to a non-Abrahamic faith—such as Hindus and Buddhists—who may not believe in one divine lawgiver,

---

[7] These competing versions of the Decalogue are temporally and theologically incompatible—even if the King James Version is philologically ecumenical—with the Christian eisegesis of the Hebrew Bible as anticipating the messiahship of Jesus. As Rabbi Mara Nathan, a plaintiff in this case's Texas companion, criticizes, the Protestant text is nowhere "found in Jewish tradition. It is a Christianized version of the Commandments that omits explicitly Jewish aspects of scripture. For example, in Judaism, the sacredness of the Commandments is rooted in the Jewish belief that, at Mount Sinai, Moses entered into a covenant with God on behalf of the children of Israel after they were freed from slavery. The Ten Commandments are a sign of the covenant between God and Jewish people. The text of the first Commandment required by [Texas's equivalent law] erases this foundational Jewish tenet and historical context."

No. 24-30706

or one creator god, or in revealed religion at all, will look all day at a religious perplexity, contrary to their parents' teachings and their own religious beliefs. *Contra Mahmoud v. Taylor*, 606 U.S. 522, 530 (2025).[8] That is why a coalition of over thirty religious organizations describes how the Decalogue is "inconsistent" with many faith traditions, such as by "openly forbid[ing] the practice" of polytheistic religions. *See* En Banc Brief of Amicus Curiae National Council of Jewish Women, et al. at 19–21 (No. 24-30706).

As James Madison warned presciently, government attempts to "employ Religion as an engine of Civil policy" are "an unhallowed perversion of the means of salvation."[9] Yet, today, the court majority permits Louisiana to do just that. H.B. 71 displaces parents and churches as belief-givers. *Contra Mahmoud*, 606 U.S. at 537 ("The practice of educating one's children in one's religious beliefs, like all religious acts and practices, receives a generous measure of protection from our Constitution."); *id.* at 559 (rejecting the "chilling vision of the power of the state to strip away the

---

[8] As the Supreme Court made clear in *Mahmoud*, "A government burdens the religious exercise of parents when it requires them to submit their children to instruction that poses a very real threat of undermining the religious beliefs and practices that the parents wish to instill. And a government cannot condition the benefit of free public education on parents' acceptance of such instruction." 606 U.S. at 530 (internal quotation marks and citations omitted).

[9] James Madison, *Memorial and Remonstrance Against Religious Assessments* (1785), *in* 5 *The Founders' Constitution* 82, 83 (Philip B. Kurland & Ralph Lerner eds., 1987); *see also* Michael W. McConnell, *No More (Old) Symbol Cases*, 2018–2019 Cato Sup. Ct. Rev. 91, 97 (noting that attempts to "interject" religious symbols "as a type of religious identity politics" offend "religious believers because they politicize religion"). Albeit with neither this historical nor scholarly pedigree, I continue to think that "[f]aith is demeaned and enfeebled when government enforces it. The reason is as old as the First Amendment and rooted in common sense: 'ecclesiastical establishments' weaken belief in the 'innate excellence' of religion and strengthen the 'suspicion' of nonbelievers." *Freedom from Religion Found., Inc. v. Mack*, 54 F.4th 320, 324 (5th Cir. 2022) (Higginson, J., dissenting from denial of rehearing en banc) (citation omitted).

No. 24-30706

critical right of parents to guide the religious development of their children"). It puts the Establishment Clause in friction with the Free Exercise Clause. *Contra Kennedy*, 597 U.S. at 532–36 (describing the "complementary" purposes of the two religion clauses). And, differently corrosive, it risks pitting religions against each other—an evil the Framers sought to protect against when they wrote into the original Constitution the No Religious Test Clause disestablishment imperative. *See* U.S. Const., art. VI § 3.[10]

---

[10] As Edmund Randolph famously explained at Virginia's ratifying convention, the No Religious Test Clause's fundamental purpose was to "put[] all sects on the same footing." 3 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution as Recommended by the General Convention at Philadelphia in 1787*, at 204 (Jonathan Elliot ed., 2d ed. 1836); *see also Murphy v. Collier*, 587 U.S. 901, 901 (2019) (Kavanaugh, J., concurring) ("The government may not discriminate against religion generally or against particular religious denominations.").

No. 24-30706

Irma Carrillo Ramirez, *Circuit Judge*, joined by Stewart, Dennis, Graves, Higginson, and Douglas, *Circuit Judges*, dissenting:

H.B. 71 mandates detailed minimum requirements for "when, where, [and] under what circumstances" the Ten Commandments shall be displayed in every Louisiana public-school classroom. Because the statute does not mandate the display of any other document, we are not required to "wait and see" the "nature" of a Ten Commandments display "in a particular classroom on a particular day" before evaluating Plaintiffs' First Amendment claims. And Plaintiffs assert that H.B. 71 is unconstitutional in all applications regardless of what other materials may surround the Ten Commandments, so this case presents pure legal issues that require no additional factual development. Because this case is ripe, I respectfully dissent.

I

H.B. 71 states, in relevant part:

(1) No later than January 1, 2025, each public school governing authority shall display the Ten Commandments in each classroom in each school under its jurisdiction. The nature of the display shall be determined by each governing authority with a minimum requirement that the Ten Commandments shall be displayed on a poster or framed document that is at least eleven inches by fourteen inches. The text of the Ten Commandments shall be the central focus of the poster or framed document and shall be printed in a large, easily readable font.

(2) The text shall read as follows:

"The Ten Commandments
I AM the LORD thy God.
Thou shalt have no other gods before me.
Thou shalt not make to thyself any graven images.
Thou shalt not take the Name of the Lord thy God in vain.
Remember the Sabbath day, to keep it holy.

No. 24-30706

> Honor thy father and thy mother, that thy days may be long
> upon the land which the Lord thy God giveth thee.
> Thou shalt not kill.
> Thou shalt not commit adultery.
> Thou shalt not steal.
> Thou shalt not bear false witness against thy neighbor.
> Thou shalt not covet thy neighbor's house.
> Thou shalt not covet thy neighbor's wife, nor his manservant,
> nor his maidservant, nor his cattle, nor anything that is thy
> neighbor's."

LA. R.S. § 17:2124(B)(1)–(B)(2).

The Ten Commandments must be displayed with a "context statement" about the "History of the Ten Commandments in American Public Education." *Id*. § 17:2124(B)(3). H.B. 71 also states that schools "may" display "the Mayflower Compact, the Declaration of Independence, and the Northwest Ordinance . . . along with the Ten Commandments." *Id*. § 17:2124(B)(4). But the statute does not *mandate* the display of any other documents along with the Ten Commandments.

Plaintiffs assert that H.B. 71 facially violates the First Amendment's Establishment Clause and Free Exercise Clause.

## II

Louisiana asserts that Plaintiffs' claims are not ripe because they "seek to enjoin displays they have never seen and whose form and appearance have not yet been determined."

"Ripeness doctrine 'is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'" *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 286 (5th Cir. 2012) (quoting *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 58 n.18 (1993)). It is "peculiarly a question of timing." *Blanchette v. Conn. Gen. Ins.*

No. 24-30706

*Corps.*, 419 U.S. 102, 140 (1974). And its "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967).

"A court should dismiss a case for lack of 'ripeness' when the case is abstract or hypothetical." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 833 F.2d 583, 586 (5th Cir. 1987). "The ripeness inquiry hinges on two factors: (1) the fitness of the issues for judicial decision; and (2) the hardship to the parties of withholding court consideration." *Gulfport Energy Corp. v. FERC*, 41 F.4th 667, 679 (5th Cir. 2022) (citation modified).

A

Louisiana argues that Plaintiffs have not met the first element of the ripeness inquiry—that their claims are fit for judicial decision.

1

"A matter is fit for review when it presents pure legal questions that require no additional factual development." *Id.* Facial challenges that assert a law is unconstitutional in all applications present quintessential "pure question[s] of law." *See United States v. Rafoi*, 60 F.4th 982, 996 (5th Cir. 2023) ("A facial challenge to the constitutionality of a statute presents a pure question of law . . . ."). "In the context of a facial challenge, a purely legal claim is presumptively ripe for judicial review . . . ." *Whole Woman's Health v. Cole*, 790 F.3d 563, 591 (5th Cir. 2015) (quoting *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009)), *rev'd on other grounds sub nom.*, *Whole Woman's Health v. Hellerstedt*, 579 U.S. 582 (2016). These claims generally "[do] not require a developed factual record." *Id.* (quoting *Harris*, 564 F.3d at 1308).

Here, Plaintiffs assert that H.B. 71 is facially unconstitutional under

the First Amendment's Establishment and Free Exercise Clauses. These are "pure question[s] of law." *See Rafoi*, 60 F.4th at 996. Louisiana, however, asserts that additional factual development is required to resolve the legal issues presented because "the *context* in and around the posters" is unknown and variable, given that no H.B. 71 posters have yet been displayed.

a

In evaluating Establishment Clause claims concerning Ten Commandments displays, the Supreme Court has instructed that "focusing on the text of the Commandments alone cannot conclusively resolve [the] case. Rather, to determine the message that the text . . . conveys, we must examine how the text is used. And that inquiry requires us to consider the context of the display." *Van Orden v. Perry*, 545 U.S. 677, 701 (2005) (Breyer, J., concurring in the judgment).

In *Van Orden*, the Supreme Court considered an Establishment Clause challenge to a singular display of the Ten Commandments on Texas State Capitol grounds. *Id.* at 681 (plurality opinion). The display was among "17 monuments and 21 historical markers," and had been there for several decades before the plaintiff sued. *Id.* at 681–82. The Supreme Court held the display was constitutional under the Establishment Clause. *Id.* at 681.

In so holding, the Court focused its analysis on the contextual differences between the display of the Ten Commandments on public grounds versus the display "on the grounds of a public school." *See id.* at 703 (Breyer, J., concurring in the judgment); *id.* at 690–91 (plurality opinion) (distinguishing Establishment Clause cases involving religion in schools). It explained that the "*limits* to the display of religious messages or symbols" often arise in the "classroom context." *Id.* at 690 (emphasis added). In fact, the Supreme Court has *repeatedly* emphasized that the "classroom context," *id.*, is *different* from cases involving a singular and discretionary display on

No. 24-30706

public grounds. *See, e.g.*, *Lee v. Weisman*, 505 U.S. 577, 592 (1992) ("As we have observed before, there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools."); *Edwards v. Aguillard*, 482 U.S. 578, 583–84 (1987) ("The Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools. . . . Students in such institutions are impressionable and their attendance is involuntary."); *Mahmoud v. Taylor*, 606 U.S. 522, 554–55 (2025) ("In other contexts, we have recognized the potentially coercive nature of classroom instruction of this kind. . . . Young children, like those of petitioners, are often impressionable and implicitly trust their teachers." (citation modified)).[1]

The Court in *Van Orden* also acknowledged its holding in *Stone v. Graham*, 449 U.S. 39 (1980) (per curium), that "a Kentucky statute requiring the posting of the Ten Commandments in every public schoolroom" was unconstitutional. 545 U.S. at 690. As *Van Orden* emphasized, this was because the religious displays in *Stone* arose "in the context of public elementary and secondary schools," where the "text confronted . . . students

---

[1] *See also McCreary County v. ACLU*, 545 U.S. 844, 908 (2005) (SCALIA, J., dissenting) ("If, as discussed above, the Commandments have a proper place in our civic history, even placing them by themselves can be civically motivated—especially when they are placed, *not in a school* (as they were in the *Stone* case upon which the Court places such reliance), but in a courthouse." (emphasis added)); *City of Elkhart v. Books*, 532 U.S. 1058, 1060–61, (2001) (REHNQUIST, C.J., dissenting) ("We have been particularly vigilant in monitoring compliance with the Establishment Clause in [the *Stone*] context, where the State exerts great authority and coercive power over students through mandatory attendance requirements." (citation modified)); *Lee*, 505 U.S. at 643 (SCALIA, J., dissenting) ("[O]ur school prayer cases turn in part on the fact that the classroom is inherently an instructional setting, and daily prayer there—where parents are not present to counter the students' emulation of teachers as role models and the children's susceptibility to peer pressure—might be thought to raise special concerns regarding state interference with the liberty of parents to direct the religious upbringing of their children . . . ." (citation modified)).

every day." *Id.* at 691 (citation modified). *Van Orden* described *Stone* as an example of the Court's "vigilan[ce] in monitoring compliance with the Establishment Clause in elementary and secondary schools." *Id.* (quoting *Edwards*, 482 U.S. at 583–84). And it specifically pointed out that "[t]he placement of the Ten Commandments monument on [public] grounds is a *far more passive use of those texts* than was the case in *Stone*." *Id.* (emphasis added). As a result, *Van Orden* does not just make clear that context is important to the Establishment Clause inquiry in religious display cases. It also makes clear that the necessary context exists in cases involving a challenge to a statute that mandates permanent religious displays in public-school classrooms "where, given the impressionability of the young, government must exercise particular care in separating church and state." *See id.* at 703 (BREYER, J., concurring in the judgment).

b

Disputes arising under the Free Exercise Clause are likewise "fact-intensive." *Mahmoud*, 606 U.S. at 550.[2] But the Supreme Court has still warned that, "when a deprivation of First Amendment rights is at stake, a plaintiff need not wait for the damage to occur before filing suit." *Id.* at 559–60. In *Mahmoud*, the Supreme Court found a justiciable case where parents asserted pre-enforcement Free Exercise Clause challenges to a school board's policy of not allowing elementary school students to opt out of instruction regarding "LGBTQ+-inclusive" storybooks. *Id.* at 537–43. The school board did not contest that it would be "introducing the storybooks into classrooms, that it [was] requiring teachers to use them as part of

---

[2] Louisiana only substantively addresses Plaintiffs' Establishment Clause claims—largely ignoring their claims under the Free Exercise Clause. But ripeness is generally addressed "claim by claim." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 434 n.27 (5th Cir. 2021).

No. 24-30706

instruction, and that it ha[d] encouraged teachers to approach classroom discussions in a certain way." *Id.* at 560. So, the parents had "undoubtedly" shown a certainly impending injury or a substantial risk of harm. *Id.* at 560 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). The record was also not "too 'threadbare' to demonstrate a burden on [parents'] religious exercise." *Id.* at 559. The Court did "not need to 'wait and see' how a particular book [was] used in a particular classroom on a particular day before evaluating the parents' First Amendment claims." *Id.* at 560. It "need[ed] only [to] decide whether—if teachers act[ed] according to the clear and undisputed instructions of the Board—a burden on religious exercise [would] occur." *Id.*[3]

c

Here, H.B. 71 thoroughly outlines the mandatory religious displays. A state-selected Protestant version of the Ten Commandments is to be permanently displayed "in each classroom in each school"; "on a poster or framed document that is at least eleven inches by fourteen inches" where the text is the "central focus" and "printed in a large, easily readable font";

---

[3] In discussing justiciability, the Supreme Court in *Mahmoud* did not make clear whether it was evaluating standing, ripeness, or both. It cited the well-established standing principle that "to pursue a pre-enforcement challenge, a plaintiff must show that 'the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Mahmoud*, 606 U.S. at 560 (quoting *Susan B. Anthony List*, 573 U.S. at 158). But the Court also emphasized the necessity of a sufficiently developed "record," *id.* at 559–60, which generally concerns ripeness. *See New Orleans Pub. Serv., Inc.*, 833 F.2d at 587 ("[A] case is not ripe if further factual development is required."). "The justiciability doctrines of ripeness and standing often intersect because the question of whether a plaintiff has suffered an adequate harm is integral to both." *Prestage Farms, Inc. v. Bd. of Sup'rs of Noxubee Cnty.*, 205 F.3d 265, 268 n.7 (5th Cir. 2000). And *Mahmoud*'s justiciability holding is particularly on-point here, as both cases involve pre-enforcement First Amendment challenges where the asserted harm is rooted in the religious coercion of students in public schools. *See Mahmoud*, 606 U.S. at 550, 553–54.

No. 24-30706

accompanied by a "context statement" regarding the "History of the Ten Commandments in American Public Education." La. R.S. § 17:2124(B)(1)–(3). The statute requires the display of no other materials.

The details provided by H.B. 71 are particularly germane to the constitutional inquiry in the "classroom context" in which this case arises, where the "text" will "confront[] . . . students every day." *See Van Orden*, 545 U.S. at 690–91; *see also Mahmoud*, 606 U.S. at 554 (recognizing the uniquely "coercive nature of classroom instruction"). And they provide the information necessary to conduct a "fact-intensive and context-specific" analysis with respect to Plaintiffs' Establishment Clause claims, *see Staley v. Harris Cnty.*, 485 F.3d 305, 309 (5th Cir. 2007) (en banc), and to "decide whether—if teachers act according to the clear and undisputed instructions of [H.B. 71]—a burden on religious exercise will occur." *See Mahmoud*, 606 U.S. at 560.

Because H.B. 71 provides sufficient information about the mandatory classroom religious displays, and requires no other materials to be displayed, "no additional factual development" is required to determine the statute's facial invalidity. *See Gulfport Energy Corp.*, 41 F.4th at 679; *see also Mahmoud*, 606 U.S. at 559–60 (finding that the record was not "too threadbare" to evaluate parents' Free Exercise Clause claims regarding the use of LGBTQ+-inclusive storybooks in elementary schools, and that the Court did "not need to wait and see how a particular book is used in a particular classroom on a particular day before evaluating the parents' First Amendment claims" (citation modified)). The dispute here is not "abstract or hypothetical." *New Orleans Pub. Serv., Inc.*, 833 F.2d at 586. "[T]he court would be in no better position to adjudicate the issues in the future than it is now." *Pearson v. Holder*, 624 F.3d 682, 684 (5th Cir. 2010) (quoting *Simmonds v. INS*, 326 F.3d 351, 359 (2d Cir. 2003)).

No. 24-30706

2

Louisiana primarily relies on *Staley* to argue that Plaintiffs' claims are not fit for judicial decision. But *Staley* does not compel dismissal.

In *Staley*, the plaintiff challenged the refurbishment and rededication of a monument featuring a Bible, which had been displayed on county courthouse grounds for several decades. 485 F.3d at 307. A panel of this court concluded that, in "the specific context of the refurbishment and rededication of the monument, . . . the display of the Bible violated the Establishment Clause." *Id.* This court granted rehearing en banc. *Id.* But shortly before en banc oral argument, the courthouse "closed for renovations" and was expected to "remain closed for a few years," during which time the monument was to be "removed and placed in storage." *Id.*

The en banc court stressed the "importance of facts and context" in religious display cases, which was "evident from the respective outcomes" in *Van Orden* and *McCreary*, both of which "address[ed] the constitutionality of Ten Commandments displays." *Id.* at 308. Ultimately, the court held the case was "moot" because "[o]ut of sight in some warehouse, the monument no longer raise[d] the potential Establishment Clause violations that offended [the plaintiff]." *Id.* at 309. As to ripeness, it explained:

> [A]ny dispute over a probable redisplay of the Mosher monument is not ripe because there are no facts before us to determine whether such a redisplay might violate the Establishment Clause. Indeed, no decision has been made regarding any aspect of the future display of the monument. In the absence of this evidence, we are unable to conduct the fact-intensive and context-specific analysis required by *McCreary* and *Van Orden*. Thus, any claim that the Establishment Clause may be violated after the Courthouse and grounds have been renovated, is not ripe for review.

No. 24-30706

*Id*. In other words, the case was not ripe because it was "not known when, where, or under what circumstance the monument and Bible [would] be restored . . . ." *Id*. at 307.

a

First, this case is ripe for all of the reasons *Staley* was not. Although the monument in *Staley* was known in considerable detail, the court had "*no* facts" regarding "when, where, or under what circumstances" its redisplay would occur. *See id*. (emphasis added). In fact, the *Staley* court was uncertain if the monument would be redisplayed at all. *See id*. at 309. In discussing ripeness, the court characterized the redisplay as only "*probable*," emphasizing that "no decision ha[d] been made regarding *any* aspect of the future display . . . ." *Id*. (emphasis added). As a result, the dispute was not ripe because it "rest[ed] upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id*. (citation modified) (quoting *United States v. Carmichael*, 343 F.3d 756, 761 (5th Cir. 2003)).

Here, H.B. 71 provides the precise details that were lacking in *Staley*—minimum requirements for "when, where, [and] under what circumstances" the Ten Commandments are to be displayed in all public-school classrooms:

- *What will be displayed*? The exact Protestant version of "the Ten Commandments" set out in the statute, La. R.S. § 17:2124(B)(1)–(B)(2), which is quoted above;

- *How will it be displayed*? As "the *central focus*" of a "poster or framed document that is *at least* eleven inches by fourteen inches," and "*printed in a large, easily readable font*," along with the "context statement" also provided by the statute, *id*. § 17:2124(B)(1), (B)(3) (emphasis added);

- *When will it be displayed*? Every day of every schoolyear, beginning

"[n]o later than January 1, 2025," *id.* § 17:2124(B)(1);

- *Where will it be displayed*? In every Louisiana public-school classroom, regardless of class subject matter, student age, or student grade, where it can be seen by students,[4] *id.*

Display in accordance with these minimum requirements is not "probable"—it is certain and mandatory under the statute. *See Staley*, 485 F.3d at 309.

b

Second, *Staley*'s emphasis on the "fact-intensive and context-specific analysis required" in Establishment Clause cases is derived from *Van Orden* and *McCreary*. *Id.* at 307–08. Like *Staley*, both cases concerned the display of religious materials on public grounds, but they resulted in different outcomes due to their "specific facts and context." *Id.* at 308–09; *compare Van Orden*, 545 U.S. at 692 (finding no Establishment Clause violation where the Ten Commandments were displayed at the Texas State Capitol), *with McCreary*, 545 U.S. at 881 (finding an Establishment Clause violation where the Ten Commandments were displayed in two Kentucky courthouses). As discussed, *Van Orden* reveals that the "context" required by *Staley* is not as specific as any conceivable detail that may or may not surround a religious display. *See Van Orden*, 545 U.S. at 703. Nor does *McCreary* require such specificity. *See McCreary*, 545 U.S. at 874 (emphasizing only that "*purpose* needs to be taken seriously under the Establishment Clause and needs to be understood in light of context" (emphasis added)). Instead, the "limits to the

---

[4] To "display" something means "to place or spread (something) for people to see." *Display*, MERRIAM-WEBSTER DICTIONARY, https://perma.cc/5YQK-NVUP. The requirement that the Ten Commandments be "display[ed]" in each classroom and "be printed in a large, easily readable font," LA. R.S. § 17:2124(B)(1), dictates that the posters be placed within students' view.

No. 24-30706

display of religious messages or symbols" are exemplified in cases like *Stone*, where there are "particular concerns that arise in the context of public elementary and secondary schools." *Van Orden*, 545 U.S. at 690–91 (citation modified). Importantly, *Van Orden* focused on distinguishing displays of the Ten Commandments on public grounds and displays "on the grounds of a public school," *id.* at 703 (Breyer, J., concurring in the judgment)—the circumstances in *Van Orden* were "far more passive." *Id.* at 691 (plurality opinion).

Here, this court knows enough about the context of the H.B. 71 displays—the permanent display of the Ten Commandments, using minimum size and font requirements, with no requirement to display other materials, in *classrooms*—to evaluate the statute's constitutionality.

c

Third, unlike this case, *Staley* did not involve a *facial challenge* to a statute *mandating* a religious display. Rather, *Staley* and the cases it primarily relied on—*Van Orden* and *McCreary*—all involved singular, *discretionary* religious displays. Because H.B. 71 provides the "aspect[s] of the future display[s]," and because Plaintiffs assert purely legal facial challenges, this court has sufficient information to conduct the Establishment Clause inquiry described in *Staley*. *See* 485 F.3d at 309. And even if Plaintiffs' Establishment Clause claims were unripe under *Staley* (they are not), that case does not shed light on the ripeness inquiry for claims asserted under the Free Exercise Clause—which Louisiana fails to substantively address at all. Those claims are ripe under *Mahmoud*.

3

Finally, Louisiana suggests that this case is not ripe because factual development about the potential variations among displays is necessary. These arguments are rooted in two H.B. 71 provisions: one expressly allowing

certain documents to be displayed "along with the Ten commandments," La. R.S. § 17:2124(B)(4), and one allowing "each governing authority" to "determine[]" the "nature of the display." *Id.* § 17:2124(B)(1). Louisiana, however, ignores both the text of H.B. 71 and the nature of Plaintiffs' *facial* claims.

H.B. 71 does not mandate any display beyond the Ten Commandments and the context statement: § 17:2124(B)(4) states that schools "*may*"—*not shall*—display other documents, such as "the Mayflower Compact, the Declaration of Independence, and the Northwest Ordinance . . . along with the Ten Commandments." *Id.* § 17:2124(B)(4). Even if H.B. 71 did not expressly allow schools to display other documents "along with the Ten Commandments," *see id.*, the statute still would not prohibit the posting of other documents.[5] And although § 17:2124(B)(1) allows schools to "determine[]" the "nature of the display," the statute leaves little else to determine. Schools are required to permanently display as a "central focus" a state-selected version of the Ten Commandments on a "poster or framed document," using minimum size and font requirements, accompanied by a specific context statement. *Id.* § 17:2124(B)(1)–(3). Section 17:2124(B)(4) and the portion of § 17:2124(B)(1) allowing schools to "determine[]" the "nature of the display" are not meaningful to the ripeness inquiry because H.B. 71 is, in effect, no different from a statute that does not include those provisions. It is no different, for example, from a similar statute

---

[5] Louisiana's own reading of the statute underscores this point. As evidenced by the numerous sample H.B. 71 displays the state cites, which include the Ten Commandments alongside quotes and pictures of prominent figures like Justice Ruth Bader Ginsburg, Martin Luther King Jr., and Lin Manuel Miranda portraying Alexander Hamilton, § 17:2124(B)(4) does not limit allowable documents to the Mayflower Compact, Declaration of Independence, and Northwest Ordinance, even though those are the only ones explicitly outlined in the statute.

No. 24-30706

passed in Texas. *See* Tᴇх. Eᴅᴜᴄ. Cᴏᴅᴇ § 1.0041 (requiring the display of the Ten Commandments in all public-school classrooms without any provision expressly allowing or prohibiting the display of other documents).

In fact, the Texas statute—Senate Bill 10 (S.B. 10)—is being challenged in a separate appeal, which we consolidated with this case for purposes of en banc oral argument only. *Nathan v. Alamo Heights Indep. Sch. Dist.*, No. 25-50695 (5th Cir. 2025), Dkt. 90 (Oct. 31, 2025). Texas has maintained that S.B. 10 is substantively identical to H.B. 71, arguing it permits "innumerable ways that teachers could integrate Ten Commandments posters into the classroom, *including displaying them with material from other faiths or with contextualizing documents* such as the Declaration of Independence and the Northwest Ordinance." Brief of Appellants at 20, *Nathan v. Alamo Heights Indep. Sch. Dist.*, No. 25-50695 (5th Cir. Nov. 24, 2025) (emphasis added). In first remarks during oral argument, it stated: "Like Louisiana's statute, Texas's S.B. 10 violates neither the Establishment Clause nor the Free Exercise Clause, particularly in the facial challenge context. Although S.B. 10 does not require contextualization of the Ten Commandments, neither does it forbid providing context similar to that which Louisiana has suggested."

Louisiana's argument that the court must know what other materials *may* accompany each Ten Commandments poster to evaluate H.B. 71's constitutionality also ignores the nature of Plaintiffs' *facial* claims—that H.B. 71's minimum requirements render it unconstitutional in *all* applications.[6]

---

[6] To be clear, this case is not ripe merely because Plaintiffs assert facial challenges. It is ripe because H.B. 71, on its face, provides sufficient details about the mandatory classroom religious displays such that this court can evaluate the statute's constitutionality. This case is not like *Texas v. United States*, 523 U.S. 296 (1998), which—although a declaratory action—did not concern a facial challenge comparable to the one presented here. Rather, in that case, Texas sought a declaration that a particular provision of a state

No. 24-30706

Whether that is true goes to the merits of Plaintiffs' claims—which is separate from the ripeness inquiry. Answering that question requires no further factual development. As the Supreme Court has made clear, this court does "not need to 'wait and see' how a particular [poster] is used in a particular classroom on a particular day before evaluating the parents' First Amendment claims." *See Mahmoud*, 606 U.S. at 560.[7] We "need only decide whether—if teachers act according to the clear and undisputed instructions of [H.B. 71]—a burden on religious exercise" or an Establishment Clause violation "will occur." *See id.*

------------

statute, which outlined potential sanctions for school boards failing to satisfy certain accreditation criteria, was not implicated by § 5 of the Voting Rights Act of 1965. *Texas*, 523 U.S. at 298–99. In holding that the case was not ripe, the Supreme Court emphasized the uncertainty surrounding whether the sanctions contemplated by the state statute would be ordered in the first place. *Id.* at 300. And even if the Court had "greater certainty," it stated that the case would not be fit for judicial decision because Texas sought a holding that "under no circumstances [could] the imposition of these sanctions constitute a change affecting voting"—which the Court did not have "sufficient confidence" to determine. *Id.* at 301. Here, on the other hand, the display of the Ten Commandments in accordance with H.B. 71 is not just "currently foreseen or even likely"—it is inevitable and mandatory. *See id.* at 300. This certainty, along with the detailed minimum requirements provided by H.B. 71, gives this court enough information to resolve the question of H.B. 71's facial invalidity using settled Establishment and Free Exercise Clause principles.

[7] Louisiana points to its numerous hypothetical H.B. 71 displays that incorporate the Ten Commandments among other documents. Setting aside the assumption that these sample displays are H.B. 71-compliant and constitutional, which is not readily apparent, *Mahmoud* rejects the premise of the state's argument. As discussed, this court need not wait and see how the Ten Commandments posters are used in a particular classroom on a particular day to evaluate Plaintiffs' facial challenge. *See Mahmoud*, 606 U.S. at 560. Instead, where, as here, the court can ascertain what the posters *must* look like under H.B. 71, it need not and should not consult hypothetical displays to address the legal issues presented. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449–50 (2008) ("In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases.").

No. 24-30706

\*     \*     \*

The minimum requirements of H.B. 71 specify the contents of the Ten Commandments displays as well as "when, where, [and] under what circumstances" they will be presented. *See Staley*, 485 F.3d at 307. Because Plaintiffs' facial claims present "pure question[s] of law," *see Rafoi*, 60 F.4th at 996, that require "no additional factual development," *see Gulfport Energy Corp.*, 41 F.4th at 679, this case is fit for judicial decision.

B

Louisiana does not contest the second element of the ripeness inquiry, i.e., whether the parties will suffer hardship should this court withhold consideration. This factor does not warrant short shrift.

Plaintiffs demonstrate hardship where they "show[] the real possibility of irremediable adverse consequences were [the court] to deny review." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 545 (5th Cir. 2008). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). That is why the Supreme Court has made clear that "when a deprivation of First Amendment rights is at stake, a plaintiff need not wait for the damage to occur before filing suit." *Mahmoud*, 606 U.S. at 559–60.

Here, Plaintiffs assert that H.B. 71 violates their rights under the Establishment and Free Exercise Clauses. They allege that, despite "not subscrib[ing] to the state's official version of the Ten Commandments," they "will be pressured into religious observance, veneration, and adoption of this religious scripture" and "will feel pressure to avoid fully expressing or practicing their own faiths and religious beliefs or non-religious beliefs . . . ." The parent-Plaintiffs also assert that H.B. 71 will usurp their role in directing their children's religious education, values, and upbringing. *See Espinoza v.*

No. 24-30706

*Montana Dep't of Revenue*, 591 U.S. 464, 486 (2020) ("[W]e have long recognized the rights of parents to direct 'the religious upbringing' of their children." (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 213–14 (1972))).

This is not a case in which "the plaintiffs [will] suffer no concrete harm from the challenged policy itself, which does not require them to do anything or to refrain from doing anything." *Trump v. New York*, 592 U.S. 125, 134 (2020) (citation modified). In this public-school context, "denying prompt judicial review would impose a substantial hardship on [Plaintiffs], forcing them to choose between" sending students to public school and facing a burden on their First Amendment rights, incurring the cost of sending their children to private schools,[8] or avoiding school and "risking costly [fines] and criminal prosecution" under Louisiana's compulsory attendance laws. *See Susan B. Anthony*, 573 U.S. at 167–68; *see also* LA. R.S. §§ 17:154.1(A)(1), 17:221(A)(1)–(2).

III

Because Plaintiffs' claims are ripe, for the reasons already explained by the panel, I would hold that Plaintiffs have standing to assert their Establishment Clause claims, that they have plausibly alleged those claims, that they are likely to succeed on the merits of those claims, and that the remaining preliminary injunction factors are satisfied. *See Roake v. Brumley*, 141 F.4th 614 (5th Cir. 2025), *reh'g en banc granted, opinion vacated*, 154 F.4th 329 (5th Cir. 2025). I respectfully dissent.

---

[8] The "availability" of private or home schooling "is no answer to the parents' First Amendment objections." *See Mahmoud*, 606 U.S. at 561. "Public education is a public benefit, and the government cannot 'condition' its 'availability' on parents' willingness to accept a burden on their [First Amendment rights]." *See id.* (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017)).